**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania,

*Plaintiffs,*

v.

UNITED STATES POSTAL SERVICE; DAVID STEINER, in his official capacity as Postmaster General, Chief Executive Officer of the Postal Service, and Member of the Postal Service Board of Governors; DOUG TULINO, in his official capacity as Deputy Postmaster General, Chief Operating Officer and Chief Human Resources Officer of the Postal Service and Member of the Postal Service Board of Governors; AMBER MCREYNOLDS, in her official capacity as Chair of the Postal Service Board of Governors; DEREK KAN, in his official capacity as Vice Chairman of the Postal Service Board of Governors; RONALD STROMAN, in his official capacity as a Member of the Postal Service Board of Governors; DANIEL TANGHERLINI, in his official capacity as a Member of the Postal Service Board of Governors,

*Defendants.*

Case No. 1:26-cv-13917

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

1. With the publication of a new regulation, crafted at the President's behest just before the midterm elections, the United States Postal Service ("USPS") has purportedly granted itself the authority to regulate mail voting in federal elections. That includes the authority to

monitor and control which voters will receive a mail ballot from state and local election officials, and to task those same officials with new election administration procedures.

2. Whether a qualified voter may vote by mail is a question of state law, as is the question of whether a ballot will be accepted for processing and tabulation. The Constitution is clear that *States* have the primary responsibility for regulating and administering elections, subject only to preemption by Congress—authority that expressly extends to the "manner" of elections. *See* THE FEDERALIST NO. 59 (Alexander Hamilton); U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2, 4.

3. Congress has not afforded USPS any authority whatsoever to set rules for federal elections or mail voting, even though Americans have cast ballots by mail for generations.

4. One need not look further than the White House to explain USPS's unprecedented and unlawful conduct. President Trump has long opposed mail voting, expressing that it would "LEAD TO THE END OF OUR GREAT REPUBLICAN PARTY."[1] Since reassuming office, the President has aimed to—in his words— "get rid of MAIL-IN BALLOTS."[2]

5. On March 31, 2026, the President issued Executive Order No. 14399 ("EO"), mandating that USPS undertake a rulemaking that would have USPS refuse to deliver ballot mail for voters not on a USPS-maintained list. The demanded rulemaking also encompassed certain mail ballot envelope design and tracking standards, and USPS review and pre-approval.

6. USPS followed the President's orders. After a short comment period and without referral to the Postal Regulatory Commission—a body required to review major changes to USPS's policies or operations—USPS published a final rule, Ballot Mail for Federal Elections, 91 Fed. Reg. 54,996 (to be codified at 39 C.F.R. pt. 111) on August 26, 2026 ("Rule").[3]

---

[1] Donald J. Trump (@realDonaldTrump), Twitter (May 29, 2020), https://twitter.com/realDonaldTrump/status/1266172570983940101.

[2] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254.

[3] The Rule's stated effective date was August 21, 2026, the day it was made available for public inspection on the Federal Registers website.

7. The Rule requires States to enroll every eligible mail voter with USPS and tasks USPS with compiling them into State-specific lists. It further establishes design requirements for ballot mail envelopes, including the requirement to use trackable Intelligent Mail barcodes, and provides that USPS must pre-approve States' ballot envelope designs. When election officials send ballot mail to voters missing from a State's USPS list or use envelopes that do not comply with the new standards, *USPS will not deliver those ballots*.

8. The Rule violates the Constitution and federal statutes many times over. It displaces state laws adopted pursuant to each State's constitutional authority to administer elections, erects new USPS functions and ballot mail constraints that are inconsistent with USPS's governing statutes, flouts USPS's procedural requirements, violates the Privacy Act, and cannot be reconciled with federal voting rights law. Each of these defects would alone establish the Rule's unlawfulness. Together, they demonstrate USPS's utter disregard for the law in carrying out the President's policy preferences.

9. The Rule inflicts significant, imminent, and irreparable harm on Plaintiff States by imposing new and burdensome mail voting requirements, enforced by USPS interception of non-conforming ballot mail, and doing so mere months before a nationwide election. If not stayed or preliminarily enjoined, the Rule will frustrate or outright prevent Plaintiff States from administering their mail voting programs in November and foreseeably disenfranchise voters who vote by mail. Indeed, this seems to be what the President prefers.

10. Though the deadline to submit mail voter lists to USPS is still several weeks away, the Rule is already causing acute harm. Plaintiff States or their subdivisions must immediately redesign their ballot envelopes and seek USPS review at significant costs to States. Plaintiff States' election officials must also develop new systems at breakneck speed to convey mail voter lists to USPS to ensure that every eligible voter who is entitled to a mail ballot receives one, create new guidance for and train election officials, and educate the public about changes to mail voting. They must also prepare for the spillover effects from USPS's new mail ballot regime, including preparing for an influx of voters who ordinarily would vote by mail, but

instead opt to do so in person because of USPS's last-minute changes. In short, they must accomplish multiple Herculean tasks, each necessary to address the disruption caused by the Rule, in a matter of weeks, with limited resources.

11. With the midterm elections rapidly approaching and USPS's new Rule upending mail voting programs upon which tens of millions of voters rely, Plaintiff States respectfully request the urgent equitable and declaratory relief detailed below.

## JURISDICTION & VENUE

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1339, and 2201(a), and 39 U.S.C. § 409(a).

13. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are the United States Postal Service or United States officers sued in their official capacities.

14. The Commonwealth of Massachusetts is a resident of this District, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts.

## PARTIES

### I. Plaintiffs

15. The State of California is a sovereign state of the United States. California is represented by Attorney General Rob Bonta, who is the State's Chief Law Officer.

16. The Commonwealth of Massachusetts is a sovereign State of the United States. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief law enforcement officer.

17. The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

18. The State of Washington is a sovereign State of the United States of America. Washington is represented by Attorney General Nicholas W. Brown, the State's Chief Legal Officer.

19. The State of Arizona is a sovereign State of the United States. Arizona is represented by Attorney General Kris Mayes, who is the State's Chief Law Officer.

20. Plaintiff the State of Colorado is a sovereign State in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

21. The State of Connecticut is a sovereign State of the United States. Connecticut is represented by Attorney General William Tong, who is the State's Chief Law Officer.

22. Plaintiff State of Delaware is a sovereign State of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

23. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb, who has general charge and conduct of all legal business of the District and all suits initiated by and against the District. D.C. Code. § 1-301.81.

24. The State of Hawaiʻi, represented by and through its Attorney General Anne E. Lopez, is a sovereign State of the United States of America. The Attorney General is Hawaiʻi's chief legal officer and chief law enforcement officer and is authorized by Hawaiʻi Revised Statutes § 28-1 to pursue this action.

25. The State of Illinois is a sovereign State of the United States. Illinois is represented by Attorney General Kwame Raoul, who is the State's Chief Law Officer.

26. Plaintiff the State of Maine is a sovereign State of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

27. The State of Maryland is a sovereign State of the United States. Maryland is represented by Attorney General Anthony G. Brown, who is the State's Chief Legal Officer.

28. The State of Michigan is a sovereign State of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

29. The State of Minnesota is a sovereign State of the United States. Minnesota is represented by Attorney General Keith Ellison, who is the State's Chief Law Officer.

30. The State of New Jersey is a sovereign State of the United States. New Jersey is represented by and through Attorney General Jennifer Davenport, who is the chief legal officer of New Jersey.

31. The State of New Mexico is a sovereign State of the United States. New Mexico is represented by Attorney General Raúl Torrez, who is the State's Chief Legal Officer.

32. The State of New York, represented by and through its Attorney General, Letitia James, is a sovereign State of the United States. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

33. The State of North Carolina is a sovereign State of the United States. North Carolina is represented by Attorney General Jeff Jackson, who is the State's Chief Law Officer. Attorney General Jackson brings this action on behalf of the State of North Carolina pursuant to his statutory authority to appear for the State in any court in any civil matter in which the State may be interested. N.C. Gen. Stat. § 114-2(1).

34. The State of Oregon, represented by and through its Attorney General Dan Rayfield, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

35. The State of Rhode Island is a sovereign State of the United States. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

36. The State of Vermont is a sovereign State of the United States. Vermont is represented by Attorney General Charity R. Clark, who is the State's Chief Law Officer.

37. The Commonwealth of Virginia is a sovereign State of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. *Id.* § 2.2-513.

38. The State of Wisconsin is a sovereign State of the United States. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to pursue this action.

39. Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania, including the Pennsylvania Department of State, and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

## II. Defendants

40. Defendant United States Postal Service is "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. Its basic function is to provide postal services throughout the country.

41. Defendant David Steiner is the Postmaster General of the United States, Chief Executive Officer of USPS, and Member of the USPS Board of Governors. He is sued in his official capacity.

42. Defendant Doug Tulino is the Deputy Postmaster General of the United States, Chief Operating Officer and Chief Human Resources Officer of USPS, and Member of the USPS Board of Governors. He is sued in his official capacity.

43. Defendant Amber McReynolds is the Chair of the USPS Board of Governors. She is sued in her official capacity.

44. Defendant Derek Kan is the Vice Chairman of the USPS Board of Governors. He is sued in his official capacity.

45. Defendant Ronald Stroman is a Member of the USPS Board of Governors. He is sued in his official capacity.

46. Defendant Daniel Tangherlini is a Member of the USPS Board of Governors. He is sued in his official capacity.

## LEGAL BACKGROUND

### I. Constitutional Provisions

47. States bear primary responsibility for elections under the U.S. Constitution. The Constitution's Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. Similarly, the Electors Clause specifies that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." *Id.* art. II, § 1, cl. 2. The Constitution likewise gives States the power to determine who may vote in federal elections, subject to other constitutional constraints. *Id.* art. I, § 2, cl. 1; *id.* amend. XVII.

48. The Constitution therefore "invests the States with responsibility" for the manner of carrying out federal elections, unless Congress acts to preempt those choices. *Foster v. Love*, 522 U.S. 67, 69 (1997). Absent Congressional action, States have the authority "to provide a complete code for [federal] elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, [and] prevention of fraud and corrupt practices." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013).

49. Federal elections are administered in accordance with this constitutional command. State constitutions and statutes establish the right to vote and the eligibility requirements to do so. Some state constitutions guarantee voters particular methods of voting (such as by mail and early voting), and other state constitutions expressly reference early and mail voting. *See, e.g.*, Mich. Const. art. II, § 4(1)(h), (k), (m); *see also* Conn. Const. art. 6, § 7 (authorizing state legislature to provide for no-excuse mail voting); Nev. Const. art. 2, § 1A(4) (voter's bill of rights referencing early voting). Plaintiff States' legislatures have enacted statutes that comprehensively structure federal (and state) elections, including detailed frameworks for absentee and mail voting.

50. Neither the President nor USPS has the constitutional authority to make or alter laws governing federal elections generally, nor voting by mail specifically. In fact, the Constitution grants the President no legislative power at all, "'refut[ing] the idea that he is to be a lawmaker.'" *Medellín v. Texas*, 552 U.S. 491, 527 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("*Youngstown*")); *cf.* U.S. Const. art. I, § 4. Likewise, as addressed further below, neither the Constitution nor Congress has afforded any authority to USPS to control who may receive and cast absentee or mail ballots.

51. The Constitution also vests Congress with the power "[t]o establish Post Offices and post Roads." U.S. Const., art. I, § 8, cl. 7. This provision has long been construed to grant Congress broad power over USPS, "'embrac[ing] the regulation of the entire Postal System of the country.'" *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 126 (1981) (quoting

*Ex parte Jackson*, 96 U.S. 727, 732 (1878)). Under this constitutional scheme, USPS is a "creature[] of statute" that "possess[es] only the authority that Congress has provided." *See Nat'l Fed'n of Indep. Bus. v. Dept. of Lab., OSHA*, 595 U.S. 109, 117 (2022) (per curiam). USPS cannot authorize itself to take on new responsibilities and powers beyond those that Congress has granted; nor can the President, in Congress's stead.

## II. State Election Laws

52. Plaintiff States' constitutions and other laws entitle eligible and duly registered voters to cast a ballot. *See, e.g.*, Cal. Const. art. II, §§ 2, 2.5; Cal. Elec. Code § 2000(a); Mass. Const. Decl. Rights art. 9, amends. art. 3; *Chelsea Collaborative, Inc. v. Sec'y of Commonwealth*, 100 N.E.3d 326, 330 (Mass. 2018); Nev. Const. art. 2, § 1; Wash. Const. art. VI, § 1.

53. Every single State permits at least certain voters to cast ballots by mail. *See Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2171 (2026) ("Access to absentee voting expanded throughout the 20th century, and today, every State lets at least some residents vote absentee.").

54. In Plaintiff States, registered voters are permitted to vote by mail if they meet the state law requirements for doing so, which vary from State to State. Each State has detailed measures to ensure that only mail ballots which are validly cast may be counted.

55. California has adopted a universal mail voting system, wherein each active registered voter is sent a mail ballot. Cal. Elec. Code §§ 3000.5, 3003, 3010. State law and guidance cover the standards for mail envelope design and tracking. *See id.* § 3011(a); Center for Civic Design, Vote-by-Mail Envelope Design for California (Dec. 15, 2017), https://perma.cc/PBF6-QPFP. After voting their ballot, a voter places it in an envelope that is signed under penalty of perjury to establish the validity of the vote. Cal. Elec. Code § 3011(a)(1)–(2). The envelope is then submitted to the appropriate election official via one of several methods: sent through prepaid USPS mail, dropped in a designated ballot drop box, or delivered to a polling location. Cal. Elec. Code §§ 3016.7, 3017. Election officials then compare the signature on the mail ballot envelope to the signature on file for the voter. *Id.*

§ 3019. When the signatures compare and the ballot is otherwise validly cast (e.g., the voter has not already cast a ballot), the ballot is tabulated. *Id.* §§ 3019, 15101, 15109; Cal. Code Regs. tit. 2, § 20282. When the signatures do not compare, election officials contact the voter to provide the opportunity to correct the mistake. Cal. Elec. Code § 3019(d)(1).

56. As reflected in the United States Election Assistance Commission's most recent biennial report analyzing state-by-state data on various topics related to the administration of federal elections, 80.8% of Californians who voted in the 2024 general election did so by mail, totaling more than 13 million people. Elec. Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (Jun. 2025), https://perma.cc/6CMS-AG82("*2024 EAVS Report*"), at 34.

57. Washington is also a universal mail voting state. Wash. Rev. Code § 29A.40.010. The State mails each active Washington voter a ballot, a security envelope in which to conceal the ballot, a larger envelope in which to return the security envelope, a declaration that the voter must sign, and associated instructions. *Id.* § 29A.40.091(1). Voters may return ballots through USPS or to a secure ballot drop box. *See id.* §§ 29A.40.091, .170. Voters must swear under penalty of perjury that they meet the qualifications to vote and have not voted in any other jurisdiction at that election. *Id.* § 29A.40.091(2). The declaration must clearly inform the voter, among other things, that it is illegal to vote if he or she is not a U.S. citizen. *Id.* Washington ensures that each returned ballot cast was by a registered voter by using a signature verification process. *Id.* § 29A.40.110(3). Before accepting a ballot, elections officials must "verify that the voter's signature on the ballot declaration is the same as the signature of that voter in the registration files of the county." *Id.*

58. As reflected in the *2024 EAVS Report*, 98.5% of Washingtonians who voted in the 2024 general election did so by mail, totaling nearly 4 million people. *2024 EAVS Report* at 35.

59. Massachusetts allows no-excuse early voting by mail, meaning any qualified voter can request and cast a mail ballot. *See* Mass. Gen. Laws ch. 54, § 25B(a)(1). When voting by mail, a voter places the completed ballot in an envelope on which an affidavit is printed which

advises the voter of criminal penalties for illegal voting and must be signed under penalty of perjury. Mass. Gen. Laws ch. 54, §§ 25B(a)(10), 92; ch. 56, § 26. The voter then places the sealed affidavit envelope within an outer mailing envelope, which bears the USPS "official election mail" logo and is marked "ballot enclosed," and can either mail it to their local election office, submit it at an early voting location or the office of the local election official, or deposit it in a secure drop box. Mass. Gen. Laws ch. 54, §§ 25B(a)(13), 92; 950 Mass. Code Regs. 47.06 (1)(b); 47.10 (2), (5). Once received, the election official examines whether the affidavit is properly executed and whether the voter's signature matches the one on file. Mass. Gen. Laws ch. 54, §§ 25B(a)(10), (14), 94; 950 Mass. Code Regs. 47.10 (5)(a). The ballot is rejected if the affidavit or signature is defective, and the voter is notified and sent a new ballot, time permitting. Mass. Gen. Laws c. 54, §§ 25B(a)(10), (14), 94; 950 Mass. Code Regs. 47.10 (5). Once a mail ballot is accepted, the ballot is considered cast, and a voter may not vote in-person either early or on Election Day. 950 Mass. Code Regs. 47.10 (7). Accepted mail ballots remain sealed and secured until counted. *Id.* 47.14; 47.15.

60. Massachusetts election officials have no discretion to refuse a mail-in ballot to a qualified and registered voter who wishes to vote by mail. Massachusetts law provides that qualified, registered voters have a right to vote by mail and a right to request and thereafter receive a mail ballot application. Mass. Gen. Laws ch. 54, § 25B(a)(1)–(2); *id.* § 25B(a)(7) (requiring the Secretary of the Commonwealth to mail registered voters a mail ballot application upon request). Upon receipt of a mail ballot application and verification of the voter's registration, mail ballots "shall be mailed" as soon as they are available. *Id.* § 25B(a)(10).

61. According to the *2024 EAVS Report*, 33.4% of Bay Staters who voted in the 2024 general election did so by mail, totaling nearly 1.2 million people. *2024 EAVS Report* at 34.

62. Nevada has adopted a universal mail voting system in which each active registered voter is sent a mail ballot. *See* Nev. Rev. Stat. § 293.269911. After voting their ballot, a voter places it in a return envelope and must sign a declaration under penalty of perjury to establish the residency and identity of the voter and the validity of the ballot. *See id.*

§ 293.269917; Nev. Sec'y of State, *Nevada Elections Procedures Manual* at 53 (Mar. 2026), https://www.nvsos.gov/home/showpublisheddocument/17254/639105657872870000 ("*Elections Procedures Manual*"). State law and guidance cover the standards for mail envelope design and tracking. *See* Nev. Rev. Stat. § 293.269913; *Elections Procedures Manual* at 52–54. The envelope and enclosed mail ballot are then returned to the appropriate election official via one of several methods: sent through prepaid USPS mail, deposited in an official ballot drop box, or hand delivered to a county clerk's office. *See* Nev. Rev. Stat. § 293.269921. Election officials then compare the signature on the mail ballot return envelope to the signature on file for the voter. *See id.* § 293.269927; *see also Elections Procedures Manual* at 55–57. When the signatures match and the mail ballot is otherwise validly cast (e.g., the voter has not already cast another ballot), election officials process and count the ballot. *See Elections Procedures Manual* at 55–57. When the signatures do not match or the voter failed to affix their signature to the return envelope, election officials contact the voter to provide the opportunity to correct the mistake. *See id.*

63. As reflected in the United States Election Assistance Commission's Election Administration and Voting Survey for 2024, 44.1% of Nevadans who voted in the 2024 general election did so by mail, totaling more than 650,000 people. *2024 EAVS Report* at 34.

64. Nationwide, 29 States offer "no-excuse" mail voting; eight States and Washington D.C. conduct elections entirely by mail; and the remaining 13 States allow voters to obtain a mail ballot if they meet certain requirements.[4]

## III. Federal Election Laws

65. Congress has established limited baseline requirements for federal elections, most often leaving the States considerable discretion in how to meet those requirements.

[4] National Conference of State Legislatures, *Table 1: States with No-Excuse Absentee Voting*, (updated July 17, 2026), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting; National Conference of State Legislators, *Table 2: Excuses to Vote Absentee* (updated June 3, 2026), https://www.ncsl.org/elections-and-campaigns/table-2-excuses-to-vote-absentee.

66. For example, Congress has forbidden certain curtailments of the right to vote. In Section 11(a) of the Voting Rights Act, Congress provided that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote." 52 U.S.C. § 10307(a). This provision prohibits public officials from denying any qualified person the right to vote. *United States v. Post*, 297 F. Supp. 46, 50 (W.D. La. 1969).

67. On the issue of voter registration, Congress has directed that each State "maintain[]" and "administer[]" a "*single* . . . statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A) (emphasis added). This "computerized list shall serve as the *single* system for storing and managing the official list of registered voters throughout the State" and "shall serve as *the official voter registration list* for the conduct of all elections for Federal office in the State." *Id.* § 21083(a)(1)(A)(i), (viii) (emphasis added). This requirement, among many other aspects of American election administration, was meant to preserve decentralized control over voter rolls and make it "impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome," by spreading control over the lists among the States instead of placing it in one federal authority. H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001).

68. On the issue of absentee and mail voting, Congress has acted only narrowly to ensure (1) that absentee voting is available to U.S. citizens for presidential elections, and (2) that members of the military and citizens residing overseas may readily participate in federal elections. Congress has also set forth certain requirements for voter registration and prohibitions concerning curtailing the right to vote.

69. In 1970, Congress enacted the Federal Voting Rights Amendment Act. As relevant here, Section 202 of the Act sought to remedy "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections." 52 U.S.C. § 10502(a); *see also* 116 Cong. Rec., pt. 5, at 6994 (1970) (reflecting purpose of ensuring that the "millions of Americans" who move or travel in an election year are not disqualified from voting for that

reason alone). The Act eliminated durational residency requirements to vote for the offices of President and Vice President, prohibited the denial of the right to vote on the basis of such requirements or because a citizen is not physically present in a State at the time of an election, and required States to provide by law for absentee voter registration not later than 30 days before a presidential election as well as for the casting of absentee ballots in those elections. Pub. L. 91-285, § 202, 84 Stat. 314, 316 (June 22, 1970) (codified at 52 U.S.C. § 10502).

70. The Voting Rights Amendments Act of 1970 secures absentee voting rights, providing that no citizen shall be "denied the right to vote" in presidential elections if they have complied with state law requirements for casting an absentee ballot. 52 U.S.C. § 10502(c). The Act does not authorize USPS to play any role in determining who receives a ballot or setting conditions or requirements for mailing ballots.

71. In 1986, Congress enacted the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") to increase access to the franchise for absent military and overseas voters. UOCAVA requires each State to permit those voters to use streamlined absentee registration procedures and imposes certain obligations to facilitate their voting by absentee ballot in all federal elections. 52 U.S.C. § 20302(a)(1), (f).

72. As the Supreme Court recently recognized, UOCAVA built atop and incorporated the foundation laid by state law governing voting by mail; it did not displace that foundation. *See* 52 U.S.C. § 20303(b)(3) (a mail ballot submitted by an eligible UOCAVA voter shall be counted only "if [it] is received by the appropriate State election official not later than the deadline for receipt of the State absentee ballot under State law"); *Watson*, 146 S. Ct. at 2173.

73. Over the past several decades, voting by mail has become more popular throughout the States. *See Voting by Mail and Absentee Voting*, MIT Election Data & Science Lab (updated Jun. 24, 2026), https://perma.cc/4SML-ZNGY. In 2014, a bipartisan Presidential Commission—chaired by the respective counsel for the Obama for President and Romney for President campaigns—recommended that States should expand voting by mail. *See* Presidential Commission on Election Administration, *The American Voting Experience: Report and*

*Recommendations of the Presidential Commission on Election Administration* (Jan. 2014) at 13 ("In order to limit congestion on Election Day and to respond to the demand for greater opportunities to vote beyond the traditional Election Day polling place, states that have not already done so should expand alternative ways of voting, such as mail balloting and in-person early voting."), https://perma.cc/UFU6-4Z4B. Many States did just that.

74. In all this time—spanning from the advent of voting by mail, tied to the Civil War, to its increased prevalence in more recent decades—Congress has never exercised its Elections Clause authority to limit mail voting or authorize USPS to monitor or control the transmission of mail ballots. Rather, Congress has only expanded and protected mail voting for military and overseas voters.

75. All told, neither the President nor USPS may control eligibility to vote by mail; nor may either impose mandates on state and local election officials implementing state law governing voting by mail. Not even recent election measures pending before Congress would give the President or USPS that authority. *See, e.g.*, SAVE Act, H.R. 8281, 118th Cong. (2024); SAVE Act, H.R. 22, 119th Cong. (2025); SAVE America Act, H.R. 7296, 119th Cong. (2026); SAVE America Act, S. 1383, 119th Cong. (2026).

**IV. Laws Governing the United States Postal Service**

76. The United States' federal mail system started in 1775.[5] It was created because a reliable and secure means of exchanging information was critical to connecting the far reaches of the then-fledgling nation.[6]

77. For more than 250 years, the federal postal service has provided reliable, vital services to millions of Americans and served to "bind the Nation together through the personal, educational, literary, and business correspondence of the people." 39 U.S.C. § 101(a).

---

[5] U.S. Postal Serv., The United States Postal Service: An American History 1 (2025), https://perma.cc/2RXM-DA65.

[6] *Id.*

78. Over its history, and particularly in recent decades, USPS has played an important role in federal, state, and local elections through the delivery of critical election materials, such as ballots, voter registration cards, absentee applications, polling place notifications, and voter information guides.[7] Despite this important role, Congress never granted any authority to USPS to regulate elections or to attempt to administer them itself. *See Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020).

79. What is today known as USPS came into existence in 1970 when Congress passed the Postal Reorganization Act ("PRA"), Pub. L. 91–375, 84 Stat. 719 (1970), pursuant to its express constitutional authority, U.S. Const. art. I, § 8, cl. 7. *See* 39 U.S.C. § 101 *et seq.*

80. In enacting the PRA, Congress provided that the Postmaster General would be appointed by a Board of Governors, which directs USPS's authority. 39 U.S.C. § 202. The Postmaster General is the "chief executive officer of the Postal Service," *id.* § 203, and is delegated authority to exercise the powers of USPS, unless that authority is reserved to the Governors or the full Board, *see id.* §§ 401(2), 402; 39 C.F.R. § 3.5.

81. In 2006, Congress again reformed USPS with the passage of the Postal Accountability and Enhancement Act ("PAEA"). Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 *et seq.*). PAEA was designed to improve oversight and accountability and focus USPS on its core postal responsibilities.

82. Through these enactments, found in Title 39 of the U.S. Code, Congress has carefully circumscribed USPS's duties and authority.

83. Title 39 affirms that USPS is "a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). Its core "obligation [is] to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people." *Id.*

---

[7] *See* U.S. Postal Serv., Election Mail, https://perma.cc/49FW-HUFE.

84. Consistent with this function, USPS "shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities." 39 U.S.C. § 101(a). When "determining all policies for postal services," USPS "shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail," *id.* § 101(e), such as ballot mail.

85. To effectuate this mandate, federal law imposes a universal service obligation on USPS. *See id.* § 403(a). USPS must "serve as nearly as practicable the entire population of the United States." *Id.* The agency must "maintain an efficient system of collection, sorting, and delivery of the mail nationwide;" "provide types of mail service to meet the needs of different categories of mail and mail users;" and "establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will . . . have ready access to essential postal services." *Id.* § 403(b).

86. Congress has defined the exclusive circumstances under which USPS may refuse mail. *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902) ("[USPS's] right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then [it] cannot exclude or refuse to deliver them."). In 39 U.S.C. §§ 3001–3018, Congress enumerated the specific and narrow categories of "nonmailable matter"—including, for example, matter declared nonmailable by criminal statute, certain hazardous materials, and specified fraudulent, obscene, or sweepstakes-related matter—and prescribed detailed procedures governing USPS's treatment of these narrowly defined non-mailable matters. Neither mail ballots nor mail ballot envelopes fall into any non-mailable category outlined in statute.

87. Congress also prohibited USPS from "mak[ing] any undue or unreasonable discrimination among users of the mails" or "grant[ing] any undue or unreasonable preferences to any such user" unless "specifically authorized." 39 U.S.C. § 403(c). Nowhere did Congress "specifically authorize[]" any discrimination or preference with respect to election officials or voters. *Id.*

88. Congress additionally limited USPS's ability to take on new non-postal services. *Id.* § 404(e). Postal services include only "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* § 102(5). USPS may only provide non-postal services if (1) it provided those services prior to January 1, 2006 and their continuation was timely approved by the Postal Regulatory Commission, or (2) the non-postal services are provided pursuant to a qualifying agreement with a government agency under Title 39, Chapter 37 of the U.S. Code. *Id.* § 404(e)(2)–(4). On information and belief, no such qualifying agreement exists as to the Rule.

89. Finally, to further safeguard USPS and its essential services, Congress established a new body to review changes to USPS's operations and policies. Specifically, the PAEA expanded and transformed the former Postal Rate Commission into the Postal Regulatory Commission ("PRC"), increasing the PRC's oversight authority regarding USPS's execution of its duties and obligations.

90. For instance, USPS must seek an advisory opinion from the PRC before making major policy or operational changes that "will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). The PRC "shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public." *Id.* § 3661(c).

91. The PRC also has the power to hear complaints related to select statutory requirements. *Id.* § 3662. However, the PRC lacks any established procedures to hear emergency motions or order interim relief. *See* 39 C.F.R. §§ 3010.150–3010.170 (rules concerning notices, motions, and information requests), 3022.1–3022.30 (rules concerning complaints), 3022.50 (remedies); *see also* 39 U.S.C. § 3662(c) (giving PRC authority to order remedies only after it "finds the complaint to be justified"). The PRC has 90 days after receiving a complaint to either dismiss the complaint or, if it finds that a complaint "raises material issues of fact or law, begin proceedings on such complaint." 39 U.S.C. § 3662(b)(1)(A)(i).

92. In line with USPS's unique role and status, Congress selectively exempted it from other laws governing federal agencies. For example, USPS is largely exempt from the Administrative Procedure Act, *id*. § 410(a), except for several targeted areas such as the conduct of PRC hearings under section 3661(c), or the conduct and judicial review of "proceedings concerning the mailability of matter," *id.* § 3001(m). When the APA applies to USPS actions, like those issuing rules determining certain matter unmailable, USPS must publish such a final rule in the Federal Register at least 30 days before it becomes effective. 5 U.S.C. § 553(d). In contrast to these selective exemptions, Congress has subjected USPS to a suite of civil rights and other citizen-protective laws, including the Privacy Act, 39 U.S.C. § 410(b)(1) (incorporating by reference 5 U.S.C. § 552a).

## FACTUAL ALLEGATIONS

### I. The President's Repeated Attempts to Usurp Control Over Elections

93. USPS's Rule is part of a broader effort by the President and his Administration to rewrite federal election law and usurp the authority of the States and Congress.

94. On March 25, 2025, the President issued Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, ordering sweeping changes to the rules for administering federal elections. Multiple courts have concluded that the executive order violated the constitutional separation of powers and enjoined key provisions of the order. *California v. Trump*, __ F. Supp. 3d __, 2026 WL 1826535 (D. Mass. June 24, 2026) (declaring multiple sections unconstitutional and permanently enjoining their implementation); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34 (D.D.C. 2026) (same), *appeal docketed*, No. 26-5098 (D.C. Cir. Mar. 31, 2026); *Washington v. Trump*, 814 F. Supp. 3d 1173 (W.D. Wash. 2026) (same), *appeal docketed*, No. 26-1429 (9th Cir. Mar. 10, 2026).

95. Similarly, U.S. DOJ has pursued an unprecedented initiative to obtain access to confidential state voter registration information in an apparent effort to commandeer States' constitutional authority to control voter registration. U.S. DOJ has sued 30 States and the

District of Columbia for declining to produce this sensitive information, but every court to consider the federal government's claims in those cases has dismissed them.[8]

96. The President has also made sweeping—and untrue—claims of presidential authority in this area. In one social media post, the President falsely claimed that "the States are merely an 'agent' for the Federal Government in counting and tabulating the votes" and "must do what the Federal Government, as represented by the President of the United States, tells them . . . to do."[9] In another, the President insisted that he has authority to change the rules for elections "whether approved by Congress or not[.]"[10] And the President has continuously pushed to "nationalize" the 2026 midterm elections.[11]

---

[8] *See United States v. Benson*, 179 F.4th 470 (6th Cir. 2026); *United States v. Evans*, No. 25-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026); *United States v. Griswold*, No. 25-cv-03967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, __ F. Supp. 3d ___, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, __ F. Supp. 3d ___, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v. Thomas*, No. 3:26-CV-21, 2026 WL 2070437 (D. Conn. July 17, 2026), *appeal docketed*, No. 26-2064 (2d Cir. July 28, 2026); *United States v. Oliver*, No. 1:25-cv-01193, 2026 WL 2031479 (D.N.M. July 14, 2026), *appeal docketed*, No. 26-2126 (10th Cir. July 27, 2026); *United States v. Koski*, No. 3:26CV42, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Warner*, __ F. Supp. 3d __, 2026 WL 2018877 (S.D.W. Va. July 13, 2026); *United States v. Bd. of Elections of N.Y.*, 1:25-CV-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, __ F. Supp. 3d __, 2026 WL 1864054 (D.N.H. June 29, 2026), *appeal docketed*, No. 26-1783 (1st Cir. July 7, 2026); *United States v. Schmidt*, __ F. Supp. 3d __, 2026 WL 1850016 (W.D. Penn. June 27, 2026); *United States v. DeMarinis*, 1:25-cv-03934, 2026 WL 1780586 (D. Md. June 18, 2026), *appeal docketed*, No. 26-1878 (4th Cir. July 13, 2026); *United States v. Wis. Elections Comm'n*, __ F. Supp. 3d __, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, __ F. Supp. 3d __, 2026 WL 1430481 (D. Me. May 21, 2026), *appeal docketed*, No. 26-1676 (1st Cir. June 15, 2026); *United States v. Fontes*, 832 F. Supp. 3d 944 (D. Ariz. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026), *appeal docketed*, No. 26-1665 (1st Cir. June 9, 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026), *appeal docketed*, No. 26-1657 (1st Cir. June 9, 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Raffensperger*, No. 5:25-cv-00548, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026).

[9] Donald J. Trump (@realDonaldTrump), Truth Social (August 18, 2025), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254.

[10] Donald J. Trump (@realDonaldTrump), Truth Social (February 13, 2026), https://truthsocial.com/@realDonaldTrump/posts/116065471857020644.

[11] *See, e.g.*, Jacob Wendler, *Trump says Republicans should 'nationalize' elections*, POLITICO (Feb. 2, 2026), https://www.politico.com/news/2026/02/02/trump-nationalize-elections-2026-midterms-00760015.

97. Congress has rejected the President's calls to prohibit mail balloting, to require documentary proof of citizenship to register to vote, to require government-issued identification in order to cast a vote, and to nationalize elections. For months, the President has relentlessly urged Congress to pass the "Safeguard American Voter Eligibility Act" (the "SAVE America Act") S. 1383 (119th Cong.), which seeks to enact some of these goals.[12] In addition, the President has called on Congress to severely restrict the ability of voters to cast ballots by mail.[13] Congress has declined to adopt the SAVE America Act, much less the other voting restrictions for which the President has advocated.

98. Having failed to persuade Congress, the President has continued his efforts to unilaterally impose federal control over elections. On March 31, 2026, the President issued the EO that led to the regulation at issue in this case.

99. Among other things, the EO directs USPS to pursue regulatory requirements that would significantly disrupt state mail voting procedures, mere months before the 2026 general election. Under Section 3, those requirements direct States to submit lists of voters eligible to vote by mail to USPS, which will compile and maintain State-specific lists of eligible mail voters; mandate that States adopt certain ballot envelope design requirements, and undergo USPS review and pre-approval of those envelopes; and prohibit USPS from transmitting ballot mail to voters not included on USPS's lists or that fail to conform to USPS's design and review standards. EO, § 3(b). The order pairs that regime with explicit threats of criminal prosecution for States, election officials, and voters who make "unlawful use of the mail in connection with elections." *Id.* § 3(a); *see also id.* §§ 3(c), 5.

100. After a coalition of States challenged these and other provisions of the EO, this Court found the provisions unconstitutional. Holding that "the Constitution reserves the power

[12] The House passed the SAVE America Act on February 11, 2026, and the Senate began debate on an updated version of the bill on March 17, 2026. S.1383, Congress.gov (last visited Aug. 25, 2026), https://www.congress.gov/bill/119th-congress/senate-bill/1383.

[13] *See, e.g.*, The SAVE America Act, Whitehouse.gov (last visited Aug. 25, 2026), https://www.whitehouse.gov/saveamerica.

to determine voter eligibility to the States alone" and that "[n]either the Executive Branch nor Congress may interfere with this power," this Court enjoined USPS and other executive agencies from implementing or enforcing Section 3 of the 2026 Executive Order, among other provisions, for the November 2026 general election. *California v. Trump*, __ F. Supp. 3d __, 2026 WL 1826490, at *15 (D. Mass. June 25, 2026), *appeal docketed*, No. 26-1779 (1st Cir. 2026), *stay granted*, 609 U.S. ___, 2026 WL 2473573 (Aug. 24, 2026) (per curiam). This Court held that "no law enacted by Congress delegates authority to control mail-in voting to USPS," and that the President's directives to USPS were ultra vires. *Id*. at *15–16. The Supreme Court subsequently stayed the injunction—not because Plaintiff States' claims lacked merit, but because the States "lack[ed] standing to bring" their claims as to the EO. *Trump v. California*, 2026 WL 2473573, at *1. As the Court explained, USPS had not yet implemented the EO, but if USPS ultimately adopts a final rule that "harms the States, they may challenge that rule." *Id.* at *4. USPS then published its final rule two days later.

101. The Administration has also continued its election interference by threatening criminal prosecution of state and local election officials. On July 7, 2026, Assistant Attorney General Harmeet Dhillon sent a letter to the chief election officials of all 50 states.[14] Under the guise of providing "notice of the federal laws applicable to state and local election officials[,]" the letter sets out thinly veiled threats of criminal prosecution six times in just the first two pages. *See, e.g.*, Letter from U.S. Dep't of Justice, Civil Rights Div., to Jared DeMarinis, State Elections Administrator, Md. State Bd. of Elections (July 7, 2026), https://perma.cc/QC3E-MUCQ.

102. On July 17, 2026, Secretary of Homeland Security Markwayne Mullin also threatened criminal prosecution of state and local election officials.[15] Secretary Mullin stated

---

[14] Jessica Huseman, *Department of Justice warns election officials they could be criminally charged over noncitizen voters* (July 7, 2026), VoteBeat, https://perma.cc/J2LQ-4BNL.

[15] *Mullin Threatens Local Election Officials With Jail Time*, N.Y. Times (July 17, 2026), https://www.nytimes.com/live/2026/07/17/us/trump-news.

that if election officials received information from the Department of Homeland Security and did not act, they could face “prison time.”

## II. USPS’s Rulemaking Implementing EO Section 3

103. On June 2, 2026, while the States’ challenge to the EO was pending, USPS began implementing the order. Expressly acknowledging Section 3 of the EO, USPS issued a notice of proposed rulemaking (“NPRM”) that proposed to amend multiple sections of the Domestic Mail Manual (“DMM”) pertaining to election mail. Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (proposed June 2, 2026) (to be codified at 39 C.F.R. pt. 111).

104. The NPRM sought to give USPS unprecedented control over election administration and mail-in voting and effective veto authority over which individuals can return a completed ballot to States. It provided that USPS would create an electronic “Federal Ballot Mail Portal.” *See* Proposed DMM 705.24.4.1. For voters to receive ballots through the mail, state and local election officials would be required to provide voter-specific information through the Portal, including each voter’s name and address, the original election office state, and a unique Intelligent Mail barcode (“IMb”) on the outgoing and return envelopes. Proposed DMM 705.24.4.2(a)–(b). Election officials would be required to provide such information at least 30 days before the election. Proposed DMM 705.24.4.2(d). Supplemental submissions would be permitted, though not necessarily accepted, and a separate submission was required for each “Outbound Federal Ballot mailing, regardless of the number of mailpieces in the mailing.” *Id.* All of this information must meet as-yet-unidentified “technical specifications for the Federal Ballot Mail Portal.” Proposed DMM 705.24.4.2(e). Voters would then be enrolled on a “Mail-In and Absentee Participation List.” Proposed DMM 705.24.4.2(a)–(c).

105. The Proposed Rule also imposed detailed and mandatory envelope standards for all ballot mail, including that ballot envelopes for both outbound and inbound mail must have a “unique IMb . . . with the Delivery Point Zip Code embedded and a Federal Ballot Mail STID,” bear an official election mail logo, and be automation compatible. Proposed DMM 705.24.3.1–2. Both outbound and inbound ballot mail would require review by USPS for both design and

barcode placement. Proposed DMM 705.24.3.1–2.

106. Under the NPRM, ballot mail that does not comply with the requirements of the NPRM would not be accepted by USPS and will not be delivered to voters. Proposed DMM 705.24.5.3. The NPRM provided no procedures to cure administrative errors by USPS or local election officials.

107. The NPRM proposed applying these rules inconsistently—only to general, special, and runoff elections involving federal offices, but not to primary elections for federal office. Proposed DMM 705.24.1(f). It also purportedly would not apply to ballot materials for U.S. citizens residing overseas, members of the military in active service, or members of the U.S. merchant marine. Proposed DMM 705.24.1(c). However, the NPRM provides no explanation as to how USPS would distinguish between mail ballots sent to those recipients from other mail ballots sent to persons who are not on USPS's lists.

108. Many state and local election officials submitted comment letters opposing the NPRM and identifying the many practical problems it would create, if adopted. For example, multiple commenters identified that the required infrastructure—the Federal Mail Ballot Portal—does not currently exist. Rolling out a dramatically different, untested technology and process that requires election officials and USPS to simultaneously input and manage tens of millions of entries in the high-stakes elections context is fraught with risk.[16] Any technological or process failure could delay or prevent the mailing of ballots to voters at a massive scale.[17]

109. Commenters observed that the exceedingly short timeframe between the potential final adoption of the NPRM and the deadlines for mailing ballots only compounded that risk,

[16] Public Rights Project, Comment on Behalf of Local Election Officials on Notice of Proposed Rulemaking on Ballot Mail for Federal Elections (July 2, 2026), https://perma.cc/CF37-K5G6.

[17] Jefferson County Colorado Clerk and Recorder's Office (June 18, 2026), https://perma.cc/53WK-2R58 ("Jefferson County, CO Comment Letter"); King County (Washington) Elections, King County Elections Public Comment on Proposed Rule, "Ballot Mail for Federal Elections," 39 C.F.R. Part 111, Federal Register Document No. 2026-10968 (July 2, 2026), https://kingcounty.gov/en/dept/elections/about-us/news-and-media-resources/news-releases/july-2-2026 ("King County, WA Comment Letter").

overburdening election officials at a time when they are already facing a "near-constant stream of critical, time-sensitive tasks."[18]

110. The NPRM also threatened to impose significant costs on state and local election offices, which are already operating on tight budgets with no funding to spare.[19] The additional costs would include the costs of new envelopes bearing the required design, new machines for applying IMbs, and expenditures for additional staffing and training.[20]

111. In particular, state and local election officials expressed alarm that the NPRM would, if adopted, disenfranchise voters.[21] As one group of commenters identified, voters would be disenfranchised through no fault of their own but instead based on administrative errors or technical failures.[22]

112. In addition to these practical obstacles, Attorneys General for 23 states and the District of Columbia submitted a detailed comment letter, attached hereto as **Exhibit 1**, identifying the NPRM's "striking disregard of federal law."[23] As that comment letter identifies, the NPRM is the product of the EO, which itself is unconstitutional and ultra vires, ignoring basic separations of powers principles. The letter also detailed how the NPRM violates USPS's governing statutes (including the PRA, Pub. L. No. 91-375, 84 Stat. 719 (1970), and the PAEA, Pub. L. No. 109-435, 120 Stat. 3198 (2006)), as well as federal voting statutes (such as the Help America Vote Act of 2002 and the Voting Rights Act Amendments of 1970).

113. The comment letter submitted by the Attorneys General further detailed the ways in which the NPRM was arbitrary and capricious. One major legal flaw was that "[t]he Proposed

---

[18] *See supra* n.16.

[19] *See id.*; *supra* n.17 Jefferson County, CO Comment Letter & King County, WA Comment Letter; Secretary of State Steve Hobbs' comments on USPS proposed ballot rule (July 2, 2026), https://perma.cc/H58K-BZTC ("Secretary Hobbs' Comments").

[20] *See supra* n.16; *supra* n.19 Secretary Hobbs' Comments.

[21] *See supra* n. 16; *supra* n.17 Jefferson County, CO Comment Letter & King County, WA Comment Letter; *supra* n.19 Secretary Hobbs' Comments.

[22] *See supra* n.16.

[23] Exhibit 1 at 1.

Rule's requirements are . . . not rationally connected to the purported basis."[24] As one Secretary of State's comment letter observed, "[t]his rule represents a solution looking for a problem. It's unnecessary and does nothing to enhance the security of our elections."[25] In addition, the NPRM failed to identify safeguards against misuse of USPS's claimed authority to intercept ballots mailed to voters.

114. Beyond the many comment letters, a complaint was filed with the PRC on June 11, 2026, to compel USPS to comply with the procedural requirements set out in 39 U.S.C. § 3661 as to the Proposed Rule, but to date the PRC has not acted on it.

115. On July 17, 2026, USPS published a proposed System of Records Notice ("Proposed SORN") providing for the collecting of voter data from the States and sharing the approved voter lists back with state election officials. General Privacy Act System of Records, USPS 820.225 Federal Ballot Mail System of Records, 91 Fed. Reg. 44,880 (July 17, 2026). The Proposed SORN closely tracks the requirements of the Rule, establishing USPS's plans to gather extensive voter data from election officials, to gather data about election officials submitting voter information, to use this data to "facilitate law enforcement efforts," and to share the data with election officials. 91 Fed. Reg. 44,881.

116. USPS stated that the Proposed SORN would only go into effect if USPS published a final mail ballot rule. *Id.* at 44,880. It further stated that "this System of Record will become effective without further notice "on the latest of (1) 30 days from the publication date of this Notice, if no comments are received; (2) the publication date of the Postal Service's responses to comments received (which will under no circumstances be published prior to 30 days from the publication date of this Notice); or (3) the effective date of any final rule in connection with that rulemaking." *Id.*

---

[24] *Id.*

[25] *See supra* n.19 Secretary Hobbs' Comments.

117. On August 14, 2026, Attorneys General for 23 States and the District of Columbia submitted a detailed comment letter, attached hereto as **Exhibit 2**, outlining multiple serious Privacy Act violations resulting from the vast, unprecedented collection and sharing of voter data required by the Rule and disclosed by the Proposed SORN. The letter explained that the proposed collection of data "exceeds the authority Congress provided to USPS in its governing statutes" and is not salvaged by the EO, which is unconstitutional. *Id.* at 1, 4–6. It also explained that the collection of voter registration and mail ballot data violates the Privacy Act's prohibition on maintaining records of First Amendment activity. *Id.* at 7–9. The letter further noted that the contemplated disclosure of this data to law enforcement did not satisfy the Privacy Act's "narrowly defined conditions of disclosure," and that the USPS's procedures for individuals to request corrections to records regarding them are inadequate. *Id.* at 9–15.

118. On August 21, 2026, Defendants filed the Rule for public inspection with the Federal Register.[26] Although the Rule in its public inspection format stated it would be published on August 26, 2026, the Rule stated that its effective date is August 21, 2026, thus requiring retroactive compliance with the Rule during a period that it was enjoined.

119. On August 26, 2026, pursuant to the terms of the Rule's public inspection document, the Rule was published in the Federal Register. 91 Fed. Reg. 54,966.

120. The Rule tracks the NPRM. It adopted only five technical revisions that clarify how USPS's mail ballot verification and review scheme would be implemented and underscore the severe burden it imposes on Plaintiff States.

121. First, USPS confirmed that the "verification process" in DMM 705.24.5 (i.e., the process by which USPS rejects mail ballots it deems noncompliant with its regime) only applies

[26] USPS submitted the Rule for public inspection (required before publication) despite being "enjoined from implementing, giving effect to, or enforcing . . . or otherwise initiating or completing rulemaking to promulgate the specific regulations outline in Section 3(b)(i)–(v) or (d) of the EO" as to Plaintiff States for the November 3, 2026 or any earlier election. *California v. Trump*, No. 1:26-cv-11581-IT (July 7, 2026), Doc. No. 207 at 3–4; *League of Women Voters of Massachusetts v. Trump*, No. 1:26-cv-11549-IT, 2026 WL 2322705, at *13 (D. Mass. Aug. 11, 2026) (same but nationwide).

to outbound ballot mail but not return ballot mail. 91 Fed. Reg. 54,966, 54,989; DMM 705.24.5.4. This was already apparent by the terms of the NPRM. The Rule also clarified that if a voter loses, misplaces, or is not provided with their return ballot mail envelope, the voter must request a compliant replacement from state or local elections officials. 91 Fed. Reg. 54,966, 54,989.

122. Second, USPS clarified that "Federal Ballot Mail Portal Users" (defined as the chief elections officer or local elections officials) cannot upload voter data to USPS until certifying that their ballot envelope design has been submitted for review to USPS and that USPS has provided feedback. 91 Fed. Reg. 54,966, 54,989; DMM 705.24.3.1, 705.24.3.2, 705.24.4.2.f. Without such certification, voter information cannot be uploaded to the Portal. DMM 705.24.4.2.f.

123. Third, USPS clarified that state and local elections officials are responsible for creating IMbs on outbound and return mail ballots. 91 Fed. Reg. 54,966, 54,990 (amending DMM 705.24.3.1.c and 705.23.3.2.c). Relatedly, USPS also clarified that the unique IMb submitted to the Portal for an individual voter is the same IMb printed on outboard and return mail ballot envelopes. 91 Fed. Reg. 54,966, 54,990 (amending DMM 705.24.4.2.b.3 and 705.24.4.2.b.4).

124. Fourth, USPS clarified that only commercial mailings are subject to commercial mailing standards and regulations. 91 Fed. Reg. 54,966, 54,990 (amending DMM 705.24.5.2).

125. Fifth, USPS changed the defined term of "Ballot Portal User" to "Federal Ballot Mail Portal User." 91 Fed. Reg. 54,966, 54,990; DMM 705.24.1.b.

126. Beyond these technical revisions, USPS provided an "explanation of how the final rule is intended to be implemented" because a "substantial volume of comments" highlighted a lack of clarity on how this last-minute ballot verification and review regime was to be implemented. 91 Fed. Reg. 54,966, 54,977–54,982. As discussed in the next section, this clarification only confirms and expands upon the harms to Plaintiff States.

**III. Harm to Plaintiff States**

127. USPS's Rule irreparably harms Plaintiff States in several ways.

128. *First*, the Rule inflicts sovereign injury by usurping Plaintiff States' constitutional power to prescribe the times, places, and manner of federal elections. Moreover, because ballots covered by the Rule also include state and local races, the Rule also harms States' sovereign interests in regulating and carrying out state and local elections. The Rule imposes new procedures on a common method of voting and threatens States' ability to guarantee the fair and lawful administration of their mail voting programs. The Rule thus harms Plaintiff States' authority to administer elections and secure the voting rights of their citizens. This invasion of States' constitutional power amounts to concrete constitutional injury, abrogating Plaintiff States' sovereign interests in conducting elections in accordance with duly enacted state and federal law.

129. *Second*, the Rule introduces chaos as the 2026 midterm elections approach, imposing significant financial and administrative burdens on Plaintiff States' electoral systems. "When an election is close at hand, the rules of the road should be clear and settled. That is because running a statewide election is a complicated endeavor." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay).

130. Americans vote by mail in significant numbers; approximately 30 percent of voters voted by mail in the November 2024 election, and that number is substantially higher in certain Plaintiff States that choose to offer their voters no-excuse mail voting. For some States, nearly 100 percent of ballots are delivered to voters by mail. USPS serves a critical role in delivering election mail, processing nearly 100 million ballots in the 2024 general election alone.[27]

---

[27] United States Postal Service, *Delivering the Nation's Election Mail Securely and Effectively: 2024 Post-Election Analysis Report* (Dec. 2, 2024), https://perma.cc/Z8FL-PTE6.

131. The scale of mail voting underscores the challenges of complying with the Rule. Preparing and mailing nearly 100 million mail ballots is already a complicated endeavor. The additional burdens of creating unique IMbs for each ballot envelope and uploading and updating information about those nearly 100 million corresponding voters are enormous. These challenges are exacerbated by the reality that voter and mail ballot registration continue in the weeks leading up to an election, meaning States will need to provide frequent amendments and additions through the USPS Ballot Portal. Yet the design of the Rule provides no realistic opportunity for States to ensure that the USPS Mail Ballot Lists are correct. *See* DMM 705.24.4.3 (providing that USPS will distribute its USPS Mail Ballot Lists to state election officials "on or about the date of the federal election"). The scale of these challenges is magnified in Plaintiff States in which most voters vote by mail, and which automatically send mail ballots to all registered voters. *See, e.g.*, Cal. Elec. Code § 3000.5(a).

132. Plaintiff States have each relied on universally available, neutral, and timely postal service from USPS in adopting state laws providing for mail voting and administering mail voting programs for both federal and state elections. Plaintiff States and their localities have also relied on previous USPS guidance to design mail ballot envelopes, including for envelopes that they intend to use for the November 2026 general election. The Rule's imposition of burdensome new requirements and threats to intercept ballot mail harm Plaintiff States' significant reliance interests.

133. If the Rule goes into effect, state and local elections officials will have to devote significant time, personnel, and money to implement and simultaneously manage and mitigate the harms associated with these dramatic changes, including by erecting new mail voting infrastructure. *See Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025), *petition for cert. denied*, No. 25-899 (U.S. Jan. 30, 2026). Among other things, many state and local election officials will have to: purchase new equipment that is capable of applying IMb to ballot envelopes; order new ballot envelopes that meet the eleventh-hour ballot design requirements dictated by the Rule; submit outbound and return envelopes to USPS for review and feedback; become authorized

users of USPS's Federal Ballot Mail Portal after certifying USPS's approval of mail ballot envelopes; enroll all mail voters in the state into USPS's Federal Ballot Mail Portal; pay for additional staff training to mitigate the risk of errors that would prevent voters from receiving ballots; and repeatedly ensure that changes in a voter's registration are reflected in USPS's Federal Ballot Mail. Because of the late date of the Rule's issuance, many Plaintiff States or their localities have already purchased ballot envelopes for the upcoming election. Affected election offices will now need to order a new set, resulting in twice as much spending on ballot envelopes as budgeted. The Rule would impose those significant monetary costs on Plaintiff States as they are administering the midterm elections and without providing any funding to fulfill those requirements.

134. The harm to how Plaintiff States administer elections is extensive. The explanation offered by USPS on how it intends to implement the Rule reveals even greater harm to Plaintiff States and a shocking misunderstanding of election administration. 91 Fed. Reg. 54,966, 54,977–54,982. For example, USPS expects the chief elections official of each state to "maintain ultimate control over access to the Portal," 91 Fed. Reg. 54,966, 54,979, but fails to consider that States with decentralized election administration systems are not run from the top down. USPS also requires Plaintiff States to segregate all outbound federal ballot mail "from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only," 91 Fed. Reg. 54,966, 54,981; DMM 705.24.1.f, when such election mail is frequently combined into a single mailing. And USPS aims to provide feedback on envelope design within two business days but fails to account for the fact that there are more than 10,000 elections jurisdictions in the United States, each frequently in charge of their own ballot envelopes. 91 Fed. Reg. 54,966, 54,979. Any delay in approving envelopes will harm Plaintiff States because USPS certification is required *before* any voter can be enrolled in the Portal by elections officials. DMM 705.24.4.2.f. USPS further estimates that the verification process for outbound mail ballots would take "less than a minute per mailpiece" and "should take no more than a few hours for larger mailings." 91 Fed. Reg. 54,966, 54,981. For California alone, that

would amount up to 23 million minutes (approximate number of registered voters receiving a ballot), or more than 43 years. Meanwhile, USPS requires that elections officials must remain at the USPS dropoff location during that verification process, assuming that there is no other delay at the USPS retail counter or Business Mail Entry Unit. In short, implementation of the Rule as USPS intends effectively eliminates mail voting through its onerous administration requirements, thereby harming Plaintiff States.

135. *Third,* the Rule will also confuse States' voters over the state of the law—whether they will receive their ballot through the mail, whether USPS will accept their ballots, whether their names are being compiled on a federal list, and whether their State may administer an election pursuant to state law. As a first point of contact for voters and the designated administrators of elections, it will be up to Plaintiff States (directly and through their political subdivisions) to bear the burden of this confusion. Plaintiff States will need to implement widespread voter education campaigns to inform voters about the Rule's significant changes, develop resources for staff to answer related questions, and divert staff to interface with the public. Beyond merely educating voters, Plaintiff States will need to prepare for the cascading effects from confused voters or uncertain availability of mail voting. Plaintiff States will need to make accommodations for an influx of in-person voters by opening more polling locations and ensuring that those locations are adequately staffed and have enough ballots.

136. *Fourth*, the public's inevitable confusion about the Rule's new regime and mail voting rules will damage the public's trust in States to administer elections fairly and in accordance with state law. Disenfranchisement of voters due to errors and flaws in the new processes will compound the harm to States' reputations as stewards of elections.

137. No adequate remedy at law is available to redress these irreparable harms.

## **FIRST CAUSE OF ACTION**

### **Separation of Powers / Elections and Electors Clauses / Commandeering / Ultra Vires & Unlawful Interference with States' Mail Voting Programs**

### **(Against All Defendants)**

138. Plaintiff States restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

139. Plaintiff States have an equitable, non-statutory right of action for claims seeking to enjoin and declare unlawful official action that is ultra vires and for which there is no other remedy at law.

140. The U.S. Constitution affords States legislative power to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," subject to preemption by Congress, U.S. Const. art. I, § 4, cl. 1, and to "direct" the "Manner" of appointment of presidential electors, *id.* art. II, § 1, cl. 2. This constitutional power encompasses the authority to create and administer a mail voting program. *See Smiley*, 285 U.S. at 366.

141. Plaintiff States allow for mail voting under legislative schemes adopted in each State. Some Plaintiff States, including California, Colorado, the District of Columbia, Hawai'i, Nevada, Oregon, and Washington, send mail ballots to all active, registered voters. Other Plaintiff States, including Arizona, Illinois, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, and Wisconsin, allow voters to request mail ballots through specified procedures. Still others, like Vermont, maintain some combination of both systems.

142. USPS promulgated a regulation adopting a comprehensive program to monitor and screen mail ballots. The Rule asserts federal authority to refuse to deliver ballots for noncompliance with the Rule, and conscripts States' resources to create a federally-approved list of mail voters and implement federal ballot envelope requirements.

143. USPS lacks the constitutional or statutory authority to enact a program to monitor and control States' mail ballot programs. The Rule intrudes upon the powers reserved by the Constitution to the States and Congress in multiple ways, improperly attempting to seize them for USPS and the Executive.

144. First, the Executive Branch has no power to unilaterally dictate election rules through agency rulemaking. By purporting to do so, the Rule unconstitutionally exceeds the Executive Branch's power. *See California v. Trump*, 786 F. Supp. 3d 359, 373 (D. Mass. 2025).

145. Second, the Rule violates the States' constitutional rights to administer elections in accordance with their own laws. State election laws and regulations determine who can cast a mail ballot and under what circumstances. The Rule, however, purports to establish additional eligibility requirements for mail voting subject to federal control, and will prevent voters entitled to cast a mail ballot under state law from doing so. And because States place federal, state, and local races on the same ballots, the Rule exerts control over non-federal elections in precisely the same way. This intrusion into States' constitutional powers and nullification of States' choices regarding election administration is unconstitutional under the Elections and Electors Clauses of the Constitution.

146. Third, the Rule unconstitutionally commandeers States' resources. Refusing States access to essential and statutorily guaranteed postal services for elections purposes unless they enact (with their own resources) a presidentially ordered federal elections program amounts to unlawfully seizing the States' personnel resources and power over elections. *See California*, 786 F. Supp. 3d at 373; *Printz v. United States*, 521 U.S. 898, 935 (1997).

147. Fourth, the Rule unconstitutionally invades Congress's power to "make or alter" election regulations under the Elections Clause. *See* U.S. Const. art. I, § 4. Pursuant to that power, Congress has enacted several statutes governing mail voting and voter registration. The Rule unconstitutionally seizes for USPS the power to regulate elections inconsistent with these statutes, violating the separation of powers. While Congress is expected to "clearly" authorize momentous regulations, it has never done so for the Rule. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

148. Fifth, the Rule unconstitutionally invades Congress's plenary power over USPS by arrogating to USPS and the Executive Branch new authority which Congress has withheld. *See* U.S. Const., art. I, § 8, cl. 7.

149. Plaintiff States have been and will be harmed by the Rule's interference with their mail voting programs, including harm to their sovereignty, significant costs and administrative burdens, and harm to their reputations as trustworthy stewards of elections.

150. Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Rule violates the separation of powers and impermissibly arrogates to USPS and the Executive Branch power that is reserved to the States and Congress. Plaintiff States are further entitled to a preliminary and permanent injunction preventing all Defendants from implementing or enforcing the Rule.

## SECOND CAUSE OF ACTION

### Administrative Procedure Act – Contrary to Statute and Arbitrary and Capricious – Treatment of Mail Ballots as Non-Mailable Matter / Violation of USPS's Universal Mail Service Obligation – 5 U.S.C. § 706(2)(A), (C) & 39 U.S.C. §§ 101(a), 101(e), 403(a), 403(b)(1), 404(a)(1), 3001(m), 3001–3018

**(Against All Defendants)**

151. Plaintiff States restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

152. Regulatory proceedings related to mailability are required to be conducted in accordance with the Administrative Procedure Act ("APA"). 39 U.S.C. § 3001(m); *DSCC v. Trump*, 2026 WL 2168617, at *2 (D.C. Cir. July 28, 2026). Defendants' publication of the Rule is an "agency action" within the meaning of the APA. 5 U.S.C. § 551(13).

153. Plaintiff States have a cause of action under the APA to challenge the Rule's violation of statutory limits on treatment of items as non-mailable matter. 5 U.S.C. §§ 701–706; 39 U.S.C. § 3001(m). No other adequate remedy in court exists.

154. Under the APA, a court must hold unlawful and set aside final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

155. By statute, USPS must provide nationwide mail service. It is obligated to accept, transport, and deliver all lawful, properly posted mailable matter tendered to it, without regard to

the sender, recipient, content, or purpose of the mail piece. 39 U.S.C. §§ 101(a) & (e), 403(a) & (b)(1), and 404(a)(1).

156. USPS's authority to reject certain mail is strictly limited by statute. Congress has carefully defined categories of "nonmailable matter," which "shall be disposed of as [USPS] shall direct." 39 U.S.C. § 3001(b); *see id.* §§ 3001–3018 (enumerating specific and narrow categories of "nonmailable mater" and prescribing detail procedures regarding same). Mail ballots transmitted between elections officials and voters are not, and never have been, nonmailable matter under 39 U.S.C. §§ 3001–3018 or any other provision of law.

157. The Rule unlawfully creates a new category of nonmailable matter by conditioning the delivery of lawful, mailable matter—ballot mail—on compliance with its voter enrollment and ballot envelope design and review requirements. No statutory authority supports these novel requirements. *See Hannegan v. Esquire, Inc.*, 327 U.S. 146, 155–156 (1946) (finding Postmaster General may not impose conditions on mail privileges that Congress has not prescribed).

158. By adopting and implementing the Rule, USPS has acted, and unless enjoined will continue to act, in excess of its statutory authority and contrary to its statutory obligations under 39 U.S.C. §§ 101(a), 101(e), 403(a), 403(b)(1), and 404(a)(1), and in derogation of the exclusive non-mailability scheme Congress enacted in 39 U.S.C. §§ 3001–3018.

159. Under the APA, a court must hold unlawful and set aside final agency action that is arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A). An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency acts arbitrarily and capriciously if it fails "to assess whether there were reliance interests [at stake], determine whether they were significant, and weigh any such

interests against competing policy considerations." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020).

160. USPS acted arbitrarily and capriciously by failing "to address whether there was 'legitimate reliance' on" the existing framework governing mail ballots. *See Regents*, 591 U.S. at 30. USPS ignored the reality of the States' election administration processes that relied on existing USPS mail guidance and decades of practice and included the purchase of USPS-approved mail ballots for the November election, and instead abused its discretion in issuing the Rule with an immediate effective date for implementation for the November 2026 midterm elections. USPS simply dismisses the concern with no real explanation: "[D]espite any logistical or financial difficulties states may face complying with the rule, including some claims that immediate implementation would prove impossible, the visibility and law-enforcement benefits of the rule, including for this election cycle, are such that there is no compelling reason for any delay." 91 Fed. Reg. 54,966, 54,985. USPS is offering no actual explanation for how a rule finalized on August 26, 2026, which requires (1) a redesign of ballots, (2) that must be approved by USPS (perhaps within 2 business days, though this is not a commitment), (3) the reordering and reprinting of potentially millions of ballots, (4) the entry of millions of pieces of data by election officials, and (5) increased time in processing ballots at a mail facility, can allow States to begin mailing out ballots by September 4, 2026. *See, e.g.*, N.C. Gen. Stat. § 163-227.10(a). USPS failed to give adequate weight to States' weighty reliance interests reflected in their state laws allowing mail voting.

161. USPS also acted arbitrarily and capriciously in failing to consider important aspects of the problem or offer explanations in line with evidence. *See State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. USPS points to no evidence of widespread fraud in mail balloting that justifies this enormous imposition, pointing instead to only potential increased transparency that may lead to "potential issues" being more easily identified. 91 Fed. Reg. 54,966, 54,969. But the vast majority of studies of the issue have demonstrated that voter fraud and non-citizen voting are extremely rare and USPS pointed to no serious issues arising from the ways that States

currently undertake mail balloting and prevent fraud. Instead, it simply asserted that "[c]oncerning the proposed rule's factual predicate (or alleged lack thereof), claims regarding the empirical evidence of voter fraud do not, as explained above [reiterating only increased transparency for law enforcement], affect the Postal Service's authority to adopt these regulations." 91 Fed. Reg. 54,966, 54,972. This is incorrect because it is arbitrary and capricious for USPS to rely on a factual premise for which there is no persuasive evidence—that existing federal and state laws do not already protect federal elections against fraud or diminished integrity—to justify a massive new federal surveillance regime. *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992).

162. USPS also acted arbitrarily and capriciously in disregarding the statutory mandate that that the "most expeditious collection, transportation, and delivery of important letter mail" is to be USPS's "highest consideration" in determining its policies. 39 U.S.C. § 101(e). The Rule prioritizes other presidentially-mandated objectives related to elections at the cost of undermining the expeditious transmission of ballot mail.

163. USPS has also violated 5 U.S.C. § 553(d) by failing to set an effective date at least 30 days after publication, without good cause or any other qualifying exception.

164. Plaintiff States have been and will be harmed by the Rule's violation of these statutory requirements, including harm to their sovereignty, significant costs and administrative burdens, and harm to their reputations as trustworthy stewards of elections.

165. For these reasons, the Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and is arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A), (C).

166. Under 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Rule is ultra vires, contrary to law, and void for violation of these statutory requirements.

167. Under 5 U.S.C. § 706(2)(C), Plaintiff States are entitled to an order vacating the Rule, holding that the Rule is unlawful, and setting the Rule aside.

168. Plaintiff States are entitled to a stay under 5 U.S.C. § 705 and preliminary and permanent injunctive relief prohibiting Defendants from implementing or enforcing the Rule.

## THIRD CAUSE OF ACTION

**Ultra Vires – USPS Implementation of Non-Postal Services – 39 U.S.C. § 404(e)**

**(Against All Defendants)**

169. Plaintiff States restate and reallege the preceding paragraphs as if fully set forth herein.

170. Plaintiff States have an equitable, non-statutory right of action for claims seeking to enjoin and declare unlawful USPS action that exceeds USPS statutory authority. No other statutory remedy is available to provide adequate and meaningful review. *See* 39 U.S.C. § 401(1).

171. 39 U.S.C. § 404(e) limits USPS's authority to provide non-postal services, or anything beyond the "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* §§ 102(5), 404(e)(1). USPS may only provide non-postal services if (1) it provided those services prior to January 1, 2006 and their continuation was timely approved by the Postal Regulatory Commission, or (2) the non-postal services are provided pursuant to a qualifying agreement with a government agency under Title 39, Chapter 37 of the U.S. Code. *Id.* § 404(e)(2)–(4).

172. The Rule requires USPS to create a new non-postal service to manage and oversee mail voting, including by erecting a novel multi-pronged scheme to enroll voters as mail ballot recipients, monitor ballot mail, and intercept non-conforming ballots.

173. Upon information and belief, USPS has not entered into any qualifying agreement to provide non-postal services to a government agency pursuant to Title 39, Chapter 37 of the U.S. Code.

174. Defendants' adoption and implementation of the Rule, which requires USPS to provide new non-postal services, is contrary to law and in excess of its statutory authority and thus constitutes ultra vires agency action.

175. Plaintiff States have been and will be harmed by the Rule's violation of this statutory requirement, including harm to their sovereignty, significant costs and administrative burdens, and harm to their reputations as trustworthy stewards of elections.

176. Under 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Rule is ultra vires, contrary to law, and void for violation of this statutory requirement. Plaintiff States are further entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or enforcing the Rule.

## FOURTH CAUSE OF ACTION

**Ultra Vires – Failure to Seek Advisory Opinion from the Postal Regulatory Commission, 39 U.S.C. § 3661(b)**

**(Against All Defendants)**

177. Plaintiff States restate and reallege the preceding paragraphs as if fully set forth herein.

178. Plaintiff States have an equitable, non-statutory right of action for claims seeking to enjoin and declare unlawful USPS action that exceeds USPS statutory authority. No other statutory remedy is available to provide adequate and meaningful review. *See* 39 U.S.C. §§ 401(1), 3662.

179. The Rule effects "a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." *Id.* § 3661(b). Accordingly, USPS was required to "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the PRC requesting an advisory opinion on the change." *Id.* § 3661(b).

180. Before this Rule, USPS had accepted and delivered all lawfully posted mail ballots without condition, and had even publicly committed to prioritizing the timely delivery of election mail. But the Rule institutes a nationwide mail ballot administration program that puts

USPS in charge of State-by-State rosters of every voter enrolled to vote by mail, along with a barcode associated with each voter. The Rule gives USPS the power to reject and return ballots associated with voters not appearing on its lists, even if that voter is eligible and validly registered to vote in their own State. The Rule applies to mail ballots in every State and the District of Columbia in connection with every federal general election, and thus affects millions of mail pieces and mail users in each election cycle.

181. USPS adopted the Rule with an immediate effective date without first seeking an advisory opinion from the PRC, as required by 39 U.S.C. § 3661(b).

182. Defendants' failure to request an advisory opinion deprived the PRC, the public's representative, mail users, and Plaintiff States of the statutorily guaranteed opportunity to be heard on the record by the PRC before USPS implements a nationwide change in postal services is implemented.

183. Defendants' adoption and implementation of the Rule without complying with 39 U.S.C. § 3661 is contrary to law, in excess of its statutory authority, and constitutes ultra vires agency action. *See California*, 2026 WL 1826490, at *16 (finding "the EO's directive that USPS require all States to use a specific mail-in ballot is inconsistent with USPS rulemaking procedure" (citing 39 U.S.C. § 3661(b))).

184. Plaintiff States have been and will be harmed by the Rule's violation of this statutory requirement, including harm to their sovereignty, significant costs and administrative burdens, and harm to their reputations as trustworthy stewards of elections.

185. Plaintiff States are entitled to a declaration that in publishing the Rule with an immediate effective date USPS has violated 39 U.S.C. § 3661. Plaintiff States are further entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or enforcing the Rule as to Plaintiff States unless and until USPS complies with the requirements in 39 U.S.C. § 3661, if the Rule is not permanently enjoined on other grounds herein.

## FIFTH CAUSE OF ACTION

### Ultra Vires – Violation of USPS's Universal Mail Service Obligation / Undue or Unreasonable Discrimination Against Users of the Mail – 39 U.S.C. §§ 101(a), 101(e), 403(a), 403(b)(1), 403(c), 404(a)(1)

### (Against All Defendants)

186. Plaintiff States restate and reallege the preceding paragraphs as if fully set forth herein.

187. Plaintiff States have an equitable, non-statutory right of action for claims seeking to enjoin and declare unlawful USPS action that exceeds USPS's statutory authority. No other statutory remedy is available to provide adequate and meaningful review. *See* 39 U.S.C. § 401(1), 3662.

188. USPS operates under a binding universal mail service mandate which obligates it to accept, transport, and deliver all lawful, properly posted mailable matter tendered to it, without regard to the sender, recipient, content, or purpose of the mail piece. 39 U.S.C. §§ 101(a) & (e), 403(a) & (b)(1), and 404(a)(1).

189. Under 39 U.S.C. § 403(c), "[i]n providing services and in establishing classifications, rates, and fees under this title," USPS "shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user."

190. Election officials in Plaintiff States who transmit ballots to voters, and voters who return completed ballots by mail, are "users of the mails" within the meaning of 39 U.S.C. § 403(c).

191. The Rule discriminates among identically situated users of the mail and USPS has not identified (and cannot identify) any legitimate operational need that justifies this disparity. For example, under the Rule, a ballot mailed by or to a voter in a State that has submitted the required voter list will be accepted and delivered, while a physically identical, lawfully posted mail ballot mailed by or to a voter in a non-compliant State will be rejected and returned—even when the individual is eligible and registered to vote under state law.

192. No provision of Title 39 "specifically authorize[s]" the Rule's discrimination. 39 U.S.C. § 403(c).

193. This discrimination is undue and unreasonable. The Rule will heavily burden States and voters and is unnecessary for the administration of mail voting. USPS has long carried election mail without the Rule, and routinely carries other government mail that is important, sensitive, and deadline-driven without any such limitations.

194. By adopting and implementing the Rule, USPS has acted, and unless enjoined will continue to act, in excess of its statutory authority and contrary to its statutory obligations under 39 U.S.C. §§ 101(a), 101(e), 403(a), 403(b)(1), and 404(a)(1), and in derogation of the prohibition on discrimination in 39 U.S.C. § 403(c).

195. Plaintiff States have been and will be harmed by the Rule's violation of these statutory requirements, including harm to their sovereignty, significant costs and administrative burdens, and harm to their reputations as trustworthy stewards of elections.

196. Under 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Rule is ultra vires, contrary to law, and void for violation of this statutory requirement. Plaintiff States are further entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or enforcing the Rule.

## SIXTH CAUSE OF ACTION

**Violation of the Voting Rights Act, 52 U.S.C. §§ 10307(a), 10502**

**(Against All Defendants)**

197. Plaintiff States restate and reallege the preceding paragraphs as if fully set forth herein.

198. Section 11(a) of the Voting Rights Act provides a right of action when any person "acting under color of law" "fail[s] or refuse[s] to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote." 52 U.S.C. § 10307(a); *see League of Women Voters of Massachusetts v. Trump*, __ F. Supp. 3d.

___, 2026 WL 2104006 at *7–10 (D. Mass. July 22, 2026). Section 11(a) "prohibits public officials from denying any qualified person the right to vote." *Post*, 297 F. Supp. at 50.

199. Section 11(a) also provides a cause of action to enforce 52 U.S.C. § 10502, enacted by the Voting Rights Amendments Act of 1970. 52 U.S.C. § 10502(c) protects the right of U.S. citizens to vote absentee in presidential elections so long as they have "complied with the requirements prescribed by the law of such State or political subdivision" concerning absentee ballots.

200. In the alternative, should it be determined that Section 11(a) does not provide a right of action, then Plaintiff States have an equitable, non-statutory right of action for claims seeking to enjoin and declare unlawful USPS action that exceeds the agency's statutory authority and violates the Voting Rights Act.

201. USPS's issuance and implementation of the Rule are actions "under color of law."

202. The Rule directs USPS to refuse to deliver certain mail ballots mailed by state and local election officials, thereby failing or refusing to permit qualified and lawfully registered U.S. citizens to vote by means of those mail ballots.

203. For many voters—such as voters in jurisdictions where elections are conducted exclusively by mail, voters who are temporarily outside of the State, voters who must present their mail ballot in order to vote in person, and voters who face barriers to voting in person—USPS interception of their mail ballots will preclude them from voting.

204. Plaintiff States are responsible for ensuring the voting rights of their eligible and duly registered voters, including those who register for mail ballots in compliance with state law. USPS's refusal to transmit mail ballots frustrates and irreparably harms Plaintiff States' ability to carry out mail and absentee voting programs in accordance with state law.

205. Plaintiff States will be harmed by the Rule's interference with their administration of mail voting, including harm to their sovereignty, significant costs and administrative burdens, and harm to their reputations as trustworthy stewards of elections.

206. Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Rule violates 52 U.S.C. §§ 10307 and 10502. Plaintiff States are further entitled to a preliminary and permanent injunction preventing all Defendants from implementing or enforcing the Rule.

**SEVENTH CAUSE OF ACTION**

**Ultra Vires – Violation of the Privacy Act, 5 U.S.C. § 552a(e)(1) & (e)(7)**

**(Against All Defendants)**

207. Plaintiff States restate and reallege the preceding paragraphs as if fully set forth herein.

208. Plaintiff States have an equitable, non-statutory right of action for claims seeking to enjoin and declare unlawful USPS action that exceeds USPS's statutory authority. No other statutory remedy is available to provide adequate and meaningful review. *See* 39 U.S.C. § 401(1).

209. USPS is subject to the requirements and prohibitions in the Privacy Act. 39 U.S.C. § 410(b)(1) (incorporating by reference 5 U.S.C. § 552a); *NLRB. v. USPS*, 841 F.2d 141, 144 & n.3 (6th Cir. 1988).

210. Under the Privacy Act, an agency may only "maintain in its records such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." 5 U.S.C. § 552a(e)(1).

211. The data that USPS must collect and maintain under the Rule is not "relevant and necessary" to any statutorily authorized purpose. Nor is it supported by any valid presidential directive, as the EO directing the collection and maintenance of this data is unconstitutional. Accordingly, the Rule's data collection and maintenance requirements are in direct contravention of the Privacy Act. *Id.*; *see id.* § 552a(a)(3) (defining the term "maintain").

212. The Privacy Act prohibits the federal government from collecting, maintaining, using, or disseminating records "describing how any individual exercises rights guaranteed by

the First Amendment," with very limited exceptions. *Id.* § 552a(e)(7); *see id.* § 552a(a)(3) (defining the term "maintain").

213. Voter registration, mail ballot participation, and voting are forms of First Amendment expression. *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999).

214. The Rule requires States to provide voter information to USPS for compilation of the agency's mail voter eligibility lists, which will reveal citizens' First Amendment activity regarding their choice to register to vote, and to vote by mail. The Privacy Act bars USPS from collecting this information. *See Weber*, 816 F. Supp. 3d at 1193.

215. No statutory exceptions apply and permit USPS to collect this information. 5 U.S.C. § 552a(e)(7).

216. Plaintiff States have been and will be harmed by the Rule's violation of this statutory requirement, including harm to their sovereignty, significant costs and administrative burdens, and harm to their reputations as trustworthy stewards of elections.

217. Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Rule violates the Privacy Act. Plaintiff States are further entitled to a preliminary and permanent injunction preventing all Defendants from implementing or enforcing the Rule.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court:

1. Issue a judicial declaration that the USPS Rule is unlawful and ultra vires because it violates the separation of powers, contravenes the States' sovereignty and authority over elections under the United States Constitution, commandeers States' election officials to implement a presidential program, is arbitrary and capricious and contrary to statute, and is contrary to Title 39 of the U.S. Code, the Voting Rights Act, and the Privacy Act;

2. Temporarily restrain and preliminarily enjoin all Defendants from implementing or enforcing the Rule and stay the effective date of the rule under 5 U.S.C. § 705 pending conclusion of these proceedings;

3. Permanently enjoin all Defendants from implementing or enforcing the Rule and vacate or set aside the rule as unlawful under 5 U.S.C. § 706;

4. Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees; and

5. Grant any other relief as this Court may deem just and proper.

August 26, 2026

Respectfully submitted.

**ROB BONTA**
Attorney General of California

By: /s/ *Anne P. Bellows*
Anne P. Bellows*
*Deputy Attorney General*
Thomas S. Patterson*
*Senior Assistant Attorney General*
Seth E. Goldstein*
*Supervising Deputy Attorney General*
Malcolm A. Brudigam*
Michael S. Cohen*
Lisa C. Ehrlich*
Kevin L. Quade*
Robert William Setrakian*
*Deputy Attorneys General*
1300 I Street, P.O. Box 944255
Sacramento, CA 95814
(916) 210-6090
anne.bellows@doj.ca.gov

*Counsel for the State of California*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: /s/ *Vanessa A. Arslanian*
Vanessa A. Arslanian (BBO No. 688099)
*State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
*Deputy State Solicitor*
Jared B. Cohen (BBO No. 689217)
Julia S. Canney (BBO No. 717328)
Phoebe M. Lockhart (BBO No. 709411)
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2107
vanessa.arslanian@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**AARON FORD**
Attorney General of Nevada

By: /s/ *K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: /s/ *Tera M. Heintz*
Tera M. Heintz*
Cristina Sepe*
Karl D. Smith*
*Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
tera.heintz@atg.wa.gov

*Counsel for the State of Washington*

(additional counsel on following page)

**KRISTIN K. MAYES**
Attorney General of Arizona

By: /s/ *Kara Karlson*
Kara Karlson*
Karen J. Hartman-Tellez*
Syreeta Tyrell*
*Assistant Attorneys General*
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-8118

*Counsel for the State of Arizona*

**WILLIAM TONG**
Attorney General of Connecticut

By: /s/ *Maura Murphy*
Maura Murphy*
*Deputy Associate Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020

*Counsel for the State of Connecticut*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: /s/ *Karthik P. Reddy*
Karthik P. Reddy*
*Special Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 741-5221

*Counsel for the District of Columbia*

**PHILIP J. WEISER**
Attorney General of Colorado

By: /s/ *Shannon Stevenson*
Shannon Stevenson*
*Solicitor General*
Peter Baumann*
*Senior Assistant Attorney General*
1300 Broadway
Denver, Colorado 80203
(720) 508-6400

*Counsel for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: /s/ *Ian R. Liston*
Ian R. Liston*
*Director of Impact Litigation*
Vanessa L. Kassab*
*Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: /s/ *Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360

*Counsel for the State of Hawaiʻi*

(additional counsel on following page)

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ *Vikas Didwania*
Vikas Didwania*
*Complex Litigation Counsel*
Alex Hemmer*
*Deputy Solicitor General*
Molly Petchenik*
*Assistant Attorney General*
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526

*Counsel for the State of Illinois*

**AARON M. FREY**
Attorney General of Maine

By: /s/ *Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: /s/ *Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: /s/ *Neil Giovanatti*
Neil Giovanatti*
*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
(517) 241-1050

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: /s/ *Angela Behrens*
Angela Behrens
Allen Cook Barr*
*Assistant Attorneys General*
Lindsey E. Middlecamp*
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN, 55101
(651) 300-0711

*Counsel for the State of Minnesota*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: /s/ *Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
Joshua P. Bohn*
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276

*Counsel for the State of New Jersey*

(additional counsel on following page)

**RAÚL TORREZ**
Attorney General of New Mexico

By: /s/ *James W. Grayson*
James W. Grayson*
*Chief Deputy Attorney General*
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060

*Counsel for the State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

By: /s/ *Colleen K. Faherty*
Colleen K. Faherty*
*Special Trial Counsel*
Rabia Muqaddam*
*Chief Counsel, Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-6046

*Counsel for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina

Laura Howard
Chief Deputy Attorney General

By: /s/ *Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27603

*Counsel for the State of North Carolina*

**DAN RAYFIELD**
Attorney General of Oregon

By: /s/ *Thomas H. Castelli*
Thomas H. Castelli*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880

*Counsel for the State of Oregon*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: /s/ *Megan Rok*
Megan Rok*
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: /s/ *Ryan P. Kane*
Ryan P. Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153

*Counsel for the State of Vermont*

(additional counsel on following page)

**JAY JONES**
Attorney General of Virginia

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge*
*Solicitor General*
202 North Ninth Street
Richmond, VA 23219

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Lynn Lodahl*
Lynn Lodahl*
*Assistant Attorney General*
17 West Main Street
Madison, WI 53707-7857
(608) 264-6219

*Counsel for the State of Wisconsin*

**JOSH SHAPIRO**
Governor of the Commonwealth
of Pennsylvania

By: */s/ Michael J. Fischer*
Michael J. Fischer*
Charlotte Gibson*
*Executive Deputy General Counsel*
Jacob B. Boyer*
*Deputy General Counsel*
30 North Third Street, Suite 200
Harrisburg, PA 17101
(717) 831-2847

*Counsel for the Governor of the Commonwealth of Pennsylvania*

*Admitted pro hac vice or pro hac vice applications forthcoming*