**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. |

**DECLARATION OF MICHELLE TASSINARI**

I, Michelle Tassinari, declare as follows:

1. I am a resident of the Commonwealth of Massachusetts. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Elections Division staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the First Deputy Secretary of the Commonwealth of Massachusetts, as well as Director and Legal Counsel of the Elections Division of the Office of the Secretary of the Commonwealth. I work for William Francis Galvin, Secretary of the Commonwealth, and support him in his official capacity as the Chief Officer of Elections for the Commonwealth. In my role, I assist Secretary Galvin in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as Legal Counsel since 2000 and Director since 2005. In 2022, I was named First Deputy Secretary. I have a BA from Brandeis University and a JD from New England Law and have been an attorney in good standing in Massachusetts since 1997.

4. The Commonwealth of Massachusetts and its subdivisions are responsible for administering federal elections in Massachusetts. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks. The Office of the Secretary of the Commonwealth (and its Elections Division) has primary state-level responsibility for fulfilling this duty throughout Massachusetts.

5. The Secretary of the Commonwealth is the state's Chief Election Officer, responsible for administering—and working with local election officials to ensure uniform administration of—all state and federal law relating to elections within Massachusetts. *See* Mass. Const. Pt. 2, ch. II, s. IV, arts. I-II (and amendments); Mass. Gen. Laws ch. 9, §§ 1-2; Mass. St. 1993, ch. 475, § 57. The Elections Division is responsible for implementing Secretary Galvin's responsibilities with regard to elections, including administering laws and providing legal and technical information to the public, local election officials and other parties. Massachusetts law charges my office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. Mass. Gen. Laws ch. 9, §§ 1, 2; Mass. Gen. Laws ch. 50, § 1; Mass. Gen. Laws ch. 56, § 60.

6. In Massachusetts, elections are conducted by local election officials in each of the 351 municipalities. The Elections Division oversees administration of state and federal primaries and elections, including certifying candidate nomination papers and ballot question petitions, printing ballots for each of the cities and towns, and certifying the election results. Mass. Gen. Laws ch. 53, §§ 10, 19, 20, 21, 32, 48; Mass Gen. Laws ch. 54, §§ 25B, 40. We also maintain the statewide database of registered voters, print state voter registration forms and vote by mail ballot applications, and provide training to local election officials and voter registration agencies.

Mass. Gen. Laws ch. 51, §§ 17A, 36, 47C; Mass. Gen. Laws ch. 54, § 25B(a)(7)(i). The Secretary's office is required by state law to send vote-by-mail applications to each registered voter 45 days before each regular state or federal primary or election. Mass. Gen. Laws ch. 54, § 25B(a)(7)(i). Before each biennial state election, this office is required by the state constitution and state law to prepare and send to every voter in the Commonwealth an "Information for Voters" booklet containing information regarding the statewide ballot questions. *See* Mass. Const. Amended Art. 48, Pt. IV; Mass. Gen. Laws ch. 54, §§ 53, 54. Local election officials are responsible for registering voters, voter list maintenance, conducting early voting, processing vote-by-mail applications, mailing ballots to voters, preparing voter lists, appointing poll workers, and tallying votes, among other things. Mass. Gen. Laws ch. 51, §§ 37, 37A, 42H, 60; ch. 54, §§ 11, 12, 105, 112.

7. In my role as Director and Legal Counsel for the Elections Division, I am responsible for overseeing day-to-day activities including responding to inquiries from local election officials, candidates and the public. We promulgate regulations in furtherance of state laws, issue guidance to local election officials and provide both online and in-person training on election administration to local election officials. Whenever there is a new law or regulation, either state or federal, the Secretary's office issues advisories and training to local election officials about changes to existing processes or the implementation of new procedures or requirements. Consistent with our longstanding practice, in 2026 we have provided training to local election officials on list maintenance, including making voters inactive and sending confirmation notices, certification of names on nomination papers and petitions, processing vote by mail applications, training poll workers, and early voting.

8. The Massachusetts Constitution provides for and protects the right to vote for qualified residents. Mass. Const. Pt. I art. 9, amends. art. 3; *see Chelsea Collaborative, Inc. v. Sec'y of Commonwealth*, 100 N.E.3d 326, 330 (Mass. 2018). To be qualified to vote, Massachusetts residents must be citizens, eighteen years of age or older, and not be under guardianship, incarcerated for a felony conviction, or disqualified, and must be a resident of the city or town in which they seek to vote. Mass. Gen. Laws ch. 51, § 1.

9. My office and local election officials statewide are currently preparing to administer the September 1, 2026, primary election and the November 2026 general election, including the preparation of training materials, guidance documents, communications to local election officials, and scheduled training sessions. Federal, state, and local races will be on the ballot. For the 2026 state primary, this office has already mailed vote-by-mail applications to each registered voter who had not yet applied for a mail ballot for the state primary, which was over 4 million voters. As required by state law, immediately after the state primary, this office will send vote-by-mail applications to any registered voter who has not applied to vote by mail for the November election. We expect this mailing to be sent to over 3 million voters. Upon receipt of a vote-by-mail application, the local election officials verify the voter's registration and then enter them into the vote-by-mail module in our statewide database, which tracks the date the application is received, the date the ballot is mailed, and the date the ballot is received, as well as the ballot's disposition. We have also provided local election officials with mail ballots and envelopes. We have also already produced and delivered to local election officials a supply of envelopes to cover both the state primary and general election to be used by voters to return their completed ballots, which are postage prepaid and pre-addressed to the appropriate election official.

10. While the September 1st primary election is rapidly approaching, the November 2026 general election is effectively already underway. As of August 24, 2026, local election officials have already received 747,715 requests for mail ballots (including 10,924 requests for absentee ballots) for the November general election. Each application must be reviewed, approved or rejected and entered into the statewide database, as well as the many others that will continue to come in over the coming weeks, according to applicable requirements under state and federal law.

11. As described below, Massachusetts provides a mail ballot to all eligible voters who request one. Mass. Gen. Laws ch. 54, § 25B(a)(1)-(2); *id.* (a)(7). Other qualified Massachusetts citizens can apply for and receive absentee ballots. Mass. Gen. Laws ch. 50, § 1; ch. 54, § 86. Massachusetts sends these ballots to voters through the United States Postal Service ("USPS").

12. In Massachusetts, ballots are mailed by local election officials in each of Massachusetts's 351 municipalities. Mail ballot envelopes are designed by the Secretary's office and must conform with state law, which requires the ballot return envelope be postage pre-paid and pre-addressed to the local election official. Mass Gen. Laws ch. 54, §§ 25B(g), 91B. Mail ballot envelopes are not required by Massachusetts law to include Intelligent Mail barcodes. Local election officials begin mailing ballots to eligible voters at least 30 days before the election.

13. Local election officials continue to send mail ballots as additional voters register to vote or request an absentee or mail-in ballot, up to 5 business days before the election.

14. Massachusetts allows no-excuse early voting by mail, meaning any qualified voter can request and cast a mail ballot. Mass. St. 2022, ch. 92, § 10; Mass. Gen. Laws ch. 54,

§ 25B(a)(i). Massachusetts law provides that qualified, registered voters have a right to vote by mail and a right to request and thereafter receive a mail ballot application. Mass. Gen. Laws ch. 54, § 25B(a)(1)-(2); *id.* (a)(7) (requiring the Secretary of the Commonwealth to mail registered voters a mail ballot application upon request).

15. The process for absentee voting is similar to early voting by mail, but the applicant must have a reason – for example, they are unable to go to the polls on election day, a religious belief prevents them from voting in-person, or they are unable to vote in-person because of a disability. To vote absentee, the voter first must submit an application. Mass. Gen. Laws ch. 54, §§ 25B(a)(1), 89, 91, 91A. After verifying the voter's application, the local election official mails the voter a ballot, instructions, inner envelope on which an affidavit is printed and an outer mailing envelope, which is postage prepaid and pre-addressed back to the local election official. Mass. Gen. Laws ch. 54, §§ 25B, 91B. Voters can request to have their ballot mailed to the address at which they are registered or any other mailing address. *Id.* § 25B(a)(6). Ballots are mailed by local election officials on a rolling basis beginning approximately 30 days before any state or federal election.

16. When voting by mail or absentee, a voter places the completed ballot in an envelope on which an affidavit is printed which advises the voter of criminal penalties for illegal voting and must be signed under penalty of perjury. Mass. Gen. Laws ch. 54, §§ 25B(a)(1), 92; ch. 56, § 26. The voter then places the sealed affidavit envelope within an outer mailing envelope, which bears the USPS "official election mail" logo and is marked "ballot enclosed," and can either mail it to their local election office, submit it at an early voting location or the office of the local election official, or deposit it in a secure drop box. Mass. Gen. Laws ch. 54, §§ 25B(a)(13), 92; 950 Code Mass. Regs. 47.06 (1)(b); 47.10 (2), (5). Once received, the

elections official examines whether the affidavit is properly executed and whether the voter's signature matches the one on their application. Mass. Gen. Laws ch. 54, §§ 25B(a)(10), (14), 94; 950 Code Mass. Regs. 47.10 (5)(a). The ballot is rejected if the affidavit or signature is defective, and the voter is notified and sent a new ballot, time permitting. Mass. Gen. Laws ch. 54, §§ 25B(a)(10), (14), 94; 950 Code Mass. Regs. 47.10 (5). Once a mail ballot is accepted, the ballot is considered cast, and a voter may not vote in-person either early or on Election Day. 950 Code Mass. Regs. 47.10 (7). Accepted mail ballots remain sealed and secured until counted. *Id.* 47.14 (3)–(4); 47.15 (3)–(4).

17. State law requires the Secretary's office to provide local election officials with return ballot envelopes to be sent to voters. Mass. Gen. Laws ch. 54, §§ 25B, 87. The envelopes are required to be postage pre-paid and pre-addressed to the appropriate election official. To do this, the Secretary's office worked with USPS to create a business reply mail master account and then 351 sub-accounts for each of the local election offices. The envelopes for each municipality were designed in accordance with postal specifications and submitted to the USPS Mailing and Shipping Solutions Center (MSSC) Mailpiece Design Analyst Help Desk for approval and for them to apply the appropriate coding to ensure appropriate delivery through their automated systems. Any time the address of a local election office is changed, the envelopes must be resubmitted for updated artwork. This has already occurred multiple times in 2026. In some cases, it took over a month for updated design submissions to receive final approval; in at least one case, USPS provided incorrect envelope design files and coding, further delaying the process. The first design file they produced had the incorrect address. The second design file overlayed the new design onto the old design, resulting in a double image, which was unusable.

18. Local election offices in Massachusetts have already been experiencing other kinds of delays and difficulties with USPS processing election mail. For example, one municipality informed my office that it twice mailed a set of ballots to its resident voters, only to have the ballots twice returned by USPS to the municipal election office, without any labeling or indication of an error (such as "return to sender" or "addressee unknown"). We have also received reports of errors and issues with USPS billing for election mailings, including municipalities being incorrectly charged to the wrong accounts (which would deplete their limited resources), and state accounts being charged twice—once at a processing facility, and then again at the local post office.

19. Massachusetts law has codified the Uniformed And Overseas Citizens Absentee Voting Act ("UOCAVA") absentee voting procedure. Mass. Gen. Laws ch. 54, § 91C. The State's law permits any UOCAVA voter to apply for an absentee ballot and requires that the relevant federal form "shall be accepted" by the State's Secretary; that upon receipt of a properly executed application, a clerk "shall" expeditiously transmit the ballot; and that the Secretary "shall provide" clear instructions for return of the ballot. *Id.* Under federal law, ballots must be transmitted to UOCAVA voters at least 45 days before any federal election. 52 U.S.C § 20302.

20. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026.

21. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule is causing and will imminently cause significant harm,

confusion, and disruption in Massachusetts election administration, and will impose unrecoverable costs on the Commonwealth and its municipalities.

22. For the reasons discussed throughout this declaration, I must act now to align Massachusetts's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

23. Our municipal election officials, who are currently administering early voting and preparing for our September 1st State Primary, have already begun contacting us with questions about their legal responsibilities as well as technical questions about IMbs and uploading vote by mail voter data. Voters who have already applied to vote by mail have also contacted us expressing concern about providing their information to USPS and have inquired about canceling their applications, while also noting they may not be able to vote otherwise.

24. It is my understanding that the Rule requires that every voter who will receive an absentee or mail ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process

above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In Massachusetts, we would have to provide that information by no later than October 4, 2026 (30 days before the election), and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

25. These requirements impose significant financial costs on my office and threaten to disenfranchise a substantial number of voters in Massachusetts.

26. I have concerns about the feasibility of USPS implementing this system in a timely and accurate fashion in the limited time remaining before the November 2026 general election. It is unclear at what point in the mailing process USPS will be comparing the envelopes containing ballots to the USPS Mail Ballot List. Given changes to the processing of mail in recent years, some mail pieces are sent out of Massachusetts for processing—including to sorting facilities in New Hampshire, Connecticut, and Rhode Island—before being delivered to the addressee in Massachusetts. We have consistently seen delivery issues and delays with election mail. A December 10, 2024, report from the USPS Office of the Inspector General found that election mail was not properly processed on multiple occasions at the Boston

Processing and Distribution Center before the 2024 election.[1] Adding another layer of review will likely delay mail delivery even more. Technological or implementation failure may lead to the inability of Massachusetts to deliver mail ballots to voters and conduct the election in accordance with state and federal law.

27. As a result of the Rule, my office must immediately prepare and update guidance for local elections offices to ensure a consistent approach across Massachusetts's 351 municipalities. This guidance would have to address topics such as using the USPS portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protection and how to apply an Intelligent Mail barcode. Local election officials do not currently have the technical capabilities within their offices to apply Intelligent Mail barcodes to the ballot envelopes—either outgoing or inbound. These preparations and updates will require significant time, personnel, and money.

28. Massachusetts anticipates mailing ballots to approximately 1 million voters during the 2026 general election beginning in mid-September.

29. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all voters who request mail ballots with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. Many voters will update their registration address or request that their ballot

[1] Efficiency of Operations at the Boston Processing and Distribution Center, Boston, MA Audit Report, Rep. No. 24-153R25, USPS Off. of Inspector General (Dec. 10, 2024), *available at* https://www.uspsoig.gov/sites/default/files/reports/2024-12/24-153-r25.pdf.

be mailed to a different address in the time leading up to the election. It is unclear how any updates would work with the USPS Mail Ballot List if their original information was entered by a different jurisdiction.

30. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[2] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS all at once. As applications are received and processed daily, and as ballots are mailed out daily, elections officials would have to enroll voters separately for each processing session. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot or if the election jurisdiction is smaller. Elections officials will not only be required to process these registration updates within our statewide database, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information. It also seems unlikely that USPS will offer adequate training or technical support.

31. State law allows a voter to spoil an unvoted mail ballot and request a new ballot up to 5 business days before an election. To ensure that voters receive these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

[2] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

32. Based on what information is available, I estimate that it will take approximately hundreds of hours for elections staff to become authorized users of the USPS Ballot Portal and enroll all voters, assuming there are no delays caused by technical or processing difficulties. As noted above, local election officials do not currently have the technology to apply IMbs to ballot envelopes. As this process will be entirely new, it will require significant training and may require additional equipment. In addition to learning how to apply IMbs, the local election officials will need to record and track which IMb is applied to which ballot envelope for each voter and then somehow enter that information into the USPS system, which I expect will take the longest time to prepare. But technical and processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Massachusetts exponentially. And if the system fails, Massachusetts may be unable to mail ballots to voters at all.

33. Further, we don't know the specifications of the USPS technology, and therefore we don't yet know if the data format from our system would be compatible with the USPS system. For example, if a bulk upload option is available to enter data into the USPS system, we may be able to export some of the data from our statewide database, into which local election officials are required to input vote-by-mail data, but that option may not be available, or we may not be able to use that option depending on the data fields available. Local election officials enter the date the voter's application is received, the date the ballot is mailed to the voter, and the address to which it is being mailed if different than their registration address, the date the ballot is received back, the method of return delivery, and the ballot's disposition. If a ballot is rejected for any reason, they must notify the voter and, if time permits, mail the voter a new ballot. This

data is entered on a rolling basis by each of our 351 local election offices. The database does not have the capability to capture and store IMbs and there is not sufficient time to modify the database to do so. As such, even if the voter data can be exported from our statewide database, the IMbs will need to be manually captured and updated for each voter's ballot envelopes. At this point, we would not be able to make any changes to our statewide database to add fields or to report different information. Changes to the database require an average of six-month lead time for planning, coding, testing and release.

34. In Massachusetts, USPS is the only way in which some voters receive a ballot. As a state in the northeast, we have a population of voters who travel to warmer climates during the fall and request that their ballots be mailed to them. Attempting to use another mail service provider such as Federal Express or UPS would be cost prohibitive. Access to mail-in voting is especially important for low-income, rural, and vulnerable populations, including voters with disabilities, who may lack access to transportation to either vote in-person or receive and return their ballot through some other means.

35. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the

essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

36. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

37. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The

threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

38. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

39. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely

address appeals related to rejected election mail. We already have experience with USPS delays and missteps in the procedures they've been using for years, which only gives us more concern that adding new procedures and requirements can only lead to further delays in processing. The stakes are incredibly high, and any systemic errors, technological difficulties, or improper staffing threatens to disenfranchise voters at a massive scale.

40. As a result of the Rule and to mitigate the impact of all this uncertainty and turmoil, Massachusetts will have to devote significant time, personnel, and money to updating training materials for local elections officials and their staff. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and to process election mail. This is yet another aspect of the Rule that will necessarily divert at least half of our team's resources from other important election administration tasks and will likely require hiring temporary staff to assist.

41. It is my understanding that the Rule requires that any mail containing a mail or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

42. These requirements of the Rule necessitate immediate action from me and my team in the Office of the Secretary of the Commonwealth, Elections Division.

43. We anticipate local election officials will mail approximately 1 million ballots to voters during the 2026 general election.

44. Our agency/local elections officials have consistently relied upon election mail guidance from USPS to design and mail ballots, and relied on that guidance in preparations that have already been taken for the November 2026 general election.

45. Massachusetts has already ordered and had printed and delivered to local election officials mail ballot envelopes for the 2026 federal election cycle, at a cost of approximately $3 million. If changes are necessary to the envelopes to comply with the Rule, it is unclear whether we would be able to have new envelopes timely printed and what funding source would be available. If we have to submit envelopes for all 351 cities and towns to USPS for review and updates, it seems unlikely that USPS would be able to review and approve or update in sufficient time to make changes and have new envelopes printed and delivered. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71.

46. As already noted, Massachusetts and the 351 municipal election officials do not currently use Intelligent Mail barcodes on ballot mail. The Rule specifies that all outbound ballot mail must be mailed in an envelope that is automation-compatible and bears a unique Intelligent Mail barcode, or successor USPS technology, that facilitates tracking and is consistent with the other requirements of the Rule. It is unclear whether this requires our office to apply the barcode or whether that requirement will fall on our local election officials. If it is the latter—which seems more likely, as local election officials in Massachusetts create and print mailing labels that are applied to the envelopes, and then are the senders directly handling mail ballots—the local election officials will require additional resources both technologically and for staff capable of

performing such tasks. This would seem to include obtaining and downloading specific new computer software to create and apply the barcodes, which would present significant cost, logistical, technological, and security challenges. While a few local election offices may have (or be able to obtain) the necessary resources and capabilities to accomplish this, most will not. In 2024, twenty-seven (27) municipalities in Massachusetts mailed less than 200 ballots to voters. To require these municipalities to purchase equipment capable of applying an Intelligent Mail barcode would likely deplete their municipal budgets. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, but that tool is only available for mailings with fewer than 50,000 pieces of mail.[3] The City of Boston, being the largest municipality in the State, would not be able to use that tool for election mail. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes, do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47.

47. Currently, my office submits ballot envelopes for Massachusetts's 351 local election offices to USPS for design review to help them, as explained in further detail above in paragraph 17.

48. In Massachusetts, the ballot envelopes used by voters to return their ballots must be different for each municipality. I am deeply concerned about the length of time it would take

[3] *See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

for USPS to conduct ballot design review for tens of thousands of jurisdictions across the country. As indicated above in paragraph 17, that review and approval process can typically take more than a month, and further delays can occur in even routine cases. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. Further, this assertion is directly contrary to our recent experiences when submitting envelopes for review. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Massachusetts's voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process. In addition, after the designs are approved, we still need to print the envelopes. In the quantities we print envelopes, our vendor has recently told us they need six weeks to construct, emboss and deliver new envelopes to our local election officials. USPS's

ballot design approval process will therefore delay us even further and jeopardize our ability to timely send out mail ballots. Or worse, if we are unable to get design approval quickly, it may be impossible to produce envelopes before the election that will be accepted even if we could comply with all other aspects of the Rule.

49. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law. It seems likely that the review by USPS will be done at a processing facility, which is not at the local post office, and in some cases is not even in Massachusetts, as noted above in paragraph 26. This will only add more time into the process for ballot mailings to arrive, be reviewed, and then returned, if necessary. And it will likely create even more risk of delivery issues and processing delays with election mail than USPS has already been experiencing, like those at the Boston Processing and Distribution Center before the 2024 election (see paragraphs 18 and 26 above).

50. Sending mail ballots in a timely fashion is not only required by state and federal law but is critical to ensuring that as many eligible Massachusetts citizens as possible can exercise their right to vote. In the 2024 general election, 1,203,106, or 34.2%, of Massachusetts voters voted by mail.

51. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent any mail voters from receiving ballots. Moreover, if

there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

52. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

53. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. Following the Proposed Rule, my office received multiple inquiries from voters and local election officials asking whether USPS would deliver ballots to and from voters. I anticipate additional inquiries from voters as a result of the Rule and even more from local election officials. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

54. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for Massachusetts voters who will have just voted by mail in the September 1st State Primary under existing state law with no impediments.

55. I estimate that such a public education effort would likely cost approximately $3 million, which is not currently budgeted for.

56. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and harm my office's reputation in a way that is difficult to reverse.

57. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 primary and general elections.

58. My office and local elections officials currently are preparing to administer the Massachusetts primary election on September 1, 2026. As of August 24, 2026, local election officials have mailed 693,476 vote by mail ballots to voters. Mailing ballots to voters will continue over the next few weeks. Official ballots have already been delivered to local election officials who are now scheduling testing of their voting equipment. Early voting in person began on August 22nd and will end on August 28th.

59. In addition to preparing for our primary election, our office and local election officials must begin mailing ballots for the 2026 general election soon after the primary. Consistent with federal law, local election officials must mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). In addition, state law requires that local election officials begin mailing vote-by-mail and absentee ballots to all other eligible voters approximately 30 days before the general

election, or by October 4, 2026. Mass. Gen. Laws ch. 54, §§ 25B, 91B. Local election offices will continue mailing ballots on a rolling basis. The deadline for Massachusetts voters to apply for an absentee or mail ballot is five (5) business days before the election, so ballots continue to be mailed until all valid applications have been processed. Mass. Gen. Laws ch. 54, §§ 25B(a)(2), 89.

60. Additionally, my office will need to continue to register those who are eligible to vote in Massachusetts. Massachusetts allows qualified individuals to register up to 10 days before Election Day. Mass. Gen. Laws ch. 51, § 26; 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Massachusetts allows citizens to register online, at their local election official's office, at various state social service agencies, and are automatically registered through Massachusetts Registry of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) as part of their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

61. In compliance with the NVRA "quiet period" for voter registration, Massachusetts does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Massachusetts does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, the voter has died, or the local election official receives confirmation that the voter has re-registered in another jurisdiction.

62. In sum, local election officials must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

63. Between now and the general election, our Office and Massachusetts's municipalities will undertake significant work and preparation for the November general election. Immediately after the primary results are tallied, my office will begin the process of creating and proof-reading the ballots for the November election. This process is extremely labor intensive as there will be over 500 ballot styles including over 1,000 candidate names, nine (9) statewide ballot questions and other questions in certain districts and municipalities. We already have trainings planned for local election officials as well. Local election officials will continue to receive voter registration and vote by mail applications as well. Additionally, local election officials will be finalizing their lists of poll workers and assignments, training those poll workers, conducting in-person early voting and testing voting equipment.

64. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task – especially if multiple elections offices are trying to mail at or around the same time, because only certain USPS facilities can accept Outbound Federal Ballot Mail. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to

"confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters. This includes important training for local election officials as well as proof-reading and preparing ballots and other election related materials.

65. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible and inconsistent with state law. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible

to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (March 31, 2026). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. The Executive Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). And more recently, in a letter to the Secretary of the Commonwealth dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

66. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

67. I am worried that I and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Massachusetts's registered voters are not citizens or not qualified to vote in Massachusetts.

68. I know that the threat of potential prosecution is on the minds of state and local elections officials like me. I recently attended a meeting of local election officials who expressed concern that simply issuing mail ballots according to state law—to duly registered voters in Massachusetts—could result in their arrest. We already have seen a recent exodus of experienced

local election officials and I worry that this could become a bigger problem in the future as people may not wish to take on the risk.

69. Should the U.S. DOJ initiate any such prosecutions or enforcement actions, this office would be required to divert significant time and resources not only to respond to such legal action, but also to educate the public, with the aim of minimizing voter confusion to the extent possible. Through my years of experience in the Office of the Secretary and the Elections Division, I know that responding to, defending, and managing lawsuits against the agency and/or its personnel—especially in an election year—takes up a tremendous amount of our limited time and resources. Public information, outreach, and education campaigns are similarly time consuming and resource intensive, but may be especially critical to combat voter confusion and misinformation in an election year. If agency employees or other public officials were forced to personally defend themselves against potential or actual criminal charges, it would make my office's work immeasurably more difficult by creating a climate of fear and reticence, lowering morale, and discouraging public officials from forthrightly discharging their duties as required under state law.

70. Any such legal proceedings would have severe and adverse consequences for the public's trust in administration of elections in Massachusetts. This office provides critical public information on the laws, regulations, and procedures governing the election process in Massachusetts. It has a strong interest in maintaining its public goodwill and reputation for administering elections with integrity. The successful administration of elections depends on the public's trust and confidence in the process and the information they are provided. Lawsuits, criminal investigations or prosecutions, and other legal proceedings that target or unduly affect this office's nonpartisan work in administering and preparing for the 2026 election would

damage the public's trust that elections in Massachusetts (in 2026 and beyond) will be conducted fairly and free of improper political interference. That would directly undermine the interests of this office, the Commonwealth, and the public in ensuring that state and federal elections are administered in a way that maximizes the public's confidence in their integrity, and minimizes confusion, doubt, and uncertainty about the process.

71. In conclusion, I estimate that the requirements of the Rule will require an increase of at least $5 million to the Office of Secretary of the Commonwealth's budget, which would have to be requested from the Legislature. Further, this amount does not include the expenditures and costs that will be imposed on local election offices in Massachusetts's 351 municipalities. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. With our most recent fiscal year budget, we were underfunded from our original request. We requested $41 million in funding for the Elections Division, an estimate based on past election spending with increases for paper costs and inflation. The final budget passed was only $30 million. The Rule will increase financial strain on my office and necessitate a higher budget. I will either need to go back to the Legislature and ask for additional funds, which I am far from assured to receive, or will need to identify equivalent cuts elsewhere in my office, a very difficult and maybe impossible task.

72. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Massachusetts's elections run smoothly and every eligible Massachusetts voter can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of

questions and handle tasks related to, for example, processing vote by mail applications, logic and accuracy testing, and voter challenges.

73. Each of these tasks and costs will divert scarce resources from other important election administration needs. We will need to supplement our staff to be able to answer inquiries from local election officials and the public in addition to doing more public outreach as to the implications. These will distract from the planned activities of training local election officials on election administration and general voter education about voting and the multiple ballot questions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Boston, Massachusetts.

Michelle K. Tassinari

Michelle K. Tassinari, Esq.
First Deputy Secretary
Director and Legal Counsel, Elections Division
Office of the Secretary of the Commonwealth