**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. _______________ |

## DECLARATION OF MARK WLASCHIN

I, Mark Wlaschin, declare as follows:

1. I am a resident of the State of Nevada. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Nevada Secretary of State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Deputy Secretary of State for Elections in Nevada. I work for the Secretary of State and support him in his official capacity as the Chief Officer of Elections for the State of Nevada. In my role, I assist the Secretary in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Deputy Secretary of State for Elections for over five and a half years (since October 2020). I have worked at the Nevada Secretary of State for six and a half years (since October 2019), previously serving as the Deputy Secretary of State for Operations at the Nevada Secretary of State from October 2019 to October 2020. Before working for the Nevada Secretary of State, I served over 20 years in the United States Marine Corps. I earned a

BA in History from the University of South Carolina, an MBA in Strategic Leadership from New England College, and I am certified as a Project Management Professional.

4. Nevada and its subdivisions are responsible for administering elections in Nevada. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5. The Nevada Secretary of State is the State's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the State, which must be liberally construed to ensure that all electors have an opportunity to participate in elections. *See* Nev. Rev. Stat. 293.124; 293.127. The Elections Division of the Office of the Secretary of State is responsible for implementing the Secretary's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. *See* Election Procedures Manual, Chapter 2: Administration of Elections (Jan. 2025), https://www.nvsos.gov/elections/election-resources/elections-procedures-manual.

6. In my role as Deputy Secretary of State for Elections, I am responsible for overseeing the Secretary of State's Elections Division, and thus I am responsible for the team of election officials who ensure the correct and legal administration of election processes in Nevada and implementation of state and federal election laws and procedures. In my role, I develop binding election-related regulations on a biennial basis and routinely provide non-binding guidance to election officials across the State. I also oversee implementation of election administration-related projects, processes, training, and public communications materials.

7. I am extremely familiar with the system and administration of elections in Nevada, including, as relevant here, voter registration requirements, list maintenance, mail in

voting, and the statewide voter database. I am directly involved in our State's work to implement state and federal law regarding voter registration and voting, as well as our continuing work to implement and improve Nevada's transition to a "top-down" statewide voter database--including changing from a daily multi-county upload and compilation process to a common voter registration database that updates in real time--as we prepare for the 2026 midterm elections. To implement this transition, Nevada has invested more than $60 million in the Voter Registration Election Management System, which is a centralized statewide voter registration database that supports the connection of election management systems located in counties throughout the State, as well as additional resources in the Secretary of State's cyber security infrastructure.

8. In administering and enforcing federal and state election law, the Office of the Secretary of State works with election officials in Nevada's 17 counties. Our office is working year-round, every year, to collaborate closely with the county and city election officials to conduct voter registration list maintenance pursuant to state and federal law; discuss the election cycle with county and city election officials so as to capture and address their lessons learned from the previous elections cycle; inform the public about elections processes and procedures, take cyber- and physical-security measures, and implement other ongoing enhancements; review and refine training plans and classes for state, county, and city election officials in preparation for our annual training conference; review and revise elections regulations spanning nine chapters of state law; review vendor contracts and, when necessary, submit requests for proposal and initiate the procurement process pursuant to the State Administrative Manual and other State purchasing requirements to ensure that the Nevada electorate is provided the best possible services and support throughout the electoral process; review and refine the voter experience relating to online applications, forms and templates, and other public-facing tools to ensure

Americans with Disabilities Act compliance and to increase accessibility for voters; and support the biennial legislative session by reviewing, on average, more than 50 elections-related proposed bill draft requests and providing fiscal, operational, and technical feedback relating to the possible implementation of each bill.

9. Our office and the counties are currently preparing to administer the November 2026 general election. Federal, state, and local races will be on the ballot. Our work unsurprisingly becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

10. Under Nevada law, the work leading up to the election also includes sending out mail ballots to every active registrant on the statewide voter registration list who has registered or updated their registration no later than 14 days before the election and has not opted out from receiving a mail ballot. *See* Nev. Rev. Stat. 293.269911. The counties send these ballots to voters through the United States Postal Service ("USPS").

11. Counties must prepare and distribute mail ballots for voters outside of Nevada no later than 40 days before the election, or on September 24, 2026. *See* Nev. Rev. Stat. 293.269911(6)(a)(2). They must prepare and distribute ballots within the State between October 5, 2026, and October 12, 2026 (on or after the 5th Monday before Election Day but not later than the 4th Monday before the federal general election). *See id*. 293.269911(6)(a)(1).

12. Counties continue to send mail ballots as additional voters register to vote because, again, Nevada law requires that ballots be sent to every active registrant on the statewide voter registration list who has registered or updated their registration no later than 14

days before the election—here, October 20, 2026—and has not opted out from receiving a mail ballot. *See* Nev. Rev. Stat. 293.269911.

13. I am familiar with the Notice of Proposed Rulemaking issued by USPS that was published in the Federal Register on June 2, 2026.

14. I am also familiar with USPS's recently adopted final regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule has already caused significant harm, confusion, and disruption in Nevada election administration, and its implementation will impose unrecoverable costs on Nevada.

15. For the reasons discussed throughout this declaration, I must act now to align the administration of mail voting in Nevada with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office will strive to ensure that eligible Nevadans are able to vote by mail, but the Rule imposes significant burdens and costs on doing so.

16. When the Rule was first published, I immediately reviewed it to determine the requirements and impacts. That assessment led to discussions with other members of the Elections Division, some county elections officials, and other State Elections Directors across the country. My staff and I had previously analyzed the President's second executive order relating to the conduct of elections and had previously discussed the implementation, but this Rule provided more clarity as to how it would be implemented. These discussions included how we would need to conduct voter education and outreach, technical requirements and implementation,

and procedural changes that would need to occur. Given the urgency of the possible timeline, these discussions took priority over other work that we normally have leading up to an election.

17. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must first be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. In Nevada, we would have to provide that information by October 4, 2026 (30 days before the election) or September 24, 2026 (the latest date counties may send ballots to out of state voters), and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date but before October 20, 2026 (14 days before the election). *See* Nev. Rev. Stat. 293.269911. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not first enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing and delivery even if the voter is fully eligible to receive a mail ballot under Nevada law.

18. These requirements impose significant financial costs and administrative burdens on my office and threaten to disenfranchise Nevadans who are fully eligible to vote and entitled

to receive a mail ballot under existing Nevada law. Particularly given the short time frame before the midterm election, I am concerned that USPS will not be able to implement the Final Rule's system in an accurate and technologically secure way. Any lag, omission, or error in Nevada's upload or USPS's creation of the USPS Mail Ballot List—whether from an untested database, human error in formatting the data, or simply the volume of records involved—will mean many of Nevada's duly registered voters would not receive their ballot.

19. Such disenfranchisement violates Nevada's sovereign interest in ensuring that every eligible voter is able to vote. *See* Nev. Rev. Stat. 293.127(1)(a). The Rule's requirements also conflict with election officials' duty under Nevada law to automatically mail a ballot to every active registrant on the statewide voter registration list who has registered or updated their registration no later than 14 days before the election and has not opted out from receiving a mail ballot. *See* Nev. Rev. Stat. 293.269911.

20. As a result of the Rule, my office must immediately prepare and update guidance for local elections offices to ensure a consistent approach across Nevada's 17 counties. This guidance would have to address topics such as using the USPS portal; ensuring timely enrollment as voter rolls change leading up to the election; how to navigate unique voter use-cases such as voters who are part of the State's Confidential Address Program, preregistered voters, or qualified electors who register to vote pursuant to Nevada's Same Day Voter registration laws in the last 30 days leading up to the Election; cybersecurity protections; testing and implementation timelines of the system itself; and informing voters about the new USPS program. These preparations and updates will require significant time, personnel, and money.

21. Nevada law requires that counties will mail ballots to approximately 2.1 million active registered voters during the 2026 general election during the period from September 14, 2026 to October 20, 2026.

22. In my experience, implementing new election technology is highly complicated and takes time and testing to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all 2.1 million voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. Nevada is a very transitory state and approximately 15% of voters update their mailing or residential address at least once every two years. These changes oftentimes happen in the last 45 days leading up to an election as state, county, and city election officials continue our voter education and outreach efforts which include reminders about updating voter registrations as we approach Election Day.

23. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Secretary of State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. See 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains

[1] Page citations to the Rule use the numbering from the preview document. See https://public-inspection.federalregister.gov/2026-17238.pdf.

only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added time-consuming burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information. Additionally, these individually sent ballots that originate from county offices cannot get an Intelligent Mail Barcode (IMB) emplaced upon the out-bound or in-bound envelopes as there is no way to print an IMB on an individual envelope, which would be in conflict with the requirements of the Rule.

24. State law allows a voter to spoil an unvoted mail ballot and request a new mail ballot up. To ensure that voters receive these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS, though they also risk not having an IMB depending on how they are created.

25. Based on what information is available, I estimate that it will take approximately 8 hours for all state, county, and city elections staff to become authorized users of the USPS Ballot Portal and an average of an additional 40 hours each to enroll all voters and then validate their enrollment, assuming there are no delays caused by technical or processing difficulties. Additionally, there would be approximately 2-8 hours of additional work each week as new voters register or existing voters updated their information and the USPS Ballot portal would need to be updated. Additional time would be spent on voter education and outreach as well, to help voters understand the new requirements and the potential risks from delays or noncompliance. Much of the specific instructions for state, county, and city election officials would have to be rapidly developed by State staff once the USPS Portal itself is created and the process by which we would enter information could vary wildly, depending on the system. The

more the USPS Ballot Portal is rushed into production, the worse it would be and the more work-arounds would be necessary to enter information accurately. Regardless, we'd need to create instructional information, checklists, and audits to ensure that it is all done properly and in a timely manner. All of this work would be critical to ensuring voters receive ballots and would be the highest priority over all other work. But technical and processing delays are common, especially when implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Nevada exponentially. And if the system fails, Nevada may be unable to mail ballots to voters at all, which would wreak havoc on the 2026 general election and leave Nevada election officials unable to administer federal and state elections using what is known as a "universal vote-by-mail" system, as required by Nevada law. *See* Nev. Rev. Stat. § 293.269911(1).

26. New voter registrations and updates to existing voter registrations continue up to the close of polls on Election Day. These changes, as they lead up to the last day to be sent a mail ballot (October 20, 2026) would have to be manually entered into the USPS Portal by county election officials. Even one missed update that does not get entered into the USPS Portal could result in a voter being disenfranchised.

27. With extremely rare exceptions, in Nevada, USPS is the only way in which voters receive a mail ballot. Prior to the 2020 election cycle, Nevada allowed any voter to request a mail ballot and many of the 17 counties had mail-ballot precincts in which all voters who lived in those precincts would be sent a mail ballot due to the remote nature of many Nevada residences statewide. During the global pandemic of the early 2020s, Nevada transitioned to universal vote-by-mail through legislative changes. USPS has historically delivered mail ballots to Nevada's

rural voters. While the sending of mail ballots through USPS has not been without its problems, those issues generally stemmed from limited funding, staffing issues, or other challenges that were experienced beyond just Nevada. Since our State's transition to universal vote-by-mail though, state and county election officials have greatly increased the frequency of our correspondence with USPS officials and have worked hard to strengthen relationships, support training of USPS personnel, and keep election officials appraised of changing USPS policies and procedures. We do this because there simply isn't another option. The use of commercial mail services such as FedEx or UPS would be cost prohibitive and could not be used as a one-for-one replacement for USPS services. In addition to the cost difference, the services provided by the USPS are not intended to make a profit, but rather only pay for themselves. UPS and FedEx are for-profit companies who would not provide the same level of service to remote rural locations, meaning that the mail delivery timelines and services would be worse for rural Nevadan voters. We have increased our voter education and outreach campaign focusing on the options available to voters; highlighting that they have the option of 2-weeks for in-person voting during the Early Voting period, 12-hours for in-person voting on Election Day, and certain universes of voters have the ability to use the Secretary's online portal called NV EASE. This system was originally created to support the voting needs of military and overseas citizens. It has since been legislatively expanded so that voters with a disability and Tribal voters who live on a colony or reservation may also use it. Access to mail-in voting is especially important for low-income, rural, elderly and vulnerable populations, including voters with disabilities, who may lack access to transportation to either vote in-person or to receive and return their ballot through some other means.

28. I am particularly concerned that USPS is only prepared for a seamless transition and that there is no contingency plan if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

29. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the hanges. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin

learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

30. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. To my knowledge, USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor, to my knowledge, has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

31. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days' advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in

election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

32. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states, Washington, D.C., and the five territories in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale and, in turn, violate multiple provisions of Nevada's duly enacted election administration laws. *See, e.g.,* Nev. Rev. Stat. § 293.269911(1) ("the county clerk shall prepare and distribute to each active registered voter in the county and each person who registers to vote or updates his or her voter registration information not later than the 14 days before the election a mail ballot for every election"); *id.* § 293.127(1)(a) (Nevada's election laws must be construed so that "[a]ll electors, including, without limitation, electors who are elderly or disabled, have an opportunity to participate in elections").

33. As a result of the Rule, Nevada will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal and enroll voters

in the Portal. This is yet another aspect of the Rule that will necessarily divert approximately 21 staff from across the agency and Elections Division from other important election administration tasks.

34. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique IMB with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review. While Nevada already complies, there are unique situations where, for example, an IMB cannot be placed upon a ballot that is printed and mailed from the county office. This would need to be discussed and addressed to ensure compliance.

35. These requirements of the Rule necessitate immediate action from me and my team in the Office of the Secretary of State.

36. Our office anticipates county election officials mailing approximately 2.1 million ballots to voters during the 2026 general election.

37. Our office and local elections officials have consistently relied upon election mail guidance from USPS to design and mail ballots and have relied on that guidance in preparations that have already been taken for the November 2026 general election.

38. All Nevada counties currently submit ballot envelopes to USPS for design review. We would need to create a new formal process to create a timeline and how to document the request to the USPS (as well as receive its approval) so that county election officials could not be investigated or prosecuted if someone were to accuse them of failing to complete this step.

39. Additionally, I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of new jurisdictions that historically have

not submitted to such review. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Nevada voters. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

40. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law. *See* Nev. Rev. Stat. 293.269911(1).

41. Sending mail ballots in a timely fashion is not only required by state and federal law but is critical to ensuring that as many eligible Nevadans as possible can exercise their right to vote. In the 2024 general election, 44.99% Nevada voters voted by mail. This method of voting is particularly important for the many Nevadans who live in extremely remote areas, where entire counties have historically been mail-ballot-only precincts due to the vast distances between population centers. For example, in Eureka County, NV it is approximately a two-hour drive to go the 130 miles on the most common route between Crescent Valley (a population center in the north part of the county) and the town of Eureka (the county seat of Eureka County). That is, in part, because Nevada is the 42nd lowest population density state in the US and eleven of the largest 100 counties in the United States (by square footage) are located in Nevada, out of more than 3,100 counties in the United States.

42. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. The USPS Ballot Portal does not currently exist and has not

faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent ***any*** voters from receiving mail ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

43. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they will receive and be able to cast their votes on a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

44. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. Following the Proposed Rule, my office received numerous inquiries from voters asking whether USPS would deliver ballots to and from voters. I anticipate more inquiries to be received from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election, or focusing on other important outreach topics such as the signature cure process, voter list maintenance, and other items that would help increase voter confidence as we approach Election Day.

45. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for Nevada residents, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law with no impediments, including as recently as Nevada's June 9, 2026, primary election. In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion. This Rule inevitably will cause voter confusion, which in turn will cause significant burdens on state and local election officials' time. This voter confusion will come at a crucial time, shortly before the election, when elections officials' limited resources are particularly stretched

46. I estimate that such a public education campaign would likely cost approximately $450,000 to $650,000 from our Voter Education and Outreach budget. This would cover a portion of the cost to communicate with voters via text, email, social media, newspaper, commercials, and other ways to begin the process of informing them about these changes and who to contact for more information. The nature of the changes and nuance required to understand every situation are complex enough that no single communication would be effective in a standalone format, so multiple formats would be needed. Additional funding from the current Voter Education and Outreach budget would be needed to translate those materials into other languages as well, including at least Spanish, Filippino, and Shoshone, as are required by federal law, potentially taking as much as 25-50% of the remaining Voter Education and Outreach budget. Finally, the agency travel budget would need to be reviewed and assessed to determine how best to support in-person outreach to many of Nevada's population centers to further maximize the effort to inform voters.

47. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to harm the reputation of my office, even though the federal government is solely responsible for the Rule's changes. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

48. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

49. Counties must begin mailing sample ballots and mail ballots for the 2026 general election in the coming weeks. Consistent with state and federal law, county election officials must mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. § 20302(a)(1)–(3), (8)(A); *see also* Nev. Rev. Stat. § 293D.320. In addition, state law requires that counties must prepare and distribute mail ballots for voters outside of Nevada no later than 40 days before the election, or on September 24, 2026. Nev. Rev. Stat. § 293.269911(6)(a)(2). They must prepare and distribute ballots within the State between October 5, 2026, and October 12, 2026 (on or after the 5th Monday before Election Day but not later than the 4th Monday before the federal general election). *Id.* § 293.269911(6)(a)(1). Counties will continue mailing ballots through at least October 20, consistent with state law.

50. Additionally, my office will need to continue to register those who are eligible to vote in Nevada. Nevada allows qualified individuals to register up to Election Day. *See* Nev. Rev. Stat. § 293.5847; 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Nevadans can register to vote online, at their county clerk's office, at various state social service agencies, and through Nevada's Department of Motor

Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

51. In compliance with the NVRA "quiet period" for voter registration, Nevada does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. § 20507(c)(2)(A), 3(A)-(B), 4(A). Per the statutory exceptions, Nevada does lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

52. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

53. Between now and November 3, we have extensive voter education and outreach to conduct, technical enhancements to our election systems that had been implemented since the June primary that must be reviewed to ensure they are functioning properly, Bill Draft Requests from Legislators that have already been pre-filed and that they have requested meetings to discuss, extensive county support including an "Election Simulation" in August, and not enough time to attempt to on-board new staff to address the requirements of the Rule if required.

54. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local

elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters.

55. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (March 31, 2026); *see also id.* § 5 (providing that "State or local election officials . . . [and] individuals involved in the administration of Federal elections; or public [] entities engaged in the printing, production,

shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under" various federal criminal laws). The Executive Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter to Secretary Aguilar dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

56. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

57. In conclusion, I estimate that all work necessary to implement the Rule, including voter education and outreach efforts, plus the development of training materials, and technical changes to our voter registration database and election management system, will cost at least $750,000. Given recent economic pressures across the State and country, I have been trying to keep my office's budgetary needs as low as possible. This Rule would result in my re-allocation of our outreach budget, shifting it from informing our voters about their existing rights under state and federal law, to this new requirement. The previously planned outreach efforts would still need to occur, but they would be done in a far less effective manner directly leading to more confusion and the disenfranchisement of voters across the State. Depending on the effectiveness

of that reduced outreach effort, I may need to request additional funds from the Nevada Legislature's Interim Finance Committee, which has discretion to approve or deny the dispersal of funds from the State Reserve for Statutory Contingency Account. But obtaining these funds is far from a sure thing, especially in the current economic climate.

58. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Nevada's elections run smoothly and every eligible Nevadan can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges. Implementing this rule will divert scarce resources from these other important election administration needs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 24, 2026, at Carson City, Nevada.

Mark Wlaschin
Deputy Secretary of State for Elections
Office of Secretary of State Francisco V. Aguilar