**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

*Plaintiffs,*

v.

UNITED STATES POSTAL SERVICE, et al.,

*Defendants.*

Case No. _______________

**<u>DECLARATION OF HILARY RUDY</u>**

I, Hilary Rudy, declare as follows:

1. I am a resident of the State of Colorado. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with staff at the Colorado Department of State, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Deputy State Elections Director in Colorado. I work for the Secretary of State and support her in her official capacity as the Chief Election Official for the State of Colorado. In my role, I assist her in the oversight, execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Deputy Elections Director in the Colorado Department of State (the "Department") since May 2013 and have worked in the state elections office in various roles since 2006. I hold a law degree from Thomas Jefferson School of Law, and an

undergraduate degree in Business Management from Colorado Mesa University, formerly Mesa State College.

4. The State of Colorado and its subdivisions are responsible for administering elections in Colorado. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks. The Colorado Department of State is responsible for supervising the conduct of elections in Colorado.

5. The Colorado Secretary of State is the state's Chief Elections Officer, responsible for executing and enforcing all state and federal law relating to elections within the state. *See* Colo. Rev. Stat. § 1-1-107 (2026). The Department of State is responsible for implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. Colorado law charges the Department with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. Colo. Rev. Stat. § 1-1-103(1).

6. Under Colorado's universal mail-ballot system, each active, registered voter receives a ballot through the mail in advance of the upcoming election. This has been the law since 2013, and Colorado voters are accustomed to receiving their ballots in the mail rather than voting in person. Voters may cast their votes on their mail ballot and return it by mail, in person at a Voting Service and Polling Center ("VSPC"), or at one of over 450 24-hour secure ballot drop boxes across the state. Of course, if a voter prefers to vote in person at a VSPC, they may do so. Colorado opens VSPCs for in-person voting 15 days before a General Election and eight days before a Primary Election.

7. Colorado prides itself on having a commonsense voting system that makes it easy for eligible voters to cast a ballot. As a result, Colorado consistently has one of the highest voter participation rates in the country, measured both as a percentage of active voters and as a percentage of the state's voting-age population. This success in making voting accessible for all eligible voters is a direct result of Colorado's mail ballot system. In most elections, more than 90% of voters vote using the ballot that was sent to them in the mail.

8. In my role as the Deputy Elections Director, I have many responsibilities, including overseeing: (1) the implementation of state and federal laws and regulations relating to Colorado's voting processes and procedures, including rules, guidance, and forms; (2) the management of the statewide voter registration system, including guidance and training, functionality development, and maintenance; (3) the development and implementation of training, guidance, and forms to implement state and federal voter registration laws, including those related to agency-based registration and third-party voter registration organizations; and (4) the training and certification program for local election officials in Colorado.

9. My office and Colorado's 64 counties are currently preparing to administer the November 2026 general election. For example, both my office and these counties are actively working to finalize the ballot content. Currently, eleven statewide ballot measures have qualified for the November ballot, and the Department of State is actively reviewing signature petitions for an additional four measures. Under Colorado law, the Department must review and approve or reject petitions associated with those measures no later than September 2, 2026. And the Secretary must certify the ballot order and content for the November general election on September 4, 2026. Federal, state, and local races will be on the November 2026 general election ballot in Colorado.

10. In addition, counties are actively preparing updated security and contingency plans for the November election, and those plans must be submitted to the Secretary no later than September 4, 2026.

11. Counties are finalizing election judge recruitment and may begin training those judges as soon as September 4, 2026.

12. Colorado will begin distributing ballots to voters in less than four weeks; ballots must be distributed to overseas and military voters by September 19, 2026, and that same day voters can request their mail ballot in person at a county clerk's office. Colo. Rev. Stat. §§ 1-8.3-110(1); 1-7.5-107(2.7)

13. At this point, it is too late in the ballot content process to change envelope and voter instructions artwork and designs. Counties have finalized the artwork and designs and have placed orders for ballot printing so that their vendors can print and prepare ballot packets ahead of the ballot mailing deadline. Meaning, no additional instructions to voters can be included on the envelope or inserted in the ballot packet, and Intelligent Mail barcodes (IMbs) cannot be added to envelopes.

14. As referenced above, Colorado mails a ballot to all active, registered voters. Colo. Rev. Stat. § 1-7.5-107(3)(a)(I). Colorado sends these ballots to voters through the United States Postal Service ("USPS") "consistent with United States postal service regulations." Colo. Rev. Stat. § 1-7.5-107(3)(a)(I).

15. In Colorado, ballots are ultimately sent to voters by the individual counties, although as a practical matter most ballots are delivered to a USPS mail processing facility for mailing by those counties' mail ballot printing vendors. Mail ballot envelopes are designed by counties, approved by the Department, and must conform with state law. Colo. Rev. Stat. §§ 1-

7.5-104.5(2)(a); 106(1)(a); 107(3)(b). At this point all counties' envelopes and instructions are reviewed and approved, and any change would require that they be resubmitted for approval by the Department. Colo. Rev. Stat. §§ 1-7.5-105(1.3)(d), 1-7.5-106(1)(a). Although fifty of Colorado's sixty-four counties, covering the vast majority of the state population, include IMbs on their outgoing ballots, Colorado law does not require IMbs. Only twenty-two of the fifty Colorado counties that use IMbs also include IMbs on their ballot return envelopes. Colorado counties will begin mailing ballots to eligible voters on October 2, 2026. Colo. Rev. Stat. § 1-7.5-107(3)(a)(I).

16. Colorado counties continue to send mail ballots as additional voters register to vote or update their registration, up to 8 days before the election, or October 26, 2026. Colo. Rev. Stat. § 1-2-201(4). In the 2024 general election, nearly 77,000 ballots were mailed to eligible voters between the date ballots originally needed to be mailed and the 8-day deadline, and 28% of those were processed at the 8-day deadline.

17. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026. The Department submitted a comment on the Proposed Rule expressing opposition and identifying specific concerns, including that the USPS lacked statutory authority to promulgate the rule, that the rule would disenfranchise Colorado voters, and that the mail ballot design provisions of the rule would be impossible for Colorado counties to satisfy. A true and correct copy of that comment letter is attached to this declaration as Exhibit A.

18. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal

Register on August 26, 2026. That Rule will imminently cause significant harm, confusion, and disruption in Colorado election administration, and will impose unrecoverable costs on Colorado.

19. For the reasons discussed throughout this declaration, the Department must act now to align Colorado's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested procedures on which the Rule relies, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

20. Already, the Department of State has taken action to respond to the Rule. We have contacted counties, including counties whose ballots do not currently contain IMbs, and have been forced to respond to a substantial increase in questions and concerns from county election officials and voters. The Department has contacted every county and begun the process of diverting our resources to help counties to implement the requirements of the Rule and to begin educating voters and responding to questions. We have also contacted USPS leadership in an effort to understand how the Rule will be implemented so that we can train county clerks and their staff to upload information to the USPS Ballot Mail Portal, respond to questions from the public, and prepare for the likely increase of in-person voters.

21. It is my understanding that the Rule requires that, to receive a mail ballot, every voter must be "enrolled" with USPS. To enroll voters, election officials or other authorized personnel must access the USPS Ballot Mail Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would

have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be submitting pieces for review simultaneously. In Colorado, we would have to provide that information by October 4, 2026 (30 days before the election) or October 2, 2026 (the date on which counties begin to distribute mail ballots), and we would thereafter have to update the information on a daily basis to include eligible voters who registered after that date or requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

22. These requirements impose significant financial costs on my office and on Colorado counties. In Colorado, counties pay 55% of all election-related expenses, with the state covering the remaining 45%. The requirements also threaten to disenfranchise voters in Colorado.

23. I do not believe that USPS can successfully implement this system in a timely and accurate fashion in the limited time remaining before now and October 2, 2026. The USPS has no experience or expertise in election administration, and in my experience, such a lack of

experience leads to mistakes. Any technological or implementation failure would prevent Colorado from being able to satisfy state law and send every registered, active voter a mail ballot. In many states, the list will be short enough that small mistakes make little difference. But as of August 24, 2026, Colorado has 4,037,260 active, registered voters. Each of those voters is entitled to a mail ballot under Colorado law, and a technological or implementation mistake affecting just 1% of that population would disenfranchise more than 40,000 voters. Given the compressed timeline, lack of institutional expertise, and nationwide effect, I am confident that there will be implementation errors.

24. As a result of the Rule, my office must immediately prepare and update guidance for local elections offices to ensure a consistent approach across Colorado's 64 counties. This guidance would have to address topics such as using the USPS Mail Ballot Portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protection, the use of IMbs on all mail ballot envelopes, and the Portal's interplay with Colorado's confidential voter program. These preparations and updates will require significant time, personnel, and money. To even begin to provide guidance, our office will need to fully contemplate how the USPS will implement this process and will require numerous conversations with USPS leadership and countless hours of staff time.

25. Colorado anticipates mailing ballots to more than 4,000,000 voters during the 2026 general election during the period from September 19, 2026, to October 26, 2026.

26. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Mail Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all four million voters with USPS will be a massive

undertaking. This task will be significantly complicated by the influx of registration updates and changes that election officials typically receive in the months, weeks, and days before any election. County clerks and their staff will need to enroll thousands of voters with the USPS in the month before the election.

27. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot necessarily enroll voters with USPS in bulk. Instead, election officials may need to enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when an election official mails a replacement ballot. Election officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—a system about which officials currently have no concrete operational information.

28. Based on what information is available, I estimate that it will take could take tens of thousands of hours for election staff across Colorado counties to become authorized users of the USPS Ballot Mail Portal and enroll all voters, assuming there are no delays caused by technical or processing difficulties. This estimate reflects that each voter's information will need to be added to the portal manually, or significant changes will need to be made to Colorado's

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

voter registration database. Colorado's statewide voter registration database, SCORE, does not currently include IMb data. But the Rule would require Colorado counties to upload to the Portal both the IMb applied to each voter's outbound mail ballot envelope *and* the voter's return mail ballot envelope. 9 CFR Part 111, Supplementary Information at 92. Even if local election officials could create outgoing and return IMbs for each voter, which is highly unlikely, that information would either need to be manually added to the Portal or manually added to SCORE. Either way, it would take tens of thousands of hours to update each voter's record to identify their IMbs alone. Moreover, because Colorado counties will need to be constantly updating the portal with new information during the election, I anticipate that Colorado will require multiple Ballot Mail Portal users in each of the 64 counties. Each of these users will require enrollment and training, and will need to update the Portal in addition to their daily work. The added training and workload associated with the Portal will significantly increase the personnel costs incurred by every county and the state. Without the details of how the Portal will work and the precise number of users who will be granted access, it is difficult to quantify the cost of implementing this process. Assuming that at a minimum, county staff would need to input the voter's name, address, and two IMbs (outgoing and return), the user would need approximately three minutes per entry (two minutes per voter to enter the information manually and approximately another minute for another user to check the entry for accuracy). If the Portal allowed bulk uploads, the workload from uploading ballots sent after the initial mailing would be extraordinary. In the 2024 general election, nearly 77,000 ballots were mailed out after the initial mailing, with over 20,000 sent in the week prior to election day. Using these numbers and the three minutes per voter estimate, county staff will spend around 3,800 hours enrolling voters with the USPS, with more than 1,100 of those hours falling at the final deadline to mail ballots.

Costs aside, it will be near impossible for counties to complete this work even if they each hired hundreds of temporary employees. Moreover, technical and processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties will increase the practical and financial burden on Colorado exponentially. And if the system fails, Colorado may be unable to mail ballots to voters at all.

29. Colorado counties are constantly processing new voter registration applications. Colorado voters can register in person, by mail, online, or at the state DMV. The ease with which Colorado voters can register—and the ensuing requirement that those voters receive a mail ballot so long as they are registered by October 26, 2026, means that Colorado counties will have to be continually updating the information it provides to USPS.

30. In Colorado, USPS is the only way in which the vast majority of voters receive a ballot. During the 2025 coordinated election, over 98% of voters voted their mail ballot. In 2024, 92% of voters voted their mail ballot. Nearly all, if not all, of those voters received those mail ballots via the USPS. Since enacting its universal mail ballot program in 2013, Colorado has worked with the USPS as a trusted partner to ensure that state and local election officials can comply with Colorado law requiring all active, registered voters to receive a mail ballot. Because Colorado anticipates sending over four million ballots in November, using a provider other than USPS—such as Federal Express or UPS—is not feasible both because of cost and because of differences in their operational practices. Colorado's mail ballot program is reliant on the USPS performing its statutory duty and delivering all mail to every Coloradan. Colorado's mail ballot program, facilitated by USPS, has been especially important for low-income, rural, and

vulnerable populations, including voters with disabilities, who may lack access to transportation to either vote in-person or to receive and return their ballot through some other means.

31. The state-specific USPS Mail Ballot List that USPS will provide to the Colorado Secretary of State does not address the problem of USPS withholding ballots from registered voters. The Rule states that USPS will provide the list "[o]n or about the date of the federal election," which will be far too late for either the Department of State or county election officials to feasibly review the list for errors and identify voters omitted from that list, much less remedy the omission or contact affected voters to ensure they are able to vote. Indeed, under the terms of the Rule, USPS may provide the list *after* the election is complete.

32. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

33. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will

soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

34. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize specific individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself will suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the

Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

35. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

36. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing, threatening to confuse and disenfranchise voters at a massive scale. Voter confusion has major consequences for the administration of an election. Voter confusion would result in a large volume of phone calls and

in-person visits to county offices and voter service and polling centers, straining those offices' resources during election administration. Voter confusion regarding the 2026 general election could also cause mistrust in election officials and election outcomes. Voters are accustomed to certain longstanding processes. When those processes change without voters fully understanding how or why, some voters will assume that the change was made to disenfranchise them. This impact is compounded by the current elections environment, in which voter concerns about election-related misinformation are substantial. This has affected voter trust and has led to harassment and even threats against election officials. As a result of the Rule, and to mitigate the impact of all this uncertainty and turmoil, Colorado will have to devote significant time, personnel, and money to update training materials for local election officials and their staff. Election staff would need to be trained on the USPS processes and technology, which at this time is entirely unknown. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Mail Portal, enroll voters in the Portal, and process election mail. This is yet another aspect of the Rule that will necessarily divert substantially more than half of our team's resources from other important election administration tasks.

37. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

38. The IMb requirements of the Rule necessitate immediate action from me and my team at the Colorado Department of State, and from local election officials across most of Colorado's 64 counties.

39. Colorado anticipates mailing more than four million ballots to voters during the 2026 general election.

40. The Department of State and county election officials have consistently relied upon election mail guidance from USPS to design and mail ballots, and they have relied on that guidance in preparations that have already been taken for the November 2026 general election.

41. All Colorado counties have already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of at least 1.2 million dollars. Counties relied on the USPS's existing guidance in ordering these envelopes and expending these funds. Counties will need to submit their envelopes to the Department for reapproval and to the USPS for a new design review to ensure compliance with the Rule. In fact, USPS confirms that counties that have already printed their ballot envelopes cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71.

*42.* 14 of Colorado's 64 counties currently do not use IMbs on ballot mail. And most of Colorado's counties do not include IMbs on the return envelopes that are included in the mail ballot packet sent to every active, registered voter. Unsurprisingly, population size is a factor in the adoption of Intelligent Mail barcodes; 71% of the counties in Colorado that do not use IMbs have a population of under 10,000 active, registered voters. Because these counties have fewer registered voters and more limited election resources, they do not have contracts with ballot print vendors that are capable of producing IMbs, nor do they have the funding to do so. These counties typically employ a single individual to administer elections and often manually print ballots, stuff envelopes, and mail ballots by hand. These counties likely would be unable to comply with the IMb requirement, and by extension, Colorado's requirement that they mail a

ballot to every active voter. Moreover, even in counties that do use IMBs, Colorado voters can request a mail ballot at a VSPC. No Colorado county could currently apply a unique IMB to mail ballot packets issued at one of the state's nearly 400 VSPCs. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, but that tool is only available for mailings with fewer than 50,000 pieces of mail.[2] Currently, twelve different Colorado counties have more than 50,000 active, registered voters. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes [that may have already been ordered], do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47. Since the USPS final rule was published, we have already heard from one of the vendors that prints ballot packets for Colorado counties that do include IMbs on both outgoing mail ballots and return envelopes that the Rule would require it to throw away nearly 500,000 existing ballot return envelopes. According to this vendor, even though those envelopes have IMbs, those IMbs are not unique to each voter because they are all being returned to the same location. A second vendor estimates that a similar issue might affect as many as 800,000 of its already-printed return envelopes. My understanding is that re-printing these envelopes would impose significant costs on Colorado counties and may not even be

---

*See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

possible depending on how widespread an issue this is and whether the vendors can procure sufficient paper.

43. In Colorado, as in much of the country, ballot envelopes vary by county. I am deeply concerned about the length of time it would take for USPS to conduct another ballot design review for thousands of jurisdictions. Although USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates an unnecessary chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design at this late stage in election preparation will seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Colorado voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local election officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process. As noted above, this will lead to substantial voter confusion and will result in a huge influx of complaints and questions from confused and frustrated voters to the counties and the Department.

44. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by mail-in ballot under state law. In such circumstances, Colorado election officials will be violating their obligations under Colorado law to provide every active, registered voter with a mail ballot. Colo. Rev. Stat. § 1-7.5-107(3)(a)(I).

45. Sending mail ballots in a timely fashion is not only required by state and federal law but is critical to ensuring that as many eligible Coloradans as possible can exercise their right to vote. In the 2024 general election, 92% of Colorado voters voted using their mail ballot. This method of voting is particularly important for the many Coloradans who live in rural areas of the state.

46. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Mail Portal does not currently exist and has not faced the test of election officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the USPS Ballot Mail Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or election officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving mail ballots.

47. Even if the USPS Ballot Mail Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can

cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot, and others will choose to vote in-person increasing the volume of in-person voters far beyond what Colorado's mail ballot system is designed to handle, increasing wait times and further discouraging eligible voters from voting.

48. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. Following the Proposed Rule, my office received many inquiries from voters asking whether USPS would deliver ballots to and from voters. As noted above, I anticipate a substantial increase in inquiries to our office and to the counties from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

49. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements and how they may impact a citizen's ability to vote by mail. This is particularly the case for Colorado voters, who have been used to automatically receiving mail ballots and being able to vote by mail under existing state law with no impediments for more than a decade.

50. I estimate that such a public education effort would likely cost millions of dollars. The Department of State does not currently have the revenue or spending authority to expend such a substantial sum and would have to significantly adjust its operations moving forward to accommodate this initiative. Additionally, the Department does not have sufficient time to successfully implement such a campaign, inevitably leading to voter confusion.

51. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local election officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harm that is difficult to reverse.

52. The harm that stems from the Rule is particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

53. Colorado counties must begin mailing ballots for the 2026 general election in the coming weeks. Consistent with federal law, counties must mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. § 20302(a)(1)-(3), (8)(A). In addition, state law allows Colorado counties to begin mailing mail ballot packets to active, registered voters on October 2, 2026, and requires counties to have mailed those mail ballot packets no later than October 9, 2026. Colo. Rev. Stat. § 1-7.5-107(3)(a)(I). Counties will continue mailing ballots through October 26, 2026, consistent with state law.

54. Additionally, Colorado counties will need to continue to register those who are eligible to vote in Colorado. Colorado allows qualified individuals to register up until close of polls on Election Day. Colo. Rev. Stat. § 1-2-202(1). Coloradans can register to vote by mail, online, at their county clerk's office, at various state social service agencies, and through Colorado's Department of Motor Vehicles. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

55. In compliance with the NVRA "quiet period" for voter registration, Colorado does not systematically remove voters from the rolls during the 90 days prior to a federal election

unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)–(B), 4(A). Colorado does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

56. In sum, staff in county offices must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required and limited by federal and state law. This will continue through the 2026 election.

57. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. Using the USPS's own estimates, it will take more than 66,000 hours to scan all of Colorado's more than four million mail ballots. If these preparations are delayed or not completed, it can have significant impacts on the conduct of the election and opportunities for voters. Diverting staff and resources from these critical activities

will most certainly result in ballot printing errors, insufficient training, understaffing in critical processes, and delayed reporting of election results resulting mistrust in the outcomes.

58. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supplementary Information at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supplementary Information at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (Mar. 31, 2026); *see also id.* § 5 (providing that "State or local election officials . . . [and] individuals involved in the administration of Federal elections; or public [] entities engaged in the printing, production, shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under" various federal criminal laws). The Executive

Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). USPS also made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supplementary Information at 60, 61. In a letter to the Colorado Secretary of State dated July 7, 2026, the U.S. Department of Justice specifically threatened to prosecute election officials if noncitizens cast any ballots.

59. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials is that noncitizen registration and voting are both extraordinarily rare.

60. I am worried that I and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Colorado's registered voters are not citizens. The threat of prosecution just for doing our job is already on the minds of state and local election officials like me. The last several years have already placed an enormous burden on state and local election officials, and I worry about Colorado's ability to find qualified staffers and volunteers who are willing to take on the risks of serving in those roles. I understand that many at the Department and individuals at the counties have been the recipients of death threats merely for doing their jobs consistent with applicable law. The threat of prosecution could even further

reduce morale and significantly deplete an already depleted workforce who are essential to ensuring the conduct of the 2026 general election.

61. In conclusion, I estimate that the requirements of the Rule will require a collective increase of millions of dollars to the budgets of the Department of State and Colorado counties. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. The Colorado General Assembly authorized the Department's budget for the fiscal year beginning on July 1, 2026, at the end of the 2025 legislative session. The EO will increase financial strain on the Department and necessitate a higher budget. We will either need to ask the General Assembly for additional funds, which we are unlikely to receive, or identify equivalent cuts elsewhere in the Department, a very difficult and likely impossible task.

62. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Colorado's elections run smoothly and every eligible Coloradan can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

63. Each of these tasks and costs will divert scarce resources from other important election administration needs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25th, 2026, at Denver, Colorado.

*/s/ Hilary Rudy*
Hilary Rudy
Deputy Elections Director
Colorado Department of State

# Exhibit A

to Declaration of Hilary Rudy

August 25, 2026

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



JUNE 26, 2026

Director, Product Classification
U.S. Postal Service
475 L'Enfant Plaza SW, Room 4446
Washington, DC 20260-5015
PCFederalRegister@usps.gov

The Deputy Secretary of State for the State of Colorado hereby submits the following public comment on behalf of the Colorado Department of State in opposition to the proposed amendment to the Mailing Standards of the United States Postal Service, Domestic Mail Manual (DMM), regarding the transmission of mail-in or absentee ballots for federal elections, as proposed in Ballot Mail for Federal Elections, 2026-10968, 91 FR 32,915 (June 2, 2026).

The Colorado Department of State oversees elections in the state of Colorado. Its sacred responsibility is to ensure that all eligible Coloradans can exercise their right to vote. To fulfill this responsibility, it promulgates rules, provides guidance to the local election officials who conduct elections in Colorado, develops and maintains the Statewide Colorado Voter Registration and Election (SCORE) system, and maintains constant, year-round contact with local election officials regarding election administration, among other duties.

Colorado allows all eligible voters to vote a mail ballot and requires election officials to send a mail ballot to every active registered Colorado voter approximately four weeks prior to an election. The proposed additions to the DMM will restrict eligible, active Colorado voters from receiving and returning their mail ballots via the U.S. Mail. This creates a very real threat of disenfranchising eligible Coloradans. The proposed changes are burdensome, in conflict with existing election laws, are premised on an Executive Order that has already been declared unlawful and enjoined, and are not even designed in a way that will serve the law enforcement purposes that underly this rulemaking. They would impose significant financial costs on the State of Colorado and its sixty-four counties and disrupt a safe and secure voting process that Colorado's voters have relied on for over a decade.

The Colorado Department of State thus requests that the Postal Service withdraw this proposed rulemaking. It should instead abide by its existing obligations to election officials and commit to expediting the timely delivery of Federal Ballot Mail.

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



## NO LEGAL AUTHORITY FOR THIS RULEMAKING

The Colorado Department of State objects to this rulemaking because the Postal Service lacks legal authority to implement the proposed additions to the DMM.

### 1. THE PROPOSED RULE IS CONTRARY TO LAW

Under the Constitution, States are responsible for regulating the manner of holding elections, subject only to alteration by Congress. In contravention of this constitutional balance, the proposed additions to the DMM seek to usurp the constitutional authority of States and Congress by proposing to regulate election materials, assert federal authority to refuse to deliver ballots to Colorado voters, and conscript Colorado's resources to create a federal list of voters who are approved by the U.S. Postal Service to vote by mail. As a federal court has already concluded, such efforts are unconstitutional. *See California v. Trump*, -- F. Supp. 3d --, Memorandum & Order, No. 1:26-cv-11581-IT (June 25, 2026) ("*California II*") (declaring unconstitutional the Executive Order on which this proposed rulemaking rests and enjoining this Postal Service rulemaking).

### A. The Proposed Additions to the DMM Violate the Constitution.

The proposed additions to the DMM violate the constitution in several ways. First, the proposal explicitly acknowledges that it was submitted to effectuate an Executive Order promulgated by the President. But as a constitutional matter, the President has no power to order such a rulemaking. States, not the President, have primary authority to regulate federal elections. U.S. CONST. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2, 4; *see also Smiley v. Holm*, 285 U.S. 355, 366 (1932). "[T]he Constitution does not grant the President any specific powers over elections." *California II*, at 6. Nothing in the constitution or in statute authorizes the federal executive to implement the type of regulations in this proposed rulemaking. The Postal Service—an agency

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



situated within the Executive Branch—is without authority to accomplish through rulemaking what the President is barred from doing directly.[1]

Second, the proposed additions to the DMM violate Colorado's constitutional authority to regulate and administer its own elections. The United States Constitution explicitly tasks states with prescribing the "Times, Places, and Manner of holding" congressional elections. U.S. CONST. art. I, § 4, cl. 1. "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times, and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, [and] counting of votes." *Smiley*, 285 U.S. at 366. Colorado has legislated accordingly, adopting a mail ballot system that is safe, secure, and the envy of voters across the country. The proposed additions to the DMM seek to upset the choices Colorado voters and their elective representatives have made. Because the proposed rulemaking undermines and nullifies the Colorado legislature's deliberate decision to deliver mail ballots via U.S. Postal Service to all active, registered voters, it is unconstitutional under the Elections Clause.

Third, the proposed additions to the DMM would unconstitutionally commandeer Colorado's resources in violation of the separation of powers between the federal government and the States. If enacted, the proposal would hijack Colorado's resources by requiring the state to provide the Postal Service with the name, address, and two unique Intelligent Mail barcodes (IMbs) for each voter. It would further require Colorado to expend its resources to modify its ballot envelopes. Refusing Colorado access to essential and statutorily guaranteed postal services unless it enacts, with its own resources, a presidentially ordered federal list of "eligible" voters is an unlawful seizure of Colorado's resources and power over elections. *California v. Trump*, 786 F. Supp. 3d 359, 373 (D. Mass. 2025) ("*California I*"); *see also Printz v. United States*, 521 U.S. 898, 935 (1997).

Fourth, the proposed additions to the DMM unconstitutionally invade Congress's constitutional powers. Pursuant to the Elections Clause, Congress can "make or alter" state election regulations. *See* U.S. CONST. art. I, § 4. It has done so through statutes governing voter

---

1 To the extent the Postal Service's independent structure insulates it from the President's direct control, the text of the Executive Order infringes on Congress's control over the Postal Service. This represents yet another constitutional infirmity.

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



registration, voting lists, and absentee voting. None of those laws authorize the Postal Service to play the role that the President and the proposed rule set forth. In fact, the only statute that assigns *any* role for the Postal Service in voting is the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20302 *et seq.*, which is explicitly excluded from the proposed rulemaking. That carve out exists because, without it, the proposal would be directly inconsistent with federal law. By linking the Postal Service's obligations under Title 39 to UOCAVA, "Congress has shown that it knows how to" require that the Postal Service treat mail ballots differently, *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) (quotation omitted), but has not chosen to do so. The President and the Postal Service have no authority to undertake this proposed sweeping takeover of mail ballot elections.

Finally, if the Postal Service refuses to deliver Federal Ballot Mail to or from an eligible Colorado voter, the Postal Service will be violating constitutional principles of free speech, free association, equal protection, and due process enshrined in the First and Fourteenth Amendments that establish a federal constitutional right to vote free from excessive burdens. *See* U.S. CONST. amends. I, XIV; *see also, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). The Postal Service also will be violating the Colorado Constitution, which establishes and protects the right to vote. *See* Colo. Cons. art. VII, § 1 (providing that a U.S. citizen who is 18 years or older, meets residency requirements, and is registered to vote under Colorado law "shall be qualified to vote at all elections"); *id.* art. II, § 5 (requiring that "[a]ll elections shall be free and open; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."). Thus, the Postal Service must withdraw this rulemaking so that is does not infringe upon the essential right of eligible U.S. citizens to vote.

### B. The Proposed Additions to the DMM are Contrary to Federal Voting Statutes

The Proposed Rule is also directly inconsistent with federal voting statutes.

First, in requiring enrollment in a state-specific list as a prerequisite for mail voting, the proposed rule conflicts with federal statutes providing for a single, state-maintained voter registration list for federal elections in each State. Federal law requires "each State" to "implement, in a uniform and nondiscriminatory manner, a single, uniform official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level," with

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



information for each legally registered voter in the State. 52 U.S.C § 21083(a)(1)(A). By law, this state-maintained list "shall serve as the single system for storing and managing the official list of registered voters throughout the State," and is the "the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* § 21083(a)(1)(A)(i) & (viii). This statutory design necessarily precludes the Proposed Rule's requirement of a second voting list housed in a federal agency and used by that agency to control delivery of ballots. *See* Proposed Rule §§ 24.4.2, 24.4.3, 24.5.1, 24.5.3.

Second, the Proposed Rule violates the Voting Rights Act Amendments of 1970, which protects the rights of voters to access absentee voting in federal elections. 52 U.S.C. § 10502. Congress enacted that law to protect citizens' constitutional rights to vote and to move freely across state lines. The statute provides that no U.S. citizen shall "be denied the right to vote" in federal elections "because of the failure of such citizen to be physically present in such State or political subdivision at the time of such election," so long as the citizen has "complied with the requirements *prescribed by the law of such State* or political subdivision" concerning absentee ballots. *Id.* § 10502(c). Thus, a voter's compliance with state law absentee voting requirements—some of which must conform to federal standards set out in the Act—are the sole prerequisite to absentee voting. The Proposed Rule violates this statute by adding a new requirement of successful enrollment with the Postal Service as a necessary precondition to delivering mail ballots. *See* Proposed Rule §§ 24.4.2, 24.5.1, 24.5.3.a (requiring mail voters to be enrolled with Postal Service and providing that the Postal Service will not accept ballot mail if recipients have not been so enrolled). For the same reason, implementation of the Proposed Rule and refusal to transmit ballot mail would also violate the enforcement provisions of the Voting Rights Act. 52 U.S.C. § 10307(a) ("No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote[.]").

### C. The Proposed Additions to the DMM are Contrary to the Privacy Act.

Because it is subject to the requirements of the Privacy Act, the Postal Service may not adopt regulations that are contrary to that statute. *N.L.R.B. v. U.S.P.S.*, 841 F.2d 141, 145 & n.3 (6th Cir. 1988). Relevant here, the Privacy Act prohibits agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment," subject to limited exceptions not relevant here. 5 U.S.C. § 552a(e)(7). The proposed rule violates this requirement by disclosing a plan to surveil and collect data regarding ballot mail sent to and from

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



registered voters. 91 Fed. Reg. at 32,915. It does so by requiring each piece of outgoing and return ballot mail to bear an IMb, a Postal Service tracking technology, and to require States to provide data that links each barcode with an individual voter. Proposed Rule §§ 24.3.1, 24.3.2, 24.4.2. This surveillance violates the Privacy Act.

### 2. The Postal Service Lacks Statutory Authority for the Sweeping Regulations that it Proposes

The Postal Service is a "creature[] of statute" that "possess[es] only the authority that Congress has provided." *Nat'l Fedn. of Indep. Bus. v. Dept. of Lab., OSHA*, 595 U.S. 109, 117 (2022) (per curiam). Because "no law enacted by Congress delegates authority to control mail-in voting to USPS[,] . . . USPS lacks statutory authorization to promulgate any biding regulations on mail-in voting" like the ones included in the proposed rulemaking. *California II*, Slip Op. at 31.

The Postal Service grounds its proposed additions to the DMM in 39 U.S.C. §§ 401 and 404. 91 Fed. Reg. at 32,915. But neither provision supports this rulemaking. Section 401(2) authorizes the Postal Service to adopt only those rules and regulations that are "*not inconsistent with* this title" and that "may be *necessary in the execution of its functions* under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." 39 U.S.C. § 401(2) (emphasis added). The proposed rule is inconsistent with multiple express provisions of Title 39, and it is not "necessary" to any postal function. Moreover, the election crime statutes cited—concerning criminal prohibitions on voter intimidation and fraudulent registration and voting—fail to supply the missing authority for this sweeping election law enforcement project. *See* 91 Fed. Reg. at 32,915 (citing 52 U.S.C. §§ 10307 & 20511). Those statutes are enforced by the Department of Justice and do not expressly confer any enforcement authority on the Postal Service.

Federal law also prohibits the Postal Service from taking on new lines of business characterized as "nonpostal services." 39 U.S.C. § 404(e)(2)–(3). "Nonpostal services" are anything that falls outside of the definition of "postal services," *id.* § 404(e)(1), which in turn is narrowly defined as "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto," 39 U.S.C. § 102(5). But the core of the proposed rule has nothing to do with mail delivery. For example, proposed § 705.24.4 would establish (1) a registration system for "Ballot Portal Users"; (2) an "enrollment" system in which States must submit the name and address of every voter receiving a mail ballot, the unique IMBs

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



on that individual's outbound and return envelopes, and the originating election office; and (3) a list-compilation and transmission service under which the Postal Service delivers to each State's chief election official, "[o]n or about the date of the federal election," a compiled statewide roster of every enrolled voter and the barcodes associated with each voter's ballot. This state-by-state voter eligibility verification and enrollment system is far outside the definition of "postal services." Nor is it "ancillary" to mail delivery; the Postal Service has delivered ballots for as long as States have mailed them—including nearly 100 million ballots in the 2024 general election alone—without ever needing to know, in advance and by name, who is permitted to receive and return their ballot.

Title 39 also requires the postal service to "render postal services to *all* communities," 39 U.S.C. § 101(a), without making "any undue or unreasonable discrimination among users of the mails," or granting "any undue or unreasonable preferences to any such user," *id.* § 403(c). But under proposed DMM 705.24.5.3, an authorized ballot mailer's mailing "will not be accepted and will be returned" if the Postal Service's verification concludes the mailing is not being sent to an individual enrolled on a State's "Mail-In and Absentee Participation List," proposed DMM 705.24.5.1, or if the state "has not submitted a certification pursuant to 24.4.2.f," proposed DMM 705.24.3.b. That is a regime of selective refusal of service: identical letters will be accepted or rejected depending on whether the intended recipient's name appears in a federal database and whether the election official sending it submitted it for federal certification. The Postal Service has not (and cannot) identify a legitimate operational need that justifies this disparity. *Cf. GameFly, Inc. v. Postal Reg. Commn.*, 704 F.3d 145, 149 (D.C. Cir. 2013) (holding that when there is discrimination, there must either be a "remedy [to] all discrimination or [an] explain[ation] why any residual discrimination is due or reasonable under § 403").

Finally, Congress has carefully delineated the specific—and exclusive—types of "nonmailable matter," (i.e., mail that the postal service may refuse to deliver). 39 U.S.C. §§ 3001-3008. Apart from these narrow categories, the postal service has no authority to refuse to deliver mail. *See, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902) ("His right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them."); *Bowie v. Williams*, 351 F. Supp. 628, 634 (E.D. Pa. 1972) ("[The Postal Service] must deliver the mail unless an item is 'nonmailable' within the definition of 39 U.S.C. § 3001."). Ballots and ballot envelopes appear nowhere in sections 3001-3008. Yet the practical effect of proposed DMM 705.24.5.3 is to render unacceptable—refused and returned to the sender—every ballot mailing

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



from a non-certifying State, every mailing addressed to a voter absent from the Mail-In and Absentee Participation List, and every mailing whose envelope has not undergone review for design and barcode placement. Nothing in Title 39 authorizes the Postal Service to create, by regulation, a new class of "refusable mail" or "conditionally accepted mail" defined by the sender's noncompliance with a data-reporting regime.

## GENERAL OBJECTIONS TO THIS RULEMAKING

While the Postal Service claims that it will not "interfere" with state or federal election law, this entire rulemaking tramples upon Colorado's sovereign authority to determine the qualifications of its voters and establish the time, place, and manner of voting, including voting by mail. *See* U.S. CONST. art. I, § 4, cl. 1. There are no modifications to the proposed rulemaking that can remedy these shocking constitutional violations. The Postal Service must withdraw this proposed rulemaking and abandon its plan to insert itself between locally elected election officials and their voters.

The proposed rule conflicts with existing Colorado election laws, which are premised on the Postal Service accepting and attempting delivery of ballot mail. Election officials are required to send a mail ballot packet to every active, registered Colorado voter approximately four weeks prior to an election. Colo. Rev. Stat. § 1-7.5-107(3)(a)(I). If the Postal Service refuses to accept and deliver those ballots, each of Colorado's 64 elected county clerks and recorders will violate that law. Election officials will also violate Colorado law if they upload the personal identifying information of confidential Colorado voters[2] to the Federal Ballot Portal. Colo. Rev. Stat. § 24-72-204(8) and Colo. Elect. R. 2.10.3.B.b. Yet without that information, the Postal Service will refuse to deliver mail ballots to or from these voters. Proposed § 24.5.3(a). Moreover, Colorado

[2] Colorado law permits certain voters to request that their addresses be confidential. The Address Confidentiality Program is a statewide program that provides survivors of stalking, sexual assault, and domestic violence with a legal substitute address and mail forwarding. Colo. Rev. Stat. § 24-30-2108(3). All state and local government agencies in Colorado must accept the substitute address for participants in this program. *Id.* In addition, Colorado's confidential voters provision covers first responders, members of protected professions, and their spouses or family members who believe they may be exposed to harassment or danger if their address is not kept confidential. *Id.* § 24-72-204(3.5).

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



law provides that voters may return their marked ballot via U.S. Mail. Colo. Rev. Stat. § 1-7.5-107(4)(b)(I)(A). Yet, under the proposed rules, the Postal Service may refuse to deliver a voted ballot if the return envelope is not compliant or local election officials have failed to satisfactorily "enroll" that voter with the Postal Service. Proposed § 24.3.2. The changes proposed by the Postal Service will disrupt the administration of the election and are likely to disenfranchise voters who have relied on the U.S. Mail to exercise their right to vote for decades. Beginning in 2013, all active, eligible Colorado voters have automatically received a mail ballot. *See* Voter Access and Modernized Elections Act, H.R. 13-1303, 69th Gen. Assemb., 1st Reg. Sess. (Colo. 2013). In the 2024 general election, approximately 92% of Coloradans used a mail ballot to cast their vote. And even before 2013, over two million voters—nearly 80% of the active, registered voters in 2012—received a mail ballot. This is because the Colorado legislature authorized no-excuse absentee voting in 1992) and a permanent mail-in voter list in 2007. *See* Voting Prior to Election Day, H.B. 92-1004, 58th Gen. Assemb., 1st Reg. Sess. (Colo. 1992) (no-excuse absentee (mail) ballot voting); Mail-in ballots, S.B. 07-234, 66th Gen. Assemb., 1st Reg. Sess. (Colo. 2007) (permanent absentee (mail) ballot system). Moreover, in 1990, local election officials were already authorized to conduct certain elections completely by mail ballot. Mail Ballots, S.B. 90-97, 57th Gen. Assemb., 2d Reg. Sess. (Colo. 1990) (authorizing political subdivisions to conduct certain elections by mail ballot) (eff. Jan. 1, 1991).

Because of these mail voting practices in Colorado, the Postal Service has had a decades-long successful partnership with the counties of Colorado. Colorado's election officials have come to rely on the Postal Service's acceptance and delivery of Ballot Mail. They work hard to comply with the Ballot Mail standards in DMM § 703.8 and to timely print and mail accurate ballots to Colorado's approximately four million active, registered voters. The Postal Service rulemaking would end this partnership and change the Postal Service from a provider of mail service to a barrier between local election officials and their constituents.

The Colorado Department of State also estimates that the proposed rulemaking will cause the Postal Service to erroneously refuse to deliver mail ballots to at least 150,000 eligible but confidential Colorado voters and nearly 650,000 eligible voters in counties that cannot implement IMbs. The actual number of erroneously refused ballots will be much higher because of errors in the Postal Service's proposed processes. With only a few months' notice, the Postal Service proposes to establish and administer a secure data portal, digest dynamic voter database from fifty different states, and "verify" the name, address, and IMb on every ballot before

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



agreeing to deliver it. Yet this rulemaking fails even to address the security of the Federal Ballot Portal or the state-specific data it will hold. Under these circumstances, errors will be inevitable.

Finally, the proposed rulemaking is a betrayal of the mission and motto of the United States Postal Service: "to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence" and to "provide prompt, reliable, and efficient services to patrons in all areas and . . . all communities." 39 U.S.C. § 101(a). The rulemaking also conflicts with the Postal Service's essential mission to "operate[] as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." *Id.* This betrayal is not justified by the Postal Service's stated goals. The proposed changes to the DMM *will not* assist the Postal Service "to investigate crimes regarding 'the use of the mails'" or provide law enforcement with "information regarding the sending of ballots through the mails." 91 Fed. Reg. 32,915. Election fraud is vanishingly rare in Colorado[3] and such crimes are prosecuted effectively by district attorneys and the Colorado Attorney General's office. Furthermore, as explained below, the types of data the Postal Service purports to be able to collect via this rulemaking will not be comparable or useful to law enforcement.

The Colorado Department of State opposes the proposed rulemaking and urges the Postal Service to withdraw the proposed rule.

[3] "[I]n recognition of the need for public confidence in voting tallies . . . . the State of Colorado has adopted paper ballots and risk-limiting audits [RLAs] statewide." *Counting the Votes: Electronic Voting Irregularities, Election Integrity, and Public Corruption*, 49 U. Mem. L. Rev. 979, 1016. "Risk-limiting audits have been endorsed by the National Academies of Sciences Engineering, and Medicine, the Presidential Commission on Election Administration, the American Statistical Association, the League of Women Voters, Common Cause, Verified Voting Foundation, and many other organizations concerned with election integrity. RLAs have been piloted more than fifty times . . . . and are required by statute in Colorado." *Evidence-Based Elections: Create a Meaningful Paper Trail, Then Audit*, 4 Geo. L. Tech. Rev. 523, 531 n.19 (2020) (reviewing the benefits of RLAs).

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



## SPECIFIC OBJECTIONS TO THE PROPOSED ADDITIONS TO THE DMM

The Colorado Department of State objects to the following proposed changes to the DMM. The Postal Service should not inject itself into election administration as a "verifier" of the appropriateness of delivering individual pieces of Federal Ballot Mail to or from specific voters. It should immediately withdraw this proposed rulemaking.

### 1. PROPOSED § 705.24.3 FEDERAL BALLOT MAIL

#### A. 24.3.1–2 Outbound and Return Federal Ballot Mail Envelope Standards

The Colorado Department of State objects to the proposed requirement in **§§ 705.24.3.1.c and 705.24.3.2.c** that all Outbound and Return Federal Ballot Mail Envelopes bear a unique Intelligent Mail barcode ("IMb"). IMbs are only as good as the Postal Service's ability to scan them, are more appropriate as recommended best practices, are nonsensical to require for mail ballot packets issued in person, and have no purpose on return ballot envelopes as this rulemaking does not propose a verification process for return ballot mail.

While IMbs can "provide visibility into ballot mail transmission based on scan data that is generated as the ballots move through the mail," their usefulness depends on the Postal Service's ability to successfully scan Ballot Mail. The Postal Service does not "guarantee that every IMb Tracing mailpiece . . . will receive a scan or multiple scans." U.S. POSTAL SERVICE, INTELLIGENT MAIL BARCODE TRACING (IMB TRACING®) USER GUIDE § 4-1 (June 17, 2014), *available at* https://postalpro.usps.com/node/1488 (last visited June 24, 2026). Ballot Mail may not be properly scanned or may go missing between scans. This has occurred more than once in Colorado. *See* Colorado Public Radio, *Hundreds of Ballots Never Reached Voters in a Southwest Colorado Race that may be Decided by Just Three Votes*, Jul. 16, 2024, *available at* https://www.cpr.org/2024/07/16/hundreds-of-ballots-never-reached-southwest-colorado-voters/ (last visited June 9, 2026); 9 News, *So This Is What Happened to a Truckload of Adams County Ballots that Went Missing Last Year*, May 24, 2019, *available at* https://www.9news.com/article/news/ac/73-29c8be36-436d-4f15-99f5-6239310bbbe6 (last visited June 9, 2026).

The Colorado Department of State objects to the proposal to make mandatory the best practices suggested in the DMM and Official Election Mail Guides. *See* U.S. POSTAL SERV., MAILING

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



STANDARDS OF THE UNITED STATES POSTAL SERVICE, DOMESTIC MAIL MANUAL § 703.8.4 (Apr. 6, 2026); U.S. POSTAL SERV., OFFICIAL ELECTION MAIL GUIDE KIT 600 (2026-2027), *available at* https://about.usps.com/kits/kit600.pdf (last visited June 11, 2026). Election administration in a state as large and diverse as Colorado—and in a nation as large and diverse as the United States—is not susceptible to a one-size-fits-all approach. Demanding that every county, regardless of physical landscape or voting population, employ the same procedures is antithetical to how elections are run. None of Colorado's 64 counties currently use IMbs on return envelopes and only one-third use IMbs on all outbound ballot mail. Sixty percent of the counties that do not use IMbs on outgoing ballots have under 10,000 active registered voters. Requiring IMbs will unfairly burden the voting rights of residents of less-populated rural or mountainous counties whose election officials may not have the personnel or the financial resources to satisfy these new, unfunded requirements. The Postal Service should leave the best practices suggested in the DMM and Official Election Mail Guides as recommendations, not requirements.

Furthermore, requiring an IMb on the outbound envelopes of mail ballot packets that are printed and delivered to voters in person is nonsensical. Colorado voters are entitled to request a mail ballot packet at a polling place or at the office of an election official. Colo. Rev. Stat. §§ 1-7.5-107(2.7). These envelopes will never go through the mail; yet the proposed rule requires that an IMb be applied to them, recorded by election officials, and certified to the Postal Service. 91 FR 32,918.

Similarly, including an IMb on every return mail ballot currently serves no purpose because the Postal Service has not proposed any verification process for voted ballots returned via U.S. Mail, using IMbs or any other method. 91 FR 32,918. Nevertheless, this requirement would impose a significant burden on each of Colorado's 64 counties, none of which currently apply IMbs to return envelopes. The burden on local election officials to print IMbs on return envelopes, match them with voters, and upload them to the Colorado-specific list each time a mail ballot is issued far outweighs any usefulness that they might even arguably have.

The Postal Service has been a trusted partner to election officials in Colorado's 64 counties for decades. Requiring IMbs on all Outbound and Return envelopes upends counties' longstanding reliance on the U.S. Mail by changing the Postal Service from a provider to all communities to a provider to only well-resourced and densely populated communities. The Postal Service should abide by its existing commitments to election officials, including those in the 2026 Kit 600, and withdraw this proposed rulemaking.

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



## 2. Proposed § 705.24.4 State-Specific Mail-In and Absentee Participation Lists

The Postal Service should withdraw its proposed rulemaking because the method it proposes to enable law enforcement "to detect potential issues meriting further investigation," 91 Fed. Reg. 32,915, is based on a misunderstanding of how ballots are issued and returned and will not provide meaningful information.

Proposed § 705.24.4 requires each state to "enroll" its eligible voters with the Postal Service by submitting a state-specific voter list. This list will purportedly "evidence how many ballots have been mailed and allow law enforcement officials to compare the total number of mailed ballots to the total number of received ballots." 91 Fed. Reg. 32,915. In Colorado, this comparison will never be useful. First, the number of ballots mailed by the Postal Service is an incomplete picture of the number of mail ballots issued in Colorado because those ballots can be delivered to voters in multiple ways. For example, election officials must provide a mail ballot packet to any Colorado voter who requests one *in person* because they are a new registrant, change their address, or their mail ballot was lost, damaged, or not received. Colo. Rev. Stat. § 1-5-102.9(3)(j), (k). Certain voters may also choose to receive a mail ballot electronically. Colo. Rev. Stat. § 1-7.5-115. Second, the term "received ballot" is not defined in the rulemaking, and its meaning is unclear. Regardless of whether it may refer to ballots cast, ballots returned via the U.S. Mail, or ballots received by voters, the "compar[ison]" proposed by the Postal Service will not be of value to law enforcement in Colorado.

### A. 24.4.1 Postal Service Federal Ballot Portal User Registration

The Colorado Department of State recommends that the Postal Service withdraw its proposed rulemaking because of the significant risk that the proposed Federal Ballot Portal will not be capable of managing the traffic it will experience or securing the personal information of Colorado voters.

Colorado anticipates that it will require more than one thousand Ballot Portal Users. The as-yet-to-be created Federal Ballot Portal will not be equipped to handle this number of concurrent users as well as supplements to the Colorado-specific list from nearly 500 locations after ballots

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



are mailed[4] through election day.[5] Colorado expects the supplements from this multitude of users and locations to be nearly constant. First, Colorado allows eligible residents to register to vote and to update their registration at any time, including on election day. Colo. Rev. Stat. §§ 1-2-217.7. During the 2024 general election, the Statewide Colorado Voter Registration and Election (SCORE) list was updated an average of 21,862 times per day. In the November 2026 election, Colorado therefore anticipates over half a million changes to the Colorado-specific list in the twenty-four days between when mail ballots must be sent and election day. Second, Colorado anticipates sending more than 250,000 supplemental mail ballots in the November 2026 election during those twenty-four days. In the 2024 general election, local election officials issued nearly 250,000 supplemental mail ballot packets to eligible voters who requested them by the eighth day before the election. Colo. Rev. Stat. §§ 1-2-201(4) (due to new registration); 1-2-216(4) (due to change of address); 1-7.5-114.5 (due to a mail ballot lost, damaged, or not received). Third, Colorado election officials must issue a mail ballot packet to any voter who requests one *in person* at any time, including on election day. Colo. Rev. Stat. § 1-5-102.9(3)(k). For all these reasons, the proposed rule will require election officials to supplement the Colorado-specific List almost constantly through election day. If the Ballot Portal is inadequate for its purpose, technical issues will result in eligible voters not being properly "enrolled" with the Postal Service. This will lead the Postal Service to refuse to deliver their mail ballots, obstructing their exercise of the right to vote.

### B. 24.4.2 Enrollment

Proposed § 24.4.2 identifies five pieces of information that local election officials must provide for each Colorado voter to be "enrolled with the Postal Service": name, address, outgoing envelope IMb, return envelope IMb, and state of origin. The Postal Service must withdraw its

---

[4] Beginning in the 2026 general election, there will be 24 days between the deadline for local election officials to send a mail ballot to every active, registered voter and election day. Colo. Rev. Stat. § 1-7.5-107(3)(a)(I).

[5] There are approximately 370 VSPCs in Colorado during a federal election and 64 county offices at which voters can update their voter registration and request a mail ballot packet. To ensure that the Colorado-specific list is up to date, each county office and VSPC will require several personnel with Ballot Portal accounts. Therefore, Colorado will require more than one thousand Ballot Portal users at nearly 500 locations.

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



proposed rulemaking because providing this data would violate Colorado law and constitute an unconstitutional restriction on Colorado's right to administer its own elections. Moreover, the absence of any technical specifications and the requirement that election officials certify information outside of their knowledge make this proposed rule completely unworkable for election officials.

First, the Colorado Department of State objects to the requirement in § **705.24.4.2.b.1–2** to include the name and address of the individual receiving a mail ballot. Colorado permits eligible voters to register to keep their addresses private under two different confidentiality programs. The Address Confidentiality program protects survivors of stalking, sexual assault, and domestic violence with a legal substitute address and mail forwarding. Colo. Rev. Stat. § 24-30-2108(3); Colo. Elect. R. 2.10. The Confidential Voter Program protects first responders, peace officers, election workers, and other Colorado citizens whose safety may be jeopardized if their address were made public. Colo. Rev. Stat. § 24-72-204(3.5). Election officials are barred from sharing these confidential voter names and addresses with outside parties, including the Postal Service. *Id.* § 24-72-204(8); Colo. Elect. R. 2.10.3. Because the proposed rule expressly conflicts with state law, and the Colorado-specific List will not be usable without voter names and addresses, the Postal Service must withdraw its proposed rulemaking.

The Postal Service also fails to define "address" for purposes of this section. In Colorado, a registered voter may have up to three addresses in the voter registration database: a residential address, a mailing address, and a temporary ballot mailing address. Colo. Rev. Stat. § 1-2-204(2)(b), (f), (f.3). These three addresses are maintained in separate data fields. The Federal Ballot Portal does not provide for three address fields, and it is not feasible for election officials to upload only one without extensive data removal and validation. Because the proposed rule does not provide a means for Colorado election officials to comply, the Postal Service must withdraw its proposed rulemaking.

Second, the Colorado Department of State objects to the requirement in § **705.24.4.2.b.3** to include a unique IMb on the Outbound Federal Ballot Mail envelope and the requirement in § **705.24.4.2.b.4** to include a unique IMb on the Return Federal Ballot Mail envelope for all the reasons set forth above in Section 1.A.

Third, the Colorado Department of State objects to the requirement in § **705.24.4.2.e** that users upload data in a manner that meets the technical specifications of the Ballot Mail Portal without

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



providing any of those technical specifications. Without more information, the Colorado Department of State cannot assess whether its data can meet or be altered to meet these specifications and cannot meaningfully comment on this requirement. The Postal Service's failure to include any technical requirements or security plans for the Ballot Mail Portal highlight that it will not be prepared to operate that portal in only a few months. This is yet another reason that it must withdraw this rulemaking.

Finally, the Colorado Department of State objects to the requirement in § **705.24.4.2.f** that Ballot Portal Users must certify that "any mail-in or absentee ballots their state's authorized ballot mailers provide to the Postal Service for mailing meet the standards in 24.3.1 and 24.3.2." Sections 24.3.1.b and 24.3.2.b require that all Outbound and Return Federal Ballot Mail be "automation compatible." Whether a piece of mail is "automation-compatible" is a determination that requires technical knowledge of Postal Service rules, regulations, and equipment that county election officials reasonably may not possess. Furthermore, Ballot Portal Users will be individual county election officials. These individuals have no knowledge of whether *every* mail ballot provided to the Postal Service from all 64 Colorado counties meet these standards. The proposed rulemaking is based on a fundamental misunderstanding of election administration as a state-wide rather than a county-specific process. The Postal Service thus must withdraw this rulemaking.

### C. 24.4.3 Provision of State-Specific Lists

The proposal for the Postal Service to provide a state-specific list back to the providing state "[o]n or about the date of the federal election" fails to account for Colorado's dynamic voter registration database and election-day registration. 91 FR 32,918. In Colorado, eligible residents may register to vote or update their registration at any time, including on election day. Colo. Rev. Stat. § 1-2-217.7. Therefore, the Colorado-specific List will be constantly subject to updates, additions, and removals. It will not be final until 7:00 p.m. on election day.

## 3. Proposed § 705.24.5 Outbound Federal Ballot Mail Verification

### A. 24.5.1 Procedure

The Colorado Department of State objects to the proposed verification procedure for Outbound Federal Ballot Mail. This section requires the Postal Service to "review" all Outbound Federal Ballot Mail "prior to acceptance" to determine whether that mail (1) meets the requirements of

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



24.3.1 and (2) is being sent to individuals on the state-specific Mail-In and Absentee Participation List. It does not, however, include any explanation of *when* or *how* this review will occur. In other words, despite the title of this subsection being "Procedure," it lacks any procedure.

Election officials conduct elections on mandatory timelines set by statute. The Postal Service's failure to include any deadlines for itself cannot be reconciled with the deadline-filled nature of election administration. Were the Postal Service to inject itself into election administration, it must operate on a mandatory schedule so that election officials can meet their deadlines and all eligible Colorado voters can exercise their right to vote by 7:00 p.m. on election day. Moreover, the Postal Service must provide concrete and actionable information to Colorado's county election officials regarding how and when they will receive notifications about the "review," acceptance, or rejection of Federal Ballot Mail. Without clear, reliable, and timely communication about rejected mail ballots, the Postal Service will disenfranchise eligible voters.

In addition, the delay in Postal Service acceptance of Federal Ballot Mail that will be caused by its review for compliance with 24.3.1 will *decrease* Coloradans' visibility into the location and status of their ballots throughout the election cycle. Colorado employs ballot tracking software to allow voters who opt-in to track their mail ballot until it is received by election officials. Colo. Rev. Stat. § 1-7.5-207. When the county delivers ballots to the Postal Service, enrolled voters receive a notification that their mail ballot is on the way. If the Postal Service rejects that mail ballot, it is not actually on the way. This is yet another conflict that demonstrates that the Postal Service's attempt to apply a single nationwide process to the election systems of fifty different states is unworkable. The Postal Service should thus withdraw this rulemaking because it fails to account for the different times, places, and manners in which states run elections.

### B. 24.5.2 Authorized Verification

The Colorado Department of State objects to the requirement in this subsection that Outbound Federal Ballot Mail with more than 200 pieces of marketing mail or more than 500 pieces of first-class mail be delivered to "a facility that performs business mail acceptance functions." If this refers to a Business Mail Entry Unit (BMEU), not every state has a BMEU, and even in states with BMEUs, the travel required to reach a BMEU for every outbound mailing of over 500 pieces is unreasonable and unworkable.

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



Colorado has only two BMEUs, one located in Denver and one in Colorado Springs. There are no BMEUs outside of this tiny portion of a mountainous, 100,000 square-mile state. The requirement that election officials transport their mail ballots across the state for mailing back to their communities is so burdensome that it will effectively prevent many counties from mailing ballots to every active, eligible voter as required by Colorado law. Because the stated intent of this rulemaking is not to conflict with federal or state election law, and the Postal Service is seemingly not able to review and verify Federal Ballot Mail outside of those two BMEUs, the Postal Service must withdraw this rulemaking as impossible to effectuate within its current capabilities.

### C. 24.5.3 Noncompliance

The Colorado Department of State objects to this section because it does not include any procedures or deadlines for the Postal Service's return of rejected Federal Ballot Mail. If the Postal Service refuses to accept and deliver certain mail ballots, it must provide clear, actionable, and enforceable information to election officials regarding how, when, where, and by whom the rejected mail will be returned. The Postal Service must also explain how rejected mail ballots will be securely maintained and how they can be collected by election officials. Finally, the Postal Service must specify how, when, where, and by whom a re-review of Federal Ballot Mail will occur with mandatory and enforceable deadlines that allow election officials to meet their ballot mailing requirements under Colorado law. The proposed rulemaking does none of this.

Colorado's local election officials are county clerks and recorders elected by the people of their respective counties. They are accountable to their constituents and belong to the same community and voting district. The Postal Service is a massive, independent federal agency headquartered in Washington, D.C. It has no accountability to voters in the plains and mountains of Colorado. This federal agency should not stand between voters and their elected county clerks. The Postal Service lacks the resources, personnel, and experience to "verify" the name and address on a mail ballot packet sent to every one of Colorado's more than four million active, eligible voters. It should withdraw this attempt to impose itself into election administration as a "verifier" of the appropriateness of delivering individual pieces of Federal Ballot Mail to eligible voters as unworkable and in conflict with federal and state election law.

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



### 4. Proposed § 705.24.6 Non-Interference with State or Federal Election Laws

Despite the title of this section, in which the Postal Service claims that its rulemaking will not "interfere" with any state or federal election law, the entire rulemaking tramples upon Colorado's sovereign authority to determine the qualifications of its voters and establish the time, place, and manner of voting, including voting by mail. *See* U.S. Const. art. I, § 4, cl. 1. The only remedy for these impending constitutional violations is for the Postal Service to withdraw this proposed rulemaking and abandon its plan to impose itself between locally elected election officials and their voters.

Furthermore, while this section disclaims that the Postal Service rulemaking "alters the eligibility of any individual to vote under state or federal law," it unquestionably restricts the ability of eligible voters to receive and return mail ballots, and it *will* disenfranchise eligible voters in Colorado. The Postal Service cannot insert itself between locally elected election officials and voters by demanding to "verify" the name and address of every eligible voter before it will deliver a mail ballot to that voter without the potential for widespread errors. While the volume and severity of these errors is yet unknown, the risk of error created by hundreds of thousands of supplements via simultaneous uploads to the Colorado-specific List in an as-yet uncreated and unsecured "Postal Service Federal Ballot Mail Portal" is obvious and significant. The constitutional right of U.S. Citizens to vote in federal elections is too precious to both individual American citizens and to our democracy to be usurped by this illegal and ill-considered rulemaking. The Postal Service must withdraw both its proposed rulemaking and abandon its proposal to appoint itself as an arbiter between locally elected election officials and their voters.

### 5. Additional Objections

The Colorado Department of State objects to the proposed definitions of a "Mail-in or absentee ballot" and "Federal election," to the separation of the proposed additions from the existing DMM section on Ballot Mail, and to the absence of any prohibition on federal actors altering the state-specific lists.

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



### A. Proposed § 705.24.1.c Defining "Mail-in or absentee ballot"

The proposed definition of "Mail-in or absentee ballot" conflicts with Colorado law. It wrongly assumes that all "mail-in or absentee" ballots are delivered to Colorado voters by U.S. Mail and excludes the mail ballot packets that Colorado election officials provide to voters who request them in person. Colorado voters are entitled to request a mail ballot packet at a polling place or at the office of an election official. Colo. Rev. Stat. §§ 1-7.5-107(2.7). Voters can choose to return those voted ballots via U.S. Mail. Colo. Rev. Stat. § 1-7.5-107(4)(b). The proposed but baseless distinction will cause confusion among Colorado election officials and is likely to disenfranchise eligible voters who choose to obtain a mail ballot packet in person and attempt to return their voted ballot via U.S. Mail. For this reason also, the Postal Service should withdraw this proposed rulemaking as unreasoned and unworkable.

### B. Proposed § 705.24.1.f Defining "Federal election"

The proposed definition of a "Federal election" appears to exclude federal congressional vacancy elections. If this is an intentional choice, and to the extent the rulemaking is not withdrawn in its entirety, the Colorado Department of State requests that the Postal Service make that exclusion explicit.

### C. Effective Date

The Postal Service must withdraw this rulemaking because it is impossible for Colorado election officials to satisfy the proposed requirements in advance of the November 2026 federal election. Local election officials must submit their final plans for this election to the Colorado Department of State by July 6, 2026. Colo. Rev. Stat. § 1-7.5-105. Election plans include all items required to administer the election, including outgoing and return envelopes, voter instructions, VSPC and ballot drop box locations, operating hours, and correspondence with voters, including notices and cure letters. *Id.* The Postal Service will not issue a final rule before those plans are due, and election officials will have no opportunity to respond to any changes to the DMM. Furthermore, election officials also must send every eligible voter a mail ballot packet for this election by October 5, 2026. Colo. Rev. Stat. § 1-7.5-107(2.7). Changes to ballot or envelope design (*e.g.*, bilingual ballots) must be completed at least 120 days prior to mailing, but the Postal Service may not issue a final rule until July 29, 2026, *see* EXEC. ORDER NO. 14,399, 91 FR 17127 (Mar. 31, 2026), leaving slightly more than 60 days before ballot mailing. This is simply not enough

STATE OF COLORADO
Department of State
1700 Broadway, Suite 550
Denver, CO 80290

Jena Griswold
Secretary of State
Andrew J. Kline
Deputy Secretary of State



time for election officials. The Postal Service should withdraw this proposed rulemaking because its timing is unreasoned and unworkable.

### D. Existing § 703.8 Ballot Mail

The DMM already contains a section addressing Ballot Mail, specifically § 703.8. The Colorado Department of State recommends that any changes to DMM requirements for Ballot Mail be incorporated into § 703.8 rather than § 705 for ease of reference.

### E. Prohibit Alterations to State-Specific Mail-In and Absentee Participation Lists

The introduction to the proposed rule states that "the Postal Service would not change the information provided by the state when compiling the [state-specific Mail-In and Absentee Participation] [L]ists." 91 FR 32,916. If this rulemaking is not withdrawn in its entirety, a final rule must prohibit federal actors from making any alterations to the state-specific lists.

## Conclusions and Recommendations

For the reasons stated above, the Colorado Department of State urges the Postal Service to withdraw this proposed rulemaking. It is contrary to the United States Constitution, the Colorado Constitution, and federal and state laws. It far exceeds the authority and mission of the Postal Service. Instead of trampling States' constitutional authority to administer elections, the Postal Service should fulfill its existing obligations to election officials and commit to expediting the timely delivery of Federal Ballot Mail. Election administration must be left to experts in the states and counties that have administered free and fair elections since the founding of the republic.

____________________________

Andrew Kline
Deputy Secretary of State
State of Colorado