**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. ________________ |

# DECLARATION OF GABE ROSENBERG

I, Gabe Rosenberg, declare as follows:

1. I am a resident of the State of Connecticut. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Secretary of the State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

## Introduction and Background.

2. I am the Chief of Staff and General Counsel in the Office of the Connecticut Secretary of the State ("SOTS"). As Chief of Staff and General Counsel, I work for the Connecticut Secretary of the State, the Honorable Stephanie Thomas, and support her in her official capacity as the Commissioner of Elections for the State of Connecticut. *See* Conn. Gen. Stat. § 9-3. In my role, I assist her in the execution and enforcement of all state and federal laws relating to elections.

3. I have worked at SOTS since 2017 when I began as Communications Director. I became General Counsel to the Secretary of the State in May 2020, and Chief of Staff and General Counsel in March 2022.

4. Connecticut and its municipalities are responsible for administering elections in Connecticut. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks. The Legislation and Elections Administration Division ("LEAD") of the Office of the Secretary of the State is responsible for creating the election calendar for voters, candidates, and local election officials; and providing information to the public about how and where to vote, and how and where to register to vote. LEAD is also the repository for various elections-related documents. The Secretary of the State and LEAD interpret Title 9 of the Connecticut General Statutes and issue instructions and opinions to effectuate the administration of elections and primaries. *See* Conn. Gen. Stat. § 9-3. Together with the Secretary, LEAD may issue an order to any local registrar of voters ("ROV") or election moderator to correct any irregularity or impropriety in the conduct of an election, primary, recanvass, or audit. *Id.*

5. The Secretary of the State is the state's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state. *See* Conn. Gen. Stat. § 9-3. Pursuant to that statutory authority, the Secretary is presumed as correctly interpreting and effectuating the administration of elections and primaries under Connecticut law and, in so doing, liberally construes statutes, ordinances, and regulations in favor of protecting the right to vote. *See* Conn. Gen. Stat. §§ 9-3, 9-368o. LEAD is responsible for implementing the Secretary of the State's responsibilities with regard to elections, including advising on election

laws and providing technical information to the public and other parties. Connecticut law charges my office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. Conn. Gen. Stat. § 9-368o. While the Connecticut Secretary of the State is the state's Chief Election Official, *see* Conn. Gen. Stat. § 9-3, Connecticut's elections are administered to a significant degree on the local level. Each of Connecticut's 169 towns has ROVs—typically two, with one from each of the major parties—and a Town Clerk who together administer elections. The Secretary has some oversight of local election officials, *see* Conn. Gen. Stat. §§ 9-3, 9-4, but it is limited by statute.

6. While Connecticut SOTS does not directly administer elections, we do provide extensive training to local election officials, including to ROVs, Town Clerks, poll workers, and other town staff. These trainings include instructions on absentee ballot procedures including but not limited to who may be sent an absentee ballot, who may assist an individual with their application or return of the ballot, procedures on conducting supervised absentee balloting, and the counting and processing of absentee ballots.

7. Additionally, SOTS helps the towns with administering the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301 *et seq.*, by providing related training and guidance to Town Clerks and ROVs. We also work in conjunction with the Federal Voting Assistance Program ("FVAP") to produce a guide for UOCAVA voters.

8. As Chief of Staff and General Counsel, my team at LEAD and I are responsible for many functions, but most relevant to this matter are our responsibilities regarding state and federal voter registration laws including coordinating state duties under the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*; Conn. Gen. Stat. § 9-23k. In addition, LEAD is responsible for prescribing voter registration forms and instructional materials for

voters and local election officials, such as fact sheets, voter guides and comprehensive manuals; assisting with the implementation of automatic voter registration; maintaining a statewide centralized voter registration system ("CVRS"); and sharing information from CVRS with other states to maintain the voter registry list. LEAD also prescribes the forms for absentee ballots and provides ongoing assistance and training to local election officials regarding absentee ballots. SOTS works in conjunction with the State Elections Enforcement Commission ("SEEC") to create fact sheets for candidates regarding the laws governing the application for and return of absentee ballots. Our office also responds to requests from candidates, political parties, and the public for information regarding absentee ballots.

9. My office and municipalities statewide are currently preparing to administer the November 2026 general election. Federal, state, and local races will be on the ballot. This past legislative session, the Connecticut General Assembly ("CGA") amended the state's early voting procedures to allow voters to insert their voted ballots directly into the tabulators (rather than using the envelope system which functioned like in person absentee balloting). Public Act 26-1. Implementing this has required SOTS staff to spend considerable time updating manuals and forms, conducting online trainings and monthly calls with local election officials, and handling an extremely high volume of questions from local election officials. This year, the CGA also passed universal access to absentee ballots and changed absentee voting from using a two envelope return system (where the voter places their ballot inside an inner envelope and signs that inner envelope before placing it into an outer envelope that serves as the return envelope) to a single envelope return system. Public Act 26-42. As all of these changes were effective upon passage, my office has worked, and continues to work, to update forms and educational manuals. They are also creating new forms required by law and new educational materials, including but

not limited to manuals, FAQ documents, guidance mailings, and public outreach documents. My staff is also conducting trainings for local election officials on these legislative changes, the new tabulator procedures under the amended early voting process, as well as trainings on the new centralized voter registration system that is set to go live in December of 2026. My staff is also updating the online poll worker training platform to reflect the 2026 legislative changes, conducting a pilot program on risk limiting audits for the 2026 election and preparing for implementation of the program for 2027, preparing for 2026 post-election audits, administering an election monitor program, and facilitating the requirements associated with the Translation Advisory Committee which works with towns required to translate written materials into Spanish for the 2026 election. My staff is also part of three working groups that address absentee ballots, increasing voter participation, and Justice of the Peace issues. My staff must also develop and administer processes for investigating and disciplining Justices of the Peace for misconduct.

10. Connecticut provides an absentee ballot to all registered active voters who submit an application. Connecticut sends the majority of these ballots to voters through the United States Postal Service ("USPS").

11. In Connecticut, ballots are mailed by the municipal clerk to voters in each of Connecticut's 169 towns. Voters may return their completed absentee ballot by mailing it in a ballot envelope issued by the municipal clerk or returning it in person. The mail ballot envelopes for the return of ballots are designed by SOTS and must conform with state law. Conn. Gen. Stat. § 9-135, as amended by Public Act 26-42, requires that each return envelope be endorsed on the outside with the words "OFFICIAL ABSENTEE BALLOT" and bear a label generated by the state-wide centralized voter registration system which must include the following elements: "(1)(A) the name and return address of the sender, (B) the applicant's name and voting residence by

street and number, (C) the applicant's voting district, (D) the ballot style, (E) the unique ballot identification number, appearing both in a text format and as a scannable barcode, and (F) the date of the primary, election or referendum at which the ballot is to be cast and, if the absentee ballot is to be cast at a primary, the name of the party holding the primary, and (2) a notice, sufficient to warn any person handling the ballot, of the restrictions . . . concerning who may possess or return the ballot and the restrictions and penalties . . . concerning the completion or execution of absentee ballots. The clerk shall also inscribe such clerk's official address for the return of the ballot on the return envelope prior to issuance of the ballot and return envelope." Mail ballots are not required by Connecticut law to include Intelligent Mail barcodes. Municipal Clerks begin mailing ballots to eligible voters on October 2, 2026 (31 days before the election, or beginning on the next proceeding business day if such day is a Saturday, Sunday, or legal holiday). Conn. Gen. Stat. § 9-140 (f).

12. Municipal Clerks continue to send mail ballots as additional voters register to vote or request an absentee ballot, up to the day before the election, or November 2, 2026.

13. I am familiar with the Notice of Proposed Rulemaking issued by USPS that was published in the Federal Register on June 2, 2026. My office submitted a comment on the Proposed Rule expressing opposition and identifying specific concerns, including a substantial risk of voter confusion and disenfranchisement. Under this proposed rule, voters are likely to receive a mail ballot from their local election official that USPS will later refuse to return. In that situation, the voter may think that they have voted, but they have not. The voter would not necessarily know to cancel that ballot and vote in person, given that the proposed rule does not charge USPS with notifying the voter. My office must take every measure possible to avoid this

kind of voter disenfranchisement. A true and correct copy of that comment letter is attached to this declaration as Exhibit A.

14. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule will imminently cause significant harm, confusion, and disruption in Connecticut election administration, and will impose unrecoverable costs on Connecticut.

15. For the reasons discussed throughout this declaration, the Connecticut Office of the Secretary of the State must act now to align Connecticut's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

16. My office has already had to field questions from the press and the public regarding the potential impact of this Rule. My staff has had to hold internal meetings and begin drafting guidance for municipal clerks and registrars of voters ("ROVs"), all while overseeing Connecticut's August 11, 2026 primary and now preparing for the November 3, 2026 election.

17. This diversion of attention and resources has produced an incredible strain on the limited staff in our office while preparing for the 2026 election and implementation of the statutory changes detailed above in paragraph 9. Our staff is comprised of 1 Director of Elections, 1 Assistant Director, 5 attorneys, 2 program managers, 1 state Voting Rights database manager, 1 GIS manager, 6 election officers, and 3 clerical positions. This Rule has pulled

attorneys from their projects of managing the roll out of the new tabulators to 169 municipalities, creating education manuals and presentations on the new tabulator technical and procedural instructions, drafting and reviewing contracts regarding the tabulators and our new voter registration system that is going live later this year, and answering voluminous amounts of election related questions from election officials, legislators, candidates, and voters. Diverting the attention of SOTS staff from managing the roll out of the new voter registry database is especially problematic. This is our biggest change in our centralized voter database system in more than 20 years. Implementing it requires learning the technical aspects of the new database, creating education manuals and PowerPoint presentations on the new database system, conducting training for local election officials on the new system, and answering questions from election officials regarding the system. The Rule has also diverted time and resources from overseeing the newly implemented Translation Advisory Committee directly during the time in which the committee is developing its structure and overseeing the timely submission of the election materials required to be translated by the federal and state Voting Rights Acts. We are currently so short-staffed and backlogged with addressing matters like those discussed above that the unfunded mandates required by this Rule have been very burdensome, and will continue to be very burdensome, for our small team to assess and implement, especially on such an unrealistic and compressed timeline.

**<u>The Rule's Requirement to Provide and Update Voter Lists Interferes with and Harms Connecticut's Ability to Administer Elections.</u>**

18. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, election officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent

Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In Connecticut, we would have to provide the information by October 2, 2026 (the date Connecticut starts to send out mail ballots), and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

19. These requirements impose significant financial costs on my office and the municipalities and, in my assessment based on years of experience in elections, will not be able to be implemented on this compressed timeline in a way that will minimize errors. Again, based on my experience, I believe there are almost certainly going to be voters in Connecticut who are disenfranchised as a result of this proposed system if it is allowed to be implemented.

20. Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to ensure local election officials understand any differences between it and Connecticut's own list of voters eligible to receive mail ballots. As a baseline matter, comparing the USPS Mail Ballot List to our current statewide voter registration list will necessitate linking registrants across the lists. Implementing this requirement for 2026 accurately is probably impossible given the time and our stretched staff and resources. The USPS Mail Ballot List will almost certainly not contain the same Connecticut-specific unique identifiers used to match voter records in Connecticut's statewide voter registration system. Connecticut's local election officials rely on Connecticut-issued driver's license numbers and Connecticut voter ID numbers to perform accurate record matching, which federal agencies generally do not have. There will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information can vary (e.g., Robert vs. Bob, Apartment #3 vs. Apt. 3, a junior or senior, etc.). I know from my experience that data matching is a complex process, and extreme care must be taken when the consequence of errors leads to voter disenfranchisement.

21. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources on both the state and local levels. Each Connecticut municipality would need to hire additional staff to assist the registrars of voters with the comparison and verification or otherwise incur additional costs to pay current staff for extra hours. This creates an additional financial and logistical burden on our municipalities, which are already under incredible strain. Connecticut recently implemented early voting, and many towns are struggling with high attrition rates of their local election officials, resulting in shortages of staff for day-to-day statutory responsibilities. Many registrars are part-time employees of their

town. The need for additional staff to perform the comparison and verification without any additional funding will place many municipalities in difficult financial positions due to their municipal budgets having already been set for this year.

22. Connecticut would expend significant resources attempting to supplement and amend the USPS Mail Ballot list as necessary if errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to USPS. Even with the best efforts of my office and local election officials, the challenges of completing a complex data-matching program in a short timeframe, while also preparing to administer the first general election following sweeping generational changes to Connecticut's election laws, pose an incredibly high risk of errors and omissions.

23. I have great concerns about the feasibility of USPS competently implementing this system in either a timely or accurate fashion considering the limited time before the November election. Any delay or mistakes on the part of USPS will cascade down to my office causing a very condensed time for implementation (including developing trainings for registrars of voters and municipal clerks). That delay will then also cascade down to the registrars and municipal clerks who will first need to learn the procedures and then work to enter each individual voter's data in an extremely condensed time before the November election. Any failure in this chain, either technological or implementation related, may lead to the inability of Connecticut to deliver mail ballots to our voters in accordance with state and federal law. Moreover, Connecticut does not have a ballot receipt grace period like some states so ballots not received by an election official in Connecticut by 8 p.m. on Tuesday, November 3, 2026 will not be counted. Conn. Gen. Stat. § 9-140b.

24. As a result of the Rule, my office must immediately prepare and update guidance for local elections offices to ensure a consistent approach across Connecticut's 169 municipalities. This guidance would have to address topics such as using the USPS Portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protection and ensure that none of our voters who are enrolled in the address protection programs have their privacy and safety violated. These preparations and updates will require significant time, personnel, and money. This is yet another aspect of implementation that will necessarily divert our team's resources from other critical election administration tasks.

25. Connecticut anticipates mailing ballots to approximately 175,000 to 200,000 voters during the 2026 general election during the period from October 2, 2026 to November 2, 2026.

26. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all 175,000 to 200,000 voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that election officials typically receive in the months, weeks, and days before any election.

27. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and municipal election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111,

Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, election officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when election officials mail a replacement ballot. Election officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information.

28. State law allows a voter who spoiled an unvoted mail ballot to request a new ballot up to the day before an election. To ensure that voters receive these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

29. Based on what information is available, I estimate that it will take thousands of total hours for election staff to become authorized users of the USPS Ballot Portal and enroll all voters, assuming there are no delays caused by technical or processing difficulties. Connecticut's Centralized Voter Registration System, CVRS, does not currently store Intelligent Mail Barcode, IMb, information for absentee ballot mailings. The USPS rule requires both a unique outbound IMb and a unique return IMb for each voter included in the Federal Ballot Mail Portal submission. Because CVRS does not currently contain these IMb values, Connecticut would not be able to generate the mailing labels with the required IMb when issuing the ballots in the CVRS system. Also, the CVRS system is only able to create the required Portal bulk upload file

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

using only information already stored in CVRS which does not include the IMb data. To support this process efficiently, changes to CVRS would likely be needed so that the outbound and return IMbs can be generated and stored with the appropriate absentee ballot record and included in a bulk export for the USPS Portal. Without these changes, local election officials would have to contract with mail processing vendors to combine CVRS voter information with IMb information outside of the system before mailing ballots and uploading the file to USPS. Therefore, although USPS states that it does not anticipate that states will need to change their statewide systems or databases, that does not appear to be the case for Connecticut. Since CVRS does not currently maintain the required IMb information, Connecticut would need either system changes or a new manual process to collect, match, and prepare the required data for submission to the USPS Portal. The document specifically says USPS will publish the Portal User Guide and Technical Specifications covering file format, account/user management, errors, and subsequent submissions. Without this information it is very difficult to determine the required changes needed to CVRS and associated processes. Additionally, towns will have to identify and designate authorized users for the portals and train them. It is unclear how much time this training would take without knowing the technical specifications of the portal. Municipal clerks will have to look at each individual ballot return envelope and outbound ballot envelope to ensure the information aligns with the municipal bar codes that match the identifying voter ID number information in the CVRS database. This may involve performing database searches using the name and/or date of birth and/or address to find voter matches. This becomes more complicated with juniors and seniors who reside at the same address. This alone will take anywhere between 5-10 minutes for each voter. It is unclear how much identifying information will be provided by USPS to ensure proper matching and whether that will add additional time to

this process. But technical and processing delays are common, especially with implementing a new, untested technology and process. All of this is occurring at a time when local election officials are in the process of learning how the new tabulators and CVRS work while implementing sweeping changes to Connecticut's election laws. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Connecticut exponentially. And if the system fails, Connecticut may be unable to mail ballots to voters at all.

30. In Connecticut, registrars of voters maintain individual voter data from the residents within their town in CVRS. Registrars receive and process voter registrations and changes of address to continually update the CVRS database. Municipal clerks and registrars of voters provide and accept returned applications for absentee ballots. Records of the issuance of the absentee ballot are updated within CVRS by the municipal clerks and ROVs. These local election officials receive returned absentee ballots and update that status within CVRS. CVRS is a constantly changing database as voter registrations are received and processed throughout the year, including on election day. From the first day absentee ballots are available and throughout election day, local election officials continually update CVRS to reflect the status of individual absentee ballots. Because all of these changes occur on a continuous basis, often within extremely sensitive timelines, it is extremely difficult for Connecticut to provide a list of absentee voters to USPS. Any delay caused by the additional steps required by this Rule could prevent voters from having enough time to receive and return their absentee ballots before the close of polls.

31. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or

other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

32. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

33. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

34. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

35. The risks of errors are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

36. As a result of the Rule, and to mitigate the impact of all this uncertainty and turmoil, Connecticut will have to devote significant time, personnel, and money to update training materials for local election officials and their staff. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and to process election mail. This is yet another aspect of the Rule that will necessarily divert 80% of our teams resources from other important election administration tasks.

**Implementing New Envelope Standards and Ballot Envelope Design at this Stage is Likely to Disrupt and Delay Connecticut's Voter Mail Program.**

37. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery

Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

38. These requirements of the Rule necessitate immediate action from me and my team in SOTS. While in the midst of a primary and preparations for the November election, my office will need to meet with USPS to discuss envelope designs and then will need to divert staff resources to re-design the envelopes with the Intelligent Mail Barcode. My staff will then have to meet with the printing vendors and the municipal clerks to coordinate the printing and delivery of the envelopes.

39. Our agency anticipates mailing approximately 175,000 to 200,000 ballots to voters during the 2026 general election with that number expected to substantially increase by 2028 due to the implementation of universal access to absentee ballots.

40. SOTS and local election officials have consistently relied upon election mail guidance from USPS to design and mail ballots, and relied on that guidance in preparations that have already been taken for the November 2026 general election.

41. Connecticut has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of $165,889.00. Connecticut would not be able to use any of these envelopes for the November 3, 2026 election and would have to order new envelopes to comply. Given our budgetary constraints, we will not be able to ask for any additional funding for a reprint and will have to redirect funds from other necessary projects such as voter information campaigns. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71.

42. Connecticut does not currently use Intelligent Mail barcodes on ballot mail. Accordingly, funds would need to be pulled from the already strained budget of the Secretary of the State. However, Connecticut municipal clerks utilize other safeguards to ensure the accuracy and security of absentee ballots. For example, each municipality creates a unique label with a barcode for the absentee ballot envelope (which also has a serial number printed on it). The town clerks scan the barcode label which pulls up the voter profile in the database and identifies the voter by the voter ID number. The town clerk logs the manner the absentee ballot was returned (in person by the voter or a designee, by mail, or by drop box) in the CVRS which ensures there is no double voting.

43. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, but that tool is only available for mailings with fewer than 50,000 pieces of mail.[2] The largest municipalities in Connecticut would not be able to use that tool for election mail. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes, which may have already been ordered, do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47. No Connecticut municipality currently submits ballot envelopes to USPS for design review. In 2020, SOTS worked closely with USPS to determine the proper placement of the municipal barcode labels to ensure that the placement

---

[2] *See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

would not interfere with the USPS machine sorting process. The municipal barcode labels provide essential tracking information that ties the individual ballot to the individual voter profile within CVRS, which the Intelligent Mail Barcodes will not do.

44. In Connecticut, as in much of the country, ballot envelopes vary by municipality. While Connecticut law previously required the absentee ballot be returned in an inner envelope that is placed in an outer envelope with the label discussed above, the Connecticut legislature passed a bill in 2026 that removed the outer envelope from the absentee ballot process. This further reduced the available space on the now, singular envelope which will need to have an area for the voter's attestation and signature as well as the municipal label. The addition of yet another barcode will only further the complexity of the envelope layout.

45. Furthermore, I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions nationally. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Connecticut voters. Indeed,

delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local election officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

**USPS Ballot Rejection Will Likely Result in Eligible Connecticut Voters, including Members of Our Nation's Submarine Force, not Timely Receiving Mail Ballots to Which They are Entitled Under State and Federal Law.**

46. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law.

47. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Connecticut citizens as possible can exercise their right to vote. In the 2024 general election, 120,422 Connecticut citizens voted by mail. In 2026, Connecticut implemented universal access to absentee ballots, which allows all active voters to request to receive and return their ballots by mail. The November 3, 2026 election will be the first general election where Connecticut voters will be able to vote via absentee ballot without meeting a limited set of statutory reasons for voting absentee. Accordingly, we expect to see a higher volume of absentee ballots this November than we saw in 2024. This method of voting is particularly important for the many Connecticut citizens who are members of the US Navy Submarine Force. Connecticut is home to Naval Submarine Base New London, the primary United States submarine base on the East Coast. All submariners, whether officer class or enlisted, are trained at the submariner school on the base. Submariners face unique hurdles in

exercising their right to vote due to the limited communication available to them during underwater exercises and missions. Submariners may, with little to no notice, be given orders to go on "underway" exercises for periods ranging anywhere from 30 to 120 days, where, during this period, the submarine is submerged and access to the internet is limited and throttled. The submarine may not surface during this exercise until returning to base. This makes the availability of mail-in ballots essential to our Submarine Force.

48. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of election officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or election officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

49. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

50. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. I anticipate we will receive many inquiries from voters concerned whether USPS will deliver ballots to and from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election and the multitude of projects detailed in paragraph 9.

51. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail.

52. I estimate that an adequate public education effort addressing all aspects of the Rule would likely cost between $2 million to $9 million, depending on the extent of the outreach ultimately required to inform the public about the rule's impact. Such public education effort would pull from, among other things, the agency resources allocated for the public information campaign regarding the changes to Connecticut's early voting and absentee ballot laws that recently passed in the state. There are approximately 8,000 registered military voters in Connecticut, located with some concentration in the areas of New London, Hartford, and New Haven. This population of military voters is both highly mobile and dispersed, making them especially vulnerable to the possibility of disenfranchisement under this Rule. I expect that such a campaign would need to broadcast on television in the Hartford-New Haven media market and cable statewide. Direct mailing and military media outreach would also be necessary. Due to the decentralized nature of information sources as a result of the rise of social media, many more forms of media outreach are needed today than ever before. The information campaign would also need to appear on social media platforms such as Meta, X, and TikTok, as well as on

streaming platforms such as Roku, YouTube, and Hulu to implement a widespread and effective campaign and demonstrate aggressive outreach across every major media channel. Connecticut would need these efforts to provide a clear argument that the State took all reasonable actions to inform every military voter. Our best estimate, based on a one-town campaign we previously ran, a quote from a vendor for a military voter campaign, and previous statewide campaigns we have run, is that this campaign would cost between $2 and $9 million.

53. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local election officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

**The Rule being Implemented Immediately before the Election Magnifies its Harms to Administering Connecticut's Election.**

54. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

55. Connecticut concluded its primary election on August 11, 2026, with the early voting period of August 3 to August 9, 2026. My staff was required to be on call for all hours of voting and assisted local election officials with all procedural and technical questions during that time.

56. Municipal clerks must begin mailing ballots for the 2026 general election in the coming weeks. In fact, this process already started. On August 5, 2026, municipal clerks were required to make available (by mail or electronically) blank absentee ballots to members of the armed forces and their families. Conn. Gen. Stat. § 9-153e. Those ballots will need to be returned to the municipal clerk via mail, drop box, or hand delivery. Consistent with federal law, agencies

mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). In addition, state law requires that municipal clerks begin mailing absentee ballots to all other eligible voters no later than October 2, 2026. Conn. Gen. Stat. §9-140(f). Municipal clerks will continue mailing ballots through November 2, 2026, consistent with state law.

57. Additionally, my office must ensure that our local election officials continue to register those who are eligible to vote in Connecticut. Connecticut allows qualified individuals to register by mail, online, at their local registrar of voters' or town clerk's office, at various state social service agencies, through Connecticut's Department of Motor Vehicles, and through other voter registration agencies, up to 18 days before Election Day, and in person during early voting. Conn. Gen. Stat. §§ 9-20; 9-20a; 9-23g; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration for a period no shorter than the 30 days preceding a federal election). Additionally, Connecticut allows voters to register on Election Day, if they satisfy the applicable requirements. Conn. Gen. Stat. § 9-19j. When registering to vote, individuals must verify their eligibility (including citizenship) by attestation under penalty of false statement. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in an influx in voter rolls and requiring time from election officials.

58. In compliance with the NVRA "quiet period" for voter registration, Connecticut does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Connecticut does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled prior to the eighteenth day

before the election or primary, when a voter registers to vote in another state, district or territory, and when a voter has died. Conn. Gen. Stat. §§ 9-21; 9-35; 9-35a; 9-35b.

59. In sum, Connecticut's statewide voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

60. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters. The implementation of this Rule will require all members of my team to divert their time from the high priority projects as discussed in paragraph 9 and the day-to-day statutory responsibilities of administering elections. This will delay my team's ability to work on providing election officials with their updated instruction manuals for the newly deployed tabulators and recent legislative changes to early voting procedures. This diversion of resources is also occurring during the

extremely tight timeframe of the next couple of months during which the framework for the election is actually put into place. August is when the major party primaries occur in Connecticut and election officials must staff and work the primaries. As mentioned above, our office must staff help lines and provide legal and technical support to the towns during the primary. There is a special primary scheduled for September 1st that our staff will have to provide legal and technical support during as well. In early September, minor parties submit their nominations for the November general election ballot. and minor parties and petitioning candidates also bring ballot access litigation challenging the Secretary's decision regarding ballot placement.. By mid September, SOTS must send a list of candidates for state and district offices to municipal clerks. Late September is when absentee ballot and UOCAVA applications are received and processed by election officials. October is when absentee ballots become available and local election officials finalize the administration of the election and oversee early voting. Simply put, there is no down time between now and Election Day for either our limited staff or the already strained local election officials of Connecticut. The months preceding an election are a time-consuming period of high pressure and not one that seasoned election administrators ever choose to make major changes to the election process. Those are typically planned for a year or more preceding an election and then implemented in an orderly, well-planned, and transparent manner so that voters and election officials all understand the changes and how to comply with them.

**The Federal Government Threatening to Prosecute Connecticut Election Officials as a Result of the Rule's Mail Ballot Tracking System is Chilling and Makes it Harder to Recruit and Retain Election Officials.**

61. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily

avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, EO § 2(b) (March 31, 2026); *see also id.* § 5 (providing that "State or local election officials . . . [and] individuals involved in the administration of Federal elections; or public [] entities engaged in the printing, production, shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under" various federal criminal laws). The Executive Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data,"

which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter to Secretary of the State, Stephanie Thomas, dated July 7, 2026, the United States Department of Justice specifically threatened to prosecute election officials if noncitizens cast any ballots.

62. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote even though, in our experience as election officials, noncitizen registration and voting are both extraordinarily rare.

63. I am worried that myself and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Connecticut's registered voters are not citizens. I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they will violate the Rule, but because the Rule increases the amount of pressure and scrutiny on them, including by the public, who might believe false narratives about voter fraud, election official misconduct or fraud. We have experienced that type of hostility firsthand in Connecticut so we know what can be generated by misinformation, disinformation and mal-information directed at election officials. We already have had significant issues staffing state and local election positions, and I worry that this will only further the problem as people may not wish to take on the risk of federal criminal prosecution.

**This Rule, if Allowed to be Implemented, Will Have Detrimental Impact on the Administration of Connecticut's 2026 General Election and Potentially Beyond**

64. In conclusion, I estimate that the requirements of the Rule will require an increase or diversion of $2 million to $9 million to the Secretary of the State's budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. We submitted our budget for the fiscal year in the fall of

2024, so there is no additional funding available for this fiscal year. The Rule will increase financial strain on my office and necessitate a higher budget. I will either need to go back to the Legislature and ask for additional funds, which I am far from assured to receive, or will need to identify equivalent cuts elsewhere in my office, a very difficult and maybe impossible task.

65. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Connecticut's elections run smoothly and every eligible Connecticut resident can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, logic and accuracy testing, and voter challenges.

66. Each of these tasks and costs will collectively divert 80% of my staff from important election administration needs and even then, I am not sure it will be enough to properly implement this drastic change to our election process at the last minute. As detailed in paragraph 9, this essential work includes implementation of universal access to absentee ballots, new early voting procedures, review process for Justices of the Peace, and the Translation Advisory Council. Staff would also be hindered from providing the necessary training to local election officials who rely upon our office to keep them informed about changes to the electoral processes in Connecticut. The ability of my staff to provide training to local election officials on the new CVRS will also be negatively impacted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Hartford, Connecticut.

Gabe Rosenberg
Chief of Staff and General Counsel
Office of the Connecticut Secretary of the State

# Exhibit A

**Office of the Secretary of the State**
State of Connecticut
165 Capitol Avenue, Suite 1000
P.O. Box 150470, Hartford, CT 06115-0470

**Stephanie Thomas**
Secretary of the State

**Jennifer D. Barahona**
Deputy Secretary of the State

Director
Product Classification
U.S. Postal Service
475 L'Enfant Plaza SW, Room 4446
Washington, DC 20260-5015

**Via E-mail:** PCFederalRegister@usps.gov

Thank you for the opportunity to comment on the proposed rule regarding the transmission of mail-in or absentee ballots for federal elections.

## I. Election Administration in Connecticut

I, Stephanie Thomas, am the Connecticut Secretary of the State, and serve in my official capacity as the Commissioner of Elections for the State of Connecticut. *See* Conn. Gen. Stat. § 9-3. Connecticut and its municipalities are responsible for administering federal elections in Connecticut. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

The Legislation and Elections Administration Division ("LEAD") of the Office of the Secretary of the State is responsible for creating the election calendar for voters, candidates, and local election officials, as well as providing information to the public about how and where to register to vote and how and where to vote. LEAD is also the repository for various elections-related documents. The Secretary of the State and LEAD interpret Title 9 of the Connecticut General Statutes and issue instructions and opinions to effectuate the administration of elections and primaries. *See* Conn. Gen. Stat. § 9-3. Together with the Secretary, LEAD may issue an order to any local registrar of voters ("ROV") or election moderator to correct any irregularity or impropriety in the conduct of an election, primary, recanvass, or audit. *Id*.

As Connecticut's Chief Elections Officer, I am responsible for executing and enforcing state and federal law relating to elections within the state. *See* Conn. Gen. Stat. § 9-3. Pursuant to that statutory authority, the Secretary is presumed to correctly interpret and effectuate the administration of elections and primaries under Connecticut law and, in so doing, liberally construes statutes, ordinances, and regulations in favor of protecting the right to vote. *See* Conn. Gen. Stat. §§ 9-3, 9-368o. LEAD is responsible for implementing the Secretary of the State's responsibilities with regard to elections, including advising on election laws and providing technical information to the public and other parties. Connecticut law charges my office with preventing disenfranchisement and ensuring

**Office of the Secretary of the State**
State of Connecticut
165 Capitol Avenue, Suite 1000
P.O. Box 150470, Hartford, CT 06115-0470

**Stephanie Thomas**
Secretary of the State

**Jennifer D. Barahona**
Deputy Secretary of the State

that all eligible voters who want to vote are able to do so. *See* Conn. Gen. Stat. § 9-368o. Although the Connecticut Secretary of the State is the state's Chief Election Official, *see* Conn. Gen. Stat. § 9-3, Connecticut's elections are administered to a significant degree on the local level. Each of Connecticut's 169 towns has ROVs—typically two, with one from each of the major parties—and a Town Clerk who, together, administer elections. The Secretary has some oversight of local election officials, but it is limited by statute. *See* Conn. Gen. Stat. §§ 9-3, 9-4.

My office has a continuing obligation to work with the municipalities to assist in their performance of regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Vote Act ("HAVA"), and Connecticut state law. Registrars must certify to my office that they have conducted the annual canvass not later than 30 days following each regular election; my office provides registrars with a list of potential duplicate registrations to be examined and rectified, if necessary, by the registrars; my office transmits lists, which are provided each month by the state's Commissioner of Corrections, of electors who have been disenfranchised due to a felony conviction and confinement for examination and list maintenance performed by the registrars, and; the registrars must remove people who have died from the list of active electors in their municipalities. *See* Conn. Gen. Stat. §§ 9-21a, 9-32(a)-(c), 9-35(b), and 9-45.

Additionally, my office must ensure that our local election officials continue to register those who are eligible to vote in Connecticut. Connecticut allows qualified individuals to register by mail up to 18 days before Election Day and in person during early voting. *See* Conn. Gen. Stat. § 9-23g; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration for a maximum period of 30 days preceding a federal election, or as provided for by state law). Additionally, Connecticut allows voters to register on the day of the general election if they satisfy the applicable requirements. *See* Conn. Gen. Stat. § 9-19j. Connecticut citizens can register to vote online, at their local registrar of voters' or town clerk's office, at various state social service agencies, and through Connecticut's Department of Motor Vehicles when they submit sufficient information about their voter qualifications (including attesting to citizenship) through their transaction. Individuals must verify their eligibility by attestation under penalty of false statement.

In compliance with the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), Connecticut allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election. *See* 52 U.S.C. §§ 20302(a)(2). In fact, Connecticut allows uniformed and overseas voters to register for a federal election at any time, either by mail or in person. *See* Conn. Gen. Stat. § 9-26.

In compliance with the NVRA "quiet period" for voter registration, Connecticut does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a

**Office of the Secretary of the State**
State of Connecticut
165 Capitol Avenue, Suite 1000
P.O. Box 150470, Hartford, CT 06115-0470

**Stephanie Thomas**
Secretary of the State

**Jennifer D. Barahona**
Deputy Secretary of the State

statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Connecticut does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled prior to the 18th day before the election or primary. *See* Conn. Gen. Stat. § 9-35b.

In sum, Connecticut's statewide voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

Connecticut election officials are required by state law to issue absentee ballots to duly registered voters who submit an absentee ballot application beginning 31 days before an election and 21 days before a primary. *See* Conn. Gen. Stat. § 9-140(f).

In compliance with UOCAVA, Connecticut issues absentee ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election. *See* 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).

Connecticut provides an absentee ballot to all registered active voters who correctly submit their absentee ballot application.

## II. USPS Lacks Authority to Implement the Proposed Rule

On June 25, 2026, the federal court in *California v. Trump,* et al., 1:26-cv-11581 (IT) held that USPS lacks any statutory authority to create binding regulations for mail-in voting, *Id.,* at 31. The March 31, 2026 Executive Order that gave rise to this proposed rule is inconsistent with USPS's own procedures. Accordingly, the promulgation of this proposed rule is null and void.

## III. Negative Effect of Proposed Rule on Connecticut Elections

It is my understanding that the United States Postal Service ("USPS") proposed rule is in response to the March 31, 2026, Executive Order (EO) 14399, titled "Ensuring Citizenship Verification and Integrity in Federal Elections." Multiple sections of this EO have been struck down in federal court as unconstitutional.[1] Under this proposed rule, the USPS will not deliver ballots to Connecticut voters unless Connecticut complies with new requirements regarding envelope design and submission of voter lists. Specifically, it requires Connecticut to provide the USPS – at least 30 days before an election -- a list of voters who are expected to receive absentee ballots by mail. It also requires the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibits the USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List. It is also my

[1] See *California v. Trump*, Civil Action No. 1:26-cv-11581-IT, 2026 LX 388420 (D. Mass. June 25, 2026) and

**Office of the Secretary of the State**
State of Connecticut
165 Capitol Avenue, Suite 1000
P.O. Box 150470, Hartford, CT 06115-0470

**Stephanie Thomas**
Secretary of the State

**Jennifer D. Barahona**
Deputy Secretary of the State

understanding that Connecticut can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but the USPS is not required to accept any changes provided by Connecticut. The United States Post Office cannot implement a policy to refuse to deliver mail to obtain policy concessions. That amounts to coercion by a supposedly independent federal agency.

Additionally, it is not clear if we would even be told whether our changes to the USPS Mail Ballot List were accepted or rejected. So, local officials and our office could be fielding calls from angry voters wondering where their ballots are and have no way of knowing why they did not receive them — whether they were simply lost, or if they did not make the USPS' list.

Creating the State Mail Ballot List will require my office and local election officials to expend time and resources to ensure that all active registered voters who request an absentee ballot in a timely manner are included. This task will be significantly complicated by the influx of registration updates and changes that election officials typically receive in the months before the election.

Although the proposed rule indicates that states will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.

**Matching federal and state records would be complex, time consuming, and error prone**
Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to ensure local election officials understand any differences between it and our own list of voters eligible to receive mail ballots. As a baseline matter, comparing the Mail Ballot List to our current statewide voter registration list will necessitate linking registrants across the lists. Implementing this requirement would be challenging, if not impossible, as it is extremely doubtful that the Mail Ballot List will contain the same unique identifiers used to match voter records in Connecticut's statewide voter registration system. Connecticut's local election officials rely on Connecticut-issued driver's license numbers and Connecticut voter ID numbers to perform accurate record matching, which federal agencies generally do not have. Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, a junior or senior, etc.). I know from my experience that data matching is a complex process, and extreme care must be taken when the consequence of errors leads to voter disenfranchisement.

**An unfunded mandate that diverts resources from running elections**

**Office of the Secretary of the State**
State of Connecticut
165 Capitol Avenue, Suite 1000
P.O. Box 150470, Hartford, CT 06115-0470

**Stephanie Thomas**
Secretary of the State

**Jennifer D. Barahona**
Deputy Secretary of the State

Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources on both the state and local levels. Each Connecticut municipality would need to hire additional staff to assist the registrars of voters with the comparison and verification or otherwise incur additional costs to pay current staff for extra hours. This creates an additional financial and logistical burden on our municipalities, which are already under incredible strain. Connecticut recently implemented early voting, and many towns are struggling with high attrition rates of their local election officials, resulting in shortages of staff for day-to-day statutory responsibilities. Many registrars are part-time employees of their town. The need for additional staff to perform the comparison and verification without any additional funding will place many municipalities in difficult financial positions due to their municipal budgets having already been set for this year.

Connecticut would expend significant resources attempting to supplement and amend the USPS Mail Ballot list as necessary if errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the USPS. Even with the best efforts of my office and local election officials, the challenges of completing a complex data-matching program in a short timeframe, while also preparing to administer an election, pose a high risk of errors and omissions.

If this rule is implemented, Connecticut will have to devote significant time, personnel, and money to update training materials for local election officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Connecticut's voter registration list and are eligible to receive a mail ballot under Connecticut law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of implementation that will necessarily divert our team's resources from other critical election administration tasks.

**The proposal creates confusion and increases the risk of voter disenfranchisement**
The proposed rule also risks voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before an election, when state and local election officials are required under Connecticut law to send absentee ballots to all registered active voters who have applied for one. Any disenfranchisement of a voter would place my office and the election officials of the municipalities at the risk of legal challenges, furthering the burden on staff time and resources.

Sending mail ballots in a timely fashion is not only required by state and federal law, it is critical to ensuring that as many eligible Connecticut citizens as possible can exercise their right to vote.

**Military and overseas voters could be left behind**

**Office of the Secretary of the State**
State of Connecticut
165 Capitol Avenue, Suite 1000
P.O. Box 150470, Hartford, CT 06115-0470

**Stephanie Thomas**
Secretary of the State

**Jennifer D. Barahona**
Deputy Secretary of the State

In the 2024 General Election, 120,422 Connecticut citizens voted by mail. This method of voting is particularly important for the many Connecticut citizens who are members of the US Navy Submarine Force. Connecticut is home to the primary United States submarine base on the East Coast. **All** our US Navy submariners, whether officer class or enlisted, are trained at the submariner school on the base.

Submariners face unique hurdles in exercising their right to vote due to the limited communication available to them during underwater exercises and missions. Submariners may, with little to no notice, be given orders to go on “underway” exercises for periods ranging anywhere from 30 to 120 days. During this period, the submarine is submerged, and access to the internet is limited and throttled. The submarine may not surface during this exercise until it returns to base. This makes the availability of mail-in ballots essential to our submarine force. Active-duty submariners who become stationed at the base following the transmission of the USPS Mail Ballot List would face disenfranchisement, as would those who are unable to register until after the transmission of the USPS Mail Ballot List due to underwater assignments.

**One error could prevent an eligible voter’s ballot from counting**
Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under this proposed rule, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return. In that situation, the voter may think that they have voted, but they have not. The voter would not necessarily know to cancel that ballot and vote in person, given that the proposed rule does not charge USPS with notifying the voter. My office must take every measure possible to avoid this kind of voter disenfranchisement.

**Connecticut’s existing ballot security measures already work**
Connecticut municipalities do not currently use Intelligent Mail barcodes on ballot mail. They do, however, utilize other safeguards to ensure the accuracy of absentee ballots. For example, each municipality creates a unique label with a barcode for the absentee ballot envelope (which also has a serial number printed on it). The town clerks scan the barcode label, which pulls up the voter profile in the database and identifies the voter by the voter ID number. The town clerk logs the manner the absentee ballot was returned (in person by the voter or a designee, by mail, or by drop box) in the centralized voter registration system, which ensures there is no double voting.

No Connecticut municipality currently submits ballot envelopes to the USPS for design review. In 2020, LEAD worked closely with the USPS to determine the proper placement of the municipal barcode labels to ensure that the placement would not interfere with the USPS machine sorting process.

**Office of the Secretary of the State**
State of Connecticut
165 Capitol Avenue, Suite 1000
P.O. Box 150470, Hartford, CT 06115-0470

**Stephanie Thomas**
Secretary of the State

**Jennifer D. Barahona**
Deputy Secretary of the State

Connecticut municipalities use materials prescribed and furnished by the Secretary's office for the transmission of absentee ballots. *See* Connecticut Public Act 26-42, § 3. A new Connecticut law requires an absentee ballot to be returned in a single envelope. This change to a single envelope will further reduce the available space on the envelope, which will need to have an area for the voter's attestation and signature as well as the municipal label. The addition of yet another barcode will only further complicate the envelope layout.

**Federal envelope approval could delay ballots to Connecticut voters**
Furthermore, I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for millions of jurisdictions nationally. Waiting on the USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Connecticut voters. Managing the fallout from such a delay would force my office and local election officials to divert critical time and money from other election administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

## IV. Conclusion

For all the reasons above and enumerated by the comment hereby submitted, Connecticut respectfully asks that the USPS reject this proposed rule in accordance with the ruling in *California v. Trump,* et al., 1:26-cv-11581 (IT) to ensure that elections continue to remain free, fair, and orderly within the states. Rejection of this proposed rule would also maintain the constitutional framework as envisioned by the founding fathers: keeping the administration of elections solely within the power of the states and honoring the separation of powers.

"The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." James Madison, The Federalist Papers: No. 47.