**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. _______________ |

**DECLARATION OF ANTHONY J. ALBENCE**

I, Anthony J. Albence, declare as follows:

1. I am a resident of the State of Delaware. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Delaware's Department of Elections staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

[**Intro and Personal/Agency Background**]

2. I am the State Election Commissioner for the State of Delaware.

3. I have served as Delaware's State Election Commissioner since July 2019. Prior to that, I worked for the Department of Elections as the County Director for New Castle County Delaware for twelve years. I have a bachelor's degree from the Catholic University of America in Washington, DC, and a master's degree in urban affairs and public policy from the University of Delaware.

4. Delaware's Department of Elections is responsible for administering elections in Delaware. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5. The State Election Commissioner is the state's Chief Officer of Elections. Under Delaware law, either the Department of Elections or the Commissioner is responsible for administering all aspects of federal and state elections in Delaware and many aspects of municipal elections in Delaware. *See* 15 *Del. C.* §§ 201, 302; *see gen.* 15 *Del. C.* §§ 101-8046. In my role, I supervise the execution of elections and enforcement of all state and federal laws relating to elections within Delaware. *See* 15 *Del. C.* § 302. I oversee the Department of Elections communications about elections, voting, and voter registration to the public. I advise Delaware's legislature and Governor on the effect that potential changes in the law would have on the operation of elections within Delaware.

6. In my role as State Election Commissioner, I am responsible for overseeing the execution of elections and enforcement of all state and federal laws relating to elections within Delaware. *See* 15 Del. C. § 302.

a) I have supervised aspects of voter registration in Delaware since 2007. I was the County Director for Delaware's largest county, New Castle, when Delaware implemented electronic voter registration through the Delaware Department of Motor Vehicles starting in 2009. I was the State Election Commissioner for Delaware when Delaware updated its electronic voter registration system to the current systematic automatic voter registration from 2021-2023. I have led Delaware through multiple systematic changes to voter registration and am

familiar with the extent of effort and attention to detail needed to implement successful change in the election system.

b) I also supervise Delaware's voter registration list maintenance. I review the processes that the state mandates by code to comply with Delaware's obligations under the National Voter Registration Act (the "NVRA") and I supervise the processes put in place by the Department to maintain a voter list that is accurate, up to date, and compliant with federal and state law.

c) In my role, I also lead the work necessary to facilitate absentee voting in Delaware, including voting pursuant to the Uniformed Oversees Citizens Absentee Voting Act ("UOCAVA"). Given Delaware's size, I am afforded the opportunity to participate firsthand in all aspects of the system – from advising the legislature to interacting with frontline post office personnel about potential mail delays. I am familiar with the control mechanisms built into the UOCAVA system to ensure that votes are properly cast at the same time maintaining a system that facilities the ability of all eligible voters to cast their vote.

d) As Commissioner, I am responsible for ensuring that Delaware has the equipment necessary to conduct elections. *See* 15 *Del. C.* § 302. By state law, Delaware must use electronic voting devices for elections. *See* 15 *Del. C.* § 5001. During my tenure I have participated in the selection and purchase of Delaware's electronic voting equipment. As Commissioner, I am also responsible for the budget and upgrades necessary to ensure secure, efficient and reliable elections. I supervise equipment and software upgrades to ensure compliance with Delaware law. *See* 15 *Del. C.* § 5002-5004.

e) In my role, I also represent Delaware in multiple multi-state organizations focused on effective administration of elections. I am a member of the elections committee of the National Association of Secretaries of State ("NASS") and I serve on the Boards of Directors of the National Association of State Election Directors ("NASED") and of the Electronic Registration Information Center ("ERIC"). These roles provide experience and background in understanding a variety of election issues on a national scale.

7. Delaware's Department of Elections is currently preparing to administer Delaware's 2026 primary election in September while also beginning to prepare for the November 2026 general election. Federal, state, and local races will be on the ballot. Specifically, the Department is engaged in extensive voter outreach across the state and has published and updated electronic voter information guides. The Department will be conducting in-person absentee voting for institutionalized persons. Simultaneously, the Department will be preparing to send absentee ballots.

8. Delaware provides a mail ballot to all eligible voters who choose to vote on an absentee basis for one of the reasons enumerated in code and who request an absentee ballot by mail. *See* 15 *Del. C.* § 5502. My office intends to comply with these state legal requirements in administering upcoming federal election. Delaware sends these ballots to voters through the United States Postal Service ("USPS") or, to UOCAVA voters, electronically upon request.

9. In Delaware, ballots are mailed by the Department of Elections. Mail ballot envelopes are designed by the Delaware Department of Elections and approved by Delaware's Attorney General. Delaware's absentee ballot envelopes must conform with Delaware law's requirements for all mail ballot envelopes. *See* 15 *Del. C.* § 5505. Mail ballots are not required

by Delaware law to include Intelligent Mail barcodes. With respect to absentee ballots, Delaware law requires the Department of Elections to mail an absentee ballot to each voter who is listed on Delaware's voter registration list and qualified to vote on an absentee basis not more than 60 days nor less than 4 days prior to an election. 15 *Del. C.* § 5502 (permitted reasons entitling a voter to vote by absentee ballot); § 5504(a)-(b) (requirement that the Department of Elections provide absentee ballots). My office intends to comply with these legal requirements in administering upcoming federal elections.

10. Delaware law permits voters qualified to vote on an absentee basis to request absentee ballots by mail until four days prior to the election. *See* 15 *Del. C.* §§ 5503(a), 5504(b). Consequently, the Department of Elections continues to mail ballots as additional voters request an absentee ballot, up to 4 days before an election.

11. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026.

12. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026.. If enforced as written, that Rule will cause significant harm, confusion, and disruption in Delaware election administration, and will impose unrecoverable costs on Delaware.

13. For the reasons discussed throughout this declaration, I must act now to align Delaware's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general

election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

[**The Impacts and Harms Caused by the Requirement to Provide and Update Voter Lists**]

14. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst (MDA) review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review, and concern that USPS MDA staff will have insufficient capacity to address an influx of design review requests from, potentially, thousands of local election jurisdictions, while balancing their existing workload. In Delaware, we would have to provide that information by September 19, 2026, the date Delaware will start to send out mail ballots to UOCAVA voters and other qualified absentee voters, and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will

provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

15. These requirements impose significant financial costs on my office and threaten to disenfranchise voters in Delaware.

16. I have concerns about the feasibility of USPS implementing this system in a timely and accurate fashion in the limited time remaining before the November 2026 general election. Technological or implementation failure may lead to the inability of Delaware to deliver mail ballots to voters and conduct the election in accordance with state and federal law. In practice, Delaware receives absentee voter applications on a rolling basis in the months and days leading up to an election. Delaware would need to develop a system to transmit additions to the USPS Ballot Portal on a rolling basis, as the Department receives absentee voter applications. It is unclear whether the USPS's system would be sufficiently nimble as to update quickly enough to permit changes in line with the deadlines to request an absentee ballot under Delaware law.

17. As a result of the Rule, my office must immediately prepare and update guidance for each office of the Department of Elections to ensure a consistent approach across Delaware's three counties. This guidance would have to address topics such as using the USPS portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, and cybersecurity protection among other issues. These preparations and updates will require significant time, personnel, and money.

18. Delaware anticipates mailing ballots to approximately 50,000 voters during the 2026 general election during the period from September 19 to October 30th.

19. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all absentee voters in Delaware with USPS will be a massive undertaking. Aligning Delaware's administration of absentee voting with the Rule would require Delaware's Department of Elections to expend time and resources to ensure that all absentee voters were added to the USPS's Ballot Portal as absentee ballot applications were submitted. This task will be significantly complicated by the influx of registration updates and changes that Delaware's Department of Elections typically receive in the months, weeks, and days before any election.

20. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. See 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these

[1] Page citations to the Rule use the numbering from the preview document. See https://public-inspection.federalregister.gov/2026-17238.pdf.

registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information.

21. State law allows a voter to spoil an unvoted mail ballot and request a new ballot up until noon on the day before an election. To ensure that voters receive these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

22. Based on what information is available, I estimate that it will not be possible for elections staff to become authorized users of the USPS Ballot Portal and enroll all voters, without hiring vendors or other such outside parties, given the press of existing responsibilities, even assuming there are no delays caused by technical or processing difficulties, for at least the following reasons:

a. First, Delaware's primary is scheduled for September 15. Thus, Delaware cannot begin preparing to mail absentee ballots for the general election until it completes and certifies the results of the primary election on September 18. Under UOCAVA, Delaware is obligated to send UOCAVA ballots requested in advance 45 days prior to the general election, that is by September 19. This creates a very short time frame in which Delaware's Department of Elections needs to implement any mail voting process related to the general election. The Department began planning for this effort months ago. Adding any additional steps at this point, such as correlating Delaware's absentee voter list with USPS's list will require retaining and training additional temporary staff. Bringing in temporary staff will increase cost and could lead to human error—if it is even possible to implement the USPS process under these time constraints.

b. Second, state-specific litigation is pending in Delaware challenging whether Delaware's permanent absentee voter statute, which was enacted in 2010, complies with the Delaware constitution. That litigation has been expedited so that its result has the possibility of effecting absentee voting in the 2026 general election. The Department of Elections anticipates a substantial increase in the quantity of election-specific absentee voter applications in response to the existence of this litigation. If Delaware's permanent absentee voting statute is found contrary to the Delaware constitution, the Department will need to substantially adjust its processes for mailing absentee ballots to comply with the court order that might issue in that litigation. If the statute is found to be constitutional, Delaware will still need to adjust its processes to address the number of permanent absentee voters who submitted additional election-specific absentee voting applications. And, the Department is already involved in a massive effort to inform and educate voters about this situation. Attempting to implement and explain to the public additional changes due to a USPS rulemaking will have a multiplicative, if not exponential effect on the logistical and communications complexity of the situation.

c. Third, Delaware does not currently use mail piece specific IMB data. Implementing that technology, as required by the Rule will require Delaware to retain a vendor at unbudgeted cost to implement the system in a very limited time frame, and any unexpected technological and processing difficulties could increase the practical and financial burden on Delaware exponentially. Delaware will need to pay the USPS substantially more than Delaware had budgeted to process mail piece specific IMB data, rather than the mail type data Delaware currently uses.

d. Fourth, Delaware's voter registration and absentee voter computer systems are reliable, but dated. Many updates and adjustments to the system must be done manually or require the active assistance of the system vendor. Developing a bulk export and upload process to automate entry of all Delaware absentee voters into a USPS system would require substantial work, if it is even possible. The alternative, manual entry of tens of thousands of voters' data, will require hiring substantial additional employees and will cause inevitable data entry errors.

e. Finally, it is universally true that technical and processing delays are common, especially with implementing a new, untested technology and process. The timing of Delaware's primary and additional pending litigation may make it difficult for the Department to mail ballots to voters sufficiently quickly for voters to return absentee ballots, if the Department has to add additional processes to comply with a new USPS rule. And if the system fails, Delaware may be unable to mail ballots to voters at all.

23. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the

essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

24. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

25. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The

threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now. Delaware began work to prepare for its general election absentee ballot mailing months ago..

26. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

27. Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses a high risk of errors and omissions. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule

to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

28. As a result of the Rule and to mitigate the impact of all this uncertainty and turmoil, Delaware will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and to process election mail. This is yet another aspect of the Rule that will necessarily divert the work of the Department away from other important election administration tasks. Moreover, based on my experience, the Department of Elections would need additional staff to reconcile and correct errors in the USPS Mail Ballot List. Delaware's most recent budget process did not include the full amount of funds requested by the Department of Elections to meet pre-existing needs. It seems unlikely that the state of Delaware could fund additional positions to address the increased workload that the EO would impose

[**<u>The Impacts and Harms Caused by Envelope Standards</u>**]

29. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery

Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

30. These requirements of the Rule necessitate immediate action from me and my team and will impose substantial risk and cost on Delaware's Department of Elections.

31. Our agency anticipates mailing approximately 50,000 ballots to voters during the 2026 general election.

32. Our agency/local elections officials have consistently relied upon election mail guidance from USPS to design and mail ballots and relied on that guidance in preparations that have already been taken for the November 2026 general election.

33. As a threshold matter, Delaware's Department of Elections already possesses mail ballot envelopes for the 2026 federal election cycle. Delaware's Department of Elections already submitted these envelopes for mail piece design analysis by the USPS and has already obtained approval for these current envelopes from the USPS. Ordering different mail ballot envelopes to use for the 2026 federal election cycle would cost additional funds and require duplicate investment of time. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71. The Department does not have funds budgeted for such a purchase. Moreover, the deadline to mail ballots is less than a month from now. It is unclear whether Delaware could design, obtain approval for, and purchase sufficient quantities of envelopes within the time available, even if funds were not an issue.

34. Delaware's Department of Elections does not currently use piece-level Intelligent Mail barcodes on mail ballot envelopes. Instead, the Department uses general Intelligent Mail

barcodes incorporating a Service Type ID ("STID"), but not tying individual pieces of mail to specific voters. The Service Type ID technology used by Delaware's Department of Elections allows the Department to track the numbers of mail ballots processed by USPS and allows the USPS to identify the mail as election mail electronically. USPS charges senders substantially more to use piece-level Intelligent Mail barcodes than USPS charges for Service Type ID barcodes

a) Delaware's Department of Elections is able to identify the voter associated with each mail ballot because Delaware law voters must print their names on the outside of their absentee mail envelopes. Delaware's Department of Elections also uses codes printed by the Department on the absentee ballots and the Department's absentee ballot tracking systems to verify when a voter requests an absentee ballot, when the ballot is mailed, when the ballot is returned, and when the ballot is confirmed to be valid for inclusion in tabulation. Switching from the Delaware Department of Elections' current system to the Intelligent Mail barcodes required by the Rule would materially increase the cost of absentee voting to the Department of Elections, require the Department to design and obtain new envelopes, and would also require the Department to adjust the software that the Department currently uses to track absentee ballots.

b) Delaware law explicitly specifies a variety of requirements for all mail ballot envelopes. *See* 15 *Del. C.* § 5505. Delaware law also states that "[t]he Department may not purchase, use, have printed upon, mail, or deliver any envelope for use under this chapter unless the type or kind of the envelope has first been approved personally by the Attorney General." *See id*. at § 5512.

Delaware's Department of Elections complies with these requirements every time that we consider an update to our ballot envelope design. Implementing an update to Delaware's mail ballot envelope design typically takes multiple months and requires the involvement of Delaware's Attorney General. Because the Rule does not permit Delaware to continue to use our currently approved envelopes, we would need to repeat the design and approval process required by Delaware law before we could use new envelopes mandated by the Rule.

c) Given the specificity of Delaware law, the standards in the Rule for mail ballot envelopes are inconsistent with the standards set by Delaware law. The Department of Elections needs to seek a legislative amendment of Delaware law or would need to seek judicial intervention in order to mail ballots. Completing that process would be excessively difficult in the limited time period before the Department must begin mailing ballots to absentee voters in advance of the primary election for 2026.

d) USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, but that tool is not available to the Department to use for election mail.[2] And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election

---

[2] *See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

officials' concern about the feasibility of applying IMbs to all outbound and return envelopes that have already been ordered, do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47.

35. Separately, I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. While Delaware uses one mail ballot envelope design state-wide, that is not the case for most states. The Rule obligates the USPS to review the various mail ballot designs in use in all of these jurisdictions. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this is not consistent with the Department's experience with this process. Moreover, the USPS provided this estimate before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. Delaware's Department of Elections will need to comply with state laws that affirmatively require certain information to be placed on ballot envelopes in certain places; adjusting Delaware's ballot envelope to meet USPS requirements will require personal approval from Delaware's Attorney General (under Delaware law) and could require Delaware's legislature to amend the Delaware code, depending upon the particular requirement. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51,

74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Delaware voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

[**The Impacts and Harms Caused by Ballot Rejection**]

36. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law. In that situation, the voter may think that they had voted, when they had not. The Department of Elections might reasonably assume that the voter had simply abandoned the voter's plan to vote by mail.

37. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Delawareans as possible can exercise their right to vote. In the 2024 general election, more than 40,000 Delawareans voted by mail. This method of voting is particularly important for many Delawareans with disabilities, the elderly, and Delawareans serving in the armed forces.

38. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the

Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots. Delaware law requires all ballots to be received by the close of the polls on election day for the ballot to be counted. *See* 15 *Del. C.* § 5508. As a result, it is particularly important that Delaware's Department of Elections provide absentee ballots in a timely manner. Any delays in the delivery of absentee ballots resulting from a need to correct USPS's Mail Ballot List could disenfranchise a voter, even if the issues were eventually resolved.

39. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

40. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. Following the Proposed Rule, my office received multiple inquiries from voters asking whether USPS would deliver ballots to and from voters. I anticipate more inquiries from voters as a result of the Rule. This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before the election. Fielding these

questions requires staff time that would otherwise be spent preparing for the 2026 general election.

41. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail.

42. I estimate that the cost of such a public education effort would likely be substantial, potentially equaling between 50% and 100% of the Department's typical public education campaign surrounding voting in a general election year.

43. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

[**The Magnification of the Harm as a Result of the Timing**]

44. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

45. Delaware's Department of Elections is currently preparing to administer Delaware's 2026 primary election in September. Specifically, the Department is engaged in extensive voter outreach across the state and has published and updated electronic voter information guides. The Department will be conducting in-person absentee voting for institutionalized persons. Simultaneously, the Department will be preparing to send absentee ballots to eligible voters.

46. The Department of Elections must begin mailing ballots for the 2026 general election in the coming weeks. Consistent with federal law, agencies mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. § 20302(a)(1)-(3), (8)(A). The Department of Elections will continue mailing ballots through October 30, 2026, which is 4 days before the election, consistent with state law. 15 *Del. C.* §§ 5503(a), 5504(b).

47. Additionally, my office will need to continue to register those who are eligible to vote in Delaware. Delaware allows qualified individuals to register up to the third Monday before Election Day. 15 *Del. C.* § 1902(c); 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Delaware residents can register to vote online, at the Department office in their county of residence, with Delaware's Department of Health and Social Services of the Division of Vocational Rehabilitation of the Delaware Department of Labor, and through Delaware's Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

48. In compliance with the NVRA "quiet period" for voter registration, Delaware does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. § 20507(c)(2)(A), 3(A)-(B), 4(A). Delaware does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled dies, or is convicted of a felony. *See* 15 *Del. C.* § 1703 (cancelation upon felony conviction); § 1704(d)(1) (cancelation at a person's

direction); § 1705 (cancelation of registrations of persons reported as deceased). Delaware law also provides for registered voters to change their residential address or name up to and including on Election Day, provided that the change of address is within the state of Delaware. *See* 15 *Del. C.* §§ 2047, 2048. Finally, Delaware law permits the correction of errors in voter registration records without regard to time period. *See* 15 *Del. C.* § 1704(i); § 1708.

49. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

50. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters.

**[Morale and threats of prosecution]**

51. I am also concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (March 31, 2026); *see also id.* § 5 (providing that "State or local election officials . . . [and] individuals involved in the administration of Federal elections; or public [] entities engaged in the printing, production, shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under" various federal criminal laws). The Executive Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). USPS made clear the

primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter to the State Election Commissioner for Delaware dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

52. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

53. I am worried that election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Delaware's registered voters are not citizens.

[**Conclusion**]

54. In conclusion, I estimate that the requirements of the Rule will require a significant increase to the Department of Elections' budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. Delaware's General Assembly approved Delaware's 2027 fiscal year annual budget on June 24, 2026. Of the $29,011,000 that the Department of Elections had requested, the Department was allocated $21,700,000. As a result, the Department of Elections has already undertaken to cut all non-essential activities and investments. Delaware does not have a mechanism for the Department of Elections to request additional funding from the General Assembly. I have no reason to believe that the state of Delaware would be able to allocate the

necessary additional funds to the Department of Elections without cutting different essential state services. Thus, it is unclear to me today where or how I would locate funding to comply with the Rule in this fiscal year.

55. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Delaware's elections run smoothly and every eligible Delawarean can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

56. Each of these tasks and costs undertaken or expended to comply with the Rule will divert scarce resources from other important election administration needs and impose additional financial and administrative burdens on the Department.

*Signature on next page*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Wilmington, Delaware.

Anthony J. Albence
State Election Commissioner
Delaware Department of Elections