**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

*Plaintiffs,*

v.

UNITED STATES POSTAL SERVICE, et al.,

*Defendants.*

Case No. _______________

**DECLARATION OF JULIE L. FLYNN**

I, Julie L. Flynn, declare as follows:

1. I am a resident of the State of Maine. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Department of the Secretary of State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am a Deputy Secretary of State in Maine. I am responsible for overseeing the Bureau of Corporations, Elections and Commissions, which is a part of the Department of the Secretary of State. I work for the Maine Secretary of State and support her as the chief elections official for the State of Maine. In my role, I assist the Secretary in the execution and enforcement of all state and federal laws relating to elections.

3. I have served in my current role since February of 1999. I served as Director of the same Bureau, including the Elections Division, from March 1995 until I was appointed

Deputy. The Elections Division is comprised of 13 staff members, including a Bureau Director, a Director of the Division of Election Administration and an Assistant Director of Elections and an Assistant Director of Voter Registration, all of whom work closely with me.

4. Maine and its municipal subdivisions are responsible for administering elections in Maine. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks. The Department of the Secretary of State is responsible for various election-related tasks, including maintaining Maine's central voter registration system; operating Maine's online voter registration system and automatic voter registration system; designing, printing, and distributing ballots; issuing, receiving, and counting ballots for all uniformed and overseas voters; tabulating and certifying election results; training municipal election officials; and conducting recounts.

5. The Secretary of State is Maine's chief elections official, responsible for executing and overseeing compliance with all state and federal laws relating to federal, state, and county elections within the state. The Elections Division within the Department of the Secretary of State is responsible for implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. Unlike most states outside New England, which administer elections at the county level, Maine elections are administered at the municipal level. The Elections Division works closely with Maine's approximately 487 municipalities that conduct their own elections to train local elections officials, to assist them in administering county, state and federal elections, and to ensure that they are complying with state and federal election laws.

6. I oversee all aspects of Maine's county, state, and federal elections. I am responsible for overseeing the development, operation, and maintenance of Maine's central voter registration application software and database ("CVR"), including ensuring that it can facilitate compliance with state and federal voter registration laws. I am responsible for overseeing Maine's compliance with the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"), including the administration of grants under HAVA and the conduct of the statewide voter list maintenance program required by the NVRA. As part of that work, I oversee the Elections Division's periodic postcard mailings under the NVRA to confirm voters' residence, as well as its work with the Electronic Registration Information Center (ERIC), which allows Maine to match its CVR data with data from other sources, including other member states, in order to maintain the accuracy and currency of its voter list. I also oversee trainings and communications with municipal election officials to ensure they are complying with state and federal election law. Given the small size of the Elections Division, I frequently work directly with individual municipal clerks and registrars to resolve problems or issues that they experience in the administration of elections. And I oversee registrations and voting under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), which in Maine is handled centrally by the Elections Division.

7. My office and municipalities statewide are currently preparing to administer the November 2026 general election. Federal, state, and county races will be on the ballot. This work includes conducting trainings and preparing written guidance for local election workers, procuring new electronic tabulators and accessible ballot-marking devices, training officials on their use, and ensuring that Maine's CVR system is updated and ready for use in the upcoming elections. In late August, my office began the intensive process of designing and proofing over

300 ballot styles for use in the November election. We will also have to design, test, and create media devices for use in each electronic tabulator and accessible voting device throughout the State, which instruct the devices how to correctly read the ballot forms applicable to that jurisdiction.

8. Maine provides a mail ballot to any eligible voter who submits a properly completed application requesting a ballot to be mailed to them. Maine also offers all voters the option to apply for ongoing absentee voter status, in which the voter is automatically sent an absentee ballot for all elections without having to request one. Maine sends these ballots to voters through the United States Postal Service ("USPS").

9. In Maine, ballots are mailed by both the Department of the Secretary of State and municipal registrars; the Department of the Secretary of State mails ballots pursuant to UOCAVA if requested in paper form and municipal registrars mail ballots to all other voters who have requested absentee ballots or who have ongoing absentee voter status. Mail ballot envelopes are designed by the Department of the Secretary of State and must conform with state law. 21-A M.R.S. § 753-B (requiring the clerk to provide the name and residence address of the voter on the return envelope and prohibiting any mark that indicates the political party of the voter to whom the absentee ballot is issued). Mail ballots are not required by Maine law to include Intelligent Mail barcodes. The Department must mail UOCAVA ballots to those with pending requests no later than September 19, 2026. Municipal officials must mail absentee ballots to those with pending requests or ongoing absentee voter status "immediately" after the ballots are delivered to their offices. 21-A M.R.S.A. § 753-B(1). By law, the Secretary generally must deliver absentee ballots to the municipalities no later than 30 days before Election Day,

which this year is October 4, 2026. 21-A M.R.S.A. § 752. Thus, municipal officials will begin mailing regular absentee ballots to voters on or around October 4, 2026, if not before.

10. The Department and municipal officials continue to send mail ballots as additional voters request absentee ballots, up to 3 business days before the election, or October 29, 2026. Between October 29, 2026, and Election Day, voters may still request absentee ballots in certain circumstances, such as unexpected absence from the municipality or illness, although such "special circumstances" ballots must be picked up in person.

11. I am familiar with the Notice of Proposed Rulemaking issued by USPS that was published in the Federal Register on June 2, 2026. My office submitted a comment on the Proposed Rule expressing opposition and identifying specific concerns, including the impossibility of assigning and training election officials in nearly 500 jurisdictions on use of the proposed Federal Ballot Mail Portal and procuring the new absentee ballot envelopes required by the rule in time for the start of absentee voting. A true and correct copy of that comment letter is attached to this declaration as Exhibit A.

12. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule will imminently cause significant harm, confusion, and disruption in Maine election administration, and will impose unrecoverable costs on Maine.

13. For the reasons discussed throughout this declaration, I must act now to align Maine's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general

election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

14. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In Maine, we would have to provide that information by October 4, 2026 (30 days before the election) or potentially earlier depending on when municipalities take delivery of absentee ballots from the state-contracted printer, and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

15. These requirements impose significant financial costs on my office and threaten to disenfranchise voters in Maine.

16. I have concerns about the feasibility of USPS implementing this system in a timely and accurate fashion in the limited time remaining before the November 2026 general election. In past elections, USPS has sometimes struggled to deliver election mail to Maine voters in a timely manner. Such delays could become more widespread and severe if USPS attempts to implement a complex new rule weeks before the November election, particularly since the rule requires USPS to perform tasks outside of its traditional role as a mail carrier. Rushed implementation of the rule before the election also seems likely to invite technological glitches and human errors, which could disenfranchise qualified voters.

17. As a result of the Rule, my office must immediately prepare and update guidance for local elections offices to ensure a consistent approach across Maine's approximately 487 municipalities. This guidance would have to address topics such as using the USPS portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protection, and proper treatment of voters enrolled in Maine's Address Confidentiality Program, which treats as confidential the residence addresses of voters who are at risk of domestic violence or human trafficking. These preparations and updates will require significant time, personnel, and money.

18. Maine anticipates mailing ballots to approximately 200,000 voters during the 2026 general election during the period from October 3 to October 29, 2026.

19. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and

implementation window—enrolling approximately 200,000 voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. In Maine elections, the submission of absentee ballot applications tends to peak around two to three weeks before the election.

20. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and municipal election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information.

21. State law allows a voter to request a duplicate absentee ballot in certain circumstances, including if the voter spoils or damages the first absentee ballot, at any point during the absentee voting period. To ensure that voters receive these ballots to which they are

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

22. Based on what information is available, I estimate that my small staff will need to devote hundreds of hours to become authorized users of the USPS Ballot Portal, learn how to use it, and train and assist municipal election officials in its use, assuming there are no delays caused by technical or processing difficulties. Maine's CVR system does not currently have functionality to assign an IMb to mailing labels for each voter based on delivery point addresses. Therefore, we would not be able to upload lists of voters in bulk containing the IMb information. This information would have to be entered manually for each voter individually, provided we could implement a system of generating IMb codes. Senior staff will also need to devote significant time, likely additional hundreds of hours, to working with our technology vendors to augment the capacity of Maine's CVR system to create and print the IMb codes required by the Rule, and then to test the resulting new module for bugs. Moreover, technical and processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Maine exponentially. And if the system fails, Maine may be unable to mail ballots to voters at all.

23. I anticipate that much of the actual work of enrolling voters through the Portal would need to be done by municipal election officials. These officials are generally responsible for processing absentee ballot requests in Maine. Under Maine's current process, upon receipt of an absentee ballot request, municipal officials create an absentee ballot record in CVR recording certain information about the request and then prepare and mail the absentee ballot and return envelope to the voter, typically using mailing labels generated through CVR. Officials are asked

to complete these tasks within one business day of receipt of the application. The USPS rule would complicate this process, requiring municipal officials to log in to the USPS Portal to record information concerning the applicant, including IMb information that would need to be retrieved from CVR through a yet-to-be-designed new module. Municipal officials would need to be rapidly trained on these new procedures by staff from my office. I expect that these new tasks will collectively require thousands of hours of municipal officials' time.

24. In Maine, more than half of voters who vote by absentee ballot rely on USPS to receive their ballots, with most of the remainder voting by in-person absentee ballot at their municipal office. Other carriers such as FedEx or UPS are not viable options to replace USPS, as they do not deliver on a regular schedule or at all to some rural parts of Maine. Moreover, these carriers' rates for delivery are considerably higher than the rates charged by USPS, placing them beyond the means of many municipalities. Access to mail-in voting is especially important for low-income, rural, and vulnerable populations, including voters with disabilities, who may lack access to transportation to either vote in-person or to receive and return their ballot through some other means.

25. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election

mail, but USPS's standard processes will not work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

26. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

27. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in

the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

28. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

29. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and

will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

30. As a result of the Rule and to mitigate the impact of all this uncertainty and turmoil, Maine will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and to process election mail. Our small Elections Division staff will be unable to devote the necessary resources to these tasks while still keeping up with our other important election administration tasks.

31. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

32. These requirements of the Rule necessitate immediate action from me and my team in the Department of the Secretary of State.

33. Our agency anticipates that Maine municipalities will mail approximately 200,000 ballots to voters during the 2026 general election.

34. Our agency has consistently relied upon election mail guidance from USPS to design and mail ballots, and relied on that guidance in preparations that have already been taken for the November 2026 general election.

35. Maine has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of $52,040.63. Given my past experience with procurement of these envelopes, I am concerned that there is not enough time for Maine to procure new envelopes and distribute them to municipalities in time for the start of absentee voting at the beginning of October, even assuming USPS approval of the new envelopes happens promptly. USPS confirms that States or localities that have already printed their envelopes cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71.

36. Maine does not currently use Intelligent Mail barcodes on ballot mail, which would require additional expenditures for software integrated with the CVR. Making this change to CVR would delay or supplant other more pressing and useful upgrades to CVR that my office wishes to pursue in the coming years. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes does not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47.

37. Maine is currently using a ballot envelope design that was reviewed by USPS a number of years ago and has not changed since.

38. USPS took weeks to approve those envelope designs. I am concerned that USPS would take as long or longer to approve any new design required by the rule. While USPS

indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Maine voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

39. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law.

40. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Maine citizens as possible can exercise their right to vote. In the 2024 general election, there were 215,643 ballots cast by mail and counted

(civilian and UOCAVA), which is 26% of the 842,447 total ballots cast. Maine is one of the most rural states in the nation and also has an unusually high percentage of elderly residents. Given these characteristics, access to absentee voting is especially critical in Maine, as many voters may have difficulty traveling in-person to polling places due to distance, disability, or both.

41. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

42. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

43. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. I anticipate

inquiries from voters and advocates as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

44. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for the roughly 10,000 Maine residents who have been participating in Maine's ongoing absentee ballot program and are thus accustomed to automatically receiving their absentee ballot.

45. Any significant paid advertising campaign would likely exceed available resources or require the Elections Division to divert its limited public awareness campaigns away from providing information about critical topics like polling locations and voter registration. As a result, the Elections Division would likely need to rely heavily on earned media and outreach efforts by existing staff for such a campaign, which would both burden staff and limit the campaign's reach. Existing staff lack the spare capacity that would be needed for such a project, and the Elections Division lacks the budget and appropriations to hire additional staff to work on such a project.

46. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

47. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

48. The Department of the Secretary of State and municipal registrars must begin mailing ballots for the 2026 general election in the coming weeks. Consistent with federal law, agencies mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. § 20302(a)(1)-(3), (8)(A). In addition, state law requires that municipalities begin mailing absentee ballots to all other eligible voters "immediately" after they take delivery of the ballots, which generally must occur no later than October 4, 2026. 21-A M.R.S.A. §§ 752; 754-A. Municipalities will continue mailing ballots through October 29, 2026, consistent with state law. Additionally, municipal registrars, with the assistance of my office, will need to continue to register those who are eligible to vote in Maine. Maine allows qualified individuals to register through the mail or online up to 21 days before Election Day, through automatic voter registration at the Bureau of Motor Vehicles up to 7 days before Election Day, and in person through the close of polls on Election Day. 21-A M.R.S. § 121-A; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). Maine citizens can register to vote online, at their town office or city hall, at various state social service agencies, through Maine's Bureau of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction, and at the polls on Election Day. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials. In the 2024 election, Maine had approximately 38,000 registrations or updates to registration in the 30 days before the election.

49. In compliance with UOCAVA, Maine allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election. 52 U.S.C. § 20302(a)(2). Under Maine law, a uniformed or overseas voter may

register or enroll at any time prior to noon on the day before election day. 21-A M.R.S.A. § 777-A.

50. In compliance with the NVRA "quiet period" for voter registration, Maine does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. § 20507(c)(2)(A), 3(A)-(B), 4(A). Maine does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, or either the Elections Division or the towns receive a death notice for a person confirmed to be a voter in the jurisdiction.

51. In sum, staff in our office must continue to assist municipal registrars in processing voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

52. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part

111, Supplementary Information at 57-58. The Elections Division has a small staff, which includes two current vacancies, and a lean budget that does not include reserves for contingencies. It is difficult for me to see how the Elections Division will be able to comply with the USPS rule while also carrying out all the necessary tasks to prepare for the November election. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters.

53. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (March 31, 2026); *see also id.* § 5 (providing that "State or

local election officials . . . [and] individuals involved in the administration of Federal elections; or public [] entities engaged in the printing, production, shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under" various federal criminal laws). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. The Executive Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). In a letter to Maine Secretary of State Shenna Bellows dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

54. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

55. I am worried that myself and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Maine's registered voters are not citizens. I am also concerned that these threats will make it much harder for my office and municipalities to recruit new election workers, which is a pressing need given the current vacancies in my office and the numbers of municipal election workers that are retiring across the State.

56. In conclusion, my office would require a substantial increase in funding and personnel to implement the Rule's requirements. However, with the Maine Legislature out of session until December, the Secretary of State has no means to seek increased appropriations. My office will therefore have to attempt to stretch existing resources to implement a complex new requirement that could, if improperly implemented, disenfranchise many qualified Maine voters.

57. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Maine elections run smoothly and every eligible Maine resident can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, logic and accuracy testing, and voter challenges.

58. Each of these tasks and costs will divert scarce resources from other important election administration needs, as detailed above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Augusta, Maine.

*/s/ Julie L. Flynn*
Julie L. Flynn
Deputy Secretary of State
Department of Secretary of State

**Exhibit A**

STATE OF MAINE
DEPARTMENT
OF THE
SECRETARY OF STATE

SHENNA BELLOWS
SECRETARY OF STATE

Shenna Bellows
Secretary of State
State of Maine
148 State House Station
Augusta, ME 04333-0148

July 2, 2026

Director,
Product Classification,
U.S. Postal Service
475 L'Enfant Plaza SW, Room 4446
Washington, DC 20260-5015

Comments On Proposed Rule Re: Ballot Mail for Federal Elections

Dear Director,

The Department of Secretary of State of the State of Maine submits these comments voicing our strong opposition to the proposed rule regarding ballot mail for federal elections.

The United States Postal Service (Postal Service) predates the Republic itself. The founders including the first Postmaster General Benjamin Franklin understood that universal postal service was foundational to the democratic republic they fought to establish and to the prosperity of the American people. Codified by Congress pursuant to its powers under Article I, Section 8, Clause 7, otherwise known as the "Postal Clause," today federal law outlines the awesome responsibility and obligations of the Postal Service in Section 101(a) of Title 39 U.S.C. as follows:

> "The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities."

The proposed rule contravenes the spirit and the letter of this law, the intent of the Founders and the Constitution by – for the first time in history – proposing that the Postal Service pre-approve who can

receive or send mail. The proposed rule would be a dangerous precedent for limiting the overall use of the public mailing system, upending a 251-year tradition of universal service.

The proposed rule further violates the separation of powers, proposing unprecedented power over elections to the federal Executive Branch and specifically, the Postal Service, because under this proposed rule, the Postal Service would have approval authority over who votes by mail and who does not. This is a blatant violation of the Elections Clause of the United States Constitution, which states clearly that the states, not the federal government, and certainly not the federal Executive Branch, are in charge of elections.

> "Article I, Section 4, Clause 1: *The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."*

Under Maine law, any voter may choose to vote via the mail under our no-excuse absentee voting law in Title 21-A of the Maine Revised Statutes. Because of the rural nature of our state and our status as the oldest state in the nation demographically, high numbers of voters including seniors, people with disabilities and those commuting long distances for work, choose to vote absentee, receiving and returning their ballots by mail.

The proposed rule would grant the Postal Service powers over who can vote by mail through the review of every single mail-in and absentee voter prior to acceptance into their Mail-In and Absentee Participation List. As a result, the Postal Service would be functionally managing absentee and vote-by-mail lists rather than the election officials charged with this responsibility under Maine law pursuant to federal law and the United States Constitution. This is an unconstitutional power grab by the Postal Service. Indeed, a federal court agreed in a decision issued on June 25, 2026, by Judge Indira Talwani in the case of *California v. Trump*, Docket No. 1:26-cv-11581 (D. Mass.). That decision enjoins implementation of the President's Executive Order in Maine and other Plaintiff States.

In addition to the serious constitutional problems with the proposed rule, there are significant practical considerations. The Maine Department of Secretary of State, which oversees elections in our state, is already preparing for the November election. Under state and federal law, ballots must be ready to send to UOCAVA voters forty-five days prior to Election Day and to all voters who wish to vote absentee (by mail) at least thirty days prior to Election Day. The proposed rule provides no appropriations to the states for training or implementation. In Maine there are 487 distinct elections jurisdictions because elections are administered at the municipal level. It is unfathomable that the Department of Secretary of State would have to assign and train nearly 500 users to access the Federal Ballot Mail Portal, a portal that has not yet been designed. Under the proposed rule, the Chief Election Official would be responsible for authorizing these users at least two days in advance of their use of the system. This proposal simply could not be implemented during a time of year when election officials at both the state and local levels are already working substantial overtime to administer the election.

The proposed rule also proposes to change the specifications of ballot envelopes, requiring a new system with personally identifiable information specific to each voter on outgoing and incoming ballots. The Department of Secretary of State completes procurement of envelopes for absentee ballots at least 60 days prior to Election Day. Within the rules of our state procurement process, the award of a contract

and purchase of proper envelopes could not be completed with the specified timeline given that the full specifications of ballot envelopes have not yet been provided. Unique barcodes for both outbound and inbound ballot envelopes for each individual would need to be included in the mail-in and absentee participation list entries, requiring a completely new process for how Maine's absentee and mail-in systems currently work. Separate submissions for each voter to their Mail-In and Absentee Participation List would be required. Election workers would be responsible for resolving data issues, which must occur before a ballot request could be re-submitted. Voter confusion will add to inbound customer service needed to be handled by election workers.

The proposed rule would undoubtedly add delays to ballot deliveries and returns and, most egregiously, would disenfranchise voters due to ballots either not being delivered to them in a timely manner or not being returned to their municipal clerk by close of polls on Election Night in order to be counted.

Furthermore, the proposed rule would authorize the Postal Service to share their Mail-In and Absentee Participation Lists with law enforcement and to investigate election officials and voters, creating a system for prosecuting states and election workers over voters' eligibility. This will no doubt have a chilling effect on the State of Maine's ability to recruit and retain election workers as the threat of federal prosecution combined with the complexity of an undetermined portal would intimidate state and local election officials.

For all of these reasons, we oppose the proposed rule in its entirety.

Sincerely,

Shenna Bellows

Shenna Bellows

Secretary of State