**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

*Plaintiffs,*

v.

UNITED STATES POSTAL SERVICE, et al.,

*Defendants.*

Case No. _______________

**DECLARATION OF MELISSIA DORSEY**

I, Melissia Dorsey, declare as follows:

1. I am a resident of the State of Maryland. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Maryland State Board of Elections (SBE) staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Assistant Deputy Administrator for Election Policy in Maryland. I work for the State Administrator of Elections ("State Administrator") and support him in his official capacity as the Chief Officer of Elections for the State of Maryland. In my role, I assist him in the execution of all state and federal laws relating to elections.

3. I have served as the Assistant Deputy for Election Policy for three years. Prior to this, I served as the Director of Election Reform and Management. I hold a bachelor's degree in English and Political Science from Towson University. I hold a law degree from George Washington University Law School, where I focused my studies on Constitutional and Civil

Rights Law. Prior to my work in elections, I spent over seven years working at the Maryland Commission on Civil Rights, where I supervised a unit charged with enforcing the civil rights of Maryland residents.

4. SBE and the local board of elections ("LBE") are responsible for administering federal elections in Maryland. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5. The State Administrator of Elections is the state's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state. *See Md. Code, Elec Law § 2-103(b)*. In particular, Maryland law charges the State Administrator with responsibility for implementing a uniform, centralized, voter registration system. *Elec. Law § 2-103(b)(7)*. The State Administrator of Elections is responsible for implementing the Maryland State Board of Elections' responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. Maryland law charges SBE and the State Administrator with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. *Elec. Law § 1-201(2)*.

6. Maryland electoral operations are organized in a centralized, top-down system. SBE sets the policies that are followed by each of Maryland's 24 LBEs to administer elections in their jurisdiction. There is little operational variation amongst LBEs in conducting elections. And with regard to voter registration and mail-in ballot tracking, the State Administrator and his staff bear responsibility for maintaining the statewide voter registration database–MDVOTERS. LBE's are able to access MDVOTERS to update voter registration records, manage mail-in ballots for voters, and use those records to conduct electoral tasks.

However, the State Administrator and his staff procured the voter registration system, support its ongoing maintenance and function, and bear responsibility for its responsiveness to changes to mail-in voting law.

7. In my role as Assistant Deputy Administrator of Election Policy, I am responsible for overseeing the administration of election processes and managing the agency's efforts to administer state and federal election laws, including the federal and state mail-in voting and voter registration laws. My duties include oversight of the mail-in voting division, voter registration division, audit division, the division that coordinates training of elections officials, and the division that produces training materials for election judges. I work with SBE staff to develop guidance for both state and local staff regarding elections administration, mail-in voting, and voter registration. To ensure compliance with laws and policies, I oversee a team of auditors who perform regular audits of the LBEs. To facilitate development and updates of voting equipment and systems, I provide policy oversight to the Information Technology (IT) department by ensuring that the changes necessary to comply with legal requirements are requested, scheduled, and implemented in the systems that facilitate voter registration, in person voting, mail-in voting and other election administration functions. I am directly involved in both the policy and technological aspects of elections administration and mail-in voting.

8. My office and the local boards of elections statewide are currently preparing to administer the November 2026 general election. This includes developing updates and enhancements to the voter registration database and voter services systems, ballot creation, and preparing materials sent to voters who requested to vote by mail. SBE staff have updated materials used by election workers and provided training to ensure updated practices are used by all local boards of elections.

9. Local boards of elections have designated early voting centers and election day polling places, which involves updating the voter registration database to include the locations. These designations were made with mail-in voting participation rates from the 2022 and 2024 election cycles in mind. Voter outreach and publicity materials have gone out to voters, identifying early voting centers and polling places. Any changes to the designation of an early voting center or polling place on an emergency basis will cause further voter confusion and some further measure of voter suppression.

10. Preparation for mail-in voting is underway. A systematic review of all addresses of mail-in voters to ensure compliance with USPS best practices has been completed. SBE has given final approval of all template materials for the inserts of our mail-in ballot packets. Envelope orders have been placed for all local boards of elections. The process to request funds for postage to be used by the state-contracted mail-in ballot vendor has begun, in order to ensure sufficient postage to mail ballots for the general election.

11. This office and the local boards of elections are already preparing for the 2026 general election. The Federal deadline for mailing ballots is September 19, 2026 and the state deadline is September 21, 2026. The processes required to mail ballots to voters who have requested them are already under way, including designing, proofing, and testing of mail-in ballots materials. Ballot design and production will begin this week. Local boards of elections continue to work through a backlog of voter registration transactions that resulted during a processing freeze for the primary election, so that voter information is accurate for the general election. The state and local board are currently processing both candidate petitions and ballot question petitions for the general election ballot.

12. Maryland provides a mail ballot to any eligible Maryland voter who requests one. Any registered voter may choose to vote by mail for either a specific election or for all future elections. *See Md. Code, Elec Law § 9-304 and 9-311.1.* Maryland sends the majority of these ballots to voters through the United States Postal Service ("USPS").

13. In Maryland, ballots are mailed by a state-contracted printing vendor. Mail-in ballot envelopes are designed by SBE and the vendor. Envelopes and ballot packets must conform with state law. *See Md. Code, Elec Law § 9-309-10.* Mail-in ballots are not required by Maryland law to include Intelligent Mail barcodes. SBE begins mailing ballots to eligible voters 45 days before the election, or on September 19, 2026.

14. SBE's state-contracted vendor continues to send mail-in ballots as additional eligible voters request a mail-in ballot or make changes that necessitate a new ballot be sent to them, up to 7 days before the election, or October 27, 2026. Maryland offers several methods of mail-in ballot delivery, including mail, fax, secure email (print-at-home), and in person. The deadline for requesting a ballot is dependent upon the method of delivery requested. To receive a ballot by mail or fax, the voter must submit the request by Tuesday, October 27, 2026. To receive your ballot as an emailed link, the voter must submit the request by Friday, October 30, 2026. All methods of ballots can be mailed back to the local board of elections via USPS mail. *See Md. Code, Elec Law § 9-305.* The requestor's information is sent twice weekly to our printing vendor to process and send mail-in ballots. Once it is not feasible to transmit information to the vendor and prepare mail-in ballot packets for voters in time for election deadlines, the local boards of elections fulfill the requests and send mail-in ballots directly to voters.

15. The amount of mail-in ballot requests in the weeks immediately preceding an election is significant and places a processing demand on local boards of elections. For the 2026 primary election, almost 8,100 voters requested a mail-in ballot in the two weeks prior to the election. For the 2024 general election, over 41,000 people requested a mail-in ballot the two weeks preceding the election. Local boards must process these requests in MDVOTERS in near real time to ensure that voters receive their ballots before election day. Once the printing vendor mails its last shipment of ballots, the local boards of elections must also prepare the requested ballots and send them to voters. This includes a labor intensive process of gathering the required inserts, ballots, stuffing and mailing the ballot envelopes. At the same time, the local boards of elections are administering early voting and beginning canvass of mail-in ballots, as required by state law.

16. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026. My office submitted a comment on the Proposed Rule expressing opposition and identifying specific concerns, including that the proposed rule would interfere with Maryland Elections while contradicting federal requirements; the proposal's technological, privacy, and security details are fatally absent; and the proposed policies would impose unfunded costs upon SBE and Maryland's local boards of elections.

17. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule will imminently cause significant harm, confusion, and

disruption in Maryland election administration, and will impose unrecoverable costs on Maryland.

18. For the reasons discussed throughout this declaration, I must act now to align Maryland's administration of mail-in voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

19. SBE has already begun conversations with the state-contracted printing vendor to determine how it can ensure compliance with the Rule. Preparation is underway to determine if SBE can develop a process for the state-contracted printing vendor to generate Intelligent Mail barcodes in a way that will permit SBE to provide them to USPS. Discussions are being had about alternatives to using USPS mail, if SBE and the vendor cannot comply with the rule in time to get ballots to voters for the 2026 general elections. At the same time, SBE has also begun to field questions from employees at local boards of elections who are concerned about how this rule might affect the 2026 general election. Similarly, SBE has received questions from voters who are concerned that this rule might affect their ability to vote in the 2026 general election.

20. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal ("Portal") to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state.

The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In Maryland, we would have to provide that information by October 4, 2026 (30 days before the election) or September 21, 2026 (Maryland law requires the mailing of domestic ballots to take place 43 days before the election), and we would thereafter have to update the information on a daily basis to include eligible voters who newly register or update their registration after that date, make changes to their existing voter registrations that result in a new mail-in ballots being issued, or newly requested a mail-in ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("US Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

21. These requirements impose significant financial costs on my office and threaten to disenfranchise voters in Maryland.

22. SBE is a small agency, comprised of roughly 51 permanent employees. In the months leading up to the election, these employees are required to work nights, weekends and overtime to meet the existing requirements of their positions, which are necessary to administer a

statewide election. SBE estimates that over 525,000 requests for a mail-in ballot to be delivered by mail and an additional 70,000 to be delivered by email and returned by mail. For each of these requests, information would need to be compiled, using several data sources, and entered into the Portal. There is no bandwidth with current staff to absorb the work needed to compile the list, gather Intelligent Mail barcodes from our vendor, and enter the information into the Portal. Nor is there time to develop technology that can complete this process for the agency. Rather, contractors will need to be hired and trained to perform the compilation and data entry. Generally, for a project of this complexity and significance, we would hire several subject matter experts to perform the compilation and entry. In my experience, the rate per subject matter expert contractor is $169 per hour. I anticipate the cost would be over $500,000. This is especially difficult given that both SBE and the State of Maryland are currently facing budget shortfalls. Because no funding has been provided to comply with this Rule, paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as developing the current and future voter registration database, developing and implementing a new pollbook solution, implementing a new voting system, and supporting the local boards of elections in voter registration and election administration matters.

23. In addition to costs, I have significant concerns about the ability to hire and train staff in time to accomplish this process for the 2026 General Election. Given the short time between the Rule's finalization and the general election, finding and onboarding subject matter experts may not be feasible. Additionally, hiring inexperienced staff and having them perform on an extremely short timeline gives rise to concerns about accuracy of data entry. Finally, there are technological considerations that will make this process difficult. Specifically, SBE does not generate Intelligent Mail barcodes for the ballots it mails. The state-contracted vendor performs

this function. Thus, SBE will need to develop the technology to gather this information from the vendor. This will be a manual process, as the current voter registration database used to track mail-in ballots, does not track this information. Given the haste with which the data transfer of Intelligent Mail barcodes must be implemented, there are additional concerns over inaccuracy and timely submission. If either of these factors lead to inaccurate or untimely submission to USPS, voters will be disenfranchised.

24. Additionally, I have concerns about the feasibility of USPS implementing the Portal in a timely and accurate fashion in the limited time remaining before the November 2026 general election. SBE has received no information about the Portal that will be used by USPS. The Agency does not have any insight into how the Portal will be accessed, how many individuals can access the system on SBE's behalf, or how long USPS anticipates data entry to take.

25. As a result of the Rule, my office must immediately prepare and update guidance for local elections offices to ensure a consistent approach across Maryland's 24 counties. This guidance would have to address topics such as what information is required by USPS, how to gather that information, how to use the USPS Portal, ensuring timely enrollment of mail-in voters as voter rolls change leading up to the election, cybersecurity protection, how to account for changes made to existing voter information between the time submitted to USPS and the mailing of a ballot, and how to implement this process for voters who are protected by the various confidentiality rules of the State. These preparations and updates will require significant time, personnel, and money. Again, SBE anticipates that contractual resources will be needed to support this effort.

26. Maryland anticipates mailing ballots to approximately 585,000 voters during the 2026 general election during the period from September 21, 2026 to October 27, 2026. Maryland also has a robust system to deliver mail-in ballots using a secure link sent to voters by email. That link provides access to an online ballot delivery system that allows the voter to mark and download their ballot. Voters are given the choice of printing an envelope or following a template to address that envelope for return to the local boards of elections. Roughly 72,000 ballots are expected to be delivered by email and returned by mail.

27. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all 525,000 voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. Leading up to the 2024 primary election, almost 80,000 voter registration changes were made in the 30 days preceding the election. For the 2024 general election, 185,500 voter record changes were made in the 30 days prior. In the 2026 primary, 3,108 changes were made during the same time frame. All of these changes would need to be entered into the system and provided to USPS.

28. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111,

Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates and ballot requests within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information.

29. Maryland State law allows a voter who spoils their unvoted mail ballot to request a new ballot up to 7 days before an election. To ensure that voters receive these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS. Additionally, there are situations where voters make changes to their record that generate a new mail-in ballot and void their original ballot. In 2024, there were over 7,000 instances of voters needing a new mail-in ballot for the primary election and 16,600 for the general election. These changes would require generation of a new Intelligent Mail barcode by the state-contracted vendor, and then communicating that new barcode to the USPS.

30. Based on what information is available, SBE has no way of estimating the number of hours that it would take for elections staff to become authorized users of the USPS Ballot Portal and enroll all voters, assuming there are no delays caused by technical or processing difficulties. SBE has significant concerns about the need to enter IMBs for each mail-in ballot sent to a voter. As aforementioned, SBE does not generate IMBs for the ballots it mails. The

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

state-contracted vendor performs this function. Given the extremely short timeline for implementation, SBE will need to develop a manual process for the vendor to provide IMBs for each mail-in ballot. This information must then be entered into the USPS system manually. The process will be time-consuming and significantly change the workflow of our current printing vendor. The current business practice of SBE and its printing vendor is that SBE provides data to the vendor, including voter information, ballot style and ballot tracking number. The vendor uses that information to create a mail-in ballot packet for each voter that includes their ballot, voter information, an outgoing envelope, and a return envelope. The vendor assigns an IMB to both the outgoing and return envelope. Using the vendor's mail tracking system, both SBE and voters can track their ballot through the mail stream from the time it is mailed to the voter until the voter's ballot is returned to the LBE. Conversely, SBE uses the ballot tracking number, not the IMB, to track voters' ballots in the voter registration database. The USPS Rule will require SBE to fundamentally change its practice and add an additional time-consuming step of gathering IMB information from the vendor and inputting it into the USPS system.

31. SBE has begun discussions with its mail-in ballot vendor regarding the feasibility of providing to SBE barcode information to be entered into the Portal. In response, the vendor has responded with a long list of questions to determine if and how this process can be accomplished. Moreover, the vendor has clearly stated that, if possible, the processing time of the first, and largest, mailing of ballots to increase by a week. Finally, the vendor has identified other risks that may be introduced to the mail-in ballot printing and mailing process that will require additional check points and controls, which is likely to add processing time to all mail-in ballot requests.

32. Adding another layer of complexity is that some mail-in ballots are sent by the local boards of elections, not the vendor. The local boards of elections do not have the capability to create and apply Intelligent Mail barcodes to either outgoing or return envelopes. SBE would need to determine if it is possible to procure technology to allow LBEs to generate and apply Intelligent Mail barcodes. Given the proximity to the General Election, it is unlikely that such a solution can be procured and implemented in time to provide the information to USPS as required by the Rule. In turn, voters who cannot have their ballots mailed by the USPS will risk disenfranchisement due to not being able to receive a mail-in ballot. If the technology can be procured and implemented timely, there would be the additional hurdle of having to train employees of the LBEs to enter information into the USPS system, or hire additional employees to manage the process.

33. As mentioned above, SBE has a robust web delivery system, also known as online ballot delivery, that nearly 70,000-100,000 voters use each election cycle. Online ballot delivery creates a unique challenge for implementing the USPS Rule. Voters who use online ballot delivery either print the return envelope for their ballot or hand address the envelope using a template provided by SBE. Included on this template are the words “Ballot Inside.” Operationally, this is necessary so that the local boards of elections can identify a ballot from other non-ballot mail to ensure proper and timely processing. The return envelopes do not have Intelligent Mail barcodes. However, the USPS Rule would require SBE to include and provide an Intelligent Mail barcode to USPS. SBE has not identified a technical or manual way to do this. As a result, this Rule potentially disenfranchises all mail-in voters who are signed up to receive mail-in ballots via secure email link.

34. Maryland Law does not allow ballot design to be finalized until after September 2 when the ballots are certified after public review. SBE's election management system does not allow for starting to assign ballot tracking numbers and then IMB numbers until after ballot design has been finalized. Additionally, SBE is also concerned that technical and processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Maryland exponentially. And if the system fails, Maryland may be unable to mail ballots to voters at all.

35. Up until 21 days before the election LBEs process updates and changes to voter registration records. Mail-in ballot applications and changes to mail-in ballot requests are processed by LBEs until 7 days before the election. This means that until 7 days before the election there are daily changes to the information that will be required to be provided to USPS. For each change that affects the information required to be provided to USPS or results in the issuance of a mail-in ballot, the LBE will need to provide that information to the USPS. This means that the LBE will be completing duplicative data entry for each change or mail-in ballot request. LBEs often struggle to keep up with the demands of processing, prior to an election. This duplicative data entry will not only slow the processing of data in the voter registration database, but slow the provision of data to the USPS as required by the Rule.

36. In Maryland, USPS is the only way in which many voters receive a ballot. Maryland's General Assembly created a permanent mail-in voting option in 2021. Currently, there are nearly 575,000 permanent mail-in voters. Of these, 502,389 have requested to have their ballots mailed to them via USPS mail. The remainder have requested ballots delivered by web delivery and returned using USPS mail. While SBE has consulted its printing vendor about

the possibility of using a commercial carrier to send ballots to voters, the vendor has indicated that this will be a time consuming and extremely costly process. Each ballot would likely need to be placed in the commercial carrier's cardboard envelope and addressed to the voter. Furthermore, this addresses the concern for outgoing mail. Marylanders would still have to return ballots to their local boards of elections using USPS. Access to mail-in voting is especially important for low-income, rural, and vulnerable populations, including voters with disabilities, who may lack access to transportation to either vote in-person or to receive and return their ballot through some other means.

37. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

38. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided

virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

39. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

40. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

41. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

42. As a result of the Rule and to mitigate the impact of all this uncertainty and turmoil, Maryland will also have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Elections staff would need to be

trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and manage voters who appear on Maryland's voter registration list and are eligible to receive a mail ballot under Maryland law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the Rule that will necessarily divert roughly two thirds of our staff from other important election administration tasks.

43. It is my understanding that the Rule requires that any mail containing a mail-in ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

44. These requirements of the Rule necessitate immediate action from me and my team in SBE.

45. Our agency anticipates mailing approximately 585,000 ballots to voters during the 2026 general election. Additionally, our agency anticipates over 72,000 ballots delivered via secure email link to be returned using self-addressed envelopes.

46. Our agency/local elections officials have consistently relied upon election mail guidance from USPS to design and mail ballots. SBE has relied on that guidance in preparations that have already been taken for the November 2026 general election.

47. Maryland has already ordered over 1.2 million mail ballot envelopes for the 2026 federal election cycle, at a cost of $132,000. While the state-contracted vendor follows the guidance set forth by the USPS, the envelopes have not been approved as required by the Rule. If the envelopes are not approved, SBE will lose this money. Additionally, based on my experience in managing mail-in voting, I am aware that envelopes have the longest production

time of all components of the mail-in ballot packets sent to voters. If the envelopes need to be reprinted, this compromises SBE's ability to meet the state law requirement of mailing ballots to voters 43 days before the election. Depending upon the time it takes for approval and reprint, there is a real concern that envelopes cannot be produced in time to mail ballots to voters with enough time to mark and return them for the general election. This is especially true, given concerns about USPS timeliness in mail delivery. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71.

48. There is no way for SBE to meet the envelope design standards of the USPS Rule for ballots delivered by secure email link. Not only can Intelligent Mail barcodes not be added, other indicia required by the Rule would not be available to voters who hand address their ballots to return to the local boards of elections.

49. The local board of elections do not currently use Intelligent Mail barcodes on ballots that are mailed from their offices. If the local boards of elections were to purchase additional equipment to apply Intelligent Mail barcodes, this would incur significant expenses and space constraints. More importantly, it is unclear that this could be accomplished prior to the general election. If possible, it will require significant training of local election officials to ensure they are able to operate the equipment and provide Intelligent Mail barcodes to the USPS. Additionally, for a federal requirement that would prevent mailing of ballots without Intelligent Mail barcodes, SBE considers the use of Intelligent Mail barcodes unnecessary for ballots mailed from local boards of elections. First, there is a proportionally small number of ballots are mailed directly from the local boards of elections, as opposed to being mailed by our state-contracted

vendor. Second, SBE uses a ballot tracking number to track the issuance, return and acceptance or rejection of mail-in ballots. The result would be a significant cost to SBE in order to ensure that a relatively small number of voters are not disenfranchised, due to the local board mailing their ballots. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, but that tool is only available for mailings with fewer than 50,000 pieces of mail.[2] The largest counties in the State would not be able to use that tool for election mail. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes [that may have already been ordered], do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47.

50. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Maryland voters. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business

---

*See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Maryland voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots

51. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law.

52. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Marylanders as possible can exercise their right to vote. In the 2024 general election, 765,695 Marylanders voted by mail. This method of voting is particularly important for the many Marylanders who live in more remote areas of the state, voters with disabilities, and voters who do not get paid leave.

53. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist

and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent any voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

54. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

55. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. My office received multiple inquiries from voters asking whether USPS would deliver ballots to and from voters and voicing concerns about the effect of the rule on their ability to vote. I anticipate additional inquiries from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

56. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for Maryland residents registered as

permanent vote-by-mail voters, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law with no impediments.

57. I estimate that such a public education effort will likely cost $500,000 to $750,000. This will divert money from other important resources at a time where the State has already cut our budget by roughly half a million dollars.

58. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail-in ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

59. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

60. SBE must begin mailing ballots for the 2026 general election in the coming weeks. Consistent with federal law, agencies mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. § 20302(a)(1)-(3), (8)(A). In addition, state law requires that SBE begin mailing mail-in ballots to all other eligible voters no later than September 21, 2026. *See EL § 9-306(c)* SBE will continue mailing ballots through October 27, 2026, consistent with state law.

61. Additionally, my office will need to continue to register those who are eligible to vote in Maryland. Maryland allows qualified individuals to register up to 21 days before Election Day and in person during early voting and on Election Day. *See EL § 3-302(a)*; 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Marylanders can register to vote online, at their local board of elections, at various state social

service agencies, and through Maryland Motor Vehicle Administration when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in an influx in voter rolls and requiring time from election officials.

62. In compliance with the NVRA "quiet period" for voter registration, Maryland does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. § 20507(c)(2)(A), 3(A)-(B), 4(A). Maryland does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled or when a voter has died.

63. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

64. Our staff must also continue to process mail-in ballot requests and ensure timely delivery of mail-in ballots no matter the method of delivery.

65. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal."

USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters. SBE estimates that it would require roughly 50% of staff to comply with this Rule, comprising the vast majority of our non-technical staff. These staff already work extra hours during the election critical times, merely to keep up with their election related work. There is no bandwidth with current staff to absorb the work needed to compare and verify the list and enter information into the USPS Portal, nor is there time to develop technology that can do this comparison for the agency. Rather, contractors will need to be hired and trained to perform the work. However, no funding has been provided to comply with this Rule, which will result in funding from other major election administrations projects being used for this purpose.

66. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith

effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail-in ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (March 31, 2026); USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter to Jared DeMarinis dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

67. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

68. I am worried that myself and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Maryland registered voters are not citizens. Election Directors at the local boards of elections have raised similar concerns with respect to their being prosecuted. In order to address these concerns, in conjunction with our State's Office of the Attorney General, we are looking into the feasibility and cost to taxpayers of retaining criminal defense counsel to defend state officials who do nothing more than conduct

their official duties. Even if such defense can be provided, I am deeply concerned, based on the nature of these conversations, that SBE will struggle to maintain state and local elections administrators.

[**Conclusion**]

69. In conclusion, I estimate that the requirements of the Rule will require an increase of $1,500,000 to the SBE's budget. Given recent economic pressures across the state and country, we have been trying to keep SBE's budgetary needs as low as possible. On September 19, 2025, SBE submitted the latest estimated budget for SBE to the Maryland Legislature, as required. The Rule will increase financial strain on my office and necessitate a higher budget. SBE will either need to go back to the Legislature and ask for additional funds, which we are far from assured to receive, or will need to identify equivalent cuts elsewhere in my office, a very difficult and maybe impossible task.

70. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Maryland's elections run smoothly and every eligible Marylander can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

71. Each of these tasks and costs will divert scarce resources from other important election administration needs. The majority of SBE staff are already working at maximum capacity due to simultaneously administering the 2026 election while working on large projects

to upgrade elections equipment and systems. Staff are in the process of several large procurements and development projects, including development of a new pollbook, development and implementation of a new voting system solution, and procurement of a new voter registration and election administration system. Many of the individuals who work on these projects are the same individuals who will need to devote significant resources to implementing the policy and technological changes necessary to comply with the Rule. However, it is essential that these projects remain on schedule due to funding availability, current contract terms, age of the current technology and expected implementation dates of upcoming election years.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Annapolis, Maryland.

Melissia Dorsey

Melissia Dorsey
Assistant Deputy for Election Policy
Maryland State Board of Elections