**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. _______________ |

**DECLARATION OF JONATHAN BRATER**

I, Jonathan Brater, declare as follows:

1. I am a resident of the State of Michigan. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Michigan Department of State ("MDOS") staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I have been employed by the Michigan Secretary of State since January 2, 2020, and in such capacity serve as Director of the Bureau of Elections ("the Bureau").

3. The State of Michigan and its subdivisions are responsible for administering federal elections in Michigan. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

4. The Secretary of State is Michigan's Chief Election Officer, responsible for issuing "instructions" and "advis[ing] and direct[ing] local election officials in the proper methods of conducting elections." Mich. Comp. Laws § 168.31(1)(a)-(b).

5. As the Director of Elections, I support Secretary of State Jocelyn Benson in her official capacity as the Chief Election Officer for the State of Michigan and assist her in the execution and enforcement of all state and federal laws relating to elections. Mich. Comp. Laws §§ 168.21; 168.32 ("The director of elections shall be vested with the powers and shall perform the duties of the Secretary of State under his or her supervision, with respect to the supervision and administration of election laws.").

6. The Bureau is responsible for implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws and providing instructional information to the public and other parties. This includes the training of Michigan's 83 county clerks and 1,521 city and township clerks, all of whom participate in the administration of elections in Michigan.

7. My office has a legal obligation to safeguard against disenfranchisement and take steps to ensure that all eligible voters who want to vote are able to do so. The Michigan Constitution provides, "No person shall . . . use any means whatsoever, any of which has the intent or effect of denying, abridging, interfering with, or unreasonably burdening the fundamental right to vote." Mich. Const. Art II § 4(1)(a).

8. Michigan operates one of the most decentralized systems of elections in the country, with 1,604 county, city, and township clerks administering elections. The Bureau works collaboratively with county and local (city and township) clerks to complete election tasks. For instance, while county clerks initiate the cancellation of some deceased voters, Mich. Comp.

Laws § 168.510(2), the Bureau sends the notification to the local clerk and cancellation is completed by the applicable local clerk. Mich. Comp. Laws § 168.510(4), (5). In many communities, the local clerk's position is part-time, and it is challenging for clerks to complete existing statutory requirements. Recent changes to the Michigan Constitution instituted early voting in 2024, and the Bureau distributed $30 million in grants to Michigan's 83 counties, with the county clerks in turn distributing funds to their cities and townships to assist with implementation. The Bureau is also obligated by statute to establish a training curriculum and continuing election education for all local clerks, as well as a training program for precinct delegates, and to provide an election day dispute resolution team available to local officials. Mich. Comp. Laws § 168.31(j), (k), (m), (n).

9. My office and Michigan's 83 counties are currently preparing to administer the November 2026 general election. Federal, state, and local races will be on the ballot. Currently, programmers assigned to Bureau tasks are working to incorporate and integrate numerous statutory requirements into Michigan's Qualified Voter File ("QVF"), as well as on a multi-year project to modernize Michigan's electronic pollbooks ("EPB"). Additionally, the Bureau is in the process of replacing the State's approved voting systems in line with statutory timelines. Mich. Comp. Laws § 168.37. The Bureau is also in the midst of post-August primary election activities and preparation for the 60-day November ballot deadline, including reviewing candidate and initiative petitions. MDOS has spent over a year working with Department staff, legislators, the Governor's office, and clerks to ensure State funding for these initiatives.

10. My office has a continuing obligation to work with clerks to perform regular voter list maintenance, as required under the National Voter Registration Act ("NVRA"), the Help America Voter Act ("HAVA"), and Michigan State law. This includes sending notices to voters

who may have moved, identifying and merging duplicates on the statewide voter registration list, and cancelling the registration of those who have died.

11. Additionally, my office and clerks must continue to register those who are eligible to vote in Michigan on an ongoing basis. Michigan allows qualified individuals to register by all allowed methods 15 days before Election Day and to register with their clerk with proof of residency beginning 14 days before Election Day. Mich. Comp. Laws § 168.497; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). Eligible Michigan residents can register to vote online, at their clerk's office, at public assistance service agencies, as well as through MDOS's branch offices (DMVs) when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. Michigan also allows eligible voters to register on Election Day if they satisfy applicable requirements. *See* Mich. Comp. Laws § 168.523a.

12. In compliance with the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), Michigan allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election. 52 U.S.C. §§ 20302(a)(2). There is no date cutoff for UOCAVA voters to register in Michigan, but a ballot may not be sent by U.S. mail after 5 p.m. on the fourth day before an election, so a UOCAVA voter could not register and request a mail ballot after that time. Mich. Comp. Laws §§ 168.759a(4); 168.761(1). Michigan recently implemented an electronic transmission and return portal that allows military voters with a Common Access Card signature to receive and return their ballot electronically. Mich. Comp. Laws § 168.759a(6). If practically possible, the portal would allow a military voter to register and receive a ballot electronically up to and on Election Day.

13. In compliance with the NVRA "quiet period" for voter registration, Michigan does not systematically remove voters from the rolls during the 90 days prior to a federal election. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Michigan does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, when a voter confirms they are no longer a resident of the jurisdiction, when an election official receives a copy of a signed registration application from another state that includes the voter's previous address in Michigan, and when a voter has died. Mich. Comp. Laws § 168.509o(4); Mich. Comp. Laws §168.510; Mich. Admin. Code. R. 168.260.

14. In sum, Michigan's statewide voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, this happens at more than a thousand locations across the state, and this will continue through the 2026 election and beyond.

15. Michigan elections officials are required by state law to issue ballots to duly registered voters. *See, e.g.*, Mich. Comp. Laws § 168.761(1) (mandating clerks to deliver absent ballots upon verification of the application); Mich. Comp. Laws § 168.720 (mandating polls open continuously from 7:00 a.m. to 8:00 p.m., and any voters still in line at closing "shall be allowed to vote"); Mich. Comp. Laws § 168.720b(1) (permitting early voting by registered and qualified electors).

16. In compliance with UOCAVA, Michigan issues ballots at least 45 days before an election to registered voters who have requested an absentee ballot under that Act. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). State law provides that "[a]n absent uniformed services voter or an overseas voter who submits an absent voter ballot application is eligible to vote as an absent

voter in any local, state, or federal election occurring in the calendar year in which the election is held for that ballot requested if the absent voter ballot application is received by the county, city, or township clerk not later than 2 p.m. of the Saturday before the election." Mich. Comp. Laws §168.759a(10).

17. Michigan also provides a mail ballot to all voters who have the right to request one, "without giving a reason[.]" Mich. Const. Art II, §4(1)(h). Under Michigan law, voters may request an absentee ballot at any time before applicable deadlines. And once registered, voters may join the permanent mail ballot list and request to have "have an absent voter ballot sent to the voter before each election by submitting a single signed absent voter ballot application covering all future elections." Mich. Const. Art II, § 4(1)(k), Mich. Comp. Laws § 168.759(5). Michigan sends these ballots to voters through the United States Postal Service ("USPS").

18. Sending mail ballots in a timely fashion is not only required by state and federal law, but is also critical to ensuring that as many eligible Michigan voters as possible can exercise their right to vote.

19. City and township clerks continue to send mail ballots as additional voters register to vote or request an absentee ballot, up to 5:00pm on the Friday before the election, or October 30, 2026, the deadline to apply and have an absentee mailed out. On an emergency basis, residents who cannot apply for an absentee ballot in person or vote in person can request a ballot after 5:00 pm on the Friday before the election. The ballot can be sent to the potential voter and then can be returned either via mail or by a family member or otherwise deputized person.

20. I am familiar with the Notice of Proposed Rulemaking issued by USPS that was published in the Federal Register on June 2, 2026. MDOS submitted a comment on the Proposed Rule expressing opposition and identifying specific concerns, including the legality of creating

the state voter list, privacy concerns, and potential to disenfranchise voters for reasons out of their control. A true and correct copy of that comment letter is attached to this declaration as Exhibit A.

21. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule, if implemented, will imminently cause significant harm, confusion, and disruption in Michigan's election administration, and will impose unrecoverable costs on Michigan.

22. For the reasons discussed throughout this declaration, I would be required to align Michigan's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office would strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

23. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office State. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under State law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters

under State law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted the outbound / return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In Michigan, we would have to provide that information by October 4, 2026 (30 days before the election) or on or before September 19, 2026 (the deadline to timely mail ballots to UOCAVA voters who have requested them, though ballots can be mailed to any voter on that date or earlier if available) and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

24. These requirements will impose significant financial costs on my office and threaten to disenfranchise voters in Michigan.

25. I have concerns about the feasibility of USPS implementing this system in a timely and accurate fashion in the limited time remaining before the November 2026 general election.

26. I am particularly concerned that USPS is preparing only for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to

the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballor Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 C.F.R. Part 111, Supplementary Information at 58.[1] USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes will not work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

27. Technological or implementation failure may lead to the inability of Michigan to deliver mail ballots to voters and conduct the election in accordance with state and federal law.

28. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 States in a condensed timeframe.

29. USPS has confirmed that it does not expect to "require additional staff" or for implemental of the Rule to impose "a significant burden on employees." *See* 39 C.F.R. Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail.

30. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

---

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

31. Michigan anticipates mailing ballots to a minimum of 1.9 million U.S-based voters during the 2026 general election during the period from approximately September 19, 2026, to October 30, 2026.

32. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling at least 1.9 million voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election.

33. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advanced coordination among State and local election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 C.F.R. Part 111, Supplementary Information at 14. Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—a system for which officials currently have no concrete operational information.

34. State law allows a voter to spoil an unvoted mail ballot and request a new ballot up to 5 days before an election. Mich. Comp. Laws § 168.765b. To ensure that voters receive these ballots to which they are entitled under State law, the information associated with these new ballots also would need to be provided to USPS.

35. Based on available information, I estimate that it will take at minimum, thousands of hours for local and state elections staff to become authorized users of the USPS Ballot Portal and enroll all voters, assuming there are no delays caused by technical or processing difficulties. But technical and processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Michigan exponentially. And if the system fails, Michigan may be unable to mail ballots to voters at all.

36. As a result of the Rule, Michigan would also have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. This is especially true where USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of process changes. While the Rule contemplates that State and local election officials will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on how the Ballot Portal will look, how it will operate, how users become authorized to use it, or how long it will take to upload voter information. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or portal." *See* 39 C.F.R. Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to State and local

election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters under the pressure of election deadlines.

37. As a result of the Rule and to mitigate the impact of this uncertainty and turmoil, my office would have to immediately prepare and update guidance for local elections offices to ensure a consistent approach across Michigan's 83 counties. This guidance would have to address topics such as using the USPS portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, processing election mail, utilizing cybersecurity protection and address confidentiality program participants, and handling any voter that may be mailed a ballot on an emergency basis, as described above. My staff would have to begin these preparations without themselves having complete information about how the USPS portal will work. Further, given that we have largely completed training and guidance for this election cycle, altering and reissuing guidance and training will necessarily divert a substantial percentage of staff resources from other important election administration tasks. In short, these preparations and updates will require significant time, personnel, and money, diverting hundreds, if not thousands, of hours from other important election administration tasks.

38. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

39. These requirements of the Rule would necessitate immediate action.

40. Local elections officials have consistently relied upon election mail guidance from USPS to design and mail ballots, and relied on that guidance in preparations that have already been taken for the November 2026 general election.

41. In Michigan, city and township clerks are responsible for issuing absent ballot envelopes and must order them from one of three approved vendors. There are 1,521 separate envelope styles corresponding to each municipal jurisdiction, which must all be designed, tested, reviewed, and printed individually. Localities currently submit ballot envelopes to USPS for design review. This process takes weeks at minimum to complete for each locality's envelope. Localities currently use Intelligent Mail barcodes on outgoing ballot mail in most cases and on incoming ballot mail in some cases. Localities that do not currently use Intelligent Mail barcodes will be required to re-design their ballot envelopes to include them, and it is not clear if currently used Intelligent Mail barcodes can be used or would need to be redesigned.

42. As noted above, we anticipate mailing at least 1.9 million ballots to Michigan voters during the 2026 general election. In Michigan, USPS is the only way in which the vast majority of voters receive a ballot. Other carriers are used only in extremely rare instances such as emergency mailings. Access to mail-in voting is particularly important for the many Michiganders who are out of state during election periods, voters who because of age or disability have difficulty voting in person, and voters who may have difficulty voting in person because of work or family obligations.

43. Jurisdictions have already ordered mail ballot envelopes for the 2026 federal election cycle. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 C.F.R. Part 111, Supplementary Information at 71.

44. But it is very likely too late for local clerks to order additional envelopes for the November election. And while USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, that tool is only available for mailings with fewer than 50,000 pieces of mail.[2] The largest jurisdictions in Michigan would not be able to use that tool for election mail. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 C.F.R. Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes that may already have been ordered do not simply reflect "confus[ion]" as USPS asserts. *See* 39 C.F.R. Part 111, Supplementary Information at 47.

45. Moreover, if a second ballot is required to be issued because of ballot design issues, local clerks will have to pay the additional cost of another set of ballot envelopes. The State will have to pay the cost of return postage.

46. In addition to the cost issues, a second round of ballots will also increase the burden on these local clerks, who have only three months between the primary and general elections. Based on my experience, many already struggle with the burden of proofing, printing and mailing out ballots. Doubling their workload will be a huge burden, especially in smaller jurisdictions with few staff.

47. The state would also have to repeat the extremely time- and resource-intensive process of setting up the return postage billing for these new envelopes.

---

[2] *See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

48. In Michigan, as in much of the country, ballot envelopes vary by city or county. I am deeply concerned about the length of time it would take for USPS to conduct a second round of ballot design review for these 1,521 jurisdictions. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 C.F.R. Part 111, Supplementary Information at 47, 49–51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Michigan voters. Indeed, delays in the approval process will prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

49. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law.

50. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Michiganders as possible can exercise their right to vote. In the 2024 General Election, 2,232,721 Michiganders voted by mail, accounting for 39% of votes in that election.

51. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent *any* voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under State law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

52. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

53. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. Following the Proposed Rule, my office as well as other MDOS information centers have received multiple

inquiries from voters asking whether USPS would deliver ballots to and from voters. I anticipate additional inquiries from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

54. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for Michigan residents on the permanent mail ballot list, who are used to automatically receiving mail ballots and being able to vote by mail under existing State law with no impediments.

55. I estimate that such a public education effort, to be effective, would likely cost in the millions of dollars.

56. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame State and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

57. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election, as outlined above. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each State to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in

the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail about how to use the Portal "shortly," 39 C.F.R. Part 111, Supplementary Information at 55, but election officials must begin work now.

58. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters. For example, diverting resources from testing and data review will prevent my staff from performing work on election software quality improvements and needed data reports. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days' advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 C.F.R. Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

59. Additionally, just depositing election mail at the post office will become a time-consuming task. Before election mail is even brought to the post office, election staff "must

segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 C.F.R. Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." *See* 39 C.F.R. Part 111, Supplementary Information at 57–58. The amount of staff time spent processing election mail will increase exponentially.

60. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with State law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supplemental Information at 78. This ignores both serious concerns with the practical ability for USPS to carry out the requirements of the Rule and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as States "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supplemental Information at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize

the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, EO § 2(b) (March 31, 2026); *see also id.* § 5 (providing that "State or local election officials . . . [and] individuals involved in the administration of Federal elections; of public [] entities engaged in the printing, production, shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under" various federal criminal laws). The Executive Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically through disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supplementary Information at 60, 61. In a letter to Secretary Benson dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

61. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

62. I am worried that myself and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Michigan registered voters are not citizens.

63. I know that the threat of prosecution is on the minds of state and elections officials. I have heard election officials discuss the strain the threat of prosecution for mistakes in election administration can cause and the likelihood that they would resign rather than face these threats. The past few years have seen unprecedented turnover in Michigan's clerks, which I believe is largely driven by increased harassment and misinformation surrounding elections. In 2024, 118 townships in Michigan did not have a candidate run for township clerk. I worry that the threat of prosecution will only exacerbate this growing problem, as people may not wish to take on the risk.

64. Should the United States Attorney General initiate any such enforcement actions, the Michigan Department of State would be required to divert significant resources not only to respond to such legal action, but also to educate the public, with the aim of minimizing voter confusion to the extent possible. Any legal action involving the Bureau requires a significant amount of work from multiple divisions within it, including administrators, subject matter experts, legal experts, and their support staff, as well as staff from other branches within the Department of State. Due to the complexity of the state's electoral system, legal actions involving the Department regularly involve the work of at least eight Department employees, and often ten or more. This work often recurs with every substantive pleading received or drafted. Further, the number of active cases involving the Department dramatically increases in election years such as this. Defending against legal actions that may not be based on correct information, as appears possible under this order, will reduce the time staff is available to handle other cases, respond to clerks and the general public, develop and conduct its training programs, conduct its own enforcement actions, and fulfill its duties as a filing official, among many other regular activities.

65. Any such legal proceedings would also have severe and adverse consequences for the public's trust in Michigan's administration of elections.

66. In conclusion, I estimate that the requirements of the Rule will require an increase of millions of dollars to MDOS's budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. The budget for fiscal year 2026-2027 was recently finalized. The Department submitted its budget requests for this budget in October 2025. Since that time, the Department has worked with the Legislature and Governor to ensure those requests are included in the final budget. While those requests included funding for early voting and the 2027 replacement of voting systems statewide, I did not anticipate change of this magnitude that would divert much of the Bureau's staff from its critical tasks. The Rule will increase financial strain on my office and necessitate a higher budget. MDOS will either need to go back to the Legislature once it returns in September and ask for additional funds, which I am far from assured to receive, or will need to identify equivalent cuts elsewhere in my office—a very difficult and likely impossible task given the costs imposed by the new requirements.

67. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Michigan elections run smoothly and that every eligible Michigander can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

68. Each of these tasks and costs will divert scarce resources from other important election administration needs. In response to the ever-increasing volume of questions, in 2024 the Bureau added a 7-member support desk section, whose staff handles first-tier questions that comprise the majority of questions to the Bureau and refers more specialized questions to subject matter experts. This has substantially decreased wait time for responses and freed up subject matter experts for other work such as updating training materials, performing accessibility audits, and reviewing ballot proofs. I anticipate that at least half of the staff of the 18-member election administration division would be shifted to field incoming phone calls for an indefinite period, likely all the way through election day.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Lansing, Michigan.



Jonathan Brater
Director of Elections
Michigan Department of State