**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

*Plaintiffs,*

v.

UNITED STATES POSTAL SERVICE, et al.,

*Defendants.*

Case No. _______________

**DECLARATION OF PAUL LINNELL**

I, Paul Linnell, declare as follows:

1. I am a resident of the State of Minnesota. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Elections Director for the State of Minnesota. I work for Secretary of State Steve Simon and support him in his official capacity as the Chief Officer of Elections for the State of Minnesota. In my role, I assist him in the administration of all state and federal laws relating to elections.

3. I have served as the Elections Director since July 2024. I also have extensive prior experience in election administration, having served as an Elections Specialist, Elections Operations Administrator, and Elections Manager for Anoka County, Minnesota from 2015 to 2022 and as the Deputy Elections Director for Secretary Simon from 2022 to 2024, before

assuming my current position. My current duties include supervising all election administration duties of the Office of the Secretary of State.

4. The State of Minnesota and its subdivisions are responsible for administering elections in Minnesota. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks. The Office of the Minnesota Secretary of State administers the statewide voter registration system, provides technical assistance and training to local election officials, and monitors compliance with state and federal election laws.

5. The Secretary of State is the state's Chief Officer of Elections, responsible for administering all state and federal law relating to elections within the state. The Office of the Minnesota Secretary of State is responsible for implementing the Secretary of State's responsibilities with regard to elections, including providing guidance on laws and providing technical information to the public and other parties. Under Minnesota law, all eligible voters who want to vote are entitled to do so. *See* Minn. Stat. § 201.014.

6. Elections in Minnesota are managed by local officials with support from the Secretary of State's Office. Under Minnesota law, counties are responsible for processing voter registration applications, applying or removing challenges to voter records and conducting absentee balloting. Cities, townships, and (where appropriate) school districts are responsible for determining precinct boundaries, setting polling locations, and hiring election judges. Some counties delegate additional tasks to cities and townships, such as the training and certification of election judges and the administration of absentee balloting.

7. In my role as Elections Director, I am responsible for ensuring the correct and legal administration of election processes and developing election guidance. I am quite familiar with the systems necessary to oversee the administration of elections in Minnesota, including the requirements necessary to register to vote, the statewide voter registration system, and administration of mail and absentee balloting.

8. My office and jurisdictions statewide are currently preparing to administer the November 2026 general election. Federal, state, and local races will be on the ballot. This is an extremely complex and resource-intensive process, involving coordination between 87 counties, more than 2,000 municipalities, and more than 4,000 individual precincts. At this point, preparations for the 2026 general election have been ongoing for well over a year and are now entering their final stages ahead of the election.

9. Minnesota provides a ballot by mail to eligible individuals who have requested one (referred to as "absentee ballots") or who reside in a jurisdiction that conducts elections entirely by mail (referred to as "mail ballots"). Minn. Stat. Ch. 203B; Minn. R. Ch. 8210; Minn. Stat. § 204B.45. The option of mail balloting is available to a city having fewer than 400 registered voters, a municipal precinct having fewer than 100 registered voters, a town of any size, or an unorganized territory. Minn. Stat. § 204B.45. Mail balloting can be used in these jurisdictions for every federal, state, county, city, or town election. There are over 1,000 mail ballot precincts in Minnesota with more than 158,000 registered voters residing in a mail ballot precinct. Voters who do not live in a mail ballot precinct may request a ballot by mail and return it by mail or in person. This process is referred to as absentee voting. Minnesota Rules set the form and content of the absentee applications, instructions, and envelopes. Minnesota Rules Ch. 8210. Counties are responsible for administering absentee voting for all county, state, and federal

elections. Any eligible voter may vote by absentee ballot as provided in state law. Minn. Stat. 203B.02. Both mail and absentee ballots are sent to voters through the United States Postal Service ("USPS").

10. In Minnesota, ballots are prepared and mailed by the county; in some cases, a county will hire a vendor for this work. In either case, mail ballot envelopes must conform with state law. *See, e.g.*, Minn. Stat. § 203B.07, subd. 2, 3; Minn. R. Ch. 8210. Mail ballots are not required by Minnesota law to include Intelligent Mail barcodes. Counties begin mailing ballots to eligible voters 46 days before the election, or on September 18, 2026, for the 2026 general election.

11. Counties continue to send mail ballots as additional voters register to vote or request an absentee ballot, up to the day before the election, or November 2, 2026.

12. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026. My office submitted a comment on the Proposed Rule expressing opposition and identifying specific concerns, including that the Proposed Rule is arbitrary, unnecessary, impossible to implement within required timelines, and would likely result in the disenfranchisement of hundreds of thousands of eligible Minnesota voters. A true and correct copy of that comment letter is attached to this declaration as Exhibit A.

13. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule will imminently cause significant harm, confusion, and

disruption in Minnesota's election administration, and will impose unrecoverable costs on local jurisdictions and the state.

14. For the reasons discussed throughout this declaration, I must act now to align Minnesota's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

15. I also anticipate that implementation of the rule will require diversion of election resources to respond to questions and concerns from local election officials such as county auditor and city clerk offices. Having to respond to these concerns and otherwise implement the rule may reduce the availability of resources for addressing other planned, important election administration projects.

16. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece

Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In Minnesota, we would have to provide that information by September 18, 2026, and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("US Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

17. These requirements impose significant financial costs on my office and threaten to disenfranchise voters in Minnesota.

18. I have significant concerns about USPS' ability to implement this system in the extremely limited time remaining before the November 2026 general election. In the less than two months remaining before the first day ballots are mailed in Minnesota, USPS needs to create, test, and implement an entirely new nationwide portal and database, review and approve ballot mail envelopes for every election jurisdiction in the nation that mails ballots, collect the information of millions of eligible voters who have requested to vote by mail (a list that changes daily), and create and staff a process for reviewing every piece of ballot mail sent throughout the election period and returning that mail if it does not meet USPS' standards or cannot be matched against the list of mail voters. Any mistake, inaccuracy, or technological issue in this new and complex process will lead to the disenfranchisement of eligible voters in Minnesota. Based on the very high likelihood of delays and confusion resulting from the rule, Minnesota will likely

need to change the deadline for requesting an absentee ballot. Currently, an eligible voter may request an absentee ballot up to the day before the election. However, this would clearly not be enough time for a county to receive the request, create unique IMbs, submit the information through the USPS' portal, have these changes approved and incorporated into the list, mail the ballot, have it reviewed and accepted by USPS, and have the ballot reach the voter. Based on the process outlined in the proposed rule, I anticipate that voters would need to request an absentee ballot at least 60 days before the election in order to potentially be able to complete these steps. In 2024, more than 420,000 voters in Minnesota requested and received absentee ballots less than 60 days before the election, and I would anticipate a similar or larger number in 2026. If the proposed rule were implemented as written, these hundreds of thousands of voters would be denied the right to vote.

19. As a result of the Rule, my office must immediately prepare and update guidance for local elections offices to ensure a consistent approach across Minnesota's 87 counties. This guidance will need to address topics such as using the USPS portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protection, how to handle address confidentiality program participants and individuals entitled to receive ballots electronically, and a host of other issues. These preparations and updates will require significant time, personnel, and money.

20. Minnesota anticipates that at least 500,000 voters will receive mail ballots during the 2026 general election during the period from September 18 to November 2.

21. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and

implementation window—enrolling all 500,000 voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. As discussed above, over 420,000 Minnesota voters requested an absentee ballot in the 60 days between the 2024 general election. In my experience, these requests greatly increase in volume as the deadline approaches.

22. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information. USPS would need to provide ongoing training, guidance, and support for the thousands of elections officials that would be using the portal every day.

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf

23. Minnesota state law allows a voter to spoil an unvoted mail ballot and request a new ballot up to the day before an election. To ensure that voters receive these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

24. Based on what information is available, I estimate that it will take approximately 8,500 hours for elections staff to become authorized users of the USPS Ballot Portal and enroll all voters, assuming there are no delays caused by technical or processing difficulties. Although USPS claims that IMb information could be uploaded in bulk, Minnesota's statewide voter registration system does not currently include IMb information. IMb information would therefore need to be added manually and could not be uploaded in bulk. For each individual voter, staff will presumably need to look at the outbound and return envelopes, find the IMb number, confirm that the IMb number matches the voter's name and address, and enter some or all of this information into the portal. Even assuming the data verification, entry, and submission process takes only 1 minute per voter, this adds up to a significant amount of staff time that must be diverted from other critical activities. Furthermore, technical and processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Minnesota exponentially. And if the system fails, Minnesota may be unable to mail ballots to voters at all.

25. In Minnesota, absentee ballot applications are processed by counties, who then update the statewide voter file, which is maintained by the OSS. This division of responsibilities adds a layer of complexity to the process of providing voter information to the USPS. OSS and

counties will need to determine an appropriate process to coordinate and ensure that each voter is submitted to the USPS only once.

26. Minnesota has a long history of sending ballots through USPS without issue and voters rely on that system working as expected. Access to mail-in voting is especially important for low-income, rural, and vulnerable populations, including voters with disabilities, who may lack access to transportation to either vote in-person or to receive and return their ballot through some other means.

27. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

28. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users

become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

29. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

30. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

31. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

32. As a result of the Rule, and to mitigate the impact of all this uncertainty and turmoil, Minnesota will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Elections staff would need to be trained on

the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and to process election mail. This is yet another aspect of the Rule that will necessarily divert substantial resources from other important election administration tasks.

33. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

34. These requirements of the Rule necessitate immediate action from me and my team at the Office of the Minnesota Secretary of State.

35. Based on statistics from previous general elections, I anticipate that approximately 500,000 ballots will be mailed to voters during the 2026 general election.

36. Local elections officials have consistently relied upon election mail guidance from USPS to design and mail ballots, and relied on that guidance in preparations that have already been taken for the November 2026 general election.

37. Many of Minnesota's 87 counties have already ordered mail ballot envelopes for the 2026 federal election cycle. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71.

38. Many of Minnesota's counties do not currently use Intelligent Mail barcodes on ballot mail and do not currently submit ballot envelopes to USPS for design review. Minnesota already has longstanding, well-understood, and effective laws and procedures around mailing of

ballots. These laws and procedures include numerous safeguards to ensure security and effective processing. In contrast, the Rule's procedures are poorly defined, unnecessary, and arbitrary. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, but that tool is only available for mailings with fewer than 50,000 pieces of mail.[2] The largest counties in the State would not be able to use that tool for election mail. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes, do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47.

39. In Minnesota, as in much of the country, ballot envelopes vary by county. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. Election officials have also reported that USPS has applied ballot design standards inconsistently, with jurisdictions receiving varying feedback and interpretations from different Mailpiece Design Analysts. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS

---

*See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Minnesota voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

40. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law.

41. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Minnesotans as possible can exercise their right to vote. In the 2024 general election, 14% of Minnesotans voted by mail.

42. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there

are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

43. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

44. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. Following the Proposed Rule, my office received numerous inquiries from voters concerned about potential changes to the mail and absentee ballot process. I anticipate many more inquiries from voters as a result of the Rule. Fielding these questions requires substantial staff time that would otherwise be spent preparing for the 2026 general election.

45. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail.

46. I estimate that such a public education effort would likely come at substantial cost and would pull resources away from other critical work.

47. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

48. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

49. These preparations involve extensive work at the state and county level, including designing, proofing, and printing ballots, receiving and processing requests for absentee ballots, finalizing polling place details, making updates to voter lists, and fielding numerous questions from voters each day.

50. Counties must begin mailing ballots for the 2026 general election in the coming weeks. Consistent with federal law, agencies mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. § 20302(a)(1)-(3), (8)(A). In addition, state law requires that Counties begin mailing mail and absentee ballots to all other eligible voters no later than September 18. Minn. Stat. § 203B.06, subd. 3. Counties will continue mailing ballots through November 2, consistent with state law. Minn. Stat. § 203B.04, subd. 1.

51. Additionally, my office will need to continue to register those who are eligible to vote in Minnesota. Minnesota allows qualified individuals to register up to 21 days before Election Day and in person during early voting and on Election Day. Minn. Stat. § 201.061; 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Eligible Minnesotans can register to vote online, at their county clerk's office, at

various state social service agencies, and through Minnesota's Driver and Vehicle Services Division when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

52. Minnesota does not systematically remove voters from the rolls during the 21 days prior to an election. However, Minnesota does lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

53. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

54. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed,

that can have significant impacts on the conduct of the election and opportunities for voters. It is far too late to obtain additional funding or staff to carry out the tasks required by the Rule.

55. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (March 31, 2026). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See*

39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter to Minnesota Secretary of State Steve Simon dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

56. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

57. I am worried that myself and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Minnesota's registered voters are not citizens. Implementation of the Rule would require adapting to an extraordinary number of changes in a short period of time. Without proper lead time for planning and training, this new process would be susceptible to errors. When layering the proposed Rule changes on top of the threats of criminal prosecution, election officials have increasingly expressed concerns about the potential consequences for an innocent mistake. Election officials already operate under intense scrutiny. Election officials have reported decreasing job satisfaction and increasing harassment in recent years, with many opting to leave the profession altogether. The Executive Order places an additional target on election officials and will only serve to exacerbate these challenges.

58. In conclusion, I estimate that the requirements of the Rule will require a significant increase to my office's budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. The Rule will increase financial strain on my office and necessitate a higher budget request in the 2027 legislative session. The OSS will either need to ask the legislature for funds well beyond previous funding levels, which the office is far from assured to receive, or will need to identify

significant cuts elsewhere in my office, a task that would be very difficult and perhaps impossible to achieve while maintaining legally required functions.

59. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Minnesota's elections run smoothly and every eligible Minnesotan can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

60. Each of these tasks and costs will divert scarce resources from other important election administration needs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at St. Paul, Minnesota

Paul Linnell
Elections Director
Office of the Minnesota Secretary of State