**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. ______________ |

## DECLARATION OF KRISTEN ZEBROWSKI STAVISKY

I, KRISTEN ZEBROWSKI STAVISKY, declare as follows:

1. I am a resident of the State of New York. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with New York State Board of Elections (NYSBOE) staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Co-Executive Director of the NYSBOE. The NYSBOE is governed by a bipartisan board of four commissioners consisting of two Democratic and two Republican commissioners, and two Co-Executive Directors who oversee the day-to-day activities of the agency. Additionally, within this context, I am the Chief State Election Official designated pursuant to 52 U.S.C. § 20509. In that role, I am directly involved in the application and implementation of state and federal laws relating to elections

3. I have served as the Co-Executive Director and Chief State Election Official since 2021. I previously served as a Commissioner of Elections at the Rockland County, New York,

Board of Elections. Accordingly, I am familiar with the voter registration processes in New York, the interplay between the NYSBOE and local boards, the details of election funding and staffing, and the interplay between state and federal laws governing elections.

4. New York and its subdivisions are responsible for administering elections in New York. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5. Specifically, the NYSBOE implements or oversees the requirements of state and federal law with regard to elections, including enforcing laws, certification of election results for congress, state senate and state assembly and any other office encompassing more than one county and providing technical information to the public and other parties. Voter registration and the mechanics of conducting New York's elections are done by local boards of elections, specifically the New York City Board of Elections and, outside of New York City, county boards of elections.

6. The NYSBOE sets standards for how local boards of elections operate. The NYSBOE routinely issues mandatory guidance on compliance with all aspects of election administration and generally assists local boards of elections with registering voters and administering elections. Specifically, the NYSBOE maintains the technological infrastructure and data sent to the statewide voter registration list known as NYSVoter, that all boards of elections in New York must by law use.

7. In my position as the Co-Executive Director of the NYSBOE, I am designated also as the state's Chief State Election Official, in the context of the bipartisan NYSBOE, which executes and enforces all state and federal laws relating to elections within New York. *See* N.Y.

Elec. Law §§ 3-100; 3-200. The NYSBOE is responsible for implementing these responsibilities with regards to elections, including enforcing laws and providing technical information to the public and other parties. Under New York law, the NYSBOE is charged with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. *See* N.Y. Elec. Law § 3-102(14) (mandating the taking of "all appropriate measures to encourage the broadest possible voter participation in elections including the administration of a program of registration for distribution by participating state agencies . . . ."); *see also* N.Y. Elec. Law § 17-202 ("In further recognition of the protections for the right to vote provided by the constitution of the state of New York, all statutes, rules and regulations, and local laws or ordinances related to the elective franchise shall be construed liberally in favor of (a) protecting the right of voters to have their ballot cast and counted . . . .").

8. In my role as Co-Executive Director, I am among those responsible for overseeing the correct and legal administration of election processes under the National Voter Registration Act (NVRA), developing election guidance, voting machine certification, the infrastructure of the statewide voter registration database, and issuing mandatory guidance and instructions to local boards of elections on every aspect of election administration. Given my past role as a county Election Commissioner, my familiarity with the processes is both overarching and often granular.

9. My office and local boards of elections statewide are currently preparing to administer the November 2026 general election. Federal, state, and local races will be on the ballot. Local boards are busy, for example, processing voter registrations, reviewing absentee and early vote by mail ballot requests, confirming poll sites, and recruiting, training and scheduling poll workers. Many of these tasks—namely, processing voter registration and mail

ballot requests—are already laborious and become much more so as the election nears and the volume of requests increases. Throughout all this planning, the NYSBOE must not only regularly field questions and concerns from local boards of elections and voters, but also continuously monitor the local boards to ensure that proper procedures are followed and voters are not inadvertently disenfranchised.

10. The NYSBOE also has a continuing obligation to work with the local boards of elections to ensure regular list maintenance is performed by local boards as required by the National Voter Registration Act, the Help America Vote Act (HAVA), and New York State law. This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling voter registrations for those convicted of a felony and currently incarcerated, and cancelling registrations of those who have died. Much of this is done by local boards through NYSVoter.

11. Additionally, the NYSBOE is currently devoting extensive time to technology projects: improvements to New York's online voter registration system, automatic voter registration system, a system to receive electronic information from agencies and route it to local boards of elections, and internal infrastructure improvements in campaign finance and election administration systems. These projects, on top of the day-to-day work of improving, maintaining, and, critically, protecting our technology systems, require extensive labor and time from our technology, operations and other business unit staff.

12. New York provides an early vote by-mail ballot to all properly registered voters who request one. N.Y. Elec. Law § 8-702. Some voters may also qualify for and request an absentee ballot instead. N.Y. Elec. Law § 8-400. Voters who meet certain criteria may also opt

into receiving an absentee ballot for every election automatically. N.Y. Elec. Law § 8-400(4). New York sends these ballots to voters through the United States Postal Service (USPS).

13. In New York, ballots are mailed by local boards of elections, often through a vendor. Mail ballot envelopes are designed by local boards and must conform with standards set by the USPS and state law. N.Y. Elec. Law §§ 8-406(2); 8-704(2). Mail ballots are not required by New York law to include Intelligent Mail barcodes (IMbs). A majority of local boards do not currently have the capability to use IMbs and would need to expend significant resources to either purchase software and train staff on a new system or hire a vendor to include that service for all outgoing ballot mail.

14. Under New York law, ballots must be certified 55 days before the election. N.Y. Elec. Law § 4-112(1). Local boards of elections begin mailing out ballots on a rolling basis starting for some jurisdictions as early as 50 days before the election through as late as 30 days prior to the election, except for UOCAVA ballots mandated by state law to always be sent by the 46th day before the election, one day sooner than the federal deadline of 45 days before the election.

15. Local boards continue to send mail ballots as additional voters register to vote or request an absentee or early vote by mail ballot. Voters may request a mail ballot up to 10 days prior to the election and, under New York law, any voter who properly and timely requests a mail ballot must be sent one by their local board. N.Y. Elec. Law §§ 8-400(2)(c); 8-704(2)(c). Based on prior elections, I anticipate that local boards will need to process more than 600,000 early mail and absentee ballots requests for the November 2026 general election. This is a conservative estimate that comports with the 536,171 ballots sent out for the 2022 midterm

election and accounts for an increase owing to the universal availability of early vote by mail ballots which were not a feature of New York's voting system in 2022.

16. I am familiar with the Notice of Proposed Rulemaking issued by the USPS that was published in the Federal Register on June 2, 2026. The State of New York submitted a comment on the Proposed Rule and joined a comment submitted by several states, including California, Massachusetts, Arizona, and others. In those comments, New York expressed opposition to the Proposed Rule and identified numerous specific concerns, including that the Proposed Rule would: shift authority over voter qualifications from the states, and the NYSBOE, to the USPS in violation of the United States Constitution; substantially burden the NYSBOE and local boards by requiring them to restructure their processes for the distribution and return of mail ballots, and impose onerous technical and administrative requirements that would take a minimum of years, not months, to implement across the entire state. Additionally, New York raised concerns that the USPS has no experience or demonstrated ability in creating, modifying, or otherwise properly administering a list of mail voters and continued financial struggles at the agency limit the USPS's ability to properly do so. A true and correct copy of those comment letters are attached to this declaration as Exhibit "A" and Exhibit "B".

17. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule has already had and will imminently cause significant harm, confusion, and disruption in New York election administration, and will impose unrecoverable costs on the NYSBOE and New York more generally.

18. For the reasons discussed throughout this declaration, I must act now to align New York's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office strives to ensure that voters have an opportunity to vote, as they are entitled to do under New York's constitution and laws. However, doing so while complying with the Rule may not be possible and will, in any event, impose significant burdens and costs on New York, the NYSBOE and local boards.

19. The NYSBOE has already received numerous complaints and concerns from both local boards of elections and voters about how the Rule will impact them. In particular, local board officials have raised concerns that they could face criminal prosecutions as a result of failure to comply with the Rule or because it is believed, wrongly or not, that noncitizens voted in New York. The NYSBOE has sought to assuage their concerns by planning for the Rule's implementation. However, without the sufficient details from the USPS prior to the publication of the final rule and technical specifications as to what constitutes compliance, making concrete plans or providing guidance to local boards has been nearly impossible.

*I. Providing and routinely updating by-mail voter lists is likely to be exceedingly burdensome and costly*

20. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique IMb from the outbound ballot envelope, unique IMb from the return ballot envelope, and the originating election office state. The information would have to be provided at

least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In New York we would have to provide that information certainly by September 19, 2026 (46 days before the election) when we are required to mail out UOCAVA ballots, and thereafter in large tranches as ballot mailing ramps up. We would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date, including up to October 24, 2026, the final day to request a mail ballot in New York. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("US Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

21. These requirements impose significant financial costs on my office and threaten to disenfranchise voters in New York.

22. As raised in New York's earlier comments on the Proposed Rule, I have grave concerns about the feasibility of implementing the system required by the Rule in an accurate and administrable manner. These concerns are significantly exacerbated by the increasingly close proximity of the November 2026 general election. Responsibility for New York's elections is, by

design, dispersed throughout the state and between the NYSBOE and the local boards. Given this, implementing the Rule will require extensive cross-agency coordination and could take more than a year to fully establish and even longer to hone. With the November 2026 general election merely a few months away, and local boards mailing ballots out in a little over a month, there is almost certainly too little time to implement the requirements of the Rule, in particular, without making significant errors or avoiding technical failures.

23. Moreover, any attempt to comply with the requirements of the Rule would require pulling NYSBOE and local board staff away from work necessary to prepare for the November 2026 general election, such as processing voter registrations, finalizing poll sites, and recruiting and training poll workers. As a result, not only is the implementation of the Rule by the NYSBOE and local boards likely to be incomplete, but any attempt to implement the Rule will limit the ability of the NYSBOE and the local boards to ensure that all other procedures for the election operate properly. Attempts to operationalize the Rule present a severe risk that voters will be disenfranchised because the NYSBOE and local board will be both unable to ensure that voters who request mail ballots receive them and will have insufficient staff to otherwise properly administer the election in accordance with state and federal law.

24. As a result of the Rule, my office must immediately prepare and update guidance for local boards to ensure a consistent approach across New York's 62 counties and 58 local boards of elections. This guidance would have to address topics such as using the USPS portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, proper integration of the mail voters between local and state-level voter registration lists, cybersecurity protection, renewed ballot envelope design criteria, and New York's Confidential Voter system, *see* N.Y. Elec. Law § 5-508. Developing and presenting these materials will require significant

time, personnel, and funds from NYSBOE staff. And despite best efforts, delays in getting out mail ballots will be inevitable.

25. In my experience, implementing new election technology is highly complicated and takes time to get right. And there is reason to doubt that the USPS's Ballot Portal will work as intended without hiccups or technical problems. Even under the best of circumstances, such a system would require extensive technical development and testing to launch smoothly, but the USPS has never developed a system of this type nor does the agency have experience recording, storing and categorizing voter registration or mail ballot information. Moreover, the USPS is trying to design and implement the Ballot Portal on an extremely tight timeline and without any input from the states who will be required to use the new system. The USPS has released only barebones technical specifications for the Ballot Portal with little information on how New York will need to format its voter information to be properly uploaded for verification. Mail voter information is stored across New York, and likely across states, in a variety of formats and file types which will further complicate this process.

26. By way of a very recent example that casts doubt on the USPS' ability to administer a program that will require significant attention to problem situations, the NYSBOE has been trying to communicate with the designated New York State USPS contact about a single 2026 primary election ballot which was held up for more than a month in customs in Queens. The ballot finally moved on to Rochester where it has remained for additional weeks. USPS has been wholly unresponsive. And a voter has been left disenfranchised at the primary elections and without any answers despite the efforts of state and county officials. If the USPS does not have the customer support logistics in place now to deal with problems, it is unimaginable they will get better when the challenges are amplified thousands-fold.

27. These concerns are heightened because, in New York, voter registration and mail ballot requests are handled primarily by the local boards of elections. The NYSBOE maintains a central, state-wide voter roll, but each local board's system is independent and built by their vendors for their specific requirements. Local boards are not presently required to send up to NYSVoter all of the mail ballot request data fields that will be required by the USPS Ballot Portal. Indeed, local boards can track mail ballots in different ways, resulting in local boards' lists recording different information and in different formats, albeit some uniform data is sent to NYSBOE now. As a result, integrating New York's diverse records into the USPS Ballot Portal may not be straightforward.

28. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which again seems highly unlikely—enrolling the roughly 600,000 voters registered in New York with USPS who will need to receive mail ballots will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. In the 30 days prior to the November 2024 election, more than 200,000 individuals registered to vote in New York. More than 100,000 voters did so in the same period before the November 2025 general election. Again, under New York law, voters may register to vote and request a mail ballot up until the start of early voting (10 days prior to election day) meaning that local boards and the NYSBOE will likely need to enroll new voters requesting a mail ballot with the USPS in close proximity to election day and while voting is actively ongoing.

29. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance

coordination between the NYSBOE and the local boards to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information.

30. Even assuming there are no delays caused by technical or processing difficulties, setting up NYSBOE staff as authorized users of the USPS Ballot Portal, enrolling all voters and comparing New York's statewide voter registration list with the ultimate list produced by the USPS is a task measured in days and weeks; not hours. Again, because absentee and early vote by mail requests are stored at the local level, in order to enroll New York voters in the USPS, each of the 58 local boards of elections would need to run a report or otherwise export the list of voters who have requested a mail ballot and provide that report to NYSBOE staff. Each report or list would need to be proofed and, because local boards require bipartisan consensus to operate, be approved by commissioners of both parties. The NYSBOE would then need to aggregate these reports, ensure that they are properly formatted to the USPS's specifications, again with bipartisan consensus, enter the compiled list of voters into the USPS system. Further, this

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

process will need to be repeated routinely as additional voters request mail ballots and local boards will need to develop a system for ensuring that each report properly excludes voters who have already been sent to the USPS without inadvertently excluding anyone. State law allows most voters to request a new ballot up to 10 days before an election. N.Y. Elec. Law §§ 8-400(2)(c); 8-700(2)(c). To ensure that voters receive these ballots, to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

31. Moreover, changes to the local boards' voter registration and mail ballot request systems are updated in near real time meaning that information may be out of date as soon as it is provided to the USPS. New York's voter registration and mail ballot systems are set up to accommodate these nearly instantaneous changes, but incorporating the USPS Ballot Portal into the process is likely to cause significant delays. Given that voters may request ballots in close proximity to the election, including after early voting has begun, these delays may mean that some voters will never receive, or will be unable to timely return, an absentee ballot.

32. Based on what information is available, I conservatively estimate that it will take approximately a minute more effort per voter, by a bipartisan team, to accomplish the necessary steps of including them on the list required by the USPS and tending to any problems after the fact. That translates into 20,000 additional hours of effort, or 533 work-weeks of effort, distributed among New York's 58 boards of elections. Based on my experience with list maintenance, proofing, data matching and customer service in the election context, I can say this is a hopeful and conservative estimate. The reality is likely to be far worse. While this process may speed up over time, each entry for a mailing into the USPS Ballot Portal will require a significant investment of staff time. And given the demonstrated inability of the USPS to provide

customer support when things go wrong, New York will need to take extraordinary steps to ensure that it has done all it can to make sure nothing within its control provokes a mismatch or error. Mailing ballots is not akin to mailing sales flyers.

33. Since 1938, New York has enshrined the right of at least some voters to vote by mail and, throughout the last 88 years, New Yorkers have generally relied upon USPS to deliver their ballots. The NYSBOE and local boards have explored alternatives to using the USPS to send out election mail and, in some instances, have relied upon those services when absolutely necessary. However, shifting mail providers, particularly this close to the election, would be difficult and costly. Processing ballots through private mailing services would require shifting internal systems for local boards and, in many counties, would require modifying existing contracts with third-party vendors who process and send out election mail. Doing so would be costly. Given current rates, I anticipate that switching mail providers away from the USPS would likely cost at a minimum a net additional $15.00 per voter. This takes into account the increased outgoing delivery costs through a vendor like UPS or FedEx on a bulk use basis, and the increased cost of return for those ballots sent back. In New York both expenses are borne by the boards of elections. Statewide the added expense over and above the current expense would be at least $9 million.

34. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they

decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes will not work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

35. Beyond being denied the opportunity to vote by mail ballot, inaccuracies in the USPS Mail Ballot List have the potential to wholly disenfranchise voters. Under New York law, voters who are issued a mail ballot are generally not allowed to vote in person (except by affidavit ballot, as explained below). N.Y. Elec. Law § 8-302. As such, voters who request and are approved for a mail ballot are functionally excluded from the poll books at their poll site. Specifically, these voters are listed in the poll book annotated as having voted by mail, thus under New York law excluded from voting on the voting machine. As a result, it is possible that, due to an error with the USPS Mail Ballot List, a voter may validly request, but never receive, a mail ballot. *Id.* This voter may cast an affidavit ballot, but that process is designed only as a fallback when other systems fail. *Id.* The affidavit balloting process is more complex than the regular voting process and can be intimidating to some voters who are unfamiliar with its requirements. Voters who are unaware of or uncomfortable with the affidavit process may fail to vote at all. As a result, a voter would be denied their right to vote through no fault of their own and despite being validly registered. Had their mail ballot been properly processed by the USPS this would not have occurred. Moreover, to the extent that more voters do opt into the affidavit ballot process there is potential for delays in voting (affidavit voter processing takes longer) and diversion of more staff resources to affidavit processing instead of voter check-ins. Indeed, if the USPS process pushed voters away from voting by mail at any stage (a near certainty), it will

increase demand on the in-person voting process generally which may require added poll site resources.

36. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

37. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The

threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

38. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

39. Even with the best efforts of my office and local boards, the challenges of completing a complex data-matching program in a short timeframe, while preparing to administer an election, poses a high risk of errors and omissions. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it would receive from all 50 states under the proposed regime in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part

111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

40. As a result of the Rule and to mitigate the impact of all this uncertainty and turmoil, the NYSBOE will have to devote significant time, personnel, and money to update training materials for local elections officials and their staffs. Both NYSBOE and local boards would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to export the necessary information and confirm the accuracy of local board reports, access the USPS Ballot Portal, and enroll voters in the Portal. Additional instruction would be needed to instruct staff on how to process election mail appropriately to conform with the Rule. Again, NYSBOE's business and technical staff is already occupied with complex and important infrastructural improvements on top of their standard work to maintain and protect our election systems. Directing staff towards the new USPS process and technology would require sacrificing progress on these ongoing and essential projects.

41. Moreover, a core responsibility of the NYSBOE is to instruct the 58 local boards of elections on how to comply with the law and new mandates, such as those established by the Rule. To implement the procedures established by the Rule, the NYSBOE would need to newly produce, or substantially update, an extensive list of training materials, guidance documents and other instructional documents. Additionally, my office will need to allocate significant resources

and staffing to respond directly to local board of elections who have questions about the Rule's operation.

42. Given that the burden of complying with the Rule is dispersed across New York's election officials, and at both the local and state levels, it is difficult to anticipate the exact impact on existing election administration tasks. However, given the extremely short timeframe, ensuring that all voters who properly request a mail ballot are properly registered with the USPS is a large undertaking and will undoubtedly require an all-hands-on-deck approach. This will require either pulling staff from other necessary projects, requiring existing staff to work extensive additional hours or hiring external vendors. Moreover, many staff are either paid hourly or eligible for overtime pay meaning that compliance will likely come with substantial additional expense not covered by current planned salaries.

*II. The Rule's envelope standards will also be costly and burdensome to comply with*

43. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique IMb with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

44. These requirements of the Rule necessitate immediate action from my team and me. While local boards are responsible for designing and distributing their election mail, including mail ballots, the NYSBOE is responsible for ensuring that they do so in compliance with state and federal law. N.Y. Elec. Law § 3-102. The NYSBOE also routinely provides local boards with guidance and training to ensure that their election mail practices conform to state and federal law. I anticipate that the Rule will require the NYSBOE to develop new training and guidance for local boards as well as additional monitoring programs in order to ensure that every

local board is in compliance. The timeframe for imposing these new requirements less than 90 days before the election makes it virtually impossible to do an adequate job.

45. A substantial number of New Yorkers are likely to vote by mail. Our agency anticipates that local boards will mail more than 600,000 ballots to voters during the 2026 general election.

46. Local boards of elections have consistently relied upon election mail guidance from USPS to design and mail ballots, and the NYSBOE has relied on that guidance in instructing the local boards in how to comply with state and federal law. Indeed, both the NYSBOE and the local boards relied on that guidance in preparations that have already been taken for the November 2026 general election.

47. Nearly every local board or its vendors have already printed their ballot issuance and return mail envelopes to be used in the November 2026 general election, in compliance with current mailing standards. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71. This will require extensive additional expense potentially totaling $914,500. And this is before the additional costs associated with designing conforming ballot envelopes and the necessary staffing to ensure that the nonconforming mailings are properly dealt with and do not make their way into voters hands are taken into account. For many local boards of elections, particularly those in small counties with more limited budgets, these additional fees may be prohibitive or require pulling staff from essential voter registration and election preparation work. Both state and local budgets have already been adopted for 2026.

48. We also learned during the pandemic that when boards of elections across the country are changing envelopes and printing new supplies under a common deadline, there are significant demand-driven supply chain problems that can cause mailing delays. This is a real possibility in this new context, but even assuming there are no supply chain issues, the logistics of envelope redesign, approval and printing on the eve of the election is a haunting specter.

49. Many local boards, particularly those in smaller counties, do not currently apply IMbs or have the capacity to do so. USPS suggests that small businesses can create IMbs free on USPS's website, but that tool is only available for mailings with fewer than 50,000 pieces of mail.[2] Moreover, USPS itself acknowledges that the current tool has technical impediments that would prevent creation of IMbs for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes [that may have already been ordered], do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47. As a result, to comply with the Rule many local boards would need to either contract with a new printing vendor or purchase new software and hire or train staff on that software. New York ballot envelopes are often already tracked, using a barcode on the inner non-mailing envelope that contains the ballot that allows the NYSBOE, local boards and, most importantly, voters to track their mail ballots as they are mailed and returned. N.Y. Elec. Law § 8-414; 8-7-12. The IMb adds little value for voters or election security beyond New

---

*See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

York's existing system but would be an expensive addition to the local boards' election mail programs.

50. Again, in New York, as in much of the country, while ballot envelopes have mandatory common elements, ballot envelopes vary in their particulars by county. In order to ensure that each ballot qualified with USPS specifications for pre-paid returns, every local board has already consulted with a USPS design specification specialist and received sign off on their current ballot envelope design. During that process, the NYSBOE dedicated staff to track compliance and ensure that each local board's design squared with USPS requirements. This was a significant undertaking and, while USPS staff were at the time able to quickly review and respond to design proposals, it still required weeks of work from both local and NYSBOE staff before the designs were finalized.

51. Under the Rule, despite being currently in compliance with prior USPS standards, local boards will need to adjust or get renewed approval of their mailing designs. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt

and delay carefully timed steps necessary to deliver mail ballots to New York voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Given the proximity of the November 2026 general election, even a weekslong review timeline could be problematic. Under present circumstances, I have substantial doubt that this process can be accomplished in a week. Even with concerted effort by New York's local boards to work expeditiously, I am deeply concerned that the design review process will stretch from weeks into months. If so, it is likely that the carefully timed steps necessary to deliver mail ballots to New Yorkers will be severely disrupted and delayed. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process. Election staff across New York are already at capacity and dedicated to the existing tasks necessary to ensure New York's elections run smoothly and cannot afford to be pulled away from this work due to USPS delays.

*III. The Rule risks rejecting validly cast mail ballots*

52. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or early mail ballot under state law.

53. Sending mail ballots in a timely fashion is not only required by state and federal law but is critical in ensuring that as many eligible New Yorkers as possible can exercise their right to vote. In the 2024 general election, more than 800,000 New Yorkers voted by mail and the NYSBOE anticipates roughly 600,000 voters will do so in the November 2026 general

election. This method of voting is particularly important for the many New Yorkers who live in more remote areas of the state and may be unable to easily get to their poll site. Absentee and early mail voting are also important for many older New Yorkers who may have mobility difficulties and are unable to easily vote in person. Indeed, New York has a statutorily mandated scheme to provide absentee ballots to voters in nursing homes and other residential care facilities that is likely undermined by the requirements of the Rule. N.Y. Elec. Law § 8-407.

54. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent *any* voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

55. Even if the USPS Ballot Portal and enrollment system works as intended—which is very doubtful given the lack of time for creation and testing—the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will likely be that fewer eligible voters decide to cast a ballot.

56. Again, even in the best case scenario, the Rule will require the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. Even before the final Rule was published, my office had received numerous complaints from local election board commissioners expressing their concerns about the costs and burdens the Rule would place on them. In particular, local boards are worried about diverting already stretched staffing and budgets to comply with the Proposed Rule. None of these challenges were anticipated with the state and local budgets were adopted. Voters too have complained to my office, concerned that through no fault of their own they will be denied their necessary, and legal, opportunity to vote by mail. With the publication of the Rule, I anticipate significantly more inquiries from both voters and local board officials. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

57. In addition, the Rule will require a wide-ranging public education campaign to ensure that both eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for New York residents who are used to automatically receiving mail ballots. Voters who qualify for this program live with either a "permanent illness or physical disability" and so are very likely to have difficulty voting in-person and will be disenfranchised if they are not provided an absentee ballot. N.Y. Elec. Law § 8-400(4).

58. I anticipate that the NYSBOE will also have to provide extensive instruction and guidance to educate local boards on the Rule. This will require not only substantial additional staffing to develop and prepare that guidance, but also to monitor compliance and answer the questions that local boards will have.

59. I conservatively estimate that these education efforts would cost state and local boards at least 12 million dollars. New York is a large state with an expensive media market. Indeed, a single mailing to every registered voter alone is a multi-million dollar expense. However, given the rapidly approaching election, the NYSBOE and local boards will be required to aggressively educate voters on the sudden changes to mail and absentee ballot procedures required by the Rule and will be required to utilize both physical and electronic media to communicate. The NYSBOE's current appropriation does not support such education programs and, absent the Governor calling an extraordinary session, no additional appropriation can be made before the November 2026 general election.

60. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse. This is particularly true as universal early mail voting is relatively new in New York and many voters are not yet fully comfortable with the process.

*IV. The November 2026 general election is rapidly approaching, which magnifies the harm of complying with the Rule*

61. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

62. Local boards will begin mailing ballots for the 2026 general election in the coming weeks. In compliance with federal law, New York's election officials first issue ballots to military and overseas voters by September 18, 2026, 46 days before the general election. 52

U.S.C. §§ 20302(a)(1)-(3), (8)(A). While federal law provides a 45-day deadline pre-election, New York law adds an additional day making the transmittal deadline 46 days before.

63. In addition, local boards of elections begin mailing the bulk of mail ballots between roughly 50 to 30 days prior to the election and continue mailing ballots until all validly requested mail ballots are sent. Typically, this is completed within a few days of the 10-day request deadline but may occur closer to election day.

64. Additionally, local boards and my office will need to continue to register those who are eligible to vote in New York. Under state law, qualified individuals are able to register up to 10 days before Election Day; including in-person on the first day of early voting. N.Y. Elec. Law § 5-210(3); 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). New York permits voters registered in New York to be transferred elsewhere in New York and have their votes counted. N.Y. Elec. Law § 5-208. New York also allows court orders issued on Election Day to register a voter left off the rolls entirely for an unlawful reason. N.Y. Elec. Law § 5-100. New Yorkers can register to vote online, by mail, at their local board of elections, at various state social service agencies, and through the New York State Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

65. In compliance with the NVRA "quiet period" for voter registration, New York does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). New

York does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

66. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election. Again, because New York maintains both local and statewide voter registration lists, this requires constant, near-immediate synchronization between numerous, distinct voter registration lists.

67. Budget and staffing allocations are already set for the November 2026 general election. As a result, any steps necessary to comply with the Rule will necessarily divert time, attention and budget away from these existing critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. The necessary work to, for example, timely register voters, recruit and train poll workers, and educate voters on where and how to vote will inevitably suffer in order to ensure compliance with the Rule. If these

preparations are delayed or not completed, there will be significant impacts on the conduct of the election and voters may be disenfranchised.

*V. Even partial implementation of the Rule is likely to disenfranchise voters and be burdensome to my office*

68. Even if the Rule were not implemented or enforced against New York, I believe that it still bears substantial risk of disenfranchising New Yorkers and substantially burdening my office and local boards. Moreover, I am deeply concerned that a two-tiered system, with the Rule in effect in some states and not in others, will be nearly impossible for the USPS to administer.

69. Under such a two-tiered system, the USPS would need to distinguish between mail ballots from different states to ensure that voters from a state where the Rule is not in effect are not subject to its provisions. However, mail ballots, and election mail more generally, often crosses state lines, meaning that ballots bound for voters of one state may be sent to or processed through another state. In addition to USPS Mail List and the USPS Ballot Portal, under a two-tiered system, the USPS must also develop a system for differentiating between, and subjecting to different procedures, ballots from, or directed to, different states. And, again, this must all be developed in mere months prior to the November 2026 general election.

70. In my experience, there are a number of reasons voters may need their ballot sent to or through another state. Many voters registered in New York are not physically in New York on election day. Indeed, absence from the state at the time of an election is a core rationale behind mail voting and a designated excuse under New York law for requesting an absentee ballot. N.Y. Elec. Law § 8-400(1)(a) (allowing a voter to request an absentee ballot if they "expect[] to be . . . absent from the county of his or her residence" on election day). Voters may,

for example, be a resident of New York, but go to college or university in another state. They may have a vacation home in another state or be traveling during the voting period.

71. Ballots requested in one state for voting in that state may also be processed by the USPS through another state. The NYSBOE has no control over where the USPS processes election mail and cannot prevent mail meant for New York addresses from being sent out of state for processing.

72. To complicate matters further, voters are, in some cases, actively registered in New York, but also inactive on another state's rolls. This can happen because of the prohibition under the NVRA on cancelling a voter registration based on a change of address unless the voter confirms that change or until the voter fails to respond to a mail check notice and two federal elections pass. 52 U.S.C. § 20507(d). Even if the Rule is not in effect in New York, voters who are validly registered and approved for a mail ballot in New York may still be subject to its provisions because of an inactive registration in a prior state. Any two-tiered system would need to ensure that these voters are not improperly denied a New York ballot because their information has or has not been provided by another state over which New York has no control.

73. Given this, even if New York was not subject to the Rule, New Yorkers would still very likely be disenfranchised. In order to ensure that New York ballots that are sent to or processed through other states are not improperly flagged and not delivered, the USPS would need to develop a comprehensive system for distinguishing New Yorker's ballots from those of voters from other states where the Rule is in effect. The Rule does not contemplate such a system and the USPS has not provided any indication that it has the current ability or capacity to develop, test and then accurately administer such a system. To my knowledge, the USPS has never developed a system to distinguish mail in this manner. I am deeply concerned that even if

the Rule is not in effect in New York, if it is in effect in any state, it will still result in the disenfranchisement of New Yorkers.

74. Even assuming that the USPS is able to develop, test, and administer a two-tiered system applying the Rule, the complexities of doing so risk substantial voter confusion. Voters will likely not understand that the Rule is not in effect for them because they are registered to vote in New York or what steps they can take to ensure that they are provided with their due opportunity to vote by mail. In order to ensure that these voters are not improperly disenfranchised, my office would need to expend additional resources to educate both local boards and these voters directly on their rights and to assist with navigating the two-tiered system. Doing so would require not just developing new materials and reallocating staff to provide that assistance, but also spending considerable resources and time even to identify what voters may be affected.

*VI. Threats of criminal prosecutions are harming election officials and risk feeding election misinformation*

75. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that

implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. Like other elections officials in New York, I am acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters are the result of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, EO § 2(b) (March 31, 2026). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter addressed to me and dated July 7, 2026, the United States Department of Justice (DOJ) specifically threatened to prosecute election officials, like me, if noncitizens cast any ballots in New York's elections.

76. I am also acutely aware, and believe other election officials are aware, that President Trump has repeatedly claimed widespread fraud with respect to noncitizen voting. But in my experience, and I believe in the experience of other election officials, noncitizen registration and voting are both extraordinarily rare.

77. I am worried that I and other election officials, at both the state and local level, could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of New York's registered voters are not citizens. Based on my experience assisting local boards and

election workers, I know many fear that they cannot register or send a ballot to a voter without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law. Indeed, I have heard these concerns directly from election commissioners. Similarly, based on my experience, I believe that vendors who work with the local boards of elections to print and distribute ballots also fear that they may face criminal prosecution for assisting in providing voters with their rightful ballot, because these fears have been expressed to me repeatedly.

78. Should the DOJ initiate any such enforcement actions, the NYSBOE and local boards would, again, be forced to divert our limited resources to respond to such legal action. There is deep concern among both state and local election officials that the DOJ seeks to use criminal prosecutions as a cudgel to force election officials to engage in, or refrain from, certain actions. An election official's innocence may offer little protection against these attempts, given the stakes and substantial expense required to defend against a criminal prosecution. Indeed, even the threat of prosecution is chilling and can limit the ability of election officials, including myself, to do our work.

79. The threat of criminal prosecution also heightens the necessity for guidance and training for local boards of elections and their staff on compliance with the Rule. Again, my office will need to dedicate significant resources to providing local boards with this instruction, monitoring their work, and responding to their questions and concerns.

80. Any attempt by the DOJ to prosecute New York election officials is also likely to have severe and adverse consequence for the public's trust in the validity of New York's elections. Misinformation and conspiracies grounded in election denialism already abound. A *single* prosecution of an election official, even if unfounded, would erode public trust in our

democratic process, perhaps irreparably, and give undue credence to false claims that New York's elections are fraudulent or invalid.

*VII. The Rule will impose a substantial financial burden on the NYSBOE and require extensive reallocation of staff*

81. In conclusion, I estimate that the Rule will require the NYSBOE and local boards of elections to allocate at least $24 million dollars in order to comply with its provisions. This is to say nothing of the burdens caused by shifting staff away from ongoing preparation for the November 2026 general election or the substantial labor and budgetary costs placed on local boards of elections. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. Additionally, the New York legislative session has concluded for the year. Any additional budget allocations to the NYSBOE would likely require the Governor to call an extraordinary session, which is a rare occurrence. As such, I am highly doubtful that the NYSBOE will be allocated any additional funding before the November 2026 general election.

82. Any work to implement the Rule must then come from the NYSBOE's existing budget and staffing allocations. This will require diverting budget, time, and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure New York's elections run smoothly and that all eligible New Yorkers can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

83. Each of these tasks and costs will divert scarce resources from other important election administration needs at a time when my office can least afford it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Albany, New York.

KRISTEN ZEBROWSKI STAVISKY
Co-Executive Director
New York State Board of Elections

# EXHIBIT A

**Office of the New York State Attorney General**

**Letitia James**
**Attorney General**

July 2, 2026

**Via E-mail (pcfederalregister@usps.gov)**

Director, Product Classification
U.S. Postal Service
475 L'Enfant Plaza SW, Room 4446
Washington, DC 20260-5015

Re: 39 CFR Part 111 Ballot Mail for Federal Elections [FR Doc. 2026–10976 Filed 6–1–26; 8:45 am] (91 Fed. Reg. 32915 June 2, 2026)

Dear Sir or Madam,

The Attorney General for the State of New York submits these comments to the U.S. Postal Service (the "Postal Service" or "USPS") Notice of Proposed Rule entitled *Ballot Mail for Federal Elections* (hereinafter "Proposed Rule").[1] New York joins comments to the Proposed Rule submitted by several states, including California, Massachusetts, Arizona, and others, and submits these additional comments to address some practical concerns with the Proposed Rule affecting the State of New York.[2]

First, the Proposed Rule constitutes a voter qualification scheme for which USPS has no authority. In particular, through a host of onerous requirements, the Proposed Rule impermissibly places the Postal Service in the position of gatekeeper as to which voters receive mail ballots and whose mail ballots will be returned, but this is the responsibility of New York's elections

[1] *Ballot Mail for Federal Elections*, 91 Fed. Reg. 32,915 (to be codified at 39 C.F.R pt. 111) (June 2, 2026).
[2] USPS should withdraw the Proposed Rule because it has been enjoined, now by two separate courts considering challenges to the Proposed Rule and the underlying Executive Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 FR 17125 (2026) ("EO 14399" or "the EO"). New York, twenty-two other states, and the District of Columbia, challenged the EO and on June 25, 2026, the district court granted summary judgment to Plaintiffs, enjoining relevant portions of the EO, including Section 3, from which the Proposed Rule stems. *California v. Donald J. Trump*, Index No. 26-CV-11581-IT, ECF 191, 2026 WL 1826490, at *17 (D. Mass. June 25, 2026). The court enjoined USPS from "completing rulemaking to promulgate the specific regulations outlined in Section 3(b)(i)–(v) or (d) of the EO as to elections mail for elections administered by Plaintiff States and ballot envelopes used by Plaintiff States for the November 3, 2026 election[.]" *Id*. at *17. On July 1, 2026, a separate court granted a motion filed by the NAACP to enforce a 2021 settlement agreement pursuant to which USPS had committed to prioritize timely delivery of election mail, enjoining USPS "from implementing the standards and procedures" set forth in the Proposed Rule as violating the settlement agreement. *NAACP v. U.S. Postal Serv.*, Index No. 20-cv-02295-EGS, ECF 182 at 14 (D.D.C. July 1, 2026).

officials. *See, e.g.*, *Ballot Mail,* 91 Fed. Reg at 32,918 (proposing § 24.4.2) (providing that voter's ability to cast a ballot depends on the State's conformance with requirements imposed by the Postal Service, as opposed to applicable state and federal law). The Proposed Rule requires states to "enroll" individual voters to receive mail ballots with the Postal Service, and to attach unique barcodes to every ballot and voter, as preconditions to the Postal Service's delivery of ballot mail. *See id.* (proposing § 24.4.2.a) (requirement to enroll any voters from whom New York "intends to receive mail-in or absentee ballots" with the Postal Service); *id.* (proposing § 24.5.2) (providing that "Authorized Verification Mailings identified as Outbound Federal Ballot Mail are verified by Postal Service employees when presented for acceptance;" and *id.* (proposing § 24.5.3.a) (providing that "[m]ailings that do not comply with 24.5.1 and 24.5.2 will not be accepted and will be returned to the authorized ballot mailer"). According to the Postal Service: "[t]he verification process by the Postal Service would confirm that a state submitted a list consistent with the conditions laid out in the proposed rule, and that the outbound ballot mail, and thus the blank ballot that could be returned by mail, is destined to individuals on the list, by checking the barcodes." *Id.* at 32,916. Postmaster General David Steiner affirmed the Postal Service's intent to play gatekeeper to the vote during testimony before the Senate on June 24, 2026, when he stated that USPS will refuse to deliver mail-in ballots in states that do not provide detailed voter registration lists to the federal government.[3] The Proposed Rule thus seeks to shift authority over voter qualification from the States to the Postal Service. But the U.S. Constitution grants States the power to prescribe "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives," subject only to preemption by *Congress*, U.S. Const. art. I, § 4, cl. 1, not the President or executive agencies. *Arizona v. Inter Tribal Council,* 570 U.S. 1, 9 (2013) (recognizing that the Elections Clause places the authority over election mechanics with the States where Congress has declined to preempt state legislation). The Postal Service thus has no authority to perform the functions or to impose the requirements laid out in the Proposed Rule on New York. New York and its elections officials have been successfully administering elections, including ensuring voters in the state are qualified, for decades upon decades. There is simply no rationale, much less authority, for the Proposed Rule.

Second, in addition to constituting unconstitutional commandeering, as amply set forth in the multi-state letter, the burdens the Proposed Rule would impose on New York are significant and serve no legitimate purpose, especially in view of the rarity of voter fraud in New York (and generally).[4] New York has 58 Boards of Elections with jurisdiction over issuing mail ballots.

---

[3] David Steiner, Postmaster Gen., U.S. Postal Serv., remarks before S. Comm. on Homeland Sec. & Gov't. Affairs (June 24, 2026), as reported in The New York Times, *Postmaster General Confirms Plan to Hold Back Mail Ballots Under Proposed Rule - The New York Times*.

[4] Data collected by Heritage Foundation identifies only a handful of incidents of any type of voter fraud in New York State over the decades between 1982 and 2025, and no instances of noncitizen voting. *See* The Heritage Found., *Explore the Data*, Election Fraud Map, *available at* https://electionfraud.heritage.org/search?state=ny (last visited June 30, 2026). In a national survey, the Brennan Center found just 30 suspected cases of noncitizen voting out of 23.5 million votes cast in the 2016 election—which amounts to 0.0001%. Douglas Kieth, Myrna Pérez, Christopher Famighetti, *Noncitizen Voting: The Missing Millions*, Brennan Center (May 5, 2017), *available at* https://www.brennancenter.org/our-work/research-reports/noncitizen-voting-missing-millions (*last visited* July 1, 2026).

These jurisdictions have processes in place for sending and receiving mail ballots and for ensuring the eligibility of voters requesting and returning them. Hundreds of thousands of such ballots are distributed and returned in a typical federal election year in accordance with these processes. Nearly all these jurisdictions or their vendors have already printed their ballot issuance and return mail envelopes to be used in the 2026 midterm elections, in compliance with current mailing standards. Any change in envelope specifications for this year's election in particular will impose a significant burden on election administrators. Requiring these jurisdictions to also create and constantly update mail-in voter lists with USPS, to assign unique outgoing and return bar codes to each individual voter, and to certify accuracy and compliance with the proposed standards, would impose additional burdens. *See, e.g.*, *Ballot Mail,* 91 Fed. Reg at 32,918 (proposing § 24.4.2.d) (requiring states to provide voter information at least 30 days before the date of the federal election or by the date on which mail-in or absentee ballots may begin to be mailed under state law); *id.* (proposing § 24.4.2.f) (requiring "Ballot Portal Users" to "certify to the Postal Service that any mail-in or absentee ballots their state's authorized ballot mailers provided to the Postal Service for mailing meet the standards" of the Proposed Rule). State officials would also necessarily be burdened by both the obligations directly imposed on them and their need to oversee election administration of the local jurisdictions. *See, e.g.*, *id.* (proposing § 24.4.1) (requiring the "chief election official" to "authoriz[e]" "Ballot Portal Users"); *see also id.* (proposing § 24.4.2.f). The data conformation requirements of the Proposed Rule would impose additional, and, as yet impossible to assess, burdens. *Id.* (proposing §§ 24.4.2.b-f; *id.* (proposing § 24.4.2.e) (requiring information provided to meet the Postal Service's technical specifications for the Federal Ballot Mail Portal). Moreover, on a basic level, the processes currently in place for the distribution and return of mail ballots in New York do not align with the scheme contemplated in the Proposed Rule. For example, mail ballots can be requested and returned in person in New York. How are such ballots to be accounted for on the lists submitted to the Post Office, if at all?

The administrative and technical requirements of the Proposed Rule are also onerous, and implementing such a system would take a minimum of years, not months. In New York, many smaller boards of elections lack the ability to apply Intelligent Mail barcodes ("IMb") to outgoing mail, as required by the Proposed Rule. *Id.* (proposing § 24.4.2.b). The Proposed Rule also speaks to rejecting a "mailing" when a piece of mail therein is noncompliant (*i.e.*, a voter's address and name are not on the official list). That means the entire tray is rejected, not just the non-conforming piece. *See id.* (proposing § 24.5.3). Moreover, to comply with the Proposed Rule, many boards of elections will no longer be able to put ballot mail in the mail stream at a local post office or through their local mail carrier because the Proposed Rule requires ballot mail in certain volumes to be mailed from a "Business Mail Acceptance" facility. *Id.* (proposing § 24.5.2). Such facilities may be located a significant distance from those jurisdictions and may only operate during limited hours. To comply with the Proposed Rule, every jurisdiction will be required to devote significantly greater resources to mail ballots with no reasonable nexus to either increased election administration efficiency or general postal efficiency.

Third, the Proposed Rule threatens millions of voters with disenfranchisement. Even setting aside the significant risk and opportunity for malfeasance presented by the contemplated scheme—which is expressly intended to allow the Postal Service to use automated processes to identify and reject delivery of *individual* ballots—the blanket changes contemplated by the

Proposed Rule present an unacceptable risk of inadvertently disenfranchising voters. This risk is exacerbated by the Proposed Rule's complete failure to consider local variation in the handling of mail ballots by the governmental entities expressly empowered to administer elections, the unworkable timeframes contemplated by the underlying EO and the Proposed Rule, and the limitations inherent in USPS's constitutionally and congressionally mandated functions, as well as its financial struggles, of which USPS has repeatedly warned Congress.[5] USPS has no demonstrated ability (and no authorization) to create, timely modify, or properly administer a list of mail voters for the express purpose of determining which ballots should be delivered, withheld, or returned. The Proposed Rule also provides no practical means of correcting errors in a timely fashion. *See id*. (proposing § 24.5.3.a) (providing that "[m]ailings that do not comply with 24.5.1 and 24.5.2 will not be accepted and will be returned" and requiring the ballot mailer or Ballot Portal User to address the error before resubmission). Thus, even if it were constitutional and supported by Congressional enactment, the Proposed Rule would be arbitrary and capricious due to USPS's complete failure to take into account the burdens imposed by the Proposed Rule and the harms it threatens to voters. *See Ohio v. EPA*, 603 U.S. 279, 292-93 (2024) (asserting that an agency action is arbitrary and capricious when it is unreasonable and the agency has "simply ignore[d] 'an important aspect of the problem'" (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983))); *see also Food & Drug Admin. v. Wages & While Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (stating that the "change-in-position doctrine" requires an agency to provide a reasoned explanation and consider serious reliance interests when they change their existing policies).

!

And while USPS claims that it will not verify whether "individuals should or should not be included on the State's Mail-In… List," given that the stated purpose of these measures is to "help determine adherence to federal law and facilitate law enforcement efforts," the Proposed Rule and underlying EO clearly contemplate that the Postal Service will provide this data to other federal agencies. *See Ballot Mail,* 91 Fed. Reg. at 32,916. This raises obvious privacy concerns and creates opportunities for abuse.[6]

**Conclusion**

First and foremost, by making USPS the gatekeeper for who may receive mail ballots, the Proposed Rule and EO from which it stems usurp New York's constitutional authority to prescribe "[t]he Times, Places and Manner of holding Elections" except as otherwise prescribed by Congress through legislative enactment. U.S. Const. art. I, § 4, cl. 1. In addition to the blatant constitutional infirmities of the EO and the Proposed Rule, which have already led courts to enjoin them, there are numerous practical concerns that would arise if local boards of elections in New York were required to implement the Proposed Rule, in particular before the upcoming

[5] *See, e.g.*, Susan Haigh, *US Postal Service expects to run out of cash in a year without help from Congress, postmaster says*, AP News (March 5, 2026), *US Postal Service faces cash crisis by 2027, postmaster general warns | AP News*.

[6] *Cf. League of Women Voters v. U.S. Dep't of Homeland Sec.*, Index No. 25-3501, slip op. at 50-55 (D.D.C. June 22, 2026) (holding that use of social security numbers and other SSA data for voter verification through the Systematic Alien Verification for Entitlements (SAVE) system violated the Privacy Act as it created an unauthorized national data bank and facilitated unlawful interagency sharing).

midterm elections. The significant burdens to the State include having to set up, update, and maintain a “mail-in and absentee participation list” according to USPS’s as yet unspecified technical requirements; assigning and tracking unique IMbs for every ballot; and reprinting hundreds of thousands of envelopes, all with no apparent nexus efficient election administration or election security. What is more, the Proposed Rule has the potential to disenfranchise millions of voters. Because it is unconstitutional, imposes burdens that far outweigh the potential benefits, if any, the Proposed Rule is arbitrary, capricious, and contrary to law.

Sincerely,

Letitia James
Attorney General of New York

# EXHIBIT B

ROB BONTA
California
Attorney General

ANDREA JOY CAMPBELL
Massachusetts
Attorney General

AARON D. FORD
Nevada
Attorney General

NICK BROWN
Washington
Attorney General

July 2, 2026

**Via Electronic Mail**

Director, Product Classification
U.S. Postal Service
475 L'Enfant Plaza SW, Room 4446
Washington, DC 20260–5015
*PCFederalRegister@usps.gov*

**Re: Ballot Mail**
**Federal Register Document No. 2026–10976**

Dear Director:

We, the Attorneys General for California, Massachusetts, Nevada, Washington, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, and Wisconsin, write in opposition to the United States Postal Service's proposed rule Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (proposed June 2, 2026) (to be codified at 39 C.F.R. pt. 111) (Proposed Rule).

The Notice of Proposed Rulemaking should be promptly withdrawn in light of the district court's well-reasoned ruling in *California v. Trump*, Case No. 1:26-cv-11581-IT, 2026 WL 1826490 (D. Mass. June 25, 2026), that the Executive Order mandating the rule was unconstitutional and ultra vires. The Court entered summary judgment in favor of the Plaintiff States and enjoined the United States Postal Service (USPS) from (1) implementing or giving effect to section 3 of Executive Order 14399; and (2) completing rulemaking to promulgate the regulations as outlined in section 3 of that Executive Order, while confining the scope of the injunction to Plaintiff States' elections up to and including November 3, 2026.

The Proposed Rule also presents a striking disregard of federal law. The Proposed Rule is inconsistent with the Constitution's assignment of authority over the manner of elections to States

and Congress. Neither USPS nor the President may unilaterally interfere with States' election regulations or commandeer States in service of a federal data collection program. The Proposed Rule would also violate USPS's governing statutes, exercising authority USPS does not have and imposing restrictions not authorized by Congress. The Proposed Rule would further run afoul of the federal voting laws, including the Help America Vote Act and Voting Rights Act Amendments of 1970, as well as the Privacy Act.

In addition, the Proposed Rule is unlawfully arbitrary and capricious. Its "one size fits all" approach fails to account for the fact that State voting systems are tailored to local circumstances. The Proposed Rule's requirements are also not rationally connected to the purported basis. The purported basis for the rule is reducing the risk of fraud, which robust evidence has shown to be a vanishingly rare phenomenon. There is no reasonable fit between the exceedingly narrow basis and the proposal to indiscriminately reject ballot mail that does not satisfy the Proposed Rule's requirements. The Proposed Rule also does not identify safeguards protecting voters from misuse of the capabilities created by the Intelligent Mail barcode requirement.

And the Proposed Rule is also arbitrary in failing to recognize the substantial reliance interests at stake. States have constructed entire election systems based on existing regulations, and they have even ordered supplies for the 2026 election cycle—including ballot envelopes—based on existing requirements. The Proposed Rule would abruptly upend all the preparation of the States' election officials on July 29, 2026, while those election officials are busy with primary elections and planning for the general election on November 3, 2026.

For each of these reasons, USPS should withdraw the Proposed Rule.

## I. Background

On March 31, 2026, President Trump issued Executive Order 14,399, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (EO). 91 Fed. Reg. 17,125 (Mar. 31, 2026). In Section 3 of the EO, the President ordered USPS, through the Postmaster General, to act within 60 days to "initiate a proposed rulemaking" that requires (1) ballot mail to carry unique Intelligent Mail barcodes and meet other formatting requirements, and (2) creation of a new system under which voters must be enrolled in a USPS "Mail-In and Absentee Participation List" based on submissions by States. EO § 3(a), (b). The EO further directed that "[a]ny final rule pursuant to [Section 3] shall be issued no later than 120 days from the date of this order." EO § 3(d).

USPS is working to implement the EO by issuing the Proposed Rule as ordered. USPS proposes additions to its Domestic Mail Manual (DMM) to enact two substantive changes to the rules governing delivery of election mail in this country. Specifically, proposed changes to DMM 705.24.3.1–3 set specific requirements for the design of envelopes for outbound federal ballot mail (States mailing voters a mail-in ballot) and return federal ballot mail (voters mailing their ballots to States to cast a vote). Proposed DMM 705.24.4.2 then requires that States intending to receive voters' completed ballots through USPS must ensure that all voters who will be sent a mail ballot are enrolled with USPS's Mail-In and Absentee Participation List. For each voter, States must provide USPS the voter's name, address, and unique Intelligent Mail barcodes for their outbound and return ballot envelopes. *Id*. Under proposed DMM 705.24.5.1–3, ballot mailings that either do

not comply with specified envelope design requirements or are intended for individuals not enrolled in USPS's state-specific Mail-In and Absentee Participation Lists will not be accepted by USPS and will not be delivered to voters.

On June 25, 2026, the District of Massachusetts granted summary judgment to twenty-four Plaintiff States that challenged the EO, many of whom are signatories to this letter. First, and significant to this comment letter, the Court declared unconstitutional the directive in Section 3 of the EO requiring "USPS to compile its own Lists of individuals eligible to vote by mail and prohibit[] the transmission of a mail-in ballot completed by anyone not on USPS' Lists." *California*, 2026 WL 1826490, at *15. In reaching this conclusion, the Court specifically cited provisions of the Proposed Rule providing that mail ballots "that do not comply with [standards required by the EO] will not be accepted and will be returned to the authorized ballot mailer." *Id.* Second, the Court held that "no law enacted by Congress delegates authority to control mail-in voting to USPS" and that "USPS [thus] lacks statutory authorization to promulgate any binding regulations on mail-in voting." *Id.* Third, the Court held that, to make the changes contemplated by the EO, USPS was required to "submit a proposal to the Postal Regulatory Commission[,]" and that failure to follow USPS rulemaking procedure deprives USPS of legal authority to "require . . . States to use a specific mail-in ballot." *Id.* at *16. The Court declared Section 3 of the EO legally void as it is ultra vires and unconstitutionally violates the separation of powers. *Id.* at *17. The Court also enjoined Defendants, including USPS, from (1) implementing or giving effect to the section 3 of Executive Order 14399, and (2) completing rulemaking to promulgate the regulations as outlined in section 3 of that Executive Order, within the twenty-four Plaintiff States. *Id.*

## II. USPS Should Withdraw the Proposed Rule and Reconsider in Light of *California v. Trump*

The Court's order in *California v. Trump* enjoins Defendants—including USPS—and their employees "from implementing, giving effect to, or enforcing Section 3(b)(i)–(v) or (d) of the EO as to elections mail for elections administered by Plaintiff States and ballot envelopes used by Plaintiff States with respect to the November 3, 2026 or any earlier federal election[.]" The Court further enjoined all Defendants—including USPS—and their employees from "initiating or completing rulemaking to promulgate the specific regulations outlined in Section 3(b)(i)–(v) or (d) of the EO as to elections mail for elections administered by Plaintiff States and ballot envelopes used by Plaintiff States for the November 3, 2026 election, or any earlier election." *Id.* at *17.[1]

USPS should promptly withdraw the Proposed Rule in light of the Court's ruling. Because the Proposed Rule is unlawful, USPS should not reissue it at all; however, at a minimum any

[1] In addition, the U.S. District Court for the District of Columbia has declared that the standards and procedures set forth in the Proposed Rule would violate a settlement agreement between the parties in *National Association for the Advancement of Colored People v. United States Postal Service*, and has thus enjoined USPS from implementing the standards and procedures described in the Proposed Rule. *See NAACP v. USPS*, No. 20-cv-2295-EGS, Dkt. Nos. 181, 182 (D.D.C. July 1, 2026). Promulgating the Proposed Rule would violate that settlement agreement and the court's injunction.

alternative rule should scrupulously ensure that Plaintiff States in the *California* litigation are not affected by the Proposed Rule for the November 3, 2026, election, or any earlier election.

## III. The Proposed Rule Is Contrary to Law

Under the Constitution, States are primarily responsible for regulating the manner of holding elections, subject only to alteration by Congress; neither the President nor USPS have constitutional authority to displace State law. Yet that is precisely what the Proposed Rule would do. It does not propose general rules for the use of mail; it proposes to regulate election materials and only election materials. It asserts federal authority to refuse to deliver State ballots for noncompliance with USPS election mail regulations. And it would conscript States' resources to create a federal list of voters who vote by mail. Neither the President through his EO nor USPS through rulemaking may usurp the constitutional authority of States and Congress in this manner.

### A. The Proposed Rule Violates the Constitution

First and foremost, the regulations outlined in the Proposed Rule are contrary to the Constitution. USPS proposes fundamentally altering and restricting access to postal delivery of mail ballots. But that reaches far beyond the authority conferred on the Executive Branch and USPS and strikes directly at the constitutionally protected right of States to administer elections, including through the provision of mail ballots in accordance with duly enacted state laws. These proposed regulations, which implement the President's unlawful attempt to dictate specific requirements concerning mail balloting in federal elections, are unconstitutional.

The Proposed Rule commandeers the States into enacting an unconstitutional federal data collection program by requiring them to provide USPS with the name, address, and unique Intelligent Mail barcode (IMb) for each voter in order to access constitutionally created postal services. USPS will not accept or deliver ballot mailings that do not conform to the new format requirements or that are addressed to recipients not enrolled in USPS's state-specific Mail-In and Absentee Participation Lists. Thus, USPS seeks to dictate who may participate in the States' mail ballot systems, as set out by state laws, by refusing States' mail access unless they enact (with their own resources) a presidentially ordered federal program. Any claims from USPS that it is not in any way interfering with the States' "administration of federal elections" ring hollow.

#### 1. The President lacks authority to issue the order that mandated this rulemaking

The Proposed Rule explicitly acknowledges that it was submitted to effectuate the EO. That EO mandates exactly what is now proposed in this rulemaking—namely, that USPS promulgate specific requirements for the design of ballot mail envelopes, as well as rules that require States to submit identifying information for mail voters to USPS, and for USPS to then compile such information into state-specific lists that dictate which voters may be delivered ballot mail. *See* EO § 3(b).

As a constitutional matter, the President has no power to order this rulemaking. States, not the President, have primary authority to regulate federal elections under the U.S. Constitution. *See*

U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2, 4. The Supreme Court recently reaffirmed that "the Constitution lodges power over congressional elections in state legislatures 'primarily' and in Congress 'ultimately.'" *Watson v. Republican Nat'l Comm.*, 609 U.S. ---, 2026 WL 1855462, at *3 (June 29, 2026) (quoting The Federalist No. 59, p. 362 (C. Rossiter ed. 1961)). This constitutional grant of power authorizes States to "provide a complete code for [federal] elections, not only as to times and places, but in relation to notices, registration . . . [and] protection of voters," among other topics. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). States "enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Id*. In short, they are "given, and in fact exercise a wide discretion" in providing for fair and efficient elections. *United States v. Classic*, 313 U.S. 299, 311 (1941). The Elections Clause further grants Congress the power to "make or alter" regulations of congressional elections. U.S. Const. art. I, § 4, cl. 1. In this way, the Clause "functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (*ITCA*) (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)). Here, States have set out detailed election procedures allowing for the use of mail balloting, which Congress has not preempted.

The President, by contrast, has no independent authority over elections. The President's role in election legislation is confined to recommending measures to Congress, U.S. Const., art. II, § 3, and signing or vetoing bills, *id.*, art. I, § 7.[2] Nothing in the Constitution or any federal statute authorizes the federal executive to dictate the type of regulations at issue in this proposed rulemaking. *Georgia v. Meadows*, 88 F.4th 1331, 1346–1347 (11th Cir. 2023) (rejecting position that the federal executive can "interfere[] with state election procedures based solely on the federal executive's own initiative"); *see League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025) (observing that executive power over federal elections "does not appear to have crossed the Framers' minds"). The President thus cannot mandate that States conform to any particular mail ballot envelope design and review process. Nor can he conscript States' resources to participate in a program of compiling lists of mail voters, or mandate regulation of mail voting that intrudes upon States' ability to administer elections in accordance with state law that provides for access to mail voting. *California v. Trump*, 786 F. Supp. 3d 359, 373 (D. Mass. 2025) (*California I*); *see Printz v. United States*, 521 U.S. 898, 935 (1997). "The President's authority to act . . . 'must stem either from an act of Congress or from the Constitution itself.'" *Medellín v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Neither source supports what the President has ordered here.

Because the President lacks authority to direct the changes to the handling of election mail, the EO is not binding on USPS. And USPS's authority to regulate elections is no broader than the President's. Like the President, an administrative agency's power is limited to that conferred to the Executive Branch by the Constitution or delegated by Congress in federal law. *See Main Street Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 558 (2d Cir. 2016). In this case, not only has Congress *not* authorized USPS to control mail ballots in this way, but the Proposed Rule is

[2] In fact, the President has tried to impose limitations on elections through advocating for restrictions in traditional Congressional legislation, but Congress has repeatedly rejected these efforts.

contrary to USPS's governing statutes, as explained below. *See infra* § III.B. By fundamentally altering how USPS handles mail ballots, the Proposed Rule violates the Constitution's separation of powers. *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

### 2. The Proposed Rule violates the States' constitutional power to regulate and administer elections

The mail ballot regime set forth in the Proposed Rule violates States' constitutional rights to administer elections in accordance with their own laws. *See ITCA*, 570 U.S. at 8–9 (recognizing States' broad power to regulate federal elections). As noted above, the Constitution explicitly tasks States—and not USPS or the President—with the responsibility to administer federal elections, empowering them to provide a "complete code" of how such elections are run, including how voters cast their ballots. *See Smiley*, 285 U.S. at 366. The States have legislated accordingly. California and Washington, for instance, have adopted universal mail voting systems, wherein every active registered voter is sent a mail ballot. *See* Cal. Elec. Code §§ 3000.5, 3003, 3010, 3011; Wash. Rev. Code §§ 29A.40.010, .091, .170. Other States, like Massachusetts, authorize no-excuse early voting by mail, allowing any qualified voter to request and cast a mail ballot. *See* Mass. St. 2022, c. 92, § 10; Mass. Gen. Laws ch. 54, § 25B(a)(i). Given the constitutionally assigned role that USPS plays in providing critical postal services to the country, *see* U.S. Const. art. I, § 8, cl. 7, the States have built in the provision of such services as central pillars of their mail voting programs.

The Proposed Rule effectively supplants States' decisions about which voters can cast a mail ballot. For instance, proposed DMM 705.24.4.2–3, which governs the process for States to enroll voters on the state-specific Mail-In and Absentee Participation List, will inevitably omit certain voters, denying USPS delivery of ballot mail to voters who are otherwise eligible to cast their vote through the mail. Proposed DMM 705.24.4.2(d) provides that a State must submit to USPS the requisite voter information "at least 30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballots may begin to be mailed under state law." But States, pursuant to their own duly enacted election rules, permit voters to request a mail ballot (and have that ballot mailed to them) well inside of that window. In California, for example, voters may register and receive a vote-by-mail ballot up to 15 days before the election. Cal. Elec. Code § 2102(a). And California requires that election officials begin mailing voters their ballots no later than 29 days before each election. *Id.* §§ 3001, 3000.5. For that reason, under the proposed restrictions on enrollment in USPS's lists, numerous California voters will likely become ineligible to receive a mail ballot inside of the Proposed Rule's alternative cutoffs.

While proposed DMM 705.24.4.2(d) permits States to "make supplemental submissions to enroll additional individuals or modify prior submissions until the last day that ballots may be mailed out to individuals under state law," this does not fully remedy the serious risk that eligible voters will be deprived of mail ballots to which they are entitled under state law. Proposed DMM 705.24.5.1 and 705.24.5.3 require that USPS review outbound ballot mail to ensure recipients are enrolled with USPS before accepting and delivering that mail. States are unlikely to be able to make real-time, instantaneous supplemental submissions with each individual change to their respective lists. As a result, many States will inevitably provide supplemental enrollment information, including immediately before or at the deadline for mailing ballots to voters under

state law. In Vermont, for example, voters may request an absentee ballot up to one day before an election. *See* Vt. Stat. Ann. tit. 17, §§ 2531(a), 2539(a)(1). Or consider New Jersey, which requires that county clerks provide eligible voters with a mail ballot by 3:00 p.m. the day before the election if the voter requests the ballot in person. *See* N.J. Stat. Ann. § 19:63-3(d). And in North Carolina, the voter, the voter's near relative, or the voter's verifiable legal guardian may request an absentee ballot by 5:00 p.m. the day before the election. *See* N.C. Gen. Stat. § 163-230.1(b). These quick turnaround times raise the serious risk that USPS will screen out legitimate ballot mail due to the unavoidable delay in the transfer and processing of information by state election officials and USPS.

Additionally, while the Proposed Rule effectuates only the EO's limitations on delivering *outbound* mail ballots, it leaves the door open to future implementation of the EO's prohibition on delivery of completed mail ballots from any voter not on USPS's voter lists. *See* EO § 3(b)(iii); proposed DMM 705.24.4.2(b)(4)) (requiring states to provide the "Unique IMb on the Return Federal Ballot Mail envelope sent to the individual[,]" which could allow USPS to track and refuse to deliver certain voted ballots as well). This, too, would have disastrous effects, misleading voters into believing they are able to cast a mail ballot only for USPS to fail to deliver it. Many voters will remain unaware that their ballot was never delivered, or they will find out too late to correct the error.

Separately, and just as troubling, proposed DMM 705.24.4.3 provides that States will be provided a copy of the state-specific Mail-In and Absentee Participant List "[o]n or about the date of the federal election." This rule affords States little, if any, time to digest state-specific lists containing potentially millions of voters to assess whether all voters eligible to be sent a mail ballot have been included. Nor does it take into account that ballots are mailed in most instances by local election officials, who do not even receive a copy of the list under the Proposed Rule, and are not contemplated by the Proposed Rule to undertake review. Indeed, such an exhaustive review would be functionally impossible in the days before an election or on Election Day. In fact, under the language of the Proposed Rule, it is possible such a list might not arrive until *after* the election, as the term "on or about" does not guarantee delivery *prior* to the election. And yet, the way in which these proposed rules work together apparently contemplates that States will proactively review USPS's lists and submit corrections to "modify prior submissions." *See* Proposed DMM 705.24.4.2(d). Moreover, the late correction of any voter omissions from USPS's lists will both prevent States from sending a mail ballot to those voters and also functionally prevent States from contacting such voters to ensure that they are aware of their omission and ability to cast a ballot in-person.

At bottom, the proposed regulations pertaining to enrollment on the state-specific Mail-In and Absentee Participation Lists will inevitably result in significant numbers of otherwise-eligible voters being unable to receive and cast a ballot through the mail. The Signatory States have each enacted state laws affording some or all voters the right to do so. Because the Proposed Rule undermines and nullifies States' deliberate decisions to administer federal elections, at least in part, through the mail, it is unconstitutional under the Elections Clause of the Constitution.

The Proposed Rule's ballot envelope design requirements run into similar constitutional concerns. The President has no authority to require States to adhere to a particular mail ballot

envelope design and review process. *Meadows*, 88 F.4th at 1346; *California I*, 786 F. Supp. 3d at 373. Nor can he direct USPS to exceed its authority—and nowhere has Congress given USPS the power to countermand a State's choices in designing its ballot envelopes or in adopting appropriate security procedures for mail ballots. *See City of Providence v. Barr*, 954 F.3d 23, 31 (1st Circ. 2020) (noting that an agency's power is limited to its statutory authorization). Nothing authorizes the President to issue ballot mail design requirements, nor to force upon States the Proposed Rule's review process, rendering it unconstitutional. *See Youngstown*, 343 U.S. at 585; *Printz*, 52 U.S. at 935.

The Proposed Rule's mandates regarding ballot delivery and ballot envelope design also unconstitutionally commandeer State resources in violation of the separation of powers between the federal government and the States. If enacted, the Proposed Rule would hijack the resources of the States to effectuate an unconstitutional federal data collection program by requiring the States to provide USPS with the name, address, and unique Intelligent Mail barcode for each voter. It would further require States to expend resources to conform ballot envelope designs to access postal services. Refusing States access to essential and statutorily guaranteed postal services unless they enact (with their own resources) a presidentially ordered federal program amounts to unlawfully seizing the States' personnel resources and power over elections. *See California I*, 786 F. Supp. 3d at 373; *Printz*, 521 U.S. at 935.

**3. The Proposed Rule also violates Congress's constitutional powers**

For the same reasons, the Proposed Rule unconstitutionally invades Congress's power to "make or alter" election regulations under the Elections Clause. *See* U.S. Const. art. I, § 4. Pursuant to that power, Congress has enacted several statutes governing voter registration, voting lists, and absentee voting. None of those laws authorize USPS to play the role that the President and the Proposed Rule set out to accomplish by fiat. In fact, as described below, the Proposed Rule disregards and violates federal voting statutes.

In addition, the Proposed Rule violates Congress' power over the Postal Service. *See* U.S. Const. art. I, § 8, cl. 7; *Ex parte Jackson*, 96 U.S. 727, 732 (1877) (Congress has exclusive constitutional power to enact law governing "the entire postal system of the country"); *accord U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 121 (1981) (recognizing Congress's broad power over postal system). Pursuant to its constitutional authority, "Congress effectively mandated certain policies to be followed by the Postal Service, leaving no discretion . . . to do otherwise." *New York v. Biden*, 636 F. Supp. 3d 1, 25 (D.D.C. 2022) (quotation omitted). However, the Proposed Rule runs contrary to a host of federal statutes governing USPS operations. As detailed more fully below, Congress has not authorized USPS to promulgate any of the requirements now posed in this rulemaking.

In fact, the only statute that assigns *any* role for USPS in voting is the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20302, et seq., which the Proposed Rule explicitly carves out.[3] Specifically, UOCAVA requires that "balloting materials,"

[3] Without that carveout, the Proposed Rule would be directly inconsistent with the requirements of that federal law. However, the carveout cannot rescue the Proposed Rule either

including mail ballots, "shall be carried expeditiously and free of postage[.]" 39 U.S.C § 3406(a)(1); *see also* 52 U.S.C. §§ 20302(a)(1) (mandating certain procedures for military and overseas voters), 20304(b) (providing that the UOCAVA administrator "shall provide expedited mail delivery service" for UOCAVA ballots). By linking USPS's obligations under Title 39 to UOCAVA, "Congress has shown that it knows how to" require that USPS treat mail ballots differently. *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) (quotation omitted). The statute also demonstrates the limited role Congress has assigned to USPS with regard to mail balloting—to carry and deliver such ballots, not to act as a gatekeeper for whose ballots should be delivered. There is nothing in Title 39 that includes anything like the Proposed Rule, which codifies the EO's appropriation of Congress's constitutional power over both elections and USPS.

Such statutory violations establish that the Proposed Rule is contrary to law, *see infra* § III.C, further illustrating that what USPS is seeking to do is unconstitutional. Rulemaking by an Executive Branch agency that countermands specific limitations on the agency's authority enacted by Congress violates the separation of powers.

### B. The Proposed Rule is Contrary to USPS's Governing Statutes

USPS is a "creature[] of statute" that "possess[es] only the authority that Congress has provided." *Nat'l Fedn. of Indep. Bus. v. Dept. of Lab., OSHA*, 595 U.S. 109, 117 (2022) (per curiam); *La. Pub. Serv. Comm'n. v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). USPS's own interpretation of the scope of its authority to enact the Proposed Rule, as set forth in the preamble, is entitled to no deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Notably, when USPS last intruded on state administration of mail voting, a federal court promptly enjoined it. *See Colorado v. DeJoy*, No. 20-cv-2768-WJM-STV, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020) (restraining USPS's nationwide vote-by-mail mailer because its instructions conflicted with state election procedures).

The federal law that created and governs USPS is Title 39 of the U.S. Code, as enacted in the Postal Reorganization Act (PRA), Pub. L. No. 91-375, 84 Stat. 719 (1970), and amended by the Postal Accountability and Enhancement Act (PAEA), Pub. L. No. 109-435, 120 Stat. 3198 (2006). Title 39 confers no authority to adopt the nationwide mail ballot administration program described in the Proposed Rule and affirmatively prohibits several of its central features. *See California,* 2026 WL 1826490, at *15 ("[N]o law enacted by Congress delegates authority to control mail-in voting to USPS."); *see also Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1175–76 (D.C. Cir. 2003) (invalidating USPS regulations that changed DMM standards restricting eligibility for a category of mail because the changes exceeded USPS's statutory authority); *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970–972 (D.C. Cir. 2022) (reaffirming that

---

because USPS still lacks statutory authorization for its proposed mail ballot regime. The Proposed Rule also does not explain how USPS will even distinguish between ballots that are sent pursuant to UOCAVA and other absentee ballots, revealing an acute risk that the Proposed Rule will conflict with UOCAVA's mandate and result in erroneous UOCAVA ballot rejection and return. *See* 91 Fed. Reg. at 32,915.

courts can review whether USPS action exceeds the bounds Congress set in Title 39). We address each defect in turn.

### 1. Sections 401 and 404 do not authorize the Proposed Rule

The Notice grounds the Proposed Rule in 39 U.S.C. §§ 401 and 404. 91 Fed. Reg. at 32,915. Neither provision supports it.

Section 401(2) authorizes USPS to adopt only those rules and regulations that are "*not inconsistent with* this title" and that "may be *necessary in the execution of its functions* under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title[.]" 39 U.S.C. § 401(2) (emphasis added). USPS's power to promulgate regulations is thus doubly limited: a regulation must be necessary to fulfill a function Congress has actually assigned to USPS, and it may not contradict the remainder of Title 39. The Proposed Rule exceeds both limitations.

As shown below, the Proposed Rule is inconsistent with multiple express provisions of Title 39 and it is not "necessary" to any postal function. USPS's functions are the "collection, handling, transportation, delivery, forwarding, returning, and holding of mail," 39 U.S.C. § 404(a)(1), all of which are in service of its "basic function"—"the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people[,]" *id.* § 101(a). Compiling rosters of mail voters, operating an enrollment portal for state election data, verifying that ballots are "destined to individuals on the list," 91 Fed. Reg. at 32,916, and generating compiled participation lists "for use by law enforcement," *id.* at 32,915, are not functions of collecting, transporting, or delivering mail. They are election administration and investigative data-collection functions that Congress never assigned to USPS—in Title 39 or anywhere else.

No purported basis for the Proposed Rule establishes its necessity for USPS's functions. For example, the Notice of Proposed Rulemaking explains that the "mailpiece preparation and data reporting standards" provide information "for use by law enforcement" and that the Mail-In and Absentee Participation Lists will "facilitate law enforcement efforts" by allowing "law enforcement officials to compare the total number of mailed ballots to the total number of received ballots to detect potential issues meriting further investigation." 91 Fed. Reg. at 32,915–916. Generating investigative leads for *other* agencies' enforcement of *election* law is not a power "incidental, necessary, or appropriate to the carrying on of" USPS's functions.[4] 39 U.S.C. § 401(10). Notably, the Proposed Rule's data collection outruns its own stated rationale: comparing the *total* number of ballots mailed against the *total* received—the Notice's sole law-enforcement illustration—requires only aggregate counts, but the Proposed Rule mandates person-level linkage

[4] This disconnect is no surprise because the Notice ties the Proposed Rule to the President's Executive Order rather than to any postal function: USPS "understands" from the EO that the Proposed Rule "will facilitate the faithful execution of federal law." 91 Fed. Reg. at 32,915. But a rule necessary to the EO's objectives is not a rule necessary to USPS's functions. *Compare* 91 Fed. Reg. at 32,915, *with* EO, § 1.

of each voter's name and address to the unique Intelligent Mail barcodes on voters' envelopes, proposed DMM 24.4.2.b.

The election crime statutes cited in the Notice of Proposed Rulmaking—concerning criminal prohibitions on voter intimidation and fraudulent registration and voting—fail to supply the missing authority for this sweeping election law enforcement project. *See* 91 Fed. Reg. at 32,915 (citing 52 U.S.C. §§ 10307 & 20511). Those statutes do not expressly confer any enforcement authority on USPS. In fact, Section 11(a) of the Voting Rights Act (cited in the Notice) affirmatively prohibits any "person acting under color of law" to "fail or refuse to permit any person to vote who is entitled to vote" or to "willfully fail or refuse to tabulate, count, and report such person's vote[,]" 52 U.S.C. § 10307(a), yet that is the result of the Proposed Rule for mail voters who are not enrolled on USPS's final State-Specific Mail-In and Absentee Participation List. The reference to 18 U.S.C. § 3061(b) also fares no better because it only grants limited law-enforcement powers to *postal inspectors* regarding crimes involving "the use of mails" and offenses subject to interagency agreement with the Attorney General. But that is not a grant to construct, by regulation, a nationwide investigative data-collection regime cataloguing which Americans vote by mail. If Congress had intended to deputize USPS as an adjunct of federal election law enforcement, it would have said so clearly. *Cf. West Virginia v. EPA*, 597 U.S. 697, 723–25 (2022) ("newfound power" discovered in a "long-extant statute" warrants skepticism); *Biden v. Nebraska*, 600 U.S. 477, 505–506 (2023).

Finally, the Notice's characterization of the Proposed Rule as "implement[ing] best practices for Postal Service ballot mailing operations," 91 Fed. Reg. at 32,915, cannot support its issuance either. USPS's existing ballot-mail recommendations are voluntary guidance offered in service of delivery. *See* USPS, *Mailing Standards of the United States Postal Service Domestic Mail Manual* 703.8.4 Design, https://pe.usps.com/text/dmm300/703.htm#ep1174014 (last visited July 1, 2026); USPS, *2026-2027 Official Election Mail Guide Kit 600* (Feb. 2026), https://about.usps.com/kits/kit600.pdf. The Proposed Rule transforms them into mandatory conditions of mail *acceptance*, enforced by refusal and return of ballot mailings, proposed DMM 705.24.5.3, and welds them to an enrollment-and-verification regime that has no analogue in any "best practice." A recommendation about how to prepare an envelope is a postal function. A federal precondition on whether a state's ballots may enter the mail stream at all is not.

**2. The Federal Ballot Mail Portal, voter enrollment, and participation lists are a prohibited new "nonpostal service"**

In PAEA, Congress expressly stripped USPS of authority to take on new lines of business characterized as "nonpostal services." *See* 39 U.S.C. § 404(e)(2)–(3). "Nonpostal services" constitute anything that falls outside of the definition of "postal services," *id.* § 404(e)(1), which in turn is narrowly defined as "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto[.]" 39 U.S.C. § 102(5). In 2022, Congress delineated permissible non-postal services that allowed USPS to, for example, enter into certain service-related agreements. *See id.* §§ 404(e)(3).

The core of the Proposed Rule has nothing to do with mail delivery, and it overrides Congress's explicit limitation on non-postal services. For example, proposed DMM 705.24.4

would establish (1) a registration system for "Ballot Portal Users"; (2) an "enrollment" system in which States must submit, voter by voter, the name and address of each individual receiving a mail-in or absentee ballot, the unique IMbs on that individual's outbound and return envelopes, and the originating election office; and (3) a list-compilation and transmission service under which USPS delivers to each State's chief election official, "[o]n or about the date of the federal election," a compiled statewide roster of every enrolled voter and the barcodes associated with each voter's ballot. This state-by-state voter eligibility verification and enrollment system is far outside the definition of "postal services." Nor is it "ancillary" to mail delivery; USPS has delivered ballots for as long as States have mailed them—including nearly 100 million ballots in the 2024 general election alone—without ever needing to know, in advance and by name, who is eligible under state law to receive and return their ballot, nor playing the role of gatekeeper to the franchise. *See also* 91 Fed. Reg. at 32,916 (Proposed Rule intended to "facilitate law enforcement efforts," not mail delivery).

The narrow statutory exceptions of nonpostal services that Congress created in 2022 confirm the broad prohibition. Section 404(e)(2) excepts only "nonpostal products or services authorized by chapter 37." Chapter 37, in turn, authorizes nonpostal services principally through reimbursable agreements with other federal agencies, subject to Postal Regulatory Commission (PRC) oversight. *See* 39 U.S.C. § 3703. No agreements, reimbursements, or PRC process are present here, and State election officials are not federal agencies. That Congress created these specific exceptions shows that when it intends for USPS to engage in non-postal practices, it will specifically so provide. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024) ("[T]he enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." (quotations omitted)).

### 3. Conditioning mail acceptance on enrollment and certification violates the Universal Service Obligation and the prohibition on discrimination among mail users

Title 39 commands that USPS "shall provide prompt, reliable, and efficient services to patrons in *all* areas and shall render postal services to *all* communities[,]" 39 U.S.C. § 101(a); that it shall "provide adequate and efficient postal services" and "serve as nearly as practicable the entire population of the United States[,]" *id.* § 403(a); that it give "the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail[,]" *id.* § 101(e); and that, "[i]n providing services . . . [USPS] shall not . . . make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user." *Id.* § 403(c).

Under proposed DMM 705.24.5.3, an authorized ballot mailer's mailing "will not be accepted and will be returned" if USPS's verification concludes the mailing is not being sent to an individual enrolled on a State's "Mail-In and Absentee Participation List," proposed DMM 705.24.5.1, or if the state "has not submitted a certification pursuant to 24.4.2.f," proposed DMM 705.24.3.b. That is a regime of selective refusal of service: identical letters will be accepted or rejected depending on whether the intended recipient's name appears in a federal database and whether the election official sending it submitted it for federal certification. USPS has not (and cannot) identify a legitimate operational need that justifies this disparity. *Cf. GameFly, Inc. v.*

*Postal Reg. Commn.*, 704 F.3d 145, 149 (D.C. Cir. 2013) (holding that when there is discrimination, there must either be a "remedy [to] all discrimination or [an] expla[nation] why any residual discrimination is due or reasonable under § 403"); *U.S.P.S. v. Postal Reg. Comm'n*, 747 F.3d 906, 910 (D.C. Cir. 2014) (affirming PRC order remedying undue and unreasonable discrimination between mail rates for DVD rental company and video game rental company).[5]

USPS also carries census questionnaires, jury summonses, tax filings, and social security correspondence—government mail that is important, sensitive, and deadline-driven—without conditioning acceptance by USPS on enrollment of the recipients in a federal database. But under the Proposed Rule, only the mailers of ballots—unquestionably "important letter mail" that Congress directed receive "the highest consideration," 39 U.S.C. § 101(e)—face that condition. That constitutes "undue [and] unreasonable discrimination among users of mail[]," *id.* § 403(c), and a refusal "to render postal services to all communities" in any State that declines, or is unable, to satisfy the enrollment-and-certification conditions, *id.* § 101(a).

#### 4. The Proposed Rule unlawfully creates a new category of nonmailable matter

USPS's authority to refuse matter tendered for mailing is governed by a comprehensive statutory scheme. Congress has "carefully defined" the categories of "nonmailable matter," 39 U.S.C. §§ 3001–3008—hazardous materials, certain solicitations, and the like—and has specified that such matter "shall be disposed of as [USPS] directs," *id.* § 3001(b). However, USPS "must deliver the mail unless an item is 'nonmailable' within the definition of 39 U.S.C. § 3001." *Bowie v. Williams*, 351 F. Supp. 628, 634 (E.D. Pa. 1972). That principle—that postal officials cannot withhold mail without a statutory basis—is as old as judicial review of postal actions itself. *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902) ("His right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them.").

Ballots and ballot envelopes appear nowhere in sections 3001–3018. Yet the practical effect of proposed DMM 705.24.5.3 is to render unacceptable—refused and returned to the sender—every ballot mailing from a non-certifying State, every mailing addressed to a voter absent from the Mail-In and Absentee Participation List, and every mailing whose envelope has not undergone review for design and barcode placement. Nothing in Title 39 authorizes USPS to create, by regulation, a new class of "refusable mail" or "conditionally accepted mail" defined by the sender's noncompliance with a data-reporting regime. That power resides exclusively with Congress. *See Ex parte Jackson*, 96 U.S. 727, 732 (1877) ("The power possessed by Congress embraces the regulation of the entire postal system of the country."); *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 155–156 (1946) (finding Postmaster General may not impose conditions on mail privileges that Congress has not prescribed).

[5] Whatever the proper forum for enforcing section 403(c) in the first instance, the provision is a substantive command of Title 39 and a regulation that transgresses it is by definition not one "consistent with this title." 39 U.S.C. § 401(2).

Existing DMM acceptance standards uniformly consider physical standards concerning the mailpiece, not the identity of the mailer.[6] A mailpiece that is not compliant can be cured by re-preparing the piece or paying a different rate; no mailpiece is precluded from the mails on account of who is sending it, who is to receive it, or whether the parties appear in a federal database. In other words, the Proposed Rule regulates access to mail based on identity of the sender and recipient and the mail contents (*i.e.*, a ballot)—which are precisely within the kinds of distinctions that fall within the scope of the nonmailability provisions. *See, e.g.*, 39 U.S.C. §§ 3002 (prohibition of mail containing master vehicle key), 3003 (prohibition on mailing fictitious name or address), 3004 (prohibition on delivery of mail to persons not a resident at the address). In fact, the Supreme Court has made clear that excluding matter from the mails on grounds unrelated to its physical character raises constitutional concerns. *See Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 306–07 (1965) (finding statute that required Postmaster General to detain "communist political propaganda," notify the recipient, and require the recipient to submit a reply card requesting that the mail be released, violated the First Amendment); *Blount v. Rizzi*, 400 U.S. 410, 416–417 (1971) (finding USPS imposed "procedures designed to deny use of the mails to commercial distributors of obscene literature" violated the First Amendment).

### C. The Proposed Rule is Contrary to Federal Voting Statutes

The Proposed Rule is also directly inconsistent with federal voting statutes.

First, in requiring enrollment in a USPS list as a prerequisite for mail voting, the Proposed Rule conflicts with federal statutes providing for a single, state-maintained voter registration list for federal elections in each State. In exercising its powers under the Elections Clause, Congress expressly left responsibility for carrying out voter registration and maintaining voting lists in the hands of the States, subject to federal standards. 52 U.S.C. §§ 21083(a)(1)(A), 20503(a), 20507. Federal law requires "each State" to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level," with information for each legally registered voter in the State. *Id.* § 21083(a)(1)(A). By law, this state-maintained list "shall serve

---

[6] *See, e.g.*, USPS, *Mailing Standards of the United States Postal Service Domestic Mail Manual* 102 Elements on the Face of a Mailpiece, https://pe.usps.com/text/dmm300/102.htm (last visited July 1, 2026); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 202 Elements on the Face of a Mailpiece, https://pe.usps.com/text/dmm300/202.htm (last visited July 1, 2026) (physical dimensions, machinability, address and postage placement); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 203 Basic Postage Statement, Documentation, and Preparation Standards, https://pe.usps.com/text/dmm300/203.htm (last visited July 1, 2026) (presort and documentation); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 204 Barcode Standards, https://pe.usps.com/text/dmm300/204.htm (last visited July 1, 2026) (barcode quality); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 233 Prices and Eligibility, https://pe.usps.com/text/dmm300/233.htm (last visited July 1, 2026); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 243 Prices and Eligibility, https://pe.usps.com/text/dmm300/243.htm (last visited July 1, 2026) (postage-category eligibility).

as the single system for storing and managing the official list of registered voters throughout the State[,]" and is the "the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* § 21083(a)(1)(A)(i) & (viii). This statutory design necessarily precludes the Proposed Rule's requirement of a second voting list housed in a federal agency and used by that agency to control delivery of ballots. *See* 91 Fed. Reg. at 32,918 (Proposed Rule §§ 24.4.2, 24.4.3, 24.5.1, 24.5.3).

Second, the Proposed Rule violates the Voting Rights Act Amendments of 1970, which protects the rights of voters to access absentee voting in federal elections. 52 U.S.C. § 10502. Congress enacted that law to protect citizens' constitutional right to vote and to move freely across state lines. The statute provides that no U.S. citizen shall "be denied the right to vote" in federal elections "because of the failure of such citizen to be physically present in such State or political subdivision at the time of such election," so long as the citizen has "complied with the requirements *prescribed by the law of such State* or political subdivision" concerning absentee ballots. *Id.* § 10502(c) (emphasis added). Thus, a voter's compliance with state law absentee voting requirements—some of which must conform to federal standards set out in the Act—is the sole prerequisite to absentee voting. The Proposed Rule violates this statute by adding a new USPS enrollment requirement as a necessary precondition to delivering absentee ballots. *See* 91 Fed. Reg. at 32,918 (Proposed Rule §§ 24.4.2, 24.5.1, 24.5.3.a) (requiring mail voters to be enrolled with USPS and providing that USPS will not accept ballot mail if recipients have not been so enrolled). For the same reason, implementation of the Proposed Rule and refusal to transmit ballot mail would also violate the enforcement provisions of the Voting Rights Act. 52 U.S.C. § 10307(a) ("No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote[.]").

### D. The Proposed Rule is Contrary to the Privacy Act

USPS is subject to the requirements and prohibitions in the Privacy Act, 5 U.S.C. § 552a. *N.L.R.B. v. USPS*, 841 F.2d 141, 145 & n.3 (6th Cir. 1988). Accordingly, it may not adopt regulations that are contrary to the Privacy Act.

Congress passed the Privacy Act "in response to the explosion of computer technology, which allowed for compilation and storage of data in quantities not seen before, coupled with rightful and broad condemnation of government surveillance programs including Watergate and the FBI's COINTELPRO." *Garris v. Fed. Bureau of Investigation*, 937 F.3d 1284, 1295–96 (9th Cir. 2019) (citation omitted). Among other goals, the Act sought to prevent the "collection of protected information not immediately needed, about law-abiding Americans, on the off-chance that Government or the particular agency might possibly have to deal with them in the future." S. Rep. 93-1183.

To that end, the Privacy Act has as one of its strongest protections a prohibition against agencies maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity[.]" 5 U.S.C. § 552a(e)(7).

The Proposed Rule discloses a plan to surveil and collect data regarding ballot mail sent to and from registered voters. The Notice of Proposed Rulemaking reflects that the purpose of the "mailpiece preparation and data reporting standards" is to "provide information regarding the sending of ballots through the mails that would be available for use by law enforcement[.]" 91 Fed. Reg. at 32,915. The Proposed Rule achieves this goal by requiring each piece of ballot mail to have Intelligent Mail barcodes, which is a USPS tracking technology, and to require States to provide data to USPS linking each barcode to an individual voter.[7] 91 Fed. Reg. at 32,917–918 (Proposed Rule §§ 24.3.1, 24.3.2, 24.4.2). This surveillance plan directly follows from the Executive Order that mandated this rulemaking procedure. *See also* EO § 1 ("Secure ballot envelope identifiers provide a reliable, auditable mechanism to enforce Federal law. . . . Unique ballot envelope identifiers, such as bar codes, enable confirmation that only citizens receive and cast ballots, reducing the risk of fraud and protecting the integrity of Federal elections.").

Voter registration, mail ballot participation, and voting are forms of First Amendment expression. *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999) (holding that the choice of whether or not to register "implicates political thought and expression"); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). For this reason, at least one court has held that the First Amendment protections in 5 U.S.C. § 552a(e)(7) bar federal agencies from collecting voter registration lists. *United States v. Weber*, 816 F. Supp. 3d 1168, 1193 (C.D. Cal. 2026). The statute equally bars the collection of data on all mail ballot voters proposed here: the lists that States must provide—on pain of losing the ability to administer their legally mandated mail-voting laws—will reveal citizens' First Amendment activity regarding the choice to register to vote.

No exception to the bar on collecting records on voters' First Amendment activity can salvage this new voter-surveillance regime. *See* 5 U.S.C. § 552a(e)(7). The collection of these records is not "expressly authorized by statute," nor, of course, by the tens of millions of voters who are the object of the surveillance. *See id.* Nor is this sweeping new system to track ballot mail "pertinent to and within the scope of an authorized law enforcement activity." The Proposed Rule cites USPS's general statutory authority to investigate and enforce criminal laws. 91 Fed. Reg. at 32,915 (citing 18 U.S.C. § 3061). But that statute enumerates USPS's powers in subsection (a), and creating a preventive surveillance program is not among them. 18 U.S.C. § 3061(a) (authorizing USPS postal inspectors to serve warrants and subpoenas, make arrests, carry firearms, and "make seizures of property as provided by law"). Nor does a general grant of authority to investigate "criminal matters" grant USPS license to surveil all mail ballots. The unprecedented scale of this data collection reflecting First Amendment activity is not "within the scope" of an "authorized law enforcement activity." *See* 5 U.S.C. § 552a(e)(7). Accordingly, the Proposed Rule's mandated data collection regarding voters receiving or sending mail ballots is prohibited by the Privacy Act.

---

[7] As described in the Notice of Proposed Rulemaking, "[u]niquely serialized IMbs facilitate the tracking of individual pieces of Ballot Mail to and from individual voters as the barcodes are scanned on the Postal Service's mail processing equipment." 91 Fed. Reg. at 32,916. Further "these barcodes provide visibility into ballot mail transmission based on scan data that is generated as the ballots move through the mail." *Id.*

## IV. The Proposed Rule Is Arbitrary and Capricious

An agency's action is arbitrary or capricious if it is "not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). Such action is likewise arbitrary and capricious if the agency fails to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Security v. Regents of the Univ. of Calif.*, 591 U.S. 1, 33 (2020).

The Proposed Rule should be withdrawn because it fails both of these tests. The Proposed Rule would arbitrarily interfere with State election administration, imposing an inflexible federal regulatory structure on State and local practices that are tailored to local conditions. It also fails to account for the significant reliance interests of States, which have structured their election systems around existing regulations. And the Proposed Rule is especially arbitrary as applied to the 2026 general election. The arbitrary and capricious impacts should preclude USPS from adopting the Proposed Rule. At an absolute minimum, USPS should delay the effective date until after the 2026 general election.

### A. The Proposed Rule Is Not Reasonable or Reasonably Explained

#### 1. The Proposed Rule arbitrarily imposes a "one size fits all" approach on the States and interferes with their election-administration duties

To start, the Proposed Rule would be arbitrary and capricious because it would impose a uniform, "one size fits all" federal regulatory approach on the States, which would interfere with their election administration duties without considering the wide diversity of approaches States and localities currently take to discharge those duties. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); *Ryan, LLC v. FTC*, 746 F. Supp. 3d 369, 388 (N.D. Tex. 2024) (finding rule "arbitrary and capricious because it is unreasonably overbroad without a reasonable explanation[, and] imposes a one-size-fits-all approach . . . which fails to establish a 'rational connection between the facts found and the choice made'" (quoting *State Farm*, 463 U.S. at 43)). As explained *supra* § III.B,, States have primary constitutional authority and responsibility for regulating federal elections, subject only to preemption by Congress. And state law sets the framework for those elections, including determining when, where, and how eligible voters may request, receive, and cast their mail ballots. But the Proposed Rule would impose a single set of nationwide requirements for mail-in and absentee participation, compliance procedures, and other election mail practices, all without adequate explanation or justification. This not only interferes with States' constitutional authority and existing state law and practice, it also arbitrarily disregards the tremendous variation in mail voting and other election administration practices of the States.

States have a wide range of different practices regarding how mail ballots are requested, provided to eligible voters, and returned by them.[8] The Proposed Rule would arbitrarily impose a nationwide criterion for mail-voter eligibility, based on the USPS mail-voter lists, without any reasoning or justification for that abrupt change. *See Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 83 (D.C. Cir. 2006) ("[W]here an agency has articulated no reasoned basis for its decision—where its action is founded on unsupported assertions or unstated inferences—[courts] will not abdicate the judicial duty carefully to review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence." (quotations omitted)).

Not only do States (pursuant to their constitutional authority and, depending on the state, consistent with state constitutional mandates[9]) have varying laws, rules, and practices for treatment of mail voting and their election mail, election administration practices vary considerably within their own borders. In many States, authority and responsibility for administering elections is divided and shared among offices and officials at the state, county, and municipal level—with different regional and local experiences leading to varying approaches and practices on mail voting, ballot and envelope design, and other election procedures.[10] This wide array of established election structures and practices has been informed by local experience throughout States of varying size, population, and character. It does not easily lend itself to a "one size fits all" approach of administrative regulation that would require rapid and uniform changes to the collection of distinct state, county, and local policies and practices. The Proposed Rule's reasoning is insufficient and flawed and it fails to account for these state reliance interests.

---

[8] *See, e.g.*, *California v. Trump*, Case No. 1:26-cv-11581-IT, Dkt. No. 100-1 (Lean Decl.) ¶¶ 20, 28, 37 (D. Mass. Apr. 23, 2026) ("In California, every active registered voter is mailed a ballot.") (Attachment 1); *id.*, Dkt. No. 100-2 (Tassinari Decl.) ¶¶ 12–14 (in Massachusetts, elections officials first send mail ballot applications to qualified registered voters upon request and then mail ballots beginning approximately 30 days before election) (Attachment 2); *id.*, Dkt. No 100-4 (Holmes Decl.) ¶ 46 ("Washington elections officials are required by state law to issue ballots to duly registered voters.") (Attachment 4); *id.*, Dkt. No. 100-7 (Rosenberg Decl.) ¶¶ 32–33, 41 (Connecticut elections officials issue mail ballots to duly registered voters who request an absentee ballot beginning 31 days before election) (Attachment 7).

[9] *E.g.*, Mich. Const. Art. II, s. 4(h) (affording each eligible Michigan voter the constitutional right to vote by mail).

[10] *See, e.g.*, Lean Decl. (Attachment 1) ¶¶ 4–6, 11, 21–22, 37, 41, 46–47, 58–59, 63 (California elections administered by state and local officials across 58 counties); Tassinari Decl. (Attachment 2) ¶¶ 4, 10, 16, 58, 81–83 (Massachusetts elections conducted by local officials in 351 municipalities); Holmes Decl. (Attachment 4) ¶¶ 4–7, 17–18, 32, 35, 39, 55–58 (Washington elections administered jointly between state and local officials, with ballot envelope design and other practices varying across 39 counties); Rosenberg Decl. (Attachment 7) ¶¶ 5–10, 21, 23–29, 41, 58, 67–69 (Connecticut elections administered primarily on local level, with ballot envelope design and other practices varying across 169 municipalities); *California v. Trump*, Case No. 1:26-cv-11581-IT, Dkt. No.100-14 (D. Mass. Apr. 23, 2026) (Linnell Decl.) ¶ 68 ("In Minnesota, as in much of the country, ballot envelopes vary by county.") (Attachment 14).

The Proposed Rule is also arbitrary because it fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The Proposed Rule does not articulate a satisfactory explanation of the fit between its purported basis and its requirements. According to the Proposed Rule, the creation of the "Mail-In and Absentee Participation Lists" and the use of an envelope barcode tracking system are necessary to "reduce the risk of fraud" and "protect the integrity of federal elections." Proposed Rule, 91 Fed. Reg. at 32915. The only citation offered in support of this rationale, however, is the EO itself. *Id.* But the EO does not present any evidence of fraud in the existing mail ballot system.[11] In contrast, studies of the issue have demonstrated that voter fraud and non-citizen voting are extremely rare. For example, a Brookings Institute study on mail voting found a minuscule percentage of fraud in a study of four elections, "about four cases of mail voting fraud out of every 10 million mail votes."[12] With respect to non-citizen voting, a study of 42 jurisdictions with high noncitizen populations found only 30 cases of suspected noncitizen voting in the 2016 Presidential Election across jurisdictions representing 23.5 million votes—a rate of 0.0001 percent.[13] And a 2024 Georgia audit of its voter rolls found only 20 noncitizens out of the state's 8.2 million voters, only 9 of whom had any record of casting a ballot.[14] It would be arbitrary and capricious for USPS to

---

[11] Nor does the Proposed Rule offer a factual or legal explanation of why, if these requirements are in fact necessary to protect election integrity, both primary elections and UOCAVA ballots are exempt from its scope. As discussed *supra* in Section II.A.3., the Proposed Rule would violate UOCAVA but for the Proposed Rule's carveout. Of course, the proposed carveout does not save the Proposed Rule due to its numerous legal flaws, as set out in this comment. And USPS has not admitted this conflict and instead "welcomes comments," 91 Fed. Reg. at 32,915, on exempting both UOCAVA and primary elections from the Proposed Rule.

[12] *See, e.g.*, Samara Angel, Jonathan Katz & Randi Wright, *Mail Voting in the US: Data Points to Very Low Fraud and Significant Benefits to Voters*, Brookings Inst. (Nov. 6, 2025), https://www.brookings.edu/articles/mail-voting-in-the-us-data-points-to-very-low-fraud-and-significant-benefits-to-voters/ (finding "an average total mail voting fraud percentage across the 2016, 2018, 2020, and 2022 general elections of only 0.000043%, or about four cases of mail voting fraud out of every 10 million mail votes"); Amy Gardner & Elise Viebeck, *Minuscule Number of Potentially Fraudulent Ballots in States with Universal Mail Voting Undercuts Trump Claims About Election Risks*, Wash. Post (June 8, 2020), https://www.washingtonpost.com/politics/minuscule-number-of-potentially-fraudulent-ballots-in-states-with-universal-mail-voting-undercuts-trump-claims-about-election-risks/2020/06/08/1e78aa26-a5c5-11ea-bb20-ebf0921f3bbd_story.html (analysis of data collected by three vote-by-mail states found that officials identified just 372 possible cases of double voting or voting on behalf of deceased people out of about 14.6 million votes cast by mail in the 2016 and 2018 general elections, or 0.0025 percent).

[13] Douglas Keith & Myrna Perez, *Noncitizen Voting: The Missing Millions*, BRENNAN CENTER (May 5, 2017), https://www.brennancenter.org/our-work/research-reports/noncitizen-voting-missing-millions.

[14] *Georgia citizenship audit finds few noncitizens on voter rolls*, AP (Oct. 23, 2024), https://apnews.com/article/georgia-noncitizens-voter-rolls-14532ef49b66f9cbf34ff483d2534280.

rely on a factual premise for which there is no persuasive evidence—that existing federal and state laws do not already protect federal elections against fraud or diminished integrity—to justify a massive new federal surveillance regime. *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992).

Further, the Proposed Rule also fails to justify or provide sufficient safeguards related to its Intelligent Mail barcode requirement. Under the requirements of the Proposed Rule, USPS and the federal government would be able to pinpoint ballots being sent to or received from specific voters. The Proposed Rule fails to explain how USPS would prevent abuse of this capability by federal officials, USPS employees, and others who may seek to target election mail to and from specific voters.

**2. The Proposed Rule arbitrarily gives the States insufficient time to make the changes being imposed**

Any rulemaking regarding ballot mail that takes effect before the November 2026 general election would be arbitrary and capricious. Other commenters have explained the significant difficulties that state and local election officials will face in implementing the change proposed in the Domestic Mail Manual.[15] As a result, making those changes effective just months before the general election—when many election officials have already printed ballot materials or are about to do so in reliance on existing regulations—would be a striking and improper intrusion on the constitutional authority of States to regulate the manner of holding elections. Like the Supreme Court and Congress, USPS should respect States' constitutional role by delaying implementation of any rule affecting election administration until after the 2026 general election.

The Supreme Court has repeatedly held that federal courts should not alter state election rules on the eve of an election. Under what is known as the *Purcell* principle, the Supreme Court has repeatedly reaffirmed "that federal courts ordinarily should not alter state election laws in the period close to an election." *Moore v. Harper*, 142 S. Ct. 1089 (2022) (Kavanaugh, J., concurring); *see also, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam); *Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (per curiam).

Congress has also recognized the importance of providing States sufficient time to implement federal changes affecting election administration. When Congress adopted the Help America Vote Act of 2002 (HAVA) in October 2002, none of its provisions altering state election administration took effect during the ongoing 2002 election cycle, and many of its provisions had effective dates in 2004 or later. Pub. L. 107-252, §§ 301(d), 302(d), 303(d), 706(d), 804(a), 116 Stat. 1666. When Congress adopted the National Voter Registration Act of 1993 (NVRA) in May 1993, it provided an effective date no earlier than January 1, 1995. Pub. L. 103-31, § 13, 107 Stat. 89. And when adopting the Uniformed and Overseas Citizens Absentee Voting Act in August 1986 (UOCAVA), Congress provided that "[t]he amendments and repeals made by this Act shall apply

[15] *See, e.g.*, Wash. Secretary of State, *Secretary of State Steve Hobbs' comments on USPS proposed ballot rule* (June 26, 2026), https://www.sos.wa.gov/about-office/news/2026/secretary-state-steve-hobbs-comments-usps-proposed-ballot-rule.

with respect to elections taking place after December 31, 1987." Pub. L. 99-410, § 204, 100 Stat. 930.

USPS should adhere to the same principles as the Supreme Court and Congress. Implementing the proposed changes to the Domestic Mail Manual close in time to the 2026 general election risks the same "disruption" and "unintended and unfair consequences for candidates, political parties, and voters" that underlie the Supreme Court's admonition against late federal judicial interventions in elections. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). For example, the Proposed Rule identifies situations in which mailings "will not be accepted and will be returned to the authorized ballot mailer." 91 Fed. Reg. at 32, 918 (Proposed Rule § 24.5.3(a), (b)). Particularly in the period shortly following initial adoption, there is a risk of inadvertent administrative errors by USPS, local election officials, and ballot material vendors. Such inadvertent errors would lead to voters either not receiving ballots or receiving them late, and, absent a delay in the effective date, this would occur in the midst of a high-profile federal general election.

The Proposed Rule presents grave constitutional and practical problems associated with altering rules for ballot mail close in time to an election. Adoption of this Proposed Rule with an effective date before the November 2026 general election would be arbitrary and capricious.

### B. The Proposed Rule Ignores Considerable Reliance Interests

When changing course, agencies must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). Here, in the context of States' longstanding reliance on USPS to facilitate their mail-voting programs, there is much to consider. Yet USPS has entirely failed to identify, much less address, any of the States' "legitimate reliance" interests, rendering the Proposed Rule arbitrary and capricious for this reason, as well.

First, as described *supra* § IV.A.1, the Proposed Rule would set a "one size fits all" federal policy, displacing a broad range of established state and local practices driven by the needs of different localities and grounded in reliance on USPS's dependable transmission of mail and absentee ballots. The Proposed Rule entirely ignores the impact of a uniform policy on these varied practices and is arbitrary and capricious for that reason alone. *See, e.g.*, *Regents of the Univ. of Cal.*, 591 U.S. at 30-31; *Cook County, Illinois v. Wolf*, 962 F.3d 208, 233 (7th Cir. 2020) (agency failed to consider "reliance interests of state and local governments"); *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1114 (D.C. Cir. 2019) (agency failed to consider how regulated entities had "crafted business models and invested significant resources").

Second, the Proposed Rule would vitiate the preparations that elections officials across the country have already made to plan and implement their mail-voting programs for this election cycle. In so doing, the Proposed Rule conflicts with USPS's longstanding recognition that clarity and early preparation are essential to reliable transmission of mail and absentee ballots. *See*, *e.g.*, USPS, *2026-2027 Official Election Mail Guide Kit 600* at 27 (explaining regulations were updated to clarify the meaning and scope of postmarks). Each federal election year, USPS conducts year-

round preparations for election mail—including internal and external trainings, outreach to election officials, and process testing—and publishes an "Official Election Mail Guide," known as "Kit 600." *See id*. The most recent version, published in February 2026, makes no mention of any of the Proposed Rule's new requirements. Introducing sweeping and novel changes at this point in an election year undermines the reliance that USPS's guidance was designed to cultivate.

In particular, the list provisions of the Proposed Rule would impose substantial financial and administrative burdens on States that have long organized their election systems around existing mail ballot procedures. States and their localities would be required to provide training and guidance to elections officials, work through USPS's upload, supplementation, and modification processes, evaluate and investigate discrepancies between the Mail-In and Absentee Participation List and the information the State had submitted, and mount public education campaigns to inform voters about the new list.[16] This would all need to be done while States continue to administer the many other aspects of their elections, under a compressed timeframe that leaves no room for the kind of changes the Proposed Rule would require. Having reasonably relied on current procedures in structuring their budgets, staffing, and election timelines, States would be forced to absorb new costs those plans never contemplated.

All this would have to be done while addressing the ballot envelope requirements of the Proposed Rule, which also disrupts States' reliance interests. Intelligent Mail barcodes and USPS design review have never been required for mail ballot envelopes. As a result, many States and localities do not currently use Intelligent Mail barcodes,[17] and some do not submit ballot envelopes

---

[16] For example, in California an analogous statewide public education campaign regarding mail balloting cost more than $15 million. *See* Lean Decl. (Attachment 1) ¶¶ 50-51.

[17] *See* Lean Decl. (Attachment 1) ¶ 63 (Three counties in California do not currently use Intelligent Mail barcodes for outbound and inbound tracking); Tassinari Decl. (Attachment 2) ¶ 82 (Massachusetts and its municipalities do not use Intelligent Mail barcodes on outbound election mail); Rosenberg Decl. (Attachment 7) ¶¶ 67–68 ("Connecticut municipalities do not currently use Intelligent Mail barcodes on ballot mail. They do, however, utilize other safeguards to ensure the accuracy of absentee ballots. For example, each municipality creates a unique label with a barcode for the absentee ballot envelope (which also has a serial number printed on it)."); Linnell Decl. (Attachment 14) ¶ 66 ("Intelligent Mail barcodes are not required nor to my knowledge used by most Minnesota counties and municipalities . . . ."); *California v. Trump*, Case No. 1:26-cv-11581-IT, Dkt. No. 100-6 (D. Mass. Apr. 23, 2026) (Rudy Decl.) ¶ 70 ("About 23% of Colorado counties do not currently use Intelligent Mail barcodes on ballot mail") (Attachment 6); *id.*, Dkt. No. 100-8 (Albence Decl.) ¶ 76 (Delaware's Department of Elections does not currently use piece-level Intelligent Mail barcodes on mail ballot envelopes) (Attachment 8); *id.*, Dkt. No. 100-10 (Flynn Decl.) ¶ 68 ("Maine does not currently use Intelligent Mail barcodes on ballot mail") (Attachment 10); *id.*, Dkt. No. 100-11 (Berry Decl.) ¶ 102 (Maryland primarily uses Intelligent Mail barcodes, but the barcodes cannot be, and are not, used for web delivery ballots because those are returned in voter–provided materials) (Attachment 11); *id.*, Dkt. No. 100-17 (Stavisky Decl.) ¶ 65 (many local boards of elections in New York State do not currently use Intelligent Mail barcodes on ballot mail) (Attachment 17); *id.*, Dkt. No. 100-19 (Dawon Decl.) ¶¶ 77–78 (some Oregon counties apply an Intelligent Mail barcode to outgoing ballots, but not necessarily to the return envelope and counties that do not use vendors do not currently have a way

for what is presently an optional USPS design review.[18] The Proposed Rule would force many jurisdictions to build new procedures from scratch and implement them unduly quickly.

The burden is particularly acute in the States and localities that have already ordered mail ballot envelopes for the 2026 general election.[19] Many of these orders were placed in reliance on the most recent version of Kit 600, which recommends Intelligent Mail barcodes and its design review process but does not require them. *See* USPS, *2026-2027 Official Election Mail Guide Kit 600* at 4–5. States understandably relied on this "Official Election Mail Guide" when designing and printing mail ballot envelopes, but the Proposed Rule would render many of those materials unusable. Redesigning envelopes, adding barcodes, and navigating the USPS approval process would impose significant additional costs for many jurisdictions. *See California v. Trump*, No. 1:26-cv-11581-IT, Dkt. No. 105 (Plaintiff States' Statement of Undisputed Material Facts) at ¶ 63 (D. Mass. Apr. 23, 2026) (Attachment 27).[20] Any delays in obtaining barcodes or design approval

---

to apply barcodes) (Attachment 19); *id.*, Dkt. No. 100-20 (Marks Decl.) ¶ 66 ("More than two dozen Pennsylvania counties, many of them small, rural counties, fulfill ballot requests in-house and do not currently use Intelligent Mail barcodes on ballot mail.") (Attachment 20); *id.*, Dkt. No. 100-21 (Rock Decl.) ¶¶ 72–73 (Rhode Island uses Intelligent Mail barcodes on envelopes sending ballots to voters, not on provided return envelopes) (Attachment 21); *id.*, Dkt. No. 100-23 (Koski Decl.) ¶¶ 66; *id.*, Dkt. No. 100-24 (Michalowski Decl.) ¶ 69–70 (Attachment 24).

[18] *See* Rosenberg Decl. (Attachment 7) ¶ 68, ("No Connecticut municipality currently submits ballot envelopes to USPS for design review."); Linnell Decl. (Attachment 14) ¶ 67, ("Minnesota counties and municipalities are not currently required to submit ballot envelopes to USPS for design review.").

[19] *See* Tassinari Decl. (Attachment 2) ¶ 81 (Massachusetts already has ordered such envelopes at a cost of approximately $3 million); Holmes Decl. (Attachment 4) ¶ 55 ("Many counties in Washington have already ordered mail ballot envelopes for the 2026 federal election cycle"); Rudy Decl. (Attachment 6) ¶ 69 (most Colorado counties have already purchased mail ballot envelopes); Albence Decl. (Attachment 8) ¶ 75 ("Delaware's Department of Elections already possesses mail ballot envelopes for the 2026 federal election cycle."); Flynn Decl. (Attachment 10) ¶ 67 ("Maine has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of $52,040.63."); Linnell Decl. (Attachment 14) ¶ 65 ("Most local elections offices in Minnesota have already ordered absentee and mail ballot envelopes for the 2026 federal election cycle[.]"); Stavisky Decl. (Attachment 17) ¶ 64 ("Upon information and belief, most New York jurisdictions have already ordered mail ballot envelopes for 2026."); Dawson Decl. (Attachment 19) ¶ 76 ("Most Oregon counties have already ordered mail ballot envelopes for the 2026 federal election cycle."); Rock Decl. (Attachment 21) ¶ 71 ("Rhode Island has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of over $50,000."); Michalowski Decl. (Attachment 24) ¶ 67 ("The Cook County Clerk has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of approximately $300,000."); *California v. Trump*, Case No. 1:26-cv-11581-IT, Dkt. No. 100-12 (D. Mass. Apr. 23, 2026) (Brater Decl.) ¶ 76 ("It is too late for these local clerks to order additional envelopes for the August primary, and likely too late for them to order additional ones for the November election.") (Attachment 12).

[20] *See* Tassinari Decl. (Attachment 2) ¶ 82 (requiring small Massachusetts municipalities "to purchase equipment capable of applying an Intelligent Mail barcode would likely deplete their municipal budgets"); Holmes Decl. (Attachment 4) ¶¶ 55, 58 (requiring counties that have already

could disrupt vote-by-mail systems, *see id.* ¶ 64, with the most serious delays threatening States' ability to accept mail-in ballots at all, *see id.* ¶ 65. These harms flow directly from reliance on procedures that have governed election administration for years and that USPS itself reinforced as recently as a few months ago, and the Proposed Rule fails to address them at all.

The scale of the reliance interests and their relation to the right to vote leaves no doubt as to their significance. Each Signatory State allows some or all of their registered voters to receive and return ballots by mail, and in the 2024 general election many millions of voters did so. *See id.* ¶¶ 40, 41. In many States, all or almost all voters vote by mail or absentee ballot. For example, 100% of Oregon voters, 92% of Colorado voters, and 80% of California voters relied on mail or absentee ballots in the 2024 general election. *Id.* ¶ 42. The proposed Mail-In and Absentee Participation List and ballot envelope requirements will therefore functionally prevent a significant portion of the electorate from casting their votes by mail.

Against this backdrop, USPS's failure to acknowledge or assess States' reliance interests is a fundamental failure of reasoned decision-making. The Proposed Rule is therefore arbitrary and capricious.

## V. The Proposed Rule Fails to Observe USPS Rulemaking Procedure Required by Law

The Postal Reorganization Act of 1970 provides that USPS must seek an advisory opinion from the PRC whenever "a change in the nature of postal services [] will generally affect service on a nationwide or substantially nationwide basis[.]" 39 U.S.C. 3661(b). USPS must "submit a proposal, within a reasonable time prior to the effective date of such proposal[.]" *Id.* The PRC may not issue that opinion until an on-the-record hearing under sections 556 and 557 of Title 5 of the U.S. Code has been afforded to USPS, mail users, and a PRC officer representing the general public. 39 U.S.C. § 3661(c). This open and deliberative process is consistent with Congress's broader project of "reduc[ing] political influences on [USPS's] operations." *Flamingo Indus.*, 540 U.S. at 740; *see also Mail Ord. Ass'n of Am. v. USPS,* 986 F.2d 509, 519 (D.C. Cir. 1993) (citation modified) (summarizing Congress's efforts to ensure USPS has "independence from political

---

ordered ballot envelopes to order replacements "would significantly increase costs to [Washington], which reimburses counties for a pro rata share of election expenses associated with state and federal elections"); Albence Decl. (Attachment 8) ¶¶ 75, 77 (requiring Intelligent Mail barcodes would require Delaware's Department of Elections to adjust the software that the Department currently uses to track absentee ballots and purchase new envelopes, but the Department does not have funds budgeted); Flynn Decl. (Attachment 10) ¶ 68 (using Intelligent Mail barcodes would require additional expenditures for software integrated with the Maine's central voter registration application software and database); Linnell Decl. (Attachment 14) ¶¶ 65, 68 (reprinting Minnesota's envelopes would come at substantial cost and divert critical time and money from other elections administration duties); Stavisky Decl. (Attachment 17) ¶ 66 (delays from ballot design review would force New York state and local election officials to divert critical time and money from other elections administration duties); Rock Decl. (Attachment 21) ¶ 73 (adding Intelligent Mail barcodes on the state-provided return envelopes in which voters submit their mail ballots would cost Rhode Island tens of thousands of dollars that were not budgeted).

pressures" and "seal off [USPS] from partisan political influence"); H.R. Rep. No. 91-1104, at 1 (1970) (Conf. Rep.), as reprinted in 1970 U.S.C.C.A.N. 3649, 3650.

Here, USPS has not sought an advisory opinion, nor can it request an advisory opinion "within a reasonable time" before the proposed effective date, *id.* § 3661(b), and the EO's self-imposed 120-day implementation deadline—July 29, 2026—cannot truncate a statutory prerequisite. EO § 3(d); *see California,* 2026 WL 1826490, at *16 (finding "the EO's directive that USPS require all States to use a specific mail-in ballot is inconsistent with USPS rulemaking procedure"). That USPS has structured this rulemaking such that section 3661 compliance is impossible before the intended effective date compounds the violation rather than excuses it. *See* 39 C.F.R. § Pt. 3020, App. A (pro forma PRC procedural schedule indicates 90 days to issue advisory opinion after process initiated); *see also* 39 C.F.R. § 3020.111(a), (d) (requiring that USPS hold a pre-filing conference before requesting an advisory opinion and provide at least 10 days' notice before the conference).

The Proposed Rule is a paradigmatic section 3661(b) change. A proposed policy or rule change triggers section 3661(b) review when it: (i) will have a meaningful, quantitative impact on service; (ii) will qualitatively change the nature of postal services; and (iii) is nationwide or substantially nationwide. *See Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 884–886 (E.D. Pa. 2020) (citing *Buchanan v. USPS*, 508 F.2d 259, 262–263 (5th Cir. 1975)).

As detailed in the States' litigation,[21] the Proposed Rule satisfies all three elements. As to quantitative impact, lawful ballot mailings will be delayed or returned outright due to conflicts between the Proposed Rule and state election laws, reducing the availability of mail service for ballot mail—an impact compounded by tight statutory deadlines under which States must transmit ballots and voters must return them. *Cf. Pennsylvania*, 490 F. Supp. 3d at 885 (finding "sharp decrease[] in mail service across the country" showed a quantitative impact); *New York v. Biden*, 636 F. Supp. 3d 1, 21–22 (D.D.C. 2022) (finding impacts on transportation schedule, decline in on-time delivery rates, and removal of high-speed sorting machines constituted meaningful, quantitative impact on service).

The Proposed Rule will likewise have a qualitative impact by instituting a new enrollment and verification regime and dramatically departing from existing postal services, which have long served as the foundation of States' mail ballot programs and on which voters have long relied. *See Pennsylvania*, 490 F. Supp. 3d at 885–886 (finding the plaintiffs' evidence that "individual postal customers . . . experience[d] an alteration in the availability of postal services as a result of the changes" showed a qualitative change in postal services). Moreover, election officials fear prosecution for any errors in administering the Proposed Rule. *See* EO, § 2(b).

Finally, any new acceptance conditions for all federal ballot mail are plainly a nationwide change—no geographical area is exempt from the Proposed Rule's reach. USPS's failure to submit a proposal to the PRC therefore violates section 3661(b). *See Pennsylvania*, 490 F. Supp. 3d at

[21] *See* Plaintiff States' Statement of Undisputed Material Facts (Attachment 27) ¶¶ 31–37, 40, 43–46, 52, 58–62, 64.

885–886; *New York*, 636 F. Supp. 3d at 21–22; *Washington v. Trump*, 487 F. Supp. 3d 976, 985 (E.D. Wash. 2020).

## VI. Conclusion

For those reasons, USPS should withdraw the Proposed Rule. The Proposed Rule is unlawful and would be an unprecedented and unacceptable interference with States' control over their elections.

Sincerely,

ROB BONTA
California Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

AAROND D. FORD
Nevada Attorney General

NICK BROWN
Washington Attorney General

KRIS MAYES
Arizona Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia Attorney General

ANNE E. LOPEZ
Hawai'i Attorney General

KWAME RAOUL
Illinois Attorney General

AARON M. FREY
Maine Attorney General

AARON BROWN
Maryland Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

JENNIFER DAVENPORT
New Jersey Attorney General

RAÚL TORREZ
New Mexico Attorney General

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

DAN RAYFIELD
Oregon Attorney General

PETER NERONHA
Rhode Island Attorney General

CHARITY R. CLARK
Vermont Attorney General

JAY JONES
Virginia Attorney General

JOSHUA L. KAUL
Wisconsin Attorney General