**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. _______________ |

**DECLARATION OF MARC BRUNTON**

I, MARC BRUNTON, declare as follows:

1. I am a resident of North Carolina. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I serve as Assistant Deputy Attorney General in the North Carolina Department of Justice. I have held this role since February 2025 and have worked at the Department since October 2023. During this time, I have advised members of the Department on various matters concerning state and federal election law. I have a law degree from Stanford Law School and a Bachelor of Arts in Public Policy and English from the University of North Carolina at Chapel Hill.

3. The State of North Carolina and its 100 counties, through their county boards of elections, are responsible for administering elections in North Carolina. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered

voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

4. The State of North Carolina, including its 100 county boards of elections, are currently preparing to administer the November 2026 general election. Federal, state, and local races will be on the ballot.

5. North Carolina provides a mail ballot to qualified voters whose request is received at least 14 days before an election. N.C. Gen. Stat. § 163-230.1(a).[1] North Carolina sends these ballots to voters through the United States Postal Service ("USPS").

6. In North Carolina, ballots are mailed by each of the 100 county boards of elections. N.C. Gen. Stat. §§ 163-230.1(c)(3); -236. State law provides that county boards of elections must begin mailing ballots to requesting eligible voters 60 days before the election, or on September 4, 2026. N.C. Gen. Stat. § 163-227.10(a).

7. County boards of elections continue to send mail ballots as additional eligible voters request a ballot, for any request received by 5 p.m. on October 20, 2026, which is 14 days before the election. N.C. Gen. Stat. § 163-230.1(a). In 2024, North Carolina county boards of elections received up to 10,000 ballot requests per day immediately preceding 14 days before the election (through the 2024 election, North Carolina law set the mail ballot request deadline as 7 days before the election).

8. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026. My office

[1] North Carolina has separate laws applicable to mail ballots for qualified military and overseas voters. *See* N.C. Gen. Stat. §§ 163-258.1, *et seq.* The discussion in this declaration will be limited to qualified civilian voters with mailing addresses within the United States. North Carolina also has procedures for allowing visually impaired voters to electronically receive and vote an accessible absentee ballot that are not addressed in this declaration.

joined a multi-state comment submitted by state attorneys general on the Proposed Rule expressing opposition and identifying specific concerns. A true and correct copy of that comment letter is attached to this declaration as **Exhibit A**.

9. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026, and implements the proposed rulemaking described above. That Rule will imminently cause significant harm, confusion, and disruption in North Carolina election administration.

10. For the reasons discussed throughout this declaration, North Carolina must act now to align its administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. North Carolina will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant burdens on doing so.

11. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters

under state law. And *before* elections officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In North Carolina, we would have to provide that information by September 4, 2026, and we would thereafter have to update the information on a near-daily basis to include eligible voters who requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

12. These requirements threaten to disenfranchise voters in North Carolina.

13. I have concerns about the feasibility of USPS implementing this system in a timely and accurate fashion in the limited time remaining before the November 2026 general election. Technological or implementation failure may lead to the inability of North Carolina to deliver mail ballots to voters and conduct the election in accordance with state and federal law.

14. Based on the number of mail ballot requests submitted for the 2022 general election, North Carolina anticipates mailing ballots starting September 4, 2026, to approximately 260,000 eligible voters during the 2026 general election.

15. Even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all these approximately 260,000 requesting voters with USPS will be a

massive undertaking. This task will be significantly complicated by the influx of new registrations and registration updates that elections officials typically receive as the general election voter registration deadline approaches, which this year will be October 9, 2026, as well as the need for county boards of elections to also prepare for the start of in-person early voting on October 15, 2026.

16. Before elections officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[2] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll these voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these mailings within their own systems, but they will bear the added burden of processing mailings in an entirely new system operated by USPS—about which officials currently have no concrete operational information. If the system fails, North Carolina may be unable to mail ballots to voters at all.

17. Access to mail-in voting is especially important for rural and vulnerable populations, including voters with disabilities, who may lack access to transportation to either vote in-person or to receive and return their ballot through some other means. The ability to vote

---

[2] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

by mail for the 2024 general election was particularly important for the many residents of western North Carolina affected by Hurricane Helene, including those who were temporarily dislocated from their legal voting residence. *See* N.C. Sess. Law 2024-51, sec. 9.1.(a)(6)-(9) (expanding availability to, and ability to return, absentee ballots for residents of counties affected by Hurricane Helene as part of the Disaster Recovery Act of 2024). Hurricane Helene hit North Carolina on September 26-27, 2024, which was barely one month before the November 5, 2024, general election.

18. I am particularly concerned that USPS has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, *see id.*, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

19. The risks of error are heightened here because while the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like or how it will operate. Although USPS states that it will "shortly after the effective date of the final rule" publish "guidance documents" for the Portal, such as a "User Guide" and "Technical Specifications" document, 39 CFR Part 111, Supplementary Information at 55, even

a "short" delay would mean North Carolina will not have such information in time to meet the September 4, 2026, date that state law mandates county boards of election begin mailing our ballots. N.C. Gen. Stat. § 163-227.10(a). In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. Nor does USPS even indicate when the Ballot Portal will become accessible for authorized users, including whether it will be available by North Carolina's September 4 statutory ballot mailing start date.

20. Despite USPS's claims that the changes imposed by the Rule are modest, the Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. And each of the process changes creates delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement.

21. It is far too late in the election cycle to introduce such dramatic changes. USPS itself states it is "logistically beneficial" if a State begins the process of enrolling election workers in the Portal 90 days before a federal election. *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or North Carolina county boards of election to prepare for such a dramatic change in election mailing.

22. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50

states in a condensed timeframe. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

23. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by mail ballot under state law. Indeed, while the Rule requires Postal Service employees to perform a "verification" of each envelope with a ballot to be sent to eligible North Carolina voters, USPS simply previews that these employees who will be gatekeepers on whether ballots will be delivered "will receive training on this process" at some unspecified time in the future, with no indication it will be before North Carolina's September 4 statutory ballot mailing start date. 39 CFR Part 111, Supplementary Information at 57.

24. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible North Carolinians as possible can exercise their right to vote. In the 2024 presidential election, 295,602 valid votes were cast by mail by North Carolina voters, which represents nearly 5.19% of all valid North Carolina votes cast for president.

25. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible

voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

26. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion may be that fewer eligible voters decide to cast a ballot.

27. The harms that stem from the Rule are particularly acute because the requirements take effect while county boards of elections are busy taking other steps to prepare for the 2026 general election.

28. As noted earlier, North Carolina county boards of elections must begin mailing ballots to requesting eligible voters on September 4, 2026. N.C. Gen. Stat. § 163-227.10(a). County boards of elections will continue mailing ballots for any request received by 5 p.m. on October 20, 2026, consistent with state law.

29. Additionally, county boards of elections will need to continue to register those who are eligible to vote. North Carolina allows qualified individuals to register up to 25 days before Election Day and in person during early voting. N.C. Gen. Stat §§ 163-82.6(d), -82.6B; 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). During the weeks and months leading up to an election, a high volume of voters register or update their registration, resulting in flux in voter rolls and requiring time from elections officials.

30. In compliance with the NVRA "quiet period" for voter registration, North Carolina does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. § 20507(a)(3)(A)-(B), (a)(4)(A), (c)(2)(A). North Carolina does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

31. In sum, county boards of elections must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

32. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." 39 CFR Part 111, Supplementary Information at 57. USPS estimates that such scanning alone could take "a few hours for larger mailings" and that election staff will have to "remain at the . . . postal retail location during the verification process." *Id*. This could force county boards of elections in North Carolina's largest counties, two of which mailed more than 30,000 ballots in the 2022 general election, to have their staff unproductively wasting their time waiting at the post office. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Raleigh, North Carolina.

/s/ Marc Brunton
Marc Brunton
Assistant Deputy Attorney General
North Carolina Department of Justice

# Exhibit A

ROB BONTA
California
Attorney General

ANDREA JOY CAMPBELL
Massachusetts
Attorney General

AARON D. FORD
Nevada
Attorney General

NICK BROWN
Washington
Attorney General

July 2, 2026

**Via Electronic Mail**

Director, Product Classification
U.S. Postal Service
475 L'Enfant Plaza SW, Room 4446
Washington, DC 20260–5015
*PCFederalRegister@usps.gov*

**Re: Ballot Mail**
**Federal Register Document No. 2026–10976**

Dear Director:

We, the Attorneys General for California, Massachusetts, Nevada, Washington, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, and Wisconsin, write in opposition to the United States Postal Service's proposed rule Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (proposed June 2, 2026) (to be codified at 39 C.F.R. pt. 111) (Proposed Rule).

The Notice of Proposed Rulemaking should be promptly withdrawn in light of the district court's well-reasoned ruling in *California v. Trump*, Case No. 1:26-cv-11581-IT, 2026 WL 1826490 (D. Mass. June 25, 2026), that the Executive Order mandating the rule was unconstitutional and ultra vires. The Court entered summary judgment in favor of the Plaintiff States and enjoined the United States Postal Service (USPS) from (1) implementing or giving effect to section 3 of Executive Order 14399; and (2) completing rulemaking to promulgate the regulations as outlined in section 3 of that Executive Order, while confining the scope of the injunction to Plaintiff States' elections up to and including November 3, 2026.

The Proposed Rule also presents a striking disregard of federal law. The Proposed Rule is inconsistent with the Constitution's assignment of authority over the manner of elections to States

and Congress. Neither USPS nor the President may unilaterally interfere with States' election regulations or commandeer States in service of a federal data collection program. The Proposed Rule would also violate USPS's governing statutes, exercising authority USPS does not have and imposing restrictions not authorized by Congress. The Proposed Rule would further run afoul of the federal voting laws, including the Help America Vote Act and Voting Rights Act Amendments of 1970, as well as the Privacy Act.

In addition, the Proposed Rule is unlawfully arbitrary and capricious. Its "one size fits all" approach fails to account for the fact that State voting systems are tailored to local circumstances. The Proposed Rule's requirements are also not rationally connected to the purported basis. The purported basis for the rule is reducing the risk of fraud, which robust evidence has shown to be a vanishingly rare phenomenon. There is no reasonable fit between the exceedingly narrow basis and the proposal to indiscriminately reject ballot mail that does not satisfy the Proposed Rule's requirements. The Proposed Rule also does not identify safeguards protecting voters from misuse of the capabilities created by the Intelligent Mail barcode requirement.

And the Proposed Rule is also arbitrary in failing to recognize the substantial reliance interests at stake. States have constructed entire election systems based on existing regulations, and they have even ordered supplies for the 2026 election cycle—including ballot envelopes—based on existing requirements. The Proposed Rule would abruptly upend all the preparation of the States' election officials on July 29, 2026, while those election officials are busy with primary elections and planning for the general election on November 3, 2026.

For each of these reasons, USPS should withdraw the Proposed Rule.

## I. Background

On March 31, 2026, President Trump issued Executive Order 14,399, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (EO). 91 Fed. Reg. 17,125 (Mar. 31, 2026). In Section 3 of the EO, the President ordered USPS, through the Postmaster General, to act within 60 days to "initiate a proposed rulemaking" that requires (1) ballot mail to carry unique Intelligent Mail barcodes and meet other formatting requirements, and (2) creation of a new system under which voters must be enrolled in a USPS "Mail-In and Absentee Participation List" based on submissions by States. EO § 3(a), (b). The EO further directed that "[a]ny final rule pursuant to [Section 3] shall be issued no later than 120 days from the date of this order." EO § 3(d).

USPS is working to implement the EO by issuing the Proposed Rule as ordered. USPS proposes additions to its Domestic Mail Manual (DMM) to enact two substantive changes to the rules governing delivery of election mail in this country. Specifically, proposed changes to DMM 705.24.3.1–3 set specific requirements for the design of envelopes for outbound federal ballot mail (States mailing voters a mail-in ballot) and return federal ballot mail (voters mailing their ballots to States to cast a vote). Proposed DMM 705.24.4.2 then requires that States intending to receive voters' completed ballots through USPS must ensure that all voters who will be sent a mail ballot are enrolled with USPS's Mail-In and Absentee Participation List. For each voter, States must provide USPS the voter's name, address, and unique Intelligent Mail barcodes for their outbound and return ballot envelopes. *Id*. Under proposed DMM 705.24.5.1–3, ballot mailings that either do

not comply with specified envelope design requirements or are intended for individuals not enrolled in USPS's state-specific Mail-In and Absentee Participation Lists will not be accepted by USPS and will not be delivered to voters.

On June 25, 2026, the District of Massachusetts granted summary judgment to twenty-four Plaintiff States that challenged the EO, many of whom are signatories to this letter. First, and significant to this comment letter, the Court declared unconstitutional the directive in Section 3 of the EO requiring "USPS to compile its own Lists of individuals eligible to vote by mail and prohibit[] the transmission of a mail-in ballot completed by anyone not on USPS' Lists." *California*, 2026 WL 1826490, at *15. In reaching this conclusion, the Court specifically cited provisions of the Proposed Rule providing that mail ballots "that do not comply with [standards required by the EO] will not be accepted and will be returned to the authorized ballot mailer." *Id.* Second, the Court held that "no law enacted by Congress delegates authority to control mail-in voting to USPS" and that "USPS [thus] lacks statutory authorization to promulgate any binding regulations on mail-in voting." *Id.* Third, the Court held that, to make the changes contemplated by the EO, USPS was required to "submit a proposal to the Postal Regulatory Commission[,]" and that failure to follow USPS rulemaking procedure deprives USPS of legal authority to "require . . . States to use a specific mail-in ballot." *Id.* at *16. The Court declared Section 3 of the EO legally void as it is ultra vires and unconstitutionally violates the separation of powers. *Id.* at *17. The Court also enjoined Defendants, including USPS, from (1) implementing or giving effect to the section 3 of Executive Order 14399, and (2) completing rulemaking to promulgate the regulations as outlined in section 3 of that Executive Order, within the twenty-four Plaintiff States. *Id.*

## II. USPS Should Withdraw the Proposed Rule and Reconsider in Light of *California v. Trump*

The Court's order in *California v. Trump* enjoins Defendants—including USPS—and their employees "from implementing, giving effect to, or enforcing Section 3(b)(i)–(v) or (d) of the EO as to elections mail for elections administered by Plaintiff States and ballot envelopes used by Plaintiff States with respect to the November 3, 2026 or any earlier federal election[.]" The Court further enjoined all Defendants—including USPS—and their employees from "initiating or completing rulemaking to promulgate the specific regulations outlined in Section 3(b)(i)–(v) or (d) of the EO as to elections mail for elections administered by Plaintiff States and ballot envelopes used by Plaintiff States for the November 3, 2026 election, or any earlier election." *Id.* at *17.[1]

USPS should promptly withdraw the Proposed Rule in light of the Court's ruling. Because the Proposed Rule is unlawful, USPS should not reissue it at all; however, at a minimum any

[1] In addition, the U.S. District Court for the District of Columbia has declared that the standards and procedures set forth in the Proposed Rule would violate a settlement agreement between the parties in *National Association for the Advancement of Colored People v. United States Postal Service*, and has thus enjoined USPS from implementing the standards and procedures described in the Proposed Rule. *See NAACP v. USPS*, No. 20-cv-2295-EGS, Dkt. Nos. 181, 182 (D.D.C. July 1, 2026). Promulgating the Proposed Rule would violate that settlement agreement and the court's injunction.

alternative rule should scrupulously ensure that Plaintiff States in the *California* litigation are not affected by the Proposed Rule for the November 3, 2026, election, or any earlier election.

## III. The Proposed Rule Is Contrary to Law

Under the Constitution, States are primarily responsible for regulating the manner of holding elections, subject only to alteration by Congress; neither the President nor USPS have constitutional authority to displace State law. Yet that is precisely what the Proposed Rule would do. It does not propose general rules for the use of mail; it proposes to regulate election materials and only election materials. It asserts federal authority to refuse to deliver State ballots for noncompliance with USPS election mail regulations. And it would conscript States' resources to create a federal list of voters who vote by mail. Neither the President through his EO nor USPS through rulemaking may usurp the constitutional authority of States and Congress in this manner.

### A. The Proposed Rule Violates the Constitution

First and foremost, the regulations outlined in the Proposed Rule are contrary to the Constitution. USPS proposes fundamentally altering and restricting access to postal delivery of mail ballots. But that reaches far beyond the authority conferred on the Executive Branch and USPS and strikes directly at the constitutionally protected right of States to administer elections, including through the provision of mail ballots in accordance with duly enacted state laws. These proposed regulations, which implement the President's unlawful attempt to dictate specific requirements concerning mail balloting in federal elections, are unconstitutional.

The Proposed Rule commandeers the States into enacting an unconstitutional federal data collection program by requiring them to provide USPS with the name, address, and unique Intelligent Mail barcode (IMb) for each voter in order to access constitutionally created postal services. USPS will not accept or deliver ballot mailings that do not conform to the new format requirements or that are addressed to recipients not enrolled in USPS's state-specific Mail-In and Absentee Participation Lists. Thus, USPS seeks to dictate who may participate in the States' mail ballot systems, as set out by state laws, by refusing States' mail access unless they enact (with their own resources) a presidentially ordered federal program. Any claims from USPS that it is not in any way interfering with the States' "administration of federal elections" ring hollow.

#### 1. The President lacks authority to issue the order that mandated this rulemaking

The Proposed Rule explicitly acknowledges that it was submitted to effectuate the EO. That EO mandates exactly what is now proposed in this rulemaking—namely, that USPS promulgate specific requirements for the design of ballot mail envelopes, as well as rules that require States to submit identifying information for mail voters to USPS, and for USPS to then compile such information into state-specific lists that dictate which voters may be delivered ballot mail. *See* EO § 3(b).

As a constitutional matter, the President has no power to order this rulemaking. States, not the President, have primary authority to regulate federal elections under the U.S. Constitution. *See*

U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2, 4. The Supreme Court recently reaffirmed that "the Constitution lodges power over congressional elections in state legislatures 'primarily' and in Congress 'ultimately.'" *Watson v. Republican Nat'l Comm.*, 609 U.S. ---, 2026 WL 1855462, at *3 (June 29, 2026) (quoting The Federalist No. 59, p. 362 (C. Rossiter ed. 1961)). This constitutional grant of power authorizes States to "provide a complete code for [federal] elections, not only as to times and places, but in relation to notices, registration . . . [and] protection of voters," among other topics. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). States "enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Id*. In short, they are "given, and in fact exercise a wide discretion" in providing for fair and efficient elections. *United States v. Classic*, 313 U.S. 299, 311 (1941). The Elections Clause further grants Congress the power to "make or alter" regulations of congressional elections. U.S. Const. art. I, § 4, cl. 1. In this way, the Clause "functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (*ITCA*) (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)). Here, States have set out detailed election procedures allowing for the use of mail balloting, which Congress has not preempted.

The President, by contrast, has no independent authority over elections. The President's role in election legislation is confined to recommending measures to Congress, U.S. Const., art. II, § 3, and signing or vetoing bills, *id.*, art. I, § 7.[2] Nothing in the Constitution or any federal statute authorizes the federal executive to dictate the type of regulations at issue in this proposed rulemaking. *Georgia v. Meadows*, 88 F.4th 1331, 1346–1347 (11th Cir. 2023) (rejecting position that the federal executive can "interfere[] with state election procedures based solely on the federal executive's own initiative"); *see League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025) (observing that executive power over federal elections "does not appear to have crossed the Framers' minds"). The President thus cannot mandate that States conform to any particular mail ballot envelope design and review process. Nor can he conscript States' resources to participate in a program of compiling lists of mail voters, or mandate regulation of mail voting that intrudes upon States' ability to administer elections in accordance with state law that provides for access to mail voting. *California v. Trump*, 786 F. Supp. 3d 359, 373 (D. Mass. 2025) (*California I*); *see Printz v. United States*, 521 U.S. 898, 935 (1997). "The President's authority to act . . . 'must stem either from an act of Congress or from the Constitution itself.'" *Medellín v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Neither source supports what the President has ordered here.

Because the President lacks authority to direct the changes to the handling of election mail, the EO is not binding on USPS. And USPS's authority to regulate elections is no broader than the President's. Like the President, an administrative agency's power is limited to that conferred to the Executive Branch by the Constitution or delegated by Congress in federal law. *See Main Street Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 558 (2d Cir. 2016). In this case, not only has Congress *not* authorized USPS to control mail ballots in this way, but the Proposed Rule is

---

[2] In fact, the President has tried to impose limitations on elections through advocating for restrictions in traditional Congressional legislation, but Congress has repeatedly rejected these efforts.

contrary to USPS's governing statutes, as explained below. *See infra* § III.B. By fundamentally altering how USPS handles mail ballots, the Proposed Rule violates the Constitution's separation of powers. *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

### 2. The Proposed Rule violates the States' constitutional power to regulate and administer elections

The mail ballot regime set forth in the Proposed Rule violates States' constitutional rights to administer elections in accordance with their own laws. *See ITCA*, 570 U.S. at 8–9 (recognizing States' broad power to regulate federal elections). As noted above, the Constitution explicitly tasks States—and not USPS or the President—with the responsibility to administer federal elections, empowering them to provide a "complete code" of how such elections are run, including how voters cast their ballots. *See Smiley*, 285 U.S. at 366. The States have legislated accordingly. California and Washington, for instance, have adopted universal mail voting systems, wherein every active registered voter is sent a mail ballot. *See* Cal. Elec. Code §§ 3000.5, 3003, 3010, 3011; Wash. Rev. Code §§ 29A.40.010, .091, .170. Other States, like Massachusetts, authorize no-excuse early voting by mail, allowing any qualified voter to request and cast a mail ballot. *See* Mass. St. 2022, c. 92, § 10; Mass. Gen. Laws ch. 54, § 25B(a)(i). Given the constitutionally assigned role that USPS plays in providing critical postal services to the country, *see* U.S. Const. art. I, § 8, cl. 7, the States have built in the provision of such services as central pillars of their mail voting programs.

The Proposed Rule effectively supplants States' decisions about which voters can cast a mail ballot. For instance, proposed DMM 705.24.4.2–3, which governs the process for States to enroll voters on the state-specific Mail-In and Absentee Participation List, will inevitably omit certain voters, denying USPS delivery of ballot mail to voters who are otherwise eligible to cast their vote through the mail. Proposed DMM 705.24.4.2(d) provides that a State must submit to USPS the requisite voter information "at least 30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballots may begin to be mailed under state law." But States, pursuant to their own duly enacted election rules, permit voters to request a mail ballot (and have that ballot mailed to them) well inside of that window. In California, for example, voters may register and receive a vote-by-mail ballot up to 15 days before the election. Cal. Elec. Code § 2102(a). And California requires that election officials begin mailing voters their ballots no later than 29 days before each election. *Id.* §§ 3001, 3000.5. For that reason, under the proposed restrictions on enrollment in USPS's lists, numerous California voters will likely become ineligible to receive a mail ballot inside of the Proposed Rule's alternative cutoffs.

While proposed DMM 705.24.4.2(d) permits States to "make supplemental submissions to enroll additional individuals or modify prior submissions until the last day that ballots may be mailed out to individuals under state law," this does not fully remedy the serious risk that eligible voters will be deprived of mail ballots to which they are entitled under state law. Proposed DMM 705.24.5.1 and 705.24.5.3 require that USPS review outbound ballot mail to ensure recipients are enrolled with USPS before accepting and delivering that mail. States are unlikely to be able to make real-time, instantaneous supplemental submissions with each individual change to their respective lists. As a result, many States will inevitably provide supplemental enrollment information, including immediately before or at the deadline for mailing ballots to voters under

state law. In Vermont, for example, voters may request an absentee ballot up to one day before an election. *See* Vt. Stat. Ann. tit. 17, §§ 2531(a), 2539(a)(1). Or consider New Jersey, which requires that county clerks provide eligible voters with a mail ballot by 3:00 p.m. the day before the election if the voter requests the ballot in person. *See* N.J. Stat. Ann. § 19:63-3(d). And in North Carolina, the voter, the voter's near relative, or the voter's verifiable legal guardian may request an absentee ballot by 5:00 p.m. the day before the election. *See* N.C. Gen. Stat. § 163-230.1(b). These quick turnaround times raise the serious risk that USPS will screen out legitimate ballot mail due to the unavoidable delay in the transfer and processing of information by state election officials and USPS.

Additionally, while the Proposed Rule effectuates only the EO's limitations on delivering *outbound* mail ballots, it leaves the door open to future implementation of the EO's prohibition on delivery of completed mail ballots from any voter not on USPS's voter lists. *See* EO § 3(b)(iii); proposed DMM 705.24.4.2(b)(4)) (requiring states to provide the "Unique IMb on the Return Federal Ballot Mail envelope sent to the individual[,]" which could allow USPS to track and refuse to deliver certain voted ballots as well). This, too, would have disastrous effects, misleading voters into believing they are able to cast a mail ballot only for USPS to fail to deliver it. Many voters will remain unaware that their ballot was never delivered, or they will find out too late to correct the error.

Separately, and just as troubling, proposed DMM 705.24.4.3 provides that States will be provided a copy of the state-specific Mail-In and Absentee Participant List "[o]n or about the date of the federal election." This rule affords States little, if any, time to digest state-specific lists containing potentially millions of voters to assess whether all voters eligible to be sent a mail ballot have been included. Nor does it take into account that ballots are mailed in most instances by local election officials, who do not even receive a copy of the list under the Proposed Rule, and are not contemplated by the Proposed Rule to undertake review. Indeed, such an exhaustive review would be functionally impossible in the days before an election or on Election Day. In fact, under the language of the Proposed Rule, it is possible such a list might not arrive until *after* the election, as the term "on or about" does not guarantee delivery *prior* to the election. And yet, the way in which these proposed rules work together apparently contemplates that States will proactively review USPS's lists and submit corrections to "modify prior submissions." *See* Proposed DMM 705.24.4.2(d). Moreover, the late correction of any voter omissions from USPS's lists will both prevent States from sending a mail ballot to those voters and also functionally prevent States from contacting such voters to ensure that they are aware of their omission and ability to cast a ballot in-person.

At bottom, the proposed regulations pertaining to enrollment on the state-specific Mail-In and Absentee Participation Lists will inevitably result in significant numbers of otherwise-eligible voters being unable to receive and cast a ballot through the mail. The Signatory States have each enacted state laws affording some or all voters the right to do so. Because the Proposed Rule undermines and nullifies States' deliberate decisions to administer federal elections, at least in part, through the mail, it is unconstitutional under the Elections Clause of the Constitution.

The Proposed Rule's ballot envelope design requirements run into similar constitutional concerns. The President has no authority to require States to adhere to a particular mail ballot

envelope design and review process. *Meadows*, 88 F.4th at 1346; *California I*, 786 F. Supp. 3d at 373. Nor can he direct USPS to exceed its authority—and nowhere has Congress given USPS the power to countermand a State's choices in designing its ballot envelopes or in adopting appropriate security procedures for mail ballots. *See City of Providence v. Barr*, 954 F.3d 23, 31 (1st Circ. 2020) (noting that an agency's power is limited to its statutory authorization). Nothing authorizes the President to issue ballot mail design requirements, nor to force upon States the Proposed Rule's review process, rendering it unconstitutional. *See Youngstown*, 343 U.S. at 585; *Printz*, 52 U.S. at 935.

The Proposed Rule's mandates regarding ballot delivery and ballot envelope design also unconstitutionally commandeer State resources in violation of the separation of powers between the federal government and the States. If enacted, the Proposed Rule would hijack the resources of the States to effectuate an unconstitutional federal data collection program by requiring the States to provide USPS with the name, address, and unique Intelligent Mail barcode for each voter. It would further require States to expend resources to conform ballot envelope designs to access postal services. Refusing States access to essential and statutorily guaranteed postal services unless they enact (with their own resources) a presidentially ordered federal program amounts to unlawfully seizing the States' personnel resources and power over elections. *See California I*, 786 F. Supp. 3d at 373; *Printz*, 521 U.S. at 935.

### 3. The Proposed Rule also violates Congress's constitutional powers

For the same reasons, the Proposed Rule unconstitutionally invades Congress's power to "make or alter" election regulations under the Elections Clause. *See* U.S. Const. art. I, § 4. Pursuant to that power, Congress has enacted several statutes governing voter registration, voting lists, and absentee voting. None of those laws authorize USPS to play the role that the President and the Proposed Rule set out to accomplish by fiat. In fact, as described below, the Proposed Rule disregards and violates federal voting statutes.

In addition, the Proposed Rule violates Congress' power over the Postal Service. *See* U.S. Const. art. I, § 8, cl. 7; *Ex parte Jackson*, 96 U.S. 727, 732 (1877) (Congress has exclusive constitutional power to enact law governing "the entire postal system of the country"); *accord U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 121 (1981) (recognizing Congress's broad power over postal system). Pursuant to its constitutional authority, "Congress effectively mandated certain policies to be followed by the Postal Service, leaving no discretion . . . to do otherwise." *New York v. Biden*, 636 F. Supp. 3d 1, 25 (D.D.C. 2022) (quotation omitted). However, the Proposed Rule runs contrary to a host of federal statutes governing USPS operations. As detailed more fully below, Congress has not authorized USPS to promulgate any of the requirements now posed in this rulemaking.

In fact, the only statute that assigns *any* role for USPS in voting is the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20302, et seq., which the Proposed Rule explicitly carves out.[3] Specifically, UOCAVA requires that "balloting materials,"

[3] Without that carveout, the Proposed Rule would be directly inconsistent with the requirements of that federal law. However, the carveout cannot rescue the Proposed Rule either

including mail ballots, "shall be carried expeditiously and free of postage[.]" 39 U.S.C § 3406(a)(1); *see also* 52 U.S.C. §§ 20302(a)(1) (mandating certain procedures for military and overseas voters), 20304(b) (providing that the UOCAVA administrator "shall provide expedited mail delivery service" for UOCAVA ballots). By linking USPS's obligations under Title 39 to UOCAVA, "Congress has shown that it knows how to" require that USPS treat mail ballots differently. *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) (quotation omitted). The statute also demonstrates the limited role Congress has assigned to USPS with regard to mail balloting—to carry and deliver such ballots, not to act as a gatekeeper for whose ballots should be delivered. There is nothing in Title 39 that includes anything like the Proposed Rule, which codifies the EO's appropriation of Congress's constitutional power over both elections and USPS.

Such statutory violations establish that the Proposed Rule is contrary to law, *see infra* § III.C, further illustrating that what USPS is seeking to do is unconstitutional. Rulemaking by an Executive Branch agency that countermands specific limitations on the agency's authority enacted by Congress violates the separation of powers.

### B. The Proposed Rule is Contrary to USPS's Governing Statutes

USPS is a "creature[] of statute" that "possess[es] only the authority that Congress has provided." *Nat'l Fedn. of Indep. Bus. v. Dept. of Lab., OSHA*, 595 U.S. 109, 117 (2022) (per curiam); *La. Pub. Serv. Comm'n. v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). USPS's own interpretation of the scope of its authority to enact the Proposed Rule, as set forth in the preamble, is entitled to no deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Notably, when USPS last intruded on state administration of mail voting, a federal court promptly enjoined it. *See Colorado v. DeJoy*, No. 20-cv-2768-WJM-STV, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020) (restraining USPS's nationwide vote-by-mail mailer because its instructions conflicted with state election procedures).

The federal law that created and governs USPS is Title 39 of the U.S. Code, as enacted in the Postal Reorganization Act (PRA), Pub. L. No. 91-375, 84 Stat. 719 (1970), and amended by the Postal Accountability and Enhancement Act (PAEA), Pub. L. No. 109-435, 120 Stat. 3198 (2006). Title 39 confers no authority to adopt the nationwide mail ballot administration program described in the Proposed Rule and affirmatively prohibits several of its central features. *See California,* 2026 WL 1826490, at *15 ("[N]o law enacted by Congress delegates authority to control mail-in voting to USPS."); *see also Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1175–76 (D.C. Cir. 2003) (invalidating USPS regulations that changed DMM standards restricting eligibility for a category of mail because the changes exceeded USPS's statutory authority); *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970–972 (D.C. Cir. 2022) (reaffirming that

---

because USPS still lacks statutory authorization for its proposed mail ballot regime. The Proposed Rule also does not explain how USPS will even distinguish between ballots that are sent pursuant to UOCAVA and other absentee ballots, revealing an acute risk that the Proposed Rule will conflict with UOCAVA's mandate and result in erroneous UOCAVA ballot rejection and return. *See* 91 Fed. Reg. at 32,915.

courts can review whether USPS action exceeds the bounds Congress set in Title 39). We address each defect in turn.

**1. Sections 401 and 404 do not authorize the Proposed Rule**

The Notice grounds the Proposed Rule in 39 U.S.C. §§ 401 and 404. 91 Fed. Reg. at 32,915. Neither provision supports it.

Section 401(2) authorizes USPS to adopt only those rules and regulations that are "*not inconsistent with* this title" and that "may be *necessary in the execution of its functions* under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title[.]" 39 U.S.C. § 401(2) (emphasis added). USPS's power to promulgate regulations is thus doubly limited: a regulation must be necessary to fulfill a function Congress has actually assigned to USPS, and it may not contradict the remainder of Title 39. The Proposed Rule exceeds both limitations.

As shown below, the Proposed Rule is inconsistent with multiple express provisions of Title 39 and it is not "necessary" to any postal function. USPS's functions are the "collection, handling, transportation, delivery, forwarding, returning, and holding of mail," 39 U.S.C. § 404(a)(1), all of which are in service of its "basic function"—"the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people[,]" *id.* § 101(a). Compiling rosters of mail voters, operating an enrollment portal for state election data, verifying that ballots are "destined to individuals on the list," 91 Fed. Reg. at 32,916, and generating compiled participation lists "for use by law enforcement," *id.* at 32,915, are not functions of collecting, transporting, or delivering mail. They are election administration and investigative data-collection functions that Congress never assigned to USPS—in Title 39 or anywhere else.

No purported basis for the Proposed Rule establishes its necessity for USPS's functions. For example, the Notice of Proposed Rulemaking explains that the "mailpiece preparation and data reporting standards" provide information "for use by law enforcement" and that the Mail-In and Absentee Participation Lists will "facilitate law enforcement efforts" by allowing "law enforcement officials to compare the total number of mailed ballots to the total number of received ballots to detect potential issues meriting further investigation." 91 Fed. Reg. at 32,915–916. Generating investigative leads for *other* agencies' enforcement of *election* law is not a power "incidental, necessary, or appropriate to the carrying on of" USPS's functions.[4] 39 U.S.C. § 401(10). Notably, the Proposed Rule's data collection outruns its own stated rationale: comparing the *total* number of ballots mailed against the *total* received—the Notice's sole law-enforcement illustration—requires only aggregate counts, but the Proposed Rule mandates person-level linkage

[4] This disconnect is no surprise because the Notice ties the Proposed Rule to the President's Executive Order rather than to any postal function: USPS "understands" from the EO that the Proposed Rule "will facilitate the faithful execution of federal law." 91 Fed. Reg. at 32,915. But a rule necessary to the EO's objectives is not a rule necessary to USPS's functions. *Compare* 91 Fed. Reg. at 32,915, *with* EO, § 1.

of each voter's name and address to the unique Intelligent Mail barcodes on voters' envelopes, proposed DMM 24.4.2.b.

The election crime statutes cited in the Notice of Proposed Rulmaking—concerning criminal prohibitions on voter intimidation and fraudulent registration and voting—fail to supply the missing authority for this sweeping election law enforcement project. *See* 91 Fed. Reg. at 32,915 (citing 52 U.S.C. §§ 10307 & 20511). Those statutes do not expressly confer any enforcement authority on USPS. In fact, Section 11(a) of the Voting Rights Act (cited in the Notice) affirmatively prohibits any "person acting under color of law" to "fail or refuse to permit any person to vote who is entitled to vote" or to "willfully fail or refuse to tabulate, count, and report such person's vote[,]" 52 U.S.C. § 10307(a), yet that is the result of the Proposed Rule for mail voters who are not enrolled on USPS's final State-Specific Mail-In and Absentee Participation List. The reference to 18 U.S.C. § 3061(b) also fares no better because it only grants limited law-enforcement powers to *postal inspectors* regarding crimes involving "the use of mails" and offenses subject to interagency agreement with the Attorney General. But that is not a grant to construct, by regulation, a nationwide investigative data-collection regime cataloguing which Americans vote by mail. If Congress had intended to deputize USPS as an adjunct of federal election law enforcement, it would have said so clearly. *Cf. West Virginia v. EPA*, 597 U.S. 697, 723–25 (2022) ("newfound power" discovered in a "long-extant statute" warrants skepticism); *Biden v. Nebraska*, 600 U.S. 477, 505–506 (2023).

Finally, the Notice's characterization of the Proposed Rule as "implement[ing] best practices for Postal Service ballot mailing operations," 91 Fed. Reg. at 32,915, cannot support its issuance either. USPS's existing ballot-mail recommendations are voluntary guidance offered in service of delivery. *See* USPS, *Mailing Standards of the United States Postal Service Domestic Mail Manual* 703.8.4 Design, https://pe.usps.com/text/dmm300/703.htm#ep1174014 (last visited July 1, 2026); USPS, *2026-2027 Official Election Mail Guide Kit 600* (Feb. 2026), https://about.usps.com/kits/kit600.pdf. The Proposed Rule transforms them into mandatory conditions of mail *acceptance*, enforced by refusal and return of ballot mailings, proposed DMM 705.24.5.3, and welds them to an enrollment-and-verification regime that has no analogue in any "best practice." A recommendation about how to prepare an envelope is a postal function. A federal precondition on whether a state's ballots may enter the mail stream at all is not.

**2. The Federal Ballot Mail Portal, voter enrollment, and participation lists are a prohibited new "nonpostal service"**

In PAEA, Congress expressly stripped USPS of authority to take on new lines of business characterized as "nonpostal services." *See* 39 U.S.C. § 404(e)(2)–(3). "Nonpostal services" constitute anything that falls outside of the definition of "postal services," *id.* § 404(e)(1), which in turn is narrowly defined as "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto[.]" 39 U.S.C. § 102(5). In 2022, Congress delineated permissible non-postal services that allowed USPS to, for example, enter into certain service-related agreements. *See id.* §§ 404(e)(3).

The core of the Proposed Rule has nothing to do with mail delivery, and it overrides Congress's explicit limitation on non-postal services. For example, proposed DMM 705.24.4

would establish (1) a registration system for "Ballot Portal Users"; (2) an "enrollment" system in which States must submit, voter by voter, the name and address of each individual receiving a mail-in or absentee ballot, the unique IMbs on that individual's outbound and return envelopes, and the originating election office; and (3) a list-compilation and transmission service under which USPS delivers to each State's chief election official, "[o]n or about the date of the federal election," a compiled statewide roster of every enrolled voter and the barcodes associated with each voter's ballot. This state-by-state voter eligibility verification and enrollment system is far outside the definition of "postal services." Nor is it "ancillary" to mail delivery; USPS has delivered ballots for as long as States have mailed them—including nearly 100 million ballots in the 2024 general election alone—without ever needing to know, in advance and by name, who is eligible under state law to receive and return their ballot, nor playing the role of gatekeeper to the franchise. *See also* 91 Fed. Reg. at 32,916 (Proposed Rule intended to "facilitate law enforcement efforts," not mail delivery).

The narrow statutory exceptions of nonpostal services that Congress created in 2022 confirm the broad prohibition. Section 404(e)(2) excepts only "nonpostal products or services authorized by chapter 37." Chapter 37, in turn, authorizes nonpostal services principally through reimbursable agreements with other federal agencies, subject to Postal Regulatory Commission (PRC) oversight. *See* 39 U.S.C. § 3703. No agreements, reimbursements, or PRC process are present here, and State election officials are not federal agencies. That Congress created these specific exceptions shows that when it intends for USPS to engage in non-postal practices, it will specifically so provide. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024) ("[T]he enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." (quotations omitted)).

### 3. Conditioning mail acceptance on enrollment and certification violates the Universal Service Obligation and the prohibition on discrimination among mail users

Title 39 commands that USPS "shall provide prompt, reliable, and efficient services to patrons in *all* areas and shall render postal services to *all* communities[,]" 39 U.S.C. § 101(a); that it shall "provide adequate and efficient postal services" and "serve as nearly as practicable the entire population of the United States[,]" *id.* § 403(a); that it give "the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail[,]" *id.* § 101(e); and that, "[i]n providing services . . . [USPS] shall not . . . make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user." *Id.* § 403(c).

Under proposed DMM 705.24.5.3, an authorized ballot mailer's mailing "will not be accepted and will be returned" if USPS's verification concludes the mailing is not being sent to an individual enrolled on a State's "Mail-In and Absentee Participation List," proposed DMM 705.24.5.1, or if the state "has not submitted a certification pursuant to 24.4.2.f," proposed DMM 705.24.3.b. That is a regime of selective refusal of service: identical letters will be accepted or rejected depending on whether the intended recipient's name appears in a federal database and whether the election official sending it submitted it for federal certification. USPS has not (and cannot) identify a legitimate operational need that justifies this disparity. *Cf. GameFly, Inc. v.*

*Postal Reg. Commn.*, 704 F.3d 145, 149 (D.C. Cir. 2013) (holding that when there is discrimination, there must either be a "remedy [to] all discrimination or [an] expla[nation] why any residual discrimination is due or reasonable under § 403"); *U.S.P.S. v. Postal Reg. Comm'n*, 747 F.3d 906, 910 (D.C. Cir. 2014) (affirming PRC order remedying undue and unreasonable discrimination between mail rates for DVD rental company and video game rental company).[5]

USPS also carries census questionnaires, jury summonses, tax filings, and social security correspondence—government mail that is important, sensitive, and deadline-driven—without conditioning acceptance by USPS on enrollment of the recipients in a federal database. But under the Proposed Rule, only the mailers of ballots—unquestionably "important letter mail" that Congress directed receive "the highest consideration," 39 U.S.C. § 101(e)—face that condition. That constitutes "undue [and] unreasonable discrimination among users of mail[]," *id.* § 403(c), and a refusal "to render postal services to all communities" in any State that declines, or is unable, to satisfy the enrollment-and-certification conditions, *id.* § 101(a).

#### 4. The Proposed Rule unlawfully creates a new category of nonmailable matter

USPS's authority to refuse matter tendered for mailing is governed by a comprehensive statutory scheme. Congress has "carefully defined" the categories of "nonmailable matter," 39 U.S.C. §§ 3001–3008—hazardous materials, certain solicitations, and the like—and has specified that such matter "shall be disposed of as [USPS] directs," *id.* § 3001(b). However, USPS "must deliver the mail unless an item is 'nonmailable' within the definition of 39 U.S.C. § 3001." *Bowie v. Williams*, 351 F. Supp. 628, 634 (E.D. Pa. 1972). That principle—that postal officials cannot withhold mail without a statutory basis—is as old as judicial review of postal actions itself. *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902) ("His right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them.").

Ballots and ballot envelopes appear nowhere in sections 3001–3018. Yet the practical effect of proposed DMM 705.24.5.3 is to render unacceptable—refused and returned to the sender—every ballot mailing from a non-certifying State, every mailing addressed to a voter absent from the Mail-In and Absentee Participation List, and every mailing whose envelope has not undergone review for design and barcode placement. Nothing in Title 39 authorizes USPS to create, by regulation, a new class of "refusable mail" or "conditionally accepted mail" defined by the sender's noncompliance with a data-reporting regime. That power resides exclusively with Congress. *See Ex parte Jackson*, 96 U.S. 727, 732 (1877) ("The power possessed by Congress embraces the regulation of the entire postal system of the country."); *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 155–156 (1946) (finding Postmaster General may not impose conditions on mail privileges that Congress has not prescribed).

---

[5] Whatever the proper forum for enforcing section 403(c) in the first instance, the provision is a substantive command of Title 39 and a regulation that transgresses it is by definition not one "consistent with this title." 39 U.S.C. § 401(2).

Existing DMM acceptance standards uniformly consider physical standards concerning the mailpiece, not the identity of the mailer.[6] A mailpiece that is not compliant can be cured by re-preparing the piece or paying a different rate; no mailpiece is precluded from the mails on account of who is sending it, who is to receive it, or whether the parties appear in a federal database. In other words, the Proposed Rule regulates access to mail based on identity of the sender and recipient and the mail contents (*i.e.*, a ballot)—which are precisely within the kinds of distinctions that fall within the scope of the nonmailability provisions. *See, e.g.*, 39 U.S.C. §§ 3002 (prohibition of mail containing master vehicle key), 3003 (prohibition on mailing fictitious name or address), 3004 (prohibition on delivery of mail to persons not a resident at the address). In fact, the Supreme Court has made clear that excluding matter from the mails on grounds unrelated to its physical character raises constitutional concerns. *See Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 306–07 (1965) (finding statute that required Postmaster General to detain "communist political propaganda," notify the recipient, and require the recipient to submit a reply card requesting that the mail be released, violated the First Amendment); *Blount v. Rizzi*, 400 U.S. 410, 416–417 (1971) (finding USPS imposed "procedures designed to deny use of the mails to commercial distributors of obscene literature" violated the First Amendment).

### C. The Proposed Rule is Contrary to Federal Voting Statutes

The Proposed Rule is also directly inconsistent with federal voting statutes.

First, in requiring enrollment in a USPS list as a prerequisite for mail voting, the Proposed Rule conflicts with federal statutes providing for a single, state-maintained voter registration list for federal elections in each State. In exercising its powers under the Elections Clause, Congress expressly left responsibility for carrying out voter registration and maintaining voting lists in the hands of the States, subject to federal standards. 52 U.S.C. §§ 21083(a)(1)(A), 20503(a), 20507. Federal law requires "each State" to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level," with information for each legally registered voter in the State. *Id.* § 21083(a)(1)(A). By law, this state-maintained list "shall serve

---

[6] *See, e.g.*, USPS, *Mailing Standards of the United States Postal Service Domestic Mail Manual* 102 Elements on the Face of a Mailpiece, https://pe.usps.com/text/dmm300/102.htm (last visited July 1, 2026); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 202 Elements on the Face of a Mailpiece, https://pe.usps.com/text/dmm300/202.htm (last visited July 1, 2026) (physical dimensions, machinability, address and postage placement); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 203 Basic Postage Statement, Documentation, and Preparation Standards, https://pe.usps.com/text/dmm300/203.htm (last visited July 1, 2026) (presort and documentation); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 204 Barcode Standards, https://pe.usps.com/text/dmm300/204.htm (last visited July 1, 2026) (barcode quality); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 233 Prices and Eligibility, https://pe.usps.com/text/dmm300/233.htm (last visited July 1, 2026); USPS, M*ailing Standards of the United States Postal Service Domestic Mail Manual* 243 Prices and Eligibility, https://pe.usps.com/text/dmm300/243.htm (last visited July 1, 2026) (postage-category eligibility).

as the single system for storing and managing the official list of registered voters throughout the State[,]" and is the "the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* § 21083(a)(1)(A)(i) & (viii). This statutory design necessarily precludes the Proposed Rule's requirement of a second voting list housed in a federal agency and used by that agency to control delivery of ballots. *See* 91 Fed. Reg. at 32,918 (Proposed Rule §§ 24.4.2, 24.4.3, 24.5.1, 24.5.3).

Second, the Proposed Rule violates the Voting Rights Act Amendments of 1970, which protects the rights of voters to access absentee voting in federal elections. 52 U.S.C. § 10502. Congress enacted that law to protect citizens' constitutional right to vote and to move freely across state lines. The statute provides that no U.S. citizen shall "be denied the right to vote" in federal elections "because of the failure of such citizen to be physically present in such State or political subdivision at the time of such election," so long as the citizen has "complied with the requirements *prescribed by the law of such State* or political subdivision" concerning absentee ballots. *Id.* § 10502(c) (emphasis added). Thus, a voter's compliance with state law absentee voting requirements—some of which must conform to federal standards set out in the Act—is the sole prerequisite to absentee voting. The Proposed Rule violates this statute by adding a new USPS enrollment requirement as a necessary precondition to delivering absentee ballots. *See* 91 Fed. Reg. at 32,918 (Proposed Rule §§ 24.4.2, 24.5.1, 24.5.3.a) (requiring mail voters to be enrolled with USPS and providing that USPS will not accept ballot mail if recipients have not been so enrolled). For the same reason, implementation of the Proposed Rule and refusal to transmit ballot mail would also violate the enforcement provisions of the Voting Rights Act. 52 U.S.C. § 10307(a) ("No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote[.]").

### D. The Proposed Rule is Contrary to the Privacy Act

USPS is subject to the requirements and prohibitions in the Privacy Act, 5 U.S.C. § 552a. *N.L.R.B. v. USPS*, 841 F.2d 141, 145 & n.3 (6th Cir. 1988). Accordingly, it may not adopt regulations that are contrary to the Privacy Act.

Congress passed the Privacy Act "in response to the explosion of computer technology, which allowed for compilation and storage of data in quantities not seen before, coupled with rightful and broad condemnation of government surveillance programs including Watergate and the FBI's COINTELPRO." *Garris v. Fed. Bureau of Investigation*, 937 F.3d 1284, 1295–96 (9th Cir. 2019) (citation omitted). Among other goals, the Act sought to prevent the "collection of protected information not immediately needed, about law-abiding Americans, on the off-chance that Government or the particular agency might possibly have to deal with them in the future." S. Rep. 93-1183.

To that end, the Privacy Act has as one of its strongest protections a prohibition against agencies maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity[.]" 5 U.S.C. § 552a(e)(7).

The Proposed Rule discloses a plan to surveil and collect data regarding ballot mail sent to and from registered voters. The Notice of Proposed Rulemaking reflects that the purpose of the "mailpiece preparation and data reporting standards" is to "provide information regarding the sending of ballots through the mails that would be available for use by law enforcement[.]" 91 Fed. Reg. at 32,915. The Proposed Rule achieves this goal by requiring each piece of ballot mail to have Intelligent Mail barcodes, which is a USPS tracking technology, and to require States to provide data to USPS linking each barcode to an individual voter.[7] 91 Fed. Reg. at 32,917–918 (Proposed Rule §§ 24.3.1, 24.3.2, 24.4.2). This surveillance plan directly follows from the Executive Order that mandated this rulemaking procedure. *See also* EO § 1 ("Secure ballot envelope identifiers provide a reliable, auditable mechanism to enforce Federal law. . . . Unique ballot envelope identifiers, such as bar codes, enable confirmation that only citizens receive and cast ballots, reducing the risk of fraud and protecting the integrity of Federal elections.").

Voter registration, mail ballot participation, and voting are forms of First Amendment expression. *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999) (holding that the choice of whether or not to register "implicates political thought and expression"); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). For this reason, at least one court has held that the First Amendment protections in 5 U.S.C. § 552a(e)(7) bar federal agencies from collecting voter registration lists. *United States v. Weber*, 816 F. Supp. 3d 1168, 1193 (C.D. Cal. 2026). The statute equally bars the collection of data on all mail ballot voters proposed here: the lists that States must provide—on pain of losing the ability to administer their legally mandated mail-voting laws—will reveal citizens' First Amendment activity regarding the choice to register to vote.

No exception to the bar on collecting records on voters' First Amendment activity can salvage this new voter-surveillance regime. *See* 5 U.S.C. § 552a(e)(7). The collection of these records is not "expressly authorized by statute," nor, of course, by the tens of millions of voters who are the object of the surveillance. *See id.* Nor is this sweeping new system to track ballot mail "pertinent to and within the scope of an authorized law enforcement activity." The Proposed Rule cites USPS's general statutory authority to investigate and enforce criminal laws. 91 Fed. Reg. at 32,915 (citing 18 U.S.C. § 3061). But that statute enumerates USPS's powers in subsection (a), and creating a preventive surveillance program is not among them. 18 U.S.C. § 3061(a) (authorizing USPS postal inspectors to serve warrants and subpoenas, make arrests, carry firearms, and "make seizures of property as provided by law"). Nor does a general grant of authority to investigate "criminal matters" grant USPS license to surveil all mail ballots. The unprecedented scale of this data collection reflecting First Amendment activity is not "within the scope" of an "authorized law enforcement activity." *See* 5 U.S.C. § 552a(e)(7). Accordingly, the Proposed Rule's mandated data collection regarding voters receiving or sending mail ballots is prohibited by the Privacy Act.

---

[7] As described in the Notice of Proposed Rulemaking, "[u]niquely serialized IMbs facilitate the tracking of individual pieces of Ballot Mail to and from individual voters as the barcodes are scanned on the Postal Service's mail processing equipment." 91 Fed. Reg. at 32,916. Further "these barcodes provide visibility into ballot mail transmission based on scan data that is generated as the ballots move through the mail." *Id.*

## IV. The Proposed Rule Is Arbitrary and Capricious

An agency's action is arbitrary or capricious if it is "not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). Such action is likewise arbitrary and capricious if the agency fails to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Security v. Regents of the Univ. of Calif.*, 591 U.S. 1, 33 (2020).

The Proposed Rule should be withdrawn because it fails both of these tests. The Proposed Rule would arbitrarily interfere with State election administration, imposing an inflexible federal regulatory structure on State and local practices that are tailored to local conditions. It also fails to account for the significant reliance interests of States, which have structured their election systems around existing regulations. And the Proposed Rule is especially arbitrary as applied to the 2026 general election. The arbitrary and capricious impacts should preclude USPS from adopting the Proposed Rule. At an absolute minimum, USPS should delay the effective date until after the 2026 general election.

### A. The Proposed Rule Is Not Reasonable or Reasonably Explained

#### 1. The Proposed Rule arbitrarily imposes a "one size fits all" approach on the States and interferes with their election-administration duties

To start, the Proposed Rule would be arbitrary and capricious because it would impose a uniform, "one size fits all" federal regulatory approach on the States, which would interfere with their election administration duties without considering the wide diversity of approaches States and localities currently take to discharge those duties. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); *Ryan, LLC v. FTC*, 746 F. Supp. 3d 369, 388 (N.D. Tex. 2024) (finding rule "arbitrary and capricious because it is unreasonably overbroad without a reasonable explanation[, and] imposes a one-size-fits-all approach . . . which fails to establish a 'rational connection between the facts found and the choice made'" (quoting *State Farm*, 463 U.S. at 43)). As explained *supra* § III.B,, States have primary constitutional authority and responsibility for regulating federal elections, subject only to preemption by Congress. And state law sets the framework for those elections, including determining when, where, and how eligible voters may request, receive, and cast their mail ballots. But the Proposed Rule would impose a single set of nationwide requirements for mail-in and absentee participation, compliance procedures, and other election mail practices, all without adequate explanation or justification. This not only interferes with States' constitutional authority and existing state law and practice, it also arbitrarily disregards the tremendous variation in mail voting and other election administration practices of the States.

States have a wide range of different practices regarding how mail ballots are requested, provided to eligible voters, and returned by them.[8] The Proposed Rule would arbitrarily impose a nationwide criterion for mail-voter eligibility, based on the USPS mail-voter lists, without any reasoning or justification for that abrupt change. *See Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 83 (D.C. Cir. 2006) ("[W]here an agency has articulated no reasoned basis for its decision—where its action is founded on unsupported assertions or unstated inferences—[courts] will not abdicate the judicial duty carefully to review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence." (quotations omitted)).

Not only do States (pursuant to their constitutional authority and, depending on the state, consistent with state constitutional mandates[9]) have varying laws, rules, and practices for treatment of mail voting and their election mail, election administration practices vary considerably within their own borders. In many States, authority and responsibility for administering elections is divided and shared among offices and officials at the state, county, and municipal level—with different regional and local experiences leading to varying approaches and practices on mail voting, ballot and envelope design, and other election procedures.[10] This wide array of established election structures and practices has been informed by local experience throughout States of varying size, population, and character. It does not easily lend itself to a "one size fits all" approach of administrative regulation that would require rapid and uniform changes to the collection of distinct state, county, and local policies and practices. The Proposed Rule's reasoning is insufficient and flawed and it fails to account for these state reliance interests.

---

[8] *See, e.g.*, *California v. Trump*, Case No. 1:26-cv-11581-IT, Dkt. No. 100-1 (Lean Decl.) ¶¶ 20, 28, 37 (D. Mass. Apr. 23, 2026) ("In California, every active registered voter is mailed a ballot.") (Attachment 1); *id.*, Dkt. No. 100-2 (Tassinari Decl.) ¶¶ 12–14 (in Massachusetts, elections officials first send mail ballot applications to qualified registered voters upon request and then mail ballots beginning approximately 30 days before election) (Attachment 2); *id.*, Dkt. No 100-4 (Holmes Decl.) ¶ 46 ("Washington elections officials are required by state law to issue ballots to duly registered voters.") (Attachment 4); *id.*, Dkt. No. 100-7 (Rosenberg Decl.) ¶¶ 32–33, 41 (Connecticut elections officials issue mail ballots to duly registered voters who request an absentee ballot beginning 31 days before election) (Attachment 7).

[9] *E.g.*, Mich. Const. Art. II, s. 4(h) (affording each eligible Michigan voter the constitutional right to vote by mail).

[10] *See, e.g.*, Lean Decl. (Attachment 1) ¶¶ 4–6, 11, 21–22, 37, 41, 46–47, 58–59, 63 (California elections administered by state and local officials across 58 counties); Tassinari Decl. (Attachment 2) ¶¶ 4, 10, 16, 58, 81–83 (Massachusetts elections conducted by local officials in 351 municipalities); Holmes Decl. (Attachment 4) ¶¶ 4–7, 17–18, 32, 35, 39, 55–58 (Washington elections administered jointly between state and local officials, with ballot envelope design and other practices varying across 39 counties); Rosenberg Decl. (Attachment 7) ¶¶ 5–10, 21, 23–29, 41, 58, 67–69 (Connecticut elections administered primarily on local level, with ballot envelope design and other practices varying across 169 municipalities); *California v. Trump*, Case No. 1:26-cv-11581-IT, Dkt. No.100-14 (D. Mass. Apr. 23, 2026) (Linnell Decl.) ¶ 68 ("In Minnesota, as in much of the country, ballot envelopes vary by county.") (Attachment 14).

The Proposed Rule is also arbitrary because it fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The Proposed Rule does not articulate a satisfactory explanation of the fit between its purported basis and its requirements. According to the Proposed Rule, the creation of the "Mail-In and Absentee Participation Lists" and the use of an envelope barcode tracking system are necessary to "reduce the risk of fraud" and "protect the integrity of federal elections." Proposed Rule, 91 Fed. Reg. at 32915. The only citation offered in support of this rationale, however, is the EO itself. *Id.* But the EO does not present any evidence of fraud in the existing mail ballot system.[11] In contrast, studies of the issue have demonstrated that voter fraud and non-citizen voting are extremely rare. For example, a Brookings Institute study on mail voting found a minuscule percentage of fraud in a study of four elections, "about four cases of mail voting fraud out of every 10 million mail votes."[12] With respect to non-citizen voting, a study of 42 jurisdictions with high noncitizen populations found only 30 cases of suspected noncitizen voting in the 2016 Presidential Election across jurisdictions representing 23.5 million votes—a rate of 0.0001 percent.[13] And a 2024 Georgia audit of its voter rolls found only 20 noncitizens out of the state's 8.2 million voters, only 9 of whom had any record of casting a ballot.[14] It would be arbitrary and capricious for USPS to

---

[11] Nor does the Proposed Rule offer a factual or legal explanation of why, if these requirements are in fact necessary to protect election integrity, both primary elections and UOCAVA ballots are exempt from its scope. As discussed *supra* in Section II.A.3., the Proposed Rule would violate UOCAVA but for the Proposed Rule's carveout. Of course, the proposed carveout does not save the Proposed Rule due to its numerous legal flaws, as set out in this comment. And USPS has not admitted this conflict and instead "welcomes comments," 91 Fed. Reg. at 32,915, on exempting both UOCAVA and primary elections from the Proposed Rule.

[12] *See, e.g.*, Samara Angel, Jonathan Katz & Randi Wright, *Mail Voting in the US: Data Points to Very Low Fraud and Significant Benefits to Voters*, Brookings Inst. (Nov. 6, 2025), https://www.brookings.edu/articles/mail-voting-in-the-us-data-points-to-very-low-fraud-and-significant-benefits-to-voters/ (finding "an average total mail voting fraud percentage across the 2016, 2018, 2020, and 2022 general elections of only 0.000043%, or about four cases of mail voting fraud out of every 10 million mail votes"); Amy Gardner & Elise Viebeck, *Minuscule Number of Potentially Fraudulent Ballots in States with Universal Mail Voting Undercuts Trump Claims About Election Risks*, Wash. Post (June 8, 2020), https://www.washingtonpost.com/politics/minuscule-number-of-potentially-fraudulent-ballots-in-states-with-universal-mail-voting-undercuts-trump-claims-about-election-risks/2020/06/08/1e78aa26-a5c5-11ea-bb20-ebf0921f3bbd_story.html (analysis of data collected by three vote-by-mail states found that officials identified just 372 possible cases of double voting or voting on behalf of deceased people out of about 14.6 million votes cast by mail in the 2016 and 2018 general elections, or 0.0025 percent).

[13] Douglas Keith & Myrna Perez, *Noncitizen Voting: The Missing Millions*, BRENNAN CENTER (May 5, 2017), https://www.brennancenter.org/our-work/research-reports/noncitizen-voting-missing-millions.

[14] *Georgia citizenship audit finds few noncitizens on voter rolls*, AP (Oct. 23, 2024), https://apnews.com/article/georgia-noncitizens-voter-rolls-14532ef49b66f9cbf34ff483d2534280.

rely on a factual premise for which there is no persuasive evidence—that existing federal and state laws do not already protect federal elections against fraud or diminished integrity—to justify a massive new federal surveillance regime. *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992).

Further, the Proposed Rule also fails to justify or provide sufficient safeguards related to its Intelligent Mail barcode requirement. Under the requirements of the Proposed Rule, USPS and the federal government would be able to pinpoint ballots being sent to or received from specific voters. The Proposed Rule fails to explain how USPS would prevent abuse of this capability by federal officials, USPS employees, and others who may seek to target election mail to and from specific voters.

**2. The Proposed Rule arbitrarily gives the States insufficient time to make the changes being imposed**

Any rulemaking regarding ballot mail that takes effect before the November 2026 general election would be arbitrary and capricious. Other commenters have explained the significant difficulties that state and local election officials will face in implementing the change proposed in the Domestic Mail Manual.[15] As a result, making those changes effective just months before the general election—when many election officials have already printed ballot materials or are about to do so in reliance on existing regulations—would be a striking and improper intrusion on the constitutional authority of States to regulate the manner of holding elections. Like the Supreme Court and Congress, USPS should respect States' constitutional role by delaying implementation of any rule affecting election administration until after the 2026 general election.

The Supreme Court has repeatedly held that federal courts should not alter state election rules on the eve of an election. Under what is known as the *Purcell* principle, the Supreme Court has repeatedly reaffirmed "that federal courts ordinarily should not alter state election laws in the period close to an election." *Moore v. Harper*, 142 S. Ct. 1089 (2022) (Kavanaugh, J., concurring); *see also, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam); *Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (per curiam).

Congress has also recognized the importance of providing States sufficient time to implement federal changes affecting election administration. When Congress adopted the Help America Vote Act of 2002 (HAVA) in October 2002, none of its provisions altering state election administration took effect during the ongoing 2002 election cycle, and many of its provisions had effective dates in 2004 or later. Pub. L. 107-252, §§ 301(d), 302(d), 303(d), 706(d), 804(a), 116 Stat. 1666. When Congress adopted the National Voter Registration Act of 1993 (NVRA) in May 1993, it provided an effective date no earlier than January 1, 1995. Pub. L. 103-31, § 13, 107 Stat. 89. And when adopting the Uniformed and Overseas Citizens Absentee Voting Act in August 1986 (UOCAVA), Congress provided that "[t]he amendments and repeals made by this Act shall apply

[15] *See, e.g.*, Wash. Secretary of State, *Secretary of State Steve Hobbs' comments on USPS proposed ballot rule* (June 26, 2026), https://www.sos.wa.gov/about-office/news/2026/secretary-state-steve-hobbs-comments-usps-proposed-ballot-rule.

with respect to elections taking place after December 31, 1987." Pub. L. 99-410, § 204, 100 Stat. 930.

USPS should adhere to the same principles as the Supreme Court and Congress. Implementing the proposed changes to the Domestic Mail Manual close in time to the 2026 general election risks the same "disruption" and "unintended and unfair consequences for candidates, political parties, and voters" that underlie the Supreme Court's admonition against late federal judicial interventions in elections. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). For example, the Proposed Rule identifies situations in which mailings "will not be accepted and will be returned to the authorized ballot mailer." 91 Fed. Reg. at 32, 918 (Proposed Rule § 24.5.3(a), (b)). Particularly in the period shortly following initial adoption, there is a risk of inadvertent administrative errors by USPS, local election officials, and ballot material vendors. Such inadvertent errors would lead to voters either not receiving ballots or receiving them late, and, absent a delay in the effective date, this would occur in the midst of a high-profile federal general election.

The Proposed Rule presents grave constitutional and practical problems associated with altering rules for ballot mail close in time to an election. Adoption of this Proposed Rule with an effective date before the November 2026 general election would be arbitrary and capricious.

### B. The Proposed Rule Ignores Considerable Reliance Interests

When changing course, agencies must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). Here, in the context of States' longstanding reliance on USPS to facilitate their mail-voting programs, there is much to consider. Yet USPS has entirely failed to identify, much less address, any of the States' "legitimate reliance" interests, rendering the Proposed Rule arbitrary and capricious for this reason, as well.

First, as described *supra* § IV.A.1, the Proposed Rule would set a "one size fits all" federal policy, displacing a broad range of established state and local practices driven by the needs of different localities and grounded in reliance on USPS's dependable transmission of mail and absentee ballots. The Proposed Rule entirely ignores the impact of a uniform policy on these varied practices and is arbitrary and capricious for that reason alone. *See, e.g.*, *Regents of the Univ. of Cal.*, 591 U.S. at 30-31; *Cook County, Illinois v. Wolf*, 962 F.3d 208, 233 (7th Cir. 2020) (agency failed to consider "reliance interests of state and local governments"); *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1114 (D.C. Cir. 2019) (agency failed to consider how regulated entities had "crafted business models and invested significant resources").

Second, the Proposed Rule would vitiate the preparations that elections officials across the country have already made to plan and implement their mail-voting programs for this election cycle. In so doing, the Proposed Rule conflicts with USPS's longstanding recognition that clarity and early preparation are essential to reliable transmission of mail and absentee ballots. *See*, *e.g.*, USPS, *2026-2027 Official Election Mail Guide Kit 600* at 27 (explaining regulations were updated to clarify the meaning and scope of postmarks). Each federal election year, USPS conducts year-

round preparations for election mail—including internal and external trainings, outreach to election officials, and process testing—and publishes an "Official Election Mail Guide," known as "Kit 600." *See id*. The most recent version, published in February 2026, makes no mention of any of the Proposed Rule's new requirements. Introducing sweeping and novel changes at this point in an election year undermines the reliance that USPS's guidance was designed to cultivate.

In particular, the list provisions of the Proposed Rule would impose substantial financial and administrative burdens on States that have long organized their election systems around existing mail ballot procedures. States and their localities would be required to provide training and guidance to elections officials, work through USPS's upload, supplementation, and modification processes, evaluate and investigate discrepancies between the Mail-In and Absentee Participation List and the information the State had submitted, and mount public education campaigns to inform voters about the new list.[16] This would all need to be done while States continue to administer the many other aspects of their elections, under a compressed timeframe that leaves no room for the kind of changes the Proposed Rule would require. Having reasonably relied on current procedures in structuring their budgets, staffing, and election timelines, States would be forced to absorb new costs those plans never contemplated.

All this would have to be done while addressing the ballot envelope requirements of the Proposed Rule, which also disrupts States' reliance interests. Intelligent Mail barcodes and USPS design review have never been required for mail ballot envelopes. As a result, many States and localities do not currently use Intelligent Mail barcodes,[17] and some do not submit ballot envelopes

---

[16] For example, in California an analogous statewide public education campaign regarding mail balloting cost more than $15 million. *See* Lean Decl. (Attachment 1) ¶¶ 50-51.

[17] *See* Lean Decl. (Attachment 1) ¶ 63 (Three counties in California do not currently use Intelligent Mail barcodes for outbound and inbound tracking); Tassinari Decl. (Attachment 2) ¶ 82 (Massachusetts and its municipalities do not use Intelligent Mail barcodes on outbound election mail); Rosenberg Decl. (Attachment 7) ¶¶ 67–68 ("Connecticut municipalities do not currently use Intelligent Mail barcodes on ballot mail. They do, however, utilize other safeguards to ensure the accuracy of absentee ballots. For example, each municipality creates a unique label with a barcode for the absentee ballot envelope (which also has a serial number printed on it)."); Linnell Decl. (Attachment 14) ¶ 66 ("Intelligent Mail barcodes are not required nor to my knowledge used by most Minnesota counties and municipalities . . . ."); *California v. Trump*, Case No. 1:26-cv-11581-IT, Dkt. No. 100-6 (D. Mass. Apr. 23, 2026) (Rudy Decl.) ¶ 70 ("About 23% of Colorado counties do not currently use Intelligent Mail barcodes on ballot mail") (Attachment 6); *id.*, Dkt. No. 100-8 (Albence Decl.) ¶ 76 (Delaware's Department of Elections does not currently use piece-level Intelligent Mail barcodes on mail ballot envelopes) (Attachment 8); *id.*, Dkt. No. 100-10 (Flynn Decl.) ¶ 68 ("Maine does not currently use Intelligent Mail barcodes on ballot mail") (Attachment 10); *id.*, Dkt. No. 100-11 (Berry Decl.) ¶ 102 (Maryland primarily uses Intelligent Mail barcodes, but the barcodes cannot be, and are not, used for web delivery ballots because those are returned in voter–provided materials) (Attachment 11); *id.*, Dkt. No. 100-17 (Stavisky Decl.) ¶ 65 (many local boards of elections in New York State do not currently use Intelligent Mail barcodes on ballot mail) (Attachment 17); *id.*, Dkt. No. 100-19 (Dawon Decl.) ¶¶ 77–78 (some Oregon counties apply an Intelligent Mail barcode to outgoing ballots, but not necessarily to the return envelope and counties that do not use vendors do not currently have a way

for what is presently an optional USPS design review.[18] The Proposed Rule would force many jurisdictions to build new procedures from scratch and implement them unduly quickly.

The burden is particularly acute in the States and localities that have already ordered mail ballot envelopes for the 2026 general election.[19] Many of these orders were placed in reliance on the most recent version of Kit 600, which recommends Intelligent Mail barcodes and its design review process but does not require them. *See* USPS, *2026-2027 Official Election Mail Guide Kit 600* at 4–5. States understandably relied on this "Official Election Mail Guide" when designing and printing mail ballot envelopes, but the Proposed Rule would render many of those materials unusable. Redesigning envelopes, adding barcodes, and navigating the USPS approval process would impose significant additional costs for many jurisdictions. *See California v. Trump*, No. 1:26-cv-11581-IT, Dkt. No. 105 (Plaintiff States' Statement of Undisputed Material Facts) at ¶ 63 (D. Mass. Apr. 23, 2026) (Attachment 27).[20] Any delays in obtaining barcodes or design approval

---

to apply barcodes) (Attachment 19); *id.*, Dkt. No. 100-20 (Marks Decl.) ¶ 66 ("More than two dozen Pennsylvania counties, many of them small, rural counties, fulfill ballot requests in-house and do not currently use Intelligent Mail barcodes on ballot mail.") (Attachment 20); *id.*, Dkt. No. 100-21 (Rock Decl.) ¶¶ 72–73 (Rhode Island uses Intelligent Mail barcodes on envelopes sending ballots to voters, not on provided return envelopes) (Attachment 21); *id.*, Dkt. No. 100-23 (Koski Decl.) ¶¶ 66; *id.*, Dkt. No. 100-24 (Michalowski Decl.) ¶ 69–70 (Attachment 24).

[18] *See* Rosenberg Decl. (Attachment 7) ¶ 68, ("No Connecticut municipality currently submits ballot envelopes to USPS for design review."); Linnell Decl. (Attachment 14) ¶ 67, ("Minnesota counties and municipalities are not currently required to submit ballot envelopes to USPS for design review.").

[19] *See* Tassinari Decl. (Attachment 2) ¶ 81 (Massachusetts already has ordered such envelopes at a cost of approximately $3 million); Holmes Decl. (Attachment 4) ¶ 55 ("Many counties in Washington have already ordered mail ballot envelopes for the 2026 federal election cycle"); Rudy Decl. (Attachment 6) ¶ 69 (most Colorado counties have already purchased mail ballot envelopes); Albence Decl. (Attachment 8) ¶ 75 ("Delaware's Department of Elections already possesses mail ballot envelopes for the 2026 federal election cycle."); Flynn Decl. (Attachment 10) ¶ 67 ("Maine has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of $52,040.63."); Linnell Decl. (Attachment 14) ¶ 65 ("Most local elections offices in Minnesota have already ordered absentee and mail ballot envelopes for the 2026 federal election cycle[.]"); Stavisky Decl. (Attachment 17) ¶ 64 ("Upon information and belief, most New York jurisdictions have already ordered mail ballot envelopes for 2026."); Dawson Decl. (Attachment 19) ¶ 76 ("Most Oregon counties have already ordered mail ballot envelopes for the 2026 federal election cycle."); Rock Decl. (Attachment 21) ¶ 71 ("Rhode Island has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of over $50,000."); Michalowski Decl. (Attachment 24) ¶ 67 ("The Cook County Clerk has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of approximately $300,000."); *California v. Trump*, Case No. 1:26-cv-11581-IT, Dkt. No. 100-12 (D. Mass. Apr. 23, 2026) (Brater Decl.) ¶ 76 ("It is too late for these local clerks to order additional envelopes for the August primary, and likely too late for them to order additional ones for the November election.") (Attachment 12).

[20] *See* Tassinari Decl. (Attachment 2) ¶ 82 (requiring small Massachusetts municipalities "to purchase equipment capable of applying an Intelligent Mail barcode would likely deplete their municipal budgets"); Holmes Decl. (Attachment 4) ¶¶ 55, 58 (requiring counties that have already

could disrupt vote-by-mail systems, *see id.* ¶ 64, with the most serious delays threatening States' ability to accept mail-in ballots at all, *see id.* ¶ 65. These harms flow directly from reliance on procedures that have governed election administration for years and that USPS itself reinforced as recently as a few months ago, and the Proposed Rule fails to address them at all.

The scale of the reliance interests and their relation to the right to vote leaves no doubt as to their significance. Each Signatory State allows some or all of their registered voters to receive and return ballots by mail, and in the 2024 general election many millions of voters did so. *See id.* ¶¶ 40, 41. In many States, all or almost all voters vote by mail or absentee ballot. For example, 100% of Oregon voters, 92% of Colorado voters, and 80% of California voters relied on mail or absentee ballots in the 2024 general election. *Id.* ¶ 42. The proposed Mail-In and Absentee Participation List and ballot envelope requirements will therefore functionally prevent a significant portion of the electorate from casting their votes by mail.

Against this backdrop, USPS's failure to acknowledge or assess States' reliance interests is a fundamental failure of reasoned decision-making. The Proposed Rule is therefore arbitrary and capricious.

## V. The Proposed Rule Fails to Observe USPS Rulemaking Procedure Required by Law

The Postal Reorganization Act of 1970 provides that USPS must seek an advisory opinion from the PRC whenever "a change in the nature of postal services [] will generally affect service on a nationwide or substantially nationwide basis[.]" 39 U.S.C. 3661(b). USPS must "submit a proposal, within a reasonable time prior to the effective date of such proposal[.]" *Id.* The PRC may not issue that opinion until an on-the-record hearing under sections 556 and 557 of Title 5 of the U.S. Code has been afforded to USPS, mail users, and a PRC officer representing the general public. 39 U.S.C. § 3661(c). This open and deliberative process is consistent with Congress's broader project of "reduc[ing] political influences on [USPS's] operations." *Flamingo Indus.*, 540 U.S. at 740; *see also Mail Ord. Ass'n of Am. v. USPS,* 986 F.2d 509, 519 (D.C. Cir. 1993) (citation modified) (summarizing Congress's efforts to ensure USPS has "independence from political

---

ordered ballot envelopes to order replacements "would significantly increase costs to [Washington], which reimburses counties for a pro rata share of election expenses associated with state and federal elections"); Albence Decl. (Attachment 8) ¶¶ 75, 77 (requiring Intelligent Mail barcodes would require Delaware's Department of Elections to adjust the software that the Department currently uses to track absentee ballots and purchase new envelopes, but the Department does not have funds budgeted); Flynn Decl. (Attachment 10) ¶ 68 (using Intelligent Mail barcodes would require additional expenditures for software integrated with the Maine's central voter registration application software and database); Linnell Decl. (Attachment 14) ¶¶ 65, 68 (reprinting Minnesota's envelopes would come at substantial cost and divert critical time and money from other elections administration duties); Stavisky Decl. (Attachment 17) ¶ 66 (delays from ballot design review would force New York state and local election officials to divert critical time and money from other elections administration duties); Rock Decl. (Attachment 21) ¶ 73 (adding Intelligent Mail barcodes on the state-provided return envelopes in which voters submit their mail ballots would cost Rhode Island tens of thousands of dollars that were not budgeted).

pressures" and "seal off [USPS] from partisan political influence"); H.R. Rep. No. 91-1104, at 1 (1970) (Conf. Rep.), as reprinted in 1970 U.S.C.C.A.N. 3649, 3650.

Here, USPS has not sought an advisory opinion, nor can it request an advisory opinion "within a reasonable time" before the proposed effective date, *id.* § 3661(b), and the EO's self-imposed 120-day implementation deadline—July 29, 2026—cannot truncate a statutory prerequisite. EO § 3(d); *see California,* 2026 WL 1826490, at *16 (finding "the EO's directive that USPS require all States to use a specific mail-in ballot is inconsistent with USPS rulemaking procedure"). That USPS has structured this rulemaking such that section 3661 compliance is impossible before the intended effective date compounds the violation rather than excuses it. *See* 39 C.F.R. § Pt. 3020, App. A (pro forma PRC procedural schedule indicates 90 days to issue advisory opinion after process initiated); *see also* 39 C.F.R. § 3020.111(a), (d) (requiring that USPS hold a pre-filing conference before requesting an advisory opinion and provide at least 10 days' notice before the conference).

The Proposed Rule is a paradigmatic section 3661(b) change. A proposed policy or rule change triggers section 3661(b) review when it: (i) will have a meaningful, quantitative impact on service; (ii) will qualitatively change the nature of postal services; and (iii) is nationwide or substantially nationwide. *See Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 884–886 (E.D. Pa. 2020) (citing *Buchanan v. USPS*, 508 F.2d 259, 262–263 (5th Cir. 1975)).

As detailed in the States' litigation,[21] the Proposed Rule satisfies all three elements. As to quantitative impact, lawful ballot mailings will be delayed or returned outright due to conflicts between the Proposed Rule and state election laws, reducing the availability of mail service for ballot mail—an impact compounded by tight statutory deadlines under which States must transmit ballots and voters must return them. *Cf. Pennsylvania*, 490 F. Supp. 3d at 885 (finding "sharp decrease[] in mail service across the country" showed a quantitative impact); *New York v. Biden*, 636 F. Supp. 3d 1, 21–22 (D.D.C. 2022) (finding impacts on transportation schedule, decline in on-time delivery rates, and removal of high-speed sorting machines constituted meaningful, quantitative impact on service).

The Proposed Rule will likewise have a qualitative impact by instituting a new enrollment and verification regime and dramatically departing from existing postal services, which have long served as the foundation of States' mail ballot programs and on which voters have long relied. *See Pennsylvania*, 490 F. Supp. 3d at 885–886 (finding the plaintiffs' evidence that "individual postal customers . . . experience[d] an alteration in the availability of postal services as a result of the changes" showed a qualitative change in postal services). Moreover, election officials fear prosecution for any errors in administering the Proposed Rule. *See* EO, § 2(b).

Finally, any new acceptance conditions for all federal ballot mail are plainly a nationwide change—no geographical area is exempt from the Proposed Rule's reach. USPS's failure to submit a proposal to the PRC therefore violates section 3661(b). *See Pennsylvania*, 490 F. Supp. 3d at

[21] *See* Plaintiff States' Statement of Undisputed Material Facts (Attachment 27) ¶¶ 31–37, 40, 43–46, 52, 58–62, 64.

885–886; *New York*, 636 F. Supp. 3d at 21–22; *Washington v. Trump*, 487 F. Supp. 3d 976, 985 (E.D. Wash. 2020).

## VI. Conclusion

For those reasons, USPS should withdraw the Proposed Rule. The Proposed Rule is unlawful and would be an unprecedented and unacceptable interference with States' control over their elections.

Sincerely,

ROB BONTA
California Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

AAROND D. FORD
Nevada Attorney General

NICK BROWN
Washington Attorney General

KRIS MAYES
Arizona Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia Attorney General

ANNE E. LOPEZ
Hawai‘i Attorney General

KWAME RAOUL
Illinois Attorney General

AARON M. FREY
Maine Attorney General

AARON BROWN
Maryland Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

JENNIFER DAVENPORT
New Jersey Attorney General

RAÚL TORREZ
New Mexico Attorney General

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

DAN RAYFIELD
Oregon Attorney General

PETER NERONHA
Rhode Island Attorney General

CHARITY R. CLARK
Vermont Attorney General

JAY JONES
Virginia Attorney General

JOSHUA L. KAUL
Wisconsin Attorney General