**DECLARATION OF DENA DAWSON**

I, Dena Dawson, declare as follows:

1. I am a resident of the State of Oregon. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Oregon Secretary of State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Elections Director for the Oregon Secretary of State and lead its Elections Division. I work for the Secretary of State and support him in his official capacity as the chief elections officer for the State of Oregon. In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Elections Director since January 2025. Prior to this role, I was Lane County Clerk, that county's chief election official. Earlier in my career, I held leadership positions at county election offices in Nevada and Colorado, and in Multnomah County, Oregon. I have more than 19 years of experience in elections administration, including five years in Oregon during which I progressed from an entry-level election clerk to leadership roles. This hands-on experience across every stage of election administration ensures that I understand the full scope of voter registration and mail-ballot processes.

4. In Oregon, elections—which are conducted by mail—are administered by the counties in collaboration with the state. ORS 254.465. County election officials are responsible for voter registration, performing list maintenance, issuing ballots, tabulating votes, and certifying results in their jurisdiction.

5. The Secretary of State is Oregon's chief elections officer, responsible for executing and enforcing all state and federal laws relating to elections within the state. *See* ORS

246.110. The Elections Division is responsible for implementing the Secretary of State's responsibilities with regard to elections, including maintaining the uniform application and operation of election law; directing, assisting, and advising county clerks on election procedures; and maintaining a maximum degree of correctness, accuracy, impartiality, and efficiency in the administration of election laws. As relevant here, the Elections Division is the administrator of the statewide voter registration list, regularly disseminates information to counties to support local list maintenance efforts, and enforces election law violations. Oregon law charges my office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. ORS 246.110; ORS 247.005.

6. Elections are administered by the counties in collaboration with the state. ORS 254.465. All active registered voters receive an official ballot from their county. The ballot can be mailed back to the county or dropped off at any official drop box across the state. Voters' pamphlets with information on ballot measures and candidates are sent to Oregon residents three weeks before each statewide election, giving voters time to research issues on the ballot, including state and local measures and candidates. Since adopting vote-by-mail, Oregon has consistently ranked as a national leader in voter turnout. As stated above, the Elections Division has oversight responsibilities, including directing, assisting, and advising county clerks on election procedures.

7. In my role as Elections Director, I lead the Elections Division. I am responsible for overseeing statewide voter registration, list-maintenance activities, and mail-ballot processes; ensuring that all elections are conducted in compliance with federal and state law; and providing written guidance, training, and other support to county elections officials.

8. My office and Oregon's 36 counties are currently preparing to administer the November 2026 general election. Federal, state, and local races will be on the ballot. Over the next week, my office will be busy reviewing and qualifying candidates for state office and filing the ballot statement of federal and state offices to be filled. Over the next month, my office is also charged with preparing the statewide voters' pamphlet. Meanwhile, county clerks will be reviewing and qualifying candidates for county office (and supporting other local filing officers through this process) and preparing and proofing official ballots and the county voters' pamphlet. At the same time, county clerks will also be mailing and receiving ballots and continuing to register voters until the deadline.

9. In Oregon, all voters receive a mail ballot. For over 25 years, Oregon has sent these ballots to voters through the United States Postal Service ("USPS").

10. Ballots are mailed by county clerks. Mail ballot envelopes are designed by counties and must conform with state law. ORS 250.037-038; OAR 165-007-0030. Mail ballots are not required by state law to include Intelligent Mail barcodes. The deadline for counties to mail ballots to Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) voters is September 19, 2026. Counties will begin mailing ballots to voters with a non-Oregon mailing address who are not military or overseas voters (absentee voters) on October 5, 2026. Counties will begin mailing ballots to all other eligible voters 20 days before the election, or on October 14, 2026.

11. Counties continue to issue ballots as inactive voters activate their registrations, and active voters update their registrations or request replacement ballots, all of which can occur up until Election Day. ORS 247.303; ORS 254.480. If a registration is updated or a replacement ballot is requested more than five days in advance of Election Day, the ballot is required to be

mailed. ORS 254.470(9); ORS 254.480(3)(d); ORS 247.307(4). In 2024, Oregon's voter registration system reflects that 22,395 inactive registrations were activated and 54,499 active registrations were updated for address changes in the 20 days preceding the November general election, and 66,285 replacement ballots were requested and sent within that same time period.

12. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026. The Oregon Secretary of State submitted a comment on the Proposed Rule expressing opposition and identifying specific concerns, including the Intelligent Mail barcode requirement and the State-Specific Mail-in and Absentee Participation List. A true and correct copy of that comment letter is attached to this declaration as Exhibit A.

13. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule has already and will imminently cause significant harm, confusion, and disruption in Oregon election administration, and will impose unrecoverable costs on Oregon.

14. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that Oregon will be unable to comply before the November 2026 general election and that the Rule will prevent eligible voters from voting. My office will strive to ensure that voters have an opportunity to vote, but the Rule imposes significant impediments to, and costs on, doing so.

15. My office has already been fielding questions from local elections officials and voters regarding the impact of the Rule on the November 2026 general election. County clerks

and their staff are asking how they can comply with Oregon's statutory ballot mail deadlines in light of the Rule, and voters want to know whether ballots can be delivered by alternative means and what my office is doing to ensure that they receive one. Given the widespread concern among county clerks, I plan to dedicate much of our next regular meeting to discussing the Rule and its impact on the November 2026 general election.

16. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst (MDA) review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. Oregon counties already designed and ordered their ballot envelopes months ago. Because Oregon law does not require MDA review for ballot envelopes, the existing envelopes may or may not have gone through that process. Moreover, of the counties that do participate in MDA review, the process is required only for ballot envelope *changes.* That means that many counties received their MDA approval in years past, and they may no longer have the documentation to prove it. In terms of enrolling voters in the USPS Ballot

Portal, Oregon would have to provide that information by October 4, 2026 (30 days before the election) or October 14, 2026 (20 days before the election or the first day on which regular ballots can be mailed), and we would thereafter have to update the information on a near-daily basis to include eligible voters who activated or updated their registration after that date or requested a replacement ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("US Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

17. These requirements impose significant financial costs on my office and threaten to disenfranchise voters in Oregon, all of whom rely on mail ballots.

18. I also have concerns about the feasibility of USPS implementing this system in a timely and accurate fashion in the limited time remaining before the November 2026 general election. If technological or implementation failure prevents the delivery of mail ballots in this vote-by-mail state, Oregonians have no other means by which to cast their votes.

19. If the Rule is implemented for the November 2026 general election, my office must immediately prepare and update guidance for local elections offices to ensure a consistent approach across Oregon's 36 counties. This guidance would have to address topics such as using the USPS Ballot Portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protection, and voter confidentiality program considerations. These preparations and updates will require significant time, personnel, and money, and we cannot even begin to undertake them until the USPS Ballot Portal goes live.

20. Oregon anticipates mailing ballots to approximately 3 million voters during the 2026 general election, typically during the period from October 14, 2026 (20 days before the election) to October 20, 2026 (14 days before the election). ORS 254.470(2)(a). Ballots will be mailed to UOCAVA voters not later than September 19, 2026 (45 days before the election) and to absentee voters starting on October 5, 2026 (29 days before the election). ORS 253.065(1).

21. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all of Oregon's approximately 3 million active voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. Recall that Oregon's voter registration system reflects that 22,395 inactive registrations were activated and 54,499 active registrations were updated for address changes in the 20 days preceding the November 2024 general election, and 66,285 replacement ballots were requested and sent within that same time period.

22. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials may not be able to enroll

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information.

23. State law allows a voter to spoil an unvoted mail ballot and request a new ballot up until 8:00 P.M. on election day. ORS 254.480(4); ORS 254.470(9). To ensure that voters receive these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

24. I do not have sufficient information to estimate how long it will take for elections staff to become authorized users of the USPS Ballot Portal and enroll all voters, but I expect it will be prohibitive. I also have serious doubts that our aging statewide voter-registration database, the Oregon Computerized Voter Registration (OCVR) system, will be capable of performing bulk uploads to the Portal within the next six weeks. Again, Oregon counties do not uniformly apply Intelligent Mail barcodes. To the best of my knowledge, only counties that contract with mail-service vendors – which tend to be the states' more populous and urbanized counties – have access to Intelligent Mail technology, and their vendors utilize Intelligent Mail barcodes on outgoing ballot mail only. Moreover, even those counties that contract with mail service vendors for bulk mailings generally handle their own supplemental mailings (that is, batches of several hundred or fewer pieces of election mail) in house. Finally, there is no place in the OCVR ballot module to log the Intelligent Mail barcode associated with a particular piece of ballot mail, and no time to update the database to facilitate this before the November 2026

general election. Therefore, any barcode information would either need to be separately uploaded by the mail service vendor (if and where possible) or manually added to the Portal for each voter – once for the outbound ballot envelope and then again for the return ballot envelope. Based on the information available, I estimate that this task would take between 30 seconds to one minute per voter. For 3 million ballots, that is between 25,000 and 50,000 hours of staff time. Needless to say, it would not be possible for me to recruit, hire, train, and deploy enough temporary staff to complete that work within the next six weeks, as my existing staff is already overextended with their regular preparations for the November 2026 general election. But technical and processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Oregon exponentially. And if the system fails, Oregon may be unable to mail ballots to voters at all.

25. In Oregon, the county clerks are responsible for ensuring that the voter list in their jurisdiction is up to date. As Oregonians register to vote for the first time, or activate or update their existing registrations, the clerks enter the new information into the OCVR system on a rolling basis. OCVR does not, and cannot, notify the Elections Division each time a voter record is updated, nor would this be desirable given the frequency of these updates. But the fact that Oregon's statewide voter list is managed by 36 different local elections officials will impair the State's ability to timely provide updated voter registration information to USPS.

26. Oregon has been a fully vote-by-mail state since 2000, and we have relied on USPS as a trusted partner ever since. USPS is the only way in which the vast majority of Oregon voters receive a ballot, and there is no viable alternative. Oregon counties pay for outgoing ballot mail out of their own budgets, and they are able to send mail to voters via USPS for less than 20

cents per mailpiece. I would be very surprised if a comparable rate were available from another carrier, and cost is a significant consideration for Oregon election officials.

27. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

28. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of

ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

29. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

30. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed,

and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

31. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

32. To mitigate the impact of the uncertainty and turmoil resulting from the Rule, Oregon would also have to devote significant time, personnel, and money to updating training materials for local elections officials and their staff. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal to process election mail. This is yet another aspect of the Rule that will necessarily divert our team's resources from other critical election administration tasks.

33. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election

Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

34. These requirements of the Rule necessitate immediate action from me and my team at the Secretary of State's office.

35. Our county election officials anticipate mailing approximately 3 million ballots to voters during the 2026 general election.

36. Our agency/local elections officials have consistently relied upon election mail guidance from USPS to design and mail ballots and relied on that guidance in preparations that have already been taken for the November 2026 general election.

37. Oregon counties have already ordered mail ballot envelopes for the 2026 federal election cycle. Oregon's 36 counties do currently utilize the USPS Election Mail Logo, and each county also prints a unique ballot ID number – which is voter- and election-specific and appears as a barcode – on each ballot return envelope. That unique ballot ID number is, in turn, entered into OCVR. But counties do not, as discussed, consistently apply an Intelligent Mail Barcode in addition to the unique ballot ID number. While it is common for county election vendors that insert ballots to apply an Intelligent Mail Barcode to outgoing mail pieces, the same is not true for ballot return envelopes. Moreover, counties that do not use vendors do not currently have a way to apply these barcodes. USPS confirms that States or localities that have already printed ballot envelopes that do not comply with the Rule cannot use

those envelopes and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71. But there is neither the time nor the money to

design, review, and reorder envelopes before ballots begin to be mailed to Oregon voters in mid-September.

38. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, but that tool is only available for mailings with fewer than 50,000 pieces of mail.[2] The largest counties in the State would not be able to use that tool for election mail. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes [that may have already been ordered], do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47.

39. In Oregon, as in much of the country, ballot envelopes vary by county. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes

---

*See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot envelope design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Oregon voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process. In addition, even after a design is approved, there is likely to be another chokepoint at the county vendor. The vendors that print envelopes for Oregon counties are going to be printing envelopes for all mail ballot states. But they do not have a stockpile of paper, and post-pandemic paper supply shortages mean that paper suppliers may not be able to timely supply our vendors with the paper they need.

40. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote under state law.

41. Sending mail ballots in a timely fashion is not only required by state and federal law, but it is critical to ensure that Oregon's approximately 3 million active voters can exercise their right to vote.

42. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

43. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

44. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. Following the Proposed Rule, my office received multiple inquiries from voters asking whether USPS would deliver ballots to and from voters. I anticipate more inquiries from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

45. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for Oregon residents, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law with no impediments.

46. I estimate that such a public education effort would likely cost in the hundreds of thousands of dollars that the Elections Division does not have in its budget. For example, sending a single piece of mail to each of Oregon's 3 million active voters to notify them of these changes would cost approximately 15 cents per mailpiece and $450,000 in total. As it is, my office is already seeking emergency funding from the legislature to simply fill gaps in our statewide physical dropbox infrastructure.

47. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

48. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

49. While Oregon's held its primary elections in May 2026, my office and county election officials have precious little time after completing our duties related to the primary to turn to preparations for the November general election.

50. Counties must begin mailing ballots for the 2026 general election next month. Consistent with federal law, agencies mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. § 20302(a)(1)-(3), (8)(A). In addition, state law requires that counties begin mailing ballots to all other eligible voters no later than October 14, 2026. ORS 254.470(2)(a). Counties will continue mailing ballots through October 20, 2026, consistent with state law. ORS 254.470(2)(a).

51. Additionally, counties will need to continue to register those who are eligible to vote. Oregon allows qualified individuals to register up to 21 days before Election Day. Or. Const., Art. II, sec. 2; ORS 247.045; 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Oregon citizens can register to vote online, at their county clerk's office, at various state social service agencies, and through Oregon's Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. Oregonians can also activate or update their existing registrations up until Election Day. ORS 247.303. During the weeks and months leading up to an election, we see a high volume of voters registering or activating/updating their registration, resulting in flux in voter rolls and requiring time from election officials.

52. In compliance with the NVRA "quiet period" for voter registration, Oregon does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. § 20507(c)(2)(A), 3(A)-(B), 4(A). Oregon does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter dies or requests that his or her registration be canceled. ORS 247.555(1)(a)-(b).

53. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

54. Our office may need to take additional steps between now and the general election.

55. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task for counties and/or their mail-service vendors. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters.

56. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by

separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (March 31, 2026); *see also id.* § 5 (providing that "State or local election officials . . . [and] individuals involved in the administration of Federal elections; or public [] entities engaged in the printing, production, shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under" various federal criminal laws). The Executive Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further

investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter to Oregon Secretary of State Tobias Read, dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

57. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

58. I am worried that I and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Oregon's registered voters are not citizens. I have heard from numerous colleagues in the counties who share my concerns.

59. In conclusion, I estimate that the requirements of the Rule could add millions to the Elections Division's annual budget, particularly during the first several election cycles. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. As it is, my office is already seeking emergency funding from the legislature (in a much smaller sum) simply to fulfill existing obligations under state law (to provide sufficient physical ballot dropboxes to serve each of Oregon's 36 counties). The Rule reflects an enormous unfunded mandate that I cannot cover with my existing budget – even accounting for potential cuts – and there will not be an opportunity to seek non-emergency funding until the 2027 legislative session. That will be too late to support our preparations for the November 2026 general election, and even future funding is far from assured.

60. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special

projects that ensure Oregon's elections run smoothly and every eligible Oregon resident can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

61. Each of these tasks and costs will divert scarce resources from other critical election administration needs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 26, 2026, at Salem, Oregon

/s/ Dena Dawson

Dena Dawson
Election Director
Oregon Secretary of State