**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. _______________ |

**DECLARATION OF JONATHAN MARKS**

I, Jonathan Marks, declare as follows:

1. I am a resident of the Commonwealth of Pennsylvania. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Pennsylvania Department of State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Deputy Secretary for Elections and Commissions for the Pennsylvania Department of State (the Department). I directly report to Al Schmidt, Secretary of the Commonwealth (Secretary), who is the Chief Election Officer in the Commonwealth of Pennsylvania. In my role, I assist the Secretary in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Deputy Secretary since February of 2019. Prior to serving as Deputy Secretary, I served as Commissioner for the Bureau of Commissions, Elections and Legislation, and before that, the Division Chief of the Statewide Uniform Registry of Electors

(SURE). I have worked at the Department since 1993 and been involved with the Department's election-related responsibilities since 2002.

4. Pennsylvania's 67 counties are responsible for administering federal elections in the Commonwealth. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, and canvassing and receiving returns of all elections and certifying results to the Secretary, among numerous other tasks. *See* 25 P.S. § 2642. The Department works closely with Pennsylvania's 67 County Boards of Elections and voter registration commissions to develop and implement procedures and guidance impacting election operations in the Commonwealth.

5. The Secretary, as Pennsylvania's Chief Officer of Elections, is responsible for executing and enforcing all state and federal laws relating to elections within the Commonwealth. *See* 25 P.S. § 2621. The Department is responsible for implementing the Secretary's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. Pennsylvania law charges the Secretary and Department with general duties to enforce the Pennsylvania Election Code and the Pennsylvania voter registration law. *See* 25 P.S. § 2621; 25 Pa.C.S.A. § 1201.

6. While the 67 County Boards of Elections have primary responsibility for adjudicating voter registration applications and conducting voter list maintenance, it is the Secretary and Department that facilitate these tasks and administers the SURE system, which is the state-wide, single, uniform, integrated computer system required by the Help America Vote Act (HAVA). See 25 P.S. § 2621; 25 Pa.C.S.A. §§ 1201, 1203, 1222; 52 U.S.C. § 21083. The Secretary effectuates these tasks by issuing directives and guidance to the county Boards of Elections and engaging in close coordination and communications with county elections officials

with respect to all aspects of the elections process including absentee and mail-in voting. The Department provides substantial technical support to the county Boards of Elections and registration commissions.

7. In my role as Deputy Secretary, I am responsible for overseeing the carrying out of the Department's election-related responsibilities and helping to ensure that the 67 County Boards of Elections fulfill their duties under both the Pennsylvania Election Code, the Pennsylvania voter registration law, and federal law, including the National Voter Registration Act (NVRA) and HAVA..

8. The Department and Pennsylvania's 67 counties are currently preparing to administer the November 2026 General Election. Federal and state races will be on the ballot. This preparation includes a large array of tasks such as ensuring that all county ballots are finalized, that county registration commissions are timely acting on registration applications, that absentee and mail-in ballots are sent out to requesting voters timely and that all required testing is completed on electronic voting systems and that polling places are prepared.

9. Pennsylvania County Boards of Elections provide a mail ballot to all registered voters who request one. 25 P.S. §§ 3146.5; 3150.15. County Boards of Elections send these ballots to voters through the United States Postal Service (USPS).

10. In Pennsylvania, ballots are mailed by the County Boards of Elections and/or through their vendors. Mail ballot envelopes are designed by the Department and must conform with state law. 25 P.S. §§ 3146.4, 3150.14 (Secretary prescribes size and contents of absentee and mail-in ballot envelopes). Mail ballots are not required by Pennsylvania law to include Intelligent Mail barcodes. In compliance with UOCAVA and UMOVA, Pennsylvania counties issue ballots to registered voters who request absentee ballots under that Act at least 45 days

before an election (75 days for those overseas and military voters in extremely remote or isolated areas) and must continue to issue ballots for eligible requesters within 48 hours after subsequent requests are received. 52 U.S.C. § 20302(a)(1)-(3); 25 Pa.C.S.A.§ 3508. In compliance with the Pennsylvania Election Code, county Boards of Elections are required to process all mail ballot applications from eligible voters received by 5:00 pm on the seventh day prior to an election. 25 P.S. § 3150.12a; *see also* 25 P.S. § 3146.2a (allowing for absentee ballots in the case of illness or other events occurring shortly before an election).

11. In compliance with the Pennsylvania Election Code, County Boards of Elections are required to process all mail ballot applications from eligible voters received by 5:00 pm on the seventh day prior to an election. 25 P.S. § 3150.12a; *see also* 25 P.S. § 3146.2a (allowing for absentee ballots in the case of illness or other events occurring shortly before an election. For the 2026 General Election, this deadline is October 27, 2026. In the 2024 General Election, 21% of the registered voters in Pennsylvania voted by mail. Based on statistics from the 2024 General Election, 664,915 mail ballot applications were made with County Boards of Elections within 30 days of Election Day (30.23 percent of the total number of mail ballot applications approved that year).

12. I am familiar with the Notice of Proposed Rulemaking issued by the USPS that was published in the Federal Register on June 2, 2026. On July 2, 2026, Pennsylvania Governor Josh Shapiro submitted a letter on the Proposed Rule expressing opposition and identifying specific concerns, including the threat it represented to the authority of states in administering elections and the strong potential for voter disenfranchisement. A true and correct copy of that comment letter is attached as an exhibit to this declaration.

13. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule will imminently cause significant harm, confusion, and disruption in Pennsylvania election administration, and will impose unrecoverable costs on Pennsylvania and its counties.

14. For the reasons discussed throughout this declaration, I must act now to align Pennsylvania's administration of mail voting with the requirements of the Rule. Given the very short time available, the haphazard approach taken by USPS to considering the Rule's practical impacts, and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 General Election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

15. Pennsylvania county election officials began reaching out to me to express their significant concerns about implementing the Rule as soon as it was published. In addition, the Department's Bureau of Elections started receiving calls from concerned voters on the Monday morning following publication of the Rule. For their part, county election officials are seeking guidance on how to implement such sweeping changes to their business processes this close to the election. They are also concerned about the potential costs and the ripple effect implementing the Rule will have on other aspects of election administration within their individual counties. As for the Commonwealth's voters, they are concerned about whether they will be able to vote by mail at all and whether their personal identifying information will be protected.

16. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In Pennsylvania, we would have to provide that information by October 4, 2026 (30 days before the election) or in the case of voters in "extremely remote or isolated areas," by September 19, 2026 (45 days before the election). 25 P.S. § 3146.5(a). County Boards of Elections would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date and through the mail ballot application deadline of October 27, 2026. 25 P.S. §§ 3146.5(b)(1), 3150.15 (mail ballots must start to be sent to domestic civilian voters no later than the second Tuesday before the election); 25 P.S. §§ 3146.2a(a), 3150.12a(a) (mail ballot applications due the Tuesday before the election). The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("US Mail Ballot List") to States' chief election officials

"[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

17. These requirements impose significant financial costs on the Department and County Boards of Election and threaten to disenfranchise voters in Pennsylvania.

18. Given the limited time before the November 2026 General Election and the challenges and nuances in any system that is required to transmit large amounts of data across different systems, I am very concerned about the feasibility of USPS implementing such a system successfully. The risk of implementing such a system is that voters (especially those applying for an absentee or mail ballot after the original list is compiled) will be left off any list altogether and will be disenfranchised.

19. As a result of the Rule, the Department must immediately prepare and update guidance for the County Boards of Elections to ensure a consistent approach across Pennsylvania's 67 counties. This guidance would have to address topics such as using the USPS portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protection and the manner of treating voters who are entitled to confidentiality protection under Pennsylvania law. These preparations and updates will require significant time, personnel, and money.

20. Pennsylvania anticipates that 2026 mail ballot requests will be comparable to the requests submitted in the 2024 presidential election, when nearly 2.2 million (23 percent) of all registered voters requested a mail ballot.

21. In my experience, implementing new election technology is a highly complex exercise and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development

and implementation window—enrolling over a million Pennsylvania voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election.

22. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information.

23. Based on what information is available, I estimate that it will take hundreds of person-hours hours for elections staff at the Department and in each of Pennsylvania's 67 counties to become authorized users of the USPS Ballot Portal and enroll all voters—assuming there are no delays caused by technical or processing difficulties. Pennsylvania's voter registration database, the SURE System, currently does not include a field for IMb codes, which

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

are generated outside of SURE. Many counties do not currently insert IMb codes on the envelopes for mail-in and absentee ballots. Use of IMb codes would require changes to our database and other systems, or require significant work to add these data manually which increases the risk of error. But technical and processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Pennsylvania and its counties exponentially. And if the system fails, Pennsylvania and its counties may be unable to mail ballots to voters at all.

24. Pennsylvania's County Boards of Elections are receiving absentee and mail ballot applications up to seven days before Election Day, so the state voter file required under the Rule would have to be updated daily. It is not clear how that information from all of Pennsylvania's 67 County Boards of Elections would be transmitted to USPS.

25. Access to mail-in voting is especially important for low-income, rural, and vulnerable populations, including the elderly and voters with disabilities, who may lack access to transportation to either vote in-person or to otherwise receive and return their ballot.

26. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election

mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

27. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

28. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in

the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

29. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

30. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and

will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

31. As a result of the Rule and to mitigate the impact of all this uncertainty and turmoil, the Department will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. With respect to data comparison review alone, I have previously estimated that the hiring of two additional experienced, full-time data analysts at a total annual cost, including salary and benefits, of $442,000 would be necessary. These positions have not been budgeted. These tasks will also require current supervisory staff to devote additional hours to manage these additional employees. Further, elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and to process election mail. This is yet another aspect of the Rule that will necessarily divert significant Department and county resources from other important election administration tasks.

32. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

33. These requirements of the Rule necessitate immediate action from me and my team in the Department.

34. Our agency anticipates that County Boards of Elections will mail over 1.75 million ballots to voters during the 2026 General Election.

35. The Department and County Boards of Elections have consistently relied upon election mail guidance from USPS to design and mail ballots, and relied on that guidance in preparations that have already been taken for the November 2026 General Election.

36. County Boards of Elections have already ordered mail ballot envelopes for the 2026 federal election cycle. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71. Not all of Pennsylvania's 67 counties currently use Intelligent Mail barcodes on ballot mail.

37. More than two dozen Pennsylvania counties, many of them small, rural counties, fulfill ballot requests in-house and do not currently use Intelligent Mail barcodes on ballot mail. However, the declaration envelope that the voter must sign contains a unique ID number barcode generated via the Commonwealth's statewide voter registration database that is associated with the voter's distinct voter record. This unique ID, together with a smaller security envelope in which the voter's ballot is sealed, ensures that each ballot packet issued by a county is linked to a distinct voter record, promoting integrity while protecting the secrecy of the voter's enclosed ballot. The change the Rule requires would necessitate that these counties either contract with a professional mail house vendor or invest in the software and materials necessary to complete this task in-house. That is simply not feasible at this point in time.

38. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, but that tool is only available for mailings with fewer than 50,000 pieces of

mail.[2] The largest counties in the State would not be able to use that tool for election mail. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 General Election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes, which may have already been ordered, do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47.

39. While the Department encourages all county Boards of Elections to submit their ballot envelopes to USPS for design review, I am concerned that with changes necessitated by the Rule, the USPS will be inundated and overwhelmed with design review requests from jurisdictions throughout the United States and will be unable to accomplish effective review in time for the 2026 General Election. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary for County Boards of Elections to deliver mail ballots to Pennsylvania voters. Managing the fallout from such a delay would require the Department and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

40. Further, beyond Pennsylvania, I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. Just within

[2] *See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

the Commonwealth this process can take multiple days. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Pennsylvania voters. Managing the fallout from such a delay would force the Department and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Pennsylvania voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would require the Department and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

41. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to Pennsylvanians who are properly registered to vote and entitled to vote by absentee or mail-in ballot under Pennsylvania law.

42. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Pennsylvania voters as possible can exercise their right to vote. In the 2024 General Election, 21% of Pennsylvanians voted by mail. This method of voting is particularly important for many Pennsylvanians such as the disabled, the elderly or those with difficulty getting to a polling place on Election Day.

43. The Rule creates a substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under Pennsylvania law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

44. Even if the USPS Ballot Portal and enrollment system work as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will

determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

45. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. Following the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"), the Department received inquiries from voters concerned about their ability to vote by mail. I anticipate more inquiries from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 General Election.

46. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail.

47. I estimate that such a public education effort would likely cost over one million dollars. For comparison, in preparation for the 2020 Primary, the first election where no-excuse mail-in voting was rolled out in Pennsylvania, the Department spent $9.9 million on advertising and voter education efforts. While there were other factors at play during that time that caused increased spending and costs, I would still believe that the efforts to educate voters about the changes the EO requires would cost the Department a significant amount of money that has not been budgeted.

48. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of the Department and the County Boards of Elections. In my experience, voters tend to blame state and local elections officials for administrative issues over which they have no

control, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

49. The harms that stem from the Rule are particularly acute because the requirements take effect while the Department is busy taking other steps to prepare for the 2026 General Election.

50. County Boards of Elections must begin mailing ballots for the 2026 General Election in the coming weeks. Consistent with federal law, agencies mail ballots to military and overseas voters by September 19, 2026, 45 days before the General Election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A); 25 P.S. § 3146.5. In addition, state law requires that counties begin mailing absentee and mail-in ballots to all other eligible voters no later than October 20, 2026. 25 P.S. § 3150.15. County Boards of Elections will continue mailing ballots for all qualified voters who apply by the ballot application deadline of October 27, 2026.

51. Additionally, County Boards of Elections will need to continue to register those who are eligible to vote in Pennsylvania. Pennsylvania allows qualified individuals to register up to 15 days before Election Day. 25 P.S. § 3071; 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Eligible Pennsylvanians can register to vote online, at their county elections office, at various state social service agencies, and through the Pennsylvania Department of Transportation's Division of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

52. In compliance with the NVRA "quiet period" for voter registration, Pennsylvania counties do not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Pennsylvania does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled. 25 Pa. C.S.A. § 1901(b)(4).

53. In sum, County Boards of Elections must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

54. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters.

55. I am also deeply concerned about harms to the morale of election officials in the Department and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, EO § 2(b) (March 31, 2026). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter to the Secretary dated

July 7, 2026, the U.S. Department of Justice specifically threatened to prosecute election officials if noncitizens cast any ballots.

56. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

57. I am worried that Department and other local election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Pennsylvania's registered voters are not citizens. I have had conversations with many county elections personnel who have told me that they believe that pressure brought on by these proposed changes will deter more people from serving as election officials and workers. I worry that this will further exacerbate the shortage of election workers and particularly increase the departures of experienced elections directors that many counties have experienced.

58. As stated above, I am concerned that the requirements of the Rule will cost the Department in money that has not been budgeted and will require Department and County Boards of Elections to divert their scarce resources which should be devoted to other vital elections tasks.

59. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, the Department and the counties' busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Pennsylvania's elections run smoothly and every eligible Pennsylvanian can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an

increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Harrisburg, Pennsylvania.

Jonathan Marks
Deputy Secretary for Elections and Commissions
Pennsylvania Department of State

# Exhibit A

July 2, 2026

David Steiner
Postmaster General
United States Postal Service
475 L'Enfant Plaza SW
Washington, D.C. 20260

Dale Kennedy
Director, Product Classification
U.S. Postal Service
475 L'Enfant Plaza SW, Room 4446
Washington, DC 20260-5015

RE: Proposed Amendment to the Mailing Standards of the United States Postal Service, USPS-2026-1289-0001, *Ballot Mail for Federal Elections*, 91 Fed. Reg. 32915 (June 2, 2026)

Dear Postmaster General Steiner and Director Kennedy,

We, the undersigned governors, write regarding the unconstitutional and illegal attempt to transform the United States Postal Service (USPS) into an election administration agency controlled by the White House and President Trump. Voting is foundational to our democracy, and our democracy works best when every eligible voter can participate. Yet if this Proposed Rule is implemented, eligible American citizens will be blocked from participating in our elections. The proposal reflects a blatant violation of the Constitution, which vests the authority to regulate the time, place, and manner of federal elections with the states and Congress alone. Indeed, a federal court has already blocked the Executive Order on which this rule is built, holding that USPS has no authority to regulate elections and that the President cannot decide who is eligible

to vote. [1] The right to vote is too important to be sacrificed at the whim of a President; it is the cornerstone of our democracy and "'one of the most sacred parts of our constitution.'"[2]

As governors, we represent a diverse array of states and interests. Yet we are united by our commitment to free and fair elections and the careful balance of state and federal authority upon which our country rests. It is for these reasons, and those below, that we voice our opposition to the Postal Service's unlawful amendment to the Mailing Standards of the USPS Domestic Mail Manual (DMM), regarding the transmission of mail-in and absentee ballots for federal elections (the Proposed Rule). We urge USPS to reclaim its independence and withdraw its Proposed Rule immediately.

## I. States Safeguard the Integrity and Efficiency of Elections for the Benefit of the Nation

Our states exercise their delegated authority under the Elections Clause of the Constitution to ensure the integrity and efficiency of federal elections. Through the Elections Clause, the Constitution expressly delegates primary authority over congressional elections to the states, subject to congressional—not Presidential—oversight.[3] The Constitution is clear on this point: "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations."[4]

The federal executive in general—and USPS in particular—has no constitutional role in setting rules governing election administration beyond the enforcement of laws enacted by Congress pursuant to its Elections Clause authority. Indeed, "executive regulatory authority over federal elections does not appear to have crossed the Framers' minds."[5] Neither President Trump nor USPS has authority to override state authority to regulate elections by forcing states to comply with federal dictates or face non-delivery of mail ballots to their voting-eligible residents, as proposed.[6]

Through this framework, our states promote and protect free and fair elections. Because the Constitution has delegated election authority to states since the Founding, states like ours have developed deep practical and institutional expertise in managing the "extraordinarily complicated" task of running statewide elections.[7] The actual work of running these elections is done by state and local officials in the more than

[1] *California v. Trump*, No. 1:26-cv-11581-IT (D. Mass. June 25, 2026), Dkt. No. 191. Specifically, the court found that the President cannot direct and USPS cannot create lists of eligible voters, because the Constitution delegates that authority to the states and the President lacks the authority to determine voter eligibility. *Id*. at 30. ("But the Constitution reserves the power to determine voter eligibility to the States alone."). In addition, the court held that "USPS lacks authority to promulgate regulations on voting and the EO's directive that USPS do so constitutes ultra vires executive action," because the timeline and requirements of the EO violate USPS's own rulemaking procedure. *Id*. at 31-32. Based on these and other findings, the court enjoined defendants "from implementing or giving effect to Sections 2 and 3 of the [Executive Order]" on which this rulemaking is based, "with respect to the November 3, 2026 or any earlier federal election" in the plaintiff states. *Id*. at 34-36.

[2] *Powell v. McCormack*, 395 U.S. 486, 534 n.65 (1969) (quoting 16 Parl.Hist.Eng. 589–90 (1769)).

[3] *Rucho v. Common Cause*, 588 U.S. 684, 699 (2019).

[4] U.S. Const. art. I, § 4, cl. 1.

[5] *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025).

[6] *See Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020) (holding that the Postal Service, as an executive agency of the federal government, does not have authority to override state election laws).

[7] *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of stay).

10,000 jurisdictions across the country.[8] These state and local election officials are dedicated, highly competent, responsible, accountable and transparent. Even in the face of increasing threats and harassment stemming from election misinformation, our state and local officials admirably discharge their duties and ensure that elections are free and fair.

This "dispersed responsibility for running elections also makes it extremely difficult, if not impossible, to rig U.S. elections at the national level."[9] Our states do not just serve as 'guard dogs' for any federal misbehavior. Instead, states remain significantly functionally independent of, and resistant to capture by, the Executive Branch due to a uniquely American mix of tradition, doctrine, and resource constraints. This system makes the risk of partisan capture "far less likely" and acts as a "bulwark against efforts by an authoritarian president to make the overall electoral playing field unfair."[10]

This state-run electoral system also "allows individual jurisdictions to experiment and innovate—to see how elections might best be run for the state and the locality's particular circumstances."[11] Elections require enormous advance preparations by state and local officials, and pose significant logistical challenges that state officials are uniquely qualified and situated to address. Our states admirably discharge their responsibility for establishing "rules that dictate everything from the date on which voters will go to the polls to the dimensions and font of individual ballots."[12] Our state and local officials exercise their discretion under the Elections Clause to make countless "difficult decisions about how best to structure and conduct elections" that reflect their respective state's varying needs and priorities.[13]

In our experience, State leadership also increases trust among the electorate. "State run elections mean that voters recognize their neighbors who staff polling stations, trust their state and local election authorities to keep their personally identifying information safe, and believe that they will not be targeted because of what they look like or who they vote for."[14] Americans view their state and local officials far more positively than federal officials,[15] and that they have substantially more trust and confidence in state and local officials as compared to federal officials.[16] The authority exercised by the states under the Elections Clause serves as a bulwark against the erosion of public confidence in our electoral system, especially in an era of rampant election misinformation and partisanship at the federal level. Many states, including some of our own, have laws that specifically address partisanship, and give both major political parties an equal role in ensuring the integrity of state-run elections.

---

[8] *Election Administration at State and Local Levels*, Nat'l Conf. of State Legislatures (Jan. 13, 2026), https://www.ncsl.org/elections-and-campaigns/election-administration-at-state-and-local-levels.
[9] *Id.*
[10] David Landau, et al., *Federalism, Democracy, and the 2020 Election*, 99 Tex. L. Rev. Online 96, 100, 104 (2021).
[11] *Election Administration at State and Local Levels*, Nat'l Conf. of State Legislatures (Jan. 13, 2026), https://www.ncsl.org/elections-and-campaigns/election-administration-at-state-and-local-levels.
[12] *Moore v. Harper*, 600 U.S. 1, 29 (2023).
[13] *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31–32 (2020) (Kavanaugh, J., concurring).
[14] *United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807, at *2 (C.D. Cal. Jan. 15, 2026).
[15] Pew Research Center, *On issue after issue, Americans say things are going better locally than nationally*, (Feb. 10, 2025), https://www.pewresearch.org/short-reads/2025/02/10/on-issue-after-issue-americans-say-things-are-going-better-locally-than-nationally/.
[16] *See* Gallup, *Americans Trust Local Government Most, Congress Least* (Oct. 13, 2023), available at https://news.gallup.com/poll/512651/americans-trust-local-government-congress-least.aspx.

Thanks to states, the division of authority established by the Elections Clause continues to confer benefits on our nation and citizenry. The primacy of Governors, state legislators, and state elections officials "allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry."[17] This system of electoral federalism is a cornerstone of our democracy. We—as governors and citizens—must defend it.

## II. USPS's Proposed Rule Would Disenfranchise Voters and Usurp State Authority

USPS's *Ballot Mail for Federal Elections* rulemaking in furtherance of the President's illegal March 31, 2026 Executive Order threatens to undermine the Constitution's careful separation of powers. It is universally understood that neither the Postal Service nor the President may regulate or administer American elections. Yet the Proposed Rule offends that basic constitutional principle of the Elections Clause, and undermines the very structure of our constitutional system.[18] Far from ensuring integrity in federal elections, the Proposed Rule would undermine trust in elections, needlessly complicate voting processes, arbitrarily disenfranchise millions of eligible voters, and undermine states' constitutional role in ensuring free and fair elections.

The proposal envisions that USPS will issue a rule to establish compulsory specifications for election mail and create an insecure master absentee voter list of millions of Americans—with the unilateral power to refuse to deliver their ballots if a state refuses to collaborate with President Trump's unlawful directives. Specifically, USPS has threatened to create a state-specific "Mail-in Absentee Participation List" process through a "Federal Ballot Mail Portal," with no indication of whether or how this information would be safeguarded from cybersecurity threats.[19] States would be required to notify USPS of all individuals to whom they are mailing a mail-in or absentee ballots, along with the unique barcode applied to the outbound and return ballot mail envelopes for such individuals so that the name and barcode of the voter will be included on a "Mail-in and Absentee Ballot List."[20] USPS would then compile and return a final state-specific Mail-in and Absentee Ballot List to the state's chief election official.[21] A state may then make supplemental submissions and modifications to its list until the last day that ballots may be mailed out to individuals under state law.[22]

The only way for a voter to be enrolled on USPS's Mail-In and Absentee Participation List is to be included on the list offered to USPS through these processes.[23] USPS would then use that information to verify ballots sent from election officials to voters before accepting them for mailing.[24] Specifically, USPS would review whether the mailing complies with new envelope standards also included in the Proposed Rule and whether it matches the state-submitted Mail-In and Absentee Participation List and associated barcodes. USPS provides no indication of what form this screening process would take, and how long such a review might last. Nevertheless, the Proposed Rule threatens that noncompliant mailings would not be accepted or transmitted; instead, they would be returned to state or local election officials or vendors. And if a state declines to certify a Mail-In and Absentee Participation List (which no source of federal law requires them

---

[17] *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S 787, 817 (2015).
[18] *See* The Federalist No. 59 (Alexander Hamilton); *Foster v. Love*, 522 U.S. 67, 69 (1997); *Washington v. Trump*, 814 F. Supp. 3d 1173, 1214 n.57 (W.D. Wash. 2026).
[19] 91 Fed. Reg. 32916.
[20] *Id*. at 32916-18.
[21] *Id*. at 32916.
[22] *Id*. at 32918.
[23] *Id*. at 32916-18.
[24] *Id*. at 32918.

to create), the Proposed Rule prohibits USPS from transmitting *any* outbound federal ballot mail to that state's voters.[25]

The Proposed Rule would thereby require USPS to refuse delivery of otherwise lawfully mailed ballots merely because the voter does not appear on an illegal federal list, without regard for whether the voter is *in fact* eligible to vote. We are unaware, in its 250-year history, of any point at which the Postal Service has refused to deliver properly addressed, stamped, and lawful mail from a government entity. Such a practice would violate the agency's longstanding statutory universal service obligation: 39 U.S.C. § 403(c). Yet the Proposed Rule would make this refusal a USPS policy, leveraging the Postal Service's control over the mail as a tool to punish any State unwilling to cede authority over its electoral system to President Trump by coercing states to relinquish their authority over elections through threats of non-delivery.

These provisions would strip states of their explicit constitutional authority to regulate elections subject only to congressional—not federal executive agency—oversight. In practice, the Proposed Rule will cause confusion among voters and election administrators alike, leading to widespread arbitrary disenfranchisement of eligible voters. If the Proposed Rule is ultimately adopted, it will increase the authority of USPS and the federal executive at the expense of the states, Congress, and the constitutional order that has maintained our electoral democracy for 250 years.

The information contained in the Mail-in and Absentee Ballot Lists envisioned by the Proposed Rule is also likely to be outdated or incorrect by the time of the election, leading to further disenfranchisement. Mail-in and absentee voting ensure that citizens living abroad (including servicemembers stationed overseas), disabled Americans, and those who know they will be traveling at the time of an election, are able to exercise their right to vote. Most states permit no-excuse absentee voting by mail and those that do not either conduct all elections by mail or permit qualified voters to vote by absentee ballot.[26] And many states allow eligible voters to request mail-in ballots shortly before Election Day. Yet the Proposed Rule requires that a state's Mail-in Absentee Participation List must be certified at least 30 days before federal Election Day or by the date on which mail-in or absentee ballots may begin to be mailed under state law.[27] The fact that the Proposed Rule includes procedures that would allow states to modify and update these lists is cold comfort. In our experience as governors, administrative, financial, and technical issues will make it difficult for busy state and local elections officials to do so under the Proposed Rule's timeframes, resulting in effective disenfranchisement of eligible voters.

Finally, the Proposed Rule raises serious privacy concerns. It would build a single national database of millions of voters — their names tied to individualized barcodes, under the control of the President, with no plan to protect it. That information would be ripe for abuse or inappropriate disclosure, risking the integrity of American elections. The Elections Clause vests states and Congress with the power to administer elections to avoid precisely this type of potential federal abuse by "diffuse[ing] government authority to prevent the accumulation of excessive power in any one actor and to encourage different representatives of the people to monitor the exercises of power by the others."[28]

The Proposed Rule illegally requires USPS to decide who gets to vote using an absentee ballot, displacing state and local election officials who have the constitutional authority—and the necessary experience—to

[25] *Id*.
[26] *States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legislatures (Mar. 10, 2026), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting.
[27] 91 Fed. Reg. at 32916.
[28] Jessica Bulman-Pozen, *Federalism as a Safeguard of the Separation of Powers*, 112 Columbia L. Rev. 459, 460 (2012).

regulate balloting procedures. This assertion of authority to regulate mail-in balloting not only violates basic principles of federalism,[29] it also risks disenfranchising the significant number of voters who rely on mail-in balloting to exercise their fundamental right to vote. Yet if this Proposed Rule is implemented, the federal government would decide whose ballot gets delivered and whose gets turned away, blocking eligible American citizens, including deployed servicemembers and disabled voters, from participating in our elections.

## III. States Cannot Wait—the Proposed Rule Must Be Withdrawn Immediately

Election administration is an inherently forward-looking enterprise. It requires many months of advance planning, including updating voter registration databases, programming and testing voting systems, printing ballots and election materials, training poll workers, coordinating with vendors, and educating voters regarding important deadlines. Yet the Proposed Rule requires the Postal Service to set up an entirely new system and database to control millions of absentee ballots just months prior to a general election, which our state and local election officials must then implement on the ground. The Postal Service already issued its election mail guidance in January, and states and local governments have been planning accordingly. All our states' ongoing election preparations would be impacted by the Proposed Rule.

Our state and local officials cannot wait until the eve of the upcoming elections to learn whether they must attempt to comply with the Proposed Rule's unlawful directives. Any uncertainty regarding the need to comply with the Proposed Rule in the face of contradictory state and federal law, or risk non-delivery of ballot mail, will create confusion among our voters and elections officials, and strain limited state and local resources. As such, the Proposed Rule is wholly unworkable and impractical. It should be withdrawn at the earliest opportunity to avoid further irreparable harm to state and local election administration.

## IV. Conclusion

Free and fair elections are the cornerstone of our constitutional system. While we share the USPS's desire to "facilitate enforcement of federal law, reduce the risk of fraud, and help protect the integrity of federal elections,"[30] the Proposed Rule accomplishes none of those aims. It violates USPS's own mandates, federal law, and the Constitution by forcing the Postal Service to assume the role of election administrator. If finalized, this rule will disenfranchise voters and transfer power over elections from our states, where it belongs, to the White House and President Trump.

The Postal Service's job is to deliver the mail, not to decide which Americans get to vote. USPS must abandon this proposed regulation and return to its core mission of serving every eligible voter. The Constitution and federal law demand nothing less.

Respectfully submitted,



Governor JB Pritzker
State of Illinois



Governor Gavin Newsom
State of California

---

[29] *Cook v. Gralike*, 531 U.S. 510, 523 (2001) (Elections Clause grants states "broad power to prescribe the procedural mechanisms for holding congressional elections").
[30] 91 Fed. Reg. 32915.

Governor Ned Lamont
State of Connecticut

Governor Tim Walz
State of Minnesota

Governor Kathy Hochul
State of New York

Governor Josh Shapiro
Commonwealth of Pennsylvania

Governor Dan McKee
State of Rhode Island

Governor Bob Ferguson
State of Washington

Governor Tony Evers
State of Wisconsin