**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>DONALD J. TRUMP, in his official capacity as President of the United States; et al.,<br>*Defendants.* | Case No. 1:26-cv-11581 |

**DECLARATION OF ROB ROCK**

I, Rob Rock, declare as follows:

1. I am a resident of the State of Rhode Island. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Rhode Island Department of State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Deputy Secretary of State/Director of Administration for the State of Rhode Island. I work for Secretary of State Gregg M. Amore and support him in his official capacity as the Chief State Election Official for the State of Rhode Island. In my role, I assist Secretary Amore in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Deputy Secretary of State/Director of Administration for the State of Rhode Island for three years and eight months. Prior to serving in this capacity, I was

the state Elections Director from 2015-2023. I have undergraduate (Political Science) and Master's (Public Administration) degrees from the University of Rhode Island.

4. The Rhode Island Department of State, the State Board of Elections, and Rhode Island's 39 cities and towns are responsible for administering elections in Rhode Island. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5. The Secretary of State is Rhode Island's third ranking elected official, following the Governor and Lt. Governor. State law gives the Secretary of State many different duties. As Rhode Island's chief state election official, the Secretary of State oversees the state's voter registration system, certifies candidates, prepares ballots, and administers oaths of office. The Secretary of State also works with companies registered to do business in Rhode Island and regulates lobbying activity in the Executive and Legislative branches of government. The Secretary of State also must sign all laws and other official acts, such as issuing bonds, to make them official. Additionally, the Secretary of State processes, preserves, and gives public access to hundreds of thousands of historic documents and public records.

6. The Secretary of State is Rhode Island's chief state election official responsible for executing and enforcing state and federal laws relating to elections within the state. *See* R.I. Gen. Laws § 17-6-1 (general powers), § 17-6-1.3 (designated chief elections official). The Department of State's Election Division is responsible for implementing the Secretary of State's responsibilities regarding elections, including providing elections information to the public and other parties. In Rhode Island, elections administration is a collaboration among the Secretary of

State's Elections Division, the State Board of Elections, and the 39 cities and towns (local boards of canvassers).

7. Rhode Island law charges my office with assisting with preventing disenfranchisement and ensuring that all eligible voters who want to vote can do so. In collaboration with the State Board of Elections and the 39 cities/towns, we ensure voter list maintenance activities are completed, oversee the mail ballot and early voting processes so that voters can vote when it is convenient for them, and conduct post-election audits to ensure voting machines read ballots the way voters intended them to.

8. In my role as Deputy Secretary of State/Director of Administration, I am responsible for assisting with overseeing the administration of elections in Rhode Island, including overseeing the state's voter registration system, training local election officials on elections administration, maintaining the online voter registration and mail ballot application portals, certifying state and federal candidates, preparing ballots, preparing and sending mail ballots to voters, preparing election calendars, providing candidate and voter information guides, implementing a statewide elections education campaign, and providing voter identification cards. I have personally overseen these responsibilities since February 2015 and, therefore, have substantial first-hand knowledge of administering elections in Rhode Island, including voter registration requirements, the statewide voter registration system, and mail ballot voting.

9. My office, the State Board of Elections, and local boards of canvassers are currently preparing to administer the November 2026 general election in tandem with preparing to administer the September 2026 primary election. Federal, state, and local races will be on the ballot in both elections. Mail ballots for our September primary were mailed on or around

August 10 and we have already begun preparing the mail ballot process for the November 3 general election.

10. Rhode Island provides a mail ballot to all qualified voters upon their request in accordance with procedures set forth at R.I. Gen. Laws § 17-20-2.1. *See generally* R.I. Gen. Laws Ch. 17-20. My office intends to comply with these state legal requirements in administering upcoming federal elections. Rhode Island sends these ballots to voters through the United States Postal Service ("USPS").

11. My office designs all mail ballot envelopes used in Rhode Island and ensures that mail ballot envelopes comply with state law. R.I. Gen. Laws §§17-20-19, 17-20-21, 17-20-22. Mail ballots are not required by Rhode Island law to include Intelligent Mail barcodes.

12. My office is also responsible for mailing ballots to voters who request them. Through our contracted vendor (who mails over 25 million mail ballots nationwide for each general election), Rhode Island begins mailing ballots to eligible voters in early October, about 30 days before the election. We expect to send the initial batch of mail ballots for the 2026 general election on Monday October 5th, then will continue to send mail ballots daily from that point on as the mail ballot application period continues. Under Rhode Island law, voters may request a mail ballot up to 21 days before an election. R.I. Gen. Laws § 17-20-2.1(c). For the 2026 general election, this deadline to apply for a mail ballot is October 13, 2026; the local boards of canvassers have until October 16 to certify mail ballot applications pursuant to R.I. Gen. Laws § 17-20-10(c). However, voters may request to vote by emergency mail ballot within the twenty days prior to any election by providing a duly executed application to the local board of elections by 4 pm the day before Election Day. R.I. Gen. Laws § 17-20-2.2. Rhode Island

continues to send mail ballots as additional voters request a mail ballot, or request a replacement mail ballot, up to the day before Election Day.

13. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026.

14. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule will imminently cause significant harm, confusion, and disruption in Rhode Island election administration, and will impose unrecoverable costs on Rhode Island.

15. USPS' sudden push to propose and finalize new requirements for mail ballot voting for the November 2026 general election has already caused considerable harm, confusion, fear, and disruption in Rhode Island elections administration, and will likely continue to do so. USPS has upended its own advance published guidance, its longstanding practice, and its own approval of Rhode Island's submitted ballot designs for this election—all of which Rhode Island reasonably relied upon in contracting and budgeting for mail ballot services.

16. For the reasons discussed throughout this declaration, I must act now to align Rhode Island's administration of mail ballot voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

17. I have undertaken immediate steps to ensure that all Rhode Island election officials are well versed in the contents of the Rule. These measures included briefings for office staff, including the Secretary of State, on the Rule; ensuring distribution of the Rule to all state and local election officials; and preparing press releases and fielding questions from the public on the Rule's new requirements.

18. The Rule has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. The most pressing concern is whether there is any logistical way in which we could comply with the Rule's new mandates without disenfranchising Rhode Island voters who are legally entitled to vote by mail; it does not appear possible. We have already sent our contracted vendor mail ballot envelope artwork signed off by USPS that would need to be redesigned and reprinted to meet the Rule's new mandates. Even if we could afford to have the mail ballot envelopes reprinted, our contracted vendor may not have time to do so wherein jurisdictions nationwide use this same vendor for election mail printing in the short timeframe before the general election. Rhode Island's vendor prints our uniformly designed external return envelopes in advance because they do not contain Intelligent Mail barcodes that would then need to be matched to the outgoing mail ballot envelopes. However, even if Rhode Island's vendor had time to reprint the state's return ballot envelopes, the vendor is unable to put an Intelligent Mail barcode on the state's return mail envelopes because Rhode Island, as required by state law, uses an external envelope for mail processing and an internal certifying envelope placed within it that contains the sealed ballot. *See* R.I. Gen. Laws §§ 17-20-19 and 17-20-21. Additional specific concerns mount: what, if anything, we could do at this stage to comply with the Rule's mail ballot

envelope requirements; how accurate will the USPS list be; how will the USPS handle mail ballots sent to voters not on the "enrolled" list; among others.

**<u>The Harm to Rhode Island and the Risk of Disenfranchisement of Rhode Island Voters Caused by the Requirement to Enroll with USPS to Receive or Submit a Mail Ballot</u>**

19. It is my understanding that the Rule requires that every voter who will receive a mail ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound mail ballot envelope, unique Intelligent Mail barcode from the return mail ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In Rhode Island, we would have to provide that information by October 4, 2026 (30 days before the election) or by the date we start to send out mail ballots if earlier as allowed under state law, and we would thereafter have to update the information on a daily basis to include eligible voters who requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further

understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

20. These requirements impose significant burdens on my office and threaten to disenfranchise voters in Rhode Island.

21. I am deeply concerned about the feasibility of USPS implementing this new and untested system in a timely and accurate fashion in the limited window remaining before the November 2026 general election. Technological and/or implementation failure will lead to the inability of Rhode Island to deliver mail ballots to voters and to conduct the election in accordance with state and federal law.

22. As a result of the Rule, my office, in collaboration with the State Board of Elections must immediately prepare to address topics such as using the USPS portal, ensuring timely enrollment of mail ballot voters as voters continue to apply for a mail ballot leading up to the election, cybersecurity protections, and to explain to Rhode Island voters how the process will work. These preparations and updates will require significant time, personnel, and money.

23. Rhode Island anticipates mailing ballots to approximately 30,000 voters during the 2026 general election in the 30-day period before election day; for the 2024 general election, Rhode Island sent approximately 55,000 mail ballots to voters but historically receives less requests for mail ballots in midterm cycles.

24. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all mail ballot voters with USPS may be a massive undertaking. This task may be significantly complicated by the influx of voter registration

updates, additional mail ballot applications, and changes that elections officials typically receive in the months, weeks, and days before any election.

25. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and local election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14. [1] Elections officials will not only be required to process these mail ballot requests within their own systems, but they will bear the added burden of processing mail ballot applications in an entirely new system operated by USPS—about which officials currently have no concrete operational information

26. State law allows a voter to spoil an unvoted mail ballot and request a new ballot. To ensure that voters receive these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

27. Based on what information is available, it is unclear how long it will take elections staff to become authorized users of the USPS Ballot Portal and enroll all voters, assuming there are no delays caused by technical or processing difficulties. Since our return mail ballot envelopes do not already contain IMbs, it is unclear if our voter registration system would need to be updated to fulfill this request. If the Rule requires us to update our voter registration system, it would be nearly impossible to do so ahead of the November election. Additionally, given the scale of the effort, any unexpected technological and processing difficulties could increase the logistical and financial burden on Rhode Island exponentially. And if the system

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

fails to any degree, Rhode Island will be unable to mail ballots to voters which will cause irreparable harm to the democratic process by disenfranchising voters.

28. In Rhode Island, USPS is the only way in which the vast majority of voters receive a mail ballot. Access to mail ballot voting is especially important for older voters and vulnerable populations, including voters with disabilities, who may lack access to transportation to either vote in-person or to receive and return their ballot through some other means. Rhode Island has always relied upon USPS for issuing and receiving mail ballots. In rare exceptional cases, Rhode Island has sent an emergency or replacement mail ballot to a voter using a third-party mail service; however, the state does not consider those private mail services to be a realistic option for handling the total volume of mail ballots the state expects to issue and receive in the 2026 election.

29. Should a Rhode Island voter be concerned with their voted mail ballot being returned safely to the State Board of Elections by the USPS, they have only two reasonable options, both of which may not be feasible depending on the voter's situation. Option 1 is to return (or have someone return) their mail ballot to one of the 41 official mail ballot drop boxes throughout the state. This assumes the voter can visit a drop box or has someone available to them to do so. Option 2 is to visit their polling place on Election Day and deposit their mail ballot in a mail ballot receptacle or vote a provisional ballot. To prevent a voter from voting by mail and voting in person, a mail ballot voter would be listed in the electronic poll book, at their polling place, as having been issued a mail ballot. The voter would be offered the option to vote a provisional ballot which requires the voter to step out of line, go to a different check-in table, fill out an application, vote their ballot, and place it into a sealed envelope. That envelope is returned to the local board of canvassers on election night. It is reviewed by the local board of

canvassers in the day or two after the election, in a time-consuming process. The ballot will be counted if the local board of canvassers determines the voter did not also return their mail ballot. For many Rhode Island mail ballot voters, this option is not viable due to physical restraints that caused the voter to vote by mail in the first place.

30. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

31. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111,

Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

32. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Official of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail ballot voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

33. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically

beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or state and local election officials to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

34. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters on a massive scale.

35. As a result of the Rule and to mitigate the impact of all this uncertainty and turmoil, Rhode Island will also have to devote significant time, personnel, and money to update training materials for relevant election officials and their staff. Elections staff would need to be trained on USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and to

process election mail. This is yet another aspect of the Rule that will necessarily divert resources from other important election administration tasks.

**The Harm to Rhode Island Caused by USPS Rescinding Prior Approval of its 2026 Ballot Mail Envelopes**

36. It is my understanding that the Rule requires that any mail containing a mail ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier on outbound and inbound envelopes, and have undergone USPS review.

37. These requirements of the Rule necessitate immediate action from me and my team.

38. My office has consistently relied upon election mail guidance from USPS to design and mail ballots and relied on that guidance in preparations that have already been taken for the November 2026 general election.

39. Rhode Island currently submits ballot envelopes to USPS for design review. Relying upon the provisions within the USPS Domestic Mail Manual (DMM), Rhode Island submitted envelope designs to USPS for approval for its "ballot mail" without distinction between "outbound ballot mail" being sent from election officials to voters and "return ballot mail" that voters return to election officials. USPS DMM section 703.8.1.1 defines "ballot mail" as "any mailpiece sent to or from an authorized election official and containing a live ballot that may be used to cast a vote in an election." Although prior to the Rule USPS recommended using automation compatible envelopes that bear unique Intelligent Mail barcodes on "ballot mail," USPS approved Rhode Island's ballot mail envelopes—both outbound and return envelope

designs—for the 2026 election cycle with Intelligent Mail barcodes solely on the outbound envelopes.

40. In reliance on USPS approval of its ballot mail envelope designs, Rhode Island has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of over $100,000. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71. Our budget cannot absorb the reprinting of mail ballot envelopes nor is there enough time to do so.

41. Rhode Island currently uses Intelligent Mail barcodes on outbound ballot mail envelopes but not on return mail ballot envelopes. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, however, USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes [that may have already been ordered], do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47. The Rule voids the State's decision to determine the manner of its ballot mail and ignores the state's reliance on USPS approval of these envelope designs.

42. The harm from the Rule's requirement to use Intelligent Mail barcodes on return ballot mail envelopes for the 2026 general election is insurmountable for Rhode Island. It will

be impossible for Rhode Island to meet this new mandate under existing state law, and this Rule therefore effectively bars Rhode Island from using USPS for election mail.

43. Pursuant to R.I. Gen. Laws § 17-20-21, each mail ballot must be returned in the provided certifying envelope upon which the voter signs a sworn oath. In accordance with the statutorily required language that "shall be printed" on the certifying envelope, the voter must enclose their marked ballot therein, seal it, sign the oath, and enclose the certifying envelope in an external envelope addressed to the board of elections. R.I. Gen. Laws § 17-20-19 dictates that "[e]nvelopes for the enclosure and return of mail ballots and their enclosing certified envelope shall have the printed or written address" for the board of elections or a post office box established and maintained by the board.

44. Rhode Island cannot change this required two-envelope system through legislative changes in advance of the 2026 general election.

45. Rhode Island's contracted vendor has relayed that it cannot put an Intelligent Mail barcode on the external envelope when an internal certifying envelope is used for the ballot. For data and process integrity reasons, both the return intelligent mail barcode and the return ballot ID barcode must appear on the same envelope. Since RI state law requires a separate return envelope, the vendor cannot reliably associate the return intelligent mail barcode with the voter.

46. Even if there was a way for our vendor to add an intelligent mail ballot barcode to our return envelopes, I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has

disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Rhode Island voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

**The Harm to Rhode Island and the Risk of Disenfranchisement of Rhode Island Voters Caused by Ballot Rejection**

47. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to voters who are properly registered to vote and entitled to vote by mail ballot under state law.

48. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Rhode Islanders as possible can exercise their right to vote. In the 2024 General Election, 55,795 Rhode Islanders voted by mail. This method of voting is particularly important for the many Rhode Islanders who have a hard time leaving their home or people of advanced age.

49. The Rule creates a very substantial risk that at least some mail ballots will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of mail ballot envelopes required by the Rule, that would also prevent voters from receiving mail ballots.

50. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election causes significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

51. At the same time my staff is performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from voters concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, the Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail. My office has already received calls from voters concerned about possible disruptions and changes to mail voting and I

anticipate inquiries from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

52. The Rhode Island Department of State is responsible for providing voter education materials for every election. The Run for Office guide, Voter Information Handbook, Election Calendar, Vote by Mail guide, and others are published every election cycle to ensure voters and candidates have the information they need to participate in the democratic process. All of these resources have been, or will soon be, disseminated for the 2026 election cycle. Additionally, our office creates training materials for local election officials on the CVRS, voter list maintenance activities, cybersecurity best practices, and overall guidance on elections administration. In conjunction with the State Board of Elections, we have also established a training and certification program for our local election officials. Local election officials in our first cohort graduated in June and became certified election administrators while doing so.

53. I estimate that such a public education effort would likely cost more than $50,000 which is not budgeted.

54. Apart from the time and monetary costs that the Rule's implementation would impose on Rhode Island, the inevitable confusion stemming from the Rule is harmful in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before the elections. Moreover, any issues with the Rule's implementation that compromise the timely delivery of mail ballots is likely to harm the reputation of my office and reduce trust in Rhode Island's fair administration of elections, even if fault may belong to a third party like USPS. Such reputational harms are difficult to reverse.

**The Magnification of the Harms in Rhode Island given the Timing**

55. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

56. The timeline is particularly burdensome in Rhode Island, and on the resources of my office, where we are in the final days before administration of Rhode Island's federal primary election on September 9, 2026 with early voting in this primary having already started on August 20, 2026.

57. Rhode Island must begin mailing ballots for the 2026 general election in the coming weeks. Consistent with federal law, we will mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). Rhode Island will continue mailing ballots up until November 2, 2026, consistent with state law.

58. Additionally, my office will need to continue to register those who are eligible to vote in Rhode Island. Article 2, § 1 of the Rhode Island Constitution grants "[e]very citizen of the United States of the age of eighteen years or over who has had a residence and home in this state for thirty days next preceding the time of voting, who has resided thirty days in the town or city from which such citizen desires to vote, and whose name shall be registered at least thirty days preceding the time of voting as provided by law, shall have the right to vote. . ." *See also* R.I. Gen. Laws § 17-9.1-1 (voter registration requirements). The state constitution further provides that "[n]o person who is incarcerated in a correctional facility upon a felony conviction shall be permitted to vote until such person is discharged from the facility." R.I. Const. art. 2, § 1. As such, qualified individuals within Rhode Island may register up to 30 days before Election Day. R.I. Gen. Laws § 17-9.1-3; *see also* 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). In 2005, the Rhode Island Secretary of State

implemented a statewide central voter registration system called the Central Voter Registration System (CVRS). R.I. Gen. Laws § 17-6-1.2. The CVRS is the centralized voter registration system, overseen by our office, that is used by our office, the State Board of Elections, and all 39 Rhode Island cities and towns to administer all federal, state, local elections and manage voter registration activity. *See* https://vote.sos.ri.gov/Elections/Administration. Eligible persons may register to vote or update their voter information in multiple ways: they may use the Department of State's online voter registration portal; register in person at the Division of Motor Vehicles (DMV) and other designated agencies, including their local board of canvassers; or register by mail. *See* R.I. Gen. Laws § 17-9.1-7 to § 17-9.1-10. Individuals must attest to their eligibility to vote in accordance with Rhode Island law to register to vote in federal elections. Id. Individuals' eligibility to vote is also verified during the registration process, including validating their driver's license or social security number and sending a confirmation notice to their residence address. Id. Pursuant R.I. Gen. Laws §17-9.1-11, "[b]efore the name of any person shall be placed on the voting list, the personal shall, at the time of registration, certify or declare that the person is a citizen of the United States." During the weeks and months leading up to an election, we see a high volume of voters registering or updating their voter registration information.

59. In compliance with the NVRA "quiet period" for voter registration, Rhode Island does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* R.I. Gen Laws § 17-9.1-27(d); 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Rhode Island does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, someone becomes deceased or incarcerated in a correctional facility upon a felony conviction, or if someone is deemed ineligible to vote by a court of law.

60. In sum, staff at the local boards of canvassers must continue to process voter registrations forms (new voters and voters making changes) up until the 30th day before the election. Registrants are constantly being added, updated, or removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

61. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters.

**Morale and threats of prosecution**

62. I am also deeply concerned about harms to the morale of Rhode Island's election officials resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive

evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, EO § 2(b) (March 31, 2026); *see also id.* § 5 (providing that "State or local election officials . . . [and] individuals involved in the administration of Federal elections; or public [] entities engaged in the printing, production, shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under" various federal criminal laws). The Executive Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter to the Rhode Island Secretary of State and the Rhode Island Attorney General dated July 7, 2026, U.S. DOJ purported to provide notice of the federal laws applicable to state and local elections, specifically delineating potential criminal penalties for election officials.

63. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

64. I am worried that Rhode Island's election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Rhode Island's registered voters are not citizens.

**Conclusion**

65. In conclusion, I estimate that the requirements of the Rule will require an increase of close to $200,000 to the Secretary of State's budget. Given recent economic pressures across the state, I have been trying to keep my office's budgetary needs as low as possible.

66. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already dedicated to routine tasks and special projects that ensure Rhode Island's elections run smoothly and every eligible Rhode Islander can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when Rhode Island election officials must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

67. Each of these tasks and costs will divert scarce resources from other important election administration needs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Providence, R.I.

Rob Rock
Deputy Secretary of State/Director of Administration
Rhode Island Department of State