**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. _______________ |

**DECLARATION OF COMMISSIONER STEVEN L. KOSKI**

I, Steven L. Koski, declare as follows:

1. I am a resident of the Commonwealth of Virginia. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Department of Elections ("ELECT") staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I currently serve as the Commissioner of Elections for the Commonwealth of Virginia. I have served in this role since January 17, 2026.

3. In my capacity as Commissioner, I head ELECT and act as its principal administrative officer. I previously served as the Election Services Manager at ELECT from July 30, 2025, until my appointment as Commissioner. I joined ELECT on June 10, 2022, as a Policy Analyst and I also served as the Legal and Compliance Advisor.

4. In Virginia, local election officials—a three-person electoral board and the general registrar—are primarily responsible for virtually all aspects of voter registration and election administration in their respective locality. The State Board of Elections and ELECT have oversight

responsibilities over the work of local election officials to protect election integrity, promote uniformity across the Commonwealth, and ensure officials act in accordance with federal and state law.

5. To that end, ELECT and the State Board of Elections issue rules, regulations, guidance and instructions to local election officials on conducting all aspects of elections consistent with law. ELECT oversees and supports local election officials' work related to, among other things, voter registration, absentee voting, in-person voting (both early and on Election Day), post-election canvassing, and election certification.

6. ELECT is also responsible for operating a statewide voter registration system that includes a full record of all registered voters in the Commonwealth. To that end, ELECT coordinates with third parties (i.e. other state agencies, other states, and federal and private operators of national databases) to obtain information that can be used to maintain the statewide voter registration list so that it is accurately updated to account for information about new voters, eligible voters with changed circumstances, and registrants who are no longer eligible.

7. As Commissioner, I am responsible for overseeing the work of ELECT. This involves, among other things, leading efforts to provide guidance and instruction to local election officials on all aspects of election administration, including absentee voting. Similarly, I have led efforts to develop and implement ELECT's policies and practices for maintaining the accuracy of the Commonwealth's voter registration list.

8. My office and local election officials statewide are currently preparing to administer the November 2026 General Election. Federal, state, and local races and referenda will be on the ballot. Following certification of the Primary Election on August 4, ELECT has been working with localities to prepare ballots for the General Election. This process includes ensuring

that candidate information is up to date in the Commonwealth's voter registration system, and reviewing ballot designs for each precinct. This review must be completed in time for localities to order their ballots to be ready for the start of early and absentee voting on September 18. ELECT is also working with localities to conduct testing of voting machines that will be used during the General Election, and to facilitate the transmission of electronic ballots to military voters and certain voters with disabilities.

9. Under Va. Code Ann. 24.2-700, any eligible voter can request a mail ballot in Virginia. Voters can request a ballot for a particular election, or, under Va. Code Ann. 24.2-703.1, they can request to be added to a permanent absentee ballot list, which entitles them to automatically receive absentee ballots in advance of every election they are eligible to vote in. My office intends to ensure compliance with these state legal requirements in administering upcoming federal elections.

10. In Virginia, ballots are mailed by local election officials and vendors. Virginia's local election officials and vendors send mail ballots to voters through the United States Postal Service ("USPS").

11. Mail ballot envelopes are designed by each of Virginia's 133 localities and must conform with state law and the regulations adopted by the State Board of Elections, including the requirement that both the outer absentee envelope and the return envelope contain Intelligent Mail barcodes. Va. Code Ann. § 24.2-706; 1 Va. Admin. Code § 20-70-70.

12. For the 2026 General Election, Virginia's local election officials and vendors must begin mailing ballots to eligible voters on or just before September 18, 2026.

13. Virginia's local election officials and vendors will continue to send mail ballots as additional voters register to vote or request an absentee ballot, up to 11 days before the election, October 23 for the 2026 General Election.

14. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026.

15. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule will imminently cause significant harm, confusion, and disruption in Virginia election administration, and will impose unrecoverable costs on Virginia.

16. For the reasons discussed throughout this declaration, I must act now to align Virginia's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 General Election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

17. It is my understanding that the Rule requires election officials to enroll every voter who will receive an absentee or mail-in ballot with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal, and enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although

supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting for review. In Virginia, we would have to provide that information by October 4, 2026 (30 days before the election) or just before September 18, which is the date when localities begin sending out mail ballots, and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("US Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

18. These requirements potentially conflict with state laws, impose significant financial costs on my office, and threaten to disenfranchise voters in Virginia.

19. Based upon our previous experience at ELECT and the proposed process set forth in the Rule, I have concerns about the conflicts in this process with Virginia law as it relates to the protection of voter data. I also have concerns about the feasibility of USPS implementing this system in a timely, accurate, and secure manner in the limited time remaining before the November 2026 General Election. I have concerns about the diversion of resources at ELECT that will be required to comply with the rule, including in relation to coordination with localities. Technological or implementation failure may lead to Virginia's inability to deliver mail ballots to

voters and conduct the election in accordance with state and federal law. And I am concerned that these additional requirements will adversely impact the ability of validly registered individuals to participate in the election via mailed ballot.

20. As an initial matter, the Rule directly contradicts Virginia law. Virginia protects the privacy of its mail ballot voters by allowing disclosure of lists of voters casting ballots by mail only to certain individuals and entities under certain circumstances. Registrars can only allow in-person inspection and copying of lists of mail voters, and only to registered voters in Virginia. Va. Code Ann. § 24.2-706(A). Political parties, candidates, and third parties can obtain an electronic list of mail voters from ELECT, but only for campaign and political purposes. *Id*. Virginia law does not authorize ELECT to provide lists to third parties outside these narrow circumstances, including to a federal agency that has no statutory basis for seeking that information. The USPS rule, by demanding Virginia provide its list of mail ballot voters, requires ELECT to violate state law protecting voters' privacy.

21. Next, implementing the untested processes contemplated in the Rule will require ELECT to divert crucial resources in the midst of administering a statewide election. If the Rule is implemented, my office would have to immediately prepare and update guidance for local elections offices to ensure a consistent approach across Virginia's 133 local jurisdictions. This guidance would have to address topics such as using the USPS portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protection, safeguarding of data for protected voters (those eligible to have their residential address kept confidential), resolving apparent conflicts with state law, and liability for non-compliance. These preparations and updates will require significant time, personnel, and money.

22. Based on data from previous elections, Virginia anticipates mailing over 400,000 ballots during the 2026 General Election during the period from September 18 through approximately October 26 (the final day for requesting is October 23).

23. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling over 400,000 voters with USPS will be a massive undertaking. This task will be significantly complicated by the large amount of registration updates and changes that elections officials typically receive in the months, weeks, and even days before any election.

24. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

entirely new system operated by USPS—about which officials currently have no concrete operational information.

25. Indeed, while ELECT has regular communication with USPS personnel, it has yet to receive information about the proposed USPS Ballot Portal to even begin planning implementation. We anticipate that ELECT and the Commonwealth's 133 registrar's offices—many of which are leanly staffed—will have to spend time to become authorized users of the USPS Ballot Portal, familiarizing themselves with the platform, and enrolling voters. This will need to occur just as ELECT and registrars are conducting crucial work preparing for and conducting the 2026 General Election.

26. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but I am concerned that USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

27. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon

begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

28. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Official of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance

documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

29. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

30. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

31. As a result of the Rule, and to mitigate the impact of all this uncertainty and turmoil, Virginia will have to devote significant time, personnel, and money to update training materials

for local elections officials and their staff. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and to process election mail. This is yet another aspect of the Rule that will necessarily divert crucial staff time and attention from other important election administration tasks.

32. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

33. These requirements of the Rule necessitate immediate action from me and my team in ELECT.

34. Our agency anticipates that local election officials and vendors will over 400,000 ballots to voters during the 2026 General Election.

35. Local election officials have consistently relied upon election mail guidance from USPS to design and mail ballots, and they have relied on that guidance in preparations that have already been taken for the November 2026 General Election.

36. Neither ELECT nor Virginia localities currently submit ballot envelopes to USPS for design review.

37. In Virginia, as in much of the country, ballot envelopes vary by locality. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for the 133 jurisdictions in Virginia, let alone nationwide. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was

before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Virginia voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots.. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

38. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law.

39. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Virginia citizens as possible can exercise their right to vote. In the 2024 General Election, election officials mailed out over 500,000 ballots to

voters.[2] This method of voting is particularly important for the many Virginia citizens who live in extremely remote areas far from their nearest polling place.

40. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

41. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

42. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. I anticipate inquiries from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 General Election.

[2] https://www.elections.virginia.gov/media/formswarehouse/maintenance-reports/2024-Post-Election-Report.FINAL.pdf

43. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for Virginia voters on the permanent absentee ballot list, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law with no impediments. No-excuse absentee voting has been in place in Virginia for multiple election cycles, which has created an expectation and routine of voters for the use of absentee by mail voting.

44. This public education effort would divert from planned voter outreach in ELECT's limited budget for voter education.

45. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local election officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harm that is difficult to reverse.

46. The harm that stems from the Rule is particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 General Election.

47. Virginia must begin mailing ballots for the 2026 General Election in the coming weeks. Consistent with federal law, Virginia mails ballots to military and overseas voters by September 18, 2026, 45 days before the General Election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). Similarly, all ballots to voters on the permanent absentee ballot list must also be sent by that same date. Va. Code 24.2-612. Local election officials can continue to receive applications for mailing ballots to other eligible voters through October 23, consistent with state law.

48. Additionally, my office will need to continue to register those who are eligible to vote in Virginia. Virginia allows qualified individuals to register up to 11 days before Election Day and, after that deadline, in person through Election Day using same-day registration. Va. Code Ann. 24.2-416; Va. Code Ann. 24.2-420.1(A); 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Eligible Virginia voters registering at least 11 days before Election Day can register to vote online, at their county clerk's office, at various state social service agencies, and through Virginia's Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. Eligible Virginia voters registering and voting the same day during early voting in the 10 days before an Election can register at their general registrar's office. And finally, eligible Virginia voters registering and voting on Election Day can do so at their designated polling location.

49. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in changes to voter rolls and requiring time from election officials.

50. In compliance with the NVRA "quiet period" for voter registration, Virginia does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Virginia does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

51. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

52. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters. This is particularly impactful for offices with limited staff who are needed to oversee all other areas of election preparation and administration.

53. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waives away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the Rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive

evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, EO § 2(b) (March 31, 2026). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically through disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter dated July 7, 2026 and addressed to me, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

54. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

55. I am worried that myself and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Virginia's registered voters are not citizens. I have had discussions with staff at ELECT and local election officials regarding concerns about the likelihood of conflicts between state law requirements and the requirements in the

Executive Order that gave rise to the Rule. I fear that serious efforts to investigate and prosecute election officials who are executing their duties under state law in good faith will be viewed as the "last straw" by many local election officials who have consistently reported job-related stress and anxiety in recent years.

56. The Rule would have a significant impact on available resources for the technical team members responsible for its implementation and execution. ELECT has limited personnel resources in relation to data within IT, and they are generally needed to contribute whenever issues arise. The work required of this team, in addition to other IT resources, would almost certainly come at the expense of other planned and emerging priorities.

57. Likewise with other current ELECT staff, time spent on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Virginia's elections run smoothly and every eligible Virginian can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Richmond, Virginia.

Steven L. Koski
Commissioner
Virginia Department of Elections