**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>DONALD J. TRUMP, in his official capacity as President of the United States; et al.,<br>*Defendants.* | Case No. |

**<u>DECLARATION OF EDMUND MICHALOWSKI</u>**

I, Edmund Michalowski, declare as follows:

1. I am a resident of the State of Illinois. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Cook County Clerk's Office staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Deputy Clerk for Elections for the Office of the Cook County Clerk. I work for the Cook County Clerk Monica Gordon and support her work as chief election authority in Cook County, Illinois. In my role, I assist in the execution of the election process at the local level. I have served in this role since 2019.

3. Illinois and its subdivisions are responsible for administering elections in Illinois. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

4. The Cook County Clerk is the election authority responsible for administering elections in suburban Cook County, Illinois. As the local election authority, the Cook County Clerk handles local voter registration, trains election judges and deputy voter registrars, selects polling places, prints ballots, oversees Election Day activities, and supervises the vote count. The Cook County Clerk is the largest election authority in the State of Illinois with approximately 1.7 million registered voters in suburban Cook County. Specifically, for the November 5, 2024, Presidential Election, there were a total of 1,720,040 registered voters in suburban Cook County. A total of 1,089,942 voters cast ballots in that election.

5. In my role as Deputy Clerk for Elections, I am responsible for preparing and conducting all primary, general, and special elections held in Cook County; developing, implementing, and directing the activities of the Election Division, including registration, candidate filings, all forms of voting, including ballot mailings, ballot programming and testing, and voter outreach efforts; drafting the Election Division’s long-term and short-term strategic goals; working with voters, political parties, candidates, political jurisdictions, media, county departments, and other entities; and developing and presenting a proposed budget.

6. My office has a continuing obligation to perform regular list maintenance, as required under the National Voter Registration Act (“NVRA”), Help America Voter Act (“HAVA”), and Illinois state law. This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling registrations of those who are currently incarcerated, and cancelling the registration of those who have died.

7. Additionally, my office will need to continue to register those who are eligible to vote in Illinois. Illinois allows qualified individuals to register online up to 16 days before Election Day and in person during early voting and on Election Day. 10 ILCS 5/5-50; 52 U.S.C.

§ 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). Illinoisans can also register to vote at their county clerk's office, at various state social service agencies, and through Illinois's Secretary of State's Office when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. Individuals must verify their eligibility (by attestation, by reporting identifying information, or by other means) to register to vote in federal elections.

8. Cook County elections officials are required by state law to issue ballots to duly registered voters. 10 ILCS 5/19-1. Cook County provides a mail ballot to voters upon request. 10 ILCS 5/19-2. My office intends to comply with these state legal requirements in administering upcoming federal elections.

9. In compliance with the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), Illinois allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election. 52 U.S.C. § 20302(a)(2).

10. Several different types of facilities in Illinois are subject to mail ballot procedures, including: facilities licensed pursuant to the Nursing Home Care Act (210 ILCS 45/1-101 et seq.), the Specialized Mental Health Rehabilitation Act of 2013 (210 ILCS 49/1-101 et seq.), the ID/DD Community Care Act (210 ILCS 47/1-101 et seq.), or the MC/DD Act (210 ILCS 46/1-101 et seq.), and federally operated veterans' homes, hospitals, or facilities. 10 ILCS 5/19-12.1.

11. There also are three federally operated veterans' facilities in the Cook County region, including: Jesse Brown VA Medical Center, Edward Hines, Jr. VA Hospital, and Captain James A. Lovell Federal Health Care Center. These facilities also are subject to mail ballot voting procedures codified in state statute. 10 ILCS 5/19-12.1.

12. Under the provisions of 10 ILCS 5/19-12.2, physically incapacitated electors residing at any of the institutions listed above are able to receive ballots by mail and vote using vote-by-mail procedures at their facilities. To do so, they are supervised by two election judges selected by the election authority. After voting, the election authority takes the ballots directly rather than having them placed in the mail. Given the nature of these environments, arrangements for these individuals to vote are highly structured.

13. My office and other counties and cities statewide are currently preparing to administer the November 2026 general election. Federal, state, and local races will be on the ballot.

14. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026.

15. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule will imminently cause significant harm, confusion, and disruption in Illinois and Cook County election administration, and will impose unrecoverable costs on Illinois and Cook County.

16. For the reasons discussed throughout this declaration, I must act now to align Cook County's administration of mail voting with the requirements of the Rule. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

17. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will simultaneously submit for review. In Illinois, we would have to submit envelopes for review, receive feedback, have them printed, and provide information about each voter's name by September 24, 2026, the date by which we begin sending ballots by mail, and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date or requested a mail ballot after that date. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("USPS Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing.

18. I am concerned that USPS will not be able to implement this system accurately in just a few months before the November 2026 election. If the system is not properly implemented,

we may be unable to deliver mail ballots to voters and conduct the election in accordance with Illinois and federal law.

19. Cook County anticipates mailing ballots to approximately 225,000 voters during the 2026 general election during the period September 24 to October 29, 2026.

20. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all approximately 1,720,040 voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. In Illinois, voters are allowed to modify their registration details through Election Day. 10 ILCS 5/5-50. In 2024, approximately 57,570 registrations were processed within 30 days of the general election.

21. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[1] In Illinois, this coordination is complex and time-consuming, because there are 108 election jurisdictions. Once election officials become authorized users—a process that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing.

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information.

22. Illinois law allows a voter to spoil an unvoted mail ballot and request a new ballot up to 5 days before an election. To ensure that voters receive these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

23. Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all voters who timely requested an absentee ballot are included. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election.

24. The deadline to provide this list to USPS no later than 30 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list. Under Illinois law, voters may request a mail ballot up to 5 days before an election. 10 ILCS 5/19-2. Although the Rule indicates that States will be able to supplement the individuals and information submitted through the Ballot Portal, USPS is not required to accept our suggestions. The Rule also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

25. Based on what information is available, I estimate that it will take many hours for elections staff to become authorized users of the USPS Ballot Portal and enroll all voters, assuming there are no delays caused by technical or processing difficulties. But technical and

processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Cook County exponentially. And if the system fails, Cook County may be unable to mail ballots to voters at all.

26. The USPS Mail Ballot List that USPS will share with Illinois's chief election officer does not address the problem of USPS withholding ballots from registered voters. The Rule states that USPS will provide the list "[o]n or about the date of the federal election," which will be far too late for my office to feasibly review the list for errors and identify voters omitted from that list, much less remedy the omission or contact affected voters to ensure they are able to vote. Indeed, under the terms of the Rule, USPS may provide the list *after* the election is complete.

27. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

28. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

29. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each

step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

30. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

31. As a result of the Rule and to mitigate the impact of all this uncertainty and turmoil, the Cook County Clerk's Office will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and process election mail. This is yet another aspect of the Rule's implementation that will necessarily divert an estimated $20,000 from other important election administration tasks.

32. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

33. These requirements of the Rule necessitate immediate action from me and my team at the Cook County Clerk's Office.

34. Our agency anticipates mailing at least 225,000 ballots to voters during the 2026 general election.

35. Our agency officials have consistently relied upon election mail guidance from USPS to design and mail ballots, and relied on that guidance in preparations that have already been taken for the November 2026 general election.

36. The Cook County Clerk has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of approximately $300,000. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and

will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71.

37. Cook County currently uses Intelligent Mail barcodes on ballot mail.

38. Cook County does not currently submit ballot envelopes to USPS for design review.

39. In Illinois, as in much of the country, ballot envelopes vary by county. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Illinois voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and

otherwise mitigate the harm from delays to the process. Should USPS reject our ballot design, my office would have to contend with enormous disruptions on an extremely short, and almost certainly unworkable, timeline. We would also be responsible for shouldering the costs of designing and ordering new ballots, which we do not have the budget for. We have no way of knowing how likely it is that USPS will reject our ballot design, as we have never before had to seek approval.

40. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by absentee or mail-in ballot under state law.

41. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Illinoisans as possible can exercise their right to vote. In the 2024 General Election, 192,412 Cook County residents voted by mail.

42. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the Ballot Portal fails, the Rule would prevent **any** voters from receiving absentee or mail-in ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

43. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

44. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. I anticipate inquiries from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

45. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail.

46. I estimate that such a public education effort would cost approximately $2,746,000, in sum. To perform this task well, we would need to engage broadcast television, social media, trainings (both internal and external), radio, and allocate over $1,000,000 for postage and printing alone.

47. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

48. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

49. The Cook County Clerk's Office must begin mailing ballots for the 2026 general election in the coming weeks. Consistent with federal law, agencies mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. § 20302(a)(1)-(3), (8)(A). In addition, state law requires that election authorities begin mailing ballots to all other eligible voters no later than September 24, 2026. 10 ILCS 5/19-4 and our office will continue mailing ballots through October 29, 2026, consistent with state law.

50. Additionally, my office will need to continue to register those who are eligible to vote in Illinois. Illinois allows qualified individuals to register up to 28 days before Election Day and in person during early voting and on Election Day. 10 ILCS 5/5-5; 5/5-50; 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Illinois citizens can register to vote online, at their county clerk's office, at various state social service agencies, and through Illinois's Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

51. In compliance with the NVRA "quiet period" for voter registration, Cook County does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. § 20507(c)(2)(A), 3(A)-(B), 4(A). Cook County does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

52. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

53. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters.

54. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which

are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. My colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (March 31, 2026). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. In a letter to Bernadette M. Matthews, Executive Director of the Illinois State Board of Elections, dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

55. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

56. I am worried that myself and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the

federal government believes, even incorrectly, that any of Cook County's registered voters are not citizens.

57. In conclusion, I estimate that the requirements of the Rule will require a significant increase in the Clerk's Office budget, which had already been allocated for the current election before these burdensome changes. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible.

58. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Cook County's elections run smoothly and every eligible resident can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

59. Each of these tasks and costs will divert scarce resources from other important election administration needs. Resources in my office that would be diverted include assigning current staff to train the influx of new staff for their roles. These trainings would divert staff from tasks to which they normally would be assigned, which further delays our operational readiness.

60. The Clerk's Office is constantly looking at ways to improve processes and procedures in efficient and cost-productive ways. But budgeting for and acquiring additional personnel just to add layers of unnecessary administrative work does not support those goals.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026, at Chicago, Illinois

Edmund Michalowski
Deputy Clerk of Elections
Cook County Clerk's Office