**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. _______________ |

**<u>DECLARATION OF JULIE WISE</u>**

I, Julie Wise, declare as follows:

1. I am a resident of the State of Washington. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with King County Elections staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the elected Director of Elections for Martin Luther King, Jr. County (King County).

3. I have served as the elected Director of Elections since 2016 and have worked as an election administrator for 26 years. I began my career as a temporary worker, answering questions from voters on the phone. From there, I've worked in every corner of the organization and from 2013 to 2015 I served as Deputy Director of King County Elections.

4. I am a state and nationally certified election administrator by the Washington Secretary of State and the National Association of Election Officials.

5. Pursuant to the King County Charter §§ 350.20.50, 610 and 647, the Director of Elections is a non-partisan office elected by the voters of King County to a four-year term. I was first elected Director of King County Elections in November 2015 and was reelected in 2019 and 2023.

6. As Director of Elections, I serve in the role of county auditor for purposes of the provisions of Chapter 29A of the Revised Code of Washington and am "ex officio supervisor of all primaries and elections" within the county. Wash. Rev. Code §§ 29A.04.216; 29A.04.025.

7. King County Elections administers elections in King County, Washington. King County is, with 2.3 million residents, the most populous county in Washington State and the 12th most populous county in the United States of America. King County alone is home to over 190 jurisdictions and conducts elections for offices from President of the United States to commissioners for special purpose districts. King County Elections has a proud tradition of winning national awards for our robust cross-partisan election observation program, civic education, and innovation in election administration.

8. King County has over 1.45 million registered voters, home to approximately one-third of Washington State's registered voters. It is one of the largest vote-by-mail jurisdictions in the nation.

9. Prior to moving to universal vote-by-mail in 2009, King County voters overwhelmingly opted to vote no-excuse permanent absentee, an option that first became available in Washington in 1991. Since 1983, Washington has been able to conduct special elections entirely by mail. It's that deep and successful history of accurate and secure vote-by-mail elections in Washington State and King County that informs my perspective.

10. The State of Washington and its subdivisions are responsible for administering elections in Washington State. This responsibility encompasses maintaining the state's voter registration and election management system, overseeing elections operations, and certifying results in all elections for federal office, among numerous other tasks. King County Elections is responsible for daily maintenance and updating of the county's voter rolls, issuing ballots to registered voters, tabulating votes, and certifying elections results.

11. As Director of King County Elections, I am committed to increasing both accessibility and security in our elections.

12. The Secretary of State is the state's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state. *See* Wash. Rev. Code § 29A.04.230. Washington State law charges that office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. Wash. Rev. Code §§ 29A.04.205, 29A.04.216. Washington's Office of the Secretary of State provides guidance, technical support, and resources to county elections offices and administers the certification program for Washington election administrators.

13. In my role as King County's elected Director of Elections, I am responsible for overseeing all aspects of election administration for King County's 1.45 million registered voters and more than 190 voting jurisdictions. This includes voter roll maintenance, such as processing new registrations and making hundreds of updates each day as voters move, change their name, or otherwise update their voter registration record; secure ballot collection from the United States Postal Service and King County's 91 official ballot drop boxes; verifying and processing all ballots in accordance with federal, state, and local law; tabulating votes and publicly posting election results; and performing audits and testing before, during, and after each election.

Additionally, it's my responsibility and that of King County Elections to ensure that our voters have accurate and reliable election information that prepares them to fully participate in their elections. Democracy works best when all voices are heard, and at King County Elections we aim to do all we can within the law to help every eligible voter get registered and cast their ballot.

14. King County Elections, like all Washington counties, is already deep into preparations for the November 2026 General Election, with key tasks underway or completed, including ordering mail ballot envelopes, preparing to issue legally required special ballots on August 5, 2026, transmitting ballot mailing files to vendors on September 11, 2026, and mailing ballots to overseas, service, and out-of-state voters on September 18, 2026. Federal, state, and local races will be on the ballot. In addition, our team at King County Elections is hard at work preparing for voter-approved changes to how the City of Seattle conducts their Primary elections, which will take place in 2027. We are already underway with planning and preparation for the upcoming 2028 Presidential election. Implementation of these USPS rules will divert time and resources away from those standard and mission-critical election preparation tasks, increasing the risk of a mistake or misstep somewhere along the way. In elections, mistakes have real costs in trust and reputation, in dollars and public scrutiny, and ultimately in voter participation. We are thorough and well-planned to save our taxpayers money and maintain trust in the electoral process.

15. Washington State votes by mail and these ballots are sent to voters through the United States Postal Service ("USPS"). Wash. Rev. Code § 29A.40.010.

16. King County Elections is responsible for mailing ballots to all 1.45 million active registered voters within King County. Our office designs our mail ballot envelopes in

compliance with state law, and these envelopes are also reviewed by USPS Mail Design Analyst. Mail ballot envelopes are not required by Washington State law to include Intelligent Mail barcodes, nor are county election offices resourced for an unfunded mandate such as this. Ballots for overseas and service voters must be mailed at least 45 days prior to Election Day or on September 19. Ballots for all other voters must be mailed at least 18 days prior to Election Day or on October 16. Wash. Rev. Code §§ 29A.40.010, 29A.40.070, 29A.40.091, Wash. Admin. Code §§434-230-015, 434-250-070, 434-230-130, 434-230-135.

17. Ballots are not mailed just once. Instead, they are mailed in waves with initial drops at different times for different voter groups, followed by daily mailings for replacement ballots, new registrations, updated addresses, and more. In Washington State and many other states, new voters can register through Election Day, and existing voters can update their address through Election Day. For instance, during the November 2024 general election, King County Elections received more than 22,000 new voter registrations after the main ballot mailing 20 days before Election Day, and we issued over 35,000 ballots for updated addresses, replacements, and other needs. Our office often issues and mails ballots within 24 hours to ensure voters receive them promptly and with enough time to cast their vote.

18. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) entitled, "Ballot Mail for Federal Elections" ("Rule"), that was published in the Federal Register on June 2, 2026. My office submitted a comment on the Proposed Rule expressing strong opposition and identifying specific concerns, including, nonacceptance of ballot mail may delay or prevent timely delivery, potentially disenfranchising thousands of voters, unique IMb requirements are costly and operationally infeasible, uploading voter lists to the Ballot Portal does not reflect real-time voter registration, the Ballot Portal lacks critical

detail, USPS IMb scan data is not reliable for reconciliation purposes, new reporting requirements add administrative burden without improving voter access, and creation of a sensitive federal voter-level dataset poses privacy and cybersecurity risk. A true and correct copy of that comment letter is attached to this declaration as Exhibit A.

19. I am also familiar with USPS's recent regulation entitled, "Ballot Mail for Federal Elections" ("Rule"), which was made available for public preview at https://public-inspection.federalregister.gov/2026-17238.pdf prior to its scheduled publication in the Federal Register on August 26, 2026. Implementation of this Rule would immediately cause significant harm, confusion and disruption for voters and election administrators in Washington State, harm trust in elections and in one of our nation's oldest institutions and will impose significant and unrecoverable costs.

20. For the reasons discussed throughout this declaration, we are well past the point when new Rules needed to be tested and adopted for accurate and effective implementation in the November 2026 General Election. This Rule undoubtedly will have significant negative impacts on voter access and will prevent the ballots of eligible voters from making their way through the mail stream quickly, efficiently, and with precision.

21. The Rule does not reflect the operational realities of vote by mail and election administration. As noted above, ballots are not mailed once; they are mailed in waves — initial drops for different voter groups, followed by daily mailings for replacement ballots, new registrations, updated addresses, and more. Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in, but not limited to, this upcoming November 2026 general election. My office will strive to ensure that voters have an opportunity to vote, and the Rule

imposes significant costs on doing so. A person's right to vote cannot be left up to untested technology and an agency that has historically never played a deciding role in whether someone is a citizen or otherwise eligible to vote.

22. From elected officials to voters themselves, my office and I have received many questions and concerns about this proposed Rule and the devastating impact it could have on Washington voters. Coupled with concerns over USPS's recent changes to their postmark processes, voters are worried that our country's public mail service may be what prevents them from being able to cast a ballot and make their voice heard. While we emphasize with voters that official ballot drop boxes are the best way to return their ballot, it's less simple to guarantee that USPS will even deliver their ballot to them in the first place with the existence of this proposed Rule.

23. It is my understanding that the Rule requires that every voter who will receive an absentee or mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. Before election officials can even begin enrolling voters, they must also certify that outbound and return envelope designs have been submitted to a Mailpiece Design Analyst and that USPS has provided feedback. This sequencing adds significant time pressure, particularly given the large volume of jurisdictions that will be simultaneously submitting for

review. In King County, we would have to provide enrollment data by September 18, 2026, when we begin to mail ballots, and we would thereafter have to update the information on a near-daily basis to include eligible voters who registered after that date, updated their address, requested a replacement ballot, etc. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("US Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS, USPS will not accept the outbound mail ballot envelope for mailing, thus denying delivery of the ballot and impeding on the voter's right to vote.

24. In addition, the proposed Rule offers no details on how the portal will function, how long USPS will take to process list updates, how data will be stored or protected, or how delays will be avoided. As noted above, ballots are not mailed once; they are mailed in waves and daily during the voting period. Our office often issues and mails ballots within 24 hours to ensure voters receive them promptly. It is unclear what delays this portal requirement will introduce and how that will affect timely delivery to voters.

25. Our office already maintains rigorous data hygiene within the voter registration database. Our voter rolls are maintained by experienced and trained election administrators, many of whom are certified at both the state and national level. We are the experts in voter list maintenance, not USPS. Imposing an additional requirement to upload constantly changing lists to a new portal adds significant administrative burden without providing meaningful benefit. In practice, this proposal adds unnecessary red tape and fails to improve ballot visibility, voter access, and especially election security.

26. Washington's Address Confidentiality Program (ACP) further complicates this requirement. The ACP offers survivors of domestic violence, sexual assault, stalking, or trafficking, and Criminal Justice Affiliates, Election Officials, and Protected Health Care Workers who are a target for threats or harassment, a substitute address to receive first class mail. The proposed Rule does not explain how to include these voters without compromising their protected information.

27. These requirements impose significant financial costs on my office and threaten to disenfranchise voters in Washington State.

28. I have significant concerns about the feasibility of USPS implementing this system accurately and on time, especially given that election activities are already well underway and virtually no time remains for such major changes. To implement changes of this magnitude successfully, USPS must work closely with election administrators to understand the complexities of vote by mail and elections overall. They also need to establish a realistic timeline for testing technical requirements, detail necessary privacy protections and safeguards, and develop and test emergency procedures to prevent technical or administrative issues from delaying ballots or undermining Americans' right to vote—steps that simply are not possible at this late stage before the November 2026 general election.

29. As a result of the Rule, my office must immediately prepare and update procedures to accommodate these changes. Because many of the new requirements remain unclear, we must also anticipate and plan for unexpected scenarios. These procedures will need to address issues such as use of the USPS portal, timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protections, and other critical considerations,

including the address confidentiality program. Preparing and updating these processes will require substantial time, staffing, and financial resources.

30. King County is mailing ballots to more than 1.45 million voters during the November 2026 general election beginning on September 18, 2026.

31. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems or cause delays—which seems highly unlikely given the short development and implementation window—enrolling all 1.45 million of King County's voters with USPS will be a massive undertaking. In a county as large as King County, there are often additional load and other testing that must take place in order to be successful. We cannot use the same tool that a county a fraction of our size uses and expect it to work as smoothly simply due to file sizes and how many records we're creating, maintaining, updating, and cancelling on a daily basis.

32. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. As I noted earlier, for large elections we can see well over 20,000 new registrations in the days leading up to Election Day and over 30,000 ballots sent for updated addresses, replacement ballots, etc.

33. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State - in Washington, the Secretary of State - which requires advance coordination among state and county election officials to identify, authorize, and train the appropriate staff statewide to use the Ballot Portal. *See* 39 CFR Part 111,

Supplementary Information at 14.[1] Once election officials become authorized users – a process that may also create delay and administrative burden – the elections officials cannot enroll these voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. In many cases, a mailing may consist of only a single ballot packet, such as when a replacement ballot is sent. Elections officials will not only need to process these registration updates within their own systems, but will also face the additional burden of entering the same updates into an entirely new USPS-operated system—one for which officials currently have no concrete operational details. Nor does this Rule provide resources for the staff time it would take to maintain two separate lists and systems.

34. Voters in Washington State can obtain a replacement ballot if they lose or damage their original mail ballot in the days leading up to Election Day. To ensure that voters receive these ballots which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

35. Given the lack of available information about the Ballot Portal, I am unable to estimate or effectively plan for what this process will entail or how time-consuming it will be for my staff to become trained and authorized users and enroll all voters. We also must prepare for delays caused by technical or processing issues, which are especially common when implementing a new and untested technology or workflow. Given the scale of this effort, any unforeseen technological or operational problems could substantially increase the practical and financial burden on King County. If the system fails, King County may be unable to mail ballots to voters at all, costing Americans their right to vote.

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

36. King County, WA has been conducting elections entirely by mail for 15 years now, and prior to the official change to mail in voting the overwhelming majority of voters opted to vote by mail rather than head to a polling place. All voters in King County and Washington State receive their ballot via USPS. We have long appreciated the Postal Service's work to support election officials and, most importantly, voters. Our partnership with USPS has led to successful initiatives both in King County and Washington State to improve voter access, such as moving to prepaid postage for return ballots. Working with USPS on mail ballot visibility, effective envelope design, and clear communication is a critical and valuable operational practice. During elections our team is in constant communication with USPS to reduce processing issues and support the timely delivery of ballots. Elections offices and USPS both play vital roles in our elections, with election administrators responsible for maintaining voter records, determining voter eligibility, verifying voter identity, and, of course, issuing and ultimately tabulating ballots. USPS reliably delivers ballots and all other mail to mailboxes across King County and this country. Never has USPS been the arbiter of voter eligibility or whether someone can exercise their right vote.

37. I am particularly concerned that USPS appears to be planning only for a seamless transition and has not developed contingency procedures should the Ballot Portal fail to operate as intended or if other errors impede the process. USPS has provided no information about how it will assist election administrators facing technical difficulties when uploading information to the Ballot Portal, nor has it explained how its own errors will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they choose to challenge a rejection of ballot mail. See 39 CFR Part 111, Supplementary Information at 58. USPS also indicates that it will not establish new appeal procedures for election mail, yet its standard

processes are incompatible with the urgent timelines of election administration, where errors must be resolved immediately to prevent voters from losing their fundamental right to vote.

38. These concerns are heightened because USPS has not committed to providing any training to election administrators on the Ballot Portal or any other aspect of the new process. While the Rule anticipates that state and local election offices will soon begin entering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information regarding the Portal's design, functionality, authorization procedures, or the time required to upload voter information. USPS explicitly states that it "declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the Rule or Portal." See 39 CFR Part 111, Supplementary Information at 81. Although USPS indicates it is still developing training for internal Postal Service employees on topics including mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. USPS also has not indicated when the Portal will become accessible to authorized users, leaving election administrators without any opportunity to learn the system before being required to use it under urgent election deadlines.

39. USPS's claim that the Rule imposes only modest changes, similar to prior "best practices" guidance, is incorrect. The Rule imposes sweeping, unprecedented requirements. USPS has never before required the Chief Election Official of each state to individually authorize local election workers to handle election mail, mandated ballot design review as a condition of mailing ballots, or required election officials to register each mail ballot voter in a federal Portal before the voter may be mailed a ballot. USPS has also never transmitted detailed information about every mail-in voter in the nation to unspecified law enforcement officials for vague and unsubstantiated purposes. The potential disclosure of such information to law

enforcement alone may chill voter participation. Each of these procedural changes introduces new delays and administrative burdens at each step, creating dangerous bottlenecks that may have cascading impacts and could disenfranchise voters at significant scale. While USPS indicates that additional guidance will be issued "shortly," see 39 CFR Part 111, Supplementary Information at 55, election officials must begin preparing now.

40. It is far too late in the election cycle to implement changes of this magnitude. USPS itself encourages the Chief Election Official in each State to provide 90 days' advance notice before sending federal election ballots, asserting that such notice is "logistically beneficial" so USPS can conduct outreach, provide resources related to IMbs, and offer guidance on accessing and using the Portal. See 39 CFR Part 111, Supplementary Information at 45. That 90-day period has already passed, and virtually no time remains for either USPS or States to prepare for such dramatic operational changes in election mailings. USPS has conducted no advance engagement with States to educate election officials about these requirements, leaving administrators with insufficient time, information, and resources to implement the Rule without risking significant disruption.

41. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has stated that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." See 39 CFR Part 111, Supplementary Information at 74. This assertion does not inspire confidence. It indicates that USPS is not preparing for all possible contingencies and will lack the staffing capacity necessary to address technical failures in the Ballot Portal or to timely resolve appeals

related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

42. As a result of the Rule, my office will also have to devote significant time, personnel, and money to update training materials for staff to address the resulting uncertainty and operational upheaval it creates. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and to process election mail This is yet another aspect of the Rule that will necessarily divert significant resources from other important election administration tasks.

43. It is my understanding that the Rule requires that any mail containing a mail-in or absentee ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

44. King County's outbound and return envelopes already include the Official Election Mail logo, meet automation compatibility standards, and have undergone review by USPS Mail Design Analysts for many years. Additionally, most of our outbound envelopes include unique Intelligent Mail barcodes (IMbs) to support visibility and troubleshooting delivery issues. However, the proposed standard would require all outbound and return ballots to include unique IMbs. Currently, our return ballot envelopes use a generic IMb that identifies our election office as the destination. For a period of time, we paid additional fees — up to $30,000 for a countywide election, of which King County can conduct up to four per year — to include

unique IMbs on return envelopes in an effort to improve tracking. Despite this significant investment, only a small percentage of returned ballots actually received scans from USPS. For example, in the February 2025 Special Election, of the 120,318 ballots returned via USPS, the data shows:

a. Only 31,602 received an outbound scan (26% of ballots delivered)

b. Only 26,380 received an "in transit" scan (22% of ballots delivered)

c. Only 5,222 received a delivery scan (4% of ballots delivered)

45. Given both the low scan rates by USPS and significant financial burden, we discontinued printing unique IMbs on return envelopes. The return on investment simply isn't there, particularly when we are spending Americans' hard-earned tax dollars to pay for it. Our office does not have funding to resume this practice, nor would it be in the financial best interest of King County and Washington State to add these unique IMbs back to return envelopes.

46. Additionally, we, like most election administrators around the country, rely on using remaining envelope inventory from prior elections to reduce costs. The proposed requirement for unique IMbs for the general election would force us to purchase new envelopes at additional expense that we simply cannot absorb. Furthermore, ballots issued in our office are produced in-house with labels generated directly from our election management system, which doesn't have the ability to generate unique IMbs, leaving voters who pick up their replacement ballot in-person behind.

47. Washington voters are also legally permitted to download and print replacement ballots through the online ballot marking program, and that system likewise cannot produce unique IMbs.

48. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website. And USPS itself acknowledges that this tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. See 39 CFR Part 111, Supplementary Information at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. This also doesn't account for the various ways in which voters legally receive ballots in Washington State, such as the online ballot marking program noted above. Accordingly, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes, do not simply reflect mere "confus[ion]" as USPS asserts. See 39 CFR Part 111, Supplementary Information at 47.

49. The proposed standard does not account for these operational realities or the significant financial burden it would impose on already resource-constrained local election offices and should not be implemented.

50. Our office has consistently relied upon election mail guidance from USPS to design and mail ballots, and relied on that guidance in preparations that have already been taken for the November 2026 general election.

51. King County Elections has already ordered mail-ballot envelopes for the November 2026 general election at a cost of more than $300,000. In addition, we are well past the deadline to produce new envelope artwork, have it reviewed by a USPS Mail Design Analyst, and order and print revised envelopes in time to meet our legally mandated mailing deadlines. There are simply not enough days in the calendar for that to be possible. USPS confirms that States or localities that have already printed their mail ballot envelopes cannot use

those envelopes under the Rule and will need to order new envelopes and submit them for design review. See 39 CFR Part 111, Supplementary Information at 71.

52. In Washington State, as in much of the country, ballot envelopes vary by county. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. Although USPS indicates that Mail Design Analysts generally aim to provide feedback within two business days, that estimate predates implementation of the Rule, and USPS does not indicate that final approval of all election mail envelopes will occur within similar timeframes. USPS also disclaims any need for additional staffing, even though thousands of jurisdictions nationwide will now be required to submit both outbound and return ballot envelopes for USPS inspection and approval. Nor does USPS provide any process for resolving disputes arising during design review. This creates a significant potential chokepoint, as election officials cannot begin uploading voter information into the Ballot Portal until USPS approves the ballot envelope designs. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Any delays in that approval process threaten to disrupt or postpone the carefully timed steps required to mail ballots to King County voters on time. Indeed, delays in USPS's design review process will prevent enrollment of voters on the USPS Mail Ballot List, effectively blocking timely ballot delivery.

53. Managing the fallout from such a delay in mail ballot delivery would force my office to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are

properly registered to vote and entitled to vote by absentee or mail-in ballot under state law. This is simply unacceptable and will leave eligible voters disenfranchised and without a voice in our democracy.

54. The nonacceptance of outbound mail ballots — especially close to statutory mailing deadlines — introduces substantial election risk and directly threatens to disenfranchise voters. If ballots are delayed due to a technical mismatch, portal malfunction, or other administrative or technical error, voters may receive their ballots later than intended – or not at all - through no fault of their own. It is unacceptable to leave someone's right to vote up to whether a data set matches properly or whether a not-yet-created nor tested portal functions properly. Through absolutely no fault of their own, voters could find themselves stripped of one of their most basic and fundamental rights as an American, the right to vote. A person's right to vote cannot and should not be left up to the United States Postal Service's ability to accurately process and manage data, particularly when that process and management is entirely new and untested.

55. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Washington State citizens as possible can exercise their right to vote. Washington is a vote by mail state and in King County in the November 2024 general election, we saw an 81.06% voter turnout with over 1.15 million voters voting.

56. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the

Ballot Portal fails, the Rule would prevent **all** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

57. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

58. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. I anticipate many inquiries from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the November 2026 general election.

59. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail.

60. In King County, I estimate that such a public education effort would likely cost upward of $250,000 to effectively reach voters in all corners of King County. This cost would pull vital resources from other mission-critical work and threatens to vastly slow the election process as we would be able to afford fewer staff to maintain voter rolls, process ballots, and

tabulate results, even with more work in front of us. Additionally, King County Elections may be forced to cut services and programs like our online ballot tracker and ballot alerts messages, language services for our federally and locally required non-English languages, and more.

61. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

62. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the November 2026 general election.

63. King County Elections staff are working to prepare for voter-approved changes to the City of Seattle's Primary elections in 2027. We are also already engaged in planning for the 2028 Presidential election. Implementing these USPS rules would divert time and attention away from these essential, ongoing preparation efforts, increasing the likelihood of mistakes or oversights. In elections, errors carry real consequences—affecting public trust, reputation, financial resources, and ultimately voter participation.

64. King County Elections must begin mailing ballots for the November 2026 general election in the coming weeks. Consistent with federal law, agencies mail ballots to military and overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). In addition, state law requires that counties begin mailing ballots to all other eligible voters no later than October 16, 2026, and will continue mailing ballots up to Election Day, consistent with state law. Wash. Rev. Code § 29A.40.070.

65. Additionally, my office will need to continue to register those who are eligible to vote in Washington State. Washington State allows qualified individuals to register up to 8 p.m. on Election Day. Wash. Rev. Code § 29A.08.140; 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Washington State citizens can register to vote online, at their county clerk's office, at various state social service agencies, and through Washington's Department of Licensing when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

66. In compliance with the NVRA "quiet period" for voter registration, King County does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). King County does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

67. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the November 2026 general election.

68. Staff are also fully engaged in mission-critical tasks required to prepare for the November 2026 general election. These responsibilities span every aspect of election administration, including designing and proofing hundreds of ballot styles, coordinating printing and quality control of mail ballots, ballot drop box preparation for nearly 100 boxes, creating and producing the local voters' pamphlets, and conducting daily voter registration maintenance to

ensure accurate and up-to-date rolls. In addition, our office must recruit, hire, and train hundreds of temporary employees who support ballot processing, customer service, outreach, and Election Day operations. Each of these activities is essential to running a secure, accurate, and well-executed election, and each demands significant staff time and attention. Layering new USPS requirements on top of this already intensive workload would further strain resources and increase the risk of delays, errors, and potentially disenfranchise voters.

69. The steps necessary to comply with the Rule will divert staff time and attention away from other critical election preparations. Any delay or incomplete execution of these tasks can have significant consequences for the conduct of the election and for voters' ability to participate. Essential activities such as ballot design, ballot printing, local voters' pamphlet production, ballot drop box activities, ballot processing preparation, voter registration maintenance, and temporary staff onboarding all follow tightly controlled timelines. Disruptions to any of these workflows can lead to late mailings, reduced voter access, increased error rates, or compressed quality-control checks—each of which carries real operational and public-trust impacts.

70. Compliance with the Rule would also require the involvement of our most experienced staff—employees whose expertise is critical to ensuring accuracy, legal compliance, and timely execution of mission-essential election work. These staff simply do not have the capacity to divert their attention away from their already heavy workloads. Reassigning them to Rule-related duties would directly reduce our ability to complete required election tasks on schedule and with the accuracy voters expect and deserve.

71. Compounding this challenge, King County Elections does not have additional funding available to hire more staff in our already budget-tight environment. Even if funding

were available, we do not have sufficient time in this short window to recruit and train new employees on the highly specialized and mission-critical tasks required for election administration, let alone prepare them to implement an entirely new USPS Rule. Training staff to perform these functions demands extensive hands-on experience, familiarity with complex election systems, and a thorough understanding of statutory requirements—none of which can be developed quickly or safely under compressed timelines.

72. Without the resources or time to expand our workforce, any reallocation of experienced personnel away from essential election duties intensifies both practical and financial pressures and increases the risk of errors, delays, and operational bottlenecks. These kinds of disruptions pose real risks to election integrity, including late ballot mailings, reduced accuracy in voter materials, diminished quality-control checks, and strained voter services operations. Ultimately, insufficient staffing capacity under these conditions could undermine the secure and reliable execution of the November 2026 general election and erode public confidence in the electoral process.

73. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS dismisses serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the Rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 CFR. Part 111, Supp. Info. at 78. This statement ignores both the practical impossibility of separating federal and non-federal elections – which are printed on the same ballot in Washington State – and the substantial operational challenges associated with implementing the Rule itself. USPS further claims, contrary to extensive evidence submitted during the comment period, that compliance is feasible

so long as states "make a good faith effort to comply with the rule." 39 CFR Part 111, Supp. Info. at 70. As detailed above, that is plainly not the case. Compounding these concerns, my colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, EO § 2(b) (March 31, 2026). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically through disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61.

74. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare. No meaningful evidence has been produced to support these claims.

75. I am concerned that myself and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of King County's registered voters are not citizens. This threat of prosecution hits election administrators hard, as we are overwhelmingly a profession that values the rule of law, following the rules, and getting it right.

76. Threats from the federal government itself are not the only we face, and we could potentially see more of with the implementation of this Rule. We have received death threats and harassment by those who believe those unfounded claims, and who believe that election workers should pay the ultimate price of our lives. We have received white powder sent to our offices along with calls to end elections. We have seen calls for hangings of election officials, including ourselves, for being transparent and following the law. The continued insistence by this administration, despite the lack of evidence, that non-citizens are voting and swaying our elections is dangerous and has created a more hostile and threatening environment for election workers in King County and across this country. This Rule is another attempt by this administration to cement the idea that non-citizens are voting or are attempting to vote in our national dialogue and institutions, when that is simply not the reality.

77. In conclusion, I estimate that the requirements of the Rule will cost more than $550,000 for new envelopes and voter education alone. And because we still have no information about how the USPS Ballot Portal will function or what implementation will actually require, it is nearly impossible to project the additional staffing or unforeseen operational costs this Rule will generate. In a time of ongoing economic pressure across the county, state, and nation, I have worked deliberately to keep my office's budget as lean as possible. This Rule would instantly reverse that progress and impose substantial new financial burdens.

78. As a result, I will either need to request additional funding from the King County Council—funding that is by no means guaranteed—or identify equivalent cuts elsewhere in my office. At this stage, such cuts are not realistic without directly harming voters and undermining the services we are legally obligated to provide. We have already made numerous reductions to

operate within our constrained budget, and there is simply nothing left to cut without compromising essential election functions. The financial pressure created by this Rule is not merely inconvenient; it threatens the stability, effectiveness, and reliability of election operations in King County.

79. Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to mission-critical tasks and special projects that ensure King County's elections run smoothly and every eligible citizen can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to managing ballot design and proofing, mail ballot production, ballot drop box preparation, creation of the local voters' pamphlets, daily voter registration maintenance, and the recruitment and training of hundreds of temporary employees.

80. Implementing the Rule would require the expertise of our most experienced personnel, who cannot be reassigned without compromising accuracy, compliance, and timely execution of mandated duties. King County Elections also lacks the funding—and the time—to hire and train additional staff in these specialized functions. Training for election administration requires hands-on experience and detailed knowledge of complex systems and statutory requirements, which cannot be developed under compressed timelines.

81. Without the capacity to expand our workforce, any redirection of skilled staff would heighten practical and financial pressures and increase the risk of errors, delays, and operational bottlenecks. Such disruptions pose direct risks to election integrity, including late ballot mailings, reduced accuracy in voter materials, diminished quality-control checks, and

strained voter service operations, ultimately threatening the secure and reliable administration of the November 2026 general election.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25 , 2026, at Seattle, WA

Julie Wise,
Director of Elections
Martin Luther King County

**Julie Wise**
Director of Elections

King County Elections vote!

June 29, 2026

Director, Product Classification
U.S. Postal Service
475 L'Enfant Plaza SW, Room 4446
Washington, DC 20260-5015

via email: PCFederalRegister@usps.gov

**Re: Public Comment on Proposed Rule, "Ballot Mail for Federal Elections", 39 CFR Part 111, Federal Register Document No. 2026-10968**

Director,

King County Elections (Washington) strongly opposes the United States Postal Service's proposed rule related to mailing ballots and election mail. We urge USPS not to finalize nor implement this rule as it would infringe our state's constitutionally mandated authority to determine the manner and method of our own elections, it will result in eligible voters not being able to cast their ballot in a timely manner, and will cause irreparable harm to the fabric of our democracy. Instead, USPS should withdraw this rule from consideration.

USPS has been a valued partner to election administrators in vote-by-mail elections since the American Civil War. At no point in that history has USPS ever held the role of deciding who should receive their ballot or election mail, essentially deciding who has the right to vote and who does not. That role and responsibility has always belonged to the trained and experienced election administrators that run free and fair elections in this country month after month, year after year, and decade after decade.

We submit this comment as election experts representing one of the largest vote-by-mail jurisdictions in the nation and the 12th largest county overall. King County Elections (KCE) conducts accurate, secure, and accessible elections for more than 1.4 million registered voters in King County, Washington. Guided by values of accuracy, equity, integrity, service, teamwork, and transparency, our team includes state and nationally certified election administrators with extensive experience not only running vote by mail elections but setting the standard for them. KCE is recognized across the country for innovation, efficiency, community outreach,

and expanding cross-partisan opportunities for election observation. We strive to lead the way in providing inclusive, accessible elections.

King County, WA has been conducting elections entirely by mail since 2009 and prior to that, the overwhelming majority of voters had elected to vote by mail. We have long appreciated the Postal Service's work to support election officials and, most importantly, voters. Our partnership with USPS has led to successful initiatives here in King County and Washington State to improve voter access, such as moving to prepaid postage for return ballots. Working with USPS on mail ballot visibility, effective envelope design, and clear communication is a critical and valuable operational practice. During elections our team is in constant communication with USPS to reduce processing issues and support the timely delivery of ballots.

Elections offices and USPS both play vital roles in our elections, with election administrators responsible for maintaining voter records, determining voter eligibility, verifying voter identity, and, of course, issuing and ultimately tabulating ballots. USPS reliably delivers ballots and all other mail to mailboxes across King County and this country.

Proposed Rule 2026-10968, Ballot Mail for Federal Elections, will have significant negative impacts on voter access and may prevent the ballots of eligible voters from making their way through the mail stream quickly, efficiently, and with precision. The rule does not reflect the operational realities of vote by mail. Ballots are not mailed just once. Instead, they are mailed in waves with initial drops at different times for different voter groups, followed by daily mailings for replacement ballots, new registrations, updated addresses, and more.

As stated above, we strongly urge USPS not to finalize this rule. To implement any election-related rule, USPS must engage with election administrators to better understand the complexities of vote-by-mail and elections in general. They must also develop a realistic timeline for testing technical requirements, establish and detail privacy protections and safeguards, and create and test emergency procedures to ensure that technical or administrative issues do not delay ballots nor cost Americans their right to vote.

That engagement has not happened, and it is clear from the proposed rule that there needs to be significant education on how vote by mail works in both policy and practice.

## Nonacceptance of Outbound Ballot Mail (DMM 705.24.5)

KCE's most grave concern is the proposed nonacceptance remedy. To put it simply, every possible measure must be taken to ensure that ballots reach voters on time.

Under this proposed rule, any ballot mail that does not comply with the verification requirements would be rejected and returned to the authorized ballot mailer until the errors are corrected. **This is simply unacceptable and will leave eligible voters disenfranchised and without a voice in our democracy.**

The nonacceptance of outbound ballots — especially close to statutory mailing deadlines — introduces substantial election risk and directly threatens to disenfranchise voters.

If ballots are delayed due to a technical mismatch, portal malfunction, or other administrative or technical error, voters may receive their ballots later than intended through no fault of their own. It is unacceptable to leave someone's right to vote up to whether a data set matches properly or whether a not-yet-created portal functions properly. Through absolutely no fault of their own, voters could find themselves stripped of one of their most basic and fundamental rights as an American, the right to vote.

A person's right to vote cannot and should not be left up to the United States Postal Service's ability to accurately process and manage data, particularly when that process and management is entirely new and untested.

## Envelope Design and Review Standards (DMM 705.24.3)

Under the proposed rule, envelope design standards that have long been touted by USPS as a best practice for ballot envelope design would become a mandatory requirement.

King County's outbound and return envelopes already include the Official Election Mail logo, meet automation compatibility standards, and have undergone review by USPS Mail Design Analysts for many years. Additionally, most of our outbound envelopes include unique Intelligent Mail barcodes (IMbs) to support visibility and troubleshooting delivery issues.

However, the proposed standard would require **all** outbound and return ballots to include unique IMbs. Currently, our return ballot envelopes use a generic IMb that identifies our election office as the destination. For a period of time, we paid additional fees — up to $30,000 for a countywide election — to include unique IMbs on return envelopes in an effort to improve tracking.

Despite this significant investment, only a small percentage of returned ballots actually received scans from USPS. For example, in the February 2025 Special Election, of the 120,318 ballots returned via USPS, the data shows:

- Only 31,602 received an outbound scan (26% of ballots delivered)

- Only 26,380 received an "in transit" scan (22% of ballots delivered)
- Only 5,222 received a delivery scan (4% of ballots delivered)

Given both the low scan rates and significant financial burden, we discontinued printing unique IMbs on return envelopes. The return on investment simply isn't there, particularly when we are spending Americans' hard-earned tax dollars to pay for it.

Our office does not have funding to resume this practice, nor would it be in the financial best interest of King County and Washington State to add these unique IMbs back to return envelopes.

Additionally, we, like most election administrators around the country, rely on using remaining envelope inventory from prior elections to reduce costs. The proposed requirement for unique IMbs for the general election would force us to purchase new envelopes at additional expense that we simply cannot absorb.

Furthermore, ballots issued in our office are produced in-house with labels generated directly from our election management system, which doesn't have the ability to generate unique IMbs, leaving voters who pick up their replacement ballot in-person behind.

Washington voters are also legally permitted to download and print replacement ballots through the online ballot marking program, and that system likewise cannot produce unique IMbs.

The proposed standard does not account for these operational realities or the significant financial burden it would impose on already resource-constrained local election offices and should not be implemented.

## Mail-In and Absentee Participation List (DMM 705.24.4)

### Ballot Portal Requirements

The proposed rule requires a list of voters to be uploaded to a ballot portal "30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballots may begin to be mailed under state law." Again, this requirement does not reflect the operational realities of election administration.

In Washington State and many others, new voters can register through Election Day, and existing voters can update their address through Election Day. Any list uploaded 30 days

before a federal election will be significantly outdated by the time ballots are mailed and even more outdated by the time Election Day rolls around.

In addition, the proposed rule offers no details on how the portal will function, how long USPS will take to process list updates, or how delays will be avoided. As noted above, ballots are not mailed once; they are mailed in waves — initial drops for different voter groups, followed by daily mailings for replacement ballots, new registrations, updated addresses, and more. Our office often issues and mails ballots within 24 hours to ensure voters receive them promptly. It is unclear what delays this portal requirement will introduce and how that will affect timely delivery to voters.

Our office already maintains rigorous data hygiene within the voter registration database. Our voter rolls are maintained by experienced and trained election administrators, many of whom are certified at both the state and national level. We are the experts in voter list maintenance, not USPS. Imposing an additional requirement to upload constantly changing lists to a new portal adds significant administrative burden without providing meaningful benefit. In practice, this proposal adds unnecessary red tape rather than improving ballot visibility, voter access, or election security.

Washington's Address Confidentiality Program (ACP) further complicates this requirement. The ACP offers survivors of domestic violence, sexual assault, stalking, or trafficking, and Criminal Justice Affiliates, Election Officials, and Protected Health Care Workers who are a target for threats or harassment, a substitute address to receive first class mail. The proposed rule does not explain how to include these voters without compromising their protected information.

## Data Privacy and Cybersecurity Concerns

In addition, the proposed rule also raises significant data privacy and cybersecurity concerns. Election administrators operate under strict public disclosure laws when handling sensitive voter information. The participation list would link voter names and addresses with outbound and return envelope barcodes, creating a voter-level federal dataset far more sensitive than a standard mailing file. USPS plans to issue a new system of records notice under the Privacy Act, but that notice must be published, reviewed, and finalized before any voter-level ballot data submission is required.

USPS must clearly define data retention periods, access controls, audit logs, redisclosure limits, vendor access rules, breach notification procedures, and how law enforcement

requests will be handled. As with the voter registration database, election administrators must be able to explain to voters what information is shared, why it is shared, how it is protected, and how long it is retained—information that must be available before any data submission is mandated.

## Ballot Reconciliation

Our County has a long history of working collaboratively with USPS. Prior to each election, we notify USPS of our planned main mail drops, key election dates, and we provide copies of our Mailpiece Design Analyst-approved ballot envelopes. At the state level, USPS also joins election administrators on regular calls throughout the election period to troubleshoot any issues that may arise. Requiring notification of who will be on the mailing list—which changes constantly as voters register, move, or cancel their registration—serves no operational purpose.

The proposed rule states that this provision will evidence how many ballots have been mailed and allow law enforcement officials to compare the total number of ballots mailed to the total number of received ballots to detect potential issues meriting further investigation.

It also suggests that IMb scan data will provide visibility into ballot transmission. However, as outlined above, IMb scan data does not reliably or accurately reflect the movement of ballots through the mail. Even outbound scans are inconsistent, and delivery scans are frequently missing. In our county alone, several rural ZIP codes never receive delivery scans because the local post offices do not have the necessary technology. USPS can and should focus on improving their scanning procedures and operations to make these additional services and costs worth the price to both election offices and the voters we serve.

Election administrators already reconcile the number of ballots issued and the number received as part of established and robust ballot accountability procedures. That is standard practice in elections and is done by trained and experienced election administrators. The proposed rule does not recognize that ballots may be returned through multiple methods—by mail, through ballot drop boxes, in person at vote centers, or via email or fax for military and overseas voters. Vote-by-mail does not mean that voters can only return their ballot by mail.

Voters may also receive replacement or reissued ballots if they move or misplace their original ballot. There are numerous complexities in ballot issuance and return, established in state law and local procedures, that this proposed rule fails to recognize or account for.

When scanning effectively, USPS data can support mail visibility and help troubleshoot delivery issues, but it should not be characterized as a substitute for official election records, chain-of-custody documentation, or ballot reconciliation processes. The proposed requirement again fails to consider the realities of election administration and risks creating confusion rather than enhancing transparency, security, or integrity.

## Conclusion

It's critical that USPS withdraw this rule and essential to the strength of our democracy that it is not implemented ahead of the November 2026 General Election. While we are heartened by the recent court decision to enjoin USPS from initiating or completing this rule-making process, it's important that USPS take formal and proactive steps to formally and publicly withdraw this rule from consideration.

Any rules regarding elections cannot and should not be made without deeper engagement with election administrators to understand the complexities of vote by mail, develop a realistic timeline for testing technical requirements, and provide detailed privacy protections, safeguards, and emergency procedures to ensure technical or administrative issues do not delay ballots or impede voter access.

Finalizing these proposed rules as written would create serious hurdles for election administrators and will undoubtedly disenfranchise thousands of voters. It would also set a dangerous precedent of a non-election agency playing the role of gatekeeper on our citizens' right to vote. That is not a role that USPS has ever played, nor been tested in. The goal of all public servants should be to facilitate free and fair elections, not to create barriers and unnecessary hoops for voters and election administrators alike.

Our continued partnership with USPS on mail ballot visibility, effective envelope design, and clear communication is an extremely valuable operational practice and one that we hope to continue. That history of partnership, and our ability to navigate our respective lanes within it, has been incredibly successful for vote by mail elections and the millions of Americans who vote in them. We urge USPS to continue to respect those differing roles in the elections process.

## Key Risks

- **Nonacceptance of ballot mail may delay or prevent timely delivery, potentially disenfranchising thousands of voters.** Rejecting outbound ballots for technical or administrative mismatches—especially close to statutory deadlines—creates a

significant risk of delayed ballots and will lead to voter disenfranchisement. The right to vote cannot be left up to untested and unnecessary data portals and list matching practices.

- **Unique IMb requirements are costly and operationally infeasible.** USPS scan rates are extremely low, costs are high, and many systems (including in-house printing and online ballot delivery tools) cannot generate unique IMbs. There is no meaningful return on investment for this requirement, and it would be an irresponsible use of taxpayer dollars given the data at hand.
- **Uploading voter lists to the ballot portal does not reflect real-time voter registration.** In Washington, voters can register or update addresses through Election Day, meaning any list submitted 30+ days in advance is immediately outdated. The proposed portal will create delays in ballot mailing and may cost Americans their vote as it will hamper their ability to receive and return their ballot on time.
- **The ballot portal lacks critical detail.** No information is provided on processing timelines, error handling, delay prevention, or how USPS will manage continual updates required during the election period. Additionally, this portal does not yet exist and there is simply not time before the November 2026 General Election to build, test, and implement a new system, particularly when that system impacts voters' access to their ballot.
- **USPS IMb scan data is not reliable for reconciliation purposes.** USPS scan rates are inconsistent and often skipped by USPS throughout the mailing process. Ballots may also be returned through multiple methods outside the USPS system. USPS data cannot substitute for official election records or state-mandated reconciliation procedures, and the data this rule purports to create already exists as part of those legally mandated processes.
- **New reporting requirements add administrative burden without improving voter access.** Constantly changing voter lists and multiple ballot mailing waves make the proposed requirements impractical and duplicative of existing, more accurate systems that have been tested and refined over many elections and many years. Thousands of updates are processed every day in King County for voters who have moved or changed their name. This rule does not reflect reality, either for election administrators or for voters.
- **Creation of a sensitive federal voter-level dataset poses privacy and cybersecurity risks.** Strong safeguards to protect voter data must be clearly defined, as they are for election administrators in state law.

## Key Recommendations

- **Withdraw this rule from consideration.**
- **Do not finalize any elections-related rules without direct engagement with election administrators.** USPS should collaborate with local and state election officials to understand vote by mail operations and test requirements before implementation.
- **Remove the nonacceptance provision.** USPS should prioritize ballot delivery and use collaborative troubleshooting, not rejection, when mismatches or technical issues occur. Failing to do so will cost Americans their right to vote.
- **Eliminate or provide flexibility for unique IMb requirements.** Allow continued use of generic IMbs for return envelopes, and account for systems that cannot generate unique codes. The significant cost of this requirement must also be considered, as should USPS' adherence to their own scanning policies and procedures.
- **Eliminate the ballot portal or clarify how it will be tested and operate before requiring data submission.** Define processing timelines, update frequency, error handling, delay mitigation, and how time sensitive mailings will be protected.
- **Ensure ACP and similar protected address programs are fully accommodated.** USPS must provide explicit procedures to protect substitute address voters from exposure. We are required by both law and morality to protect these vulnerable voters from having their personal information disclosed or exposed. It is not an exaggeration to say that lives will be at risk if this information is not fully protected as Washington law requires.
- **Publish and finalize the Privacy Act system of records notice before implementation.** Define retention periods, access controls, audit logs, redisclosure limits, breach notifications, and handling of law enforcement requests.
- **Acknowledge that USPS data cannot replace official election reconciliation processes.** Ballot tracking data should support ballot visibility, not the statutory chain of custody and reconciliation procedures already in place. It is not a substitute nor a needed or helpful supplement.

A thoughtful, collaborative approach is essential to ensuring that any new USPS requirements regarding election mail strengthen election administration, not hinder it. Local election offices, including ours, and the millions of voters that we serve rely on predictable mail service, clear guidance, and tested systems to meet strict legal deadlines and uphold public trust. By working directly with election administrators, evaluating real world impacts, and refining these provisions before implementation, USPS can help support a secure, efficient vote by

mail system that helps Americans participate in our elections and democracy, rather than disenfranchising them.

Sincerely,

Julie Wise, Elected Director of Elections

Janice Case, Deputy Director of Elections

Kendall LeVan Hodson, Chief of Staff

Jerelyn Hampton, Election Operations Division Director

Molly Gordon, TECHGIS Division Director

Meredith Merriman, Administrative Services Manager

Halei Watkins, Communications Manager

Kenny Austin, Voter Services Manager