**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI‘I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania,

*Plaintiffs,*

v.

UNITED STATES POSTAL SERVICE; DAVID STEINER, in his official capacity as Postmaster General, Chief Executive Officer of the Postal Service, and Member of the Postal Service Board of Governors; DOUG TULINO, in his official capacity as Deputy Postmaster General, Chief Operating Officer and Chief Human Resources Officer of the Postal Service and Member of the Postal Service Board of Governors; AMBER MCREYNOLDS, in her official capacity as Chair of the Postal Service Board of Governors; DEREK KAN, in his official capacity as Vice Chairman of the Postal Service Board of Governors; RONALD STROMAN, in his official capacity as a Member of the Postal Service Board of Governors; DANIEL TANGHERLINI, in his official capacity as a Member of the Postal Service Board of Governors,

*Defendants.*

No. 1:26-cv-13917

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STATES’ MOTION FOR A TEMPORARY RESTRAINING ORDER, EMERGENCY STAY, AND AN EXPEDITED PRELIMINARY INJUNCTION AND STAY**

## TABLE OF CONTENTS


Introduction ........ 1

Background ........ 2

Legal Standard ........ 4

Argument ........ 4

- I. Plaintiff States Have a Strong Likelihood of Success on the Merits ........ 4
  - A. The Rule Violates the Separation of Powers ........ 4
  - B. The Rule Creates an Unauthorized Category of Nonmailable Matter, Violating USPS's Duty to Provide Universal Mail Services ........ 8
  - C. The Rule Requires USPS to Provide Unauthorized Non-Postal Services ........ 11
  - D. The Rule Unreasonably Discriminates Among Users of the Mails ........ 12
  - E. USPS Ignored Statutory Procedures by Failing to Seek an Advisory Opinion from the Postal Regulatory Commission ........ 13
  - F. The Rule Violates the Voting Rights Act ........ 14
  - G. The Rule Violates the Privacy Act's Prohibitions on Agencies Maintaining Records that Are Unnecessary or Reflect First Amendment Activity ........ 15
- II. USPS's Rule Is Judicially Reviewable ........ 17
  - A. Plaintiff States Have a Cause of Action for Each of Their Claims ........ 17
  - B. Plaintiff States Need Not Seek Review Before the Postal Regulatory Commission ........ 18
- III. Plaintiff States Will Be Irreparably Harmed Absent Immediate Injunctive Relief ........ 19
- IV. The Equities and the Public Interest Favor Injunctive Relief ........ 24
- V. Plaintiff States' Requested Relief is Proper ........ 26
  - A. *Purcell* Does Not Foreclose Injunctive Relief ........ 26
  - B. The Emergency and Interim Relief Requested by Plaintiff States is Proper ........ 27

Conclusion ........ 29

## TABLE OF AUTHORITIES

**CASES**

*Abbott v. Perez*
585 U.S. 579 (2018)....................23

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
458 U.S. 592 (1982)....................20

*Am. Encore v. Fontes*
152 F.4th 1097 (9th Cir. 2025)....................27

*Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin.*
771 F. Supp. 3d 717 (D. Md. 2025)....................26

*Am. Hosp. Ass'n v. Kennedy*
820 F. Supp. 3d 30 (D. Me. 2025)....................29

*Am. Sch. of Magnetic Healing v. McAnnulty*
187 U.S. 94 (1902)....................2, 8

*Arizona v. Inter Tribal Council of Ariz., Inc.*
570 U.S. 1 (2013)....................2

*Armstrong v. Exceptional Child Center, Inc.*
575 U.S. 320 (2015)....................17

*Axon Enter., Inc. v. FTC*
598 U.S. 175 (2023)....................19

*Bost v. Ill. State Bd. of Elections*
607 U.S. 71 (2026)....................24, 25

*Bowen v. Mich. Acad. of Fam. Physicians*
476 U.S. 667 (1986)....................18

*Buckley v. Am. Const. L. Found., Inc.*
525 U.S. 182 (1999)....................16

*Cabrera v. U.S. Dep't of Lab.*
792 F. Supp. 3d 91 (D.D.C. 2025)....................29

*California v. Trump*
786 F. Supp. 3d 359 (D. Mass. 2025)....................7

*California v. Trump*
___ F. Supp. 3d ___, 2026 WL 1826490 (D. Mass. June 25, 2026)....................5

*Carson v. Simon*
978 F.3d 1051 (8th Cir. 2020) ....................26, 27

*City of Providence v. Barr*
954 F.3d 23 (1st Cir. 2020) ....................12

*Clarkson v. IRS*
678 F.2d 1368 (11th Cir. 1982) ....................16

*Clinton v. Jones*
520 U.S. 681 (1997) ....................7

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*
48 F.3d 618 (1st Cir. 1995) ....................25

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*
603 U.S. 799 (2024) ....................29

*Ctr. for Auto Safety v. Fed. Highway Admin.*
956 F.2d 309 (D.C. Cir. 1992) ....................10

*Democratic Nat'l Comm. v. Wis. State Legislature*
141 S. Ct. 28 (2020) ....................19, 26

*DHS v. Regents of the Univ. of California*
591 U.S. 1 (2020) ....................10

*Doe v. Trump*
157 F.4th 36 (1st Cir. 2025) ....................17, 23, 28

*Doe v. Trump*
766 F. Supp. 3d 266 (D. Mass. 2025) ....................23

*Does 1–6 v. Mills*
16 F.4th 20 (1st Cir. 2021) ....................24

*DSCC v. Trump*
2026 WL 2168617 (D.C. Cir. July, 28, 2026) ....................17, 26

*E. Bridge, LLC v. Chao*
320 F.3d 84 (1st Cir. 2003) ....................18

*Fish v. Kobach*
840 F.3d 710 (10th Cir. 2016) ....................25

*Foster v. Love*
522 U.S. 67 (1997) ....................2

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
561 U.S. 477 (2010)....................17

*Garris v. FBI*
937 F.3d 1284 (9th Cir. 2019)....................15

*Georgia v. Meadows*
88 F.4th 1331 (11th Cir. 2023)....................5

*Goldstein v. Batista Contracting LLC*
671 F. Supp. 3d 68 (D. Mass. 2023)....................4

*Gregory v. Ashcroft*
501 U.S. 452 (1991)....................6

*Hannegan v. Esquire, Inc.*
327 U.S. 146 (1946)....................9

*Harding v. Edwards*
487 F. Supp. 3d 498 (M.D. La. 2020)....................25

*Humane Soc'y of U.S. v. USPS*
609 F. Supp. 2d 85 (D.D.C. 2009)....................17

*Ex parte Jackson*
96 U.S. 727 (1877)....................7

*Kansas v. United States*
249 F.3d 1213 (10th Cir. 2001)....................20

*Kollett v. Harris*
619 F.2d 134 (1st Cir. 1980)....................11

*Krabach v. King County*
2023 WL 7018431 (W.D. Wash. Oct. 25, 2023)....................18

*League of United Latin Am. Citizens v. Exec. Off. of the President*
818 F. Supp. 3d 34 (D.D.C. 2026)....................17

*League of Women Voters of Mass. v. Trump*
___ F. Supp. 3d ___, 2026 WL 2104006 (D. Mass. July 22, 2026)....................8, 12, 18

*League of Women Voters of Mass. v. Trump*
___ F. Supp. 3d ___, 2026 WL 2322705 (D. Mass. Aug. 11, 2026)....................7, 25, 27, 28

*League of Women Voters of United States v. Newby*
838 F.3d 1 (D.C. Cir. 2016)....................23, 24

*Louisiana v. Biden*
55 F.4th 1017 (5th Cir. 2022) ....................23

*Loving v. United States*
517 U.S. 748 (1996) ....................7

*Maryland v. King*
567 U.S. 1301 (2012) ....................20

*Massachusetts Fair Hous. Ctr. v. HUD*
496 F. Supp. 3d 600 (D. Mass. 2020) ....................4

*Massachusetts v. HHS*
923 F.3d 209 (1st Cir. 2019) ....................23

*Me. Forest Prods. Council v. Cormier*
586 F. Supp. 3d 22 (D. Me. 2022) ....................25

*Medellín v. Texas*
552 U.S. 491 (2008) ....................4

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ....................10

*N.H. Youth Movement v. Scanlan*
__ F. Supp. 3d __, 2026 WL 1500857 (D. N.H. May 28, 2026) ....................25

*Nat'l Ass'n of Postal Supervisors v. USPS*
26 F.4th 960 (D.C. Cir. 2022) ....................17

*Nat'l Fed'n of Indep. Bus. v. OSHA*
595 U.S. 109 (2022) ....................2

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*
407 F. Supp. 2d 323 (D. Mass. 2005) ....................25

*New York v. Trump*
181 F.4th 132 (D.C. Cir. July 14, 2026) ....................18

*Obama for Am. v. Husted*
697 F.3d 423 (6th Cir. 2012) ....................24

*Oregon v. Mitchell*
400 U.S. 112 (1970) ....................7

*Pennsylvania v. DeJoy*
490 F. Supp. 3d 833 (E.D. Pa. 2020) ....................13, 14, 18

*Printz v. United States*
521 U.S. 898 (1997)....................8

*Purcell v. Gonzalez*
549 U.S. 1 (2006)....................24, 26

*R.I. Dep't of Env't Mgmt. v. United States*
304 F.3d 31 (1st Cir. 2002)....................17

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*
589 U.S. 423 (2020)....................25, 26

*Reuber v. United States*
829 F.2d 133 (D.C. Cir. 1987)....................16

*Rhode Island v. Trump*
781 F. Supp. 3d 25 (D.R.I. 2025)....................7

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013)....................25

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
102 F.3d 12 (1st Cir. 1996)....................24

*Rowell v. Andrus*
631 F.2d 699 (10th Cir. 1980)....................11

*Sears, Roebuck & Co. v. USPS*
844 F.3d 260 (D.C. Cir. 2016)....................17

*Smiley v. Citibank (S.D.), N.A.*
517 U.S. 735 (1996)....................10

*Smiley v. Holm*
285 U.S. 355 (1932)....................2, 5, 20

*Texas v. Biden*
646 F. Supp. 3d (N.D. Tex. 2022)....................29

*Town of Milton v. FAA*
87 F.4th 91 (1st Cir. 2023)....................24

*Trump v. California*
609 U.S. ___, 2026 WL 2473573 (Aug. 24, 2026)....................3, 5, 27

*Trump v. CASA, Inc.*
606 U.S. 831 (2025)....................28, 29

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*
121 F.4th 339 (1st Cir. 2024)....................4

*United States v. Post*
297 F. Supp. 46 (W.D. La. 1969)....................14

*United States v. Weber*
816 F. Supp. 3d 1168 (C.D. Cal. 2026)....................16

*USPS v. Council of Greenburgh Civic Ass'ns*
453 U.S. 114 (1981)....................2

*Util. Air Regul. Grp. v. EPA*
573 U.S. 302 (2014)....................6

*Washington v. Trump*
145 F.4th 1013 (9th Cir. 2025)....................23

*Watson v. Republican Nat'l Comm.*
146 S. Ct. 2165 (2026)....................2, 4

*West Virginia v. EPA*
577 U.S. 1126 (2016)....................29

*West Virginia v. EPA*
597 U.S. 697 (2022)....................6

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*
___ F.4th ___, 2026 WL 2279789 (1st Cir., Aug. 7, 2026)....................28, 29

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952)....................5, 7

**Constitutional Provisions**

U.S. Const. art. I
§ 4, cl. 1....................2
§ 8, cl. 7....................2, 5, 7

U.S. Const. art. II
§ 1, cl. 2....................2
§ 3....................7

U.S. Const. amend. I....................3, 15, 16

**FEDERAL STATUTES**

5 U.S.C.
§ 522a(e)(1) ....... 3, 15
§ 522a(e)(7) ....... 3, 15, 16
§ 553(d) ....... 11
§ 705 ....... 4, 27, 28, 29
§ 706(2)(A) ....... 10
§ 706(2)(c) ....... 12, 17

18 U.S.C.
§ 3061 ....... 6, 7
§ 3061(a) ....... 16

28 U.S.C.
§ 1339 ....... 18

39 U.S.C.
§ 101 ....... 5
§ 101(a) ....... 2, 9
§ 101(e) ....... 2, 9, 10
§ 102(5) ....... 11
§ 401 ....... 6, 7
§ 401(1) ....... 18
§ 401(2) ....... 7
§ 403 ....... 5
§ 403(a) ....... 2, 9
§ 403(b) ....... 9
§ 403(b)(1) ....... 2
§ 403(c) ....... 2, 12, 18
§ 404 ....... 6
§ 404(a) ....... 7
§ 404(a)(1) ....... 2
§ 404(e) ....... 3, 11, 12
§ 404(e)(1) ....... 11
§ 404(e)(2) ....... 11, 12
§§ 404(e)(2)–(5) ....... 11
§ 409 ....... 18
§ 409(a) ....... 18
§ 410(a) ....... 17
§ 410(b) ....... 3
§§ 3001–3018 ....... 2, 8, 9

§ 3001(d) ....................................................................................................9
§ 3001(e)(2) ................................................................................................9
§§ 3001(g)(1)-(2) .........................................................................................9
§ 3001(h)(1) ................................................................................................9
§ 3001(i)(1) .................................................................................................9
§ 3001(m)...............................................................................................9, 17
§ 3001(n)(1) ................................................................................................9
§ 3002a.........................................................................................................9
§ 3010...........................................................................................................9
§ 3406...........................................................................................................8
§ 3661.......................................................................................................3, 18
§ 3661(b)..................................................................................................13, 14
§ 3661(c) ....................................................................................................13
§ 3662(a) ....................................................................................................18
§ 3662(b)....................................................................................................19
§ 3662(c) ....................................................................................................19
§ 3663.........................................................................................................13
§§ 3701–3705.........................................................................................11, 12
§ 3703(a) ....................................................................................................11

52 U.S.C.
§ 10307(a) .....................................................................................2, 14, 15, 18
§ 10502.........................................................................................................2
§ 20302.........................................................................................................2
§ 21083.........................................................................................................2

Administrative Procedure Act.................................................................... *passim*

Postal Reorganization Act.............................................................................13

Privacy Act...........................................................................................3, 15, 16

**STATE STATUTES**

Cal. Elec. Code
§ 3000.5.........................................................................................................5
§ 3003...........................................................................................................5
§ 3010...........................................................................................................5
§ 3011...........................................................................................................5

Mass. Gen. Laws ch. 54
§ 25B(a)(1)....................................................................................................5

Md. Code. Ann., Elec. Law
§ 9-309-10.....................................................................................................5

N.C. Gen. Stat.

§ 163-227.10(a) ........ 3

Wash. Rev. Code
§ 29A.40.010 ........ 5
§ 29A.40.091 ........ 5
§ 29A.40.170 ........ 5

**REGULATORY MATERIALS**

39 C.F.R.
§§ 3010.150–3010.170 ........ 19
§ 3020.112 (2026) ........ 13
§§ 3022.1–3022.30 ........ 19
§ 3022.50 ........ 19

40 Fed. Reg. 28,949 (July 9, 1975) ........ 16, 17

Exec. Order No. 14,399, § 3(b), 91 Fed. Reg. 17,125 (Mar. 31, 2026) ........ 3, 4, 12, 27

91 Fed. Reg. 32,915, 2026 WL 1537967 (June 2, 2026) ........ 3, 4, 15

Ballot Mail for Federal Elections, 39 C.F.R. Part 111, 91 Fed. Reg. 54,966 (Aug. 26, 2026) ........ *passim*

Domestic Mail Manual
24.5.1 ........ 6
24.5.3.a. ........ 6
705.24.0–705.24.6 ........ 3
705.24.1.f ........ 13
705.24.3 ........ 3, 6
705.24.3.1.c ........ 15
705.24.3.2.c ........ 15
705.24.4 ........ 3
705.24.4.2.b ........ 15
705.24.4.2.f ........ 3, 6
705.24.5.3 ........ 9
705.24.5.3.a ........ 3
705.24.6 ........ 6

**COURT RULES**

Fed. R. Civ. P. 65(b)(3) ........ 27

**LEGISLATIVE MATERIALS**

S. Rep. 93-1183 (1974) ........ 15

## INTRODUCTION

Millions of Americans will vote by mail in this year's general election. The rules for doing so—set by the States and Congress, as the Constitution requires—are settled. But mere days before the first mail ballots go out, the United States Postal Service ("USPS") has adopted a new regulation that threatens to plunge mail voting into chaos. *See* Ballot Mail for Federal Elections, 39 C.F.R. Part 111, 91 Fed. Reg. 54,966 (Aug. 26, 2026) ("Rule").

The Rule brazenly seizes control over mail voting in federal elections, with disastrous effect. If a voter is not on a USPS list or their ballot is not posted in a USPS-approved envelope, the Rule will prevent them from receiving mail ballots—even if they are entitled to do so under state law. This new regime radically departs from the decades of practice upon which States have built their mail voting systems, and it comes after States have *already* put those systems in motion for this election. As attested to by elections officials across the country, allowing this Rule to go into effect for the upcoming elections would be a catastrophe for voting rights and elections administration. For some States, compliance will be impossible.

The Rule imposes its novel and massively consequential restrictions even though USPS lacks *any* authority to regulate voting. That constitutional defect is fatal to the Rule. But the Rule's lawlessness extends further, violating USPS's governing statutes and other federal laws many times over. It contravenes restrictions on USPS's ability to reject mail, to offer non-postal services, and to discriminate among users of the mail. Its hasty adoption also bypassed procedural requirements for nationwide changes in USPS operations. Finally, the Rule runs afoul of federal voting rights law and the Privacy Act's protections against data aggregation.

Because Plaintiff States are likely to succeed on their claims that the Rule is unconstitutional, contrary to statute, and ultra vires; because the Rule imposes immediate burdens on election officials, harms their preparations for upcoming elections, and jeopardizes mail voting; and because the public interest and the equities favor relief, this Court should promptly issue a temporary restraining order and emergency stay, and then, following expedited briefing, postpone the effective date of the Rule and preliminarily enjoin its implementation.

**BACKGROUND**

The U.S. Constitution grants States responsibility for regulating and administering federal elections, unless Congress—not the Executive Branch—preempts those choices. U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2; *see also Foster v. Love*, 522 U.S. 67, 69 (1997). States have the power "to provide a complete code for [federal] elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, [and] prevention of fraud," among other things. *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013). States do just that, regulating nearly every aspect of election administration—including voter registration, absentee and mail voting procedures, and much more. Today, "every State lets at least some residents vote absentee" by means of mail ballots. *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2171 (2026).

Congress has invoked its power over federal elections selectively. As relevant here, Congress has protected access to absentee voting in presidential elections, *see* 52 U.S.C. § 10502; created absentee voting procedures for members of the military and citizens residing overseas, *see id.* § 20302; established requirements for state voter registration rolls, *id.* § 21083; and outlawed official actions that prevent qualified voters from voting, *id.* § 10307(a).

Separately, the Constitution grants Congress the power to establish a postal service, U.S. Const., art. I, § 8, cl. 7—a power that "embraces the regulation of the entire Postal System of the country." *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 126 (1981) (quotations omitted). USPS, for its part, "possess[es] only the authority that Congress has provided." *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). USPS may not "exclude letters, or . . . refuse to permit their delivery," absent explicit authorization by Congress. *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902).

Pursuant to this authority, Congress has set strict rules for USPS's operations, including a mandate that USPS provide nationwide mail service, 39 U.S.C. §§ 101(a), 101(e), 403(a), 403(b)(1), 404(a)(1); limitations on the circumstances under which USPS may refuse mail, *id.* §§ 3001–3018; and prohibitions on USPS discriminating among mail users, *id.* § 403(c), or

taking on new non-postal services, *id.* § 404(e). USPS must also submit major changes to postal services for review by a separate entity, the Postal Regulatory Commission ("PRC"). *Id.* § 3661. Finally, Congress has subjected USPS to the strictures of the Privacy Act, including its protections against collecting personal records that are not relevant and necessary to a lawful purpose, or that reflect First Amendment activity. *See id.* § 410(b); 5 U.S.C. § 522a(e)(1), (e)(7).

The President and USPS have disregarded each of these legal requirements in acting to significantly interfere with the States' mail voting programs. On March 31, 2026, the President issued an executive order directing USPS to adopt the regulations now before the Court. *See* Exec. Order No. 14,399 ("EO"), § 3(b), 91 Fed. Reg. 17,125, 17,126. USPS issued its proposed rule on June 2, 2026. 91 Fed. Reg. 32,915. Plaintiff States and others submitted comment letters raising grave legal, procedural, and practical concerns. Brunton (NC) Decl. Ex. A, Doc. No. 4-18 at 12. Notwithstanding these comments, on August 26, 2026, USPS published the Rule. 91 Fed. Reg. 54,966 (promulgating Domestic Mail Manual § ("DMM") 705.24.0–705.24.6).

The Rule has two main components. First, it requires States to enroll every eligible mail voter with USPS, including by providing USPS with the barcodes for each voter's ballot envelopes. DMM 705.24.4. Second, it sets ballot envelope design requirements, including the requirement to use trackable Intelligent Mail barcodes ("IMbs"), and provides that USPS must review all ballot envelope designs for compliance. *Id.* 705.24.3. Election officials must certify compliance with the envelope review requirements to begin enrolling voters. *Id.* 705.24.4.2.f. When election officials send ballot mail to voters missing from a State's USPS list, the Rule provides that *USPS will not deliver those ballots*. *Id.* 705.24.5.3.a (ballot mailings that do not comply with the enrollment requirement "will not be accepted").

USPS chose to promulgate the Rule just days before the first mail ballots must be mailed for the November 3 general election. *See, e.g.*, N.C. Gen. Stat. § 163-227.10(a) (requiring mailing to begin 60 days before general election, *i.e.*, September 4 for this year). Unless blocked, the Rule will jeopardize Plaintiff States' mail voting programs, divert their resources from critical election preparations, and disenfranchise voters. *Cf. Trump v. California*, 609 U.S.

___, 2026 WL 2473573, at *4 (Aug. 24, 2026) (per curiam) ("If the Postal Service's final rule harms the States, they may challenge that rule.").

## LEGAL STANDARD

To obtain a temporary restraining order, a stay under 5 U.S.C. § 705, or a preliminary injunction, the movant must show that it is likely to succeed on the merits, that it will suffer irreparable harm, and that the equities and public interest favor relief. *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (preliminary injunction); *Goldstein v. Batista Contracting LLC*, 671 F. Supp. 3d 68, 72 (D. Mass. 2023) (TRO); *Massachusetts Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020) (stay).

## ARGUMENT

### I. PLAINTIFF STATES HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

The Rule runs directly contrary to the Constitution and federal statutes, and Plaintiff States are therefore likely to prevail on the merits of their claims.

#### A. The Rule Violates the Separation of Powers

The Rule purports to regulate mail voting for federal elections in the absence of—and contrary to—constitutional authority. By erecting a new regime to design, monitor, and screen mail ballots, the Rule trespasses the limits of Executive power and impermissibly encroaches on powers belonging to the States and Congress.

The Rule implements presidential mandates set out in the EO. *See* 91 Fed. Reg. 32,915, 2026 WL 1537967 (June 2, 2026) (proposed rule acknowledging purpose of complying with the EO). Both the President and USPS have affirmed that the Rule is meant to regulate elections. EO § 1; 91 Fed. Reg. 32,915, 2026 WL 1537967 (June 2, 2026). As a constitutional matter, however, it is *States*—not USPS or the President—that have authority to regulate federal elections, subject to preemption only by Congress. *See Watson*, 146 S. Ct. at 2170.

In contrast, the Executive Branch's "authority to act . . . 'must stem either from an act of Congress or from the Constitution itself.'" *Medellín v. Texas*, 552 U.S. 491, 524 (2008) (quoting

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Neither the Constitution nor any federal statute authorizes the Executive Branch to unilaterally dictate election regulations. *See Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023) (rejecting argument that the executive can "interfere[] with state election procedures based solely on the federal executive's own initiative"); *California v. Trump*, ___ F. Supp. 3d ___, 2026 WL 1826490, at *15 (D. Mass. June 25, 2026) ("*California II*") *stayed on other grounds sub nom. Trump v. California*, 2026 WL 2473573 (U.S. Aug. 24, 2026) ("[N]o law enacted by Congress delegates authority to control mail-in voting to USPS.").

Consistent with their legal authority, each Plaintiff State has adopted a "complete code" governing mail voting. *See Smiley*, 285 U.S. at 366. These laws address which voters are eligible to receive a mail ballot and how those mail ballots may be received, cast, and counted. These mail voting programs vary considerably from State to State. California and Washington, for instance, have adopted universal mail voting systems, wherein every active registered voter is sent a mail ballot. *See* Cal. Elec. Code §§ 3000.5, 3003, 3010, 3011; Wash. Rev. Code §§ 29A.40.010, .091, .170. Other States, like Massachusetts, authorize no-excuse early voting by mail, allowing any qualified and registered voter to request, receive, and cast a mail ballot. *See* Mass. Gen. Laws ch. 54, § 25B(a)(1). Notwithstanding these differences, each of these mail voting programs relies on USPS to transmit mail ballots—and justifiably so, given USPS's legally-mandated role as a neutral and universal provider of postal services. *See* U.S. Const. art. I, § 8, cl. 7; 39 U.S.C. §§ 101, 403. States have also adopted various design requirements for their mail ballot envelopes. *See, e.g.*, Md. Code. Ann., Elec. Law § 9-309-10.

The Rule intrudes upon Plaintiff States' power in this area by regulating numerous aspects of mail voting and withholding mail ballots from eligible voters unless the Rule's demands are met. The Rule effectively wrests control over mail voting from the States and Congress and interposes new mandatory procedures created to further the President's policy goals. Its provisions dangerously and impermissibly undermine Plaintiff States' decisions about who may cast a ballot and how they may do so.

First, the Rule prohibits USPS from transmitting ballot mail where, despite a State's best efforts, an intended recipient is missing from a USPS Mail Ballot List. DMM 24.5.1 & 24.5.3.a. USPS exercises absolute control over this ballot screening regime. Although the Rule purports to disclaim responsibility for the contents of the Lists, *see* DMM 705.24.6, States cannot ensure the accuracy of lists maintained within USPS and used for screening purposes by USPS staff, over whom States have no supervision or control. The Rule thereby dramatically impairs Plaintiff States' ability to ensure that qualified mail voters, including those who are disabled or absent from the jurisdiction on election day, receive their ballots.

Second, the Rule establishes new and burdensome requirements for ballot envelopes that are a precondition not only for USPS transmission of mail ballots but also the antecedent step of States' enrolling voters with USPS. DMM 705.24.3 & 705.24.4.2.f. These envelope design requirements govern both outbound and return mail ballot envelopes and demand, among other things, automation compatibility, use of unique IMbs, and that States submit their ballot envelope designs to USPS for review and preapproval. DMM 705.24.3. The Rule thus supplants Plaintiff States' decisions about ballot envelope design and gives USPS the final say in those designs—or else withholds postal service altogether.

USPS thus purports to implement an extraordinary reordering of mail voting procedures, but it lacks any authority from Congress to do so. Congress must "clearly" authorize such an "enormous and transformative expansion" of an agency's authority, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), on a question of vast "'political significance,'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022), that upsets "the usual constitutional balance between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Nothing like this clear authorization can be found in the U.S. Code. While the Rule cites the statutory enumeration of USPS's powers, rulemaking authority, and narrow law enforcement authority, these provisions do not authorize USPS to surveil or control mail voting. *See* 91 Fed. Reg. at 54,967–72 (citing 39 U.S.C. §§ 401, 404; 18 U.S.C. § 3061). USPS's enumerated powers do not mention ballots, voter lists, election law enforcement, or any power to condition mail on a States' compliance

with a USPS program. *See* 39 U.S.C. §§ 401, 404(a); 18 U.S.C. § 3061. As for its rulemaking authority, USPS may only adopt regulations that are "not inconsistent with" Title 39 and that "may be necessary in the execution" of its lawful functions. 39 U.S.C. § 401(2). Setting, administering, and enforcing election rules are not among USPS's lawful functions, and as explained below, the Rule is inconsistent with USPS's governing statutes. *See infra* I.B–E, I.G. USPS is therefore wrong to assert that the Rule can be justified by the Executive's duty to "take care" that the laws be faithfully executed. *See* 91 Fed. Reg. at 54,968; *cf.* U.S. Const. art. II, § 3; *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 51 (D.R.I. 2025).

All told, the Rule violates the separation of powers several times over. First, it constitutes Executive action unsupported by the Constitution or statute. *See Youngstown*, 343 U.S. at 585; *League of Women Voters of Mass. v. Trump*, ___ F. Supp. 3d ___, 2026 WL 2322705, at *10 (D. Mass. Aug. 11, 2026) ("*LWVM II*") ("The executive branch has no authority to regulate elections."). Second, by displacing Plaintiff States' decisions about their mail voting programs in favor of the President's policy preferences, the Rule infringes the States' exclusive authority to regulate federal elections where Congress has remained silent. *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *California v. Trump*, 786 F. Supp. 3d 359, 373 (D. Mass. 2025) ("*California I*"). And because ballots covered by the Rule also include state and local races, that incursion into States' electoral systems extends beyond federal elections at least for this November's elections. *See Oregon v. Mitchell*, 400 U.S. 112, 124–125 (1970). Third, by disrupting States' administration of their mail voting programs, the Rule "'impair[s]'" the States "'in the performance of their constitutional duties.'" *See Clinton v. Jones*, 520 U.S. 681, 701 (1997) (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)). Fourth, the Rule usurps Congress's exclusive constitutional power to enact laws governing "the entire postal system of the country," *Ex parte Jackson*, 96 U.S. 727, 732 (1877); *see* U.S. Const., art. I, § 8, cl. 7, by claiming for USPS the power to enact rules that have no basis in statute.

Finally, the Rule unlawfully conscripts States' election officials to implement critical portions of the new data collection and ballot control regime, from requiring election officials to

upload millions of voter entries to USPS to mandating that officials redesign ballot envelopes and shepherd them through the USPS review process. By refusing States access to essential and statutorily guaranteed postal services for election purposes unless they implement (with their own resources) a presidentially ordered federal elections program, the Rule effectively seizes the States' personnel resources. *See Printz v. United States*, 521 U.S. 898, 935 (1997).

### B. The Rule Creates an Unauthorized Category of Nonmailable Matter, Violating USPS's Duty to Provide Universal Mail Services

The Rule also impermissibly creates new categories of nonmailable matter, contravening USPS's obligation to provide universal mail service. The new nonmailability rules are also arbitrary and capricious and procedurally defective.

USPS's "right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then [it] cannot exclude or refuse to deliver them." *See McAnnulty*, 187 U.S. at 109. In 39 U.S.C. §§ 3001–3018, Congress enumerated specific and narrow categories of "nonmailable matter"—e.g., hazardous materials or specified fraudulent, obscene, or sweepstakes-related matter—and prescribed detailed procedures for this material. Mail ballots transmitted between election officials and voters are not, and never have been, nonmailable matter under 39 U.S.C. §§ 3001–3018 or any other law. *See League of Women Voters of Mass. v. Trump*, ___ F. Supp. 3d ___, 2026 WL 2104006, at *6 n.5 (D. Mass. July 22, 2026) ("*LWVM I*")). To the contrary, Congress has legislated to facilitate the transmission of ballots by mail. *See, e.g.*, 39 U.S.C. § 3406 (UOCAVA ballot materials must be carried by USPS "expeditiously and free of postage").

USPS attempts to distance the Rule from nonmailability provisions by arguing that it only imposes "conditions on the acceptance of mailable matter," which, it claims, are "distinct from a determination that the matter is nonmailable." 91 Fed. Reg. at 54,974. This claim is contradicted by the provisions governing nonmailability in §§ 3001–3018. Almost none of these provisions impose a flat ban. Rather, the overwhelming majority impose conditions: mail will be refused, returned, or disposed of unless a disclosure, label, recipient restriction, or other

condition is satisfied. *See, e.g.*, 39 U.S.C. § 3001(d), (e)(2), (g)(1)–(2), (h)(1), (i)(1) (imposing conditions variously related to disclosure, labeling, recipients, and sealing); *id.* § 3002a (condition limiting recipients); *id.* § 3010 (list-check condition). Other statutory provisions explicitly grant USPS authority to condition acceptance. *See, e.g.*, *id.* § 3001(n)(1) (hazardous materials nonmailable "[e]xcept as otherwise authorized by law or regulations of the Postal Service"). The statutory meaning of "nonmailability" thus includes mail matter that does not satisfy conditional requirements for its category. The Rule precisely tracks this model, as USPS concedes ballot mailings that fail the verification process will be rejected. DMM 705.24.5.3.

Outside of the narrow categories of nonmailable matter set by statute, USPS must perform its "basic function" and "obligation" to "provide prompt, reliable, and efficient services to patrons in all areas," and "render postal services to all communities." 39 U.S.C. § 101(a); *see also id.* § 403(a) (requiring USPS to "plan, develop, promote, and provide adequate and efficient postal services" and "serve as nearly as practicable the entire population of the United States"); *id.* § 403(b) (USPS must maintain an "efficient system of collection, sorting, and delivery of the mail nationwide"). In line with this universal service duty, Congress has required that the "most expeditious collection, transportation, and delivery of important letter mail" is to be USPS's "highest consideration" in determining its policies. *Id.* § 101(e).

These governing statutes preclude USPS from unilaterally determining that it will not accept or transmit election mail pertaining to voters not on the USPS Mail Ballot Lists, or election mail that does not comply with the Rule's new design and review standards—conditions found nowhere in Title 39 or any other federal law. *See Hannegan v. Esquire, Inc.*, 327 U.S. 146, 155–156 (1946) (holding that the Postmaster General may not impose conditions on mail privileges that Congress has not prescribed). The Rule therefore contravenes the exclusive nonmailability scheme that Congress enacted in 39 U.S.C. §§ 3001–3018 and USPS's statutory obligations under 39 U.S.C. §§ 101(a), 101(e), 403(a), 403(b).

USPS's decision to create new nonmailability rules also failed to follow the requirements of the Administrative Procedure Act ("APA"). *See* 39 U.S.C. § 3001(m) (APA applies to

"proceedings concerning the mailability of matter."). The APA prohibits final agency action that is arbitrary, capricious, or an abuse of discretion, 5 U.S.C. § 706(2)(A), such as when an agency fails "to consider an important aspect of the problem," when its explanation "runs counter to the evidence," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or when it fails adequately consider "reliance interests." *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). The Rule abjectly fails this standard.

Most urgently, USPS arbitrarily disregarded the States' "'legitimate reliance'" on USPS's existing practices related to mail ballots for the imminent November elections. *See Regents*, 591 U.S. at 30 (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996)); Brunton (NC) Decl. Ex. A, Doc. No. 4-18 at 33–36. USPS dismissed out-of-hand serious concerns about "logistical or financial difficulties states may face in complying with the rule, including some claims that immediate implementation would prove impossible," and declared that "the visibility and law-enforcement benefits of the rule, including for this election cycle, are such that there is no compelling reason for any delay." 91 Fed. Reg. at 54,985. In making this pronouncement, USPS completely failed to grapple with extraordinarily serious implementation questions regarding States' ability to timely mail ballots in mere days or weeks after the late August publication of a new Rule that requires (1) a redesign of envelopes, (2) review by USPS on an uncertain timeline, (3) the reordering and reprinting of potentially millions of ballots, (4) the entry of millions of pieces of data by election officials, and (5) increased time in processing ballots at a mail facility.[1]

---

[1] The Rule is arbitrary and capricious in other ways as well. USPS turns its back on its statutory duty to make "most expeditious" transmission of "important letter mail" its "highest consideration" in determining its policies, 39 U.S.C. § 101(e), and substitutes instead election policy goals beyond its statutory ambit. Additionally, while USPS touts the law enforcement benefits of the Rule, it points to no evidence of widespread fraud in mail balloting that justifies the enormous new impositions, shrugging off concerns about the rule's "factual predicate (or alleged lack thereof)" as irrelevant to its authority. 91 Fed. Reg. at 54,972. But USPS cannot rely a factual premise for which there is no persuasive evidence in adopting such a consequential and burdensome Rule. *See Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992).

The Rule also violated the APA's procedural requirements by setting an immediate effective date. *See* 5 U.S.C. § 553(d) (requiring publication of a final rule "not less than 30 days before its effective date"); *Kollett v. Harris*, 619 F.2d 134, 144 (1st Cir. 1980). While this "time lag" is designed "to afford persons affected a reasonable time to prepare," *Rowell v. Andrus*, 631 F.2d 699, 703 (10th Cir. 1980) (citation modified), the Rule's immediate effective date saddles States with burdensome new tasks on an impossible timeline, *see infra* III.

### C. The Rule Requires USPS to Provide Unauthorized Non-Postal Services

The Rule also violates statutory limits on USPS's authority to provide "nonpostal service[s]." *See* 39 U.S.C. § 404(e). Non-postal services are all services that fall outside "postal service[s]," *id.* § 404(e)(1), while "postal service[s]" are limited to "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto," *id.* § 102(5). The Rule creates a new non-postal service consisting of a multipart system to monitor and control voting. The Rule also requires USPS to maintain and provide technology to receive, house, and manage vast troves of voter information. These new duties fall far afield of mail delivery and do not qualify as "postal service[s]." *See id.*

The Rule does not fall within either of the two categories of non-postal services that USPS's governing statutes permit. First, it is not a "nonpostal service[] . . . offered as of January 1, 2006" and approved by the PRC. *Id.* § 404(e)(2)–(5). Second, it is not a "nonpostal product[] or service[] authorized by chapter 37 [of Title 39]," *id.* § 404(e)(2), which allows USPS to "enter into agreements" with state, local, or tribal governments to provide non-postal services, subject to certain safeguards, *id.* § 3703(a); *see generally id.* §§ 3701–3705. No such agreements exist. Quite the opposite, as election officials are *forced* to participate in USPS's new procedures to fulfill their state law duties to send ballots to voters. Likewise, the Rule does not disclose any authorizing agreement with a federal agency. USPS discounts this statutory bar on new non-postal services as applicable only to services that are "commercial" in nature, 91 Fed. Reg. at 54,975, but that definitional gloss cannot be reconciled with the statute itself, which explicitly

creates an exemption from the statutory bar to allow USPS to perform non-commercial services for government agencies pursuant to agreement. *See* 39 U.S.C. §§ 404(e)(2), 3701–3705.

Because the Rule's new non-postal services do not fit within the narrow statutory exceptions, USPS is prohibited from providing them. *Id.* § 404(e); 5 U.S.C. § 706(2)(c); *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("'[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.'" (citation omitted)).

**D. The Rule Unreasonably Discriminates Among Users of the Mails**

As a corollary to the universal mail service obligation, *see supra* I.B, Congress prohibited USPS from "mak[ing] any undue or unreasonable discrimination among users of the mails" or "grant[ing] any undue or unreasonable preferences to any such user" unless "specifically authorized." 39 U.S.C. § 403(c). The Rule requires just that sort of unlawful discrimination, dictating which "users of the mails"—here, election officials and voters—can avail themselves of postal service. *See LWVM I*, 2026 WL 2104006, at *6 n.5 (finding that the directives in the EO "violat[e] . . . USPS's obligation not to make 'any undue or unreasonable discrimination among users of the mails'" (quoting 39 U.S.C. § 403(c)).

Under the Rule, a ballot mailed to a voter on a USPS Mail Ballot List which conforms to the Rule's envelope design and review standards will presumably be accepted and delivered, while identical ballot mail that does not comply with the Rule's conditions (but is otherwise lawfully posted) will be rejected and returned. That is a regime of selective refusal of service: identical mail pieces will be accepted or rejected depending on whether the recipient's/sender's name appears in a federal database and whether USPS has pre-approved the envelope's design.

That discrimination is both "undue" and "unreasonable." USPS has long carried election mail without the Rule, and routinely carries other government mail that is important, sensitive, and deadline-driven (jury summonses, tax filings, social security correspondence, and the like) without any such limitations. State election officials, who have the constitutional responsibility to administer elections, can and do manage ballot mail on their own, enabling millions of voters

to lawfully vote by mail each cycle. Indeed, even under the Rule, USPS will deliver election mail for federal primaries without imposing the new requirements. *See* DMM 705.24.1.f. Not only are the Rule's requirements unjustifiable, they also stand to disenfranchise voters across the country. USPS cannot identify any legitimate operational need that justifies this disparity.

### E. USPS Ignored Statutory Procedures by Failing to Seek an Advisory Opinion from the Postal Regulatory Commission

USPS also failed to comply with required procedure in adopting the Rule. *See California II*, 2026 WL 1826490 at *16 *stayed on other grounds sub nom. Trump v. California*, 2026 WL 2473573 (U.S. Aug. 24, 2026) (noting that the EO's "timeframe provides no allowance for Congress' mandated procedure regarding USPS rulemaking" under 39 U.S.C. § 3661(b)).

The Postal Reorganization Act requires USPS to seek an advisory opinion from the PRC before making any "change in the nature of postal services" that will "generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). To do so, USPS must submit its proposal to the PRC "within a reasonable time" *before* the changes take effect. *Id.*; *see* 39 C.F.R. § 3020.112 (2026) (an advisory opinion request must be filed "not less than 90 days before the proposed effective date" of the change). The PRC must hold a formal hearing and issue a written opinion, 39 U.S.C. § 3661(c), which the D.C. Circuit can review, *id.* § 3663.

The Rule is a paradigmatic change subject to § 3661(b). A change qualifies for review under § 3661(b) when it will (i) have a meaningful, quantitative impact on service, (ii) qualitatively change the nature of postal services, and (iii) apply nationwide or substantially nationwide. *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 876 (E.D. Pa. 2020), *order clarified*, 2020 WL 6580462 (E.D. Pa. Oct. 9, 2020).

First, the Rule's new requirements will significantly degrade election mail service. The quantitative impact is indisputable: USPS is imposing new design and voter enrollment requirements for mail ballots in all federal general elections, affecting many millions of mail pieces in each election cycle. The Rule will also create serious delays in USPS's acceptance of mail ballots due to the new requirement for USPS to confirm each mail ballot's compliance.

Requiring election officials to manage mail voter lists on USPS technology creates further risk of delay and errors—whether from lags or omissions from an untested database, human error in formatting or inputting the data, or simply the volume of records involved. The harms resulting from these delays are compounded by the tight statutory deadlines for transmitting and returning ballots, leaving no slack to absorb ballot rejections or even a modest increase in processing time.

Second, the Rule will qualitatively change the nature of postal service by changing longstanding USPS practices. Instead of accepting and prioritizing ballot mail under uniform postal rules, USPS now intends to impose a new enrollment and verification regime that conditions delivery on envelope design and presence of a name on a USPS list. That is precisely the kind of change in "the availability of postal services" that individual customers experience and that qualifies as a qualitative change. *DeJoy*, 490 F. Supp. 3d at 885–886.

Third, the Rule applies nationwide, governing federal ballot mail submitted to USPS in every State and territory. *See* 91 Fed. Reg. at 54,971 (the Rule sets "a single, nationwide standard for Federal Ballot Mail"). Unlike a change confined to a single facility or region, the Rule reaches every postal customer issuing or casting a federal ballot by mail.

Because the Rule satisfies all three § 3661(b) conditions, USPS violated the statute by failing to seek an advisory opinion before the PRC.

### F. The Rule Violates the Voting Rights Act

The Rule also violates the Voting Rights Act's prohibition on actions taken under color of law to refuse to permit qualified voters to cast ballots. Section 11(a) of the Act provides, as relevant here: "No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote[.]" 52 U.S.C. § 10307(a). This provision straightforwardly "prohibits public officials from denying any qualified person the right to vote." *United States v. Post*, 297 F. Supp. 46, 50 (W.D. La. 1969). The Rule violates Section 11(a) by directing USPS to refuse to accept and deliver mail ballots that do not conform to its requirements, without

regard to voters' qualifications. In doing so, USPS will necessarily "fail or refuse to permit" qualified registered voters to receive and cast mail ballots. *See* 52 U.S.C. § 10307(a).

### G. The Rule Violates the Privacy Act's Prohibitions on Agencies Maintaining Records that Are Unnecessary or Reflect First Amendment Activity

Finally, in creating a federal database of citizens' exercise of their right to vote by mail, the Rule violates the Privacy Act's prohibition on maintaining records that are not "relevant and necessary" to accomplish a lawful purpose of the agency or which "describe[e] how any individual exercises rights guaranteed by the First Amendment." 5 U.S.C. § 552a(e)(1), (e)(7).

Congress passed the Privacy Act "in response to the explosion of computer technology," which introduced new risks of data compilation and government surveillance. *Garris v. FBI*, 937 F.3d 1284, 1295–96 (9th Cir. 2019) (citation omitted). The Act sought to prevent the "collection of protected information not immediately needed, about law-abiding Americans." S. Rep. 93-1183 (1974). Agencies may only maintain records necessary to accomplish a purpose of the agency required by statute or executive order. 5 U.S.C. § 552a(e)(1). The Act is particularly protective of individuals' First Amendment activities, outright barring collection of records of those activities except in narrow circumstances. *See id.* § 552a(e)(7).

The Rule directs data collection and surveillance of ballot mail sent to and from registered voters. Collecting and maintaining this data is not necessary to accomplish USPS's statutory purpose, as no statute requires (nor even authorizes) it to surveil mail ballots. *See supra* I.B–E. Nor can an unconstitutional executive order justify the Rule. *See California*, 2026 WL 1826490, at *15. Thus, the Rule violates the requirements of 5 U.S.C. § 552a(e)(1).

It also violates the Act's protections for First Amendment activity. The stated purpose of the Rule's "mailpiece preparation and data reporting standards" is to "provide information regarding the sending of ballots through the mails that would be available for use by law enforcement." 91 Fed. Reg. at 32,915. To achieve this goal, the Rule requires each piece of ballot mail to have an IMb and requires States to provide barcodes for each individual voter to USPS. DMM 705.24.3.1.c, 705.24.3.2.c, 705.24.4.2.b. With these data, USPS explains that the

Rule "will afford significantly enhanced visibility into the sending of Federal Ballot Mail" to "in turn facilitate federal law enforcement efforts." 91 Fed. Reg. at 54,969.

Voter registration and voting are forms of First Amendment expression. *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999) (holding that the choice of whether or not to register "implicates political thought and expression"); *United States v. Weber*, 816 F. Supp. 3d 1168, 1193 (C.D. Cal. 2026), *appeal pending*, No. 26-1232 (9th Cir. filed Mar. 3, 2026). Yet the Rule demands that States provide precisely that information—on pain of losing the ability to administer their mail voting programs. The Rule's voter enrollment and ballot surveillance programs thus run headlong into 5 U.S.C. § 552a(e)(7). *See Weber*, 816 F. Supp. 3d at 1193 (5 U.S.C. § 552a(e)(7) bars federal agencies barred from collecting voter rolls). USPS asserts that 5 § 552a(e)(7) applies only to records revealing the *content* of First Amendment activity, 91 Fed. Reg. at 54,970 (citing *Reuber v. United States*, 829 F.2d 133, 143 (D.C. Cir. 1987)), ignoring that the decisions to register and vote are themselves forms of First Amendment expression, *see Weber*, 816 F. Supp. 3d at 1193.

No exception to the bar on collecting records of voters' First Amendment activity can salvage this voter surveillance program. *See* 5 U.S.C. § 552a(e)(7). The collection of these records is not "expressly authorized by statute" or by the tens of millions of voters who are the object of the surveillance. *See id.* Nor is this sweeping new system to track ballot mail "pertinent to and within the scope of an authorized law enforcement activity." *Id.*

The Rule cites USPS's general statutory authority to investigate and enforce criminal laws, but that authority plainly does not encompass creating a surveillance program to track voting. *See* 18 U.S.C. § 3061(a), (b) (authorizing USPS postal inspectors to serve warrants and subpoenas, make arrests, carry firearms, and seize property), *cited in* 91 Fed. Reg. at 54,972. As one court put it, when an agency collects protected information, unconnected to any specific "investigation of past, present or anticipated violations of the statutes which it is authorized to enforce, subsection (e)(7) of the [Privacy] Act has been violated." *Clarkson v. IRS*, 678 F.2d 1368, 1374 (11th Cir. 1982); *see also id.* at 1374 (quoting Privacy Act Guidelines, 40 Fed. Reg.

28,949, 28,965 (July 9, 1975)) (the law enforcement exception not meant to allow "maintenance of files on 'persons who are merely exercising their constitutional rights.'"). In other words, a general grant of authority to investigate criminal matters does not legitimize a dragnet of every mail ballot in America.

## II. USPS's Rule Is Judicially Reviewable

### A. Plaintiff States Have a Cause of Action for Each of Their Claims

As to Plaintiff States' first claim, that the Rule violates the Constitution, it is well established that "an aggrieved party may seek equitable relief from unconstitutional Government action by proceeding 'directly under the Constitution.'" *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 81 (D.D.C. 2026) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)); *see also Doe v. Trump*, 157 F.4th 36, 46–47 (1st Cir. 2025) (citing *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015)); *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42–44 (1st Cir. 2002).

Plaintiff States' second claim, which alleges that the Rule's treatment of nonconforming ballots as nonmailable matter exceeds USPS's statutory authority and limitations, is properly presented under the APA. *See* 5 U.S.C. § 706(2)(c). Although USPS is generally exempt from the APA, *see* 39 U.S.C. § 410(a), Congress explicitly subjected USPS "proceedings concerning the mailability of matter" to APA standards, including judicial review pursuant to "chapter . . . 7 of title 5," 39 U.S.C. § 3001(m); s*ee DSCC v. Trump*, 2026 WL 2168617 at *2, n.6 (D.C. Cir. July, 28, 2026) (per curiam); *Humane Soc'y of U.S. v. USPS*, 609 F. Supp. 2d 85, 94–97 (D.D.C. 2009) (applying APA review).

Likewise, Plaintiff States have a non-statutory, equitable cause of action to challenge USPS conduct that is contrary to statute, as asserted in claims III, IV, V, and VII. *See, e.g.*, *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970–972 (D.C. Cir. 2022) (claims that USPS exceeded its statutory authority are judicially reviewable); *Sears, Roebuck & Co. v. USPS*, 844 F.3d 260, 265 (D.C. Cir. 2016) (discussing scope of "non-APA review" of USPS actions).

Moreover, Congress has affirmed that district courts have jurisdiction over civil claims "arising under any Act of Congress relating to the postal service." 28 U.S.C. § 1339; *see also* 39 U.S.C. § 409 (same).

Finally, Section 11(a) of the Voting Rights Act provides a right of action. *LWVM I*, 2026 WL 2104006, at *8–10; *see also, e.g. Krabach v. King County*, 2023 WL 7018431, at *3–4 (W.D. Wash. Oct. 25, 2023) (county could sue under related Voting Rights Act provision). Plaintiff States' claim VI is therefore properly before the Court.

### B. Plaintiff States Need Not Seek Review Before the Postal Regulatory Commission

Defendants may argue that only the PRC has jurisdiction over Plaintiff States' claims related to USPS's violation of Title 39's limitations on discrimination and failure to comply with required procedures. *See* 39 U.S.C. § 3662(a) (allowing parties to lodge complaints pertaining to 39 U.S.C. §§ 403(c) & 3661 with the PRC). This contention should be rejected.

Congress expressly vested federal district courts with jurisdiction over civil claims brought against USPS, *see* 28 U.S.C. § 1339; 39 U.S.C. § 409(a), and provided that USPS can "be sued in its official name," *id.* § 401(1). Moreover, courts presume judicial review of agency action is available absent "clear and convincing evidence" of contrary congressional intent, *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 671 (1986), and no such intent is "fairly discernible" here, *DeJoy*, 490 F. Supp. 3d at 864. Title 39 provides that an interested person "*may* lodge a complaint" with the PRC. *See* 39 U.S.C. § 3662(a) (emphasis added). This language reflects that "resort to the [PRC] is permissive" and does not displace Congress's grant of jurisdiction to district courts. *DeJoy*, 490 F. Supp. 3d at 860.

Even if the Court reads 39 U.S.C. § 3662(a) to generally require complaints to be brought to the PRC, that requirement does not apply here, where seeking administrative review would result in "effectively . . . no review at all." *E. Bridge, LLC v. Chao*, 320 F.3d 84, 89 (1st Cir. 2003); *cf. New York v. Trump*, 181 F.4th 132, 136, 140 n.3 (D.C. Cir. July 14, 2026) (concluding that certain claims raised on summary judgment must go first to the PRC, but declining to decide

whether parties must first file before the PRC for relief needed "only months before" an election where PRC proceedings would "foreclose[] all meaningful judicial review"). The statutes and regulations governing PRC review contemplate a protracted process, giving the PRC 90 days to simply decide whether to dismiss a complaint or "begin proceedings." 39 U.S.C. § 3662(b). And the PRC has neither procedures for emergency motions nor power to order interim injunctive relief. *See id.* § 3662(c); 39 C.F.R. §§ 3010.150–3010.170, 3022.1–3022.30, 3022.50. Because PRC action on Plaintiff States' claims and subsequent judicial review "would come too late to be meaningful," this Court has jurisdiction in the first instance. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023).

## III. PLAINTIFF STATES WILL BE IRREPARABLY HARMED ABSENT IMMEDIATE INJUNCTIVE RELIEF

Because "running a statewide election is a complicated endeavor," "[w]hen an election is close at hand, the rules of the road should be clear and settled." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay). The Rule does just the opposite, pulling the rug out from under States who have long relied on USPS to facilitate their mail voting programs, and doing so at the eleventh hour. By upending Plaintiff States' election administration on the eve of an election, the Rule inflicts several serious and immediate injuries on Plaintiff States, up to and including making it almost certainly impossible to send any mail ballots at all in some States.[2]

[2] Each of the below harms is supported by the declarations filed herewith. Southard (CA) Decl. ¶¶ 14–62, Doc. No. 4-1 at 7–26; Tassinari (MA) Decl. ¶¶ 21–73, Doc. No. 4-2 at 8–30; Wlaschin (NV) Decl. ¶¶ 14–58, Doc. No. 4-3 at 5–23; Holmes (WA) Decl. ¶¶ 17–68, Doc. No. 4-4at 7–31; Fontes (AZ) Decl. ¶¶ 12–59, Doc. No. 4-5 at 6–29; Rudy (CO) Decl. ¶¶ 13–63, Doc. No. 4-6 at 4–25; Rosenberg (CT) Decl. ¶¶ 13–66, Doc. No. 4-7 at 6–31; Albence (DE) Decl. ¶¶ 12–56, Doc. No. 4-8 at 5–26; Miller (DC) Decl. ¶¶ 9–35, Doc. No. 4-9 at 3–9; Nago (HI) Decl. ¶¶ 14–63, Doc. No. 4-10 at 4–18; Flynn (ME) Decl. ¶¶ 11–58, Doc. No. 4-11 at 5–22; Dorsey (MD) Decl. ¶¶ 17–71, Doc. No. 4-12 at 6–29; Brater (MI) Decl. ¶¶ 21–68, Doc. No. 4-13 at 7–23; Linnell (MN) Decl. ¶¶ 13–60, Doc. No. 4-14 at 4–21; Barber (NJ) Decl. ¶¶ 14–56, Doc. No. 4-15 at 4–19; Vigil (NM) Decl. ¶¶ 15–58, Doc. No. 4-16 at 7–24; Stavisky (NY) Decl. ¶¶ 17–83, Doc. No. 4-17 at 6–35; Brunton (NC) Decl. ¶¶ 9–32, Doc. No. 4-18 at 3–10; Dawson (OR) Decl. ¶¶ 13–61, Doc. No. 4-19 at 4–22; Marks (PA) Decl. ¶¶ 13–59, Doc. No. 4-20 at 5–22; Rock (RI) Decl. ¶¶ 14–67, Doc. No. 4-21 at 5–24; Hanzas (VT) Decl. ¶¶ 13–58, Doc. No. 4-22 at 4–19;

With only days until Plaintiff States begin mailing ballots for the 2026 general election, the Rule immediately interferes with Plaintiff States' "sovereign power . . . to create and enforce a legal code." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Plaintiff States have each exercised their powers to "provide a complete code for [federal] elections" as well as state elections, including rules for mail voting. *Smiley*, 285 U.S. at 366. The Rule undermines this sovereign exercise by requiring Plaintiff States to share sensitive information with USPS, review and correct USPS's Mail Ballot Lists, and redesign mail ballot envelopes for USPS review—all to prevent USPS from refusing to transmit mail ballots, despite contrary state law. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (preventing States from "effectuating statutes" constitutes irreparable injury). Where, as here, "sovereign interests and public policies [are] at stake," a party faces irreparable injury. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

The scale of the Rule's disruption is catastrophic. Even before Plaintiff States begin mailing ballots, the Rule requires Plaintiff States to immediately spend significant time, manpower, and money to erect wholly new mail voting infrastructure, which is essentially impossible in many States on any reasonable (let alone legally mandated) timeline.[3] Among other things, election officials will have to develop new processes to insert and track IMbs on

Koski (VA) Decl. ¶¶ 15–57, Doc. No. 4-23 at 4–18; Michalowski (Cook Cnty., IL) Decl. ¶¶ 15–60, Doc. No. 4-24 at 4–18; Wise (King Cnty., WA) Decl. ¶¶ 19–81, Doc. No. 4-25 at 6–28; Hilby (City of Sun Prairie, WI) Decl. ¶¶ 15–29, Doc. No. 4-26 at 4–8.

[3] *See, e.g.*, Holmes (WA) Decl. ¶ 42, Doc. No. 4-4 at 20–21 ("gravely concerned that Washington State would not be able to reprint its ballot envelopes to comply with the requirements of the Rule and would be prevented by the Rule from sending ballots to any of Washington's residents."); Dawson (OR) Decl. ¶ 37, Doc. No. 4-19 at 13–14 ("there is neither the time nor the money to design, review, and reorder envelopes before ballots begin to be mailed to Oregon voters in mid-September"); Nago (HI) Decl. ¶¶ 5, 43, Doc. No. 4-10 at 2, 12 (In Hawaii, in-person voting is less than 5 percent of turnout, and yet, under the Rule, cannot use its existing printed envelopes may be unable to procure compliant envelopes from its vendor on the continent in time for the November election); Rock (RI) Decl. ¶ 18, Doc. No. 4-21 at 6–7 (compliance with the Rule "without disenfranchising Rhode Island voters who are legally entitled to vote by mail" does "not appear possible").

ballot envelopes;[4] change the rules for ballot envelope design, redesign those envelopes, promptly submit them to USPS for review and pre-approval, and order (or reorder) compliant envelopes;[5] work with USPS to obtain access to the USPS Ballot Portal and enroll millions of voters through that portal;[6] develop and pay for additional staff training to share information about the new requirements and mitigate the risk of errors that would prevent voters from

[4] *See, e.g.*, Rock (RI) Decl. ¶¶ 18, 42–45, Doc. No. 4-21 at 6–7, 15–16 (the harms from the new barcode requirements are "insurmountable for Rhode Island" due to state law processes, vendor requirements, and data integrity issues; "the vendor is unable to put an [IMb] on the state's return mail" due to existing legal requirements for envelopes); Flynn (ME) Decl. ¶ 36, Doc. No. 4-11 at 14 (implementing software integration to incorporate IMbs to database would delay other more pressing updates).

[5] *See, e.g.*, Holmes (WA) Decl. ¶ 42, Doc. No. 4-4 at 20–21 (SOS outreach to its three ballot envelope vendors revealed one could not reprint envelopes after August 27, 2026, one could not reprint envelopes at all, and one did not respond but is unlikely to be able to reprint envelopes for entire state); Rock (RI) Decl. ¶ 18, Doc. No. 4-21 at 6–7 (would need to redesign and reprint all ballots, vendor used by jurisdictions nationwide may not have capacity to reprint in time); Dorsey (MD) Decl. ¶ 47, Doc. No. 4-12 at 19–20 (ordering replacement envelopes will "compromise[] SBE's ability to meet the state law requirement of mailing ballots to voters 43 days before the election" and could prevent voters from receiving ballots in time to vote); Rosenberg (CT) Decl. ¶¶ 41–44, Doc. No. 4-7 at 19–21 (Connecticut has already purchased envelopes that it will not be able to use, and will need to redesign and reorder all envelopes, and "[t]he addition of yet another barcode" in addition to one required by state law "will only further the complexity of the envelope layout"); Brater (MI) Decl. ¶¶ 41–47, Doc. No. 4-13 at 13–14 (Michigan has "1,521 separate envelope styles corresponding to each municipal jurisdiction, which must all be designed, tested, reviewed, and printed individually" under the Rule, and in many cases reordered); Southard (CA) Decl. ¶¶ 38–41, Doc. No. 4-1 at 17–19 (California counties have "relied upon [existing] election mail guidance from USPS," that "ballot envelopes vary by county," and that "many counties have already received their mail ballot envelopes" for this cycle).

[6] *See, e.g.*, Tassinari (MA) Decl. ¶ 33, Doc. No. 4-2 at 13–14 (highlighting serious technical concerns and noting that "even if the voter data can be exported from our statewide database, the IMbs will need to be manually captured and updated for each voter's ballot envelopes"); Rudy (CO) Decl. ¶ 28, Doc. No. 4-6 at 9–11 ("Colorado will require multiple Ballot Mail Portal users in each of the 64 counties," each of whom "will require enrollment and training, and will need to update the Portal in addition to their daily work," generating an "extraordinary" added workload); Stavisky (NY) Decl. ¶ 30, Doc. No. 4-17 at 12 (describing extensive and burdensome process to compile lists from counties).

receiving ballots;[7] engage with the public to address voter confusion and concern;[8] and much else, all while otherwise performing the tasks necessary to administer upcoming elections.[9] Worse still, many States will likely be unable to re-order ballot envelopes at all in the time remaining before the election.[10] Even if States are able to acquire new ballot envelopes, each ballot mailing will now become "exorbitantly time-consuming" due to new requirements to segregate ballot mail and wait in-person while USPS confirms compliance.[11] Plaintiff States must begin these initiatives now, diverting scarce time and resources from the complex choreography of election tasks in the coming weeks.[12] Moreover, delays in USPS review of

---

[7] *See, e.g.*, Rudy (CO) Decl. ¶ 24, Doc. No. 4-6 at 8 (Secretary of State must create guidance on "using the USPS Mail Ballot Portal, ensuring timely enrollment of mail voters as voter rolls change leading up to the election, cybersecurity protection, the use of IMbs on all mail ballot envelopes, and the Portal's interplay with Colorado's confidential voter program"); Albence (DE) Decl. ¶ 22, Doc. No. 4-8 at 9–11 (Delaware will have to hire vendors and outside parties to assist the task of enrolling voters).

[8] *See, e.g.*, Nago (HI) Decl. ¶ 51, Doc. No. 4-10 at 14 (a wide-ranging public education campaign will be necessary because Hawaiʻi voters are used to mail voting without impediments); Michalowski (Cook Cnty., IL) Decl. ¶ 46, Doc. No. 4-24 at 14 (public outreach in Cook County will cost approximately $2,746,000, with over $1,000,000 allocated for mailers alone).

[9] *See, e.g.*, Vigil (NM) Decl. ¶ 52, Doc. No. 4-16 at 20 ("Compliance with the Rule will necessarily divert close to 100% of our understaffed team's resources from other important election administration tasks"); Stavisky (NY) Decl. ¶ 40, Doc. No. 4-17 at 18 ("Directing staff towards the new USPS process and technology would require sacrificing progress on [other] ongoing and essential projects"); Wlaschin (NV) Decl. ¶¶ 8–9, Doc. No. 4-3 at 3–4 (detailing the year-round, collaborative work that the State does with counties to administer elections and how that work ramps up in the months before an election).

[10] *See* n.3, *supra*, and citations therein; *see also* Rudy (CO) Decl. ¶ 42, Doc. No. 4-6 at 16-18 (vendors have stated that Rule will require throwing away nearly 1.3 million existing ballot return envelopes, and re-printing these envelopes "may not even be possible depending on how widespread an issue this is and whether the vendors can procure sufficient paper.").

[11] *See, e.g.*, Holmes (WA) Decl. ¶ 61, Doc. No. 4-4 at 27–28 (requirement to segregate mail and wait in person "exorbitantly time-consuming" and "amount of staff time spent processing election mail will increase exponentially."); 91 Fed. Reg. at 54,981 (election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail" and must "remain at the postal retail location during the verification process" which could require a minute per piece of mail).

[12] *See, e.g.*, Brunton (NC) Decl. ¶¶ 6, 19, 23, Doc. No. 4-18 at 2, 6–8 (state law deadline to begin mailing ballots is September 4, 2026 presents exceptional risk of harms from timing of

ballot envelopes could hinder the voter enrollment process and even preclude timely ballot mailings and receipt.[13]

Such "serious administrative upheaval" and unrecoverable administrative costs also constitute irreparable harm. *See Doe v. Trump*, 766 F. Supp. 3d 266, 285 (D. Mass. 2025), *vacated in part on other grounds*, 157 F.4th 36; *see also Massachusetts v. HHS*, 923 F.3d 209, 221–227 (1st Cir. 2019); *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (citing "substantial administrative costs"); *Louisiana v. Biden*, 55 F.4th 1017, 1033–34 (5th Cir. 2022) (citing "diversion of resources" resulting in "nonrecoverable compliance costs"). And because implementing the Rule will divert resources from other election administration tasks, the Rule will cause "inability to enforce [Plaintiff States'] duly enacted plans," which "clearly inflicts irreparable harm on the State[s]." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Put another way, these directives present an "obstacle[] [that] unquestionably make[s] it more difficult" for Plaintiff States to carry out core state law election duties, causing irreparable harm. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). There is no adequate remedy at law for these harms, as no damages may be had to compensate Plaintiff States for the costs of complying with the Rule. *Doe*, 157 F.4th at 79 (affirming irreparable harm based on "unrecoverable costs" associated with States modifying systems and guidance).

---

implementation); Tassinari (MA) Decl. ¶ 71, Doc. No. 4-2 at 29 (estimating that implementing the Rule will require $5 million for the Office of the Secretary alone, in the context of an existing budget shortfall of $10 million); Hilby (City of Sun Prairie, WI) Decl. ¶ 19, Doc. No. 4-26 at 5 (Wisconsin elections officials must enroll voters "by **September 17, 2026**, which is the date on which we must begin mailing absentee ballots" and thereafter accommodate requests for absentee ballots "on a near-daily basis").

[13] *See, e.g.*, Holmes (WA) Decl. ¶ 45, Doc. No. 4-4 at 22–23 (USPS envelope review is a "potential chokepoint" threatening serious delays to mailing, particularly considering the number of jurisdictions submitting envelopes, USPS's plans not to hire additional staff, and questions regarding process); Fontes (AZ) Decl. ¶ 18, Doc. No. 4-5 at 9–11 (detailing failures of regular USPS processing in primary election, creating "grave" concern USPS cannot meet "new burdensome regulations"); Flynn (ME) Decl. ¶ 38, Doc. No. 4-11 at 14–15 (USPS took weeks to approve prior envelope design); Rosenberg (CT) Decl. ¶ 23, Doc. No. 4-7 at 11 (harms from any delays will "cascade" and any mail ballots not received by election day "will not be counted").

The chaos born of the Rule inflicts a further injury on Plaintiff States' reputations as trustworthy stewards of elections. The Rule is just the sort of "late-breaking" change to election rules that can confuse and discourage voters, damaging trust in Plaintiff States' election administration. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 80 (2026); *see also, e.g.*, Linnell (MN) Decl. ¶ 47, Doc. No. 4-14 at 17 (administrative challenges "can reduce trust in our electoral system and cause reputational harms that are difficult to reverse"). That "injury to goodwill and reputation is not easily measured" and "is often held to be irreparable." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996); *see also Town of Milton v. FAA*, 87 F.4th 91, 95 (1st Cir. 2023).

## IV. THE EQUITIES AND THE PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

The equities and public interest weigh heavily in favor of the relief requested here. *See, e.g.*, *Does 1–6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (these factors "merge when the [g]overnment is the opposing party") (citation omitted).

Perhaps most importantly, eligible voters have a "strong interest in exercising the fundamental political right to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); *accord Newby*, 838 F.3d at 14; *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). This interest is jeopardized where the Rule will give rise to widespread disruption and confusion and threatens disenfranchisement of many eligible voters due to foreseeable errors and omissions in USPS's Mail Ballots List, the risk of technological breakdowns and delays, the lack of any meaningful opportunity for States to identify or correct errors in the Lists, and the absence of any opportunity for voters themselves to ensure their ballots are counted given the lack of assurances that USPS will notify voters whose ballots will not be delivered.[14] The urgency of this interest

[14] *See, e.g.*, Southard (CA) Decl. ¶ 33, Doc. No. 4-1 at 16 ("Several categories of voters may be wholly denied the opportunity to vote" if affected by an error or omission or if their ballot is rejected, including "California's numerous confidential voters, who by law cannot be included on the USPS Mail Ballot List, and voters who are disabled, hospitalized, in jail, in nursing homes, or out of town and unable to vote in person."); Rudy (CO) Decl. ¶¶ 23, 30, Doc. No. 4-6 at 7–8, 11–12 ("a technological or implementation mistake affecting just 1%" of Colorado's active registered voters "would disenfranchise almost 40,000 voters."); Stavisky (NY) Decl. ¶

strongly supports interim relief because "there can be no 'do-over' or redress of a denial of the right to vote after an election." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016); *LWVM II*, 2026 WL 2322705, at *12 ("[E]nfranchisement heavily outweighs the executive's attempt to unconstitutionally insert itself into the domain of election regulation.")

The public interest also favors relief because "[t]he public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006); *accord Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 33 (D. Me. 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022) ("It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." (citation omitted)). Similarly, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

Finally, the requested relief would do no more than "preserve the status quo" while the Court engages in "full adjudication." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). Given the complexity and significance of election administration, that preservation is especially important here. Indeed, the Supreme Court has repeatedly cautioned against "alter[ing] the election rules on the eve of an election." *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam); *Bost*, 607 U.S. at 80. An injunction would serve that important interest.

Preserving the status quo will not harm the federal government because fraudulent voting, the Rule's purported target, is "extremely rare[.]" *See N.H. Youth Movement v. Scanlan*, __ F. Supp. 3d __, 2026 WL 1500857, at *17 (D. N.H. May 28, 2026) ("Wrongful voting, meaning unqualified voters *intentionally or unintentionally* casting ballots, is extremely rare"); *Harding v.*

---

35, Doc. No. 4-17 at 15 ("Under New York law, voters who are issued a mail ballot are generally not allowed to vote in person" except by affidavit, and "are functionally excluded from the poll books at their poll site."); Dawson (OR) Decl. ¶ 18, Doc. No. 4-19 at 6 ("If technological or implementation failure prevents the delivery of mail ballots in this vote-by-mail state, Oregonians have no other means by which to cast their votes.").

*Edwards*, 487 F. Supp. 3d 498, 516 (M.D. La. 2020) (recognizing statements from Louisiana Secretary of State that voter fraud is "a rare occurrence" and "has not been widespread," as well as data indicating only four known instances of voter fraud in Louisiana, none related to mail voting). Accordingly, there is no harm to the federal government in allowing States to administer elections as they have successfully done for decades. *Cf. Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 808 (D. Md. 2025) (minimal government interest shown by a "search [for] a fraud epidemic, based on little more than suspicion").

## V. Plaintiff States' Requested Relief is Proper

### A. *Purcell* Does Not Foreclose Injunctive Relief

The *Purcell* principle, a principle of judicial restraint with respect to election-related injunctions, does not prevent this Court from enjoining the Rule. *See generally Republican Nat'l Comm.*, 589 U.S. at 425. *Purcell* generally counsels against federal courts altering election rules on the "eve of an election." *Id.* at 424. *Purcell* vindicates a "federalism interest" against a federal court "swoop[ing] in and re-do[ing] a State's election laws in the period close to an election." *DSCC v. Trump*, 2026 WL 2168617, at *5.

That principle has no bearing here. It would be getting "the *Purcell* principle backwards" to invoke it to impose "massive changes on the States' voting systems on the threshold of the upcoming election." *Id.* at *6. The drastic changes wrought by the Rule "could be enjoined without implicating any federalism or reliance interests because the injunction would preserve the States' existing electoral status quo"—in this case, the administration of mail voting in accordance with state and federal law and past practice. *Id.*; *see Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020) (court could enjoin state election official from changing the deadlines for mail ballot receipt contrary to state law shortly before election).

If anything, *Purcell* weighs *in favor* of the Court enjoining the Rule because doing so would prevent confusion and "protect[] the State[s'] interest in running an orderly, efficient election and in giving citizens . . . confidence in [its] fairness." *See Democratic Nat'l*

*Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). Furthermore, "[w]hen the constitutionally mandated locus for election decisions is disregarded . . . the same rationale that works to prevent election interference by federal courts also works to prevent interference by other entities as well," including USPS. *See Carson*, 978 F.3d at 1062.

Notably, in asking the Supreme Court to stay this Court's injunction of the EO, the federal government insisted that "staying the injunction would impose no meaningful burden" on Plaintiff States, because "[i]f and when [USPS took steps to implement the EO], the States c[ould] pursue claims at that time." Appl. for a Stay at 5, *Trump v. California*, No. 26A124 (July 27, 2026). Having persuaded the Supreme Court to grant a stay on that basis, the federal government cannot now be heard to argue that the Plaintiff States' claims are too late.

**B. The Emergency and Interim Relief Requested by Plaintiff States is Proper**

Plaintiff States respectfully request that the Court enter a temporary restraining order and emergency stay of the Rule and schedule expedited preliminary injunction and stay proceedings. *See* Fed. R. Civ. P. 65(b)(3); 5 U.S.C. § 705. Without an order in place protecting them from the Rule, Plaintiff States must *immediately* begin work to bring their envelopes into compliance, to engage with the USPS Ballot Portal and prepare lists of mail voters, to train election officials, and to put in motion public education campaigns. *See, e.g.*, Dorsey (MD) Decl. ¶ 19, Doc. No. 4-12 at 7 (describing immediate tasks to change ballot envelopes, create a process for generating and sharing IMbs, and field questions from staff and voters). Relief from these burdens is imperative for Plaintiff States' election preparations to proceed unimpeded.[15]

[15] As of this filing, implementation of the Rule remains barred under the injunction in *LWVM II*. 2026 WL 2322705, at *13. Federal defendants in that case are currently seeking a stay or reconsideration of that injunction, raising the specter of the Rule going into immediate effect at no notice. *See* 91 Fed. Reg. at 54,966 (noting the immediate effective date); *Am. Encore v. Fontes*, 152 F.4th 1097, 1121 (9th Cir. 2025) ("district courts frequently issue overlapping preliminary injunctions on the same subject matter"). The League of Women Voters plaintiffs themselves have said they will seek a temporary restraining order against the Rule itself. *LWVM v. Trump*, 1:26-cv-11549-IT (D. Mass.), D. 199 at 2, 8–10.

The Court's orders should prevent USPS from implementing or enforcing the Rule as to all ballots issued by Plaintiff States and cast by their voters, including the numerous ballots issued to and cast by the States' voters in other jurisdictions and ballots cast in-State but processed in out-of-State USPS facilities.[16] Defendants previously represented to this Court that USPS cannot administer the Rule as to some States but not others. *See California v. Trump*, 1:26-cv-11581-IT (D. Mass.), D. 194-2, Decl. of S. Monteith, ¶¶ 4–5 ("Operationally, it would not be possible for [USPS] to put a two-tiered system in place where one set of rules apply to the ballot mail of the Plaintiff States, and another applies to the remaining states."); *LWVM II*, 2026 WL 2322705 at *10 (noting similar representations by USPS). If true, Plaintiff States are entitled to injunctive relief that prevents Defendants from *any* implementation of the Rule. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (holding that courts may issue injunctions that provide "complete relief to each plaintiff with standing to sue"); *see also id.* at 853 ("The complete-relief inquiry" can be "complicated" for States and a broader injunction may be necessary "to provide the States *themselves* with complete relief"); *Doe*, 157 F.4th at 80–81 (affirming nationwide relief "as a means of providing the State-Plaintiffs complete relief" following *CASA*). If Defendants insist on bifurcated implementation, this Court should require them to explain how and why they now believe they can do so reliably, without jeopardizing Plaintiff States' ballot mail. *Doe*, 157 F.4th at 80–82 (affirming nationwide relief where federal government had failed to show a narrower injunction offered complete relief).

Additionally, because Plaintiff States' claim pertaining to nonmailable matter is brought under the APA, the Court could issue a stay pursuant to that claim postponing the effective date of the Rule under 5 U.S.C. § 705. That statute confers "independent" authority to "postpone[] the effective date of . . . agency action," *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, ___ F.4th ___, 2026 WL 2279789, at *19 (1st Cir., Aug. 7, 2026), empowering

[16] *See, e.g.*, Holmes (WA) Decl. ¶ 35, Doc. No. 4-4 at 16–19 (Washington will send ballots to over 225,000 absentee voters distributed across "each of the fifty states"); Stavisky (NY) Decl. ¶¶ 25–26, Doc. No. 4-17 at 10 (describing shortfalls in USPS services and capabilities).

the Court to "do more than simply redress a party-specific harm," *id.* at *21; *see CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring) ("[I]n cases under the [APA], plaintiffs may ask a court to preliminarily 'set aside' a new agency rule" without limiting relief to plaintiffs); *Am. Hosp. Ass'n v. Kennedy*, 820 F. Supp. 3d 30, 47 (D. Me. 2025) (finding that court may "act directly against the challenged agency action" under § 705, quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring)); *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025) ("[J]ust as vacatur under § 706 is not a party-specific remedy . . . neither is a stay under §705" (citations omitted)).[17]

Plaintiff States have amply demonstrated that they are entitled to such relief, not least because Defendants have already represented that they cannot bifurcate implementation of the Rule and the equities—including the damage that the Rule inflicts on the right to vote and on Plaintiff States' administration of rapidly approaching elections—decisively support relief. *See Woonasquatucket River*, 2026 WL 2279789, at *20–22 (discussing broad remedial authority under the APA to redress irreparable harm and affirming "universal" injunction).

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court grant Plaintiff States' motion and issue a temporary restraining order and emergency stay, followed by an expedited preliminary injunction and stay of the Rule pending resolution on the merits.

[17] That the Rule became effective immediately is "irrelevant to this Court's ability to issue a Section 705 stay." *Texas v. Biden*, 646 F. Supp. 3d, 753, 770 (N.D. Tex. 2022) (collecting authority); *West Virginia v. EPA*, 577 U.S. 1126 (2016) (staying rule already in effect).

August 26, 2026

Respectfully submitted.

**ROB BONTA**
Attorney General of California

By: /s/ *Anne P. Bellows*
Anne P. Bellows*
*Deputy Attorney General*
Thomas S. Patterson*
*Senior Assistant Attorney General*
Seth E. Goldstein*
*Supervising Deputy Attorney General*
Malcolm A. Brudigam*
Michael S. Cohen*
Lisa C. Ehrlich*
Kevin L. Quade*
Robert William Setrakian*
*Deputy Attorneys General*
1300 I Street, P.O. Box 944255
Sacramento, CA 95814
(916) 210-6090
anne.bellows@doj.ca.gov

*Counsel for the State of California*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: /s/ *Gerard J. Cedrone*
Vanessa A. Arslanian (BBO No. 688099)
*State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
*Deputy State Solicitor*
Jared B. Cohen (BBO No. 689217)
Julia S. Canney (BBO No. 717328)
Phoebe M. Lockhart (BBO No. 709411)
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**AARON FORD**
Attorney General of Nevada

By: /s/ *K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: /s/ *Tera M. Heintz*
Tera M. Heintz*
Cristina Sepe*
Karl D. Smith*
*Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
tera.heintz@atg.wa.gov

*Counsel for the State of Washington*

(additional counsel on following page)

**KRISTIN K. MAYES**
Attorney General of Arizona

By: /s/ *Kara Karlson*
Kara Karlson*
Karen J. Hartman-Tellez*
Syreeta Tyrell*
*Assistant Attorneys General*
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-8118

*Counsel for the State of Arizona*

**PHILIP J. WEISER**
Attorney General of Colorado

By: /s/ *Shannon Stevenson*
Shannon Stevenson*
*Solicitor General*
Peter Baumann*
*Senior Assistant Attorney General*
1300 Broadway
Denver, Colorado 80203
(720) 508-6400

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: /s/ *Maura Murphy*
Maura Murphy*
*Deputy Associate Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: /s/ *Ian R. Liston*
Ian R. Liston*
*Director of Impact Litigation*
Vanessa L. Kassab*
*Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: /s/ *Karthik P. Reddy*
Karthik P. Reddy*
*Special Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 741-5221

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: /s/ *Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360

*Counsel for the State of Hawaiʻi*

(additional counsel on following page)

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ *Vikas Didwania*
Vikas Didwania*
*Complex Litigation Counsel*
Alex Hemmer*
*Deputy Solicitor General*
Molly Petchenik*
*Assistant Attorney General*
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526

*Counsel for the State of Illinois*

**AARON M. FREY**
Attorney General of Maine

By: /s/ *Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: /s/ *Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: /s/ *Neil Giovanatti*
Neil Giovanatti*
*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
(517) 241-1050

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: /s/ *Angela Behrens*
Angela Behrens
Allen Cook Barr*
*Assistant Attorneys General*
Lindsey E. Middlecamp*
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN, 55101
(651) 300-0711

*Counsel for the State of Minnesota*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: /s/ *Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
Joshua P. Bohn*
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276

*Counsel for the State of New Jersey*

(additional counsel on following page)

**RAÚL TORREZ**
Attorney General of New Mexico

By: /s/ *James W. Grayson*
James W. Grayson*
*Chief Deputy Attorney General*
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060

*Counsel for the State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

By: /s/ *Colleen K. Faherty*
Colleen K. Faherty*
*Special Trial Counsel*
Rabia Muqaddam*
*Chief Counsel, Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-6046

*Counsel for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina

Laura Howard
Chief Deputy Attorney General

By: /s/ *Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27603

*Counsel for the State of North Carolina*

**DAN RAYFIELD**
Attorney General of Oregon

By: /s/ *Thomas H. Castelli*
Thomas H. Castelli*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880

*Counsel for the State of Oregon*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: /s/ *Megan Rok*
Megan Rok*
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: /s/ *Ryan P. Kane*
Ryan P. Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153

*Counsel for the State of Vermont*

(additional counsel on following page)

**JAY JONES**
Attorney General of Virginia

By: /s/ *Tillman J. Breckenridge*
Tillman J. Breckenridge*
*Solicitor General*
202 North Ninth Street
Richmond, VA 23219

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: /s/ *Lynn Lodahl*
Lynn Lodahl*
*Assistant Attorney General*
17 West Main Street
Madison, WI 53707-7857
(608) 264-6219

*Counsel for the State of Wisconsin*

**JOSH SHAPIRO**
Governor of the Commonwealth
of Pennsylvania

By: /s/ *Michael J. Fischer*
Michael J. Fischer*
Charlotte Gibson*
*Executive Deputy General Counsel*
Jacob B. Boyer*
*Deputy General Counsel*
30 North Third Street, Suite 200
Harrisburg, PA 17101
(717) 831-2847

*Counsel for the Governor of the Commonwealth of Pennsylvania*

**Admitted pro hac vice or pro hac vice applications forthcoming*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 26, 2026, I provided a copy of the foregoing document to counsel for the Defendants by email as follows:

Esam Al-Shareffi, Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
esam.k.al-shareffi@usdoj.gov

Stephen M. Pezzi, Chief Litigation Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
stephen.pezzi@usdoj.gov

August 26, 2026

/s/ *Gerard J. Cedrone*
Gerard J. Cedrone (BBO No. 699674)
*Deputy State Solicitor*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov