**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

Defendants.

Case No. 1:26-cv-11549-IT

STATE OF CALIFORNIA, *et al.*,

Plaintiffs,

v.

UNITED STATES POSTAL SERVICE, *et al.*,

Defendants.

Case No. 1:26-cv-13917-IT

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR A STAY PENDING APPEAL**

## INTRODUCTION

On August 21, 2026, the United States Postal Service ("Postal Service" or "USPS") promulgated a Final Rule imposing modest envelope-design and data-reporting standards for federal ballot mail for States that wish to transmit ballots via U.S. Mail. *See Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026). Yesterday, this Court issued a temporary restraining order partially enjoining enforcement or implementation of that rule. *See* Mem. & Order of Aug. 27, 2026, ECF No. 31 ("Order"). Under that order, while Defendants may continue to review envelope design and facilitate Portal data entry for States that wish to use those processes—or that wish to take certain preparatory steps in the event that this Court's Order is later stayed—they may not implement the Rule's verification process, even for States that would voluntarily participate. *Id.* at 10-11; *see also* Defs.' Notice of Compliance, *California* ECF No. 57; *LWVMA* ECF No. 227. The government suffers irreparable harm from that restriction on implementation, as some States are scheduled to begin sending ballots during the fourteen days that the TRO is in effect, and "appellate review would come too late" to remedy that harm later. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026). On the other side of the ledger, the irreparable harm on which the Court premised the TRO will *not* come to pass during those 14 days. To the contrary, the two States that plan to send ballots while the TRO is in place have not demonstrated that "compliance with the Final Rule at this late date is impossible." Order at 9. The government is also likely to succeed on the merits, for the reasons stated in its TRO opposition and reiterated below. Defendants thus respectfully request a stay of the order pending appeal.

## BACKGROUND

### I. Regulatory Background

Earlier this week, the Postal Service published the Final Rule in the Federal Register. *See* U.S. Postal Service, *Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026). The Postal Service issued the rule pursuant to its rulemaking and operational authority in 39 U.S.C. §§ 401(2) and 404(a)(1). The rule amends USPS's Domestic Mail Manual to place modest reporting and design requirements on envelopes carrying federal ballot mail.

The Final Rule requires federal ballots transmitted through the U.S. Mail to be mailed in envelopes that include the official Election Mail logo, are automation compatible, and use unique barcodes. *See* 91 Fed. Reg. at 54,990-91. State and local election officials must submit their envelope designs for review to ensure compliance with those requirements, and provide the Postal Service with certain information about the federal ballot mail they intend to send. *Id.* at 54,991. Specifically, the unique barcodes applied to each ballot mail envelope, along with the name and address of the recipient and the State sending the ballot, must be uploaded to an online portal prior to presenting an outbound ballot mailing. *Id.* at 54,990. Election officials may continually update this information as many times as necessary. *Id.* at 54,991. When outbound federal ballot mail is presented for mailing, the Postal Service will match the barcode data to the portal data, to ensure compliance with the Rule's requirements. *Id.* at 54,990-91. All mailings that comply with these requirements will be accepted. USPS will not perform any verification of voter eligibility or the like; its role is limited to ensuring that the envelopes comply with the rule's envelope design requirements—as the rule emphasizes, "State election officials will thus retain full control over who is permitted to vote in federal elections in their state by U.S. mail." *Id.* at 54,969. On or near the date of the election, the Postal Service will also provide each State that used the U.S. Mail to transport ballots with a single list containing all the state's submissions for the ballots it intended to send. *Id.* at 54,993-94.

Several features of this Rule are not new: for years, the Postal Service has recommended that federal ballot mail use unique barcodes, be automation compatible, include the official Election Mail logo, and undergo mailpiece design review in advance of mailing. *See* U.S. Postal Service, *Official Election Mail Guide* (''Kit 600''); *Domestic Mail Manual* 703.8.0. This Rule simply turns these longstanding recommendations—which many of the Plaintiff States have already adopted at least in part, and some have long advocated for—into requirements. These requirements are only a baseline; "nothing in the rule prevents or discourages election officials from including envelope design elements required by state law," nor will the rule "create a single, uniform ballot envelope design across all states[.]" *Id.* at 54,978. And most importantly, States remain

entirely free to run their own elections and manage their own voter rolls in any manner that is otherwise consistent with federal law, including by using (or not using) the U.S. mail for any part of their election process.

## II. Litigation Background

On the morning of August 26, 2026, the Postal Service published the Final Rule in the Federal Register. *See* U.S. Postal Service, *Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026). Later that day, Plaintiffs in both above-captioned matters filed motions requesting (among other forms of relief) a temporary restraining order. *California* ECF No. 5; *LWVMA* ECF No. 207. The Court ordered Defendants and Defendant-Intervenors to respond by 12 PM Eastern Time on August 27, 2026. *California* ECF No. 7; *LWVMA* ECF No. 212. They did so. *California* ECF No. 17; *LWVMA* ECF Nos. 214, 215.

On the evening of August 27, 2026, the Court issued a "Memorandum and Order Granting in Part Plaintiffs' Motions for a Temporary Restraining Order." *California* ECF No. 31; *LWVMA* ECF No. 218.

1. The court grants an emergency fourteen-day stay of the implementation or enforcement of the following sections of the Final Rule as to elections occurring before or on November 3, 2026. USPS Defendants may take no further preparatory steps or implement in any way for elections occurring before or on November 3, 2026:

    a. DMM Section 705.24.3.1, to the extent that the section makes Ballot Mail Envelope Standards mandatory;

    b. DMM Section 705.24.3.2, to the extent that the section makes Return Federal Ballot Mail Envelope Standards mandatory;

    c. DMM Section 705.24.4.1; to the extent that the section makes Postal Service Federal Ballot Mail Portal registration mandatory;

    d. DMM Section 705.24.4.2; to the extent that the section makes voter enrollment in the Postal Service Federal Ballot Mail Portal mandatory

    e. DMM Section 705.24.5.1;

    f. The first two sentences of DMM Section 705.24.5.2; and

g. DMM Section 705.24.5.3(a), (b), (c).

2. Defendants' counsel must, within 24 hours after receiving service of this Order:

(i) provide written notice of this Order to the USPS Defendants and their employees;

(ii) notify all such recipients that they are required to comply with this Order, under penalty of contempt; and

(iii) file on the docket a copy of the notice and/or communications referred to in (i)-(ii).

Plaintiffs' motions for preliminary injunctions remain under advisement.

IT IS SO ORDERED.

Order, Aug. 27, 2026.

Undersigned counsel promptly notified counsel at the Postal Service of the order. And earlier today, undersigned counsel provided written instructions to the Postal Service regarding compliance with the order, and the Postal Service also notified its employees of the Order, as required by Sections 2(i) and 2(ii). As required by Section 2(iii) of the Order, those communications have now also been filed on the docket. *See* Defs.' Notice of Compliance. Out of an abundance of caution, Defendants' notice of compliance also explained how the United States is interpreting this Court's order, including that it permits implementation of some (but not all) portions of the Final Rule, including with respect to the November 3, 2026 elections, so long as participation by State and Local jurisdictions with respect to those features remains voluntary. *See id.*

Earlier today, Defendants filed a notice of appeal in both cases. *California* ECF No. 42; *LWVMA* ECF No. 221. Defendants now move for a stay pending appeal.

## LEGAL STANDARD

In deciding a motion or a stay pending appeal, a district court considers "four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The final two factors "merge when the

Government" is a party. *Dorcas Int'l Inst. of Rhode Island v. USCIS*, 2026 WL 2042424, at *3 (D.R.I. July 15, 2026) (quoting *Nken*, 556 U.S. at 435).

**ARGUMENT**

**I. THE EQUITABLE FACTORS FAVOR A STAY PENDING APPEAL.**

Despite the limits in the Court's Order that allow for voluntary participation in envelope design review and voluntary use of the Portal, the Order nonetheless imposes irreparable harm on the federal government. The government understands that two States intend to begin mailing ballots during the 14 days the Order is in place—North Carolina on September 4, *see* Order (Aug. 27, 2026), *California* ECF No. 31, at 8-9 (citing *California* ECF No. 5 at 20 n.3, 22 n.12), and Alabama on September 9, *see* Ala. Code § 17-11-12. Because the Order prohibits the government from verifying compliance with the Final Rule's requirements before mailing those ballots, it bars the Rule's operation with respect to those ballots. As the Supreme Court recognized in staying this Court's earlier injunction in *California I*, the Government suffers irreparable harm when "reversal of [the TRO Order] would come too late" for the upcoming election. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026). Thus, because two States are scheduled to begin mailing ballots while the Order is in place, the Court's Order "deal[s] 'a serious setback' to the Executive's 'goals' while this litigation unfolds" and imposes irreparable harm. *Id.* (citation omitted); *see also id.* ("When a federal court 'improperly intrudes on a coordinate branch' in this way, interim relief is justified.") (citation omitted).

By contrast, neither States nor voters will suffer irreparable harm due to the Rule during the next 14 days. As explained, the government understands that two States intend to begin mailing ballots during that 14-day period—North Carolina on September 4, and Alabama on September 9. *See supra*. But whatever might be said of the other Plaintiff States, North Carolina, at least, has not established that "compliance with the Final Rule at this late date is impossible." Order at 9. To the contrary, in a public statement made just yesterday (before this Court's Order), the North Carolina State Board of Elections announced that the State had begun taking steps to comply with the Rule, and that it "is confident that the county boards of elections plan to send out absentee

ballots to North Carolina voters who have requested them for this election, starting September 4, as required by state law, will happen flawlessly and smoothly." Jen Rice, *Facing time crunch, North Carolina takes first step to comply with new USPS mail voting rule while fighting it* (Aug. 27, 2026), https://perma.cc/SFB6-PAVD. And Alabama, an intervenor-defendant here, has never argued that it would be impossible to comply with the rule. Accordingly, the Court's finding of irreparable harm to states and voters based on the prospect that it will be impossible for some States to comply with the Rule's requirements lacks any basis with respect to the ballots that will be mailed while the TRO is in place—precisely the mailings to which the Court's time-limited order applies. And with respect to other States that do not intend to send ballots until after this Court's TRO Order expires, the equities favor continued steps toward compliance with the Rule: a later injunction could always ensure that no ballots are refused by the Postal Service if, after preliminary-injunction briefing and a hearing, this Court holds that the Rule is likely unlawful and should be subject to a preliminary injunction. And in the interim, this Court's order risks deterring States from voluntary compliance, which could well end up causing additional harm if an appellate court later stays or vacates this Court's order or any later preliminary injunction, at which point the Rule's requirements would again become mandatory.[1]

## II. THE AUGUST 27, 2026 ORDER IS IMMEDIATELY APPEALABLE.

The First Circuit, like other courts of appeals, has held that a TRO may be reviewable on appeal under 28 U.S.C. § 1292(a)(1) where it "has the 'practical effect of granting or denying an injunction.'" *Rhode Island State Council of Churches v. Rollins*, 158 F.4th 304, 311 (1st Cir. 2025) (quoting *Abbott v. Perez*, 585 U.S. 579, 594 (2018)); *see also Northeast Ohio Coalition for Homeless and Service Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1005-06 (6th Cir. 2006) (collecting cases). Here, circumstances "counsel in favor of construing the District Court's

[1] Further, respectfully, the Order's statement that "the Final Rule includes no deadline or contemplated turn-around time for USPS approval of submitted mail ballot envelopes" is not correct. Order at 9. The Final Rule states that "[USPS Mailpiece Design Analysts] typically aim to provide feedback to mailers within 2 business days after receiving the mailer's request and necessary information and samples." 91 Fed. Reg. at 54,979.

order as an appealable preliminary injunction." *Dep't of Education v. California*, 145 S. Ct. 966, 968 (2025). In particular, as explained above, the TRO "threaten[s] to inflict irretrievable harms before the TRO expire[s]," *Blackwell*, 467 F.3d at 1006; *Rollins*, 158 F.4th at 311 (noting "substantial and immediate consequences" of TRO supported jurisdiction), particularly because state law requires at least one state, if not more, to begin mailing their ballots to voters during the pendency of the 14-day period in which the TRO is in effect. *See* Order (Aug. 27, 2026), *California* ECF No. 31, at 8-9 (citing *California* ECF No. 5 at 20 n.3, 22 n.12) (noting North Carolina begins mailing ballots on September 4). And of course, if the TRO were to be continued for more than 14 days, more States would fall into this category. *Id.*

As the Supreme Court held just this week, because appellate review in the ordinary course "would come too late for the 2026 midterms," an erroneous injunction would necessarily cause irreparable harm to the government. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026). The same applies to an erroneous TRO as to those ballots mailed before the TRO is converted into a preliminary injunction. For related reasons, courts have sometimes treated a TRO that bars application of a regulatory requirement as altering the status quo in a way that supports treating the TRO as a preliminary injunction, insofar as the TRO changes the legal landscape in ways that might have more lasting consequences. *Blackwell*, 467 F.3d at 1006 (citing *OPM v. American Fed'n of Gov't Emps.*, 473 U.S. 1301, 1305 (1985) (Burger, C.J., in chambers) (contrasting unappealable denial of TRO that "merely allows implementation of regulations in accordance with the express intent of Congress" with a grant of a TRO, which "would . . . have disturbed the status quo")). For example, in *Blackwell*, the Sixth Circuit held that a TRO requiring the Secretary of State to "direct County Boards of Elections not to enforce the disputed voter identification requirements" was reviewable because it "both threaten[ed] to inflict irretrievable harm before it expires and acts as a mandatory injunction that does not preserve the status quo." 467 F.3d at 1006. Accordingly, the Court's Order, though labeled a TRO, is immediately appealable.

## III. DEFENDANTS ARE LIKELY TO SUCCEED ON THE MERITS.

Defendants acknowledge that the merits arguments that follow were effectively rejected by the Court yesterday evening, albeit summarily and implicitly. Even so, Defendants have reiterated their merits arguments again here, to avoid any question as to compliance with recent First Circuit precedent regarding preservation obligations in a district-court motion for a stay pending appeal. *See Rhode Island v. Trump*, 155 F.4th 35, 46-47 (1st Cir. 2025). The core of Defendants' submission on the merits is straightforward: this is ultimately a regulation of the U.S. mail, and a modest one at that—not a federal takeover of election administration by the Postal Service. That basic reality undermines virtually all of Plaintiffs' claims and illustrates why Defendants are likely to succeed on the merits of their appeal.

### A. The Final Rule is authorized by statute.

**1.** Although federal-court litigation challenging significant government policies has become the norm in recent years, the Final Rule at issue here is not subject to the same form of review as most of those cases. That is because "the Postal Service is exempt from review under the Administrative Procedure Act." *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) (citing 39 U.S.C. § 410(a)).

To be sure, "the absence of a cause of action for judicial review under the APA does not necessarily foreclose all judicial review." *Id.* at 307. "But while such review may be available, it is quite narrow," *id.*, for at least two reasons. One, "[i]t is available only to determine whether the agency has acted 'ultra vires'—that is, whether it has 'exceeded its statutory authority.'" *Id.* (quoting *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)) (citing *Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (asking whether the agency's action was "in excess of its delegated powers and contrary to a specific prohibition in the Act [that] is clear and mandatory")). And two, that sort of non-statutory ultra vires claim requires identification of an agency violation of "a specific prohibition" in a statute that "is clear and mandatory." *Leedom*, 358 U.S. at 188. In other words, as the Supreme Court put it last year, "a *Leedom v. Kyne* claim is essentially a Hail Mary

pass—and in court as in football, the attempt rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025). Plaintiffs cannot satisfy that high standard.

For the most part, Plaintiffs do not even try to identify any "specific" or "mandatory" statutory provision that the Final Rule violates. Instead, they "basically dress up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. But "[e]ven if one were to disagree with the [Postal Service's] conclusion" about the reach of its authority as articulated in the Final Rule, that sort of routine "statutory argument falls well shy of a meritorious *Leedom v. Kyne* claim." *Id.*

**2.** Whatever the appropriate standard of review, Congress authorized the Postal Service "to adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." *Id.* § 401(2). Congress further granted the Postal Service "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). And those specific powers include the power "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* § 404(a)(1). The Postal Service's general rulemaking powers plainly include at least *some* authority to impose reasonable requirements for envelope design and labeling and require mailers to provide basic information regarding particularly sensitive items. *See* 39 U.S.C. §§ 401-404.

Indeed, as explained in the Final Rule, *see* 91 Fed. Reg. at 54,974, the Postal Service has invoked these very authorities in the past—including where, as here, the type of mail in question is both sensitive and non-dangerous. For example, cremated human and animal remains must be transported through specific types of USPS-provided boxes, and must be trackable via barcode. *See Cremated Remains Packaging Requirements*, 90 Fed. Reg. 9843 (Feb 19, 2025) (implementing rules concerning the sending of cremated remains in specific types of USPS-provided boxes because the Postal Service understands such remains are "sensitive matter and believes this will improve visibility and enhance handling methods throughout processing and transportation"). Similarly, replica explosives—which, although not dangerous, also require special handling to prevent

operational disruptions—rather than being prohibited from the mail altogether, must be mailed in certain ways, including in-person presentation to a retail counter and shipment via Registered Mail. *See Restricting the Mailing of Replica or Inert Explosives*, 75 Fed. Reg. 282 (Jan. 5, 2010) (noting that "[t]his process will ensure that packages containing these items remain separate and easily identifiable during the mailing process"). This Rule functions similarly, and for similar reasons—although ballot mail does not present the same operational issues as cremated remains or replica explosives, it is sensitive mail that raises unique and important operational considerations.

In the face of these broad grants of statutory authority over "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," 39 U.S.C. § 404(a)(1), Plaintiffs try to shift the focus away from the text, and instead to the context of elections. And so, Plaintiffs' arguments that the Postal Service lacks statutory authority here are largely premised on their repeated assertions that USPS doesn't have the power to regulate *elections*. But that argument fails to grapple with the very limited nature of the rule—which does not regulate elections at all.

Under the Rule, States can continue to mail ballots to whomever they wish whenever they wish; the rule does not regulate the form or content of the ballots themselves, the timeline for transmission of ballots, voter eligibility, vote-by-mail eligibility, or anything similar. It regulates only how States must design and label the envelopes they send via U.S. mail (should they elect to use the U.S. mail to send ballots). As the Rule itself makes clear, "[t]he Postal Service does not purport to alter the eligibility of any individual to vote under state or federal law." 91 Fed. Reg. 54,991. And both before and after this Rule, "[t]he Postal Service does not have any legal responsibility for management of state voter rolls or administration of federal elections within each state." *Id.* In other words, this is a regulation of the U.S. mail—not a regulation of elections.

Plaintiffs cannot seriously contend that the Postal Service is disabled from adopting *any* election-mail-specific rules, since their co-counsel and co-Plaintiffs have long advocated for and benefited from specific ballot-mail envelope design elements and the prioritization of such mail. *See NAACP v. USPS*, 2026 WL 1893762, at *1 (D.D.C. July 1, 2026); U.S. Postal Service, Kit

600: 2026-2027 Official Election Mail 4, https://about.usps.com/kits/kit600.pdf. If the Postal Service has no legal authority to make any rules specific to election-related mail—as seems to be Plaintiffs' theory—it is hard to understand how those longstanding efforts would be lawful. This court's implicit and summary rejection of the government's arguments, *see* Order at 8, likewise fails to meaningfully engage with the statutory provisions outlined above and calls into question those longstanding efforts.

Nor is the Postal Service legally obligated to turn a blind eye to the use of the mails to facilitate specific types of fraud. Consider, for example, a scenario in which retirement communities are repeatedly targeted for elder-abuse mail scams: there is no evident reason why the Postal Service could not impose special design and registration rules for envelopes used to send solicitations to such locations. This Rule follows the same basic form, by acknowledging the indisputable reality that election-related mail is particularly sensitive, and that crimes relating to election mail are particularly important. *See* 91 Fed. Reg. at 54,969. And so, "[w]hether or not voter fraud is common or uncommon, the Postal Service has the legal authority to take the measures in this rule to facilitate enforcement of federal law[.]" *Id.*

**B. The Final Rule does not violate the Constitution.**

Under the Elections Clause, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. And so, Plaintiffs' filings argue repeatedly that the President does not have any constitutional authority to directly regulate elections, on his own.

As explained above, the Final Rule does not regulate elections—States retain full control over the administration of their elections. But in any event, the Final Rule was not issued by the President, it was issued by the Postal Service—as a matter of the Postal Service's own judgment about how "it is appropriate to exercise *its* statutory authority" over the U.S. mail in order "to faithfully execute federal law and also to advance the Postal Service's operational interests[.]" 91 Fed. Reg. at 54,976 (emphasis added). And it is *also* undisputed that *Congress* does have the

authority to regulate in this area—whether the Rule is conceived as a regulation of the U.S. Mail, or even if framed (incorrectly, in the government's view) as a regulation of elections. After all, all parties agree that *Congress* can regulate elections. So Plaintiffs' Elections Clause claim adds nothing to this case. If the Postal Service's rule is unauthorized by Congress, *but see supra*, then it is unlawful (without the need to address the Constitution at all). And if the Postal Service's rule is authorized by Congress, then that necessarily means there is no Elections Clause problem. After all, Plaintiffs do not even argue that Congress has unlawfully delegated its authority to the Postal Service—nor could they.

In any event, Plaintiffs' constitutional-authority objection proves far too much. Again, it is undisputed that the Postal Service, for example, *already* uses the Election Mail logo and takes certain extraordinary measures, every election cycle, to prioritize the timely delivery of election mail. Indeed, these Plaintiffs' co-counsel and co-Plaintiffs have filed lawsuits arguing that the Postal Service had not gone far *enough* in prioritizing election mail. *See supra* (citing *NAACP v. USPS*, 2026 WL 1893762, at *1). But if *any* election-specific regulation of the U.S. Mail violates the Constitution, all those prioritization efforts would have been equally unconstitutional—a highly unlikely result that illustrates the untenable nature of Plaintiffs' theory.

**C. Plaintiffs' remaining claims lack merit.**

That leaves a variety of miscellaneous claims from the *California* Plaintiffs, which are also unlikely to succeed on the merits.

**a.** Plaintiffs argue that the Postal Service has impermissibly created a new category of nonmailable matter, usurping the role of Congress, in violation of the APA.[2] And, to be sure, Congress has identified certain categories of nonmailable matter directly by statute. *See, e.g.*, 39 U.S.C. § 3001(a) (prohibiting the mailing of, for example, fraudulent representations, firearms,

[2] This is the only statutory claim in this case for which normal APA review applies. *See* 39 U.S.C. § 3001(m).

poisons and poisonous animals, explosives, diseases, ballistic knives, alcoholic beverages, some tobacco products, and many live animals).

But this is not a mailability rule; the Rule does not create a new category of "nonmailable matter" into which Ballot Mail as a class may generally fall. To the contrary, USPS hopes to mail as many lawful ballots as the States wish to send, no more and no less—and the Rule does not prohibit *any* ballots from being mailed. All outbound federal ballot mail that meets these modest requirements will be accepted, and then processed and delivered as before.

The Rule does, of course, place certain conditions on acceptance of federal ballot mailings—but that alone is not enough to create a new category of non-mailable matter. After all, the Postal Service could refuse to mail a heavy package if the customer failed to pay sufficient postage, but that does not mean that heavy packages are nonmailable. Similarly, if the Postal Service refused to deliver election mail from States to voters that was sent without any postage, that would not render unstamped election mail "nonmailable" or otherwise violate the statutory rules governing creation of categories of nonmailable matter. The same logic applies here.

**b.** Plaintiffs argue that the Postal service is now offering a "nonpostal service" in violation of 39 U.S.C. § 404(e), which prohibits the Postal Service from offering "any service that is not a postal service." But the requirements in the Final Rule are not "services" at all. As the Postal Regulatory Commission has explained (in an interpretation that the D.C. Circuit has upheld), "services" for purposes of 39 U.S.C. § 404(e) refer to ongoing commercial activities offered to the public for the purpose of financial gain. *USPS v. Postal Regul. Comm'n*, 599 F.3d 705, 708 (D.C. Cir. 2010). This is nothing of the sort.

Even if the Final Rule offers "services," they are not "nonpostal" services. 39 U.S.C. § 404(e). Rules for sending certain types of mail, through the mail, are about as "postal" as it gets. *See* 39 U.S.C. § 102(5) (the term "'postal service' refers to the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto").

**c.** Plaintiffs argue that the Final Rule is an "undue or unreasonable discrimination among users of the mails," 39 U.S.C. 403(c), because it subjects ballot mail to more rigorous envelope-design, reporting, and verification requirements than certain other types of mail. This argument fails both at the threshold and on the merits.

First, in *New York v. Trump*, 181 F.4th 132, 137-42 (D.C. Cir. 2026), the D.C. Circuit correctly held that the Postal Regulatory Commission has exclusive jurisdiction over claims covered by 39 U.S.C. § 3662(a), which includes claims that the Postal Service acted in violation of 39 U.S.C. § 403(c). Plaintiffs' only response seems to be that sometimes the Postal Regulatory Commission might take "90 days" to make certain decisions. *California* TRO Br. at 19. But that is no basis for ignoring a straightforward limitation on the Court's subject-matter jurisdiction.

Second, 39 U.S.C. § 403(c) only prohibits discrimination "[i]n providing services and in establishing classifications, rates, and fees under this title," and the challenged requirements are none of those things. The Rule also applies to all ballot mailers equally—just like the rules about mailing replica explosives or cremated remains apply to mailers of those types of mail equally. For obvious reasons, Congress never said that all types of mail must always be treated identically. To the contrary, Congress provided expressly that "[i]t shall be the responsibility of the Postal Service . . . to provide types of mail service to meet the needs of different categories of mail and mail users." 39 U.S.C. § 403(b)(2). That is all it has done here.

**d.** Plaintiffs argue that the Postal Service was obligated to first seek an advisory opinion from the Postal Regulatory Commission before issuing this rule, under 39 U.S.C. § 3661. But as with Plaintiffs' Section 403(c) discrimination claims, that sort of claim is beyond the subject-matter jurisdiction of this Court. *See New York*, 181 F.4th at 137-42. Although Plaintiffs may bring that sort of challenge, they can only do so by complying with the administrative-review scheme set forth by Congress, *see* 39 U.S.C. § 3662, and then bringing their claims in the Court of Appeals in the first instance, *see id.* § 3663.

**e.** Plaintiffs argue that the Final Rule violates the Voting Rights Act, in particular the provision that provides that "[n]o person acting under color of law shall fail or refuse to permit

any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote[.]" 52 U.S.C. § 10307(a). For starters, that provision of the Voting Rights Act is not judicially enforceable by a private right of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("Without [statutory authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."); *see also Schilling v. Washburne*, 592 F. Supp. 3d 492, 499 (W.D. Va. 2022) (no private right of action to enforce 52 U.S.C. § 10307(b)).

Regardless, the Final Rule is entirely consistent with that provision of the Voting Rights Act. The Rule explains repeatedly that the names provided by each State will "be listed by and at the discretion of election officials, and the Postal Service will not second-guess the states' submissions." 91 Fed. Reg. at 54,969. In other words, "State election officials will . . . retain full control over who is permitted to vote in federal elections in their state by U.S. mail." *Id.* So the Postal Service will never be "refus[ing] to permit" anyone to vote who is "otherwise qualified to vote" according to their own State election officials. 52 U.S.C. § 10307(a). The question of who can and cannot vote will be—both before and after the Rule—up to State election officials to decide.

**f.** Finally, the *California* Plaintiffs argue that the Postal Service has violated the Privacy Act. But injunctive relief is generally unavailable under the Privacy Act, except in limited circumstances that Plaintiffs do not even argue are applicable here. *See, e.g.*, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs."). And organizations (rather than individuals) are not entitled to *any* relief under the Privacy Act. *See* 5 U.S.C. § 552a(g)(1)(D) (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence.").

To be sure, in recent years, litigants have often tried (and sometimes succeeded) in evading these limitations by bringing APA claims predicated on alleged violations of the Privacy Act. *See, e.g.*, *Heritage Found. v. DOJ*, 2026 WL 1766549, at *3 (D.D.C. June 19, 2026) (noting that "the

availability of injunctive relief under the APA" to remedy a Privacy Act violation "is an unsettled question with which other courts are actively wrestling"). The government's longstanding position is that this maneuver is inconsistent with Congress's judgments in the Privacy Act itself. *See, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175 (4th Cir. 2025) ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026). Regardless, that workaround is plainly inapplicable here, because the Postal Service is not subject to APA litigation in the first place. *See* 39 U.S.C. § 410(a). Plaintiffs' Privacy Act claims fail on threshold grounds.

Nor does the Final Rule reflect the "creat[ion] a surveillance program to track voting" that would violate the Privacy Act. *California* TRO Br. at 16. The Rule has nothing to do with "collecting records of voters' First Amendment activity." *Id.* So the Privacy Act claims would also fail on the merits.

* * *

Because all of Plaintiffs' claims fail on the merits, Defendants are likely to succeed on the merits of their appeal.

## CONCLUSION

The Court should stay its August 27, 2026 order pending appeal.

Dated: August 28, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
Chief Litigation Counsel (FL Bar 1041279)
MICHAEL S. POLITO
Trial Attorney (DC Bar 90041172)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov