**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-11549-IT |
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-13917-IT |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **2**

**I. Regulatory Background** .......... **2**

**II. Litigation Background** .......... **5**

**ARGUMENT** .......... **6**

**I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS** .......... **6**

A. The organizational Plaintiffs lack Article III standing. .......... 6

B. The Final Rule is lawful. .......... 8

1. The Final Rule is authorized by statute. .......... 8

2. The Final Rule is consistent with the Constitution. .......... 13

3. Plaintiffs' remaining claims lack merit. .......... 14

**II. THE EQUITABLE FACTORS DISFAVOR INJUNCTIVE RELIEF.** .......... **20**

**III. PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.** .......... **23**

**CONCLUSION** .......... **24**

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aid Ass'n for Lutherans v. USPS*,
321 F.3d 1166 (D.C. Cir. 2003) ........ 8

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........ 17

*Am. Fed'n of Tchrs. v. Bessent*,
152 F.4th 162 (4th Cir. 2025), *abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026) ... 18

*Associated Third Class Mail Users v USPS*,
600 F.2d 824 (D.C. Cir. 1979) ........ 9

*Becky's Broncos, LLC v. Town of Nantucket*,
138 F.4th 73 (1st Cir. 2025) ........ 6

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........ 11

*Buchanan v. USPS*,
508 F.2d 259 (5th Cir. 1975) ........ 16, 17

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........ 22

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ........ 21

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 7

*Draper v. Healey*,
827 F.3d 1 (1st Cir. 2016) ........ 7

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 6, 7

*Heritage Found. v. DOJ*,
2026 WL 1766549 (D.D.C. June 19, 2026) ........ 18

*Hochendoner v. Genzyme Corp.*,
823 F.3d 724 (1st Cir. 2016) ........ 6

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) ........ 11

*Leedom v. Kyne*,
358 U.S. 184 (1958) ........ 8

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ........ 5-6,20

*Mittleman v. Postal Regul. Comm'n*,
757 F.3d 300 (D.C. Cir. 2014) ........ 8, 22

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........ 6

*NAACP v. USPS*,
2026 WL 1893762 (D.D.C. July 1, 2026) ........ 11, 13

*Nat'l Ass'n of Postal Supervisors v. USPS*,
26 F.4th 960 (D.C. Cir. 2022) ........ 8

*New York v. Trump*,
181 F.4th 132 (D.C. Cir. 2026) ........ 15, 16

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 19

*NRC v. Texas*,
605 U.S. 665 (2025) ........ 8, 9

*Pagán v. Calderón*,
448 F.3d 16 (1st Cir. 2006) ........ 6

*Pennsylvania v. DeJoy*,
490 F. Supp. 3d 833 (E.D. Pa. 2020) ........ 17

*Planned Parenthood Fed'n of Am., Inc. v. Kennedy*,
162 F.4th 155 (1st Cir. 2025) ........ 5

*Postal Police Officers Ass'n v. USPS*,
502 F. Supp. 3d 411 (D.D.C. 2020) ........ 17

*Schilling v. Washburne*,
592 F. Supp. 3d 492 (W.D. Va. 2022) ........ 18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .... 6

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .... 7

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) .... 18

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) .... 2, 20

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .... 22

*USPS v. Council of Greenburgh Civic Associations*,
453 U.S. 114 (1981) .... 9

*USPS v. Postal Regul. Comm'n*,
599 F.3d 705 (D.C. Cir. 2010) .... 14

*Wachovia Bank v. Schmidt*,
546 U.S. 303 (2006) .... 15

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .... 19

*West Virginia v. EPA*,
597 U.S. 697 (2022) .... 11

*Winter v. Nat. Res. Def.* Council*, Inc.*,
555 U.S. 7 (2008) .... 5, 6, 19, 20

**<u>Constituional Provisions</u>**

U.S. Const. art. I, § 4, cl. 1 .... 12

**<u>Statutes</u>**

5 U.S.C. § 552a .... 18

5 U.S.C. § 705 .... 22

39 U.S.C. § 102 .... 14, 15

39 U.S.C. § 401 .... 2, 9, 13

39 U.S.C. § 402 ........ 9
39 U.S.C. § 403 ........ 9, 15
39 U.S.C. § 404 ........ 2, 9, 10, 14
39 U.S.C. § 410 ........ 19
39 U.S.C. § 3001 ........ 13, 22
39 U.S.C. § 3002 ........ 13
39 U.S.C. § 3002a ........ 13
39 U.S.C. § 3005 ........ 13, 22
39 U.S.C. § 3007 ........ 13, 22
39 U.S.C. § 3012 ........ 13, 22
39 U.S.C. § 3661 ........ 16, 17
39 U.S.C. § 3662 ........ 15, 16
39 U.S.C. § 3663 ........ 15, 16
52 U.S.C. § 10307 ........ 17, 18

**Rules**

Local Rule 40.1 ........ 5

**Regulations**

75 Fed. Reg. 282 (Jan. 5, 2010) ........ 10
90 Fed. Reg. 9843 (Feb 19, 2025) ........ 9
91 Fed. Reg. 54,966 (Aug. 26, 2026) ........ *passim*
Executive Order 14,399 ........ 4, 5

**Other Authorities**

Domestic Mail Manual 703.8.0 ........ 4

Jen Rice, Facing time crunch, North Carolina takes first step to comply with new USPS mail voting rule while fighting it (Aug. 27, 2026), https://perma.cc/SFB6-PAVD. .......... 21

USPS, Business Mail 101: Automation, https://perma.cc/RY48-FWT9. .......... 3

USPS, Official Election Mail Guide (''Kit 600'') .......... 4, 11

## INTRODUCTION

These lawsuits, in their current form, are largely premised on the theory that the United States Postal Service (USPS) intends to seize control of the administration of federal elections. It does not. Plaintiffs' contrary narrative was seemingly formed months before the Final Rule was ever published, and it is impossible to square with the actual text of the actual Rule—which differs in material respects from the doomsday assumptions that animated Plaintiffs' earlier filings.

The Final Rule imposes modest informational requirements on senders of outbound federal ballot mailings. It creates standardized design and review requirements for federal ballot envelopes that have long been recommended by the Postal Service, and some of which are already in use in many States (including many of Plaintiff States here). It requires uploading the name-and-address information of intended recipients of ballot mail in an online portal—information that all election officials sending ballot mail necessarily already possess (or they couldn't send that mail in the first place). And critically, the Final Rule allows States—not the Postal Service—to identify which voters should receive ballots by mail, and makes no changes whatsoever to the roster of State residents who are or are not permitted or able to vote by mail. USPS will not scrutinize those decisions or alter that information in any way—instead leaving it entirely up to the States to accurately and lawfully identify its residents who are eligible to vote by mail. The Postal Service will not determine voter eligibility, ballot content, mailing or receipt deadlines, or ballot-counting procedures. The Rule does not displace a single State election law. And it need not and should not prevent a single voter from voting by mail.

These improvements and modernizations of the Postal Service's infrastructure for supporting this particularly sensitive category of mail are fully consistent with USPS's statutory and constitutional authority. The Postal Service has long taken election-specific actions surrounding envelope design and processing, such as priority processing for ballot mail bearing the election mail logo. And the Postal Service has likewise relied on the same statutory authorities at issue here to adopt special handling and conditions on acceptance for other types of mail that are similarly sen-

sitive yet non-dangerous, raising unique operational concerns—such as cremated remains or replica explosives. There is no material distinction between those prior actions and this one with respect to the legal authority of the Postal Service. Accordingly, Plaintiffs are unlikely to succeed on the merits, and their preliminary-injunction motions should be denied.

Even if Plaintiffs could show a likelihood of success, the equities weigh against their request for extraordinary preliminary-injunctive relief. For one thing, the Supreme Court held on Monday that, because appellate review in the ordinary course "would come too late for the 2026 midterms," an erroneous injunction would necessarily cause irreparable harm to the government. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026). And although Plaintiffs' filings emphasize their fears of last-minute confusion and chaos, they ignore the mirror-image problems that are likely to result from this Court's *granting* of their motions—especially on the heels of the Supreme Court's stay and this Court's resulting vacatur of the previous court orders that had erroneously constrained the Postal Service's authority.

Plaintiffs' motions for a preliminary injunction should be denied.

## BACKGROUND

### I. Regulatory Background

On August 26, 2026, the Postal Service published the Final Rule in the Federal Register. *See* USPS, *Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026). USPS issued the Rule under its rulemaking and operational authority in 39 U.S.C. §§ 401 and 404(a)(1). *See id.* at 54,971. Specifically, Congress empowered USPS "to adopt . . . such rules and regulations . . . as may be necessary in the execution of its functions and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." 39 U.S.C. § 401(2). Congress also provided the Postal Service "all other powers incidental, necessary or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). One of those specific powers is "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* § 404(a)(1).

In accordance with authority delegated by Congress, the Final Rule amends USPS's Domestic Mail Manual to impose modest reporting and design requirements on federal ballot mail envelopes. The Rule requires federal ballots transmitted through the U.S. Mail to be mailed in envelopes that include the official Election Mail logo, are automation compatible,[1] and use unique barcodes. *See* 91 Fed. Reg. at 54,990-91. State and local election officials must submit their envelope designs for review to ensure compliance with those requirements, and provide the Postal Service with certain delivery-related information about the federal ballot mail they intend to send. *Id.* at 54,991. Specifically, the unique barcodes applied to each ballot mail envelope, along with the name and address of the recipient and the State sending the ballot, must be uploaded to an online portal prior to presenting an outbound ballot mailing. *Id.* at 54,990. Election officials may continually update this information as many times as necessary. *Id.* at 54,991. When outbound federal ballot mail is presented for mailing, the Postal Service will match the sampled barcode data to the portal data, to ensure compliance with the Rule. *Id.* at 54,990-91. All mailings that comply with these requirements will be accepted; those that do not will be "returned to the authorized ballot mailer" who may then "address the error(s)" and "resubmit[] the mailing." *Id.* at 54,991.

USPS will not perform any verification of voter eligibility; its role is limited to ensuring that envelopes comply with the rule's design requirements—as the rule emphasizes, "[e]ligible voters will therefore be listed [in the Portal] by and at the discretion of election officials, and the Postal Service will not second-guess the states' submissions. State election officials will thus retain full control over who is permitted to vote in federal elections in their state by U.S. mail." *Id.* at 54,969. States likewise need not worry about "the accuracy of lists maintained within USPS," *California* PI Br. at 6, ECF No. 5—those lists will be created *by the States*, and the States

[1] Automation compatibility ensures that mail can be processed by the Postal Service's high-speed mail processing equipment, ensuring fast and accurate delivery. Mail that is not automation compatible can require hand processing by postal workers, which may result in slower delivery. *See* USPS, *Business Mail 101: Automation*, available at https://perma.cc/RY48-FWT9.

alone.[2] On or near the date of the election, the Postal Service will also provide each State that used the U.S. Mail to transport ballots with a single list containing all the state's submissions for the ballots it intended to send. 91 Fed. Reg. at 54,993-94.

Several features of this Rule are not new: for years, the Postal Service has recommended that federal ballot mail envelopes use unique barcodes, be automation compatible, include the official Election Mail logo, and undergo mailpiece design review in advance of mailing. *See* U.S. Postal Service, Kit 600: *Official Election Mail Guide* (''Kit 600''), https://about.usps.com/kits/kit600.pdf; *Domestic Mail Manual* 703.8.0 ("DMM"), https://pe.usps.com/text/dmm300/703.htm#ep1174014. This Rule simply turns "these longstanding recommendations"—which many of the Plaintiff States have already adopted, at least in part, and some have long advocated for—into requirements. 91 Fed. Reg. at 54,986; *see id.* at 54,978. These requirements are only a baseline; "nothing in the [R]ule prevents or discourages election officials from including envelope design elements required by state law," nor will the Rule "create a single, uniform ballot envelope design across all states[.]" *Id.* at 54,978. And most importantly, the Rule "leav[es] the administration of elections firmly in the hands of the [S]tates," *id.* at 54,970; "the Postal Service will not play any role in determining voter eligibility, maintaining voter rolls, or counting ballots," *id.* at 54,978.

The Final Rule explains that these requirements "will afford significantly enhanced visibility into the sending of Federal Ballot Mail, and this will in turn facilitate law enforcement efforts by enabling law enforcement to better detect potential issues meriting further investigation." 91 Fed. Reg. at 54,969. Ultimately, "[w]hether or not voter fraud is common or uncommon," the Rule is intended "to facilitate enforcement of federal law, reduce the risk of fraud, and help protect

[2] This is a material departure from Plaintiffs' original, mistaken assumptions about how Executive Order 14,399 would be implemented. *See, e.g.*, *California I*, Compl. ¶ 169, ECF No. 1 in No. 1:26-cv-11581 (alleging that "Section 3 of the EO grants federal agencies decisive control of this list, preventing States from ensuring accuracy").

the integrity of federal elections," *id.*—at least with respect to the narrow but important role played by the Postal Service, in States that choose to use the U.S. mail to send ballots.

## II. Litigation Background

On the morning of August 26, 2026, the Postal Service published the Final Rule in the Federal Register. *See* U.S. Postal Service, *Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026). That same day, the *League of Women Voters of Massachusetts* Plaintiffs filed a supplemental complaint (with Defendants' consent), *LWVMA* ECF No. 205, and the *California* Plaintiffs filed a new action, *California* ECF No. 1, marking it as related to its previous lawsuit and to the *League of Women Voters of Massachusetts* case.[3] Later that day, Plaintiffs in both above-captioned matters filed motions requesting (among other forms of relief) a temporary restraining order. *California* ECF No. 5; *LWVMA* ECF No. 207. The Court ordered Defendants and Defendant-Intervenors to respond by 12 PM Eastern Time on August 27, 2026. *California* ECF No. 7; *LWVMA* ECF No. 212. They did so. *California* ECF No. 17; *LWVMA* ECF Nos. 214, 215.

On the evening of August 27, 2026, the Court issued a "Memorandum and Order Granting in Part Plaintiffs' Motions for a Temporary Restraining Order." *California* ECF No. 31; *LWVMA* ECF No. 218. Yesterday, Defendants filed a notice of appeal in both cases, *California* ECF No. 42; *LWVMA* ECF No. 221, as well as motions for a stay pending appeal, *California* ECF No. 58; *LWVMA* ECF No. 228. Defendants now oppose Plaintiffs' motions for a preliminary injunction and stay.

[3] Defendants do not agree that Case No. 1:26-cv-13917-IT (*California II*) is "related" to Case No. 1:26-cv-11549-IT (*League of Women Voters of Massachusetts*) or Case No. 1:26-cv-11581-IT (*California I*), within the meaning of Local Rule 40.1, and thus note and preserve their objection to that designation. The first two cases originally challenged only Executive Order 14,399; the latest case challenges only a Postal Service Final Rule. And although there are some overlapping legal issues, the Local Rules state explicitly that "[c]ivil cases, even when they involve some or all of the same parties, shall not be deemed related to each other solely on the ground that they . . . involve the same or substantially similar challenges to a law, regulation, or government policy or practice; or . . . otherwise involve a common question of law." Local Rule 40.1(g)(3).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, a plaintiff "'must establish' that: (1) it is 'likely to succeed on the merits'; (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in its favor'; and (4) 'an injunction is in the public interest.'" *Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, 162 F.4th 155, 166 (1st Cir. 2025) (quoting *Winter*, 555 U.S. at 20). The injunction "should not be granted unless" Plaintiffs, "by a clear showing, carr[y] the burden of persuasion" on each factor. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *see Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 77 (1st Cir. 2025). Because Plaintiffs have not carried this burden, the Court should deny their motions for a preliminary injunction.

### I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

#### A. The organizational Plaintiffs lack Article III standing.

"At the preliminary injunction stage," Plaintiffs "must make a 'clear showing' that" they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). That is, Plaintiffs must show they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And because Article III standing is "plaintiff-specific," the Court "must determine whether each particular plaintiff" has clearly established these elements. *Pagán v. Calderón*, 448 F.3d 16, 26 (1st Cir. 2006); *see Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 733 (1st Cir. 2016) (standing requires "plaintiff-by-plaintiff and claim-by-claim analysis"). The organizational Plaintiffs—that is, all Plaintiffs in *League of Women Voters*—fail this test.[4]

[4] Defendants do not dispute that the *California* Plaintiffs have Article III standing to challenge the Final Rule, as the Rule does impose at least some regulatory burden on the States.

The organizational Plaintiffs may "sue on their own behalf" only if they show "injury in fact, causation, and redressability." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (citation omitted). They contend the Final Rule makes their goals for voter participation harder to achieve. *See, e.g.*, ECF Nos. 208-1 ¶¶ 32, 35; 208-2 ¶ 26; 208-3 ¶ 16; 208-4 ¶ 28; 208-5 ¶ 53; 208-6 ¶ 25. That does not suffice. "A plaintiff must show far more than simply a setback to the organization's abstract social interests," "no matter how longstanding the interest and no matter how qualified the organization" or the strength of its "opposition to the government's conduct." *All. for Hippocratic Med.*, 602 U.S. at 394 (citation omitted).

Otherwise, the organizational Plaintiffs attempt to show standing through the expenditure of time, effort, or money informing their constituents about the Final Rule's impact. *See, e.g.*, ECF Nos. 208-1 ¶¶ 13, 20-22; 208-2 ¶ 38; 208-3 ¶ 16; 208-4 ¶ 28; 208-5 ¶ 43; 208-6 ¶ 36. But the Supreme Court has been clear that an "organization cannot manufacture its own standing in that way," *i.e.*, by "engaging in public advocacy and public education" in response to a governmental action. *All. for Hippocratic Med.*, 602 U.S. at 394. To accept "that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395.

The organizational Plaintiffs fare no better at "assert[ing] the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Associational standing "requires, among other things, that at least one of the group's members have standing as an individual." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016). So "at the very least," each organizational Plaintiff must "identify a member who has suffered the requisite harm." *Id.* (citation modified); *see Summers*, 555 U.S. at 498 (discussing the requirement that "plaintiff-organizations . . . make specific allegations establishing that at least one identified member had suffered or would suffer harm"). Yet the organizational Plaintiffs here—save for one—only claim generic harm to unknown and unidentified members, *see, e.g.*, ECF Nos. 208-1 ¶ 36; 208-3 ¶ 14; 208-5 ¶ 64, which "is insufficient" for standing, *Draper*, 827 F.3d at 3.

Although the League of Women Voters of Massachusetts does discuss the "risk of not being [able] to vote at all" for particular members, ECF No. 208-4 ¶ 59, this "potential future" injury rests on a "speculative chain of possibilities"—in particular, the Commonwealth of Massachusetts' inability to facilitate mail-in voting in accordance with the Final Rule—that equally precludes standing, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Thus, the Court should deny the organizational Plaintiffs' preliminary-injunction motion for lack of standing.

**B. The Final Rule is lawful.**

On the merits, the Final Rule is ultimately a regulation of the U.S. mail, and a modest one at that—not a federal takeover of elections by the Postal Service. That reality undermines virtually all of Plaintiffs' claims and illustrates why they are unlikely to succeed on the merits.

**1. The Final Rule is authorized by statute.**

**a.** As a threshold matter, although federal-court litigation challenging significant government policies has become the norm in recent years, the Final Rule at issue here is not subject to the same form of review as most of those cases. That is because "the Postal Service is exempt from review under the Administrative Procedure Act." *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) (citing 39 U.S.C. § 410(a)).

To be sure, "the absence of a cause of action for judicial review under the APA does not necessarily foreclose all judicial review." *Id.* at 307. "But while such review may be available, it is quite narrow," *id.*, in at least two ways. One, "[i]t is available only to determine whether the agency has acted 'ultra vires'—that is, whether it has 'exceeded its statutory authority.'" *Id.* (quoting *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)) (and citing *Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (asking whether the agency's action was "in excess of its delegated powers and contrary to a specific prohibition in the Act [that] is clear and mandatory"). And two, that sort of non-statutory ultra vires claim requires identification of an agency violation of "a specific prohibition" in a statute that "is clear and mandatory." *Leedom*, 358 U.S. at 188; *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022) ("The Postal Service is

correct that a challenged action must contravene a clear and specific statutory mandate to be susceptible to ultra vires review."). In other words, as the Supreme Court put it last year, "a *Leedom v. Kyne* claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025). So too here.

For the most part, Plaintiffs do not even try to identify any "specific" or "mandatory" statutory provision that the Final Rule violates. Instead, they "basically dress up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. But even if the Court "disagree[s] with the [Postal Service's] conclusion" in the Final Rule about the reach of its authority, that sort of routine "statutory argument falls well shy of a meritorious *Leedom v. Kyne* claim." *Id.* That alone is enough to reject Plaintiffs' statutory-authority claims.

**b.** Whatever the appropriate standard of review, Congress authorized the Postal Service "to adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." 39 U.S.C. § 401(2). Congress further granted the Postal Service "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). Those specific powers include the power "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* § 404(a)(1).

Interpreting these provisions, the Supreme Court has stated that, "under 39 U.S.C. § 401 the Postal Service is broadly empowered to adopt rules and regulations designed to" maintain an efficient system for collecting, sorting, and delivering mail nationwide. *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 123 (1981); *see Associated Third Class Mail Users v USPS*, 600 F.2d 824, 826 n.5 (D.C. Cir. 1979) ("[T]he Service is authorized under 39 U.S.C. § 401(2) (1976) to promulgate regulations to further the objectives of Title 39."). Under these authorities

and precedents, the Postal Service's general rulemaking powers include authority to impose reasonable requirements for envelope design and labeling and to require that mailers provide basic information regarding particularly sensitive items. *See* 39 U.S.C. §§ 401-404.

As explained in the Final Rule, *see* 91 Fed. Reg. at 54,974, the Postal Service has invoked these very authorities before—including where, as here, the type of mail in question is sensitive but non-dangerous. For example, cremated human and animal remains must be transported through specific types of USPS-provided boxes, and must be trackable via barcode. *See Cremated Remains Packaging Requirements*, 90 Fed. Reg. 9843 (Feb 19, 2025) (implementing rules concerning the sending of cremated remains in specific types of USPS-provided boxes because the Postal Service understands such remains are "sensitive matter and believes this will improve visibility and enhance handling methods throughout processing and transportation"). Similarly, replica explosives—which, although not dangerous, also require special handling to prevent operational disruptions based on the misperception that they are actual explosives—rather than being prohibited from the mail altogether, must be mailed in certain ways, which include in-person presentation to a retail counter and shipment via Registered Mail. *See Restricting the Mailing of Replica or Inert Explosives*, 75 Fed. Reg. 282, 283 (Jan. 5, 2010) (noting that "[t]his process will ensure that packages containing these items remain separate and easily identifiable during the mailing process"). This Rule functions similarly, and for similar reasons—although ballot mail does not present the same operational issues as cremated remains or replica explosives, it is sensitive mail that raises unique operational considerations. Namely, it creates an opportunity for the mails themselves to be used to facilitate serious criminal activity, *see* 91 Fed. Reg. at 54,969—and the Postal Service must have at least as much authority to prevent that sort of harm as it does to ensure that mortal remains are not lost in the mail.

Nor is the Postal Service legally obligated to turn a blind eye to the use of the mail to facilitate specific *types* of fraud. Consider, for example, a scenario in which retirement communities are repeatedly targeted for elder-abuse mail scams: there is no evident reason why the Postal

Service could not impose special design and registration rules for envelopes used to send solicitations to such locations. This Rule follows the same basic form, by acknowledging the indisputable reality that election-related mail is particularly sensitive, and that crimes relating to election mail are particularly important. *See id*. And so, "[w]hether or not voter fraud is common or uncommon, the Postal Service has the legal authority to take the measures in this rule to facilitate enforcement of federal law[.]" *Id.*

**c.** In the face of these broad grants of statutory authority over "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," 39 U.S.C. § 404(a)(1)—and the Postal Service's obvious authority to adopt modest design requirements to reduce the risk that the mail is used to commit fraud—Plaintiffs try to shift the focus away from the text, and instead to the context of elections. And so, Plaintiffs' arguments that the Postal Service lacks statutory authority here are largely premised on their repeated assertions that USPS doesn't have the power to regulate *elections*. But that argument fails to grapple with the very limited nature of the rule—which does not regulate elections at all.

Under the Rule, States can continue to mail ballots to whomever they wish whenever they wish; the rule does not regulate the form or content of the ballots themselves, the timeline for transmission of ballots, voter eligibility, vote-by-mail eligibility, or anything similar. It regulates only how States must design and label the envelopes they send via U.S. mail (should they elect to use the U.S. mail to send ballots). As the Rule itself makes clear, "[t]he Postal Service does not purport to alter the eligibility of any individual to vote under state or federal law." 91 Fed. Reg. at 54,991. Both before and after this Rule, "[t]he Postal Service does not have any legal responsibility for management of state voter rolls or administration of federal elections within each state." *Id.* In other words, this is a regulation of the U.S. mail—not a regulation of elections.

That reality is also fatal to Plaintiffs' invocation of the major-questions doctrine, through which courts often consider the "economic and political significance'' of the authority at issue. *Learning Res., Inc. v. Trump,* 607 U.S. 229, 246 (2026). "[A]lthough actual changes to eligibility of voters to vote by mail might fairly be described as having political significance in some sense,

this rule makes no such changes—it instead leaves voter-eligibility unchanged, requiring only certain modest envelope design and data reporting standards." 91 Fed. Reg. at 54,973. And the "economic significance" of the rule is not remotely comparable to any prior major-questions case. *See, e.g.*, *Learning Resources*, 607 U.S. at 246 ("could be worth $15 trillion"); *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) ("between $496 billion and $519 billion"). Ultimately, requiring conditions on the sending of certain types of mail that raise particular sensitivities or operational concerns is hardly some "unheralded power representing a transformative expansion of [USPS's] regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (internal quotations and citation omitted). To the contrary, USPS has invoked these same statutory authorities in the past, to accomplish similar goals. *See supra* at 10; *see also* 91 Fed. Reg. at 54,974 (same).

In any event, Plaintiffs cannot seriously contend that the Postal Service is disabled from adopting *any* election-mail-specific rules, as their co-counsel and co-Plaintiffs have long advocated for and benefited from specific ballot-mail envelope design elements and the prioritization of such mail. *See NAACP v. USPS*, No. 20-cv-2295 (EGS), 2026 WL 1893762, at *1 (D.D.C. July 1, 2026), *appeal filed*, No 26-5257 (D.C. Cir. July 9, 2026); Kit 600 at 4. Indeed, the Postal Service has long had election-specific rules and practices that have never been justified by reference to any election-specific statutory language—for example, the Postal Operations Manual provides that, even if a mailer does not affix the necessary postage, "absentee balloting materials must not be detained or treated as unpaid mail," and must instead "be promptly dispatched and delivered to the addressees." U.S. Postal Service, *Postal Operations Manual* § 171.3, *available at* https://perma.cc/HY9N-TJ6Q. If the Postal Service has *no* legal authority to make any rules specific to election-related mail—as seems to be Plaintiffs' theory—it is hard to understand how those longstanding efforts would be lawful. And when it comes to the Postal Service's legal authority, it is no answer that those prior efforts were focused on reducing the risk of disenfranchisement, rather than (as here) to "reduce the risk of fraud, and help protect the integrity of federal elections." 91 Fed. Reg. at 54,969. Those are policy distinctions, not legal distinctions.

**d.** This Court's TRO order, in granting only certain forms of relief to the Plaintiffs, seemed to rely implicitly on a distinction between permissive rules and mandatory rules—and thus allowed certain provisions of the Rule to remain in effect for the November 2026 elections, to the extent those provisions are treated as voluntary. *See* Defs.' Notice of Compliance, *California* ECF No. 57; *LWVMA* ECF No. 227. But Defendants are aware of no textual basis in any potentially relevant statutory provisions for that distinction. And the prior regulatory examples (about cremated remains and replica explosives) cited above, *see supra* at 10, and in the Final Rule, *see* 91 Fed. Reg. at 54,974, are likewise mandatory, not permissive.

**2. The Final Rule is consistent with the Constitution.**

Under the Elections Clause, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. Plaintiffs argue "the Rule trespasses the limits of Executive power and impermissibly encroaches on powers belonging to the States and Congress." *California* PI Br. at 4. These arguments attack a strawman.

The Final Rule "leav[es] the administration of elections firmly in the hands of the [S]tates." 91 Fed. Reg. at 54,970. "Eligibility for mail-in and absentee voting will continue to be governed by state law; state and local election officials will still determine which individuals are eligible under these laws; and state and local election officials will determine whether completed ballots are eligible to be counted." *Id.* at 54,978. "[T]he Postal Service will not play any role in determining voter eligibility, maintaining voter rolls, or counting ballots." *Id.* The Final Rule is thus a modest exercise of the Postal Service's own judgment about how "to exercise *its* statutory authority"—granted by Congress—"to faithfully execute federal law and also to advance the Postal Service's operational interests[.]" *Id.* at 54,976 (emphasis added).

Similarly, Plaintiffs' filings argue repeatedly that the President does not have any constitutional authority to directly regulate elections, on his own. But the Rule was issued by the Postal Service, not the President. Moreover, it is undisputed that *Congress* does have the authority to

regulate in this area—whether the Rule is conceived as a regulation of the U.S. Mail, or even if framed (incorrectly, in the government's view) as a regulation of elections. After all, however one might characterize this Rule, all parties agree that *Congress* can directly regulate the manner of elections, U.S. Const. art. I, § 4, cl. 1 (Elections Clause), as well as the U.S. mail, U.S. Const. art. I, § 8, cl. 7 (the Postal Clause). So Plaintiffs' constitutional claims add nothing to this case. If the Postal Service's rule is unauthorized by Congress, *but see supra*, then it is unlawful (without the need to address the Constitution at all). And if the Postal Service's rule is authorized by Congress, then that necessarily means there is no Elections Clause (or Postal Clause) problem. Indeed, Plaintiffs do not even argue that Congress has unlawfully delegated its authority to the Postal Service—nor could they.

In any event, Plaintiffs' constitutional-authority objection proves far too much. Again, the Postal Service has long used election-specific rules and practices. *See supra* at 12 (citing *Postal Operations Manual* § 171.3 (even without postage, "absentee balloting materials must not be detained or treated as unpaid mail" and instead must "be promptly dispatched and delivered to the addressees"). And these Plaintiffs' co-counsel and co-Plaintiffs have filed lawsuits arguing that the Postal Service had not gone far *enough* in prioritizing election mail. *See NAACP v. USPS*, 2026 WL 1893762, at *1. But if *any* election-specific regulation of the U.S. Mail violates the Constitution, all those prioritization efforts would have been equally unconstitutional—an implausible result that illustrates the untenable nature of Plaintiffs' theory.

**3. Plaintiffs' remaining claims lack merit.**

**a. Mailability.** Plaintiffs claim that the Rule impermissibly creates a new class of "non-mailable" material unauthorized by Congress and is therefore subject to APA review under 39 U.S.C. § 3001(m). *See California* PI Br. at 9–10. But the Rule is not a qualifying "proceeding[] concerning the mailability of matter." 39 U.S.C. § 3001(m). Most obviously, the Postal Service expressly disclaimed "creat[ing] a new category of 'nonmailable matter' into which Federal Ballot Mail as a class may generally fall." 91 Fed. Reg. at 54,973. Nor does the Rule constitute one of

the types of proceedings covered by 39 U.S.C. § 3001(m). *See id.* 32 U.S.C. §§ 3005, 3007, 3012(c) (examples of proceedings).

Even if APA review of this claim were permissible, Plaintiffs are wrong on the merits. Plaintiffs suggest that the Postal Service is precluded from setting conditions for delivery of certain material through rulemaking because Congress has designated certain material as nonmailable, either categorically or conditionally (*i.e.*, material cannot be mailed unless certain conditions are met). *See, e.g.,* 39 U.S.C. §§ 3001, 3002, 3002a. *See California* PI Br. at 8–9. But none of those provisions say that they are the *exclusive* categories of "nonmailable matter," and Congress instead has granted the Postal Service broad discretion to adopt regulations that "may be necessary in the execution of its functions," and "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." 39 U.S.C. § 401(2), (10).

In any event, this is not a mailability rule; the Rule does not create any new category of "nonmailable matter" into which Ballot Mail as a class generally falls. To the contrary, USPS intends to process and deliver as many lawful ballots as the States wish to send, no more and no less—and the Rule need not prohibit *any* ballots from being mailed. All outbound federal ballot mail that meets the Rule's requirements will be accepted, processed, and delivered as before.

The Rule does, of course, place certain conditions on acceptance of federal ballot mailings—but that alone is not enough to create a new category of non-mailable matter. After all, the Postal Service could refuse to mail a heavy package if the customer failed to pay sufficient postage, but that does not mean that heavy packages are nonmailable. Similarly, if the Postal Service refused to deliver election mail from States to voters that was sent without any postage, that would not render unstamped election mail "nonmailable" or otherwise violate the statutory rules governing creation of categories of nonmailable matter. The same logic applies here.

**b. Non-Postal Services.** Plaintiffs next claim that the Rule "violates statutory limits on USPS's authority to provide 'nonpostal service[s].'" *California* PI Br. at 11–12 (quoting 39 U.S.C. § 404(e)). As an initial matter, the standards and procedures set forth in the Rule are not "services" within the meaning of 39 U.S.C. § 404(e). As the Postal Regulatory Commission has explained

(in an interpretation that the D.C. Circuit has upheld), "services" for purposes of 39 U.S.C. § 404(e) refer to ongoing commercial activities offered to the public for the purpose of financial gain. *USPS v. Postal Regul. Comm'n*, 599 F.3d 705, 708 (D.C. Cir. 2010). This is nothing of the sort.

But even if the Rule's standards and procedures could fairly be characterized as "services," the Rule does not require or permit the Postal Service to do anything "nonpostal." *California* PI Br. at 11; 39 U.S.C. § 404(e). "[P]ostal service[s]" are "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5). The Rule, on its face, could thus pertain *only* to postal services: it places conditions on the "delivery of . . . printed matter," including its acceptance into the mailstream. 91 Fed. Reg. at 54,975. Merely labeling these measures as an effort "to monitor and control voting," *California* PI Br. at 11, does not transform the Rule into a "nonpostal" endeavor; reducing the risk of a particularly salient form of mail fraud is necessarily a "postal" activity. Indeed, the Rule takes pains to distinguish its mailpiece design and data reporting standards from the complete control States retain over election administration—including decisions about who is eligible to vote by mail and the extent to which the State uses the Postal Service in their elections.

c. **Discrimination.** Plaintiffs argue that the Rule unduly and unreasonably discriminates among users of the mail in violation of 39 U.S.C. § 403(c). *See California* PI Br. at 12–13. This Court lacks jurisdiction over this claim, which Congress channeled to the Postal Regulatory Commission with subsequent judicial review in the D.C. Circuit. *See* 39 U.S.C. §§ 3662(a), 3663; *New York v. Trump*, 181 F.4th 132, 137-42 (D.C. Cir. 2026). The *California* plaintiffs' attempt to distinguish *New York v. Trump*—on the ground that the election is too close to pursue proceedings before the Commission—is meritless. Although the D.C. Circuit ultimately did not fully resolve that question, *see id.* at 140 n.3, it did "decline to adopt a general 'irreparable harm' exception by which parties can evade jurisdictional channeling provisions," *id.* at 140. Ultimately, federal subject-matter jurisdiction cannot expand or contract based on "convenience" to the plaintiff. *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006). Congress explicitly directed that all claims of violations of 39 U.S.C. § 403(c) be presented first to the Postal Regulatory Commission, so to that

body Plaintiffs must go. And to the extent there is time-sensitivity, that is an argument Plaintiffs may make to the Postal Regulatory Commission (and, if necessary, the D.C. Circuit). That is the only path that Congress provided for review of a claim like this.

In any event, this argument would also fail on the merits. Section 403(c) prohibits discrimination in "providing services and in establishing classifications, rates, and fees." 39 U.S.C. § 403(c). The Federal Ballot Mail design and data-entry standards in the Final Rule are not "services" within the meaning of section 403(c). *See supra* at 15-16. They are acceptance preconditions to facilitate the enforcement of federal law and to implement best practices for Postal Service operations regarding ballot mail. Nor are they rates: the Rule has nothing to do with "fees for postal services," *id.* § 102(7). So § 403(c) does not apply here.

Even if it did, the Rule does not discriminate among users of the mail. The Rule applies equally to anyone, in any state, sending federal ballot mail through the Postal Service; it thus applies a uniform national standard. 91 Fed Reg. at 54,971. To the extent that anyone receives less favorable service, it would stem not from any effect of the rule, but from their jurisdiction's failure to comply with Rule's provisions.

Plaintiffs contend that the Rule "dictat[es]" which mail users can "avail themselves of postal service," creating a "regime of selective refusal of service." *California* PI Br. at 12. For this reason, they argue, "identical mail pieces will be accepted or rejected" depending on whether the mailpiece satisfies the Rule's conditions. *See id.* at 12. But Plaintiffs' question-begging use of the word "identical" could be applied to *any* condition attached to the Postal Service's acceptance of any mailpiece, and it misses the point; just as two mail pieces cannot be considered "identical" if one has a stamp and one does not, two mail pieces are not "identical" if one contains the Election Mail logo and the other does not. Ultimately, Section 403(c) forbids discrimination between *users of the mails*, not between mailpieces; the Rule permits any user to send their ballot through the mail if its conditions are satisfied.

**d. Advisory Opinion.** Plaintiffs argue that the Postal Service needed to seek an advisory opinion from the Postal Regulatory Commission under 39 U.S.C. § 3661 before adopting the Rule.

*See California* PI Br. at 13–14. Again, this Court lacks jurisdiction over this claim, which Plaintiffs must bring before the Postal Regulatory Commission and then (if necessary) to the D.C. Circuit. *See* 39 U.S.C. §§ 3662(a), 3663; *New York*, 181 F.4th at 137-42. Indeed, the *California* Plaintiffs come close to acknowledging this point, in describing the administrative process that Congress designed. *See California* PI Br. at 13 ("The PRC must hold a formal hearing and issue a written opinion, 39 U.S.C. § 3661(c), which the D.C. Circuit can review, *id.* § 3663.").

Regardless, the Postal Service had no duty here under 39 U.S.C. § 3661(b) to seek an advisory opinion here. That obligation applies only when (1) the change that has a "meaningful impact on service," (2) the change is "in the nature of postal services," and (3) the change affects service "on a nationwide or substantially nationwide basis." *Buchanan v. USPS*, 508 F.2d 259, 262-63 (5th Cir. 1975). As to the first prong, the Rule does not create a quantitatively "meaningful" change, rather than a "minor" or minimal effect, on the general class of mail users. *Id.* at 262. It applies "only to Federal Ballot Mail"—a subset of ballot mail, which is itself a subset of election mail, which is itself a minuscule subset of all mail—"and only in connection with federal general, special, or runoff elections (and not state elections or primary elections)." 91 Fed. Reg. at 54,976. By contrast, "in 2020 the Postal Service delivered roughly 400 million pieces of mail per day, and election mail in the 2020 general election accounted for only a small fraction of a percentage (roughly 0.1%) of that total mail volume." *Id.*; *see also Postal Police Officers Ass'n v. USPS*, 502 F. Supp. 3d 411, 423 (D.D.C. 2020) (dismissing failure to file a § 3661(b) claim for failing to allege that the subject change "is of sufficient scale and scope to have more than a *de minimis* effect of the nature of postal services available to the ordinary USPS users.").

Under "a qualitative examination of the manner in which postal services available to the users will be altered," the Rule also does not change the "nature of postal services" within the meaning of § 3661(b). *Buchanan*, 508 F.2d at 262-63. The Rule "do[es] not directly affect the provision of postal services"; rather, it "encompass[es] preparation and documentation requirements that are within the control of the states and, if adhered to, will not disturb the acceptance, processing, transmission or delivery of Federal Ballot Mail." 91 Fed. Reg. at 54,976. Put simply,

there will be no impact for "the experience of the individual postal consumer," who is the relevant "intended beneficiary of the policies incorporated by § 3661." *Pennsylvania v. DeJoy,* 490 F. Supp. 3d 833, 885 (E.D. Pa. 2020).

**e. Voting Rights Act.** Plaintiffs argue that the Final Rule violates the Voting Rights Act, in particular the provision that provides that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote[.]" 52 U.S.C. § 10307(a). For starters, there is no private right of action to enforce that provision of the Voting Rights Act. *See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("Without [statutory authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."); *see also Schilling v. Washburne*, 592 F. Supp. 3d 492, 499 (W.D. Va. 2022) (no private right of action to enforce 52 U.S.C. § 10307(b)).

Regardless, the Final Rule is entirely consistent with that provision of the Voting Rights Act. The Rule explains repeatedly that the names provided by each State will "be listed by and at the discretion of election officials, and the Postal Service will not second-guess the states' submissions." 91 Fed. Reg. at 54,969. In other words, "State election officials will . . . retain full control over who is permitted to vote in federal elections in their state by U.S. mail." *Id.* So the Postal Service will never be "refus[ing] to permit" anyone to vote who is "otherwise qualified to vote" according to their own State election officials. 52 U.S.C. § 10307(a). The question of who can and cannot vote will be—both before and after the Rule—up to State election officials to decide.

**f. Privacy Act.** Finally, the *California* Plaintiffs argue that the Postal Service has violated the Privacy Act. But injunctive relief is generally unavailable under the Privacy Act, except in limited circumstances that Plaintiffs do not even argue are applicable here. *See, e.g.*, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs."). And organizations (rather than individuals) are not entitled to *any* relief under the Privacy Act. *See* 5 U.S.C. § 552a(g)(1)(D) (authorizing a cause of action for adversely affected "individuals"); *id.*

§ 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence.").

To be sure, in recent years, litigants have often tried (and sometimes succeeded) in evading these limitations by bringing APA claims predicated on alleged violations of the Privacy Act. *See, e.g.*, *Heritage Found. v. DOJ*, 2026 WL 1766549, at *3 (D.D.C. June 19, 2026) (noting that "the availability of injunctive relief under the APA" to remedy a Privacy Act violation "is an unsettled question with which other courts are actively wrestling" (citation omitted)), *appeal filed*, No. 26-5235 (D.C. Cir. June 23, 2026). The government's longstanding position is that this maneuver is inconsistent with Congress's judgments in the Privacy Act itself. *See, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175 (4th Cir. 2025) ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026). Regardless, that workaround is plainly inapplicable in this case, because the Postal Service is not subject to APA litigation in the first place. *See* 39 U.S.C. § 410(a). Plaintiffs' Privacy Act claims fail on threshold grounds.

On the merits, the Final Rule does not resemble anything like "creat[ion] a surveillance program to track voting" that would violate the Privacy Act. *California* PI Br. at 16. And the Rule is not about "collecting records of voters' First Amendment activity." *Id.* So the Privacy Act claims would also fail for that reason.

## II. THE EQUITABLE FACTORS DISFAVOR INJUNCTIVE RELIEF.

Plaintiffs' motions should also be denied because the balance of equities and the public interest disfavor enjoining USPS from implementing modest informational requirements on senders of outbound federal ballot mailings. "In exercising [its] sound discretion," the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Here, both "the balance of equities and consideration of the overall public interest in this case tip

strongly in favor of" USPS. *Id.* at 26; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (harm to others and public interest factors "merge when the Government is the opposing party").

"Ballot mail presents unique considerations" for the Postal Service. 91 Fed. Reg. at 54,968. "From an operational standpoint, the Postal Service deploys special practices on a nationwide basis for the processing and delivery of ballot mail," including "the use of extraordinary measures during the period surrounding federal general elections to accelerate the delivery of return ballot mail beyond the Postal Service's typical operations when its employees are able to identify a mailpiece as a ballot." *Id.* "The use of the U.S. Mail to vote also implicates federal interests regarding whether the postal system is being used in a manner that is consistent with federal law, including those laws governing who is allowed to vote in federal elections." *Id.* Thus, the Postal Service should be allowed to implement the "actions deemed necessary to ensure the faithful execution of federal law and enhance the efficiency of postal operations." *Id.* at 54,968–69.

For example, the Rule converts "several of the Postal Service's longstanding mailpiece design preparation recommendations"—such as "the Official Election Mail logo, automation-compatible envelope design, uniquely serialized IMbs on outbound and return envelopes, and mailpiece design review"—into "required elements for Federal Ballot Mail." *Id.* at 54,978. By "mak[ing] these proven measures a consistent baseline for every jurisdiction that mails federal ballots," the Postal Service will "clos[e] the patchwork that today inhibits mailpiece visibility and can make it more difficult to process and deliver ballot mail." *Id.* In short, these "design requirements help to ensure timely processing and delivery of Federal Ballot Mail." *Id.*

Additionally, the Final Rule's "data reporting and mail-preparation requirements" will place "law enforcement in a better position to identify any potential issues regarding compliance with federal law that may merit further investigation," *id.* at 54,985, and "strengthen public confidence" in voting by mail, *id.* at 54,986. Indeed, the Postal Service found the "visibility and law-enforcement benefits" so significant, "including for" the November 2026 "election cycle, are such that there [wa]s no compelling reason for any delay" in the Rule's effective date. *Id.* at 54,985. To thwart the Postal Service from uniformly implementing these beneficial practices, as Plaintiffs

want, necessarily harms the interests furthered by the Final Rule. *Cf. California*, 2026 WL 2473573, at *5 (recognizing irreparable "harm" to the government when an "injunction meddles in the workings of the Executive Branch" and "prevent[s] it from even trying to lawfully implement the Order").

On the other side of the ledger, Plaintiffs have not clearly shown they will suffer immediate, irreparable harm unless the Court grants extraordinary relief. *See Winter*, 555 U.S. at 20; *Mazurek*, 520 U.S. at 972. The *California* Plaintiffs assert that the Final Rule interferes with their sovereign power to prescribe elections law. *California* PI Br. at 20. But in reality, "states will retain control over the manner of their elections, unaltered by the" Final Rule. 91 Fed. Reg. at 54,985. "The [R]ule requires merely that [S]tates that choose to use the U.S. mail as part of their elections adhere to certain standard mailpiece design and data reporting standards when sending Federal Ballot Mail." *Id.*; *see also id.* at 54,969. And "establishing a standardized set of mailpiece design requirements for" a category of mail "lies within the Postal Service's authority." *Id.* at 54,969. There is no harm to a State's sovereignty when, if it chooses to use mail service offered by the federal government, it must comply with basic requirements placed on the provision of that service.

Next, the State Plaintiffs object to "diverting scarce time and resources" to comply with the Final Rule before the November 2026 general election. *California* PI Br. at 22. That ignores how "the Postal Service will make available considerable educational and other support resources . . . to assist election officials with implementation and help facilitate timely compliance." 91 Fed. Reg. at 54,985; *see also id.* at 54,974 ("[A]mple resources are available to assist states with ballot mail envelope design, should such assistance be required."). Given that USPS support, significant "conjecture" is necessary to conclude that the State Plaintiffs still will suffer irreparable harm from the Rule. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).[5]

[5] Further, respectfully, the TRO Order's statement that "the Final Rule includes no deadline or contemplated turn-around time for USPS approval of submitted mail ballot envelopes" is not correct. TRO Order at 9. The Final Rule states that "[USPS Mailpiece Design Analysts] typically aim to provide feedback to mailers within 2 business days after receiving the mailer's request and necessary information and samples." 91 Fed. Reg. at 54,979.

Indeed, the State with the earliest deadline for sending out mail ballots—and thus the least amount of time to come into compliance—apparently has no concerns. In a public statement made earlier this week (before this Court's TRO order), the North Carolina State Board of Elections announced that the State had begun taking steps to comply with the Rule, and that it "is confident that the county boards of elections plan to send out absentee ballots to North Carolina voters who have requested them for this election, starting September 4, as required by state law, will happen flawlessly and smoothly." Jen Rice, Democracy Docket, *Facing time crunch, North Carolina takes first step to comply with new USPS mail voting rule while fighting it* (Aug. 27, 2026), https://perma.cc/SFB6-PAVD. The grave concerns expressed by Plaintiff North Carolina's litigation counsel seem not to be shared by Plaintiff North Carolina's actual election officials.

As for the organizational Plaintiffs, *see LWVMA* PI Br. at 13–18, they have not clearly shown irreparable harm to either themselves or their members for the same reasons why they lack standing. "A finding of irreparable harm must be grounded on something more than conjecture," but that is all they have here. *Charlesbank Equity*, 370 F.3d at 162. And whatever resources the organizations use to inform the public about the Final Rule would be in service of, not a diversion from, their missions to educate voters. Thus, Plaintiffs have not established the irreparable harm necessary to obtain extraordinary relief.

Finally, the equities favor continued steps toward compliance with the Rule. Additional injunctive relief from this Court risks deterring States from voluntary compliance, which could well end up causing additional harm if an appellate court later stays or vacates the order, at which point the Rule's requirements could again become mandatory with even less time to comply—a worse outcome both for the Postal Service and for the Plaintiff States.

## III. PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.

If the Court finds Plaintiffs have carried their burden for interim relief, it should still decline to enter the sweeping injunction proposed by Plaintiffs. Consistent with "the party-specific principles . . . of equity," any injunction must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 844, 861 (2025).

Because the organizational Plaintiffs lack standing, any preliminary injunction should not address them, their interests, or their members.

As to the State Plaintiffs, they would receive complete relief from an injunction against the operation of Domestic Mail Manual 705.24.5.3, which precludes USPS from accepting mailings that do not comply with DMM 705.24.5.1 and 705.24.5.2. That would fully resolve the State Plaintiffs' ultimate concern: that the Postal Service will not accept or deliver a State's ballot mail if that State cannot or does not comply with the Final Rule. Under such an injunction, the Rule could otherwise go into effect, but such mail still would be accepted and delivered by USPS regardless of compliance with the Rule.

A bar on implementation of any other portions of the Final Rule would be "more burdensome to the [government] than necessary." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). For instance, some States may wish to comply voluntarily with the Rule. There is no reason for the Court to prohibit the Postal Service from assisting those States, such as by operating the Federal Ballot Mail Portal or reviewing ballot envelope designs. Those voluntary compliance efforts inflict no injury on the State Plaintiffs and thus need not be enjoined by the Court—as the Court implicitly recognized in similarly limiting its TRO order. *See* Defs.' Notice of Compliance. And those efforts could ultimately prove beneficial to all, including Plaintiffs, if any new preliminary injunction from this Court is stayed or reversed on appeal.

Finally, the State Plaintiffs wrongly suggest this Court could stay the Rule's effective date under the APA, 5 U.S.C. § 705. *California* PI Br. at 28. Postal Service actions are "exempt from review under the Administrative Procedure Act," *Mittleman*, 757 F.3d at 305 (citing 39 U.S.C. § 410(a)), with the exception of certain "proceedings concerning the mailability of matter," 39 U.S.C. § 3001(m). As explained above, the Rule is not such a proceeding. *See id.* §§ 3005, 3007, 3012(c) (examples of proceedings). Thus, there is no basis for the Court to review, much less stay, the Rule under the APA—and certainly not on any theory other than Plaintiffs' mailability theory.

## **CONCLUSION**

For these reasons, Plaintiffs' motions for a preliminary injunction should be denied.

Dated: August 29, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
Chief Litigation Counsel (FL Bar 1041279)
MICHAEL S. POLITO
Trial Attorney (DC Bar 90041172)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov