**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | ) | No. 26-cv-11549-IT |
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | ) | No. 26-cv-13917-IT |

**BRIEF *AMICUS CURIAE* OF THE SOCIETY FOR THE RULE OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

**LEAVE TO FILE GRANTED ON AUGUST 28th, 2026**

Inga Bernstein
Zalkind Duncan & Bernstein LLP
2 Oliver Street, Suite 200
Boston, MA 02109
(617) 742-6020
ibernstein@zalkindlaw.com

Richard D. Bernstein*
1875 K Street NW, Suite 100
Washington, DC 20006
(301) 775-2064
*Motion for Pro hac vice pending
*Counsel for Amicus Brief*

August 31, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………………………………….. i

TABLE OF AUTHORITIES ........................................................................................ii

INTEREST OF *AMICUS CURIAE*…………………………………………………… 1

INTRODUCTION AND SUMMARY OF ARGUMENT…………………………………… 1

ARGUMENT……………………………………………………………………………… 2

I. The Constitution And Federal Election Statutes Preclude The USPS From Using Non-Election Provisions In Title 39 To Require Voter Lists, Restrict Ballot Delivery, Or Restrict Absentee Balloting ........................................................................2

A. HAVA ........................................................................................4

B. NVRA ........................................................................................7

C. VRA ........................................................................................8

II. The USPS Rule Also Violates Title 39 Provisions That Deny The USPS Any Authority To Require Voter Lists, Impose A New Ballot Delivery System, And Restrict Absentee Balloting ........................................................................8

III. Constitutional And Statutory Design, Structure, And History Confirm That USPS Has No Rulemaking Powers Concerning Voter Lists, Restricting The Delivery Of Paper Ballots, And Restricting Absentee Balloting ............................................12

IV. Clear Statutory Authorization Is Required And Wholly Absent ..................................... 15

A. Federalism Presumption ........................................................................15

B. The Major Questions Doctrine ........................................................................16

V. *Purcell* Does Not Immunize The Belated USPS Rule ................................................... 20

CONCLUSION……………………………………………………………….. 22

## TABLE OF AUTHORITIES

Page(s)

Cases

*Arizona v. Inter Tribal Council of Arizona, Inc.,*
570 U.S. 1 (2013) .....16
*Biden v. Nebraska*,
600 U.S. 477 (2023) ..... 18, 20
*Bond v. United States*,
572 U.S. 844 (2014) .....16
*Bost v. Illinois Board of Elections*,
607 U.S. 71 (2026) .....17
*Chamber of Commerce of the United States v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .....3
*Chiafalo v. Washington,*
591 U.S. 578 (2020) ..... 17, 20
*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) .....5
*DSCC v. Trump*,
2026 WL 2168617 (D.C. Cir. July 28, 2026) .....21
*Esteras v. United States*,
606 U.S. 185 (2025) .....5
*Fourco Glass Co. v. Transmirra Prods. Corp.,*
353 U.S. 222 (1957) .....9
*Gonzales v. Oregon,*
546 U.S. 243 (2006) .....17
*Hannegan v. Esquire, Inc.*,
327 U.S. 146 (1946) .....9
*Heffernan v. City of Paterson*,
578 U.S. 266 (2016) .....19
*Husted v. A. Philip Randolph Institute*,
584 U.S. 756 (2018) .....6
*Jarecki v. G.D. Searle & Co.*,
367 U.S. 303 (1961) ..... 10, 15
*Learning Resources*, *Inc. v. Trump*,
607 U.S. 229 (2026) ..... 13, 17, 18, 19
*Moore v. Harper*,
600 U.S. 1 (2023) .....3
*NAACP v. United States Postal Serv.,*
No. 26-5257, 2026 WL 2168004 (D.C. Cir. July 17, 2026) .....2
*National Federation of Independent Business v. OSHA,*
595 U.S. 109 (2022) .....14
*Powell v. McCormack*,
395 U.S. 486 (1969) .....17

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ..... 21
*Scott v. McDougle*,
930 S.E.2d 332 ..... 21
*Shelby County v. Holder,*
570 U.S. 529 (2013) ..... 15
*Slack Technologies, LLC v. Pirani*,
598 U.S. 759 (2023) ..... 5
*Trump v. Barbara*,
146 S. Ct. 2438 (2026) ..... 13
*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) ..... 2
*United States v. Classic*,
313 U.S. 299 (1941) ..... 20
*United States v. Comstock,*
560 U.S. 126 (2010) ..... 16
*United States v. Gradwell*,
243 U.S. 476 (1917) ..... 15, 16
*United States v. Rahimi*,
602 U.S. 680 (2024) ..... 13
*United States v. Town of Thornapple*,
143 F.4th 793 (7th Cir. 2025) ..... 7
*Watson v. Republican Nat'l Comm.,*
146 S. Ct. 2165 (2026) ..... 4, 11, 12
*West Virginia v. EPA*,
597 U.S. 697 (2022) ..... passim
*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ..... 17

Statutes

1 Stat. 239 (1792) ..... 14
16 Stat. 433 (1871) ..... 14
28 Stat. 36 (1894) ..... 14
56 Stat. 753 (1942) ..... 14
79 Stat. 437 (1965) ..... 15
120 Stat. 577 (2006) ..... 15
120 Stat. 3198 (2006) ..... 15
2 U.S.C. §§ 1-9, 381-96 ..... 14, 18
3 U.S.C. §§ 1-22 ..... 14, 18
18 U.S.C. §§ 592-611 ..... 14, 18
39 U.S.C. § 401 ..... 15
39 U.S.C. § 401(2) ..... 10, 12, 16, 18
39 U.S.C. § 404(e)(2) ..... 12
39 U.S.C. § 3001(g)(2) ..... 10
39 U.S.C. § 3001(n)(1) ..... 10
39 U.S.C. §§ 3001-18 ..... 2, 9, 12

39 U.S.C. §§ 3001(a) and 3003(a) .......... 11
39 U.S.C. §§ 3001(g)(2), 3001(h)(1)(b), 3001(i)(1)(b), 3001(n)(1), 3002(b), 3014(c), 3018(a)&(b)(1) .......... 10
52 U.S.C. § 10502(b)-(f) .......... 8
52 U.S.C. § 10502(g) .......... 8
52 U.S.C. §§ 20506(a)(1), 20507(a) .......... 7
52 U.S.C. §§ 20507(d), 20984(a)(1)(B)(ii) .......... 6
52 U.S.C. § 20508(a)(1)-(3) .......... 7
52 U.S.C. § 21081(a) .......... 7
52 U.S.C. § 21081(b)(2)(E) .......... 7
52 U.S.C. § 21082 .......... 19
52 U.S.C. § 21083(a)(1)(A) .......... 6
52 U.S.C. § 21084 .......... 4, 5
52 U.S.C. § 21145(a) .......... 1, 4, 5, 9

Other Authorities

2 The Records of the Federal Convention of 1787 (M. Farrand ed., 1911) .......... 13
91 Fed. Reg. 32915-16 .......... 4
DMM 705.24.5 .......... 7
Executive Order 14399 .......... 1
Federalist No. 39… .......... 17
Federalist No. 51… .......... 17
H.R. 22 (2025) .......... 18
H.R. 7296 (2026) .......... 18
H.R. 7300 (2026) .......... 18
H.R. 8281 (2024) .......... 18
H.R. Rep. No. 107-329 .......... 6
Merriam-Webster Dictionary… .......... 6
National Conference of State Legislatures, Challenges to Voter Eligibility, Table 2: Challenge Processes… .......... 20

## INTEREST OF *AMICUS CURIAE*

*Amicus* The Society for the Rule of Law and Democracy, Inc., doing business as The Society for the Rule of Law ("SRL") is a national non-profit, non-partisan membership organization of conservative, libertarian, and right-of-center-lawyers, and others, who are dedicated to defending the legal principles of the rule of law, separation of powers, and federalism.[1] SRL has an interest in seeing that the United States Postal Service does not violate these principles by violating the Constitution, federal election statutes, and multiple provisions of Title 39.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Without covering every basis to enjoin the USPS rule directed by Executive Order ("EO") 14399, this brief focuses on five reasons. Part I shows that the election provisions of the Constitution and federal election statutes preclude the USPS rule. The Help America Vote Act of 2002 ("HAVA"), the National Voter Registration Act of 1993 ("NVRA"), and the Voting Rights Act Amendments of 1970 withhold from the USPS *any* regulatory role concerning any voter list, imposing a new requirement for the delivery of paper ballots, or restricting absentee ballots. Indeed, in 52 U.S.C. § 21145(a) in HAVA, Congress precluded the USPS from using the Title 39 non-election provisions on which defendants rely to regulate those topics.

Part II shows that non-election provisions of Title 39 also preclude the USPS rule. In particular, defendants concede that Congress has withheld from the USPS any authority to create a new category of unmailable items. The text of 39 U.S.C. §§ 3001-18 shows that a rule like the

[1] All parties have consented to filing this *amicus* brief. *Amicus* states that no counsel for any party authored this brief in whole or in part, and that no entity, aside from *amicus* and its counsel, made any monetary contribution toward the preparation or submission of this brief. The views of SRL do not necessarily represent the views of all individual members.

USPS's new mail-in rule that prohibits delivery of a category except for those items that satisfy USPS regulations *is a classic nonmailability rule*. Indeed, the nonmailability statutory sections use that approach nine times for categories from fragrance advertising samples to hazardous materials. But never for election mail. And that is what the USPS rule illegally does.

Part III discusses how constitutional and statutory design, structure, and history further support that Congress has withheld authority from the USPS to regulate the election topics here: voter lists, delivery requirements for paper ballots, and restricting absentee balloting.

Part IV shows that an additional reason why the USPS rule is unauthorized is that federalism and the major question doctrine would require a clear statement or clear authorization. Those are sorely lacking here for Title 39's non-election provisions.

Part V shows that if defendants raise the argument that the *Purcell* doctrine immunizes the application of the USPS rule to the 2026 elections, the Court should reject that argument, as the D.C. Circuit did.

## ARGUMENT

### I. The Constitution And Federal Election Statutes Preclude The USPS From Using Non-Election Provisions In Title 39 To Require Voter Lists, Restrict Ballot Delivery, Or Restrict Absentee Balloting

Although the purported authority for the USPS rule consists exclusively of non-election provisions in Title 39, the USPS rule is obviously an election rule. Indeed, the defendants prevailed on their prior argument that they needed to issue the final rule in order for the final rule to apply in the 2026 general election. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026) (per curiam); *NAACP v. United States Postal Serv.,* No. 26-5257, 2026 WL 2168004, at *1 (D.C. Cir. July 17, 2026) (quoting Mot. for Stay 24). The USPS rule is also

replete with purported election integrity justifications for the rule. 91 Fed. Reg. 54966-70. And it applies only to election mail.

Moreover, if as defendants contend, non-election provisions in Title 39 governed the envelope requirements for mail-in ballots and the verification of eligibility of mail-in voters because these are postal matters, that would imperil scores of state laws, including state laws requiring voters or witnesses to sign envelopes or have them postmarked by a certain date. States have authority over election issues, but only the federal government has authority over postal matters. Const., art. I, § 8, cl. 7.

So the place to start is the election provisions of the Constitution and federal election statutes. The USPS final rule is illegal and *ultra vires* because it contradicts those constitutional and "statutory limitations on [federal] governmental authority." *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996). The Elections and Electors Clauses confer all rulemaking authority relating to elections on the states, unless Congress by statute provides differently. This means that unless Congress confers a rulemaking power related to federal elections on a federal agency, only a state legislature—never a federal agency—may prescribe "everything from the date[s] on which voters go to the polls to the dimensions and font of individual ballots . . ., including regulations relating to . . . registration, supervision of voting, . . . prevention of fraud and corrupt practices, counting of votes, [and] duties of inspectors." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (quotations omitted). The clearest lack of federal agency authority occurs where, as here, federal election statutes expressly leave a rulemaking power with the states, without any suggestion that a federal agency may, by regulating under *non-election statutes,* impose or change rules relating to federal elections. In that circumstance, the Constitution and Congress necessarily withhold regulatory power relating to that election

topic from federal agencies. *See Watson v. Republican Nat'l Comm.,* 146 S. Ct. 2165, 2181 (2026) (federal election law extends "so far as it is exercised, and no farther") (quotations omitted).

The federal government has admitted that it lacks authority for its new mail-in ballot delivery restrictions to apply to "ballots covered under the Uniformed and Overseas Citizens Absentee Voting Act" because "UOCAVA is a separate federal statutory scheme with its own requirements." 91 Fed. Reg. 32915-16. But UOCAVA is actually part of a broader, integrated "federal statutory scheme with its own requirements" that also includes UOCAVA, HAVA, NVRA, and the Voting Rights Act ("VRA"). Indeed, HAVA both expressly integrates all of HAVA, UOCAVA, NVRA, and the VRA, and excludes using the Title 39 non-election provisions on which defendants rely to make election rules. *See* 52 U.S.C. § 21145(a); *infra*, at 4-6. This integrated scheme covers all federal ballots in all federal elections, often as here by allocating regulatory authority exclusively to the states. As Part II.A-C demonstrates, in HAVA*,* NVRA, and the Voting Rights Act Amendments of 1970, Congress specifically withheld from the USPS any rulemaking role concerning any voter list, system specifically for delivering paper ballots, or absentee ballot restriction. This withholding by itself refutes any argument that the USPS may use non-election provisions in Title 39 as authority for its recent election rule.

### A. HAVA.

52 U.S.C. § 21084 provides that "a *State*"—not a federal agency—may "establish[] election technology and administration requirements that are more strict than the requirements under this subchapter" provided that the stricter "State requirements" are not inconsistent with the "Federal requirements" of HAVA "or any law described in section 21145 of this title." (Emphasis added.) 52 U.S.C. § 21145(a) not only lists those federal laws, it also makes clear

that HAVA supersedes, limits, and restricts the non-election Title 39 provisions on which defendants rely. Section 21145(a) states that "nothing in this chapter may be construed to authorize or require conduct prohibited under any of *the following laws*, or to supersede, restrict, or limit the application of *such laws*." (Emphases added.) The six, specified, saved federal statutes that comprise "the following laws" and "such laws" are UOCAVA, the VRA, and NVRA, the Voting Accessibility for the Elderly and Handicapped Act and two primarily non-election statutes, the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973. *Id.*

Both "such laws" and "the following laws" are narrowing phrases. *See Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799, 817 (2024) ("the" "focuses on a specific" thing"); *Slack Technologies, LLC v. Pirani*, 598 U.S. 759, 767 (2023) ("'such' … narrows the law's focus"). This means that on election topics addressed by HAVA, the application of statutes other than "the following" six specified statutes *is* superseded, restricted, and limited by HAVA. Section 21145(a) *omits* all the Title 39 provisions on which the defendants rely from the series of six statutes that § 21145(a) saves from HAVA's superseding and restrictions and limits. Under the "well established canon of statutory interpretation: *expressio unius est exclusio alterius*," *Esteras v. United States*, 606 U.S. 185, 195 (2025), 52 U.S.C. §§ 21084 and 21145(a) prevent the federal executive branch from using omitted Title 39 non-election provisions to establish stricter requirements on HAVA topics. "Indeed, the *expressio unius* canon has particular force here because the" six preserved federal statutes in § 21145(a) "constitute an 'established series,' such that any 'omission' from that series necessarily 'bespeaks a negative implication.'" *Esteras*, 606 U.S. at 195 (citation omitted). Congress here "exclude[d] another [provision] left unmentioned." *Id.* (quotations omitted).

This exclusion of non-election statutory provisions including those in Title 39 was deliberate. It matches a central HAVA purpose that state and local administration of federal elections "must be preserved" so that it remains "*impossible* for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001) ("HAVA Report") (emphasis added).

The USPS rules violates HAVA in two ways. The first is by imposing on states a new voter list. As "enrolled" and "Participation List" in the USPS rule indicate, each USPS Mail-In and Absentee Participation List would be a new voter list that the USPS both imposes and would administer to block the casting of potential mail-in votes. Indeed, "enrolled" and "registered" are synonyms. *Enrolled*, Merriam-Webster, www.merriam-webster.com/dictionary/enrolled (last visited April 10, 2026); *Registered*, Merriam-Webster, https://www.merriam-webster.com/dictionary/registered (last visited April 10, 2026). HAVA, NVRA, and the Supreme Court describe voter lists as "voter *rolls*." 52 U.S.C. §§ 20507(d), 20984(a)(1)(B)(ii) (emphasis added); *Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 781 (2018) (emphasis added).

But HAVA directs that "a *single*, . . . official . . . statewide voter registration list" for each state be "defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A) (emphasis added). This "computerized list shall serve as *the single system* for storing and managing *the official list* of registered voters throughout the State" and "shall serve as *the official voter registration list* for the conduct of all elections for Federal office in the State." *Id.* § 21083(a)(1)(A)(i), (viii) (emphases added). The USPS rule illegally uses Title 39 non-election provisions to impose a second federally mandated statewide voter list for each state, *i.e.*, a list of those registered to vote by mail. Under the USPS rule, a state cannot have *any* mail-in voting

unless the state has a "List" of those voters submitted through a USPS portal, and then only for voters verified by the USPS as on the "List." DMM 705.24.5. The USPS rule thus violated HAVA by using Title 39 to impose and have the USPS administer new voter lists.

Second, 52 U.S.C. § 21081(a) establishes the only federal "requirements" for "[e]ach voting system used in an election for Federal office." The term "voting system" includes "the practices and associated documentation used . . . to make available any materials to the voter (such as notices, instructions, forms, or *paper ballots*)." 52 U.S.C. § 21081(b)(2)(E) (emphasis added). Every method used for "paper balloting" is a "voting system" under HAVA. *United States v. Town of Thornapple*, 143 F.4th 793, 798-99 (7th Cir. 2025).

Certainly, the documentation and practices used for delivering paper ballots to mail-in voters, including mailing and envelopes, constitute a "voting system." Here, under the USPS rule, the barcoded Outbound Federal Ballot Mail Envelopes, portal information, and Mail-in and Absentee Participation List, singly and combined, constitute a new, more restrictive "voting system" because they are documentation and practices used to make notices, instructions, forms, and mail-in paper ballots available to *fewer* voters. Therefore, the USPS rule illegally used Title 39 to impose more restrictive federal requirements for delivery of mail-in paper ballots in violation of HAVA.

**B. NVRA.**

NVRA charges only *state* agencies with "the registration of voters in elections for Federal office" and "the *administration* of voter registration for elections for federal office." 52 U.S.C. §§ 20506(a)(1), 20507(a) (emphasis added). 52 U.S.C. § 20508(a)(1)-(3) limits the federal authority to issue "regulations" on NVRA topics to the Election Assistance Commission, and one subject – "a mail voter registration application form." The NVRA withheld all

rulemaking authority from USPS concerning making and administering voter lists.

**C. VRA.**

The Voting Rights Act Amendments of 1970 confirm that, as in HAVA and NVRA, although Congress sometimes permits states to vary from federal statutory baseline requirements regarding a voting process, Congress has never permitted federal agencies to add requirements. 52 U.S.C. § 10502(b)-(f) set forth federal standards that require states to make available "absentee balloting in presidential elections." Most important, 52 U.S.C. § 10502(g) allows "any *State* or political subdivision" to "adopt[] *less restrictive* voting practices than those that are described herein." (Emphasis added.) Unlike subsections (b)-(f) of § 10502, subsection (g) does not refer to presidential elections and thus reflects that the absentee balloting authority allocated to the states is *not* limited to presidential elections. The executive branch is not allowed to adopt more restrictive practices, nor even less restrictive practices. As the USPS rule adopts more restrictive practices for absentee balloting, it is illegal.

**II. The USPS Rule Also Violates Title 39 Provisions That Deny The USPS Any Authority To Require Voter Lists, Impose A New Ballot Delivery System, And Restrict Absentee Balloting.**

The Title 39 non-election provisions on which defendants rely cannot save the USPS rule for at least five independently sufficient reasons. First, under the Electors and Elections Clauses, where Congress expressly has left regulatory authority on election issues with the states, the USPS lacks regulatory authority to use non-election provisions to impose new or different rules for federal elections. *Supra*, at 3-4. Congress left with the states all regulatory authority concerning voter lists, imposing new or changed requirements for the delivery of paper ballots to voters, and restricting absentee balloting, but the USPS rule illegally purports to regulate all three. *Supra*, at 4-8.

Second, 52 U.S.C. § 21145(a) precludes use of any of the Title 39 non-election provisions on which defendants rely to regulate concerning voter lists, imposing new requirements for the delivery of paper ballots to voters, or restricting absentee balloting. All of which the USPS rule illegally does. Part I.A, *supra*.

Third, the USPS rule applies only to elections. Under the canon that the specific statute governs the general, it is only the federal election statutes that could give federal agencies authority to regulate elections, not the postal statutes that do not mention elections. *See Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222, 228–29 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling.")

Fourth, the USPS cannot by rule create a new nonmailable category and that is what the USPS rule does. 39 U.S.C. §§ 3001-18 specify *all* the categories that are "nonmailable." "The postal laws make a clear-cut division between mailable and nonmailable material." *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 152 (1946). The "power" to make nonmailability rules "has been zealously watched and *strictly confined*" by Congress. *Id.* at 156 n. 18 (emphasis added).

Defendants do not and could not argue that any of the Title 39 provisions on which they rely authorize a nonmailability rule for any ballots sent by mail. Instead, they argue that conditioning the acceptance of an entire category of items for mailing on satisfying regulations imposed by USPS is not a nonmailability rule. The statutory nonmailability provisions foreclose this argument. Although some statuory nonmailability bans are absolute, at least nine statutory nonmailability provisions take an indistinguishable approach from DM 705.24.5-1 to 705.24.5.3 in the USPS rule. As here, those nine statutory nonmailiability provisions bar the mailing of a category of items except when a sender satisfies the conditions set by the USPS in regulations, including conditions about what is on the envelope, thereby rendering items that do not meet the

USPS regulatory conditions nonmailable. *See* 39 U.S.C. §§ 3001(d)(2), 3001(g)(2), 3001(h)(1)(b), 3001(i)(1)(b), 3001(n)(1), 3002(b), 3010(a), 3014(c), 3018(a)&(b)(1). This is how the statute renders nonmailable some but not all fragrance advertising samples, solicitations for certain purchases and contributions, motor vehicle master keys, certain advertisements, plants, and even hazardous materials. For example, 39 U.S.C. § 3001(g)(2) states: "The Postal Service shall by regulation establish the standards or requirements which a fragrance advertising sample must satisfy in order for the mail matter involved not to be considered nonmailable under this subsection." *See also* 39 U.S.C. § 3001(n)(1) ("Except as otherwise authorized by law or regulations of the Postal Service, hazardous material is nonmailable."). Despite the absence of any such statutory authority for the USPS to make some election mail nonmailable, the USPS rule takes exactly the same nonmailability approach for Outbound Federal Ballot Mail—barring all such mail unless the USPS regulatory conditions are satisfied.

It is inconceivable that Congress used this form of nonmailability in nine specific statutory nonmailability provisions if the USPS had the authority to use other, general, indeed boilerplate provisions like 39 U.S.C. § 401(2) ("the boilerplate provisions") to impose the exact same requirements for the items in those nine superfluous nonmailability provisions. Indeed, by the logic of the defendants' arguments, they could use the boilerplate provisions to impose similar requirements to render nonmailable *every* conceivable category of items except for those items that satisfy the USPS regulatory conditions. As the Supreme Court has asked rhetorically: "If there is a big hole in the fence for the big cat, need there be a small hole for the small one?" *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

The narrow statutory nonmailability provisions, not any assertedly broad boilerplate provision, are the exclusive places where Congress gives the USPS authority to bar mailing of

items in any category that do not meet the regulatory conditions that the USPS imposes. And Congress omitted any such authority over election mail from the statutory nonmailability provisions. The USPS should offer its purported policy justifications for changing the law to "legislatures, not courts." *Watson*, 146 S. Ct. at 2179-80.

A future Administration could use the defendants' logic to condition mailing ballots on having the voter and a witness sign the envelope and having the envelope postmarked five days before the election. Or, because these topics would now be USPS matters, a future administration could override state-law signature and postmark date requirements. And so on.

Defendants cannot rely on the justification that the USPS is helping federal criminal investigations of non-citizen voting. Title 39 renders nonmailable items only when a sender's mailing *actually violates* one of ten *specified* criminal-law sections of other Titles. Title 39 does this by expressly cross-referencing in 39 U.S.C. §§ 3001(a) and 3003(a) an actual "violation" of one of that series of ten criminal-law sections. Mere investigation of one of the ten specified criminal statutes is never made a basis for nonmailability, much less when a sender is not violating the criminal provision.

Moreover, the USPS rule does not even purport to show how it enables investigation of any crime under any of those specified ten criminal-law sections. That is because none of those ten sections criminalizes non-citizens registering to vote or voting. Under the *expressio unius* canon, *supra*, at 5, even actual violations of those criminal-law sections that are *omitted* from Title 39's nonmailable sections are excluded from USPS's authority to block mailing. Much less to block USPS's acceptance of mail involving the vast majority of voters who are citizens and committing no crimes.

Fifth, not only do the Title 39 boilerplate provisions fail to provide an end-run around the

statutory limits on nonmailability, by their own terms they preclude the USPS rule. 39 U.S.C. § 401(2) bars the USPS from promulgating regulations that are "inconsistent with this title" or not "necessary in the execution of its functions under this title [or] such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." To start, the USPS rule is "inconsistent" with the nonmailability limits in 39 U.S.C. §§ 3001-18. *Supra*, at 9-11. It is also inconsistent with 39 U.S.C. § 404(e)(2), because each of imposing and administering new voter lists, modifying existing voting systems, and restricting absentee balloting is a "nonpostal service." HAVA, NVRA, and the VRA establish that these functions are the exclusive domain of a state legislature or Congress. *Supra*, Part I.A-C. *See Watson*, 146 S. Ct. at 2173, 2177 n. 8 (applying the "most rudimentary rule" of "the related-statute canon" to federal election law) (quotations omitted). This means that the USPS rule additionally violates the limit in Section 401(2) that regulations must be "necessary" to execute "functions" assigned to the USPS by statute.

## III. Constitutional And Statutory Design, Structure, And History Confirm That USPS Has No Rulemaking Powers Concerning Voter Lists, Restricting The Delivery Of Paper Ballots, And Restricting Absentee Balloting.

Start with constitutional design. *See Watson,* 146 S. Ct. at 2173 (making "th[e] interpretation of the election-day statutes . . . consistent with the way the Constitution treats elections"). The Constitution deliberately excluded the federal executive branch both from making election rules and administering such rules without statutory authorization. The founding generation had learned the lessons of the Glorious Revolution and the English Bill of Rights of 1689. A critical reason for both was that King James II and his agents attempted to subvert elections for Parliament by exercising control concerning election practices and voting. *See Harper v. Hall*, 866 S.E.3d 393, 434-37 (N.C. 2023) (reviewing history). Indeed, at the

Constitutional Convention, James Madison discussed the history where "the influence of the Crown was most dangerously exerted." 2 The Records of the Federal Convention of 1787, at 204 (M. Farrand ed., 1911). The Court has relied on the history of the Glorious Revolution and the English Bill of Rights in interpreting both our Constitution and limits on federal executive power. *See, e.g., United States v. Rahimi*, 602 U.S. 680, 694 (2024); *Trump v. Barbara*, 146 S. Ct. 2438, 2458 (2026); *Learning Resources*, *Inc. v. Trump*, 607 U.S. 229, 298 (2026) (Gorsuch, J., concurring).

As Justice Gorsuch recently explained, all Presidents have a "desire for more power." *Id.* at 270. The Constitution gave power over election rules to legislatures, rather than the federal executive branch, to give opportunity for "deliberation [to] temper[] impulse, and compromise hammer[] disagreements into workable solutions" that "tend to endure." *Id.* at 300. Giving power to "one man"– any President –to make the rules for *elections* "is no recipe for a republic." *Id.* at 271. As the HAVA Report stated, *supra*, at 5-6, our federalist election structure, designed by the Elections and Electors Clauses, fosters both the reality and appearance of election integrity by decentralizing election rules and their administration.

If the courts lifted the lid even a sliver, every two years every administration will scour the non-election statutes in the gargantuan U.S. Code—such as postal statutes—to find any potential hook to tilt or control every biennial federal election. The inevitable legal challenges each election cycle would drag federal courts "over and over again" into "one of the most intensely partisan aspects of American political life." *Rucho v. Common Cause*, 584 U.S. 718-19 (2019). Rather than creating "such an extraordinary and unprecedented" departure, *id.* at 719, for both the federal executive and judicial branches, the courts should keep those evils sealed in

the box in which the Elections and Electors Clauses put them 238 years ago by empowering only legislatures to make election rules.

Turn to statutory structure. Federal election statutes have regulated aspects of federal elections since 1791, *see* 1 Stat. 239 (1792), voter lists and voting practices since 1871, *see infra*, at 14-15, and voting by mail since at least 1942, ch. 561, § 9, 56 Stat. 753, 756 (1942). Congress has not been shy about exercising power concerning federal elections, but only in election statutes in the voluminous Title 52 and in extensive provisions expressly for federal elections in Titles 2, 3, and 18. *See* 2 U.S.C. §§ 1-9, 381-96; 3 U.S.C. §§ 1-22; 18 U.S.C. §§ 592-611. The elephant of any USPS rulemaking authority concerning voter lists, voting systems, or absentee balloting would never have been hidden for decades in a non-election mousehole in Title 39. *See National Federation of Independent Business v. OSHA,* 595 U.S. 109, 119 (2022) (*per curiam*); *id.* at 125 (Gorsuch, J., concurring).

Statutory history provides additional proof of Congress's deliberate denial of authority here to the USPS. When Congress twice gave limited power over a voter list or a voting system to federal nonjudicial officials, both times Congress did so in an election statute and later repealed that authority. In 1871, the Second Enforcement Act gave federal "supervisors of election" in larger cities and towns in House elections authority to "verify" and sometimes make voter "lists," inspect and scrutinize "the manner in which voting is done," and "prevent fraudulent registration and fraudulent voting" and "fraudulent conduct on the part of any officer of election." 16 Stat. 433, 434-36, 438 (1871). However, in 1894, Congress repealed *all* these statutory provisions. 28 Stat. 36, 36-37 (1894).

There is a second repeal. In 1965, Sections 6 and 7 of the original VRA authorized, in certified jurisdictions, the federal Civil Service Commission (CSC) to appoint examiners to place

an eligible voter "on a list of eligible voters" and "transmit" that partial list to state officials. 79 Stat. 437, 440 (1965). Section 9(b) gave the CSC authority to "prescribe[] . . . regulations" concerning the partial "eligibility lists." *Id.* at 441. In 2006, however, Congress *repealed* §§ 6, 7, and 9 of the original VRA. 120 Stat. 577, 580 (2006).

The Supreme Court relied on "the history" of the 1894 repeal to reject shoehorning into a non-election federal statute the kind of federal authority that had been withheld by Congress by repealing the prior federal statutes. *See United States v. Gradwell*, 243 U.S. 476, 479-85 (1917). Yet that is what the USPS rule attempts to do through its illegal use of Title 39 to engage in election rulemaking.

## IV. Clear Statutory Authorization Is Required And Wholly Absent.

As an alternative holding, the court should decide that clear authorization is required here. As shown in Parts I- III, *supra*, nothing the defendants cite in Title 39 comes remotely close.

### A. Federalism Presumption

The Title 39 provisions on which defendants rely are legislation enacted under the Postal Clause, *see* Postal Accountability and Enhancement Act, § 504, 120 Stat. 3198, 3235 (2006) (revising 39 U.S.C. § 401 to add the narrowing limitation "not inconsistent with this title"), *not* the Elections Clause. These Title 39 provisions do not even mention elections. Federalism and Tenth Amendment principles apply to "congressional" and other federal elections. *Shelby County v. Holder,* 570 U.S. 529, 543 (2013). Accordingly, those non-election Title 39 provisions must overcome the presumption that, absent a clear statement, a federal statute does not change the usual allocation of authority between the states and the federal government. *See*

*Bond v. United States*, 572 U.S. 844, 857-60 & n. 2 (2014).[2] It is certainly the usual allocation that states, not federal agencies, provide and administer voter lists, modify voting systems, and decide the restrictions on absentee balloting. *See* Parts I and III, *supra*.

The only exceptions were the 1871 and 1965 election statutes that were repealed in 1894 and 2006, respectively. *Supra*, at 14-15. The Supreme Court relied on "the history" of the 1894 repeal to interpret a different, non-election federal statute as lacking the "positive and clear" language necessary to regulate similar federal election topics. *United States v. Gradwell*, 243 U.S. 476, 479-85 (1917). Here, the Title 39 boilerplate provisions do not come close to the positive and clear language that *Bond* and *Gradwell* hold is necessary. *See* Parts II- III, *supra.*

**B. The Major Questions Doctrine**

Independently, the major questions doctrine also requires "clear congressional authorization," *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022), before any federal agency may be found to have authority concerning voter lists, voting systems, or absentee balloting. The core of the major questions doctrine is that courts "presume that Congress intends to make major policy decisions itself, not leave these decisions to agencies." *Id.* at 723 (quotations omitted). This reflects "both separation of powers principles and a practical understanding of legislative intent." *Id.* at 723-24. "[A] reasonable interpreter would not expect Congress to pawn . . . a big-

[2] There is an exception to this presumption for "Elections Clause legislation," that is, for statutes enacted "under the Elections Clause." *Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. 1, 13-15 & n. 6 (2013). But 39 U.S.C. § 401(2) is enacted under the Postal Clause. Likewise, all the criminal statutes cited as justification for the USPS final rule are also enacted under the Necessary and Proper Clause, *see United States v. Comstock,* 560 U.S. 126, 135-36 (2010), not the Elections Clause. In ruling that a federal statute that criminalized defrauding the United States did not apply to a case about a congressional election, *United States v. Gradwell* relied on the practice of Congress that "whenever it has assumed to regulate [congressional] elections it has done so by positive and clear statutes." 243 U.S. 476, 485 (1917).

time policy call . . . off to another branch." *Learning Resources, Inc. v. Trump,* 146 S. Ct. 628, 641 (2026) (plurality opinion) ("*Learning Resources* Plurality") (cleaned up). The decision as to what is a major question also reflects "constitutional structure and common sense." *Id.* at 639.

Nothing could fit the major questions doctrine better than whether a federal agency has been given federal statutory authority concerning elections by a non-election statute. That is because federal elections control who exercises federal legislative and federal executive power. Therefore, "the electoral process" is "of the most fundamental significance under our constitutional structure." *Bost v. Illinois Board of Elections*, 607 U.S. 71, 77 (2026). Indeed, elections are "preservative of all rights," including economic liberty. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

As James Madison explained in *Federalist* No. 39, elections make the federal government "a republic." Madison further explained in *Federalist* No. 51 that "[a] dependence on the people" through elections "is, no doubt, the primary control on the government." It is through elections that "here, We the People rule." *Chiafalo v. Washington,* 591 U.S. 578, 597 (2020).

The major questions doctrine is *not* limited to economic issues. *West Virginia,* 597 U.S. at 722, cited *Gonzales v. Oregon,* 546 U.S. 243 (2006), as a formative case in the major questions doctrine. *Gonzales* involved assisted suicide. Although assisted suicide is a profound issue, it is not an economic issue. Moreover, the major questions doctrine protects all the legislative powers vested in Congress. As the Elections Clause makes plain, the power over federal elections is a core congressional power. There is no basis to exempt that core power from the major questions doctrine. "There is no major questions exception to the major question doctrine." *Learning Resources* Plurality, 146 S. Ct. at 642.

Moreover, Congress has considered expanding federal power in proposed federal election statutes concerning voter lists, voting systems, and restricting absentee balloting. *See* SAVE Act, H.R. 8281, 118th Cong. (2024); SAVE Act, H.R. 22, 119th Cong. (2025); SAVE America Act, H.R. 7296, 119th Cong. (2026); Make Elections Great Again Act, H.R. 7300, 119th Cong. (2026). That Congress has so far not adopted these bills and expanded the federal role in these areas provides further reason to apply the major questions doctrine. *See West Virginia,* 597 U.S. at 731-32; *Biden v. Nebraska*, 600 U.S. 477, 503 & n. 8 (2023).

At the heart of election regulation are voter lists, voting systems, and the extent of absentee voting. They determine who votes and how they vote. But Congress in the NVRA, HAVA, and VRA has left the providing and administering of voter lists, the voting systems for delivering paper ballots to voters, and restricting absentee balloting to state officials. *See* Part I.A-C, *supra*.

Each of 39 U.S.C. § 401(2) and other Tile 39 non-election boilerplate provisions is the kind of "ancillary provision" or "gap filler" that is not sufficient to satisfy a clear statement or clear authorization rule. *West Virginia*, 597 U.S. at 724; *see also id*. at 723 ("modest words, vague terms, or subtle devices" do not suffice); *id.* at 732 ("a vague statutory grant is not close" to sufficient); *Learning Resources* Plurality, 146 S. Ct. at 642 ("delegations of core congressional powers" do not "lurk[] in ambiguous statutory text") (cleaned up). To the contrary, similar to tariffs, the history in 1871 and 1965, *supra,* at 14-15, shows that when Congress has delegated its power to federalize something concerning voter lists or voting systems, Congress has done so in the most explicit, detailed terms in an election statute. *See Learning Resources* Plurality, 146 S. Ct. at 639 ("When Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits.").

It further supports application of the major questions doctrine where an issue presents a policy choice and "[t]he basic and consequential trade-offs involved in such a choice are ones that Congress would likely have intended for itself." *West Virginia,* 597 U.S. at 730. The most fundamental policy choice here goes to the very structure of our republic. As the HAVA Report stated, *supra*, at 5-6, our federalist election structure, designed by the Elections and Electors Clauses, fosters both the reality and appearance of election integrity by decentralizing election rules and their administration. Further, a President's control concerning voting lists, voting systems, or absentee balloting, via the USPS, could be exercised to expand as well as contract the level of voting. "[I]n the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016). In our tit-for-tat world, a future Democratic President could order the USPS to restrict delivery of mail-in ballots to and from rural counties because they have higher mail theft rates and higher USPS costs.

Whether the federal government should impose or administer voter lists, modify a voting system, or restrict absentee balloting involves numerous policy choices of the kind that Congress usually makes. Congress has recognized that voter lists and voting systems produce errors, and Congress has required state processes that find and remedy such errors. *See* 52 U.S.C. § 21082 (requiring that voters missing from voter lists have the opportunity to cast provisional ballots). Such errors, when uncaught and unremedied, deprive eligible voters of their long-established constitutional rights to vote for members of Congress, *see United States v. Classic*, 313 U.S. 299, 314-18 (1941), and their rights to cast popular votes in presidential elections in all 50 states and D.C., *see Chiafalo*, 591 U.S. at 584-85. But the USPS rule has no provision requiring notice to a voter to learn about or fix errors, or an opportunity for the voter to challenge an omission or mistake.

The USPS has no expertise or history concerning voter lists, modifying voting systems, or restricting absentee balloting. *See West Virginia,* 597 U.S. at 730 (relying on an agency's lack of expertise as support for applying the major questions doctrine); *Biden*, 600 U.S. at 518 (Barrett, J., concurring) ("Another telltale sign that an agency may have transgressed its statutory authority is when it regulates outside its wheelhouse."). Having the USPS check envelopes against voter lists also would slow down the delivery of mail-in ballots to voters, thereby shortening the time given by state legislatures to those voters to consider and make their choices for federal, state, and local offices. In contrast, state voter list laws do not interfere with the timely delivery of mail-in ballots because they allow voter list issues to be resolved at the time of registration, or after the timely delivery of mail-in ballots, or both. *See* National Conference of State Legislatures, *Challenges to Voter Eligibility, Table 2: Challenge Processes* (last updated Feb. 19, 2026), https://www.ncsl.org/elections-and-campaigns/challenges-to-voter-eligibility.

Add to the policy choices involved in the USPS rule the uncompensated costs of the new tasks for the USPS. Like everyone else, Congress is well aware of the multi-decade funding problems of the USPS.

For all these reasons, the major questions doctrine requires clear authorization before any non-election Title 39 provision gives the USPS authority concerning voter lists, voting systems, or absentee balloting. That is sorely lacking here.

## V. *Purcell* Does Not Immunize The Belated USPS Rule.

Defendants previously have stated that they may well argue that *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), now makes it too late for a federal court injunction before the 2026 elections. As the D.C. Circuit already held, *DSCC v. Trump*, 2026 WL 2168617 (D.C. Cir. July 28, 2026), any such argument should be rejected. First, it would unprecedented for a federal

court to apply *Purcell* to allow any *federal* administration to change federal election rules without judicial review. Even when *Purcell* does apply to a federal court's potential injunction for a violation of federal law by a *state* executive official's newly-issued election rule, that does not mean the state official can violate its own state's law. *State courts* remain free to stop that state rule based on *state constitutional or statutory law*. The equivalent is equally true here. *Purcell* could not mean that a federal court must let anything go under federal law for belated federal executive branch election rules.

Second, *Purcell* is based on equity and it is not equitable for a rule's proponents to have their cake and eat it too. The defendants cannot be permitted to argue that now is too late to enjoin the USPS final rule after prevailing on their prior argument that any challenge before the final rule was unripe. For similar reasons, the Virginia Supreme Court recently held that merits review was fully available to invalidate a state constitutional amendment on redistricting after voters approved it, because the amendment's proponents had successfully opposed judicial review as unripe before the vote. *Scott v. McDougle*, 930 S.E.2d 332, 337-38 & nn. 13-14 (2026), *stay denied*, No. 25A1240 (U.S. May 15, 2026).

Third, the USPS could have issued the final rule for the 2028 elections at any time, thereby permitting a much earlier, ripe merits challenge. Indeed, while the injunctions from the District Court of Massachusetts were unstayed, the USPS published the final rule for 2028 and stated it would apply to 2026 if the injunctions were lifted. Equity should not reward defendants' tactical delay.

## CONCLUSION

The Court should enjoin the final rule.

Respectfully submitted,

/s/ Inga S. Bernstein
Inga S. Bernstein
Zalkind Duncan & Bernstein LLP
2 Oliver Street, Suite 200
Boston, MA 02109
(617) 742-6020
ibernstein@zalkindlaw.com

*Of Counsel:*

Richard D. Bernstein (Motion for admission *pro hac vice* forthcoming)
1875 K Street NW, Suite 100
Washington, DC 20006
(301) 775-2064

Dated: August 31, 2026