**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants,*<br>STATE OF MISSOURI, et al.,<br>*Intervenor-Defendants.* | No.: 1:26-cv-13917-IT |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND STAY**

## TABLE OF CONTENTS

**Page**

Introduction .......... 1
Argument .......... 2
I. Plaintiffs Have Shown that They Are Likely to Succeed on the Merits .......... 2
A. The Rule Violates the Separation of Powers by Regulating Mail Voting Without Congressional Authorization .......... 2
B. The Rule Creates an Unauthorized Category of Non-Mailable Matter, Violating USPS's Duty to Provide Universal Mail Services .......... 9
1. The Rule constitutes a mailability proceeding, subject to APA review .......... 9
2. The Rule is in excess of statutory authority, contrary to statute, and not in accordance with law .......... 11
3. The Rule is arbitrary and capricious .......... 14
C. The Rule Violates Various Statutes Governing USPS Operations .......... 16
II. USPS's Rule is Judicially Reviewable .......... 20
III. Plaintiff States' Imminent Irreparable Harm and the Public Interest Weigh Strongly in Favor of Injunctive Relief .......... 24
IV. The Court Should Not Reduce the Scope of Relief .......... 29
Conclusion .......... 30

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Aid Ass'n for Lutherans v. USPS*
321 F.3d 1166 (D.C. Cir. 2003) ........................................................................21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
458 U.S. 592 (1982)........................................................................................27

*Am. Sch. of Magnetic Healing v. McAnnulty*
187 U.S. 94 (1902)..............................................................................13, 21, 23

*Arizona v. Inter Tribal Council of Ariz., Inc.*
570 U.S. 1 (2013)..............................................................................................2

*Armstrong v. Exceptional Child Ctr., Inc.*
575 U.S. 320 (2015)........................................................................................20

*Axon Enter., Inc. v. FTC*
598 U.S. 175 (2023)........................................................................................23

*Biden v. Nebraska*
600 U.S. 477 (2023)..........................................................................................3

*Buchanan v. USPS*
508 F.2d 259 (5th Cir. 1975) ..........................................................................17

*Burlington Truck Lines, Inc. v. United States*
371 U.S. 156 (1962)........................................................................................16

*California v. Mullin*
833 F. Supp. 3d 50 (D. Mass. 2026) ..............................................................15

*California v. Trump*
___ F. Supp. 3d ___, 2026 WL 1826490 (D. Mass. June 25, 2026)..............................21

*City of Providence v. Barr*
954 F.3d 23 (1st Cir. 2020)..............................................................................14

*Collins v. Yellen*
594 U.S. 220 (2021)........................................................................................21

*Democratic Nat'l Comm. v. Wis. State Legislature*
592 U.S. 1039 (2020)..........................................................................................2

*DHS v. Regents of the Univ. of Cal.*
591 U.S. 1 (2020)..............................................................................14, 15, 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Doe v. Chao*
540 U.S. 614 (2004)....................23

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016)....................15

*Esteras v. United States*
606 U.S. 185 (2025)....................10

*Fish v. Kobach*
840 F.3d 710 (10th Cir. 2016)....................28

*Guerrero Orellana v. Moniz*
__ F.4th __, 2026 WL 2352042 (1st Cir. 2026)....................10

*Hannegan v. Esquire, Inc.*
327 U.S. 146 (1946)....................11

*Heritage Found. v. Dep't of Just.*
2026 WL 1766549 (D.D.C. June 19, 2026)....................23

*Humane Soc'y of U.S. v. USPS*
609 F. Supp. 2d 85 (D.D.C. 2009)....................9

*Kollett v. Harris*
619 F.2d 134 (1st Cir. 1980)....................11

*League of Women Voters v. U.S. Dep't of Homeland Sec.*
___ F. Supp. 3d ___, 2026 WL 1784297 (D.D.C. June 22, 2026)....................23

*League of Women Voters of Mass. v. Trump*
___ F. Supp. 3d ___, 2026 WL 2104006 (D. Mass. July 22, 2026)....................19, 23

*Learning Resources, Inc. v. Trump*
607 U.S. 229 (2026)....................3, 5, 6, 7

*Mass. v. HHS*
923 F.3d 209 (1st Cir. 2019)....................27

*Me. Forest Prods. Council v. Cormier*
586 F. Supp. 3d 22 (D. Me. 2022)....................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983)....................16

*N.H. Youth Movement v. Scanlan*
833 F. Supp. 3d 93 (D.N.H.)....................29

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*NAACP v. USPS*
2026 WL 1893762 (D.D.C. July 1, 2026)........................................................................6

*Nat'l Ass'n of Postal Supervisors v. USPS*
26 F.4th 960 (D.C. Cir. 2022)........................................................................21, 23

*Nat'l Council of Nonprofits v. McMahon*
__ F. Supp.3d __, 2026 WL 1876366 (D. Mass. June 30, 2026)....................................14

*New York v. McMahon*
784 F. Supp. 3d 311 (D. Mass. 2025)........................................................................21

*New York v. Trump*
181 F.4th 132 (D.C. Cir. 2026)........................................................................23

*Nuclear Regul. Comm'n v. Texas*
605 U.S. 665, 681 (2025)........................................................................21, 22

*Obama for Am. v. Husted*
697 F.3d 423 (6th Cir. 2012)........................................................................28

*Ohio v. EPA*
603 U.S. 279 (2024)........................................................................16

*Pennsylvania v. DeJoy*
490 F. Supp. 3d 833 (E.D. Pa. 2020)........................................................16, 17, 23

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
102 F.3d 12 (1st Cir. 1996)........................................................................27

*Ryan v. U.S. Immigr. & Customs Enf't*
974 F.3d 9 (1st Cir. 2020)........................................................................13, 14

*Trump v. California*
609 U.S. ___, 2026 WL 2473573 (U.S. Aug. 24, 2026)....................................20, 21, 28

*Trump v. Cook*
146 S. Ct. 2234 (2026)........................................................................20

*United States v. Hernandez-Ferrer*
599 F.3d 63 (1st Cir. 2010)........................................................................10

*USPS v. PRC*
599 F.3d 705 (D.C. Cir. 2010)........................................................................19

*Utility Air Regulatory Group v. EPA*
573 U.S. 302 (2014)........................................................................7

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Victim Rts. L. Ctr. v. Cardona*
552 F. Supp. 3d 104 (D. Mass. 2021)....................11

*Watson v. Republican Nat'l Comm.*
146 S. Ct. 2165 (2026)....................3, 6

*West Virginia v. EPA*
597 U.S. 697 (2022)....................3, 6, 7

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952)....................3, 8

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 4, cl. 1....................1, 3, 4

U.S. Const. amend. I....................20

**FEDERAL STATUTES**

5 U.S.C.
§ 552a(e)(1)....................8, 23
§ 552a(e)(7)....................8, 20, 23
§ 553(d)....................11, 15
§ 702....................10
§ 704....................10
§ 706(2)(A)....................11, 14
§ 706(2)(C)....................11

18 U.S.C.
§ 1716....................5, 12, 13
§ 1716(a)....................12
§ 1716(b)....................11, 12

28 U.S.C.
§ 1339....................22

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

39 U.S.C.
§ 101(a) .....1, 14
§ 102(5) .....8, 18
§ 401(2) .....10, 13
§ 401(10) .....10, 13
§§ 403(a)-(b) .....14
§ 403(c) .....8, 19, 22, 23
§ 404(2) .....11
§ 404(a)(1) .....10
§ 404(e) .....8, 18
§ 409 .....22
§§ 3001–3018 .....7, 8, 9, 11
§ 3001(a) .....9, 11, 12
§ 3001(c)(1)(A) .....12
§ 3001(g) .....9
§ 3001(m) .....9, 10, 20
§ 3001(n) .....10
§ 3005(a) .....9, 12
§ 3005(e)(2) .....9
§ 3005(e)(3) .....12
§ 3007(a)(1) .....9
§ 3010(b) .....9
§ 3012(c) .....9
§ 3018(a) .....10
§ 3018(b)(2) .....10, 11
§ 3406 .....7, 12
§ 3629 .....7
§ 3661 .....22, 23
§ 3661(a) .....17
§ 3661(b) .....8, 16, 17, 18, 22
§ 3662(a) .....22, 23
§ 3682 .....12

52 U.S.C.
§ 10307(a) .....8, 19
§§ 10502(c)-(f) .....7
§ 10502(g) .....7
§ 21081 .....7
§ 21083(a)(1)(A) .....7

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


**STATE STATUTES**

Cal. Elec. Code
§ 2166(b)(2) ....................4
§ 2166.5(b)(2) ....................4
§ 2166.7(d)(2) ....................4
§ 2166.8(d)(1) ....................4
§ 2166.9(d)(1) ....................4

N.C. Gen. Stat. § 163-228(c) ....................4, 27

Va. Code Ann. § 24.2-706(A) ....................4

**REGULATORY MATERIALS**

39 C.F.R.
§ 233.1 ....................30
§ 3020.112 (2026) ....................16

75 Fed. Reg. 282,283 (Jan. 5, 2010) ....................5, 12

90 Fed. Reg. 9843 (Feb. 19, 2025) ....................5, 12

Exec. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (March 31, 2026) ....................4, 19, 20, 21

Ballot Mail for Federal Elections, 91 Fed. Reg. 54966 (Aug. 26, 2026).................... *passim*

Domestic Mail Manual
703.8.0 ....................14
705.24.0-705.24.6 ....................3
705.24.3.1 ....................1, 4
705.24.3.2 ....................1, 4, 5
705.24.4.2.b ....................1
705.24.5.1 ....................2, 5, 9, 10, 30
705.24.5.2 ....................9, 10, 30
705.24.5.3 ....................5, 10, 30
705.24.5.3.a ....................9

**OTHER AUTHORITIES**

*Proceeding*, Black's Law Dictionary (12th ed. 2024) ....................9

*Proceedings*, Merriam-Webster ....................9

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Reid J. Epstein, *Postal Service Rule Could Bar Millions From Voting by Mail*, N.Y. Times (Aug. 30, 2026)....................29

*Service*, Black's Law Dictionary (12th Ed. 2024)....................18

U.S. Election Assistance Commission, *Election Administration and Voting Survey 2022 Comprehensive Report* (June 2023)....................1

U.S. Postal Service, *Postal Operations Manual* § 171.3....................6

U.S. Postal Service, Publication 52: Hazardous, Restricted, and Perishable Mail
Part 1.11.111....................12
Part 2.21.211....................12
Part 434....................12
Part 451....................12
Part 451.22....................12

## INTRODUCTION

Over the next several weeks, state and local election officials will begin mailing ballots to tens of millions of voters who, under the laws of the Plaintiff States, have a right to receive and cast those ballots. This is a massive undertaking. In the 2022 midterm elections, more than 28 million voters in Plaintiff States cast ballots by mail.[1] And, in several Plaintiff States, including Colorado, Hawaiʻi, Oregon, and Washington, elections are run *almost exclusively* by mail.

In the Elections Clause, U.S. Const. art. I, § 4, cl. 1, the Constitution assigns regulation of this complex web of democracy to the States, unless Congress expressly declares otherwise. But last week, a federal agency—the United States Postal Service ("USPS"), whose "basic function" is "the obligation to provide postal services to bind the Nation together" and to "provide prompt, reliable, and efficient services to patrons in all areas," 39 U.S.C. § 101(a)—asserted a never-before-exercised, unilateral authority to set new procedures for voting by mail. It did so at the express direction of President Trump, but without any Congressional authorization whatsoever.

USPS now attempts to assure the Court that its novel claim of power is "modest" and that the new requirements are "limited." *See* Doc. No. 65 at 8, 10, 15, 18, 19, 20, 27. It brushes off the elections impacts by claiming its new rule is only "a regulation of the U.S. mail." *Id.* at 15. But the mail is a critical instrumentality through which elections are conducted—nearly exclusively in some Plaintiff States, heavily in all. And the authority USPS claims is immense, not "modest," as confirmed by the plain text of the Rule and any serious analysis of USPS's purported authority. The Rule provides that USPS will entirely *refuse* to mail ballots, unless election officials meet a bevy of new requirements: ballot envelope designs reviewed and approved by USPS, including voter-specific Intelligent Mail barcodes (IMbs), DMM 705.24.3.1–2; enrollment of every mail voter through a USPS Mail Ballot Portal, including the IMbs for each voter's ballot mail; DMM 705.24.4.2.b; and USPS's review of each outgoing ballot to

---

[1] *See* U.S. Election Assistance Commission, *Election Administration and Voting Survey 2022 Comprehensive Report* (June 2023) at 30–31, https://www.eac.gov/sites/default/files/2024-11/2022_EAVS_Report_508c.pdf.

ensure the presence of such barcodes on the envelope, *and* on USPS's voter list, prior to acceptance for mailing. DMM 705.24.5.1. That USPS previously *recommended* certain features on ballot mail does not make "modest" a Rule immediately *requiring* specific envelope features, USPS approval, and voter enrollment with USPS—on pain of refusing to deliver ballots at all. Extensive and unrebutted declarations from Plaintiff States establish that these requirements range from infeasible to impossible. *See infra* III. Mass disenfranchisement will result.

To make matters worse, USPS's new requirements have been foisted upon the States in disregard of that "basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled." *Democratic Nat'l Comm. v. Wis. State Legislature*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring). Because ballot envelopes for the impending midterm elections already have been designed and ordered—and the ballots they will carry include state and local offices, along with federal offices—USPS's claim of authority will *also* determine who will receive mail ballots for those non-federal races.

If any of this were lawful, this Court would expect to see clear Congressional authorization; otherwise, the time, place, and manner of elections are the exclusive province of the States. Instead, the Rule promulgated by USPS not only lacks a statutory basis, but actually violates various provisions of Title 39, including those relating to nonmailable matter, imposing mandatory procedures for nationwide service changes, and barring novel nonpostal services.

Because the Rule is illegal and would have significant, far-reaching effects on the upcoming election—and on the health of the democratic processes in the Plaintiff States—it should be preliminarily enjoined and stayed.

## ARGUMENT

### I. PLAINTIFFS HAVE SHOWN THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS

#### A. The Rule Violates the Separation of Powers by Regulating Mail Voting Without Congressional Authorization

States are charged with the constitutional responsibility to administer elections in accordance with their own rules, subject to preemption by Congress. *Arizona v. Inter Tribal*

*Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013); *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2170 (2026). USPS, an Executive Branch agency, plays no role in that process. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (the Executive's authority to act "must stem either from an act of Congress or from the Constitution itself"). Congress has not authorized USPS to promulgate regulations on voting, let alone to adopt rules that fundamentally impair the States' administration of elections. For such "extraordinary delegations of Congress's powers," the Supreme Court has long declined to read congressional authorization absent a clear statutory indication. *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 242–243 (2026); *accord West Virginia v. EPA*, 597 U.S. 697, 732 (2022); *Biden v. Nebraska*, 600 U.S. 477, 494 (2023).

Here, the Rule unequivocally regulates the administration of mail voting, creating an entirely new infrastructure to track voters' receipt and return of mail ballots, mandating new specifications and a compulsory design review process for ballot envelopes, and requiring election officials to comply with the burdensome new requirements on pain of losing access to mail service for ballot mail. DMM 705.24.0–705.24.6. In enacting these transformative new requirements, the Rule usurps for USPS an unprecedented power to surveil mail ballots and control States' and localities' choices regarding mail ballot tracking and envelope design. Yet Defendants can point to no delegation by Congress to USPS of its Elections Clause authority to "make or alter" regulations prescribing the "Manner of holding Elections for Senators and Representatives" in this way. *See* U.S. Const. art. I, § 4, cl. 1.

At this late hour, Defendants resist the premise that the Rule regulates an aspect of election administration, characterizing it as just "a regulation of the U.S. mail." Doc. No. 65 at 15, 18. The content of the Rule, its purpose and provenance, and the Rule's conflict with state election laws, all belie this claim. *First*, as just described, the Rule invades state law choices regarding the mechanics of designing and tracking mail ballots and imposes significant new burdens on election officials. Its application literally decides how voters may cast their ballots, and, in some circumstances, whether the voter can receive or cast a ballot at all. *Second*, the Rule originates in and implements an executive order explicitly focused on elections policy. 91 Fed. Reg. 54966

(citing Exec. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (March 31, 2026) ("EO")). The preamble to the Rule invokes the EO's goal of "'[p]reventing violations of [f]ederal criminal law and maintaining confidence in election outcomes.'" *Id.* (quoting EO § 1). The preamble also pervasively points to these election policy goals to justify the new provisions. *See, e.g.*, *id.* (justifying immediate effect date based on upcoming election); *id.* at 54968–54969 (identifying elections integrity goals). *Third*, the Rule imposes new requirements that directly conflict with state law, including limitations on sharing identifying information on voters registered to receive a mail ballot or categorized as confidential voters for safety reasons. *See* Va. Code Ann. § 24.2-706(A) *cited in* Koski (VA) Decl. ¶ 20, Doc. No. 4-23 at 6; Cal. Elec. Code §§ 2166(b)(2), 2166.5(b)(2), 2166.7(d)(2), 2166.8(d)(1), 2166.9(d)(1) *cited in* Southard (CA) Decl. ¶ 22, Doc. No. 4-1 at 10–11; N.C. Gen. Stat. § 163-228(c) ("The official register" of absentee ballot requests "shall be confidential"). Similarly, for some jurisdictions, the Rule's new ballot design requirements impossibly conflict with state law. *See, e.g.*, Albence (DE) Decl. ¶ 34(b), (c), Doc. No. 4-8 at 16–17 (Delaware would require legislative amendment or judicial intervention to change ballot envelopes).

The Rule's character as election regulation is vividly confirmed by its bottom line: USPS will refuse to transmit ballots if its requirements are not met. DMM 705.24.3.1 & 2. Indeed, the record demonstrates that the Rule as applied to the November 2026 would dictate the "time[], place[], and manner of holding Elections." *See* U.S. Const. art. I, § 4, cl. 1. A mountain of evidence before the Court substantiates that the Rule will functionally eliminate mail ballots as an option for voting in many States, disenfranchising otherwise eligible voters at a massive scale. This is because with only two months before the upcoming elections, most Plaintiff States have ordered their ballot envelopes and cannot re-design and re-order replacements.[2] Even if Plaintiff

[2] *See, e.g.*, Holmes (WA) Decl. ¶ 42, Doc. No. 4-4 at 20–21 ("gravely concerned that Washington State would not be able to reprint its ballot envelopes to comply with the requirements of the Rule and would be prevented by the Rule from sending ballots to any of Washington's residents."); Dawson (OR) Decl. ¶ 37, Doc. No. 4-19 at 13–14 ("there is neither the time nor the money to design, review, and reorder envelopes before ballots begin to be mailed to Oregon voters in mid-September"); Nago (HI) Decl. ¶¶ 5, 43, Doc. No. 4-10 at 2, 12

States could theoretically procure compliant envelopes, the inescapable delay associated with the Rule's requirement that *all* of the thousands and thousands of mail-ballot jurisdictions submit their envelopes for USPS review and approval, *see* DMM 705.24.3.1–2, will leave little to no time for States to ultimately send approved ballot materials to voters.[3] And critically, this envelope-review process must be completed *before* States can begin the separate arduous task of uploading millions of voters' information to USPS's portal for compilation of the USPS Mail Ballot Lists. *See* 91 Fed. Reg. 54979. This process also contains multiple opportunities for delay, from the requirement that USPS portal users be specifically authorized by the state's chief elections officer, *see id.*, to the process of generating and uploading millions of unique IMbs for individual voters, *see id.* 54990–54991. Any error at any point in this process—whether in collecting and transferring millions of mail-voter records to USPS by the States, or in maintaining and searching this data by USPS—will result in USPS's refusal to deliver ballot mail. *See* DMM 705.24.5.1, 24.5.3. The undeniable upshot of these intractable problems, both individually and in aggregate, is that substantial numbers of otherwise eligible citizens will be denied their right to cast a mail ballot—contrary to state law mail ballot programs. Never before has USPS claimed authority to adopt rules of such "political significance" that they would functionally deprive large swaths of the electorate of their right to cast their vote through the mail. *See Learning Resources, Inc.*, 607 U.S. at 246.[4]

---

(In Hawaii, in-person voting is less than 5 percent of turnout, and yet, under the Rule, State cannot use its existing return envelopes and may be unable to procure compliant envelopes from its vendor on the continent in time for the November election); Rudy (CO) Decl. ¶ 42, Doc. No. 4-6 at 16-18 (Rule will require throwing away nearly 1.3 million existing ballot return envelopes, and re-printing these envelopes "may not even be possible depending on how widespread an issue this is and whether the vendors can procure sufficient paper.").

[3] *See* Southard (CA) Decl. ¶ 41, Doc. 4-1 at 18–19 (USPS must review thousands of jurisdictions' ballot envelopes without additional staff or resources).

[4] Federal Defendants' primary comparison of the Rule's restrictions to those for mailings containing cremated remains or replica explosives, *see* Doc. No. 65 at 17 (citing 90 Fed. Reg. 9843 (Feb. 19, 2025) & 75 Fed. Reg. 282283 (Jan. 5, 2010)), is inapt. As explained in depth below, these conditional acceptance regulations are based on an express nonmailability statute, *see* 18 U.S.C. § 1716, in which Congress conferred on USPS the authority to designate these

Though Congress has authorized USPS to adopt regulations necessary to execute its core functions, no statute cited by Federal Defendants permits USPS to exercise that power in a manner that undermines and overrides existing rules governing voting. This point distinguishes Federal Defendants' reliance on USPS's past actions to facilitate the delivery of mail ballots, including the agency's requiring that "absentee balloting materials must not be detained or treated as unpaid mail," and must "be promptly dispatched and delivered to the addressees," *see* U.S. Postal Service, *Postal Operations Manual* § 171.3, and its agreement in a settlement to prioritize monitoring and timely delivery of election mail, *see NAACP v. USPS*, 2026 WL 1893762, at *1 (D.D.C. July 1, 2026) *stayed pending appeal* 2026 WL 2168004, at *1 (D.C. Cir. July 17, 2026). Contrary to Federal Defendants' arguments, there is an inherent and significant "legal distinction" between past agency practice that prioritizes and expedites the delivery of mail ballots, and a regulation that imposes external requirements on mailers and hinders or curtails ballot delivery altogether. Doc. No. 65 at 19. Only the latter has the effect of overriding existing rules for how elections are conducted and who can participate, a core power assigned to Congress, and nowhere expressly delegated by Congress to the Executive Branch.

Although Federal Defendants maintain that the Rule is authorized by statute, *see* Doc. No. 65 at 21–27, USPS's wholesale assumption of authority to dictate the terms of a massive portion of voting nationwide is the type of "'context' [that] counsel[s] 'skepticism.'" *Learning Resources, Inc.*, 607 U.S. at 243 (quoting *West Virginia*, 597 U.S. at 721). Millions and millions of citizens, in election after election, cast their ballots through the mail. *See, e.g.*, Southard (CA) Decl. ¶ 43, Doc. No. 4-1 at 19–20 (80% of the 15.1 million ballots cast in California in the 2024 General Election were mail ballots). And "*every State* lets at least some resident vote absentee" by mail. *Watson*, 146 S. Ct. at 2171 (emphasis added). The functional impacts of this Rule could not be more "major." Yet, missing from the generic USPS regulatory authority cited by Federal Defendants is any express (or even implied) authorization by Congress for USPS to

---

items "Restricted Matter" and place conditions on their mailing. *See infra* I.B.2. No similar grant of statutory authority supports the Rule's treatment of mail ballots.

supersede state election schemes or set specific terms for the transmission of ballots. In fact, Congress has set requirements for States on the subjects addressed in the Rule, enacting superseding requirements related to state voter lists, the sending of paper ballots to voters, and absentee ballots. *See, e.g.*, 52 U.S.C. §§ 21083(a)(1)(A); 21081, 10502(c)–(f). But Congress has otherwise left decisions about the administration of federal elections, including mail ballot programs, in the hands of the States. *See, e.g.*, 52 U.S.C. §§ 21084, 10502(g). Because the Rule explicitly conflicts with various state election laws and, particularly as to the upcoming November elections, will inevitably result in widespread disenfranchisement of voters who count on USPS to cast their ballot, the "major questions doctrine" is clearly implicated. *See Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'").

The absence of a "clear statement" from Congress delegating its constitutional power to supersede state election laws is fatal to Federal Defendants' claim of statutory authority. *Learning Resources, Inc.*, 607 U.S. at 242–243; *id.* at 279 (Gorsuch, J., concurring); *Utility Air*, 573 U.S. at 324. Nothing in USPS's governing statutes, including those providing for regulations about mail standards, includes any hint that USPS can place restrictions on election mail that functionally undermine and override existing state rules pertaining to mail ballots. The only mention of elections in Title 39 cut squarely in the opposite direction, facilitating States' use of the postal service by requiring that USPS afford favorable postage rates to election mail, *see* 39 U.S.C. § 3629, and deliver UOCAVA ballots expeditiously and postage-free, *see id.* § 3406. By contrast, in Title 39's nonmailability provisions—the only place where Congress has expressly conferred on USPS the power to restrict delivery of certain categories of mail—there is no reference whatsoever to election mail. *See id.* §§ 3001–3018; *infra* I.B. Accordingly, even though USPS possesses general regulatory control over the mail, Congress has not clearly authorized a delegation of its core constitutional power to determine how federal elections are conducted. *Learning Resources, Inc.*, 607 U.S. at 242 (quoting *West Virginia*, 597 U.S. at 723, 732) (even if statutory text might support a delegation of congressional power, where the

delegation concerns "major questions," "'ambiguous statutory text'" will not suffice). The Rule violates the Constitution's separation of powers.

The Rule's trespass of constitutional limits on the Executive Branch's power is further demonstrated by its affirmative violation of USPS governing statutes. *See Youngstown*, 343 U.S. at 637 (where the Executive "takes measures that are incompatible with the express or implied will of Congress," its power to do so is "at its lowest ebb"). As noted above, Congress has enumerated specific and narrow categories of "nonmailable matter," *see* 39 U.S.C. §§ 3001–3018, and none of these statutes reference (let alone restrict delivery of) mail ballots. Yet the Rule flatly prohibits delivery of ballot mail when voters are not found on the USPS Mail Ballot Lists, where the mailing does not conform to USPS's mandatory envelope design, and even where a state has complied with both requirements, but through inadvertent process error, the IMbs on a voter's portal entry and ballot envelope do not match. *See* 91 Fed. Reg. 54991. The Rule also blatantly violates Congress's restriction on USPS's provision of "nonpostal service[s]." *See* 39 U.S.C. § 404(e); *infra* I.C. USPS's creation of a system of monitoring and control of voting, as well as maintenance of gargantuan stores of private data, do not constitute "postal service[s]," which Congress has limited to "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* § 102(5). In that sense, the Rule assigns USPS the unauthorized role of mail-ballot enforcer. Moreover, the Rule violates a statutory prohibition on discrimination against mailers, *see id.* § 403(c); *infra* I.C, transgresses congressionally required procedures for "change[s] in the nature of postal services," *see id.* § 3661(b); *infra* I.C, and ignores clearly applicable federal-law protections guaranteeing personal privacy and the right to vote, *see* 5 U.S.C. § 552a(e)(1), (e)(7); 52 U.S.C. § 10307(a); *infra* II. Each of these affirmative violations of statute illuminate how far afield this Rule takes USPS from its congressionally authorized purpose.

### B. The Rule Creates an Unauthorized Category of Non-Mailable Matter, Violating USPS's Duty to Provide Universal Mail Services

The Rule also impermissibly creates new categories of nonmailable matter, contravening Congress's careful designation of only certain matter as nonmailable, along with other Title 39 provisions, and violates the Administrative Procedures Act's ("APA") guarantee against arbitrary and capricious decisionmaking.

#### 1. The Rule constitutes a mailability proceeding, subject to APA review

Under 39 U.S.C. § 3001(m), "proceedings concerning the mailability of matter . . . shall be conducted in accordance with [the APA]." As a threshold matter, Federal Defendants argue that the Rule does not concern "mailability." *See* Doc. No. 65 at 21–22. That argument is wrong.[5]

Federal Defendants' argument falters on the plain text of the Rule itself. DMM 705.24.5.3.a ("Mailings that do not comply with 24.5.1 and 24.5.2 will not be accepted and will be returned[.]"). In USPS's telling, the Rule somehow avoids being about mailability by focusing on the conditions under which ballot mail will be accepted (or not). Doc. No. 65 at 22; 91 Fed. Reg. 54973–74. But that is a false distinction, as the statutory nonmailability provisions demonstrate. *See* 39 U.S.C. §§ 3001–3018; *id.* § 3001(a). These provisions mostly define nonmailable matter by establishing conditions under which the matter will be accepted rather than imposing a flat ban. *See, e.g.*, *id.* § 3001(g) (fragrance ad samples are nonmailable, unless sealed in certain way); *id.* § 3010(b) (mailers are required to check USPS-maintained list before mailing sexually oriented ads). That is what the Rule does, but without statutory authorization.

---

[5] Federal Defendants' citation to statutes providing for enforcement proceedings of certain nonmailability provisions, Doc. No. 65 at 22, do not purport to exhaustively define the term proceeding. *See* 39 U.S.C. §§ 3005(a), (e)(2), 3007(a)(1), 3012(c). Here, the process that resulted in the Rule involved a notice of proposed rulemaking, submission of comments by Plaintiff States (among others), and a response to and rejection of those comments by USPS. Indeed, USPS repeatedly refers to its rulemaking process as "this *proceeding*." 91 Fed. Reg. 54967–68 (emphasis added). And courts interpreting "proceeding" under § 3001(m) give that term its plain meaning. *See Humane Soc'y of U.S. v. USPS*, 609 F. Supp. 2d 85, 94–97 (D.D.C. 2009) (USPS letter declining to deem publication nonmailable constituted a "proceeding" under § 3001(m)); *see Proceeding*, Black's Law Dictionary (12th ed. 2024) ("Any procedural means for seeking redress from a tribunal or agency."); *Proceedings*, Merriam-Webster, ("[A]n official record of things said or done"), https://tinyurl.com/5h4vfp4j.

The structure of the hazardous materials provisions is instructive. *Compare* DMM 705.24.5.1–.3 *with* 39 U.S.C. §§ 3001(n), 3018(b)(2). In that context, Congress instructed USPS to regulate the manner in which hazardous material is to be mailed. *See* 39 U.S.C. § 3018(a) (USPS "shall prescribe regulations"). And, then, Congress determined that hazardous materials would be nonmailable absent compliance with those conditions. *Id.* § 3018(b)(2) (hazardous materials nonmailable if in violation of USPS regulation "restricting the time, place, or manner in which hazardous material may be mailed"). USPS's interpretation of 39 U.S.C. §§ 401(2), (10) and 404(a)(1) as giving it limitless rulemaking authority to condition mailing would render the detailed hazardous materials statutes mere surplusage. *Cf. Guerrero Orellana v. Moniz*, __ F.4th __, 2026 WL 2352042, at *10 (1st Cir. 2026) (courts should "give meaning to the words of a statute in a manner that avoids redundancies"). The safe transport of hazardous materials through the mail is also far closer to USPS's operational core than supposed election fraud detection through a nationwide mail ballot surveillance system, and thus should be *more* likely, not less, to be authorized by the general grant of power in 39 U.S.C. §§ 401(2), (10) and 404(a)(1). But Congress saw fit to add authority to regulate hazardous material in 2006.[6] These provisions, along with the entire mailability chapter, show that Congress legislates expressly when it wants USPS to operate a refuse-unless-compliant scheme. *See Esteras v. United States*, 606 U.S. 185, 195 (2025) ("the *expressio unius* canon has particular force" where statute has "an 'established series,' such that any 'omission' from that series necessarily 'bespeaks a negative implication'"); *United States v. Hernandez-Ferrer*, 599 F.3d 63, 67–68 (1st Cir. 2010) (finding absence of one provision, coupled with presence of others, "highly significant").

Thus, because the Rule constitutes a proceeding concerning the mailability of mail ballots

[6] Postal Accountability and Enhancement Act of 2006, Pub. L. No. 109-435, § 1008, 120 Stat. 3198, 3259. In the same enactment, Congress also narrowed USPS's authority under § 401(2), which once authorized USPS to regulate "*as it deems necessary* to accomplish the objectives of this title," but Congress deleted "*as it deems*," and replaced "objectives of this title" with "execution of *its functions under this title*." *Id.*, § 504, 120 Stat. 3198, 3235 (emphasis added); *cf. Webster v. Doe*, 486 U.S. 592, 600 (1988) (Congress uses "as it deems" to embed discretion). Thus, the pre-2006 cases Federal Defendants cite indicating USPS is "broadly empowered to adopt rules and regulations," Doc. No. 65 at 16–17, have been abrogated by statute.

and is final agency action, it is subject to review under the APA. *See* 39 U.S.C. § 3001(m); 5 U.S.C. §§ 702, 704. For the reasons discussed above and below, the Rule is in excess of statutory authority, contrary to law, arbitrary and capricious, and procedurally defective, as USPS did not provide a 30-day period between publication and effective date.[7] *See* 5 U.S.C. § 553(d); *Kollett v. Harris*, 619 F.2d 134, 144 (1st Cir. 1980).

**2. The Rule is in excess of statutory authority, contrary to statute, and not in accordance with law**

Agency action is "unlawful and [must be] set aside" under the APA, when it is "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A), (C); *see Victim Rts. L. Ctr. v. Cardona*, 552 F. Supp. 3d 104, 127 (D. Mass. 2021) (finding no "practical difference" between these two provisions).

Congress has expressly and specifically regulated nonmailability and the statutory regime does not mention mail ballots. *See Hannegan v. Esquire, Inc.*, 327 U.S. 146, 152 (1946) ("The postal laws make a clear-cut division between mailable and nonmailable material."). As shown above, 39 U.S.C. §§ 3001–3018, along with the incorporated Title 18 provisions, *see* § 3001(a), represents its exhaustive judgment about what USPS may refuse to carry. And where Congress authorized USPS to define a nonmailable class by regulation, it also said so expressly. *See, e.g.*, *id.* § 3018(b)(2); 18 U.S.C. § 1716(b). Here, Federal Defendants concede the Rule results in mail ballots not being mailed if the requirements are not met, which is precisely how the mailability provisions operate, *supra* II.B.1, and admit no mailability provision directly supports the Rule. Doc. No. 65 at 16–17, 22; 91 Fed. Reg. 54971.

Instead, Federal Defendants contend that the Rule does not concern nonmailability because USPS has enacted *other* regulations that put conditions on the acceptance of mail. Doc. No. 65 at 19, 22. These regulatory examples are all inapt. For instance, Defendants contend that the Rule is no different than USPS refusing to mail a heavy package without sufficient postage, or an

[7] Even if the Court determines that the Rule does not constitute a nonmailability regulation in all circumstances, the Rule is, at minimum, a nonmailability regulation with respect to the November 2026 election, given its dramatic impact on Plaintiff States' mail voting. *See infra* III.

operations manual providing that when mail balloting materials lack adequate postage they "must not be detained or treated as unpaid mail," and must instead "be promptly dispatched and delivered to the addressees." *Id.* at 19, 21. But in those instances, unlike this one, USPS is acted pursuant to *express authority* to impose conditions related to postage and weight. *See* 39 U.S.C. § 404(2); *id.* § 3001(c)(1)(A); *id.* § 3682; *id.* § 3406. As for the elder abuse mail scam example, Doc. No. 65 at 17–18, this too is covered by express statutory authority in the nonmailability provisions. *See* 39 U.S.C. § 3005(a), (e)(3). No such statutory authority exists for mail ballots, because Congress did not authorize USPS to determine for itself which state and local election officials would be permitted to send mail ballots.

Next, Federal Defendants point to regulations regarding replica explosives and cremated remains. Doc. No. 65 at 17; 91 Fed. Reg. 54974. But those conditional acceptance regulations also implement an express nonmailability statutory provision. *See* 18 U.S.C. § 1716; 39 U.S.C. § 3001(a) (incorporating § 1716 into nonmailability provisions). Both of those regulations "amend[ed] [USPS's] Publication 52, Hazardous, Restricted, and Perishable Mail" and categorized replica explosives and cremated remains as "Restricted Matter" within Publication 52. 90 Fed. Reg. 9843-01; 75 Fed. Reg. 282-01. Publication 52 "outlines the policy for nonmailable articles and substances, as well as the special conditions under which some may be mailed." Publication 52, Part 1.11.111, https://perma.cc/PT4D-XQQU. And Publication 52 *explicitly* relies on 18 U.S.C. § 1716 as statutory authority for making cremated remains and replica explosives and other "restricted matter" nonmailable. *See* Publication 52, Part 2.21.211 (Chapter 4: "Restrict matter mailing conditions"), https://perma.cc/6Z2A-HVDA; *id.*, Part 434 (replica explosives), https://perma.cc/K445-VVDT; *id.* Part 451.22 (cremated remains), https://perma.cc/F8FX-82KX.

In fact, 18 U.S.C. § 1716(a)'s text makes "all explosives" and all matter that may "injure the mails or other property" nonmailable but permits USPS to allow transmission of such items in the mail "under such rules and regulations as it shall prescribe as to preparation and packaging," *id.* § 1716(b). Both replica explosives and cremated remains potentially disrupt or

"injure the mails" through unnecessary post office evacuations, 75 Fed. Reg. 282-01, or leaking of powdered remains, and are similar to other items restricted under Publication 52. *See* Publication 52, Part 451 (restricting cremated remains in the "Liquids, Powders, and Odor-Producing Materials" chapter); *id.*, Part 434 (restricting replica explosives in the "Firearms" chapter). None of these same concerns apply to ballot mail, as Federal Defendants admit. Doc. No. 65 at 17 ("[B]allot mail does not present the same operational issues as cremated remains or replica explosives[.]"); 91 Fed. Reg. 54974 (same). And most importantly, there is no express statutory authority to regulate ballot mail as there were for these regulations. Accordingly, USPS did not, and could not, rely on 18 U.S.C. § 1716, or any other statutory authority, to classify mail ballots as "restricted materials" and impose the Rule.

Still, Federal Defendants insist the Rule is permitted because ballot mail "is sensitive mail that raises unique operational consideration"; specifically, "it creates an opportunity for the mails themselves to be used to facilitate serious criminal activity," and so, USPS "must have at least as much authority to prevent that sort of harm as it does to ensure that mortal remains are not lost in the mail." Doc. No. 65 at 17. But USPS has only as much authority as Congress assigned to it. *See Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 19 (1st Cir. 2020) ("[T]he power of an executive agency administering a federal statute is authoritatively prescribed by Congress."). And the Supreme Court has long recognized as much. *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902) ("[The] right to exclude letters, or [] refuse . . . delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them."). In *McAnnulty*, the Postmaster General issued an order refusing delivery of mail from a business promoting use of the mind to heal ills because he determined the business was engaged in a scheme to obtain money through the mails by false and fraudulent pretenses, contrary to statute. *Id.* at 99, 103. In overturning the Postmaster General's order, the court concluded that "[t]hey had violated no law which Congress had passed" and thus "had the legal right, under the general acts of Congress relating to the mails, to have their letters delivered." *Id.* at 110. So too here. The absence of a statute authorizing the

Rule's mail ballot refusal scheme is decisive, and this Court has "power . . . to grant relief." *Id.*

Lacking express authority for the Rule, Federal Defendants bank on USPS's general grants of authority, which are themselves limited to USPS's "functions" and regulations that are "not inconsistent with" Title 39. 39 U.S.C. § 401(2), (10). But "where no grant exists or the grant is unclear, an agency is without power to act." *Nat'l Council of Nonprofits v. McMahon*, __ F. Supp.3d __, 2026 WL 1876366, at *18 (D. Mass. June 30, 2026) (citing *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020)). In fact, not only is the Rule unmoored from an express grant of authority, but it also contravenes several Title 39 statutes, *infra* I.C, and exceeds USPS's functions by delving into election administration, *supra* I.A. And no inference that USPS's general rulemaking authority permitted it to regulate mail ballots in such a sweeping, mandatory manner would be proper, because where "the grant is unclear, an agency is [still] without power to act." *McMahon*, 2026 WL 1876366, at *18 (citing *Barr*, 954 F.3d at 31). Because USPS lacks statutory authority for the Rule, it has "act[ed] in a manner not authorized by statute, [so] its action is ultra vires and a violation of the APA." *Ryan*, 974 F.3d at 19.

Finally, by refusing to deliver lawfully mailable matter that has not been deemed otherwise by Congress, the Rule conflicts with USPS's mandatory delivery duties in 39 U.S.C. §§ 101(a) and 403(a)–(b). Because no federal law carves out the application of the universal delivery obligation to mail ballots, USPS must deliver them.

### 3. The Rule is arbitrary and capricious

The Rule is also arbitrary and capricious in violation of the APA. *See* 5 U.S.C. §§ 706(2)(A); Doc. No. 1-1 at 18–25. Critically, the Rule ignores longstanding reliance interests of Plaintiff States and the harms of immediate implementation. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020); Doc. No. 1-1 at 22–25.

Plaintiff States built their 2026 election calendars, vendor contracts, envelope printing, and statutory mailing deadlines around USPS's longstanding practices in transmitting mail ballots, as they have over many federal election cycles. *Infra* III. USPS previously limited mail ballot guidance to nonbinding *recommendations*, codified as best practices in DMM 703.8.0 only four

years ago, 91 Fed. Reg. at 54,968, and issued as guidance in USPS's Election Mail Guide (Kit 600), *id.* at 54,978. The Rule converts those recommendations to requirements and adds others, effective immediately, weeks (even days) before Plaintiff States send out mail ballots. *See, e.g.*, Millis (WI) Decl. ¶¶ 9–12, 14, Doc. No. 100-1 at 3 (ballots set to be mailed as early as September 1); Brunton (NC) Decl. ¶ 6, Doc. No. 4-18 at 2 (September 4); Linnell (MN) Decl. ¶ 10, Doc. No. 4-14 at 4 (September 18). It did so without explaining what was inadequate about the voluntary regime published in 2022, or why each of the less restrictive alternatives proposed were inadequate. *See* 91 Fed. Reg. at 54984–85; *Regents*, 591 U.S. at 30 ("[A]nalysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'"). USPS only asserted that these less restrictive alternatives "would not achieve all of the rule's benefits" and "may prevent the full benefits of the rule from being realized." 91 Fed. Reg. 54985. There was no reasoned analysis as to why the "rule's benefits" required *immediate* enactment.

Despite being presented with Plaintiff States' substantial reliance interests, 91 Fed. Reg. 54983–84, including that compliance would be "difficult if not impossible" before the November midterms, *id.* at 54984; *infra* III, USPS did not substantially modify the Rule. USPS responded to the impending administrative upheaval by assuring Plaintiff States it "weighed these considerations" and concluded that they "have to be balanced against" the need for "faithful execution of federal law." *Id.* at 54985. It is not clear which federal law USPS is referencing, let alone how that law's enforcement somehow outweighs the fact that entire States will be prevented from carrying out their 2026 November election if the Rule goes into immediate effect. *Infra* III. A mere recitation that interests were weighed without any analysis or explanation is arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) ("conclusory statements do not suffice to explain [agency] decision").[8]

[8] For these same reasons, Federal Defendants also have not satisfied the "good cause" exception for failure to comply with the procedural requirements of the APA. 5 U.S.C. § 553(d); *see California v. Mullin*, 833 F. Supp. 3d 50, 78 (D. Mass. 2026) (good cause not met by contention that required procedures would be "impracticable" and "cause[] delay to the implementation," and challenged agency materials lacked "any statement invoking the good-cause exception").

USPS also declined to make any findings regarding the problem it claims to address. *See* 91 Fed. Reg. 54969 ("[T]he incidence of voter fraud does not impact the proposed rule's legal grounding."); *see also* Doc. No. 1-1 at 20 & n.12 (studies show "minuscule percentage of fraud" with mail voting). USPS must engage in reasoned decision-making, *Regents*, 591 U.S. at 16, and offer "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962))). Here, the Rule found no facts. It simply asserts that list data "will help facilitate enforcement of federal law" by providing information like "a list of individuals to whom states planned to mail a ballot . . . along with the associated barcode data," 91 Fed. Reg. 54982, but it acknowledges the list "may be over-inclusive," *id.* USPS also does not explain how this information provides any investigatory benefit, particularly when this information is publicly available or can be obtained through ordinary investigatory tools. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024) (action arbitrary or capricious if not "reasonable and reasonably explained").

**C. The Rule Violates Various Statutes Governing USPS Operations**

The Rule also violates many of USPS's governing statutes, further substantiating the unlawfulness of USPS's action.

**1.** The Rule was also adopted in an unlawful process, with USPS ignoring its statutory obligation to first seek an advisory opinion from the Postal Regulatory Commission ("PRC"). Such an opinion is required before any "change in the nature of postal services" that will "generally affect service on a nationwide or substantially nationwide basis" can take effect. 39 U.S.C. § 3661(b); 39 C.F.R. § 3020.112 (2026). A "change" occurs if a new regulation will (i) have a meaningful, quantitative impact on service, (ii) qualitatively change the nature of postal services, and (iii) apply nationwide or substantially nationwide. *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 884–886 (E.D. Pa. 2020).

Federal Defendants dispute the applicability of 39 U.S.C. § 3661(b) to the Rule. Doc. No. 65 at 25. First, Federal Defendants contend the Rule will have a "minimal effect" on its service

to the ordinary user, and that the Rule is not a meaningful change because it affects only ballot mail, and only for federal general, special, or runoff elections. *Id.* This argument defies reality considering the harm to Plaintiff States. *Infra* III. The Rule affects election mail service by causing delays or denial in accepting ballots both through the time-intensive compliance process or delayed or mistaken implementation. *See id.*; 39 U.S.C. § 3661(a). Federal Defendants point to a daily volume share threshold of 0.1%, but the relevant inquiry is whether the change is a "meaningful impact on service." *Buchanan v. USPS*, 508 F.2d 259, 262 (5th Cir. 1975). The more relevant consideration is that the Rule reaches all federal ballot mail in every State for every general election—i.e., tens of millions of mail users face a "meaningful" change in service with respect to mail ballots. And the Rule is so onerous—even on USPS itself—that it will inevitably impact mail service beyond just mail ballots. For instance, the verification process for California alone could take up to 43 years of USPS employee time. *See infra* III.

Second, Federal Defendants argue the Rule does not affect the nature of postal service because it "encompass[es] preparation and documentation requirements that are within the control of the states and, if adhered to, will not disturb the acceptance, processing, transmission or delivery of Federal Ballot Mail." Doc. No. 65 at 25 (quoting 91 Fed. Reg. 54976). Incredibly, they assert that the Rule "contemplates no changes to how [USPS] processes and delivers election mail." 91 Fed. Reg. 54976; *see* Doc. No. 65 at 25. But Federal Defendants are only viewing the Rule's change through the perspective of the voter. The experience of Plaintiff States and elections officials, as mailers and postal consumers, *completely* changes. *DeJoy*, 490 F. Supp. 3d at 885–86 (considering evidence of impact on government agencies as impacting "individual postal customers"). Of course, the voter's experience also changes if the Plaintiff States cannot comply: no ballot arrives.

Third, Federal Defendants do not contest that the Rule applies nationwide, governing federal ballot mail submitted to USPS in every State and territory. *See* 91 Fed. Reg. at 54,971 (the Rule sets "a single, nationwide standard for Federal Ballot Mail").

Intervenor Defendants argue that following the statutory procedure could result in PRC's

unconstitutionally "prevent[ing] USPS from implementing the Ballot Mail Rule consistent with the presidents' wishes." Doc. No. 64 at 21–22. But the PRC's role is to issue an *advisory* opinion based on its expertise, and its pre-promulgation review cannot prevent USPS from adopting any given rule. *See* 39 U.S.C. § 3661(b).

**2.** The Rule illegally authorizes nonpostal services. *See* Doc. No. 5 at 22–23. As explained, "postal service[s]" are defined by statute as "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto," 39 U.S.C. § 102(5), and USPS is explicitly forbidden from providing "nonpostal services" outside of narrow statutory exceptions, *id.* § 404(e). Requiring States to compile and deliver data on voters, and to enable USPS to monitor their receipt and return of ballots, sorts no mail and transports no package. These new election-administration functions likewise fall outside the two narrow exceptions for permissible nonpostal services.

USPS claims the Rule ranks as a postal service because it simply conditions the delivery of printed matter. Doc. No. 65 at 23. But under that logic, USPS could require *anything* of would-be mail users—from assembling a list of all registered voters to pledging to support a candidate in an upcoming election—if it punished noncompliance by not delivering mail. Indeed, the Rule explicitly states its nonpostal focus, pledging to facilitate law enforcement. 91 Fed. Reg. 54968–69 ("It is fully appropriate for the Postal Service, as an establishment of the Executive Branch, to take actions deemed necessary to ensure the faithful execution of federal law and enhance the efficiency of postal operations.").

The Rule likewise concerns a "service" within the meaning of the statute. Service is defined as providing labor, or meeting a public demand.[9] Maintaining datasets of voters and tracking ballots via IMbs for the purpose of facilitating law enforcement easily fits this bill. Federal Defendants cite non-circuit precedent for the proposition that "services" are limited to

[9] *Service*, Black's Law Dictionary (12th Ed. 2024) ("Labor performed in the interest or under the direction of others . . . . In this sense, *service* denotes an intangible commodity in the form of human effort, such as labor, skill, or advice.").

*commercial* services. Doc. No. 65 at 22–23 (citing *USPS v. PRC*, 599 F.3d 705, 710 (D.C. Cir. 2010)). But even if the statutory construction in that case had merit, that court deferred to the PRC under the now-defunct *Chevron* doctrine. *See USPS v. PRC*, 599 F.3d at 710–11. This Court should not follow invalidated out-of-circuit precedent.

**3.** The Rule unduly and unreasonably discriminates among users of the mail. *See* 39 U.S.C. § 403(c). The Federal Defendants counter that, by its terms, § 403(c) only bars discrimination "'[i]n providing services and in establishing classifications, rates, and fees,'" and claim that the Rule concerns of none of these covered activities. Doc. No. 65 at 24. But this is nonsensical. The Rule has an obvious and direct effect on how USPS "provid[es] services" by regulating the acceptance and transmission of mail ballots. As explained, under the Rule, different voters, otherwise identical in terms of eligibility to cast a mail ballot, will receive disparate treatment from USPS with respect to their ability to procure and cast a mail ballot depending on their jurisdiction's ability to comply with the Rule's various requirements. Federal Defendants blame the victim, arguing that "to the extent that anyone receives less favorable service, it would stem not from any effect of the rule, but from their jurisdiction's failure to comply with the Rule's provisions." Doc. No. 65 at 24. The confession that some voters will "receive less favorable service" due to the Rule demonstrates the merit of the claim. *See id.*

**4.** The Rule violates § 11(a) of the Voting Rights Act ("VRA"), which prohibits "fail[ing] or refus[ing] to permit" any qualified person to vote. 52 U.S.C. § 10307(a). Federal Defendants argue that the Rule allows any person "otherwise qualified to vote according to their own State elections officials" to vote. Doc. No. 65 at 26. But USPS has established impossible conditions while also stating that it will refuse to transmit ballots that do not fulfill those conditions. It cannot be that a government can functionally prevent voting by qualified voters as long as it calls its rule an impossible-to-fulfill "condition" instead of a prohibition. This Court previously held the USPS mail ballot provisions contemplated by the EO conflicted with § 11(a). *LWVM*, 2026 WL 2104006, at *10. The substantially identical provisions which USPS has now adopted are equally unlawful.

**5.** Federal Defendants make no serious effort to argue that the Rule complies with Privacy Act, *see* Doc. No. 65 at 27, nor could they. USPS will amass lists of voters tied to unique IMbs to conduct a massive surveillance program on First Amendment activity of tens of millions of voters—identifying who registered to vote by mail or in fact voted by mail—for the purpose of "identify[ing] potentially anomalous incidents that may merit further investigation." 91 Fed. Reg. at 54982. This textbook surveillance violates the Privacy Act's mandatory prohibition on collecting records of First Amendment activity. 5 U.S.C. § 552a(e)(7). Intervenor Defendants justify the data collection as necessary to accomplish the purposes of the EO, arguing this Court's holding that the EO was unconstitutional "has no legal effect" after the Supreme Court's stay of the resulting injunction. Doc. No. 64 at 23. But the Court did not address, much less reverse, this Court's merits analysis. *Trump v. California*, 2026 WL 2473573, at *3, 5.

## II. USPS's Rule is Judicially Reviewable

Beyond the merits, Federal Defendants raise a smattering of jurisdictional and justiciability objections. With respect to Plaintiff States' ultra vires claims (Counts III, IV, V, and VII), Federal Defendants argue that Plaintiffs lack a cause of action. Doc. No. 65 at 15–16. With respect to the claims about discrimination and failure to seek an advisory opinion (Counts IV and V), Federal Defendants argue that Plaintiffs must first bring their claims to the PRC. *Id.* at 23–25. With respect to the VRA claim (Count VI), Federal Defendants argue that the statute does not provide a private right of action. *Id.* at 26. And with respect to the Privacy Act (Count VII), Federal Defendants argue Plaintiff States may not use a nonstatutory equitable cause of action to seek injunctive relief for violations of the act. *Id.* Notably, *none* of Defendants' threshold objections apply to Plaintiffs' claims under the Constitution (Count I) or the APA (Count II).[10]

[10] A wealth of precedent recognizes plaintiffs "may sue 'in equity' without a congressionally-provided cause of action 'to prevent an injurious action by a public officer.'" *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)). As for the APA claim, Federal Defendants do not dispute that, pursuant to 39 U.S.C. § 3001(m), the APA applies to USPS proceedings related to mailability; instead, they contest only whether the Rule concerns the mailability of ballots. *See* Doc. No. 65 at 21–22.

As to the remaining objections, Federal Defendants' arguments are unavailing.

**Ultra Vires Claims.** Although Federal Defendants argue that Plaintiff States lack a cause of action for their ultra vires claims, the Supreme Court has allowed direct equitable challenges to actions in excess of USPS's statutory authority. Specifically, in *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), the Court rejected USPS's bid to avoid judicial review of an order intercepting and returning mail that was not covered by the nonmailability statute. *Id.* at 98–101, 107, 109. The Court explained that when injured individuals challenge USPS actions that exceed its statutory authority, "the courts generally have jurisdiction to grant relief." *Id.* at 108. Courts continue to apply that principle today. *See, e.g.*, *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970–972 (D.C. Cir. 2022) (considering ultra vires claim against USPS); *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1175 (D.C. Cir. 2003) (same). Plaintiff States' ultra vires claims follow in this tradition

Federal Defendants argue that this Court's review is circumscribed by *Nuclear Regul. Comm'n v. Texas* ("*NRC*"), which addressed when "judicial review statutes" like the APA "displace pre-existing nonstatutory ultra vires review." 605 U.S. 665, 681 (2025). But *NRC* does not apply to constitutional claims. *See id.*, *see also, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *New York v. McMahon*, 784 F. Supp. 3d 311, 349–350 (D. Mass. 2025) *appeal dismissed*, 2025 WL 3451815 (1st Cir. Sept. 15, 2025). Nor does *NRC* apply to ultra vires claims against USPS where no judicial review scheme is available. 605 U.S. at 681. Accordingly, *NRC* has no application to the vast majority of Plaintiff States' claims.

In any event, even if the standard from *NRC* did apply, this Court previously concluded it was satisfied by Plaintiff States' contentions that the provisions directed by the EO, and now implemented in the Rule, trespassed the limits of USPS statutory authority. *California v. Trump*, ___ F. Supp. 3d ___, 2026 WL 1826490 at *9 (D. Mass. June 25, 2026) ("*California II*"), *stayed on other grounds sub nom. Trump v. California*, 2026 WL 2473573 at *4 (U.S. Aug. 24, 2026). *NRC* preserves residual ultra vires review where plaintiffs (1) assert claims that an agency has "taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in

a statute," (2) show that under the circumstances the statutory scheme fails to provide "'a meaningful and adequate opportunity for judicial review,'" and (3) demonstrate that the statutory review scheme does not foreclose judicial review. 605 U.S. at 681 (citations omitted).

Each of Plaintiff States' statutory claims assert that USPS acted both "entirely 'in excess of its delegated powers,'" *id.*; *see supra* I.A; and contrary to specific statutory prohibitions, *see supra* I.C.1–3, 5. The remaining *NRC* requirements are also satisfied as to the two claims which could be brought as administrative complaints before the PRC: USPS's promulgation of the Rule without first completing the PRC review process, 39 U.S.C. § 3661, and the Rule's discriminatory provision of mail services, *id.* 403(c). *See id.* § 3662(a). Because the PRC administrative process is lengthy and devoid of the authority and the procedures for emergency relief, *see* Doc. No. 5 at 30, it does not provide "'a meaningful and adequate opportunity for judicial review'" of the relevant claims prior to the November election.[11] *See NRC*, 605 U.S. at 681 (citations omitted). As Plaintiff States have explained, the Rule will imminently disrupt and even fully preclude ballot mailings, and the PRC has no immediate power to stop any of it. Finally, the PRC statute does not foreclose judicial review, but rather permissively allows that interested persons "*may* lodge a complaint" with that body. 39 U.S.C. § 3662(a) (emphasis added). Congress also explicitly granted district courts jurisdiction over statutory claims against USPS. *See* 28 U.S.C. § 1339; 39 U.S.C. § 409. Each factor of the *NRC* test is thus satisfied—and Federal Defendants make no specific argument otherwise. *See* Doc. No. 65 at 16.

**Jurisdiction over violations of 39 U.S.C. §§ 403(c) and 3661.** For much the same reasons, the Court should reject the argument that it lacks jurisdiction to consider the violations of 39 U.S.C. §§ 403(c) and 3661 for the reasons set forth in *Pennsylvania v. DeJoy*, 490 F. Supp.

[11] The City of Madison and voting rights group filed an administrative complaint with the PRC regarding this rulemaking on August 4, 2026, and it is pending without any action yet from the PRC. *See* Compl. of League of United Latin American Citizens, Secure Families Initiative, Arizona Students' Association, and City of Madison, Wisconsin Regarding United States Postal Service Violations of 39 U.S.C. § 3661(b) and 39 U.S.C. § 403(c), No. C2026-27 (Aug. 4, 2026), https://prc.arkcase.com/portal/dockets/11558.

3d 833 (E.D. Pa. 2020). As the court there explained, no intent to preclude district court review is fairly discernible in the PRC review statute, given its permissive wording and the preservation of district court jurisdiction elsewhere. *DeJoy*, 490 F. Supp. 3d at 860, 862. Regardless, even if § 3662(a) precluded district-court review *in some circumstances*, it would not preclude district-court review *here* given the acute harms to Plaintiff States' administration of the November election will be "impossible to remedy once the [PRC] proceeding is over" and the elections have already passed. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023).[12]

**Voting Rights Act.** Defendants argue that § 11(a) of the VRA does not provide a private right of action. Doc. No. 65 at 26. That argument is wrong for reasons this Court previously explained. *See LWV of Mass. v. Trump*, 2026 WL 2104006, at *7–10 (D. Mass. July 22, 2026). And even if the argument were correct, Plaintiff States' VRA claim would still be reviewable as ultra vires USPS action. *See McAnnulty*, 187 U.S. at 108.

**Privacy Act.** Lastly, Federal Defendants argue Plaintiff States lack a cause of action for their Privacy Act claim. Doc. No. 65 at 26–27. Yet courts have rejected the position that the Privacy Act's remedy provisions are exclusive. *See Doe v. Chao*, 540 U.S. 614, 619, n.1 (2004) (discussing absence of standards for equitable remedies for certain violations due to other avenues for relief); *Heritage Found. v. Dep't of Just.*, 2026 WL 1766549, at *3 (D.D.C. June 19, 2026); *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 2026 WL 1784297, at *21 (D.D.C. June 22, 2026). These Privacy Act violations flout precisely the kind of "'clear and specific statutory mandate[s],'" binding on USPS, that are proper for ultra vires review. *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971 (citation omitted); *see* 5 U.S.C. § 552a(e)(1), (e)(7).

---

[12] For this reason, the decision in *New York v. Trump*, 181 F.4th 132 (D.C. Cir. 2026), is inapposite: the court there cautioned that its reasoning did not necessarily extend to certain "here-and-now injuries that are impossible to remedy if judicial review is deferred"—such as challenges "at the preliminary injunction stage" to "Postal Policy Changes only months before the November . . . general election." *Id.* at 140 n.3 (citation omitted).

## III. Plaintiff States' Imminent Irreparable Harm and the Public Interest Weigh Strongly in Favor of Injunctive Relief

USPS fails to grapple with the catastrophic impacts of implementing the Rule prior to the November 2026 general election, waving away Plaintiff States' concerns with a cavalier disregard. USPS makes not a single mention of any of the extensive, documented compliance harms that will lead to States being unable to send ballots, or citizens being unable to vote. *See generally* Doc. No. 65. The voluminous evidence in the record establishes that implementation of this Rule, on this timeframe, will prevent millions of Americans from voting by mail under state law, and likely, from voting at all. This inevitability does incalculable and irreparable harm to Plaintiff States, as well as severe damage to the public's fundamental interest in the right to freely participate in our democracy.

Washington, for example, which uses three vendors to print its 5.1 million voter ballot packets, and has averred that, at this time, two vendors cannot reprint any ballot envelopes in time for the general election, and the third did not respond inquiries, but would "very unlikely" to be able to reprint envelopes for the entire state. Holmes (WA) Decl. ¶ 42, Doc. No. 4-4 at 20–21. Washington is an entirely vote-by-mail state and "the State no longer has the infrastructure to accommodate a last-minute reversion to in-person voting." *Id.* Thus, if Washington uses its existing ballot envelopes—the ones that comply with state and federal law and cannot realistically be replaced before November—the Rule will require USPS to refuse to deliver them, resulting in millions of Washingtonians being unable to vote.

Hawai'i faces similar effects. In-person voting on the islands makes up less than 5 percent of the total turnout. Nago (HI) Decl. ¶ 5, Doc. No. 4-10 at 2. But the Rule's design requirements for ballot envelopes render Hawai'i's previously ordered envelopes non-compliant and it "may not be possible to get new orders of size 10 envelopes delivered to Hawai'i from the continent on such short notice." *Id.* ¶ 43, Doc. No. 4-10 at 12. Moreover, there is "simply insufficient time to coordinate the necessary polling places, volunteers, and logistical framework that would be necessary to emulate the prior polling place model that existed prior to the advent of elections by mail." *Id.* ¶ 24, Doc. No. 4-10 at 7. If Hawai'i cannot get new envelopes shipped in time, it will

not have Rule-compliant return envelopes to mail to residents. And with residents unable to vote by mail, large numbers of people may be unable to vote at all. *Id.*

In Oregon, another vote-by-mail state, "there is neither the time nor the money to design, review, and reorder envelopes before ballots begin to be mailed to Oregon voters in mid-September." Dawson (OR) Decl. ¶ 37, Doc. No. 4-19 at 13–14. If Oregon uses its existing legally compliant ballots, USPS will refuse to deliver them. With any failure that "prevents the delivery of mail ballots" "Oregonians have no other means by which to cast their votes." *Id.* ¶ 18, Doc. No. 4–19 at 6; *see also* Doc. No. 5 at 30–35, nn. 2–14.

In Colorado, another universal mail-ballot state, vendors report the Rule will require nearly 1.3 million existing ballot return envelopes to be thrown away, and re-printing these envelopes "may not even be possible." Rudy (CO) Decl. ¶ 42, Doc. No. 4-6 at 16–18. Again, if Colorado uses the ballot envelopes it already has, which most likely cannot be replaced, USPS will refuse to deliver them and Coloradans will be unable to vote through the State's regular methods. It is far from clear that Colorado has adequate time and resources to create alternatives.

The current Republican chair of the Wisconsin Elections Commission describes that "[i]t will be virtually impossible for Wisconsin to comply with the Rule." Millis (WI) Decl. ¶ 21, Doc. No. 100-1 at 4. The Rule comes as local election officials are preparing to mail ballots "as early as September 1, 2026," consistent with state law. *Id.* ¶¶ 9–12, 14, Doc. No. 100-1 at 3 (emphasis in original). Wisconsin elections are administered by 1,850 municipal clerks, many of whom "hold these positions part-time, have other full-time jobs" with "little to no administrative support." *Id.* ¶ 4, Doc. No. 100-1 at 2. The data entry, and inbound and outbound IMb requirements, each individually create hurdles that may be insurmountable, and together, are "virtually impossible." *Id.* ¶¶ 12–34, Doc. No. 100-1 at 4–8. And as of this morning, "USPS has not released its Ballot Portal, nor . . . issued instructions on its use." *Id.* ¶ 6, Doc. No. 100-1 at 6.

Even if States were able to re-design, get USPS re-approval, and procure new ballot envelopes—impossible in many States—other aspects of the Rule would realistically prevent States from administering elections according to State law. For example, in Colorado, election

officials estimate that it would take "tens of thousands of hours for election staff . . . to become authorized users of the USPS Ballot Mail Portal and enroll all voters," explaining that the current statewide database does not include IMb data and that information would need to be entered manually for each and every voter—that is over 400 days of 24-hour data entry work. Rudy (CO) Decl. ¶ 28, Doc. No. 4-6 at 9. Even if States were able to enter all voter information in the Ballot Portal in a timely fashion—impossible in many States—the Rule then requires each piece of election mail to be individually scanned and processed by a postal service agent "to 'confirm the presence of scanned barcodes in the Federal Mail Ballot Portal'" which USPS estimates could alone take a minute per piece of mail, and election staff must "remain at the postal retail location during the verification process." Southard (CA) Decl. ¶ 55, Doc. No. 4-1, at 23–24. California, for example, must mail out over 23 million mail ballots to comply with state law. *Id.* At one minute per ballot, the scanning time alone will take over **43 years** to complete.

And even if States were able to have ballot mailings scanned in a timely manner—again, impossible in many States—some states have additional challenges that will lead to mail ballot voters being excluded. For example, in Delaware, the standards in the Rule for mail ballot envelopes are inconsistent with the specific standards set by Delaware law, and the Department of Elections would need to "seek a legislative amendment of Delaware law or would need to seek judicial intervention in order to mail ballots," which would be "excessively difficult" in the limited time remaining. Albence (DE) Decl. ¶ 34, Doc. No. 4-8 at 15–18. Similarly, in New Mexico, state law allows those on remote tribal reservations to receive ballots at a centralized government building, and for intimate partner violence survivors to vote in a manner that protects their current address from disclosure to county officials, but neither procedure would be possible under the requirements of the Rule—disenfranchising those voters. Vigil (NM) Decl. ¶¶ 16, 18, Doc. No. 4-16 at 7–8; *see also, e.g.*, Southard (CA) Decl. ¶ 22, Doc. No. 4-1 at 10–11. And for some voters on those remote trial reservations, IMbs cannot be created and used because their non-standard addresses cannot be verified using Delivery Point Verification. Fontes (AZ) Decl. ¶ 38, Doc. No. 4-5 at 20–21. The scale of disruption and disenfranchisement from the

Rule, and therefore irreparable harm to Plaintiff States, is staggering, and Federal Defendants do not rebut a single piece of the above evidence of the Rule's impacts.

The Rule's undermining of Plaintiff States' ability to administer elections in accordance with their own state laws—particularly, by denying delivery ballots to voters otherwise eligible to cast a mail ballot under state law—interferes with the States' "sovereign power . . . to create and enforce a legal code," *see Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); causes administrative upheaval, unrecoverable compliance costs, and diversion of resources, *see Mass. v. HHS*, 923 F.3d 209, 221–227 (1st Cir. 2019); and will harm Plaintiff States' reputations as trustworthy stewards of elections, *see Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996)—all irreparable harms.

Federal Defendants respond that "[t]here is no harm to a State's sovereignty when, if it chooses to use mail service offered by the federal government, it must comply with basic requirements on the provision of that service." Doc. No. 65 at 29. That conclusory statement is wrong as a matter of law, *supra* I, and wishes away the States' extensive documented harms. And concretely, it ignores that the Rule renders many states unable to comply with their state election laws, which both *require* sending ballots by mail and also have requirements that *conflict* with the specific dictates of the Rule. *See, e.g.*, Albence (DE) Decl. ¶ 34, Doc. No. 4-8 at 15–18 (standards in the Rule for mail ballot envelopes are inconsistent with the specific standards set by Delaware law); Koski (VA) Decl. ¶ 20, Doc. No. 4-23 at 6 ("[T]he Rule directly contradicts Virginia law" prohibiting registrars to provide voter lists outside very limited circumstances that do not cover USPS); *cf.* N.C. Gen. Stat. § 163-228(c) (requiring official register of absentee ballot requests to be kept confidential). Federal Defendants point to North Carolina, which must mail ballots by September 4. Doc. No. 65 at 30. This task must be carried out by 100 county boards of elections. Brunton (NC) Decl. ¶ 6, Doc. No. 4-18 at 2. Defendants cite to one state official's press statements regarding complying with the Rule, but ignore the declaration evidence that USPS has not committed to making necessary details about the new USPS portal available by September 4 nor committed to provide training before September 4 to

USPS employees who will be the gatekeepers for whether ballots will be delivered. *Id.* ¶¶ 15–16, Doc. No. 4-18 at 4–5. And Federal Defendants argue States' harm from "diverting scarce time and resources" to comply with the Rule ignores that USPS has pledged to make available "considerable educational and other support resources" "to assist states with ballot mail envelope design." Doc. No. 65 at 29.[13] Setting aside that the Rule indicates USPS is not providing "additional staff" for implementation, 91 Fed. Reg. 54986, Federal Defendants fail to explain how USPS *assistance with ballot mail envelope design* means "significant 'conjecture' is necessary to conclude that the State Plaintiffs still will suffer irreparable harm from the Rule." Doc. No. 65 at 29. In fact—not conjecture—the Rule will cause USPS to refuse to deliver millions of mail ballots in the coming weeks.

Relatedly, the fact that otherwise eligible voters in Plaintiff States will be denied their right to cast a mail ballot—and, in many cases, their right to vote altogether—demonstrates the strong public interest favoring an injunction against the Rule. "The public interest . . . favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). There is urgency here. The November elections are two short months away and Plaintiff States must begin sending mail ballots to voters in a matter of days and weeks. The equities and public interest demand an injunction because "there can be no 'do-over' or redress of a denial of the right to vote." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016).

The purported harms identified by Federal Defendants do not come close to outweighing the devastation to voting rights. *See* Doc. No. 65 at 28. Though Federal Defendants say they will be injured if unable to enforce the Rule requirements for the November elections, *see id.* at 29 (citing *Trump v. California*, 2026 WL 2473573, at *5), simply setting back the Executive's immediate purported goals cannot be enough to universally foreclose injunctive relief against an illegal government action. *See Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 33

[13] Notably, Federal Defendants do not provide any declarations from USPS personnel detailing either preparation for this extensive assistance, nor statements about USPS's general ability to fully implement the Rule in sworn testimony.

(D. Me. 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022) ("It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." (citation omitted)). Moreover, while USPS stated the Rule's purported law enforcement benefits are so significant that there was no compelling reason for delay, 91 Fed. Reg. 54985, the Federal Defendants have not shown any factual basis or need for the Rule's burdensome requirements. *See N.H. Youth Movement v. Scanlan*, 833 F. Supp. 3d 93, 116 (D.N.H.) ("Wrongful voting, meaning unqualified voters *intentionally or unintentionally* casting ballots, is extremely rare").

Intervenor Defendants point to the same alleged harm from the "loss of election integrity measures" they wish to implement. Doc. No. 64 at 24. But nothing stops Intervenor Defendants from implementing the design standards in the Rule for their own mail ballots, or tracking all state ballot mail by unique IMb codes in a state list, thus, reaping the alleged benefits of the data transparency in the Rule. So while Missouri's declarant states that "[a]lthough my staff are still figuring out some details of implementation, I believe it is possible to implement this rule for the 2026 General Election," Hoskins (MO) Decl. ¶ 5, Doc. No. 64-1 at 3,[14] an injunction or stay would not prevent Missouri from moving forward with the ballot design and IMb code list.

The limited harms and lack of evidence for widespread fraud must matter when the evidence shows that implementing the Rule would result in disrupting voting for potentially millions of citizens. The balance of equities and public interest here are not close. An injunction must issue to ensure that eligible Americans can participate in the November elections.

## IV. THE COURT SHOULD NOT REDUCE THE SCOPE OF RELIEF

The TRO issued by the Court struck the right balance on the scope of relief by staying most provisions of the Rule only to the extent they are mandatory, and fully staying the core

[14] This view of harms may not be universal in Intervenor Defendants' States. While Florida's litigation counsel are silent on the ability of Florida to comply with the Rule, a local Florida Republican Supervisor of Elections says of the Rule's last minute changes to elections "[y]ou can't do it on short notice," calling it "unwise at best." Reid J. Epstein, *Postal Service Rule Could Bar Millions From Voting by Mail*, N.Y. Times (Aug. 30, 2026), https://www.nytimes.com/2026/08/30/us/politics/mail-voting-trump-midterms-supreme-court.html?smid=nytcore-ios-share.

enforcement provisions that require USPS to review and verify mailings prior to acceptance, and to refuse and return noncompliant mailings without accepting responsibility for them. Doc. No. 31 at 10–11. The Court should maintain this scope of relief in issuing a preliminary injunction and stay of the Rule, which would satisfy the federal defendants' request to allow States to "comply voluntarily with the Rule" and would not preclude them from working collaboratively to further the purposes of the Rule with States who wish to do so. Doc. No. 65 at 31.

Federal Defendants ask the Court to enjoin *only* the provision requiring USPS to refuse to accept and return noncompliant mailings. Doc. No. 65 at 31 (citing DMM 705.24.5.3).[15] To the extent Defendants are asking that the envelope design and enrollment provisions go into effect as *mandatory* provisions (but without any enforcement mechanism), Plaintiff States strongly oppose this request. Even if USPS is prevented from intercepting and rejecting ballots, those provisions are infeasible for many States; would cast an intolerable shadow over Plaintiff States' mail ballots; and cause confusion among voters. And Federal Defendants notably do not disclaim any intent to use other enforcement tools to ensure compliance with the Rule. *See, e.g.*, 39 C.F.R. § 233.1 (granting postal inspectors law enforcement powers over "violations of postal laws"). To the extent Defendants' interest lies in allowing voluntary compliance by willing States, the scope of relief ordered in the TRO adequately protects that interest.

## CONCLUSION

Plaintiff States request the Court grant their motion for a preliminary injunction and stay.

[15] Defendants do not address DMM 705.24.5.1, which requires USPS to review ballot mailings "prior to acceptance," but as explained above that provision would force Plaintiff States' elections officials to collectively spend decades waiting for the review to be complete. They also fail to address DMM 705.24.5.2, but its USPS verification and location requirements will likewise consume election officials' scarce time.

August 31, 2026

Respectfully submitted.

**ROB BONTA**
Attorney General of California

By: /s/ *Anne P. Bellows*
Anne P. Bellows*
*Deputy Attorney General*
Thomas S. Patterson*
*Senior Assistant Attorney General*
Seth E. Goldstein*
*Supervising Deputy Attorney General*
Malcolm A. Brudigam*
Michael S. Cohen*
Lisa C. Ehrlich*
Kevin L. Quade*
Robert William Setrakian*
*Deputy Attorneys General*
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3847
anne.bellows@doj.ca.gov

*Counsel for the State of California*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: /s/ *Vanessa A. Arslanian*
Vanessa A. Arslanian (BBO No. 688099)
*State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
*Deputy State Solicitor*
Jared B. Cohen (BBO No. 689217)
Julia S. Canney (BBO No. 717328)
Phoebe M. Lockhart (BBO No. 709411)
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2107
vanessa.arslanian@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**AARON FORD**
Attorney General of Nevada

By: /s/ *K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: /s/ *Tera M. Heintz*
Tera M. Heintz*
Cristina Sepe*
Karl D. Smith*
*Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
tera.heintz@atg.wa.gov

*Counsel for the State of Washington*

(additional counsel on following page)

**KRISTIN K. MAYES**
Attorney General of Arizona

By: /s/ *Kara Karlson*
Kara Karlson*
Karen J. Hartman-Tellez*
Syreeta Tyrell*
*Assistant Attorneys General*
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-8118

*Counsel for the State of Arizona*

**PHILIP J. WEISER**
Attorney General of Colorado

By: /s/ *Shannon Stevenson*
Shannon Stevenson*
*Solicitor General*
Peter Baumann*
*Senior Assistant Attorney General*
1300 Broadway
Denver, Colorado 80203
(720) 508-6400

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: /s/ *Maura Murphy*
Maura Murphy*
*Deputy Associate Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: /s/ *Ian R. Liston*
Ian R. Liston*
*Director of Impact Litigation*
Vanessa L. Kassab*
*Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: /s/ *Karthik P. Reddy*
Karthik P. Reddy*
*Special Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 741-5221

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: /s/ *Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360

*Counsel for the State of Hawaiʻi*

(additional counsel on following page)

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ *Vikas Didwania*
Vikas Didwania*
*Complex Litigation Counsel*
Alex Hemmer*
*Deputy Solicitor General*
Molly Petchenik*
*Assistant Attorney General*
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526

*Counsel for the State of Illinois*

**AARON M. FREY**
Attorney General of Maine

By: /s/ *Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: /s/ *Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: /s/ *Neil Giovanatti*
Neil Giovanatti*
*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
(517) 241-1050

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: /s/ *Angela Behrens*
Angela Behrens
Allen Cook Barr*
*Assistant Attorneys General*
Lindsey E. Middlecamp*
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN, 55101
(651) 300-0711

*Counsel for the State of Minnesota*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: /s/ *Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
Joshua P. Bohn*
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276

*Counsel for the State of New Jersey*

(additional counsel on following page)

**RAÚL TORREZ**
Attorney General of New Mexico

By: /s/ *Bailey Colfax*
Bailey Colfax*
*Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060

*Counsel for the State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

By: /s/ *Colleen K. Faherty*
Colleen K. Faherty*
*Special Trial Counsel*
Rabia Muqaddam*
*Chief Counsel, Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-6046

*Counsel for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina

Laura Howard
Chief Deputy Attorney General

By: /s/ *Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27603

*Counsel for the State of North Carolina*

**DAN RAYFIELD**
Attorney General of Oregon

By: /s/ *Thomas H. Castelli*
Thomas H. Castelli*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880

*Counsel for the State of Oregon*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: /s/ *Megan Rok*
Megan Rok*
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: /s/ *Ryan P. Kane*
Ryan P. Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153

*Counsel for the State of Vermont*

(additional counsel on following page)

**JAY JONES**
Attorney General of Virginia

By: /s/ *Tillman J. Breckenridge*
Tillman J. Breckenridge*
*Solicitor General*
202 North Ninth Street
Richmond, VA 23219

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: /s/ *Lynn Lodahl*
Lynn Lodahl*
*Assistant Attorney General*
17 West Main Street
Madison, WI 53707-7857
(608) 264-6219

*Counsel for the State of Wisconsin*

**JOSH SHAPIRO**
Governor of the Commonwealth of Pennsylvania

By: /s/ *Michael J. Fischer*
Michael J. Fischer*
Charlotte Gibson*
*Executive Deputy General Counsel*
Jacob B. Boyer*
*Deputy General Counsel*
30 North Third Street, Suite 200
Harrisburg, PA 17101
(717) 831-2847

*Counsel for the Governor of the Commonwealth of Pennsylvania*

*Admitted pro hac vice or pro hac vice applications forthcoming*