**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants.

Leave to file granted on September 3, 2026

Civil Action No. 1:26-cv-11549-IT

STATE OF CALIFORNIA, et al.,

Plaintiffs,

v.

UNITED STATES POSTAL SERVICE, et al.,

Defendants.

Civil Action No. 1:26-cv-13917-IT

**BRIEF OF *AMICUS CURIAE* NATIONAL SECURITY LEADERS FOR AMERICA IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

Yevgeniy Pilipovskiy (BBO No. 714018)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
ypilipovskiy@cov.com
(202) 662-6000

*Counsel for* Amicus Curiae *National Security Leaders for America*

August 31, 2026

## TABLE OF CONTENTS


TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

INTEREST OF *AMICUS CURIAE* ........ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 2

BACKGROUND ........ 3

A. Military and Diplomatic Families Confront Unique Challenges When Voting ........ 3

B. UOCAVA Requires that Absentee Ballots Be Made Available to Eligible Voters Who Request Them and that Those Absentee Ballots Can Be Returned and Counted ........ 6

C. USPS's Final Rule Provides No Viable Process for Respecting UOCAVA's Mandates ........ 7

ARGUMENT ........ 9

I. The Requirements of Section 3 of Executive Order 14,399 and the Final Rule Conflict with UOCAVA's Mandates to the States and the Executive Branch ........ 9

A. Executive Order 14,399 ........ 9

B. The Final Rule ........ 10

1. The Final Rule's ballot requirements ........ 10

2. The Final Rule cannot be reconciled with UOCAVA ........ 11

II. Implementation of the Final Rule Would Produce Chaos in Military and Diplomatic Voting That Prevents the States from Counting Ballots of Eligible Voters ........ 14

A. UOCAVA's Firm Deadlines Do Not Allow for Correction of the Final Rule's Inadequate Procedure for Exclusion of UOCAVA Ballots from the Enrollment-and-Barcode Regime ........ 15

B. Any Errors in a Rushed Rollout of Section 3 and the Final Rule Will Impact Those Voters Least Able to Correct Them ........ 17

C. *Purcell*'s Anti-Disruption Principle Applies with Particular Force to Military and Overseas Voters, Who Have No Opportunity to Try Again ........ 18

CONCLUSION ........ 20

CERTIFICATE OF SERVICE ........ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .....14

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .....19

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .....19

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) .....19

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .....14

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .....18

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
589 U.S. 423 (2020) .....18

**Statutes**

52 U.S.C. § 20301 .....7

52 U.S.C. § 20302 .....6, 7, 11, 12, 15, 16, 17, 19

52 U.S.C. § 20303 .....7

52 U.S.C. § 20304 .....7, 8, 11, 15

Fla. Stat. § 101.68 .....5

Ga. Code § 21-2-386 .....5

Ga. Code § 21-2-419 .....5

Military and Overseas Voter Empowerment Act, Pub. L. No. 111-84, 123 Stat.
2190 (2009) .....6

Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410, 100
Stat. 924 (1986) .....1

**Regulatory Materials**


Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (June 2, 2026) .......................................10

Ballot Mail for Federal Elections, 91 Fed. Reg. 54,966 (Aug. 26, 2026) .........................................................1, 8, 9, 10, 11, 12, 13, 14, 16, 17

Comment of National Security Leaders for America to the United States Postal Service Proposed Rule Amending the Domestic Mail Manual Regarding the Transmission of Mail-In or Absentee Ballots for Federal Elections (July 1, 2026) .........................................................................................................13, 14

Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (2026) .................................................1, 10, 16, 17


**Other Authorities**


Camilla Rodriguez Guzman, *Serving in the Military Shouldn't Mean It's Harder to Vote*, Nat'l Conf. of State Legis. (Aug. 26, 2025) ...........................................................5

Christopher Patten, *UOCAVA RCV Overseas Voters: Short Stories from Overseas Voters* (2020) ...............................................................................................................5

Fed. Voting Assistance Prog., *2026–27 Voting Assistance Guide* (Oct. 2025) ..................5, 15, 17

Fed. Voting Assistance Prog., *Issue Brief: Ballot Outcomes by Ballot Receipt Date* (archived Aug. 25, 2026) ..............................................................................6

Fed. Voting Assistance Prog., *State of the Military Voter* (archived July 29, 2026).......................4

H.R. Rep. No. 99-765 (1986)..................................................................................3, 19

Mariel Padilla, *If You're in the Military, Voting This Year Could Be Tricky*, The 19th (July 12, 2024) .........................................................................................4

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (2025) ...............................................................3, 4, 6, 9

U.S. Gov't Accountability Off., GAO-25-107098 Highlights, *State Department: Spending on Pay, Benefits, and Allowances for Overseas Employees* (Dec. 19, 2024) ...........................................................................................................3

USPS, *Intelligent Mail Barcode* ..............................................................................13

USPS Office of Inspector General, *Audit Report: Manual Mail Processing Efficiency* at 12 (Sept. 21, 2021)......................................................................13

*Why the Wait? Unpacking California's Untimely Election Counting Process*: *Hearing Before the Comm. on H. Admin.*, 119th Cong. (2025) ...............................................4

## INTEREST OF *AMICUS CURIAE*[1]

National Security Leaders for America ("NSL4A") is a non-partisan network of over 1,500 former senior military and civilian leaders possessing broad experience in national security issues and sharing viewpoints and affiliations from across the political spectrum. Over 800 of NSL4A's members are retired Generals, Admirals, or other senior officers from one of the uniformed services of the United States. Approximately 200 of its members served as ambassadors of the United States in foreign countries, while many more served in senior diplomatic posts around the world.

This extensive service to our country has afforded many NSL4A members first-hand experience with the difficulties military and diplomatic personnel encounter in casting ballots when on assignment abroad or in the United States away from their legal residences. NSL4A can assist the Court to understand the harms that will be inflicted upon the voting rights of uniformed military members, diplomats, and their families by the restrictive policies announced in Executive Order 14,399 of March 31, 2026, 91 Fed. Reg. 17,125, and the United States Postal Service's ("USPS") Final Rule, Ballot Mail for Federal Elections, 91 Fed. Reg. 54,966 (Aug. 26, 2026) (to be codified at 39 C.F.R. pt. 111) ("Final Rule"). NSL4A and its members also are familiar with how Executive Order 14,399 and the Final Rule conflict with the protections Congress afforded to voters in federal service under the Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410, 100 Stat. 924 (1986) ("UOCAVA").

The timely delivery of UOCAVA ballots to voters, their successful return to election offices, and accurate tabulation of these ballots are matters of significant concern to NSL4A

---

[1] No party or counsel for a party authored the proposed brief in whole or in part, and no person other than the *amicus curiae*, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

members. NSL4A can provide a unique and meaningful perspective to ensure that UOCAVA voters can exercise their fundamental right to access the ballot box and have their votes counted. NSL4A is not aware of any party or court having addressed these issues in the instant or related litigation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress enacted UOCAVA to ensure that military personnel and their family members serving or living away from their voting residence, as well as diplomats and other American citizens living overseas, are able to have their votes counted despite the delays and practical barriers inherent in voting away from their legal residences. Section 3 of Executive Order 14,399 directs USPS to interfere with that framework by imposing a new barcode-and-enrollment regime for ballot mail, implemented on a compressed election-year timeline, that would interfere with the protections Congress guaranteed UOCAVA voters. Although the Final Rule nominally purports to exempt UOCAVA ballots from its implementation of Section 3's unlawful requirements, the exclusion is neither fully developed nor workable.

This Court should grant Plaintiffs' motions to preliminarily enjoin implementation of Section 3 and the Final Rule for multiple reasons, including two of particular significance to UOCAVA voters.

*First*, Section 3 and the Final Rule cannot be lawfully implemented because they conflict with UOCAVA's express requirement that States may not reject covered ballots based on envelope-type restrictions. The Final Rule provides no plausibly effective procedures by which USPS can ensure that ballots from UOCAVA voters will not be rejected as noncompliant under the Final Rule's barcode-and-enrollment policy.

*Second*, implementation of the Final Rule would inject confusion and operational disruption into military and diplomatic and other overseas voting at the very time when State

officials must distribute, receive, and count UOCAVA ballots. The processes prescribed to protect UOCAVA voters preclude any realistic conclusion that there will be adequate time to resolve the conflicts and uncertainties associated with the Section 3 and Final Rule ballot procedures before the November 3, 2026, general election. Accordingly, allowing USPS to implement the Final Rule would create an imminent risk that military personnel and their families serving away from their legal residences and other eligible voters living abroad will lose votes that cannot later be restored.

## BACKGROUND

### A. Military and Diplomatic Families Confront Unique Challenges When Voting

For as long as the United States has sent her citizens to serve at geographically dispersed domestic and overseas military installations and diplomatic postings, military members and diplomatic personnel, along with their family members, have confronted unique challenges in casting their ballots. Stationed hundreds or thousands of miles from home, military members often serve in remote areas with slow or sporadic mail service. They may also be away from their posts for days or weeks at a time. For this group, voting by absentee ballot is frequently the only feasible way to exercise their democratic right. As Congress has acknowledged, "When overseas voters fail to receive their absentee ballots in time to vote and return them, they are clearly and effectively disenfranchised." H.R. Rep. No. 99-765, at 12 (1986).

These issues are not abstract. Many of the estimated 1.31 million active-duty members and roughly 549,000 military spouses and voting-age dependents are assigned to areas away from their legal voting residence. U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* 194–95 (2025) ("2024 Report"), https://perma.cc/SE86-6WBP. Thousands of diplomatic personnel staff hundreds of foreign U.S. posts. *See* U.S. Gov't Accountability Off., GAO-25-107098 Highlights, *State Department: Spending on Pay, Benefits, and Allowances for Overseas Employees* (Dec. 19, 2024),

https://perma.cc/ZF5F-EPPH. In practice, most of these voters use the postal system to cast their ballots. In the 2024 general election, 65.8 percent of absentee ballots returned and submitted by military and overseas voters arrived via postal mail. 2024 Report at 204.

Yet even with the hundreds of thousands of military and diplomatic ballots mailed out each year, these voters continue to face particular challenges. In 2024, 15 percent of military voters reported they did not receive their ballot in time or that their ballot never arrived. Fed. Voting Assistance Prog. ("FVAP"), *State of the Military Voter* (archived July 29, 2026), https://perma.cc/DRT6-2X8U. Even voters who do receive ballots have reported that their ballots were never counted. In the 2020 election, for instance, one military spouse stationed in Japan requested an absentee ballot and mailed it back to her home state of South Dakota the day after she received it. Mariel Padilla, *If You're in the Military, Voting This Year Could Be Tricky*, The 19th (July 12, 2024), https://19thnews.org/2024/07/military-voting-challenges-election-2024/. When the voter went to check her ballot identification number on the county supervisor's website, a notification stated her ballot had been "received but not counted." *Id.* She contacted the county supervisor of elections by email but never heard back. *Id.* Being thousands of miles away from home in connection with her spouse's posting, the voter was unable to resolve her voting issue in person and was unable to have her ballot counted. She was disenfranchised.

As mail ballots are first sent to the voter and then returned to election officials, delays and other issues arise for two principal reasons. First, due to the distance some of these ballots must travel, military and diplomatic voters often confront condensed timelines to receive and return their ballots. Mail to military families stationed abroad commonly can take six to eight weeks to arrive. *See Why the Wait? Unpacking California's Untimely Election Counting Process*: *Hearing Before the Comm. on H. Admin.*, 119th Cong. 26–27 (2025) (statement of Rebecca Nowatchik,

Dir. of External P'ships, Secure Families Initiative), https://perma.cc/JSZ6-485C. An overseas voter in Fiji explained that mail often arrives in that country nine months late. Christopher Patten, *UOCAVA RCV Overseas Voters: Short Stories from Overseas Voters* at 8 (2020), https://perma.cc/94KJ-DM39. In an apparent acknowledgment of mail delays, UOCAVA voters are advised to return their ballots as early as 30 or 35 calendar days before Election Day. *See* FVAP, *2026–27 Voting Assistance Guide* 10 (Oct. 2025), https://perma.cc/KG45-TMBD.

Second, military members and diplomats may have transient posts, further complicating ballot delivery. A 2025 media report highlighted the case of a Navy sailor whose post was "essentially his ship." Camilla Rodriguez Guzman, *Serving in the Military Shouldn't Mean It's Harder to Vote*, Nat'l Conf. of State Legis. (Aug. 26, 2025), https://perma.cc/G7FB-4MU8. The sailor requested an absentee ballot for the 2024 presidential election, but the ballot "never made it through the mail" due to processing problems, preventing him from voting. *Id.*

Furthermore, some States provide voters only a very brief window after Election Day to fix a missing or mismatched signature on a mail ballot. In Florida and Georgia, for example, military voters whose absentee ballots are rejected because of a signature or verification issue have only until the second or third day after the election, respectively, to provide the required affidavit and personal identification to cure the ballot. Fla. Stat. § 101.68; Ga. Code §§ 21-2-386, 21-2-419. For military and overseas voters, these compressed deadlines can be impossible to meet. Notifications may arrive late, and the voters may be in service away from their mailing address when the notification comes.

A recent report by the Federal Voting Assistance Program highlights these obstacles, noting that "When a ballot is received too close to Election Day, there may not be sufficient time to resolve errors, and a ballot that might have otherwise been counted if the issue had been fixed

is ultimately rejected." FVAP, *Issue Brief: Ballot Outcomes by Ballot Receipt Date* (archived Aug. 25, 2026), https://perma.cc/DQ35-H762. And the problem is becoming more severe. In the 2024 federal elections, the overall rejection rate for regular absentee ballots submitted by UOCAVA voters was 3.7 percent—a 77 percent increase from the 2.1 percent reported in 2020. 2024 Report at 206.

In short, military members and diplomatic personnel commonly must cast their votes by mail, and they face elevated barriers when doing so. Faithful implementation of protective laws like UOCAVA is critical to ensuring these individuals can successfully exercise their voting rights.

### B. UOCAVA Requires that Absentee Ballots Be Made Available to Eligible Voters Who Request Them and that Those Absentee Ballots Can Be Returned and Counted

Generally, UOCAVA requires States to permit covered voters "to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1). As amended through the Military and Overseas Voter Empowerment Act (MOVE Act), Pub. L. No. 111-84, Subtitle H, §§ 575–89, 123 Stat. 2190, 2318–35 (2009), UOCAVA requires that (absent a hardship exemption) when the request for an absentee ballot is received at least 45 days before the election, States must "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election." 52 U.S.C. § 20302(a)(8). For the November 3, 2026, general election, that date is September 19, 2026. In practical effect, therefore, UOCAVA requires State procedures for absentee voting to be established and operational significantly in advance of 45 days before the election, that is, well before September 19 this year.

As to registration and application, UOCAVA requires States to accept any valid voter registration application and absentee ballot application received at least 30 days before any election. *Id.* § 20302(a)(2). For the upcoming general election, therefore, States must accept

registrations and absentee ballot applications as late as October 4, 2026. In addition to any method of registering to vote or applying for an absentee ballot prescribed by the States, moreover, UOCAVA requires States to accept and process "an official post card form, containing both an absentee voter registration application and an absentee ballot application" prescribed by federal authorities. *Id.* §§ 20301(b)(2), 20302(a)(4). UOCAVA also provides for a "Federal write-in absentee ballot . . . for use in general, special, primary, and runoff elections for Federal office by . . . voters who make timely application for, and do not receive, States['] absentee ballots." *Id.* § 20303(a)(1). Among other requirements, UOCAVA requires the States to establish procedures to enable covered voters to request and receive voter registration and absentee ballot applications by mail or electronically, *id.* § 20302(a)(6)(A)–(B), and to transmit "blank absentee ballots" to eligible voters "by mail and electronically," *id.* § 20302(a)(7).

As to ballot collection and delivery of marked ballots, UOCAVA requires federal authorities to implement procedures for collecting and facilitating the delivery of marked absentee ballots "to the appropriate election officials" "not later than the date by which an absentee ballot must be received in order to be counted in the election." *Id.* § 20304(a)–(b). For these purposes, UOCAVA directs federal authorities to "cooperat[e] and coordinat[e] with" USPS to "provide expedited mail delivery service for all such marked absentee ballots . . . that are collected on or before the [prescribed] deadline." *Id.* § 20304(b). Absent an applicable exception, the prescribed collection deadline "is noon (in the location in which the ballot is collected) on the seventh day preceding the date of the regularly scheduled general election for Federal office." *Id.*

### C. USPS's Final Rule Provides No Viable Process for Respecting UOCAVA's Mandates

On August 26, 2026, USPS published its Final Rule to implement Executive Order 14,399. Implicitly acknowledging that Section 3 of the Executive Order conflicts with UOCAVA's mandate

to facilitate expedited delivery of UOCAVA ballots, the Final Rule purports to exempt UOCAVA ballots from its conditions. 91 Fed. Reg. at 54,988. Yet it provides no processing procedures to ensure outbound UOCAVA ballots are delivered to voters despite the new delivery restrictions the Final Rule imposes on federal election mail generally. Nor does the Final Rule provide any method to ensure that return ballots from UOCAVA voters will be delivered for tabulation when those ballots would be rejected for other mail-in voters due to the absence of machine-readable markings on their return envelopes. Bizarrely, USPS took the position that these practical issues of fundamental importance to UOCAVA voting—which NSL4A and other commenters raised as concerns in response to USPS's proposed rule—did not have to be considered in the Final Rule or made a part of the revised Domestic Mail Manual ("DMM") provisions. *See* 91 Fed. Reg. at 54,988 (noting that commenters "asked for more assurances and safeguards to ensure UOCAVA ballots would not be impacted by the rule, as errors could occur that would accidentally apply the rule's standards to UOCAVA ballots" and further "sought clarification on how the Postal Service would distinguish between ballots sent pursuant to UOCAVA and other mail-in or absentee ballots"). "[O]perational changes or service commitments for ballots mailed to and from military and overseas voters," USPS responded, "are beyond the scope of this proceeding and will not be addressed." 91 Fed. Reg. at 54,968.

Instead of establishing mail-handling procedures to expedite delivery of UOCAVA ballots consistent with 52 U.S.C. § 20304, the Final Rule appears to assume that USPS will be able to identify and exempt many thousands of individual pieces of outbound and return UOCAVA ballot mail based on the franking language that exempts the mail from postage requirements, *i.e.*, language on the envelopes stating "No Postage Necessary in the U.S. Mail—DMM 703.8.0" or "U.S. Postage Paid 39 U.S.C. 3406." 91 Fed. Reg. at 54,988. At the same time, though, USPS

appears to acknowledge that its automated reading and sorting technology will not respond to these envelope markings because they are not machine readable: USPS's only solution for outgoing ballot mail is to require that election officials segregate their outbound UOCAVA ballots from other ballots so that the UOCAVA ballots can be "properly accepted" at the Post Office. *Id.* New section 705.24.5.2 of the DMM confirms this reliance on manual sorting, stating that election officials must present their outbound UOCAVA ballot mail at a USPS facility and the exempt mail "will be verified by Postal Service employees when presented for acceptance." 91 Fed. Reg. at 54,991. Even more alarming, the Final Rule is entirely silent about procedures for handling return ballots mailed by UOCAVA voters that are not acceptable for delivery under the Final Rule's barcode-and-enrollment procedures.

## ARGUMENT

The Plaintiff States collectively include within their populations hundreds of thousands of UOCAVA voters. For example, in 2024 California reported having 165,341 UOCAVA voters, Virginia reported 174,315 such voters, and Washington State reported 124,410 such voters. 2024 Report at 210–11. Thousands more reside in other Plaintiff States. *See id.* As explained below, implementation of Section 3 of Executive Order 14,399 and the Final Rule would directly, immediately, and irrevocably interfere with the States' fulfillment of their obligations to these UOCAVA voters. A preliminary injunction against implementation of the Final Rule is necessary to prevent this certain harm to the Plaintiff States and their citizens serving our country abroad.

### I. The Requirements of Section 3 of Executive Order 14,399 and the Final Rule Conflict with UOCAVA's Mandates to the States and the Executive Branch

#### A. Executive Order 14,399

Section 3 of the Executive Order is irreconcilable with UOCAVA's specific commands governing expedited delivery of all properly marked military and overseas ballots. It directs that

USPS "shall" specify "that all outbound ballot mail must be mailed" in an envelope that must, among other requirements, be "marked as Official Election Mail" and "bear[] a unique Intelligent Mail barcode ["IMb"] or successor USPS technology." Exec. Order No. 14,399, § 3(b)(i)(A)–(B), 91 Fed. Reg. 17,125, 17,126 (2026). That command contains no exception for ballots that are properly marked and mailable under UOCAVA, which are not required to have the machine-readable markings required by the Executive Order, thus creating a facial conflict between the Executive Order and governing law.

### B. The Final Rule

USPS purported to resolve this conflict by declaring in its rulemaking that the new rule's provisions "do not apply to ballots covered under the Uniformed and Overseas Citizens Absentee Voting Act." Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915, 32,915–32,916 (June 2, 2026) (proposed rule). As explained below, though, the actual text of the Final Rule and revised DMM cannot be harmonized with UOCAVA's explicit statutory requirement that States must accept a properly marked UOCAVA ballot regardless of other envelope features. Against the Final Rule's general policy that inevitably will lead to rejection and non-delivery of some UOCAVA mail, USPS has failed to establish any plausibly reliable process for ensuring that all outbound UOCAVA ballots are delivered from election offices to mail-in voters, and no procedures to prevent rejection of UOCAVA return mail from voters back to their home election offices.

#### 1. The Final Rule's ballot requirements

The new USPS procedures for outbound ballots are contrary to UOCAVA, unworkable, and arbitrary. To implement Section 3's command, the Final Rule requires that "[o]utbound Federal Ballot Mail must be mailed in an envelope that . . . [b]ears a unique IMb with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier." 91 Fed. Reg. at 54,990 (amending DMM 705.24.3.1.c). The Final Rule nevertheless asserts, without any

significant explanation, that USPS will correctly identify and exempt outbound UOCAVA mail that does not contain the IMb based on envelope franking language that states "No Postage Necessary in the U.S. Mail—DMM 703.8.0" or "U.S. Postage Paid 39 U.S.C. 3406." 91 Fed. Reg. at 54,988. USPS supposedly "will review mailings identified as Outbound Federal Ballot Mail prior to acceptance to evaluate whether the mailing meets the standards in 24.3.1 and is being sent to individuals who have been enrolled . . . on the state's Mail-In and Absentee Participation List," *id.* at 54,991 (DMM 705.24.5.1)—a review USPS elsewhere describes as "checking the outbound barcode," *id.* at 54,969. Any mailing that does not pass this review "will not be accepted and will be returned to the authorized ballot mailer." *Id.* at 54,991 (DMM 705.24.5.3.a).

The Final Rule provides that States' return ballots mail "must meet" similar barcoding and formatting requirements. *Id.* (DMM 705.24.3.2 (Return Federal Ballot Mail Envelope Standards) & DMM 705.24.4.2.f (requiring certification of compliance with standards for return ballots)). More specifically, USPS will rely on "mailpiece design review" to clear return ballots. *Id.* (DMM 705.24.3.2c). Critically, the Final Rule provides no provision for how postal personnel will handle UOCAVA return ballots that lack the required barcode.

**2. The Final Rule cannot be reconciled with UOCAVA**

UOCAVA commands a very different approach. Under that law, States, supported by procedures of the Federal Government including USPS, "shall not refuse to accept and process" an otherwise valid marked absentee ballot "solely on the basis of" "[r]estrictions on . . . envelope type," 52 U.S.C. § 20302(i), (i)(3); *id.* § 20304. These requirements leave no room for a verification standard that conditions a ballot's acceptance on the presence of a particular barcode or other marking. Under Section 3 and DMM 705.24.3.1.c and 705.24.5.1 (governing outbound mail), a UOCAVA ballot Congress has specifically directed the States to accept regardless of its envelope type is precisely the kind of mailing that USPS is likely to reject under the Final Rule.

*See* 52 U.S.C. § 20302(i), (i)(3) (prohibiting refusal to accept applications based on envelope type). If these changes are implemented, Section 3 and the Final Rule thus would prevent the States from satisfying their obligations under UOCAVA and abrogate the Executive Branch's own duties under that law.

USPS's claimed exemption for UOCAVA ballots is just a promise without a mechanism. In its commentary supporting the Final Rule, USPS seeks to avoid the conflict with UOCAVA by instructing that outbound ballots "should be segregated from Outbound Federal Ballot Mail when presented for mailing." *Id.* USPS further suggests that UOCAVA ballot envelopes can be singled out for delivery by the presence of unique envelope markings, *i.e.*, language on the envelopes stating "No Postage Necessary in the U.S. Mail—DMM 703.8.0" or "U.S. Postage Paid 39 U.S.C. 3406." 91 Fed. Reg. at 54,988. In doing so, USPS implicitly confirms that its automated technology will not recognize the UOCAVA franking language that USPS now is giving critical importance—while providing no other mechanism or safeguards for ensuring delivery of UOCAVA ballots that lack acceptable IMb barcodes.

While the Final Rule relies on election officials to pre-sort their outbound UOCAVA mail and on postal workers to correctly deliver the outbound ballots notwithstanding the general barcode-and-enrollment process, the Final Rule and its commentary provide no guidance on how return UOCAVA ballots will be processed. Perhaps USPS would argue that manual inspection of UOCAVA return envelopes by some postal employee, at some point during their journey, would identify the presence of the UOCAVA frank on the envelopes so that the ballots could be timely delivered for tabulation. But without any provision in the DMM for immediately inspecting every rejected return ballot to ensure it is not a UOCAVA ballot that must be delivered in a timely fashion, this is simply speculation.

Indeed, there is no basis for assuming manual verification of acceptable UOCAVA mailings will be workable or timely. USPS's Inspector General (among others) has highlighted the inaccuracies and delays inherent in manual mail processing of the sort USPS appears to contemplate for UOCAVA mail. With respect to manual package operations, for instance, the Inspector General noted that "management did not always ensure packages were scanned to capture the number of mailpieces processed manually," resulting in inaccurate counts of manually processed mail. USPS Office of Inspector General, *Audit Report: Manual Mail Processing Efficiency* at 12 (Sept. 21, 2021), https://perma.cc/6USE-DMJS. Further, the Inspector General's report broadly emphasized that manual processing is "less productive" than automated processing and can hinder "prompt, reliable, and affordable mail service." *Id.* at 1. The Final Rule entirely fails to address how manual procedures for UOCAVA ballot mail would avoid the difficulties that bedevil other manually processed mail.

As the Final Rule suggests, USPS's automated sorting technology operates by reading barcodes—not by reading the franking language USPS claims will identify UOCAVA mail. *See* 91 Fed. Reg. at 54,988; USPS, *Intelligent Mail Barcode*, https://perma.cc/Z3WB-WVZ8 (stating the IMb is "used to sort and track letters, cards and flats"). A return ballot mailed by a UOCAVA voter in a plain envelope without an IMb will thus be indistinguishable, to USPS's automated systems, from a non-compliant ballot subject to rejection under the Final Rule. USPS has provided no training protocols, technological solutions, or operational guidance to ensure that postal workers will recognize UOCAVA ballots without IMbs as exempt and route them to the appropriate election office. *See* Comment of National Security Leaders for America to the United States Postal Service Proposed Rule Amending the Domestic Mail Manual Regarding the Transmission of Mail-In or Absentee Ballots for Federal Elections at 4 (July 1, 2026) ("NSL4A Comment") (noting that

"the Proposed Rule identifies no training program or implementation guidance to ensure the consistent treatment of UOCAVA ballots").

NSL4A specifically raised these deficiencies in its comments on the Proposed Rule, warning that because UOCAVA voting envelopes "would not meet the requirements of proposed rules DMM 24.3 and 24.4 . . . neither the outgoing absentee ballot nor the returned cast ballot would contain the unique, computer readable code required to enable the USPS to complete the mailing and receipt of absentee ballots from UOCAVA voters." NSL4A Comment at 4. NSL4A further observed that while the identifiers on UOCAVA ballot envelopes "could identify whether those envelopes are going to and coming from a UOCAVA voter, they are not machine readable," meaning that "USPS employees would need to identify and distinguish UOCAVA ballot materials manually." *Id.* And NSL4A raised the substantial practical constraints USPS would face in uniformly implementing these practices, noting the challenges of training a massive workforce of over 624,000 postal service employees who process billions of pieces of mail annually.

In issuing its Final Rule, USPS did not address these critical concerns, as it was required to do. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ( "An agency must consider and respond to significant comments received during the period for public comment." (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Instead, USPS asserted that these plainly relevant issues exceeded the scope of their rulemaking and no detailed procedures for processing UOCAVA mail are needed. 91 Fed. Reg. at 54,968. This response is no response at all.

## II. Implementation of the Final Rule Would Produce Chaos in Military and Diplomatic Voting That Prevents the States from Counting Ballots of Eligible Voters

Even apart from the legal conflict of Section 3 and the Final Rule with UOCAVA's mandate to facilitate voting, implementation of the Final Rule would inflict immediate, concrete,

and irreversible harm on the States' voting processes for military and diplomatic and other overseas voters in the November 3, 2026, elections. UOCAVA's statutory deadlines leave no room to repair or revise the untested manual processing process and unlawful barcode requirement the Final Rule would in practical effect impose on UOCAVA ballots. The harms from the resulting election-administration disruption would fall hardest on the voters least equipped to bear it—service members, diplomatic personnel, and other eligible voters overseas who cannot appear at a polling place or easily correct an erroneous voter record from their domestic or overseas assignment, and who have no practical opportunity to recast or otherwise remedy a ballot rejected under the Final Rule. These are the very voters whose rights Congress sought especially to protect by enacting UOCAVA.

### A. UOCAVA's Firm Deadlines Do Not Allow for Correction of the Final Rule's Inadequate Procedure for Exclusion of UOCAVA Ballots from the Enrollment-and-Barcode Regime

As explained above, UOCAVA requires States to transmit ballots to covered voters no later than September 19, 2026 (45 days before the election per 52 U.S.C. § 20302(a)(8)), while continuing to accept valid registration forms and ballot requests submitted as late as 30 days before that election, *id.* § 20302(a)(2), and further to ensure that completed ballots reach election officials by the deadline generally applicable under State law, *id.* § 20304(b)(1). Once a ballot is transmitted by State election officials, military and overseas voters must return it—often across international mail systems—in sufficient time for it to arrive by Election Day; the Federal Voting Assistance Program accordingly instructs voters to mail their ballots back 30 to 35 days before Election Day. FVAP, *2026–27 Voting Assistance Guide* 10.

Section 3's architecture wreaks havoc on that timeline. The Executive Order provides that a State choosing to submit a list of voters eligible to vote by mail can do so up to 60 days before

the election. Exec. Order § 3(b)(ii), 91 Fed. Reg. at 17,126. Earlier submission, although technically permitted, would compound the risk of an incomplete or inaccurate list. The Final Rule separately requires the State officials enrolling individual voters with USPS to submit that voter-specific enrollment data "at least 30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballots may begin to be mailed under state law," with supplemental submissions permitted only "until the last day that ballots may be mailed out . . . under state law." 91 Fed. Reg. at 54,991 (DMM 705.24.4.2.d).

The fundamental problem is that while Congress established early deadlines for UOCAVA procedures to avoid ballot-processing issues and facilitate overseas voting, the Executive Order and Final Rule set a highly compressed schedule to squeeze their new ballot-rejection procedures into the November 2026 election cycle. The table below illustrates the incompatible schedules imposed on the States by UOCAVA and the Final Rule.

| **Days Before Election (Date in 2026)** | **UOCAVA** | **Section 3 / Final Rule** |
|---|---|---|
| **90 days** (Aug. 5, 2026) | | State *may* notify USPS of intent to use the mail for federal ballots. Exec. Order § 3(b)(ii), 91 Fed. Reg. at 17,126; 91 Fed. Reg. at 54,990 (DMM 705.24.2). |
| **60 days** (Sept. 4, 2026) | | States choosing to submit an eligible-voter list to USPS must do so. Exec. Order § 3(b)(ii), 91 Fed. Reg. at 17,126. |
| **45 days** (Sept. 19, 2026) | States **must transmit** ballots to UOCAVA voters by this date. 52 U.S.C. § 20302(a)(8). | The Final Rule's voter-specific enrollment deadline (30 days) has **not yet arrived** — meaning a ballot UOCAVA requires be mailed *today* may not yet carry the enrollment data or barcode Section 3 will require for acceptance. 91 Fed. Reg. at 54,991 (DMM 705.24.4.2.d). |

| | | |
|---|---|---|
| **30 days** (Oct. 4, 2026) | States must accept UOCAVA registration forms and ballot requests submitted this late. 52 U.S.C. § 20302(a)(2).<br><br>FVAP instructs voters to mail back **completed ballots** by this date. FVAP, *2026–27 Voting Assistance Guide* 10. | Final Rule's deadline for USPS enrollment-data submission. 91 Fed. Reg. at 54,991 (DMM 705.24.4.2.d). USPS will also verify barcode/ enrollment before accepting Return Federal Ballot Mail. *Id.* (DMM 705.24.5.1). |

As the table shows, allowing Section 3 and the Final Rule to go forward for the upcoming November 2026 elections would oblige the States, along with USPS and thousands of local election offices, to implement the novel enrollment-and-barcode system— including its half-baked exclusion for UOCAVA ballots—during the same weeks in which the States must already be printing, addressing, and transmitting UOCAVA ballots to voters at duty stations and diplomatic posts around the country and the globe. *Cf.* Exec. Order § 3(d), 91 Fed. Reg. at 17,127 (setting a July 29, 2026, deadline for any final rule). It is simply unworkable for the States and USPS simultaneously to comply with UOCAVA and the Final Rule.

### B. Any Errors in a Rushed Rollout of Section 3 and the Final Rule Will Impact Those Voters Least Able to Correct Them

As explained above, nearly two million active-duty members, military spouses, and voting-age dependents are stationed away from their legal voting residence, and this population moves with a frequency uncommon to civilian voters domiciled in the United States, often relocating under orders that provide little notice and no latitude in execution. Even under existing procedures, UOCAVA voters are encouraged to submit a new Federal Post Card Application ("FPCA") every January and every time they move to reduce the possibilities of error and delay. If Section 3 and the Final Rule are precipitously implemented for the November 2026 elections, the States will have little practical ability to educate their military and diplomatic voters stationed outside the jurisdiction about the applicable UOCAVA procedures, to help these voters navigate an unfamiliar

enrollment process that will be layered atop their existing FPCA obligations, or to correct registration errors before the relevant cutoff date. These difficulties are exacerbated by the undisputed reality that most election jurisdictions design and print their mail ballot envelopes well in advance of an election, leaving little or no time to accommodate a late-breaking change in USPS's treatment of UOCAVA mail.

Meanwhile, postal employees will be tasked, for the first time and on a compressed timeline, with manually distinguishing UOCAVA-covered mail from other mail-in ballots subject to the new barcode-and-enrollment verification standard by examining envelopes for the presence of unique UOCAVA frankings. The inevitable confusion will arise and intensify as UOCAVA's 45-day transmission deadline and 30-day registration and ballot-request deadlines approach, leaving no opportunity for course correction once the rollout begins. A rushed, bifurcated system administered nationwide across thousands of postal facilities during the run-up to a federal election is sure to cause grave operational disruption to State voting procedures.

### C. *Purcell*'s Anti-Disruption Principle Applies with Particular Force to Military and Overseas Voters, Who Have No Opportunity to Try Again

The Supreme Court has long cautioned that federal courts should not permit last-minute changes to election rules that risk voter confusion and disenfranchisement. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam); *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424–25 (2020) (per curiam) (staying order that altered election procedures shortly before an election). This principle counsels granting the preliminary injunction Plaintiffs seek. The injunction will preserve the ballot-mail procedures under which States, USPS, and voters have operated for decades, whereas allowing implementation of the Final Rule to go forward would introduce the kind of late-breaking change *Purcell* warns against on a nationwide scale, shortly before the November election.

*Purcell*'s concern has particular force for military and diplomatic personnel and their families. A domestic voter whose mail ballot is rejected retains some recourse; she may vote in person, seek a provisional ballot, or return to her local election office to resolve a registration problem before Election Day. A UOCAVA voter may have none of these options. She cannot appear at a polling place thousands of miles away, and once her ballot is transmitted under the schedule UOCAVA requires, *see* 52 U.S.C. § 20302(a)(8), there is ordinarily no time left in the calendar to receive a rejection notice, obtain a compliant envelope or enrollment, and return a replacement ballot before it is due. As the courts of appeals have recognized in analogous contexts, once a ballot deadline has passed, there is "no do-over." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *see also Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (emphasizing that election officials and voters alike need stability, not last-minute change, as an election approaches). For a UOCAVA voter, a mid-cycle change to the rules governing ballot acceptance is not an inconvenience to be managed. It is the loss of a vote that cannot be recovered.

Implementation of the Final Rule thus risks precisely the harm UOCAVA was enacted to prevent: States failing to count the votes of military members and diplomatic personnel serving their country at distant posts, as well as the votes of their family members, due to mailing obstacles. *See* H.R. Rep. No. 99-765, at 12 (overseas voters who fail to receive or return their ballots in time are "clearly and effectively disenfranchised"). Because that harm is concrete, imminent, and beyond any court's power to undo after the fact, the motions for preliminary injunction should be granted.

## CONCLUSION

Plaintiffs' motions for a preliminary injunction to enjoin enforcement of Section 3 of Executive Order 14,399 and the Final Rule for the November 3, 2026, general election should be granted.

Respectfully submitted,

/s/ *Yevgeniy Pilipovskiy*
Yevgeniy Pilipovskiy (BBO No. 714018)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
ypilipovskiy@cov.com
(202) 662-6000

*Counsel for* Amicus Curiae
*National Security Leaders for America*

August 31, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *Amicus Curiae* Brief in Support of Plaintiffs' Motions for Preliminary Injunction was on this day served on all counsel via the court's electronic service system.

Date: September 3, 2026

/s/ *Yevgeniy Pilipovskiy*
Yevgeniy Pilipovskiy